**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| Richard Barton, | |
| Doug Langley, | |
| Benny Webb, | |
| Dale Seay, | |
| David DeMarcus II, | |
| David DeMarcus, Sr., | **Civil Action No. _____** |
| Steve Stakelin, | |
| Agriculture Workforce Management Association, Inc., | |
| North Carolina Growers' Association, Inc., | |
| Wafla, | **COMPLAINT** |
| USA FARMERS, Inc., | |
| National Council of Agricultural Employers, | |
| | |
| *Plaintiffs*, | |
| v. | |
| | |
| United States Department of Labor, | |
| | |
| JULIE SU, Acting Secretary of the U.S. Department of Labor, in her official capacity, | |
| | |
| JOSE JAVIER RODRIGUEZ, Assistant Secretary for Employment and Training, U.S. Department of Labor, in his official capacity, | |
| | |
| *and* | |
| | |
| JESSICA LOOMAN, Administrator, Wage & Hour Division, U.S. Department of Labor, in her official capacity | |
| | |
| *Defendants.* | |

## INTRODUCTION

1.       The Department of Labor recently issued a revolutionary new set of new regulations governing the H-2A temporary agricultural visa program that fundamentally depart from the Department's prior interpretation and application of the program's authorizing statute. These new regulations exceed the Department's authority and directly conflict with the Immigration and Nationality Act ("INA") and the National Labor Relations Act ("NLRA").

2.       The new regulations entitled, "*Improving Protections for Workers in Temporary Agricultural Employment in the United States*" ("Final Rule"), 89 Fed. Reg. 33898 (Apr. 29, 2024), *inter alia*, confer certain new "rights" on foreign agricultural workers who are employed temporarily in the United States on H-2A visas, as well as on American agricultural workers deemed to be engaged in "corresponding employment" with the H-2A workers.  Yet, Congress authorized no such action and even expressly declared that agricultural workers are not to be afforded the new rights the Final Rule purports to create and confer on agricultural workers.

3.       The Final Rule also imposes unprecedented and intrusive new requirements on farms participating in the H-2A program requiring, *inter alia*, that employers must disclose sensitive personal information about owners, operators, managers, and supervisors when such requirements are found nowhere in authorizing legislation, nor in any previous regulations issued in the history of the H-2A visa program, nor its predecessor agricultural guestworker programs dating back more than 70 years.

4.       The Final Rule also changes the implementation date for annual increases to the Adverse Effect Wage Rate ("AEWR"), shifting its implementation date forward from January 1 to a date in mid-December and making the new rates effective immediately upon publication, creating new financial and administrative burdens on Plaintiffs.

5.      The Final Rule requires State Workforce Agencies ("SWA"), to discontinue certain employment services that DOL requires be provided as part of the H-2A application process. The Final Rule requires that SWA's discontinue these services to H-2A employer applicants on the basis of unproven allegations and without meaningful due process, resulting in the H-2A employer applicant being effectively debarred from the H-2A program.

6.      The Final Rule unfairly advantages foreign H-2A agricultural workers over American agricultural workers.

7.      Defendants have issued a host of new application forms which purportedly correspond to the Final Rule and impose additional requirements and new obligations on H-2A program applicants and employers that are not authorized by statute.

## RECENT LITIGATION IN GEORGIA

8.      The Defendants published the Final Rule on April 29, 2024, with an effective date of June 28, 2024, although the Department later declared that many provisions of the Final Rule and new application filing requirements would take effect on August 29, 2024.

9.      On June 10, 2024, 17 states, a Georgia farm, and a Georgia trade association filed suit in the U.S. District Court for the Southern District of Georgia, *Kansas et al. v. U.S. Department of Labor et al.*, 2:24-cv-00076-LGW-BWC, seeking a preliminary and permanent injunction of the Final Rule.

10.     On August 26, 2024, the U.S. District Court for the Southern District of Georgia granted the plaintiffs' motion for a temporary injunction, "find[ing] that the Final Rule violates federal law and that Plaintiffs are likely to succeed on the merits of their claim." (Docket No. 99 at *26). The court did not, however, grant the plaintiffs' request for a "universal" or "nationwide" injunction prohibiting the Defendants from implementing the Final Rule, instead choosing to grant

3

preliminary relief by enjoining application and enforcement of the Final Rule only as to the 17 states and two private-sector entities who filed suit.  *Id.* at *30-37.

11.     On August 29, 2024, Defendants declared in a statement posted on their website that they would comply with the Order of the U.S. District Court for the Southern District of Georgia and not enforce the Final Rule against the *Kansas* parties, and would postpone implementation and application nationwide of certain obligations contained in the Final Rule, but did not otherwise postpone application or enforcement of the Final Rule nationwide in its entirety.

12.     On September 10, 2024, Defendants declared in a statement posted on their website that beginning on September 12, 2024, Defendants would process employer applications from employers who are not covered by the *Kansas* injunction in accordance with the provisions of the Final Rule. Applications from employers who were covered by the *Kansas* injunction, however, would be processed by the Defendants in accordance with the regulations that were in effect prior to the Final Rule. The Defendants further stated that an H-2A employer applicant who operates in a state that is included in the *Kansas* injunction and also operates in a state that is not covered by the *Kansas* injunction must divide what would otherwise be a single H-2A application into multiple applications: "Employers must submit a job order for work performed in states subject to the Kansas Order and a separate job order for work performed in states not covered by the Kansas Order."

13.     The newly created multiple-application requirement and process conflicts with the Department's H-2A regulations and is fundamentally incompatible with the H-2A petition process required by the Department of Homeland Security U.S. Citizenship and Immigration Services ("USCIS") regulations.

14.     The Defendants' newly created application process has been imposed on H-2A employer applicants without notice and comment rulemaking as required by the Administrative Procedure Act, without an evaluation of cost burden on applicants as required by the Regulatory Flexibility Act, and without an evaluation of the information collection burden as required by the Paperwork Reduction Act.  These statutes prohibit the Defendants' on-the-fly *ad hoc* creation of substantive obligations modifying existing regulatory requirements.

15.     The Defendants' newly created application process will result in substantial cost increases to employer applicants who operate in multiple states and will be forced to file multiple H-2A applications.

16.     The limited scope of the injunction issued by the U.S. District Court for the Southern District of Georgia, as well as the Department's repeated delays to the effective date and implementation date of various parts of the Final Rule, as well as the Department's on-the-fly *ad hoc* creation of separate H-2A application processes whose applicability depends on the identity and location of the applicant and their work locations, results in a confusing and haphazard regulatory regime that sows confusion among those subject to the Final Rule.  The Defendants' actions conflict with the Department's stated commitment to "an orderly and seamless implementation of the changes required by this final rule." 89 Fed. Reg. at 33904.

17.     Plaintiffs here are not plaintiffs in the *Kansas* litigation and are believed to be not otherwise included within the protection of the injunction issued in the U.S. District Court for the Southern District of Georgia.

18.     In this Complaint, the Plaintiffs assert some claims that are similar to claims asserted in the U.S. District Court for the Southern District of Georgia.  But Plaintiffs here

challenge the entirety of the Final Rule, not just the offending provisions that were specifically described in the *Kansas* decision.

19.     The entire Final Rule's implementation and enforcement should be enjoined in order to preserve the uniformity and consistency of the existing H-2A program.

20.     In short order, Plaintiffs intend to seek for themselves and their members declaratory and injunctive relief from Defendants' illegal actions, and vacatur of Defendants' illegal Final Rule.

## THE PARTIES

21.     Plaintiff Richard Barton is an individual who lives and farms in Fayette County, Kentucky.  In the 2024 growing season he employed workers through the H-2A program.  Based on past experience, he believes he will be unable to meet his labor needs with available U.S. workers next season and will therefore need to again participate in the H-2A program. He is injured by the Final Rule.

22.     Plaintiff Doug Langley is an individual who lives and farms in Shelby County, Kentucky.  In the 2024 growing season he employed workers through the H-2A program.  Based on past experience, he believes he will be unable to meet his labor needs with available U.S. workers next season and will therefore need to again participate in the H-2A program.  He is injured by the Final Rule.

23.     Plaintiff Dale Seay is an individual who lives and farms in Christian County, Kentucky.  In the 2024 growing season he employed workers through the H-2A program.  Based on past experience, he believes he will be unable to meet his labor needs with available U.S. workers next season and will therefore need to again participate in the H-2A program.  He is injured by the Final Rule.

6

24.     Plaintiff Benny Webb is an individual who lives and farms in Clark County, Kentucky.  In the 2024 growing season he employed workers in the H-2A program. Based on past experience, he believes he will be unable to meet his labor needs with available U.S. workers next season and will therefore need to again participate in the H-2A program.  He is injured by the Final Rule.

25.     Plaintiff David DeMarcus II is an individual who lives and farms in Fayette County, Kentucky.  In the 2024 growing season he employed workers in the H-2A program. Based on past experience, he believes he will be unable to meet his labor needs with available U.S. workers next season and will therefore need to again participate in the H-2A program. He is injured by the Final Rule.

26.     Plaintiff David DeMarcus Senior is an individual who lives and farms in Fayette County, Kentucky.  In the 2024 growing season he employed workers in the H-2A program. Based on past experience, he believes he will be unable to meet his labor needs with available U.S. workers next season and will therefore need to again participate in the H-2A program. He is injured by the Final Rule.

27.     Plaintiff Steve Stakelin is an individual who lives and farms in Fayette County, Kentucky.  In the 2024 growing season he employed workers in the H-2A program. Based on past experience, he believes he will be unable to meet his labor needs with available U.S. workers next season and will therefore need to again participate in the H-2A program. He is injured by the Final Rule.

28.     Plaintiff Agriculture Workforce Management Association, Inc. ("AWMA") is organized under the laws of Kentucky and owned by its shareholder farmers, each of whom are

employers in the H-2A program.  AWMA's headquarters and principal place of business is located in Lexington, Kentucky.

29.     AWMA has since 2008 provided support services, including filing applications for its shareholder member farmers seeking government approval to hire individuals with H-2A temporary work visas when there is a demonstrated shortage of willing, eligible and available U.S. workers to meet the farm's agricultural labor needs. AWMA's mission includes providing a reliable workforce for its shareholder farmers by means of the H-2A visa program, providing technical assistance, acting as a liaison between farmers and governmental agencies, and providing a voice for farmers on farm labor issues.

30.     AWMA has more than 700 total shareholder member farmers located in Kentucky and 15 other states.

31.     Thus far in 2024, AWMA has filed more than 1,000 H-2A applications on behalf of its shareholder member farmers for more than 6,500 farmworker positions.

32.     AWMA shareholder member farmers produce a variety of agricultural crops, products and commodities, including tobacco, numerous types of fruits and vegetables, soybeans, corn, hay, livestock, plant nursery products and trees.

33.     AWMA shareholder member farmers are located in Kentucky, Ohio, Pennsylvania, Illinois, Mississippi, Michigan, West Virginia, Alabama, and Connecticut are not covered by the injunction in the Southern District of Georgia, while AWMA shareholder farmers in Tennessee, Indiana, Arkansas, Oklahoma, Florida, Missouri, and Texas are covered by the injunction.

34.     AWMA shareholder member farmers in states not covered by the *Kansas* injunction intend to participate in the H-2A program after September 12, 2024, and are injured by the Final Rule.

35.     Plaintiff North Carolina Growers Association, Inc. ("NCGA") is a non-profit membership association organized under the laws of North Carolina.  NCGA's headquarters and principal place of business is located in Vass, North Carolina.

36.     NCGA was formed by farmers in 1989 to serve agricultural employers in North Carolina seeking to participate in the H-2A program.  NCGA is a joint employer of H-2A workers with its farmer members.

37.     NCGA has more than 600 hundred members who farm in North Carolina, Virginia and Tennessee.

38.     Thus far, in 2024, NCGA has filed more than 180 H-2A applications for more than 10,000 farmworker positions.

39.     NCGA member farms produce flue cured tobacco, sweet potatoes, Christmas trees and more than 50 other crops.

40.     NCGA and its members in North Carolina who farm in North Carolina are not covered by the injunction in the Southern District of Georgia, although it appears that NCGA members who farm in Virginia and Tennessee would be covered by the injunction when conducting farming operations in those states.

41.     NCGA and its members in states not covered by the *Kansas* injunction intend to participate in the H-2A program after September 12, 2024, and are injured by the Final Rule.

42.     Plaintiff Wafla, d/b/a Worker and Farmer Labor Association ("Wafla") is a non-profit membership association organized under the laws of Washington.  Wafla's headquarters and principal place of business is located in Lacey, Washington.

43.     Since 2007, Wafla has helped make labor stability a reality for farmers and workers to ensure farmers and farmworkers are treated with dignity and respect. Wafla provides services

for its members to access several federal visa programs, provides technical assistance, manages regional farmworker housing hubs, and advocates for the agricultural community on labor issues. Wafla assists farmers in obtaining government approval to hire temporary H-2A foreign guestworkers to fill a farmer's proven U.S. worker labor shortage to meet their seasonal labor needs. Wafla is a joint employer of H-2A workers with many of its farmer members.

44.     Wafla has a total of more than 1,300 members in Washington, Oregon, Idaho, Wyoming, Utah, California, Arizona, Arkansas, and Florida.

45.     Wafla member farms produce a variety of agricultural crops, products and commodities, including apples, pears, cherries, numerous other types of fruits and vegetables, hops, corn, plant nursery products and trees.

46.     Thus far, in 2024, Wafla has filed more than 300 H-2A applications for more than 17,000 farmworker positions.

47.     Wafla members located in Washington, Oregon, Wyoming, Utah, California, and Arizona are not covered by the injunction in the Southern District of Georgia, while Wafla members in Idaho, Arkansas, and Florida are covered by the injunction.

48.     Wafla and its members in states not covered by the *Kansas* injunction intend to participate in the H-2A program after September 12, 2024, and are injured by the Final Rule.

49.     Plaintiff USA FARMERS, INC. is a nonprofit association organized under the laws of North Carolina. USA FARMERS provides education and advocacy nationwide on behalf of its members concerning federal agricultural labor policy, including the H-2A program.

50.     USA FARMERS has more than 1,500 members that participate in the H-2A program across the country.

51.     USA FARMERS has hundreds of members located among the 33 states that are not covered by the injunction in the Southern District of Georgia.

52.     USA FARMERS members in states not covered by the *Kansas* injunction intend to participate in the H-2A program after September 12, 2024, and are injured by the Final Rule.

53.     Plaintiff National Council of Agricultural Employers ("NCAE") is a non-profit membership association organized under the laws of the District of Columbia.   NCAE was founded in 1964 and focuses on agricultural labor issues on behalf of agricultural employers.

54.     NCAE has a national membership with members in nearly every state in the union. NCAE members collectively employ an estimated 85-90% of all H-2A workers admitted into the U.S. or its territories on H-2A visas.  NCAE's members employ H-2A workers in every State except Alaska.

55.     NCAE has hundreds of members located among the 33 states that are not covered by the injunction in the Southern District of Georgia.

56.     NCAE members in states not covered by the *Kansas* injunction intend to participate in the H-2A program after September 12, 2024, and are injured by the Final Rule.

57.     Defendant United States Department of Labor (the "Department" or "DOL") is an executive department of the federal government of the United States.

58.     Defendant Julie Su is the Deputy Secretary of Labor and the Acting Secretary of Labor and is an officer of the United States.  The Secretary of Labor is charged with carrying out certain limited responsibilities under the INA.  Acting Secretary Su is sued in her official capacity.

59.     The Final Rule was promulgated by two agencies within DOL, the Employment and Training Administration and the Wage and Hour Division.

60.     The Employment and Training Administration, among other responsibilities, exercises the Secretary of Labor's limited authority pursuant to the INA to issue labor certifications in the H-2A program.

61.     Defendant Jose Javier Rodríguez is the Assistant Secretary for the Employment and Training Administration and is an officer of the United States.  Assistant Secretary Rodriguez signed the Final Rule that was published in the *Federal Register* on April 24, 2024.  He is sued in his official capacity.

62.     The Wage and Hour Division, among other responsibilities, exercises the Secretary of Labor's limited authority pursuant to the INA to assure employer compliance with the terms and conditions of employment under the H-2A program.

63.     Defendant Jessica Looman is the Administrator of the Wage and Hour Division and is an officer of the United States.  Administrator Looman signed the Final Rule that was published in the *Federal Register* on April 24, 2024.  She is sued in her official capacity.

## JURISDICTION AND VENUE

64.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 702, 703.

65.     The Court is authorized to vacate or set aside the challenged agency actions, postpone their effective date pending judicial review, hold them unlawful, grant preliminary and permanent injunctive relief, and award the declaratory and injunctive relief requested by Plaintiffs. *See* 5 U.S.C. §§ 705, 706; 28 U.S.C. §§ 1361, 2201, 2102.

66.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because Plaintiff Richard Barton, David DeMarcus II, David DeMarcus Senior, Benny Webb, Doug Langley, Steve Stakelin, and AWMA reside in the Eastern District of Kentucky.  Additionally, Defendant DOL is

an agency of the federal government exercising authority in this District and the individual Defendants are acting in their official capacities as officers of DOL and of the United States.

## RELEVANT STATUTORY AUTHORITY

67.     The H-2A temporary agricultural visa program was created by Congress through the Immigration Reform and Control Act of 1986, which amended the INA to enable employers to hire foreign agricultural workers on a temporary seasonal basis.  *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

68.     The INA is administered by the Secretary of Homeland Security, the Attorney General and the Secretary of State.  *See* 8 U.S.C. §§ 1103, 1104.

69.     The INA confers broad rulemaking authority on the Secretary of Homeland Security, the Attorney General, and the Secretary of State to carry out the INA.  *See* 8 U.S.C. §§ 1103(a)(3), 1103(g), 1104(a).

70.     The INA confers only very limited rulemaking authority, and for only discrete functions, to the Secretary of Labor with respect to the H-2A program. *See* 8 U.S.C. § 1188(a)(2), (c)(4), (e).

71.     Congress included protections for American workers within the H-2A program by requiring prospective H-2A employers to first obtain from the Secretary of Labor a certification that "there are not sufficient workers who are able, willing and qualified, and who will be available at the time and place needed" to perform the agricultural work, and that employment of an H-2A worker "will not adversely affect the wages and working conditions of workers in the United States *similarly employed*."  8 U.S.C. § 1188(a)(1) (emphasis added).

72.     Congress created the NLRA in 1935.  The NLRA established the right of certain employees to "self-organization, to form, join, or assist labor organizations, to bargain collectively

through representatives of their own choosing, and to engage in other concentrated activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

73.    Since its enactment, the NLRA has excluded "any individual employed as an agricultural laborer" from its definition of "employee." 29 U.S.C. § 152(3).

74.    The Paperwork Reduction Act ("PRA") requires agencies to comply with numerous obligations to, *inter alia*, "minimize the paperwork burden for individuals . . . and other persons resulting from the collection of information by or for the Federal Government." 44 U.S.C. § 3501 *et seq*.

75.    The Administrative Procedure Act ("APA") requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law." 5 U.S.C. § 706.

## THE DEFENDANTS' FINAL RULE IS UNLAWFUL

76.    The Final Rule exceeds the Secretary of Labor's authority, and is unlawful, in a number of ways, including without limitation the ways set forth in the following paragraphs.

**a.  The Final Rule contravenes labor-relations limitations established by Congress.**

77.    The Final Rule impermissibly adopts key substantive provisions of the NLRA, (*e.g.*, 29 U.S.C. §§ 157, 158) and applies the content of those NLRA provisions to foreign H-2A workers and some U.S. workers under the guise of an H-2A regulation.  *See* 20 C.F.R. § 655.135(h), (m), (n); 89 Fed. Reg. at 34062-63; *see also* 89 Fed. Reg. at 33901, n.1 ("Certain provisions of this final rule apply only to workers or persons engaged in FLSA agriculture (who are excluded from the NLRA's protections")).

78.     The Final Rule extends NLRA-type anti-retaliation protections for a person who "[h]as engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions, or has refused to engage in any or all of such activities," or "[h]as refused to attend an employer-sponsored meeting with the employer or its agent, representative or designee, the primary purpose of which is to communicate the employer's opinion concerning activity protected by this subpart; or listen to speech or view communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart." 89 Fed. Reg. at 34068; 29 C.F.R. § 501.4.

79.     The Final Rule attempts to justify its conferral of these rights on foreign H-2A workers and some U.S. workers by claiming such rights will prevent adverse effects for similarly employed American workers. *See* 89 Fed. Reg. at 33091.  Defendants claim that these provisions "prohibit retaliation for self-advocacy and concerted activity [and] thus fall within the Department's authority to ensure that foreign labor certification of H-2A workers does not adversely affect similarly employed workers in the United States." 89 Fed. Reg. at 34005. Similarly, the Defendants claim that these provisions enabling "H-2A and corresponding workers to . . . assert their rights is necessary to ensure that the employment of H-2A workers does not adversely affect the wages and working conditions of similarly employed workers in the United States." *Id.*

80.     Defendants claim that granting additional rights to H-2A workers will prevent adverse effect on American workers similarly employed in agriculture, but Congress has already affirmatively determined American agricultural workers are not entitled to such rights.

**b.      The Final Rule requires SWA's to violate H-2A employers' due process rights.**

81.     As part of the process of filing and H-2A labor certification application with the Department of Labor, an applicant must first submit a Job Order (also known as a clearance order) to the SWA to be circulated through the so-called interstate clearance system advertising the applicant's available farmworker positions.  These actions by the SWA are generally referred to as "employment services" pursuant to the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq*.

82.     The Final Rule compels a SWA to discontinue employment services to H-2A employer applicants who meet one of several possible conditions, including after being "found by a final determination by an appropriate enforcement agency to have violated any employment related laws."  89 Fed. Reg. 34065; 20 C.F.R. § 658.501(a)(4).  The Final Rule does not define what constitutes "an appropriate enforcement agency" nor define "any employment related laws" rendering the scope and application of the regulation impermissibly vague.

83.     The Final Rule also compels a SWA to initiate procedures for discontinuation of employment services to H-2A employer applicants who merely have been "found," with no requirement for a final determination, to have misrepresented the terms or conditions of employment, failed to comply fully with an assurance made on a job order, or violated regulations relating to worker housing. 89 Fed. Reg. 34065; 20 C.F.R. § 658.501(a)(3), (5).

84.     The Final Rule requires a SWA to discontinue these employment services to employers without due process. *See, e.g.,* 89 Fed. Reg. at 34067; 20 C.F.R. § 658.502(b). ("SWA officials must discontinue services immediately in accordance with § 658.503, without providing the notice described in this section, if an employer has met any of the bases for discontinuation of services under § 658.501(a) and, in the judgment of the State Administrator, exhaustion of the administrative procedures set forth in this section would cause substantial harm to workers.").

85.     A discontinuation of services by a SWA means the SWA will not post the employer's job order in the interstate clearance system.  If the SWA refuses to post an employer's job order, that employer is prevented from being able to file an H-2A labor certification with the Department of Labor.  In effect, the SWA's discontinuation of services is a debarment of the employer from the H-2A program, preventing it from accessing critically needed labor thereby jeopardizing the employer's ability to plant or harvest a crop, the viability of the farming operation, and the economic well-being of American workers whose employment depends on the farm's H-2A workers being able to perform their jobs.

86.     The Final Rule's requirement that a SWA discontinue services based on mere allegations of a rule violation and without requiring a final determination, and without providing due process, effectively debars an employer from the H-2A program and is illegal.

87.     Defendants lack statutory authority to prevent an employer from accessing the H-2A program based on a SWA's mere allegation that the employer has violated some local, state or federal employment-related law.  Defendants similarly lack statutory authority to compel a SWA to take an action that Defendants themselves cannot take.  Defendants' limited debarment (denial of certification) authority is carefully circumscribed by statue.  *See* 8 U.S.C. § 1188(b)(2), (d)(3). Defendants lack statutory authority to effectively debar an employer from the H-2A program based on an allegation of violation and without due process.  Defendants similarly lack statutory authority to compel a SWA to effectively debar an employer from the H-2A program based on an allegation of violation and without due process.

c.      **The Final Rule deprives employers of the ability to choose how employees will be paid.**

88.     The Final Rule without explanation departs from longstanding regulations in the H-2A program (and prior similar programs) that recognize employers possess the authority to

choose whether to calculate and pay employees on hourly rate basis or on a "piece rate" basis, depending on various factors, including the crop, conditions, and the production needs of the farm. The Final Rule reinterprets the INA to remove this longstanding authority from employers and instead requires them at the end of each pay period to calculate and pay employees by whichever method the Department believes would have resulted in higher pay to workers during that completed pay period. *See* 89 Fed. Reg. at 34061;20 C.F.R. § 655.122(l).

89.     There are legitimate reasons why one employer might choose to pay on a piece rate basis, such as to encourage quick work and maximum production, while another employer might choose to pay by the hour to ensure the careful handling of delicate fruit. The Final Rule upends the longstanding pay structure of the H-2A program (and prior programs) and imposes a one-size-fits-all approach to pay that deprives employers of the ability to make key decisions about how to best structure their operations to ensure they can produce a marketable crop. Defendants ignored the harm caused by this change in policy and the Final Rule lacks a rational explanation for the Department's change in its longstanding interpretation of the INA.

**d.      The Final Rule impermissibly imposes mid-season changes on the terms and conditions of employment and existing employer/employee relationships.**

90.     The Final Rule upsets employers' settled contractual obligations by changing the previously agreed upon terms and conditions of employers' present participation in the H-2A program. Employers currently employ H-2A workers pursuant to applications filed under, and labor certifications issued under and governed by, their pre-existing H-2A regulatory obligations. Employers did not consent or agree to have their pre-existing contractual relationships modified and governed by Defendants' subsequently issued Final Rule.

91.     The Department's imposition of new obligations in the Final Rule upon employers who did not consent to, or agree to be bound by, such obligations at the time their H-2A applications were approved results in retroactive application of the Final Rule.

92.     Defendants cite no authority in the Final Rule permitting them to promulgate regulations with retroactive effect and Defendants possess no such authority.

93.     The Final Rule immediately imposes substantial additional financial, managerial, and operational burdens on Plaintiffs' farms, that are greater than those required by the H-2A regulations that were in effect when Plaintiffs were approved to participate in the H-2A program for the 2024 season.

**e.      The Final Rule imposes a new duty on employers to ensure that every occupant wears a seatbelt.**

94.     The Final Rule prohibits an employer from operating any vehicle unless every person in the vehicle is wearing a seatbelt.  89 Fed. Reg. at 34060; 20 C.F.R. § 655.122(h)(4) ("The employer must not operate, or allow any other person to operate, any employer-provided transportation that is required by the U.S. Department of Transportation's Federal Motor Vehicle Safety Standards, including 49 CFR 571.208, to be manufactured with seat belts, unless all passengers and the driver are properly restrained by seat belts meeting standards established by the U.S. Department of Transportation, including 49 CFR 571.209 and 571.210.").

95.     This seatbelt-wearing requirement is a dramatic change from longstanding rules in the H-2A program that require only that employers *provide* seatbelts for occupants in vehicles equipped by the manufacturer with seatbelts.  The Final Rule impermissibly creates a strict liability regime whereby an employer is liable for a violation over which it has no reasonable control: the actions of an adult in choosing whether or not to wear a seatbelt that has been provided.

96.     The Department's imposition of a seatbelt requirement upon employers lacks a rational basis.  The Department explains that it imposed this requirement "to avoid degrading worker safety conditions to prevent adverse effect on similarly employed workers in the United States."  89 Fed. Reg. 33964.  Yet, there is no federal law requiring every driver or passenger in a motor vehicle to wear a seatbelt.  Nor does each State uniformly require that the driver and each passenger in a motor vehicle wear a seatbelt.

97.     The Department imposes a seatbelt requirement on employers of H-2A workers that does not exist for employers of American workers – or even for the individual workers themselves.  Thus, H-2A workers who are passengers in a motor vehicle (and who are not required by H-2A regulation to wear a seatbelt) cannot possibly result in an adverse effect on similarly employed U.S. workers across the country who are not required by state or federal law to wear seatbelt.

**f.     The Final Rule requires employers to follow a multiple-step termination for cause procedure, fundamentally altering the at-will nature of the employment relationship.**

98.     The Final Rule establishes a multiple-step "termination for cause" requirement for foreign H-2A workers and U.S. workers in "corresponding employment." 89 Fed. Reg. at 34061-62; 20 C.F.R. § 655.122(n).

99.     The Final Rule's multiple-step "termination for cause" requirement is fundamentally incompatible with the at-will employment relationship that is the prevailing law and custom in States where Plaintiffs and their members operate.

100.     The Defendants do not possess authority to issue regulations that preempt state laws governing at-will employment.

g.     **The Final Rule requires employers to allow an employee facing discipline to bring a "designated representative" to investigatory interviews.**

101.     The Final Rule establishes a new right for employees potentially facing discipline. 89 Fed. Reg. at 34063; 20 C.F.R. § 655.135(m) ("With respect to any H–2A worker or worker in corresponding employment engaged in agriculture as defined and applied in 29 U.S.C. 203(f), employed at the place(s) of employment included in the Application for Temporary Employment Certification, the employer must permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview. Where the designated representative is present at the worksite at the time of the investigatory interview, the employer must permit the representative to attend the investigatory interview in person. Where the designated representative is not present at the time and place of the investigatory interview, the employer must permit the representative to attend the investigatory interview remotely, including by telephone, videoconference, or other means.").

102.     The Final Rule makes clear that this new right must be extended not only to H-2A workers but also to U.S. workers in "corresponding employment." 89 Fed. Reg. at 34063; 20 C.F.R. § 655.135(m).

103.     The Defendants do not have authority to create this new right.

h.     **The Final Rule requires H-2A employers to allow public access to employer-provided H-2A housing facilities.**

104.     The Final Rule establishes a new right that allows the public to enter into the employer's property without the owner's permission. *See* 89 Fed. Reg. at 34063; 20 C.F.R. § 655.135(n) ("Workers residing in employer-furnished housing must be permitted to invite, or

accept at their discretion, guests to their living quarters and/or the common areas or outdoor spaces near such housing during time that is outside of the workers' workday subject only to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas. Because workers' ability to accept guests at their discretion depends on the ability of potential guests to contact and seek an invitation from those workers, restrictions impeding this ability to contact and seek an invitation will be evaluated as restrictions on the workers' ability to accept guests.").

105.    The Defendants do not compensate employers for taking their property in this manner and Defendants have no authority to create this new right. *See Cedar Point Nursery v. Hassid*, 594 U.S. ___ (2021).

**i.    The Final Rule shifts forward the effective date of new wage rates, causing financial harm as well as administrative burdens to H-2A employers.**

106.    The Final Rule changes the Department's longstanding policy regarding the effective date of the Department's annual increase to the mandated AEWR that must be paid to H-2A workers.  In the past, the Department published the new AEWR several weeks in advance of the date on which the new wage rates would take effect, and the new effective date was typically January 1 of the coming year.  The Final Rule, however, changes this structure and requires employers to begin paying new wage rates on the same day that the Department publishes the new wage rates in the Federal Register, which has traditionally occurred in mid-December.  *See* 89 Fed. Reg. at 34048-49, 34060; 20 C.F.R. § 655.120(b)(2), (3).

107.    H-2A employers will experience new administrative and cost burdens, not least by the requirement to implement a new wage on the very day when the new wage is published by the Department, with no prior notice and even though the publication date may fall on a day of the week that does not mark the beginning of a new pay period.

**j.     The Final Rule requires new disclosures of sensitive personal information.**

108.    The Final Rule requires farms participating in the H-2A program to disclose intrusive sensitive personal information about owners, operators, managers, and supervisors, including their date of birth. *See* 89 Fed. Reg. at 34047; 20 C.F.R. § 655.130(a)(3). ("Once the rule takes effect, H–2A employers will need to submit additional information on the H–2A Application[.] . . . The additional information includes the names, addresses, business phone numbers, and dates of birth for the owner(s) of each employer, each operator of the place(s) of employment, and all managers and supervisors of workers employed under the H–2A Application; DBA information; and information about the identity and location of any foreign labor recruiter the employer engaged, directly or indirectly, in international recruitment, as well as all persons and entities hired by or working for the recruiter or agent, and any of the agents or employees of those persons and entities.").

109.    No statute authorizes the Defendants to impose such requirements and collect such information, and in the entire 70-year history of the H-2A program and predecessor agricultural visa programs, Defendants have not required such intrusive information be provided as a condition of participating in the program.  The Final Rule does not provide a rational explanation of the Defendants' reinterpretation of the INA to suddenly require the provision of such information, nor explain what actions Defendants have taken to ensure adequate protection for safeguarding such sensitive personal information from public disclosure.

**k**.     **The Department's new H-2A application forms require disclosure of sensitive personal information.**

110.    On or about July 31, 2024, Defendants issued new H-2A application forms, including without limitation Form ETA-9142A, Form ETA-9142A – Appendix C, and Form ETA-9142A – General Instructions.  Defendants require through the Final Rule that employers seeking

23

to participate in the H-2A program provide extensive information on these forms that is not authorized by statute.

111.    The Final Rule does not provide a rational explanation of the Defendants' reinterpretation of the INA to suddenly require the provision of such information, nor explain what actions Defendants have taken to ensure adequate protection for safeguarding such sensitive personal information from public disclosure.

**l.      The Department's creation of multiple application processes and imposition of contradictory legal obligations is unlawful.**

112.    On September 10, 2024, Defendants announced the creation of multiple application filing processes and requirements to take effect on September 12, 2024. *See* https://www.dol.gov/agencies/eta/foreign-labor.

113.    These new *ad hoc* multiple application filing processes and requirements, and the corresponding imposition of different substantive rules on different applicants violates the congressional intent in creating the H-2A visa program to provide American farmers with a program to be administered on a uniform basis nationwide.  The Department lacks statutory authority to create a different application system for, and apply different regulations to, different H-2A applicants and employers.

114.    Through executive fiat, rather than through notice and comment rulemaking, Defendants engaged in on-the-fly *ad-hoc* rulemaking, impermissibly creating multiple labor certification application filing processes and requirements, which require certain employers to file multiple labor certification applications when the applicable regulations require the filing of only a single application.

115.    Each H-2A labor certification application that is approved by the Department requires the applicant to pay a fee. The newly created requirement to file multiple applications imposes additional financial burdens on H-2A applicants.

116.    Each H-2A labor certification application approved by the Department must then be submitted to USCIS along with a petition seeking approval to fill with foreign nationals the specified number of positions approved on the DOL labor certification.  USCIS charges fees to process an employer's petition. The newly created requirement to file multiple applications likewise forces employers to also file multiple petitions with USCIS, thereby at least doubling each applicant's costs.  The Final Rule contains no evaluation of these added costs imposed on H-2A applicants.

117.    Defendants' new *ad hoc* requirement for H-2A applicants to file multiple applications for the same work to occur in the same area of intended employment during the same dates with the same workforce violates existing DOL H-2A regulations, as well as the requirements of the Final Rule, and conflicts with USCIS regulations governing the filing of petitions.

118.    Defendants' requirement that an employer with some work locations in states that are covered by the *Kansas* injunction and other work locations in states not covered by the *Kansas* injunction must file separate applications covering the same workforce requires an employer to simultaneously comply with two regulatory regimes that impose two different sets of obligations upon the employer.  Defendants' imposition of these contradictory requirements is irrational, arbitrary and capricious.

119.    As part of the Department's newly created *ad hoc* multiple application processes, H-2A employer applicants are required to complete certain electronic forms online and provide certain information to the Department.  The Department has revised without authorization and

25

without following the required procedures, the information it requires from applicants to complete the new *ad hoc* application processes.

120.    The Department's newly created multiple application processes revises the collection of information from applicants that the Department claims applicants are required to provide, but such collection of information has not been authorized by applicable law, including the PRA, has not been subjected to review by and approval from the Office of Management and Budget, and the agency has not subjected such revisions to public comment nor published the required notice in the Federal Register setting forth the required information about the proposed changes.

121.    Defendants state in their announcement of September 10, 2024, that they are limiting the relief granted in *Kansas* injunction to members of the Georgia Fruit and Vegetable Association only if the member was a member of that Association on August 26, 2024.  The *Kansas* injunction itself contains no such limitation and Defendants lack the authority to narrow the scope of or otherwise modify the *Kansas* injunction.

## COUNT ONE
### Agency Action in Excess of Statutory Authority
### 5 U.S.C. § 706

122.    Plaintiffs incorporate by reference all preceding paragraphs.

123.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

124.    The Final Rule is in excess of statutory jurisdiction, authority, or limitations, or is short of statutory right.

125.    Defendants do not have general rulemaking authority with respect to the H-2A program.  Congress granted the Secretary of Homeland Security, United States Attorney General,

and Secretary of State authority to generally issue regulations and administer the statute — but not the Secretary of Labor.  *See* 8 U.S.C. §§ 1103, 1104.

126.    The limited rulemaking authority that the Defendants do possess with respect to the H-2A program is confined to narrow grants of authority. *See, e.g.,* 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ("to perform agricultural labor or services, as defined by the Secretary of Labor in regulations"); 8 U.S.C. § 1188(a)(2) ("Secretary of Labor may require by regulation . . . the payment of a fee to recover the reasonable costs of processing applications for certification"); 8 U.S.C. § 1188(c)(4) ("the Secretary of Labor shall issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock").  But through the Final Rule, Defendants promulgated extensive legislative regulations governing other matters for which they have no grant of rulemaking authority.

127.    The INA does not provide Defendants the authority to grant collective bargaining rights to agricultural workers.

128.    The INA does not provide Defendants the authority to require farms participating in the H-2A program to disclose such sensitive personal information, including the date of birth, of owners, operators, managers, and supervisors.

129.    The INA does not provide the Defendants authority to deprive employers of the ability to choose a pay rate for their employees, require employers to accept and adapt to mid-season changes to terms and conditions that were established between employers and employees prior to the promulgation of the Final Rule, require employers to ensure that employees use seatbelts, require employers to follow a multiple-step termination for cause procedure, require employers to allow employees to bring a personal representative to an investigatory interview,

require employers to allow public access to housing facilities; or require employers to disclose sensitive personal information in the application process and forms issued by Defendants.

130.    The information contained on completed H-2A application forms required by Defendants is routinely disclosed to the public by the Defendants.  The Final Rule provides no protections that would safeguard the sensitive personal information of owners, operators, managers, and supervisors collected by Defendants to prevent unauthorized access, nor does the Final Rule provide any assurances that such sensitive personal information will not be publicly disclosed by Defendants.

131.    There is no authority under the INA to grant rights to H-2A workers that are more extensive than the rights enjoyed by American workers.

132.    To the extent that there is any ambiguity in INA, Defendants are not entitled to any deference in their interpretation of such ambiguity.

133.    An agency's departure from its longstanding practice in the absence of additional congressional authorization indicates the agency is pursuing a course that was not authorized by Congress.  *See Nat'l Fed'n Indp. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022).

134.    Over more than 70 years, including the near 40-year history of the H-2A program and the preceding decades under similar prior programs permitting the admission of aliens into the U.S. to perform farmwork, the Defendants have never attempted to use their purported authority to create union protections for agricultural workers or impose on employers the draconian new requirements in the Final Rule.  Notably, in the entire history of the H-2A program, there has been no material change to the governing statutory provisions that would authorize Defendant's revolutionary actions in the Final Rule.

135.     Congress has not granted Defendants the authority they purport to exercise in promulgating the Final Rule.  The Final Rule is in excess of the Defendants' statutory jurisdiction, authority, or limitations, is contrary to law, and must be enjoined and vacated.

## COUNT TWO
### Agency Action in Excess of Statutory Authority and
### in Violation of Major Questions Doctrine
### U.S. Const. art. I, § 1

136.     Plaintiffs incorporate by reference all preceding paragraphs.

137.     Principles governing the separation of powers among the branches of government foreclose the ability of an executive agency to decide issues of great economic or political significance or issues that are traditionally the domain of state law ("major questions") unless the agency has received clear authorization from Congress to do so.  *See West Virginia v. EPA*, 597 U.S. 697 (2022).

138.     Unionization rights and immigration standards are controversial policy matters that have been fiercely debated in the legislative branch of government for more than 100 years.

139.     In 1935, Congress settled the issue, for purposes of federal law, regarding the unionization rights available to American workers by enacting the NLRA.  Congress has periodically revisited the issue and amended the NLRA, including in 1947 and 1959.  But Congress has clearly spoken through the NLRA and determined that agricultural workers should be excluded from rights and protections provided by the NLRA.

140.     Similarly, immigration policy, including under what terms and conditions aliens should be admitted to the U.S. for employment purposes, has long been an area in which Congress has exercised its authority. In 1952, Congress settled the issue, for purposes of federal law, by enacting the INA.  Congress has periodically revisited the issue and amended the INA, including in the 1986 Immigration Reform and Control Act establishing the H-2A program.

141. The Final Rule confers collective bargaining and unionization rights on foreign farmworkers working in the United States, as well as U.S. workers engaged in "corresponding employment."

142. Nothing in the NLRA grants authority to Defendants to confer on farmworkers the rights described in the Final Rule, and indeed, the NLRA expressly excludes farmworkers from its coverage.

143. Nothing in the INA grants authority to Defendants to confer on farmworkers the rights described in the Final Rule.

144. By the Defendants' own projections, the consequences of the Final Rule, even without including additional new costs resulting from the illegal *ad hoc* rulemaking actions taken by Defendants since the Final rule was published, will result in the imposition of annual costs and transfer payments in excess of $14 million.

145. Defendants' Final Rule impermissibly intrudes into the province of Congress by attempting through regulation, and without authority, to contravene the policy decisions of the legislative branch.

146. The Final Rule determines matters of great political and economic significance that Defendants were not authorized to decide.

147. The employment relationship is historically governed by state law, other than for well-defined federal exceptions.   In many states, including states where Plaintiffs reside, employment is generally considered to be at-will.

148. The Final Rule invades the province of state law to regulate the employment relationship by imposing a vague, multi-step "termination for cause" regime on employers of H-

2A and some American workers.  Defendants lack authority to preempt state law treatment of the employment relationship, including treatment of employment as at-will.

149.    The Final Rule invades the province of state law to regulate the employment relationship by depriving employers of the ability to decide whether employees will be paid an hourly wage or a "piece rate" wage.  Defendants lack authority to preempt state law treatment of the employment relationship, including an employer's ability to decide how its employees will be paid.

150.    The Final Rule thus violates the major questions doctrine, and a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

151.    The Final Rule exceeds the Defendants' statutory authority and must be enjoined and  vacated.

### COUNT THREE
### Agency Action That Is Contrary to Statute
### 5 U.S.C. § 706

152.    Plaintiffs incorporate by reference all preceding paragraphs.

153.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . .  not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

154.    The Final Rule is not in accordance with federal law and is in excess of statutory jurisdiction, authority, limitations, or short of statutory right.

155.    Congress previously declared – some 90 years ago in the NLRA – that agricultural workers do not have collective bargaining rights.

156.    The INA provides no authority to Defendants to override provisions of the NLRA.

31

157.     Defendants lack statutory authority to contravene the will of Congress by promulgating regulations in the H-2A program to provide collective bargaining rights to H-2A and American workers.

158.     The Final Rule is not in accordance with the NLRA, nor the INA, and is in excess of statutory jurisdiction and authority and must be enjoined and vacated.

**COUNT FOUR**
**Arbitrary and Capricious Agency Action**
**5 U.S.C. § 706**

159.     Plaintiffs incorporate by reference all preceding paragraphs.

160.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

161.     An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or fails to consider either alternatives to its action or the affected communities' reliance on the prior rule. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

162.     In the near 40 years since the INA was amended to create the H-2A program, there has never been an attempt by the Defendants to provide collective bargaining rights to H-2A workers.

163.     In doing so, Defendants do not provide a reasonable explanation for this sharp deviation from their prior longstanding interpretation of the INA.

164.      Defendants claim that by allowing H-2A workers to unionize, they would limit the exploitation of such workers, which would in turn prevent adverse effects on similarly employed American workers.

32

165.    This rationale is not a reasonable explanation for the Final Rule because American farmworkers are not, other than by the Final Rule, granted collective bargaining rights.

166.    The Final Rule provides H-2A farmworkers with greater organizing and collective bargaining rights than similarly employed American farmworkers.

167.    The Final Rule is a sharp deviation from the agency's prior practice.  Instead of acknowledging this dramatic change in course and providing a reasoned explanation, Defendants provide an illogical justification contending they are acting in accord with current law.

168.    The Final Rule effectively provides NLRA-type rights to H-2A workers. These are rights that American farmworkers explicitly do not have under federal law.

169.    The Final Rule claims that providing these rights for H-2A workers—which similarly situated Americans do not possess—will somehow prevent adverse effects on similarly situated American workers.

170.    The proffered rationale is so illogical, irrational, and implausible that the Final Rule cannot be ascribed to a difference in view or the product of agency expertise.

171.    The Final Rule is nothing more than the agency's attempt to undo through regulation decisions that Congress has affirmatively settled through legislation.

172.    The Final Rule is arbitrary and capricious in other ways, including without limitation, by requiring SWA officials to violate the Due Process rights of employers, by requiring employers to accept and adapt to mid-season changes to terms and conditions that were established between employers and employees prior to the promulgation of the Final Rule, by requiring employers to ensure that employees use seatbelts, by requiring employers to follow a multiple-step termination for cause procedure, by requiring employers to allow employees to bring a personal representative to an investigatory interview, by requiring employers to allow public

access to housing facilities; by changing the effective date of increases to the AEWR, by requiring employers to disclose sensitive personal information in the application process  and in forms issued by Defendants, by creating multiple application processes that conflict with existing DOL and USCIS regulations, and by limiting the scope of the injunction issued by Southern District of Georgia.

173.    The Final Rule is arbitrary and capricious and must be enjoined and vacated.

**COUNT FIVE**
**Violation of the Due Process Clauses of the Federal Constitution**
**U.S. Const. amend. V, XIV**

174.    Plaintiffs incorporate by reference all preceding paragraphs.

175.    The Final Rule violates the Fifth Amendment and Fourteenth Amendment's guarantees of due process of law, including without limitation in the manner set forth in the following paragraphs.

176.    The Fifth Amendment states, in part, that, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."

177.    The Final Rule allows or requires H-2A employers to be deprived of their liberty or property without due process of law, in violation of the Fifth Amendment by forcing State Workforce Agencies to effectively debar an employer from the H-2A program based on a mere allegation of a violation of an employment-related law or other regulation.

178.    The Fourteenth Amendment states, in part, that, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any

state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

179.    The Final Rule allows or requires SWA's to deprive H-2A employers of their liberty and property without due process of law in violation of the Fourteenth Amendment by forcing State Workforce Agencies to effectively debar an employer from the H-2A program based on a mere allegation of a violation of an employment-related law or other regulation.

180.    The Final rule is unconstitutional and must be enjoined and vacated.

## COUNT SIX
### Violation of the Takings Clause of the Federal Constitution
### U.S. Const. amend. V

181.    Plaintiffs incorporate by reference all preceding paragraphs.

182.    The Final Rule violates the Fifth Amendment's Takings Clause, including without limitation in the manner set forth in the following paragraphs.

183.    The Fifth Amendment states, in part, that, "nor shall private property be taken for public use, without just compensation."

184.    The Final Rule purports to allow members of the public to enter into an employer's property, without the employer's permission, for certain purposes. The Final Rule does not provide any just compensation for this intrusion, in violation of the Takings Clause.

185.    The Final Rule is unconstitutional and must be enjoined and vacated.

## COUNT SEVEN
### Violation of the Paperwork Reduction Act
### 44 U.S.C. § 3507

186.    Plaintiffs incorporate by reference all preceding paragraphs.

187.    Defendants' actions in promulgating the Final Rule and *ad hoc* establishment of multiple H-2A application processes violates the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, including without limitation in the manner set forth in the following paragraphs.

188.    The Paperwork Reduction Act ("PRA") requires that "an agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information . . . the agency has . . . conducted the review established under section 3506(c)(1) ; . . . evaluated the public comments received under section 3506(c)(2); . . . submitted to the Director [of the Office of Management and Budget] the certification required under section 3506(c)(3)[;] . . . published a notice in the Federal Register [with the specified information]; the Director has approved the proposed collection [and] . . . the agency has obtained from the Director a control number to be displayed upon the collection of information."  44 U.S.C. § 3507(a)(1).

189.    Defendants state that its newly created *ad hoc* application processes announced on September 10, 2024, will "require the employer, or the employer's authorized attorney or agent, prior to initiating an H-2A job order and Application for Temporary Employment Certification, to identify" and provide certain information, including *inter alia* whether the "legal business name of the employer identified . . . is a member of the 'Georgia Fruit and Vegetable Growers Association' as of August 26, 2024."  The Defendants claim that provision of such information is mandatory to complete an application for temporary labor certification.

190.    Defendants' *ad hoc* decision to impose additional information collection burdens on applicants, without first going through the procedures mandated by the PRA, and their insistence that an application for temporary labor certification cannot be complete without the new information, is unlawful because it violates 44 U.S.C. § 3512.

36

191.    The new *ad hoc* application procedures are illegal and must be held unlawful, enjoined and vacated.

## COUNT EIGHT
### Agency Action Without Observance of Procedure Required by Law
### 5 U.S.C. § 706

192.    Plaintiffs incorporate by reference all preceding paragraphs.

193.    The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

194.    Defendants' actions in promulgating the Final Rule and the *ad hoc* establishment of multiple H-2A application processes, including the revision of the collection of information from applicants, failed to comply with the requirements of the PRA, 44 U.S.C. § 3501 *et seq.*

195.    The new *ad hoc* application procedures are illegal and must be held unlawful, enjoined and vacated.

### PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs ask this Court to:

a.  Declare the Final Rule and *ad hoc* H-2A application procedures to be illegal, void, and ineffective;

b.  Vacate the Final Rule because it was issued without statutory authority;

c.  Hold unlawful and set aside the Final Rule and the *ad hoc* H-2A application procedures as contrary to law and unreasonable, arbitrary, and capricious;

d.  Issue orders preliminarily and permanently enjoining Defendants from implementing or enforcing the Final Rule and the *ad hoc* H-2A application procedures;

e.  Award Plaintiffs their costs and reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, or other applicable law; and

f.  Award such other and further relief as this Court deems equitable and just.

Respectfully submitted,

/s/Joseph A. Bilby_____
Leon R. Sequeira, MO Bar No. 52303**
Joseph A. Bilby, KY Bar No. 94384
**SEQUEIRA BILBY PLLC**
106 Progress Drive
Frankfort, KY 40601
Telephone: (502) 409-1778
Leon@SequeiraBilby.com
Joe@SequeiraBilby.com

*Counsel for Plaintiffs*

***PHV application forthcoming*