UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

*Electronically filed*

RICHARD BARTON, *et al*.,

     *Plaintiffs;*

COMMONWEALTH OF KENTUCKY,

STATE OF ALABAMA,

STATE OF OHIO,

STATE OF WEST VIRGINIA,

     *Intervening Plaintiffs*

v.

U.S. DEPARTMENT OF LABOR;

JULIE SU, in her official capacity as Secretary of the Department of Labor;

JOSE JAVIER RODRIGUEZ, in his official capacity as Assistant Secretary for Employment and Training; and

JESSICA LOOMAN, in her official capacity as Administrator of the Wage and Hour Division,

     *Defendants*

Civil Action No. 5-24-cv-00249-DCR

---

## INTERVENING COMPLAINT

---

1

1.      In what has seemingly become the *modus operandi* of the Biden-Harris Administration, the Department of Labor has issued regulations that exceed its authority.

2.      Earlier this year, the Department of Labor promulgated a final rule entitled, "*Improving Protections for Workers in Temporary Agricultural Employment in the United States*," 89 Fed. Reg. 33898 (Apr. 29, 2024) ("Final Rule") [Exhibit 1]. According to the Agency, the Final Rule "focus[es] on strengthening protections for temporary agricultural workers and enhancing the Department's capabilities to monitor program compliance and take necessary enforcement actions against program violators." 89 Fed. Reg. at 33,898. In reality, the Final Rule confers rights on foreign agricultural workers that Congress explicitly said did not extend to them— and it demands that State agencies discontinue employment services to farmers who refuse to comply with the unlawful rule.

3.      The Final Rule should be vacated and enjoined because it violates the Administrative Procedure Act ("APA") and the U.S. Constitution.

## PARTIES

4.      Intervening Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Russell Coleman is the duly elected Attorney General of the Commonwealth. He has constitutional, statutory, and common-law authority to bring suit on behalf of the Commonwealth and its citizens. *See* Ky. Rev. Stat. § 15.020; *see also Commonwealth ex rel. Beshear v. Commonwealth ex rel. Bevin*, 498 S.W.3d 355, 362–65 (Ky. 2016).

5.     Intervening Plaintiff State of Alabama is a sovereign State of the United States of America. Steve Marshall is the duly elected Attorney General of Alabama. He has constitutional, statutory, and common-law authority to bring suit on behalf of Alabama and its citizens. *See* Ala. Code § 36-15-21.

6.     Intervening Plaintiff State of Ohio is a sovereign State of the United States of America. Dave Yost, the Attorney General of Ohio, is "the chief law officer for the state and all its departments." Oh. Rev. Code § 109.02. He is authorized to represent the State of Ohio "in any court or tribunal in a cause . . . in which the state is directly interested." *Id.*

7.     Intervening Plaintiff State of West Virginia is a sovereign State of the United States of America. Patrick Morrisey is the Attorney General of the State of West Virginia. The Attorney General "is the State's chief legal officer," *State ex rel. McGraw v. Burton*, 569 S.E.2d 99, 107 (W. Va. 2002), and his express statutory duties include "appear[ing] as counsel for the state in all causes pending . . . in any federal court[ ] in which the state is interested," W. Va. Code § 5-3-2.

8.     Defendant United States Department of Labor (the "Department") is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). The Department of Labor is tasked with aiding the United States Attorney General in determining whether to import any alien as a nonimmigrant under 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ("H-2A"). Specifically, the Attorney General cannot approve a petition to import any alien under H-2A unless the Secretary of the Department of Labor issues a certification to the petitioner that (1) "there are not sufficient workers who are able,

willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," and (2) "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188. Defendant Julie Su is the Secretary of the Department of Labor (the "Secretary").

9.     The Secretary "has delegated the authority to issue temporary agricultural labor certifications to the Assistant Secretary for Employment and Training." 89 Fed. Reg. at 33,899. Defendant Jose Javier Rodriguez is the Assistant Secretary for Employment and Training.

10.     The Secretary has delegated to the Wage and Hour Division the responsibility to "assure employer compliance with the terms and conditions of employment under the H-2A program." *Id*. Defendant Jessica Looman is the Administrator of the Wage and Hour Division.

## JURISDICTION AND VENUE

11.     This case arises under the APA, 5 U.S.C. §§ 701–706, and under the Constitution and laws of the United States.

12.     This Court has federal question jurisdiction under 28 U.S.C. § 1331.

13.     The Court may award declaratory and injunctive relief under the APA, 5 U.S.C. §§ 705–706; 28 U.S.C. §§ 2201–2202; and Federal Rules of Civil Procedure 57 and 65.

14.     Venue is proper under 28 U.S.C. § 1391(e)(1)(C). The Intervening Plaintiff the Commonwealth of Kentucky is located in this judicial district, and the

Defendants are officers or an agency of the United States exercising authority in this district.

## BACKGROUND

### I.    The H-2A Visa Program

15.    In 1986, Congress passed the Immigration Reform and Control Act (IRCA), which amended the earlier-enacted Immigration and Nationality Act (INA). IRCA created a class of migrant workers that could "com[e] temporarily to the United States to perform agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)(ii)(a); *see also* 8 U.S.C. § 1184(c)(1); 8 U.S.C. § 1188.

16.    The admission to the U.S. of any such workers "shall be for such time and under such conditions as the [U.S.] Attorney General may by regulations prescribe[.]" 8 U.S.C. § 1184(a)(1). Employers wishing to "import[ ]" any alien as a nonimmigrant under subparagraph (H) . . . of section 1101(a)(15)" must petition the Attorney General for approval. *Id*. at § 1184(c)(1). The Attorney General then determines whether to grant the petition "after consultation with appropriate agencies," which for immigrants described under Section 1101(a)(15)(H)(ii)(a)—that is, H-2A workers—"means the Department of Labor and includes the Department of Agriculture." *Id*.

17.    Under 8 U.S.C. § 1188(a), a petition may not be approved by the Attorney General unless the petitioner has applied to the Secretary for a certification that confirms (1) "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," and (2) "the employment of the alien in such labor

or services will not adversely affect the wages and working conditions of workers in the United States similarly employed."

18.    Prior to filing an application for the certification, an employer must submit a completed job order between 60 and 75 days before the employer's "first date of need." *See* 20 C.F.R. § 655.121((b). The State Workforce Agency ("SWA") serving the area where the job is to be performed reviews the job order for compliance with related regulations. 20 C.F.R. § 655.121(e)(2). If the SWA approves the job order, "the SWA must promptly place the job order in intrastate clearance and commence recruitment of U.S. workers." 20 C.F.R. § 655.121(f). "The SWA . . . must refer each U.S. worker who applies" to the employer. 20 C.F.R. § 655.121(g).

19.    This is the SWA's responsibility under the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq.*, which "develop[ed] a national system of employment offices" to "connect the unemployed worker with a job." *See Flores v. Rios*, 36 F.3d 507, 512 (6th Cir. 1994) (citation omitted); 89 Fed. Reg. at 33,899.

20.    However, the SWA is estopped from offering employment services to employers who have violated employment-related laws or regulations. 29 C.F.R. § 500.1(f) ("The facilities and services of the U.S. Employment Service, including State agencies, authorized by the Wagner-Peyser Act may be denied to any person found . . . to have violated any employment-related laws[.]").

21.    The employer is also obligated to engage in its own recruitment of American workers as part of demonstrating it needs the H-2A workers. *See* 8 U.S.C. § 1188(b)(4). If the employer fails to make such efforts, the "Secretary of Labor may

6

not issue a certification." 8 U.S.C. § 1188(b). Likewise, the Secretary cannot issue the certification if there is a strike or lockout in the course of a labor dispute, the H-2A employer violated a material term or condition of labor certification during the previous two-year period, or the employer has not provided the Secretary with assurances that it will provide insurance at least equal to what is covered under State workers' compensation law. *See id*.

## II.    The National Labor Relations Act

22.    Enacted in 1935, the National Labor Relations Act (NLRA) established statutorily protected rights to collective bargaining for certain employees. Under the NLRA, "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The NLRA also provides that it is an "unfair labor practice" for an employer to "dominate or interfere with the formation or administration of any labor organization" and "to encourage or discourage membership in any labor organization" by "discriminat[ing] in regard to hire or tenure of employment or any term or condition of employment . . . ." *Id*. at § 158(a)(2)–(3).

23.    When it passed the NLRA, Congress expressly chose not to extend these rights to agricultural workers. Congress defined "employee" to include "any employee . . . unless the Act explicitly states otherwise." *Id*. at § 152. The NLRA explicitly excludes agricultural workers: "The term 'employee' . . . shall not include any individual employed as an agricultural laborer." *Id*. at § 152(3). Therefore, Congress

made it abundantly clear the law does not extend collective bargaining rights to H-2A workers.

## III.   The Final Rule

24.     On April 29, 2024, the Department's Employment and Training and Wage and Hour Divisions promulgated the Final Rule.

25.     According to the Department, with the Final Rule, the Department is "exercising its long-recognized authority to establish the minimum terms and conditions of employment (i.e., the 'baseline' of working conditions) necessary to 'neutralize any adverse effect resultant from the influx of temporary foreign workers.'" 89 Fed. Reg. at 33,992 (quoting *Williams v. Usery*, 531 F.2d 305, 306–07 (5th Cir. 1976)).

26.     In fact, the Final Rule is a radical departure from any "long-recognized authority" of the Department. Specifically, the Final Rule expands such minimum terms and conditions to include, *inter alia*, that an employer (1) cannot retaliate against an H-2A worker for engaging in "collective action and concerted activity," *see* 89 Fed. Reg. at 33,901, 33,992, 34,062; (2) must not operate or allow anyone else to operate employer-provided transportation unless all passengers are wearing seat belts, *see id*. at 34,060; (3) must permit workers "to designate a representative to attend any investigatory interview that the worker believes might result in disciplinary action," *id*. at 34,063; and (5) must allow workers residing in employer-furnished housing "to invite, or accept at their discretion, guests" subject only to "reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas," *id*.

8

27.     Under the Final Rule, SWAs "must initiate procedures for discontinuation of [employment] services to employers who" do not comply with these—and all other—conditions for employment as set out in the Final Rule. *Id*. at 34,065–66.

## IV.    Legal Challenges to the Final Rule

28.     After the Final Rule was published, 17 states, a Georgia farm, and a Georgia trade association filed a challenge to the Final Rule in a federal district court in Georgia. *See Kansas v. U.S. Dep't of Labor*, No. 2:24-cv-00076, 2024 WL 3938839 (S.D. Ga. Aug. 26, 2024).

29.     On August 26, 2024, the district court in Georgia granted the plaintiffs' motion for a preliminary injunction, "find[ing] that the Final Rule violates federal law and that the Plaintiffs are likely to succeed on the merits of their claim." *Id*. at *9. Specifically, the court held that, "by implementing the Final Rule, the DOL has exceeded the general authority constitutionally afforded to agencies." *Id*. at *7.

30.     The district court in the Georgia case only extended its grant of injunctive relief to the plaintiffs in that case. *See id*. at *13.

31.     The Commonwealth of Kentucky and the States of Alabama, Ohio, and West Virginia were not plaintiffs in *Kansas v. U.S. Department of Labor*. Therefore, the Department is not enjoined from applying the Final Rule to them.

32.     Indeed, on September 10, 2024, the Department announced it would begin applying and enforcing the Final Rule against all States not covered by the

injunction on September 12, 2024.[1] As of September 12, 2024, the Agency began operating a two-prong system for H-2A applications. If the work to be performed will be located in one or more states subject to the *Kansas* injunction, the applicant will use an old job order form.[2] For any work to be performed in any state not covered by the *Kansas* injunction, the employer will use the new form that went into effect June 28, 2024.[3]

33.     Farmers in Kentucky, Alabama, Ohio, and West Virginia, which are not covered by the *Kansas* injunction, must now use the new form and comply with all the requirements of the Final Rule.

34.     SWAs in States not covered by the Kansas injunction, including Kentucky, Alabama, Ohio, and West Virginia, must adhere to the requirements of the Final Rule.

35.     Private plaintiffs in Kentucky, including individual farmers and associations of farmers, filed this action on September 16, 2024.

36.     The Commonwealth of Kentucky and the States of Alabama, Ohio, and West Virginia (collectively, "the States") now seek to bring this intervening complaint.

---

[1]     *The Department of Labor's Office of Foreign Labor Certification Announces Revised Transition Schedule and Technical Guidance for Implementing H-2A Job Orders and Applications Associated with the 2024 Farmworker Protection Final Rule; Compliance with District Court Order* (Sept. 10, 2024), *available at* https://www.dol.gov/agencies/eta/foreign-labor/news.

[2]     *Id.*

[3]     *Id.*

## STANDING

37.     As the object of some of the Final Rule's requirements, and because of the compliance costs the States will incur as a result of the Final Rule, the States have standing to bring the claims set forth herein.

38.     Where a State is "'the object of' [the rule's] requirement[s]," "there can be 'little question' that the rule does injure the State[ ]." *W. Va. v. Envtl. Prot. Agency,* 597 U.S. 697, 719 (2022) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992)); *see also Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584, 592 (6th Cir. 2022) ("When the plaintiff is an object of the challenged action there is ordinarily little question that the action or inaction has caused him injury." (citation omitted)); *Kentucky v. Fed. Highway Admin.,* No. 5:23-CV-162-BJB, 2024 WL 1402443, at *3 (W.D. Ky. Apr. 1, 2024) ("The Final Rule operates on State Departments of Transportation directly; they are the "object" of the emissions target-and-reporting requirements. So they have standing to complain that the Administrator overstepped his authority in imposing those requirements." (internal citation omitted)).

39.     SWAs are the object of some provisions of the Final Rule. Specifically, the Department requires SWAs to discontinue employment services to employers who do not comply with the applicable regulations. *See* 89 Fed. Reg. at 34,058 (amending 20 C.F.R. § 653.501 by adding a paragraph that says, "If the employer requesting access to the clearance system is currently debarred from participating in the H-2A or H-2B foreign labor certification programs, the SWA must initiate discontinuation of services. . . "); *Id.* at 34,065 (revising 20 C.F.R. § 658.501 to establish new bases for

when "SWA officials must initiate procedures for discontinuation of services to employers").

40. A discontinuation of employment services means the SWA cannot post the employer's job orders into the intrastate or interstate clearance systems used to recruit American workers. If an employer has not attempted to recruit American workers, it cannot participate in the H-2A program. Therefore, the discontinuation of employment services effectively means the employer will not be able to hire foreign workers and will have to do all its own recruitment to hire American workers.

41. The new requirements on employers in the Final Rule mean there are more triggers for discontinuation of employment services. Under the new section 658.501, as revised and republished in the Final Rule, SWAs must now initiate procedures to discontinue employment services if, for example, an employer:

- does not allow H-2A workers to engage in "collective action and concerted activity," *see, e.g., id*. at 33,901, 34,062–3;

- does not ensure all passengers in employer-provided transportation are wearing seat belts, *see id*. at 33,903, 34,060;

- does not allow workers to designate a representative to attend any investigatory interview that the worker believes might result in disciplinary action, *see id*. at 34,011, 34,063;

- does not allow workers living in employer-provided housing to "invite, or accept at their discretion, guests" to such housing, *id*. at 34,021. 34,063.

42.     Kentucky's SWA is the Kentucky Career Center.[4] It is operated under the auspices of the Education and Labor Cabinet, which under Kentucky law is tasked with performing the duties imposed by the Wagner-Peyser Act. Ky. Rev. Stat. § 336.045(1); *see also id.* at § 336.045(2) (designating the Education and Labor Cabinet as "the agency of this state for the purposes of the Wagner-Peyser Act").

43.     The SWA in Alabama is the Alabama Department of Labor. Under Alabama law, the duties of the Alabama Department of Labor include cooperating with all authorities of the United States having powers and duties under the Wagner-Peyser Act. Ala. Code § 25-2-2(5).

44.     In Ohio, the Office of Workforce Development in the Ohio Department of Job & Family Services is the SWA. Ohio law directs the director of job and family services to administer the Wagner-Peyser Act. Oh. Rev. Code § 6301.02.

45.     West Virginia's SWA is WorkForce West Virginia. WorkForce West Virginia is a state agency that oversees the state unemployment insurance program as well as a network of workforce development services. W.Va. Code § 21A-1-4(a). It is part of the West Virginia Department of Commerce which, under West Virginia law, is tasked with enforcing the duties imposed by the Wagner-Peyser Act. *See* W.Va. Code § 21-2-2.

46.     These States' SWAs are the object of some of the requirements of the Final Rule. *See, e.g.*, 89 Fed. Reg. at 34,058, 34,065. This alone is sufficient to

---

[4]   *See* U.S. DEPARTMENT OF LABOR, *State Workforce Agencies*, https://www.dol.gov/agencies/eta/wotc/contact/state-workforce-agencies (last accessed Sept. 20, 2024) (linking to Kentucky Career Center website).

establish standing. *See Kentucky v. Fed. Highway Admin.,* 2024 WL 1402443, at *3 ("No additional proof is necessary when a rule purports to impose legal obligations directly on a state plaintiff.").

47.     Additionally, the compliance costs of complying with the Final Rule are sufficient to establish standing. *See Carman v. Yellen*, 112 F.4th 386, 407 (6th Cir. 2024) ("Because plaintiffs have pleaded facts showing that they will indeed be subject to the reporting requirements in some form or another and pay compliance costs, the district court should have proceeded to the merits on these claims."); *Kentucky v. Yellen*, 54 F.4th 325, 342–43 (6th Cir. 2022) (citing a string of cases finding "compliance costs are a recognized harm for purposes of Article III").

48.     Here, the Department acknowledges there will be "quantifiable" costs "associated with rule familiarization." 89 Fed. Reg. at 34,044; *see also id.* at 33,904 (explaining the Department allowed for a transition period "to provide training and technical assistance to . . . State workforce agencies (SWAs) . . . in order to familiarize them with changes required by this final rule"). SWAs are mandated to initiate discontinuation of employment services if certain new requirements imposed by the Final Rule are not met. Additionally, SWAs must collect complaints from H-2A visa holders who believe employers are not complying with the regulation. There necessarily will be some time and manpower spent on rule familiarization by SWAs in order to comply with these duties. These are compliance costs. Therefore, because these compliance costs "result from being regulated by the [rule]," they are a sufficient injury for standing. *See Carman*, 112 F.4th at 409.

14

## COUNT ONE

### The Final Rule exceeds agency authority.

49.     The Plaintiff States incorporate by reference the preceding allegations of this Intervening Complaint as if fully set forth herein.

50.     The Administrative Procedure Act requires courts to hold unlawful and set aside agency action that is "not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

51.     "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Public Serv. Comm'n, v. FCC.*, 476 U.S. 355, 374 (1986). Indeed, "[m]erely because an agency has rulemaking power does not mean that it has . . . authority to adopt a particular regulation." *Kentucky v. Fed. Highway Admin.*, 2024 WL 1402443, at *10 (quoting *N.Y. Stock Exchange LLC v. SEC*, 962 F.3d 541, 554 (D.C. Cir. 2020)).

52.     Congress conferred general rulemaking authority to carry out the H-2A visa program on two agencies: the Department of Homeland Security and the U.S. Attorney General. 8 U.S.C. § 1103(a)(3), (g)(2).

53.     The Department is not given the same general rulemaking authority. Rather, Congress gave the Department limited and specific rulemaking authority.

54.     First, the statute allows the Secretary to "require by regulation, as a condition of issuing the certification, the payment of a fee to recover the reasonable costs of processing applications for certification." 8 U.S.C. § 1188(a)(2).

15

55.     Later in the same section, Congress gave the Secretary authority to "issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock." 8 U.S.C. § 1188(c)(4).

56.     Congress also directs the Secretary to grant the certification necessary for an employer to hire H-2A workers if the "employer has complied with criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary). 8 U.S.C. § 1188(c)(3)(A)(i).

57.     There are at least some requirements that the Final Rule imposes on employers—and on SWAs that must enforce them with respect to the provision of employment services—that clearly do not fall within these limited grants of authority. For instance, requiring employers to mandate that all individuals riding in employer-provided transportation wear seat belts is not related to fees for certification applications, to housing requirements, or to criteria for recruitment. Similarly, the Department does not—and cannot—explain how requiring employers to permit an H-2A worker to designate a representative to attend any interview related to potential discipline could be justified by the limited grant of authority to require by regulation a fee for certification applications, issue regulations to address housing requirements, or set criteria for recruitment.

58.     Moreover, nothing in the statutory language relating to the certification responsibilities Congress assigned to the Department gives it authority to regulate in the manner it attempts with the Final Rule.

59.     The statute says that a petition to import H-2A workers "may not be approved by the Attorney General unless the petitioner has applied to the Secretary of Labor for a certification that—(A) there are not sufficient workers who are able, willing, and qualified and who will be available at the time and place needed, to perform the labor or services involved in the petition, and (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1).

60.     While this provision certainly requires the Secretary to know about the available workforce and what will adversely affect the wages and working conditions of American agricultural workers, nothing in this language gives the Defendants authority to promulgate regulations establishing requirements on employers as conditions to issuing the certification. This is true even if the Department believes the requirements would help avoid adversely affecting the wages or conditions of American agricultural workers. The Department simply does not have that kind of legislative authority. *See W.Va. v. EPA*, 597 U.S. at 723 ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency may add pages and change the plot line.'" (cleaned up, citation omitted)).

61.     Indeed, immediately following this language, Congress granted the Secretary the very limited authority to issue, "by regulation," just *one* condition to issuing certification: the "payment of a fee to recover the reasonable costs of processing applications for certification." 8 U.S.C. § 1188(a)(2).

62.    Congress itself established the other conditions for denial of the certification. *See* 8 U.S.C. § 1188(b). And by doing so, it is clear Congress did not delegate generally the job to establish conditions to the Department. Rather, it identified just one condition for denial for which the Department could issue regulations. *See* 8 U.S.C. § 1188(a)(2).

63.    There is no basis then to assume the Department has authority to impose additional conditions like the ones in the Final Rule. "The preeminent canon of statutory interpretation requires [the court] to presume that the legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 183 (2004) (cleaned up and quotations omitted). "Thus, [the court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Id.* The text of the statute here is unambiguous, and this Court need go no further to determine the Department has exceeded its statutory authority.[5]

---

[5]    The district court in Georgia found that "the 'best reading' of § 1188, in its entirety, is that Congress granted the DOL authority to issue regulations to ensure that any certification it issues for H-2A visas do not 'adversely affect' American agricultural workers." 2024 WL 3938839 at *5. To do so, the court relied on a D.C. Circuit case that found the Department's methodology for computing the adverse effect wage rate (which is the minimum wage that employers must offer American and foreign workers) was a valid exercise of the Department's authority under § 1188. *Id.* at *6; *AFL-CIO v. Dole,* 923 F.2d 182, 183 (D.C. Cir. 1991). While the D.C. Circuit does not explain its reasoning by identifying a particular provision that gave the Department authority, it makes sense that wage setting would fall within the Department's authority under 8 U.S.C. § 1188(c)(3)(A)(i), which allows the Secretary to prescribe criteria for recruitment. That *Dole* may be correct in the fact-specific context of that case does not mean that the Department has authority to issue any regulation it wants so long as there is some connection to ensuring the H-2A visas do not "adversely affect" American agricultural workers. Indeed, here, where requirements of the Final Rule cannot be shown to have similar connections to the statutory text, *Dole*'s rationale does not apply. And just because the D.C. Circuit described the authority given to the Department as a "rather broad congressional delegation" does not mean that the D.C. Circuit's interpretative language should override long-recognized statutory interpretation principles.

64.    Indeed, it would be odd to think that Congress would use language conditioning certification for use of H-2A workers on a determination of no adverse effect on American workers to allow the Department to act in ways it elsewhere in the law clearly disallowed. With the NLRA, Congress explicitly decided not to extend collective bargaining rights to agricultural workers. *See* 29 U.S.C. § 152(a)(3). Yet, through the Final Rule, the Department attempts to give H-2A workers collective bargaining rights.

65.    The NLRA protects covered employees' right to "engage[ ] in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. It also makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the[ir] rights," 29 U.S.C. § 158(a)(1), "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157.

66.    In strikingly similar language, the Final Rule protects "concerted activity for mutual aid and protection which encompasses numerous ways that workers can engage, individually or collectively, to enforce their rights." 89 Fed. Reg. at 34,005. And it prohibits employers from "discharg[ing], or in any manner discriminat[ing] against . . . any person who has . . . engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or

19

has engaged in other concerted activities for the purpose of mutual aid or protection." *Id*. at 34,062.

67.     In doing so, the Final Rule creates a right for H-2A workers "not previously bestowed by Congress." *See Kansas*, 2024 WL 3938839 at *8 (finding the Final Rule "provides for agricultural workers' right to participate in concerted activity to further their interests. That is a right that Congress has not created by statute."). Indeed, it is not just that Congress has not *yet* bestowed such rights on H-2A workers, but that Congress has already explicitly said it is not bestowing such rights on H-2A workers as agricultural laborers. *See* 29 U.S.C. § 152(3). The Department cannot take such action.

68.     First, to do so conflicts with Congress' intent and explicit restriction in the NLRA. *Id.; see also Kansas*, 2024 WL 3938839 at *8. ("[T]he NLRA exhibits Congress's intent to refrain from affording agricultural workers the right to participate in such concerted activity." (emphasis omitted)).

69.     Second, the Department has no authority to make law. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 283 (2002) (explaining that to determine whether a federal right exists, courts must "determine whether Congress intended to create a federal right" (emphasis omitted)); *Dixon v. United States*, 381 U.S. 68, 74 (1965) ("The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law." (citation omitted)); *United States v. Grimaud*, 220 U.S. 506, 517 (1911) (explaining that statutes

conferring power on executive officers to make rules and regulations cannot "confer legislative power").

70.     And it would not matter if the Department had general rulemaking authority with respect to the H-2A visa program like the U.S. Attorney General and the Department of Homeland Security, *see* 8 U.S.C. § 1103(a)(3), (g)(2). An agency cannot contradict Congress' policy decisions and directions. *See W.Va. v. EPA*, 597 U.S. at 723 ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency may add pages and change the plot line.'" (cleaned up, citation omitted)); *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself."). Courts "must reject administrative constructions of the statute . . . that are inconsistent with the statutory mandate or frustrate the policy that Congress sought to implement." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32 (1981); *see also Flores*, 36 F.3d at 514 ("'[T]he clear meaning of statutes as written' ultimately trumps the policy of 'judicial deference to a reasonable statutory interpretation by an administering agency.'" (quoting *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476 (1992)).

71.     The Final Rule's extension of collective bargaining rights to agricultural workers when Congress excluded agricultural workers from the employees given such rights is clearly not in accordance with law as required by the APA. *See FCC v. Nextwave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (explaining that when the APA requires courts to set aside federal agency action that is not in accordance with

law, it "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering"). Because the Final Rule violates the NLRA, it must be vacated.

## COUNT TWO

### The Final Rule impermissibly commandeers State SWAs.

72.     The Plaintiff States incorporate by reference the preceding allegations of this Intervening Complaint as if fully set forth herein.

73.     Under the anti-commandeering doctrine, the Federal Government may not compel the States or the officers of the States to implement, administer, or enforce federal regulatory programs. *See Printz v. United States,* 521 U.S. 898, 925–6, 935 (1997).

74.     "It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Id.* at 928. And this sovereignty cannot be intruded upon by requiring the States either to enact policy or to enforce policy. *See id.* Indeed, where the Federal Government "reduc[es the States] to puppets of a ventriloquist" by requiring them to administer and enforce federal laws and regulations, the "preservation of the States as independent and autonomous political entities" is even more undermined than when the Federal Government requires the States to make policy. *See id.* "Neither the Constitution nor the Administrative Procedure Act authorizes administrative ventriloquism." *Kentucky v. Fed. Highway Admin.,* 2024 WL 1402443, at *2.

75.     The Final Rule amounts to administrative ventriloquism. The Department has determined requirements for employers seeking H-2A workers and

22

demands that States, through their SWAs, enforce those requirements by mandating SWAs initiate discontinuation of employment services if employers fail to comply with the requirements of the Final Rule. *See* 89 Fed. Reg. at 34,065.

76. The federalist system of government established in the Constitution bars such commandeering. Therefore, the Final Rule should be invalidated. *See Printz*, 521 U.S. at 933 ("Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear 'formalistic' in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." (quoting *New York v. United States*, 505 U.S. 144, 187 (1992))).

77. Similarly, the Federal Government cannot direct the States to do what it could not do—including violating constitutionally-protected rights like due process.

78. "The basic elements of procedural due process are notice and opportunity to be heard." *Arch of Ky., Inc. v. Dir., OWCP*, 556 F.3d 472, 478 (6th Cir. 2009). To satisfy constitutional due process requirements, a person who the government seeks to deprive of liberty, property, or privileges is entitled, at a minimum, to notice of the Government's evidence and an opportunity to rebut it. *See Hicks v. Comm'r of Soc. Sec.,* 909 F.3d 786, 797 (6th Cir. 2018). The Sixth Circuit has

determined that "some form of hearing is required before an individual is finally deprived of a property interest." *Id*. at 800 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

79.     The Final Rule eliminates the opportunity for a hearing prior to the SWAs discontinuing employment services for violations of the regulatory requirements. 89 Fed. Reg. at 33,928. Under the Final Rule, the SWA will issue its final decision to discontinue services and notify the employer "that the discontinuation of services is effective 20 working days from the date of the determination." *Id*. The decision must notify employers they may request reinstatement or appeal the discontinuation determination by requesting a hearing. *Id*. A request for a hearing will automatically stay the discontinuation pending the outcome. *Id*.

80.     According to the Department, this process "provides sufficient due process," *id*., and in particular, the Department asserts that the automatic stay means the process "provides the same due process rights available in the current H-2A debarment procedures," *id*. at 33,929.

81.     To the extent this process results in deprivation by governmental action without a hearing first, it violates due process. *See Hicks,* 909 F.3d at 800; *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982) (discussing the "interests" of residents in the federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act of 1952").

24

82.    Just as the Federal Government cannot violate due process, neither can the States. And the Federal Government cannot commandeer the SWAs to do its unlawful work.

83.    The States cannot be mandated to enforce the Final Rule—and certainly cannot be mandated to violate the due process rights of farmers within its borders. The anti-commandeering doctrine dictates that the Final Rule should be invalidated.

**COUNT THREE**

**The Final Rule is arbitrary and capricious.**

84.    The Plaintiff States incorporate by reference the preceding allegations of this Intervening Complaint as if fully set forth herein.

85.    An agency decision is arbitrary and capricious when the agency has relied on factors which Congress did not intend for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *Kentucky Waterways Alliance v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008).

86.    The Final Rule is arbitrary and capricious first because the Department relied on factors Congress did not intend it to consider. When Congress enacted protections for collective bargaining rights for most employees, it explicitly said it was not extending such rights to agricultural workers. *See* 29 U.S.C. § 152(3). Yet, the Department now attempts to use the Final Rule to enable collective action by H-2A

25

workers. While that may be policy supported by the Biden-Harris Administration, it clearly conflicts with Congressional intent and explicit statutory restrictions.[6] And it is indeed Congress, not any federal agency or the Biden-Harris Administration, that makes law. Attempting to establish collective bargaining rights for H-2A workers is beyond the scope of what Congress has intended for the Department to consider. As such, the Final Rule is arbitrary and capricious.

87. Further, the result of allowing the Department to provide protections for collective bargaining actions to H-2A workers under the Final Rule would produce a result so implausible it could not be ascribed to a difference in view. The Final Rule requires employers to allow H-2A workers to engage in collective action under the auspices of doing so "to better protect against adverse effects on similarly employed workers in the United States." *See* 89 Fed. Reg. at 33,901. But the consequence of failing to allow H-2A workers to engage in collective action is the discontinuation of employment services through the SWAs. *See id.* at 34,065 (requiring SWAs to initiate procedures for discontinuation of services to employers). The employment services the SWAs offer are to help provide the farmers with *American* workers. This means the result of the Final Rule would be to stop SWAs from connecting American workers with employers who need workers.

---

[6]   The Department is fully aware that Congress declined to give collective bargaining rights to agricultural workers. *See* 89 Fed. Reg. at 34,003 (explaining that the "new protected activity [in the Final Rule] relating to self-organization and concerted activity [ ] would be limited to persons engaged in FLSA agriculture, namely those workers who are not eligible for protection under sec. 7 of the NLRA, 29 U.S.C. 157, because they are not "employees" as defined in 29 U.S.C. 152(3)").

88.     American workers are the group the Department is tasked with protecting. *See* 8 U.S.C. § 1188(a)(1). Therefore, that the Final Rule's result is to require SWAs to no longer connect American agricultural workers with available work is an implausible—not to mention harmful[7]—result. The Final Rule should be invalidated as arbitrary and capricious.

89.     The Final Rule is also arbitrary and capricious because the Department fails to articulate a rational connection between the facts and the Final Rule. *See Motor Vehicle*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made.").

90.     The Department attempts to justify requiring the recognition of collective bargaining rights for H-2A workers by asserting that H-2A workers are more vulnerable than American workers. Therefore, according to the Department, H-2A workers need greater protections because without the additional protections, employers will choose to hire the vulnerable H-2A workers rather than American workers. *See* 89 Fed. Reg. at 33,987. But the Department offers no evidence for this bald assertion. *See id.* at 33,987 (saying the Department "*believed* that this vulnerability of the H-2A workforce, and the ability of employers to hire this vulnerable workforce, *may* suppress or undermine the ability of farmworkers in the

---

[7]     Doing so will have serious consequences for American workers who need jobs. It will also have serious consequences for farmers. One commenter to the proposed rule informed the Department that if, due to non-compliance with the Final Rule's requirements, the farm was "subsequently not able to hire U.S. workers via the SWA, [it] would need to go out of business." 89 Fed. Reg. at 33,923.

United States to negotiate with employers and advocate on their own behalf[.]" (emphasis added)).

91.   There can be no "rational connection between the facts found and the choice made," *see Motor Vehicles,* 463 U.S. at 42, that would justify the Department's decision when there were no facts found.  The Final Rule is therefore arbitrary and capricious.

92.   Moreover, while the Department does not have authority to provide collective bargaining rights for H-2A workers, federal law clearly directs the Department to certify, for *every* request for H-2A workers, that there are insufficient American workers. 8 U.S.C. § 1188. If there are, in fact, American workers who could be hired by the employer—that is, workers the employers are declining to choose in favor of the foreign workers—then the Department's statutorily-mandated responsibility is to not issue the certification so the U.S. Attorney General can disapprove the petition. *See id.* Yet, the Department seems to completely ignore that it has this explicit authority that could—and should—be used to address any problem there may be with employers choosing foreign workers over American ones because of the alleged vulnerability of the foreign workers. Instead, the Department attempts to use the Final Rule to expand collective bargaining rights for H-2A workers. This is arbitrary and capricious.

93.   The Department has acted arbitrarily and capriciously in promulgating the Final Rule. The Rule should be vacated.

## PRAYER FOR RELIEF

WHEREFORE, Intervening Plaintiff States respectfully ask this Court to:

A.     Declare the Final Rule is unlawful because it: (1) exceeds the Agencies' authority, (2) commandeers State agencies to enforce federal policy, and (3) is arbitrary and capricious;

B.     Vacate and set aside the Final Rule in its entirety;

C.     Issue preliminary and permanent injunctive relief prohibiting the Department from implementing, applying, enforcing, or otherwise proceeding under the Final Rule;

D.     Award the States reasonable costs and fees, including attorney's fees, pursuant to any applicable statute or authority; and

E.     Grant the States such additional legal and equitable relief that the Court deems appropriate.

Respectfully submitted,

**RUSSELL COLEMAN**
Attorney General

*/s/ Lindsey R. Keiser*
Justin D. Clark
Aaron J. Silletto
Victor B. Maddox
Lindsey R. Keiser
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Justind.Clark@ky.gov
Aaron.Silletto@ky.gov
Victor.Maddox@ky.gov
Lindsey.Keiser@ky.gov
*Counsel for the Commonwealth of Kentucky*

**STEVE MARSHALL**
Attorney General

*/s/ Robert M. Overing*
Robert M. Overing*
Deputy Solicitor General
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Robert.Overing@AlabamaAG.gov
*Counsel for the State of Alabama*

**DAVE YOST**
Attorney General

/s/ *T. Elliot Gaiser*
T. Elliot Gaiser*
Solicitor General
Office of the Ohio Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
Thomas.Gaiser@ohioago.gov
*Counsel for the State of Ohio*

**PATRICK MORRISEY**
Attorney General

/s/ *Michael R. Williams*
Michael R. Williams*
Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov
*Counsel for the State of West Virginia*

\* *Pro Hac Vice* application forthcoming

**CERTIFICATE OF SERVICE**

I certify that on September 20, 2024, the above document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record.

/s/ *Lindsey R. Keiser*
*Counsel for the Commonwealth of Kentucky*

30

# Exhibit 1

**DEPARTMENT OF LABOR**

**Employment and Training Administration**

**20 CFR Parts 651, 653, 655, and 658**

**Wage and Hour Division**

**29 CFR Part 501**

**[DOL Docket No. ETA–2023–0003]**

**RIN 1205–AC12**

**Improving Protections for Workers in Temporary Agricultural Employment in the United States**

**AGENCY:** Employment and Training Administration and Wage and Hour Division, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** The Department of Labor (Department or DOL) is amending its regulations governing the certification of temporary employment of nonimmigrant workers employed in temporary or seasonal agricultural employment and the enforcement of the contractual obligations applicable to employers of these nonimmigrant workers. The revisions in this final rule focus on strengthening protections for temporary agricultural workers and enhancing the Department's capabilities to monitor program compliance and take necessary enforcement actions against program violators.

**DATES:** This final rule is effective June 28, 2024.

**FOR FURTHER INFORMATION CONTACT:** For further information regarding 20 CFR parts 651, 653, and 658, contact Kimberly Vitelli, Administrator, Office of Workforce Investment, Employment and Training Administration, Department of Labor, Room C–4526, 200 Constitution Avenue NW, Washington, DC 20210, telephone: (202) 693–3980 (this is not a toll-free number). For further information regarding 20 CFR part 655, contact Brian Pasternak, Administrator, Office of Foreign Labor Certification, Employment and Training Administration, Department of Labor, 200 Constitution Avenue NW, Room N–5311, Washington, DC 20210, telephone: (202) 693–8200 (this is not a toll-free number). For further information regarding 29 CFR part 501, contact Daniel Navarrete, Acting Director of the Division of Regulations, Legislation, and Interpretation, Wage and Hour Division, Department of Labor, Room S–3018, 200 Constitution Avenue NW, Washington, DC 20210, telephone: (202) 693–0406 (this is not a toll-free number). For persons with a hearing or speech disability who need assistance to use the telephone system, please dial 711 to access telecommunications relay services.

**SUPPLEMENTARY INFORMATION:**

**Preamble Table of Contents**

I. Acronyms and Abbreviations
II. Background
    A. Legal Authority
    B. Current Regulatory Framework
    C. Need for Rulemaking
III. General Comments on the Proposed Rule
IV. Overview of This Final Rule
    A. Summary of Major Provisions of this Final Rule
    B. Section-by-Section Analyses
    C. Transition Procedures
V. Discussion of Revisions to Employment Service Regulations
    A. Introduction
    B. 20 CFR part 651—General Provisions Governing the Wagner-Peyser Act Employment Service
    C. 20 CFR part 653—Services of the Wagner-Peyser Act Employment Service System
    D. 20 CFR part 658, subpart F—Discontinuation of Services to Employers by the Wagner-Peyser Act Employment Service
VI. Discussion of Revisions to 20 CFR part 655, subpart B
    A. Introductory Sections
    B. Prefiling Procedures
    C. Application for Temporary Employment Certification Filing Procedures
    D. Labor Certification Determinations
    E. Post-Certification
    F. Integrity Measures
VII. Discussion of Revisions to 29 CFR part 501
    A. Section 501.3, Definitions
    B. Section 501.4, Discrimination prohibited
    C. Section 501.10, Severability
    D. Sections 501.20, 501.33, 501.42, Debarment and revocation
    E. Section 501.33, Request for hearing
VIII. Administrative Information
    A. Executive Order 12866: Regulatory Planning and Review, Executive Order 14094: Modernizing Regulatory Review, and Executive Order 13563: Improving Regulation and Regulatory Review
    B. Regulatory Flexibility Analysis, Small Business Regulatory Enforcement Fairness Act, Executive Order 13272: Proper Consideration of Small Entities in Agency Rulemaking
    C. Paperwork Reduction Act
    D. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)
    E. Unfunded Mandates Reform Act of 1995
    F. Executive Order 13132 (Federalism)
    G. Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments)

**I. Acronyms and Abbreviations**

ADA  Americans with Disabilities Act
AEWR  Adverse effect wage rate
AIE  Area(s) of intended employment
ALJ  Administrative Law Judge
ALRA  California Agricultural Labor Relations Act
ALRB  California Agricultural Labor Relations Board
ARB  Administrative Review Board
ARIMA  Autoregressive integrated moving average
ARS  Agricultural Recruitment System
ATV  All-terrain vehicle
BALCA  Board of Alien Labor Certification Appeals
BLS  Bureau of Labor Statistics
CAGR  Compound annual growth rate
CBA  Collective bargaining agreement
CFR  Code of Federal Regulations
CO  Certifying Officer
CRA  Congressional Review Act
CY  Calendar year
DBA  Doing business as
DHS  Department of Homeland Security
DOJ  Department of Justice
DOL  Department of Labor
EEOC  Equal Employment Opportunity Commission
E.O.  Executive Order
ES  Employment Service
ES  system Employment Service system
ETA  Employment and Training Administration
FDA  Food and Drug Administration
FEIN  Federal Employer Identification Number
FLAG  Foreign Labor Application Gateway
FLS  Farm Labor Survey
FLSA  Fair Labor Standards Act
FMVSS  Federal Motor Vehicle Safety Standards
FOIA  Freedom of Information Act
FR  Federal Register
FRN  Federal Register notice
FY  Fiscal year
GAO  Government Accountability Office
GVWR  Gross Vehicle Weight Rating  H–2ALC  H–2A labor contractor
HR  Human resources
ICR  Information Collection Request
IFR  Interim final rule
INA  Immigration and Nationality Act
MSFW  Migrant or seasonal farmworker
MSPA  Migrant and Seasonal Agricultural Worker Protection Act
NAICS  North American Industry Classification System
NARA  National Archives and Records Administration
NHTSA  National Highway Traffic Safety Administration
NIOSH  National Institute for Occupational Safety and Health
NLRA  National Labor Relations Act
NLRB  National Labor Relations Board
NOD  Notice of Deficiency
NPC  National Processing Center
NPRM  Notice of proposed rulemaking
NPWC  National Prevailing Wage Center
OALJ  Office of Administrative Law Judges
OEWS  Occupational Employment and Wage Statistics
OFLC  Office of Foreign Labor Certification
OHV  Off-highway vehicle
OIG  Office of Inspector General
OIRA  Office of Information and Regulatory Affairs
OMB  Office of Management and Budget
OSHA  Occupational Safety and Health Administration

OWI   Office of Workforce Investment
PII   Personally identifiable information
PRA   Paperwork Reduction Act
Pub.L.   Public Law
RFA   Regulatory Flexibility Act
RIN   Regulation Identifier Number
ROPS   Roll-Over Protective Structure
SBA   Small Business Administration
SBREFA   Small Business Regulatory
   Enforcement Fairness Act of 1996
Sec.   Section of a Public Law
Secretary   Secretary of Labor
SOC   Standard Occupational
   Classification
SORN   System of Records Notice
Stat.   U.S. Statutes at Large
SUSB   Statistics of U.S. Businesses
SWA   State workforce agency
TVPA   Victims of Trafficking and Violence
   Protection Act of 2000
UMRA   Unfunded Mandates Reform Act of
   1995
U.S.C.   United States Code
USCIS   U.S. Citizenship and Immigration
   Services
USDA   U.S. Department of Agriculture
U.S.DOT U.S.   Department of Transportation
VSL   Value of a statistical life
WHD   Wage and Hour Division

## II. Background

### A. Legal Authority

#### 1. Immigration and Nationality Act

The Immigration and Nationality Act (INA), as amended by the Immigration Reform and Control Act of 1986, establishes an "H–2A" nonimmigrant visa classification for a worker "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services . . . of a temporary or seasonal nature." 8 U.S.C. 1101(a)(15)(H)(ii)(a); *see also* 8 U.S.C. 1184(c)(1) and 1188.[1] Permanent, year-round job opportunities cannot be classified as temporary or seasonal. 87 FR 61660, 61684 (Oct. 12, 2022);[2] *see also* 8 U.S.C. 1101(a)(15)(H)(ii)(a) (the INA permits only "agricultural labor or services . . . of a temporary or seasonal nature" to be performed under the H–2A visa category).

The H–2A nonimmigrant worker visa program enables U.S. agricultural employers to employ foreign workers on a temporary basis to perform temporary or seasonal agricultural labor or services only where the Secretary of Labor (Secretary) certifies that: (1) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition; and (2) the employment

of the foreign worker in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed. 8 U.S.C. 1188(a)(1).[3] The INA prohibits the Secretary from issuing this certification—known as a "temporary agricultural labor certification"—unless both of the above-referenced conditions are met. The INA further prohibits the Secretary from issuing a temporary agricultural labor certification if any of the conditions in 8 U.S.C. 1188(b) apply concerning strikes or lock-outs, labor certification program debarments, workers' compensation assurances, and positive recruitment.

The Secretary has delegated the authority to issue temporary agricultural labor certifications to the Assistant Secretary for Employment and Training, who in turn has delegated that authority to the Employment and Training Administration's (ETA) OFLC. *See* Secretary's Order 06–2010 (Oct. 20, 2010), 75 FR 66268 (Oct. 27, 2010). In addition, the Secretary has delegated to WHD the responsibility under 8 U.S.C. 1188(g)(2) to assure employer compliance with the terms and conditions of employment under the H–2A program. *See* Secretary's Order 01–2014 (Dec. 19, 2014), 79 FR 77527 (Dec. 24, 2014). Pursuant to the INA and implementing regulations promulgated by DOL and the Department of Homeland Security (DHS), DOL evaluates an employer's need for agricultural labor or services to determine whether it is seasonal or temporary during the review of an H–2A Application. 20 CFR 655.161(a); 8 CFR 214.2(h)(5)(i)(A) and (h)(5)(iv).

#### 2. Wagner-Peyser Act

The Wagner-Peyser Act of 1933 established the United States Employment Service (ES), a nationwide system to improve the functioning of the nation's labor markets by bringing together individuals seeking employment with employers seeking workers. 29 U.S.C. 49 *et seq.* Section 3(a) of the Act sets forth the basic responsibilities of the Department in the

ES, which include assisting in coordinating the State public employment service offices throughout the country and in increasing their usefulness by prescribing standards for efficiency, promoting uniformity in procedures, and maintaining a system of clearing labor between the States. 29 U.S.C. 49b. The Act further authorizes the Department "to make such rules and regulations as may be necessary to carry out [its] provisions." 29 U.S.C. 49k.

Consistent with the aims of sec. 3(a), the ES system provides labor exchange services to its participants and has undergone numerous changes to align its activities with broader national workforce development policies and statutory requirements. The Workforce Innovation and Opportunity Act (Pub. L. 113–128), passed in 2014, expanded upon the previous workforce reforms in the Workforce Investment Act of 1998 and, among other things, identified the ES system as a core program in the One-Stop local delivery system, also called the American Job Center network.

In 1974, the case *National Ass'n for the Advancement of Colored People (NAACP), Western Region, et al.* v. *Brennan et al.,* No. 2010–72, 1974 WL 229 (D.D.C. Aug. 13, 1974), resulted in a detailed court order mandating various Federal and State actions consistent with applicable law (Richey Order). The Richey Order required the Department to implement and maintain a Federal and State monitoring and advocacy system and set forth requirements to ensure the delivery of ES services, benefits, and protections to migrant or seasonal farmworkers (MSFWs) on a non-discriminatory basis, and to provide such services in a manner that is qualitatively equivalent and quantitatively proportionate to those provided to non-farmworkers. In 1977 and 1980, consistent with its authority under the Wagner-Peyser Act, the Department published regulations at 20 CFR parts 651, 653, and 658 to implement the requirements of the Richey Order. Part 653 sets forth standards and procedures for providing services to MSFWs and provides regulations governing the Agricultural Recruitment System (ARS), a system for interstate and intrastate agricultural job recruitment. Part 658 sets forth standards and procedures for the administrative handling of complaints alleging violations of ES regulations and of employment-related laws, the discontinuation of services provided by the ES system to employers, the review and assessment of State agency compliance with ES regulations, and the process the Department must follow if

---

[1] For ease of reference, sections of the INA are referred to by their corresponding section in the United States Code.

[2] Final Rule, *Temporary Agricultural Employment of H–2A Nonimmigrants in the United States,* 87 FR 61660 (Oct. 12, 2022) (2022 H–2A Final Rule).

[3] Following certification by DOL, the employer must file an H–2A petition (defined at 20 CFR 655.103(b) as the U.S. Citizenship and Immigration Services (USCIS) Form I–129, Petition for a Nonimmigrant Worker, with H Supplement or successor form and/or supplement, and accompanying documentation required by DHS for employers seeking to employ foreign persons as H–2A nonimmigrant workers) with USCIS, requesting one or more workers not to exceed the total listed on the temporary agricultural labor certification. Generally, USCIS must approve this petition before the worker(s) can be considered eligible for an H–2A visa or for H–2A nonimmigrant status. The limited exceptions from this requirement may be found at 8 CFR 274a.12(b)(20) and (21).

State agencies are not complying with the ES regulations.

### B. Current Regulatory Framework

Since 1987, the Department has operated the H–2A temporary agricultural labor certification program under regulations promulgated pursuant to the INA. The standards and procedures applicable to the certification and employment of workers under the H–2A program are found in 20 CFR part 655, subpart B, and 29 CFR part 501. The majority of the Department's current regulations governing the H–2A program were published in 2010 and many were strengthened in a final rule the Department published in October 2022.[4] The Department incorporated the provisions for employment of workers in the herding and production of livestock on the range into the H–2A regulations, with modifications, in 2015.[5] The provisions governing the employment of workers in the herding and production of livestock on the range are codified at 20 CFR 655.200 through 655.235.[6] Relatedly, the regulations implementing the Wagner-Peyser Act at 20 CFR parts 651, 653, and 658 establish the ARS, through which employers can recruit U.S. workers for agricultural employment opportunities, and which prospective H–2A employers must use to recruit U.S. workers as a condition of receiving a temporary agricultural labor certification.

### C. Need for Rulemaking

This final rule aims to address some concerns expressed by various stakeholders during rulemaking. It also responds to recent court decisions and program experience indicating a need to enhance the Department's ability to enforce regulations related to foreign labor recruitment, to improve accountability for successors in interest and employers who use various methods to attempt to evade the law and

regulatory requirements, and to enhance worker protections, as explained further in the sections that follow.

In particular and as noted above, the Department recently published the 2022 H–2A Final Rule, which strengthened worker protections in the H–2A program, clarified the obligations of joint employers and the existing prohibitions on fees related to foreign labor recruitment, authorized debarment of agents and attorneys for their own misconduct, enhanced surety bond obligations and related enforcement authorization, modernized the prevailing wage determination process, enhanced regulation of H–2A labor contractors (H–2ALCs), and provided additional safeguards related to employer-provided housing and wage obligations. *See* 87 FR 61660. In response to the notice of proposed rulemaking (NPRM) published prior to the 2022 H–2A Final Rule, the Department received many comments suggesting changes that were beyond the scope of that rulemaking, such as suggestions relating to increased enforcement and transparency regarding the foreign labor recruitment process, increased worker protections, revisions to the definition of employer, stronger integrity provisions to account for complex business organizations and for methods used to circumvent the regulations, strengthening provisions related to piece rate pay, and suggestions to revise the Wagner-Peyser Act regulations to ensure stronger protections for workers in the event of harmful last-minute start date delays.

After careful consideration of comments from the public, the Department is adopting important provisions in this final rule that will further strengthen protections for agricultural workers and enhance the Department's enforcement capabilities, thereby permitting more effective enforcement against fraud and program violations. These revisions will help prevent exploitation and abuse of agricultural workers and ensure that unscrupulous employers do not financially gain from their violations or contribute to economic and workforce instability by circumventing the law, both of which would adversely affect the wages and working conditions of workers in the United States similarly employed, and undermine the Department's ability to determine whether there are, in fact, insufficient U.S. workers for proposed H–2A jobs. It is the Department's policy to maintain robust protections for workers and vigorously enforce all laws within its jurisdiction governing the administration and enforcement of

nonimmigrant visa programs. This includes the coordination of the administration and enforcement activities of ETA, WHD, and the Department's Office of the Solicitor in the promotion of the hiring of U.S. workers and the safeguarding of wages and working conditions for workers in the United States. In addition, these agencies make criminal referrals to the Department's Office of Inspector General (OIG) in appropriate circumstances, such as when the agencies encounter visa-related fraud. The Department has determined through program experience, recent litigation, challenges in enforcement, comments on this rulemaking as well as on prior rulemakings, and reports from various stakeholders that it is necessary to adopt stronger protections for agricultural workers to better ensure that employers, agents, attorneys, and labor recruiters comply with the law, and to enhance program integrity by improving the Department's ability to monitor compliance and investigate and pursue remedies from program violators. The recent surge in use of the H–2A program amplifies these needs.[7]

### III. General Comments on the Proposed Rule

On September 15, 2023, the Department published an NPRM requesting public comments on proposals intended to improve protections for workers in temporary agricultural employment in the United States. *See* 88 FR 63750 (Sept. 15, 2023).[8] The proposed revisions focused on strengthening protections for temporary agricultural workers and enhancing the Department's capabilities to monitor program compliance and take necessary enforcement actions against program violators. The NPRM invited written comments from the public on all aspects of the proposed amendments to the regulations. A 60-day comment period allowed for the public to inspect the proposed rule and provide comments through November 14, 2023.

The Department received a total of 12,928 public comments in response to the NPRM before the end of the comment period. Included in these comments were multiple form letter campaigns, which were received as bundled submissions to the

---

[4] Final Rule, *Temporary Agricultural Employment of H–2A Aliens in the United States,* 75 FR 6884 (Feb. 12, 2010) (2010 H–2A Final Rule); Final Rule, *Temporary Agricultural Employment of H–2A Nonimmigrants in the United States,* 87 FR 61660 (Oct. 12, 2022) (2022 H–2A Final Rule).

[5] Final Rule, *Temporary Agricultural Employment of H–2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States,* 80 FR 62958 (Oct. 16, 2015) (2015 H–2A Herder Final Rule).

[6] Consistent with a court-approved settlement agreement in *Hispanic Affairs Project, et al. v. Scalia, et al.,* No. 15–cv–1562 (D.D.C.), the Department recently rescinded 20 CFR 655.215(b)(2). *See* Final Rule, *Adjudication of Temporary and Seasonal Need for Herding and Production of Livestock on the Range Applications Under the H–2A Program,* 86 FR 71373 (Dec. 16, 2021) (2021 H–2A Herder Final Rule).

[7] *See, e.g.,* OFLC, Performance Data, *https://www.dol.gov/agencies/eta/foreign-labor/performance* (last accessed Feb. 8, 2024) (providing disclosure data for the H–2A labor certification program since Fiscal Year (FY) 2008).

[8] NPRM, *Improving Protections for Workers in Temporary Agricultural Employment in the United States,* 88 FR 63750 (Sept. 15, 2023) (2023 NPRM).

*Regulations.gov* website. After accounting for duplicate submissions, the Department received comments from 8,725 unique commenters. Comments can be viewed online at *https://www.regulations.gov/docket/ETA-2023-0003.* The commenters represented a wide range of stakeholders from the public, private, and not-for-profit sectors. The Department received comments from a geographically diverse cross-section of stakeholders within the agricultural sector, including farmworkers, workers' rights advocacy organizations, farm owners, farm labor contractors, trade associations for agricultural products and services, not-for-profit organizations representing agricultural issues, and other organizations with an interest in agricultural activities. Public sector commenters included Federal elected officials, State officials, and agencies representing State governments. Private sector commenters included business owners, recruiting companies, and law firms. Not-for-profit sector commenters included both industry organizations (*e.g.,* professional associations) and worker advocacy organizations.

The Department recognizes and appreciates the value of comments, ideas, and suggestions from all those who commented on the proposal, and this final rule was developed after review and consideration of all public comments timely received in response to the NPRM. Some comments provided general opinions on the proposed rule, or on agricultural labor generally, and the Department thanks the commenters for their time to submit their feedback. Where public comments provided substantive feedback on specific proposals in the NPRM, they have been responded to in the sections that follow. When the Department has made changes from the NPRM as a result of public comment, those changes are identified in the sections below.

### IV. Overview of This Final Rule

*A. Summary of Major Provisions of This Final Rule*

#### 1. Protections for Worker Voice and Empowerment

In this final rule, the Department is adopting several revisions to § 655.135 that will provide stronger protections for workers protected by the H–2A program to advocate on behalf of themselves and their coworkers regarding their working conditions and prevent employers from suppressing this activity. As detailed in Section VI, the Department believes that these protections are important to prevent adverse effect on the working conditions

of workers in the United States similarly employed. 8 U.S.C. 1188(a)(1). Specifically, the Department is broadening § 655.135(h), which prohibits unfair treatment by employers, by expanding and explicitly protecting certain activities all workers must be able to engage in without fear of intimidation, threats, and other forms of retaliation. For those workers engaged in agriculture as defined and applied in 29 U.S.C. 203(f) of the Fair Labor Standards Act (FLSA) (''FLSA agriculture''), who are exempt from the protections of the National Labor Relations Act (NLRA), 29 U.S.C. 151 *et seq.,* the Department also revises § 655.135(h) to include some new protections to safeguard collective action and concerted activity for mutual aid and protection, and, in a change responsive to comments, to allow those workers to decline to attend or listen to employer speech regarding protected activities without fear of retaliation.[9]

The Department also finalizes one of the provisions initially proposed at § 655.135(m) to require employers to permit workers engaged in FLSA agriculture to designate a representative of their choosing in certain interviews, with minor changes in response to comments, and adopts a new provision at § 655.135(n) to permit workers to invite or accept guests to worker housing (which has been substantially revised in response to comments received). New § 655.135(m) and (n) are intended, like the revisions and additions to § 655.135(h), to strengthen the ability of workers to advocate on behalf of themselves and their coworkers regarding their required terms and conditions of employment, to better protect against adverse effect on

similarly employed workers in the United States.

The final rule does not require H–2A employers to recognize labor organizations or to engage in any collective bargaining activities such as those that may be required by the NLRA itself or by a State law such as the California Agricultural Labor Relations Act (ALRA), Cal. Lab. Code § 1140 *et seq.,* nor does it create any independent rights or obligations for labor organizations. Instead, this final rule requires employers to provide assurances that they will not intimidate, threaten, or otherwise discriminate against certain workers or others for engaging in ''activities related to self-organization,'' including ''concerted activities for the purpose of mutual aid or protection relating to wages or working conditions,'' or refusing to engage in such activities. 20 CFR 655.135(h)(2). Such activities may include seeking to form, join, or assist a labor organization, but also encompasses numerous other ways that workers can engage, individually or collectively, to enforce their rights, as further discussed below.

#### 2. Clarification of Termination for Cause

In this final rule, the Department adopts with modifications the NPRM definition of ''termination for cause'' at § 655.122(n) by adopting five criteria that must be satisfied to ensure that disciplinary and termination processes are justified and reasonable, which are intended to promote the integrity and regularity of any such processes. These changes will help to ensure employers do not arbitrarily and unjustly terminate workers, thereby stripping them of essential rights to which they would otherwise be entitled under the H–2A program. Moreover, these changes will assist the Department in determining whether an individual worker was terminated without cause where the employer gives pretextual reasons for a termination, and will provide regulatory certainty to employers by providing clear guidelines. In response to comments, the Department adopts minor modifications from the NPRM in this final rule to clarify the definition of termination for cause, the criteria that an employer must meet to terminate a worker for cause, and the types of terminations that are not ''for cause.''

#### 3. Immediate Effective Date for Updated AEWR

The Department adopts the proposed revisions to § 655.120(b)(2) to designate the effective date of each updated adverse effect wage rate (AEWR) as its date of publication in the **Federal**

---

[9] As discussed further in Section VI.C.2.b below, the NLRA excludes from its protections workers who are engaged in FLSA agriculture. See definition of ''employee'' at 29 U.S.C. 152(3) (excluding ''any individual employed as an agricultural laborer''). Congress has provided that the definition of ''agricultural'' in sec. 3(f) of the FLSA also applies to the NLRA. *See, e.g., Holly Farms Corp. et al. v. NLRB,* 517 U.S. 392, 397–98 (1996). The H–2A statute and the Department, however, define ''agricultural labor or services'' under the H–2A program more broadly to include FLSA agriculture as well as other activities. *See* 8 U.S.C. 1101(a)(15)(H)(ii)(a); 20 CFR 655.103(c). Certain provisions of this final rule apply only to workers or persons engaged in FLSA agriculture (who are excluded from the NLRA's protections). Therefore, workers who are not engaged in FLSA agriculture (*e.g.,* those in logging occupations) will not be covered by the provisions of this final rule that are limited to workers or persons engaged in FLSA agriculture. However, the vast majority of such workers are already covered by the NLRA as ''employees'' under 29 U.S.C. 152(3). Nothing in this final rule alters or circumscribes the rights of workers who are already protected by the NLRA to engage in conduct and exercise rights afforded under that law.

**Register**, and revises paragraph (b)(3) to state that the employer will be obligated to pay the updated AEWR immediately upon publication of the new AEWR in the **Federal Register**. If the update falls in the middle of a pay period, the employer may pay the updated AEWR at the end of the following pay period, but the employer must provide retroactive pay for all hours worked during the period in which the AEWR was updated, beginning immediately on the date the Department publishes the notice in the **Federal Register**. This change is intended to help ensure workers are paid at least the updated AEWR, as soon as it is published, for all work they perform, and thereby help to ensure that the employment of H–2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed.

4. Enhanced Transparency for Job Opportunity and Foreign Labor Recruitment

The Department is adopting the proposed changes for new disclosure requirements to enhance transparency in the foreign worker recruitment chain and bolster the Department's capacity to protect vulnerable agricultural workers from exploitation and abuse, as explained more fully below. This final rule includes a new § 655.137, *Disclosure of foreign worker recruitment*, and a new § 655.135(p), *Foreign worker recruitment*, which are similar to the regulations governing disclosure of foreign worker recruitment in the H–2B program. The provisions require an employer and its attorney or agent, as applicable, to provide a copy of all agreements with any agent or recruiter that the employer engages or plans to engage in the recruitment of prospective H–2A workers, regardless of whether the agent or recruiter is located in the United States or abroad. The provisions also require the employer to disclose the identity (*i.e.,* name and, if applicable, identification/registration number) and geographic location of persons and entities hired by or working for the foreign labor recruiter and any of the agents or employees of those persons and entities who will recruit or solicit prospective H–2A workers. As explained more fully below, the Department will gather the additional recruitment chain information when the employer files its H–2A Application and will require the employer to submit a Form ETA–9142A, *Appendix D,* which mirrors the Form ETA–9142B, *Appendix C.* Consistent with current practice in the H–2B program, § 655.137(d) provides for the

Department's public disclosure of the names of the agents and foreign labor recruiters used by employers. These additional disclosures of information about the recruitment chain are necessary for the Department to carry out its enforcement obligations, protect vulnerable agricultural workers and program integrity, and ensure equitable administration of the H–2A program for law abiding employers.

The Department also is adopting, with minor changes, the proposal to require the employer to provide the full name, date of birth, address, telephone number, and email address of all owner(s) of the employer(s), any person or entity who is an operator of the place(s) of employment (including the fixed-site agricultural business that contracts with the H–2ALC), and any person who manages or supervises the H–2A workers and workers in corresponding employment under the H–2A Application. The Department has revised the Form ETA–9142A to require, where applicable, additional information about prior trade or doing business as (DBA) names the employer has used in the most recent 3-year period preceding its filing of the H–2A Application. Sections 655.130 and 655.167 clarify that the employer must continue to update the information required by the above paragraphs until the end of the work contract period, including extensions thereto, and retain this information for a period of 3 years from the date of certification and produce it upon request by the Department. These disclosure requirements will help prevent adverse effects on the working conditions of workers in the United States similarly employed by increasing transparency in the international recruitment chain, aiding the Department in assessing the nature of the job opportunity and the employer's need, enhancing the Department's ability to enforce the prohibition against recruitment-related fees and to pursue remedies from program violators, assisting the Department in identifying potential successors in interest to debarred employers, and better protecting agricultural workers from abuse and exploitation in the United States and abroad.

5. Enhanced Transparency and Protections for Agricultural Workers

a. Disclosure of Minimum Productivity Standards, Applicable Wage Rates, and Overtime Opportunities

In this final rule, the Department adopts the proposal to revise § 655.122(l) to require employers to

disclose any minimum productivity standards they will impose as a condition of job retention, regardless of whether the employer pays on a piece rate or hourly basis. This is intended to help ensure that agricultural workers are fully apprised of the material terms and conditions of employment, including any productivity standards that may serve as a basis for termination for cause. An existing regulatory provision, § 655.122(b), would require that any such minimum productivity standard be bona fide and normal and accepted among non-H–2A employers in the same or comparable occupations and crops. This revision is intended to ensure that workers are aware of productivity standards that are a condition of job retention before accepting the job, and that an employer cannot raise productivity standards mid-contract with the goal of terminating workers.

The Department also adopts revisions at §§ 655.120(a) and 655.122(l), with minor changes responsive to comments, to require employers to offer and advertise on the job order any applicable prevailing piece rate, the highest applicable hourly wage rate, and any other rate the employer intends to pay, and to pay workers the highest of these wage rates, as calculated at the time work is performed. The Department also adopts proposed new provisions, at § 655.122(l)(4) and § 655.210(g)(3) of this final rule, that explicitly require the employer to specify in the job order any applicable overtime premium wage rate(s) for overtime hours worked and the circumstances under which the wage rate(s) for such overtime hours will be paid. These revisions are intended to help ensure that agricultural workers are fully apprised of the material terms and conditions of employment, and to aid the Department in its administration and enforcement of the H–2A program.

b. Enhanced Protections for Workers Through the ES System

The Department adopts revisions to the Wagner-Peyser Act implementing regulations at 20 CFR 653.501 to clarify an employer's obligations in the event of a delayed start date and to make conforming revisions to the H–2A regulations at 20 CFR 655.145 and a new § 655.175 to clarify pre-certification H–2A Application amendments and employer obligations in the event of post-certification changes to the start date. As noted above, the previous regulations require an employer to provide notice to the ES Office holding the job order of delayed start dates and impose obligations on employers that

fail to provide the requisite notice, but do not require employers to notify workers directly of any such delay.

The Department adopts revisions to part 658, subpart F, and related definitions at § 651.10, regarding the discontinuation of Wagner-Peyser Act ES services to employers. The Department clarifies and expands the scope of entities whose ES services can be discontinued to also include agents, farm labor contractors, joint employers, and successors in interest. The Department also adopts revisions to clarify the bases for discontinuation at § 658.501, and to clarify and streamline the discontinuation procedures at §§ 658.502 through 658.504, including the notice requirements for SWAs, evidentiary requirements for employers, when and how employers may request a hearing, and procedures for requesting reinstatement. These changes are designed to increase the reach and utility of the discontinuation of services regulations, which, as discussed in the NPRM, SWAs have infrequently used relative to the number of complaints and apparent violations that SWAs processed in recent years. *See* 88 FR 63761. These changes are described in more detail below.

### c. Enhanced Transportation Safety Requirements

The Department adopts the proposal, with minor modifications, to revise § 655.122(h)(4) to require the provision, maintenance, and wearing of seat belts in most employer-provided transportation, which would reduce the hazards associated with agricultural worker transportation. Specifically, as explained in detail below, the Department revises § 655.122(h)(4) to prohibit an employer from operating any employer-provided transportation unless all passengers and the driver are properly restrained by seat belts meeting standards established by the U.S. Department of Transportation (U.S. DOT), as long as the transportation was manufactured with seat belts pursuant to U.S. DOT's Federal Motor Vehicle Safety Standards (FMVSS). Essentially, if the vehicle is manufactured with seat belts, this final rule would require the employer to retain and maintain those seat belts in good working order and ensure that each worker is wearing a seat belt before the vehicle is operated. In response to public comment, the Department clarifies in this final rule that an employer must not allow any other person, in addition to the employer, to operate employer-provided transportation unless seat belts are provided, maintained, and worn.

### d. Protection Against Passport and Other Immigration Document Withholding

The Department adopts the proposal to create a new § 655.135(o) that will directly prohibit an employer from holding or confiscating a worker's passport, visa, or other immigration or government identification documents. This prohibition is independent of whether the employer is otherwise in compliance with the Victims of Trafficking and Violence Protection Act of 2000 (TVPA), Public Law 106–386 (2000), 18 U.S.C. 1592(a), as required under the current H–2A regulations. This change is intended to better protect workers from potential labor trafficking.

### e. Protections in the Event of a Minor Delay in the Start of Work

The Department adopts the proposal to create a new § 655.175 that addresses post-certification changes currently addressed at § 655.145(b) and creates new obligations and procedures in the event an employer must briefly delay the start of work due to unforeseen circumstances that jeopardize crops or commodities prior to the expiration of an additional recruitment period. Section 655.175 limits minor delays to 14 calendar days or less and requires the employer to notify each worker and the SWA of any minor delay in the start of work. Consistent with § 653.501(c), § 655.175 includes new compensation obligations that require the employer to pay workers the applicable wage rate for each day work is delayed, for a period of up to 14 calendar days, starting with the certified start date, if the employer fails to provide 10 business days' notice of the delay.

### 6. Enhanced Integrity and Enforcement Capabilities

#### a. Enhancements to the Department's Ability To Apply Orders of Debarment Against Successors in Interest

The Department adopts a new § 655.104 regarding successors in interest, revised from the NPRM based on comments received, which clarifies the liability of successors in interest for debarment purposes and streamlines the Department's procedures to deny temporary agricultural labor certifications filed by or on behalf of successors in interest to debarred employers, agents, and attorneys. The Department adopts conforming revisions to §§ 655.103(b), 655.181, and 655.182 and 29 CFR 501.20. These revisions are intended to better reflect the liability of successors in interest under the well-established successorship doctrine, and to better

ensure that debarred entities do not circumvent the effects of debarment.

#### b. Defining the Single Employer Test for Assessing Temporary Need, or for Enforcement of Contractual Obligations

The Department adopts the proposal to define the term *single employer* at a new § 655.103(e) and adopts factors to determine if multiple nominally separate employers are acting as one. Defining the term would codify the Department's long-standing practice of using the single employer test (sometimes referred to as an "integrated employer" test), or similar analysis, to determine if separate employers are a single employer for purposes of assessing seasonal or temporary need, or for enforcement of contractual obligations. In relation to seasonal or temporary need, the Department has received applications for temporary agricultural labor certification that purport to be for job opportunities with different employers when, in reality, the workers hired under these certifications are employed by companies so intertwined that they are operating as a de facto single employer in one area of intended employment (AIE) for a period of need that is not truly temporary or seasonal. In its enforcement experience, the Department has increasingly encountered H–2A employers that purport to employ H–2A workers under one corporate entity and non-H–2A workers under another, creating the appearance that the H–2A employer has no workers in corresponding employment when actually, the corporate entities are so intertwined that all of the workers are employed by a single H–2A employer. Some employers have attempted to use these arrangements to avoid the obligation to provide certain H–2A program requirements to workers in corresponding employment, including the required wage rate. Codifying the definition of single employer will prevent employers from using their corporate structures to circumvent statutory and regulatory requirements.

### *B. Section-by-Section Analyses*

Sections V through VII of the preamble provide the Department's responses to public comments received on the NPRM and rationale for the amendments adopted to 20 CFR parts 651, 653, 658, and 655, and 29 CFR part 501, section by section, and generally follow the outline of the regulations. Within each section of the preamble, the Department has noted and responded to those public comments that are addressed to that particular section of this final rule. If a proposed change is

not addressed in the discussion below, it is because the public comments did not substantively address that specific provision and no changes have been made to the proposed regulatory text. The Department received some comments on the NPRM that were outside the scope of the proposed regulations, and the Department offers no substantive response to such comments. The Department has also made some non-substantive changes to improve readability and conform the document stylistically.

*C. Transition Procedures*

The Department is providing a short transition period for receiving and processing criteria clearance orders and *Applications for Temporary Employment Certification* in order to promote an orderly and seamless implementation of the changes required by this final rule. This transition period will provide the Department with the necessary time to implement changes to Office of Management and Budget (OMB)-approved application forms within the Foreign Labor Application Gateway (FLAG) System and to its standard operating procedures and policies, and to provide training and technical assistance to the Office of Foreign Labor Certification (OFLC), Wage and Hour Division (WHD), State workforce agencies (SWAs), employers, and other stakeholders in order to familiarize them with changes required by this final rule.

The Department's regulations require that an employer submit a completed job order on Form ETA–790/790A (including all required addenda), an *Application for Temporary Employment Certification* on Form ETA–9142A (including all required addenda), and all required supporting documentation with the National Processing Center (NPC), using the electronic method(s) designated by the OFLC Administrator. Except where the employer has received prior approval from the OFLC Administrator to submit by mail as set forth in § 655.130(c)(2) or has been granted a reasonable accommodation as set forth in § 655.130(c)(3), the NPC will return without review any job order or *Application for Temporary Employment Certification* submitted using a method other than the designated electronic method(s).

In order to promote an orderly and seamless transition to this final rule, the NPC will process all H–2A applications submitted on or after 12:00 a.m. Eastern Daylight Time, August 29, 2024, in accordance with 20 CFR part 655, subpart B. in effect as of June 28, 2024.

The NPC will continue to process all H–2A applications submitted before 7:00 p.m. Eastern Daylight Time on or before August 28, 2024, in accordance with 20 CFR part 655, subpart B in effect as of the calendar day before the effective date as stated in this rule. The Department will use the 5 hours between 7:00 p.m. Eastern Daylight Time on August 28, 2024, and 12:00 a.m. Eastern Daylight Time on August 29, 2024, to initiate procedures to deploy and test changes to the FLAG System in order to effectively implement the new changes. No job orders or applications can be filed during this timeframe. All initiated, but unsubmitted, H–2A applications in FLAG as of 7:00 p.m. Eastern Daylight Time on August 28, 2024, will be deleted as of that time.

The Department believes this short transition period will provide employers, or their authorized agents or attorneys, with adequate time to plan and prepare their job orders and *Applications for Temporary Employment Certification* for submission under this final rule and to collect all necessary information that must be filed or retained in support of an H–2A application.

After the transition period, FLAG will not permit an employer to file prior versions of forms.

## V. Discussion of Revisions to Employment Service Regulations

*A. Introduction*

In this final rule, the Department revises the ES regulations (20 CFR parts 651 through 654 and 658) that implement the Wagner-Peyser Act of 1933. These regulations include the provision of ES services with a particular emphasis on MSFWs, as well as provisions governing the discontinuation of ES services to employers. This final rule updates the language and content of the regulations to, among other things, improve and strengthen the regulations governing discontinuation of ES services to employers, including the applicable bases and procedures. In some areas, this final rule establishes entirely new responsibilities and procedures; in other areas, this final rule clarifies and updates pre-existing requirements. The revisions make important changes to the following components of the ES system: definitions, requirements for processing clearance orders, and the discontinuation of ES services provided to employers.

Within the revisions to the ES regulations, the Department is adopting the following modifications to the proposed regulatory amendments in the NPRM as a result of public comments received: (1) revising the new *successor in interest* definition in § 651.10 to omit unnecessary and potentially contradictory language; (2) revising provisions on the discontinuation of services list in new § 653.501(b)(4) to allow employers to submit requests for determinations to the Administrator of ETA's Office of Workforce Investment (OWI); (3) clarifying the requirements in § 653.501(c)(1)(iv)(E) for disclosure of wages on the clearance order; (4) revising the provisions in § 653.501(c) on delays in the start of work to clarify the applicability of the housing requirement to migrant workers, replace the proposed subsistence requirement with a requirement that the employer provide or pay all benefits and expenses listed on the clearance order, and incorporate requirements on method of delivery and language access for notifications to workers; and (5) providing that the SWA must consider whether there is a basis to discontinue services in cases of alleged misrepresentation or noncompliance in connection with a current or prior temporary labor certification, if the circumstances occurred within the previous 3 years. Additionally, the Department is adopting the following modifications to proposed amendments in the NPRM for clarity and consistency: (1) revising the *employment-related laws* definition in § 651.10 to clarify that it includes "rules" and "standards"; (2) relocating language on liability of successors from the new *successor in interest* definition in § 651.10 to § 658.500; (3) making minor conforming changes to the assurances and delayed start requirements in § 653.501(c)(3)(i) and (iv) and § 653.501(c)(5); and (4) incorporating into § 658.501(b) existing obligations on SWAs under part 655, subpart B, and 29 CFR parts 501 and 503 to notify OFLC and WHD in cases of alleged misrepresentation or noncompliance with temporary labor certification requirements.

Note that on November 24, 2023, the Department issued a final rule regarding Wagner-Peyser Act staffing (Staffing Final Rule). 88 FR 82658 (Nov. 24, 2023). In the NPRM to the Staffing Final Rule (Staffing NPRM), 87 FR 23700 (Apr. 20, 2022), the Department proposed changes to several sections in 20 CFR parts 653 and 658 that govern the provision of ES services to MSFWs. As relevant here, in the Staffing NPRM, the Department proposed changes to 20 CFR 653.501(b)(4) and (c)(3) (ES office and SWA requirements for processing clearance orders); § 658.501(a)(4), (b),

and (c) (bases for discontinuation of ES services); § 658.502(a) and (b) (notification requirements for discontinuation of ES services); and § 658.504(a) and (b) (procedures for reinstatement of ES services). 87 FR at 23717, 23722, 23736, 23740–23741.

In the NPRM to this final rule, which the Department published on September 15, 2023, the Department proposed further changes to the above-named provisions. In some instances, these changes conflicted with changes proposed in the Staffing NPRM. Because the Department had not yet issued the Staffing Final Rule when the NPRM to this rule was published, the Department recognized that the proposed changes in this rulemaking might generate questions within the regulated community about how the Department ultimately proposed to revise these provisions, including how the proposed changes in this rulemaking would affect the proposed changes in the Staffing NPRM, and what the Department might do in finalizing the changes proposed in the Staffing NPRM. As discussed in the NPRM to this final rule, where the proposed changes in this rulemaking conflicted or intersected with changes proposed in the Staffing NPRM, the Department is using this rulemaking as the operative proceeding to provide notice and an opportunity to comment on the proposed changes to the provisions referenced above. Accordingly, the Department did not finalize changes to the above referenced provisions in the Staffing Final Rule. The Staffing Final Rule notified the public that changes to the above referenced provisions would be made through this rulemaking. 88 FR at 82708–82709, 82710. The Department has concluded that the proposed changes to these provisions are better suited for this rulemaking because they are meant to strengthen protections for agricultural workers and, therefore, better align with the overall purpose of this rulemaking. Further, the Department has concluded that this is the most transparent approach to address the overlap and is the approach that best minimizes confusion within the regulated community while ensuring the public the full opportunity to receive notice and provide comments on the proposed changes.

*B. 20 CFR Part 651 — General Provisions Governing the Wagner-Peyser Act Employment Service*

Part 651 (§ 651.10) sets forth definitions for parts 652, 653, 654, and 658. In the NPRM, the Department proposed to add or revise the following definitions primarily to clarify aspects

of its discontinuation of Wagner-Peyser Act ES services regulation at 20 CFR part 658, subpart F, including new provisions added in this rulemaking that expand the scope of entities whose services can be discontinued. Where appropriate, as discussed below, the Department has sought to align these new definitions with the same or similar definitions at 20 CFR 655.103. The Department received comments on each of the proposed additions and revisions, and it notes that many commenters did not raise objections to the proposed changes. After carefully considering these comments, the Department adopts most of the additions and revisions as proposed, with exceptions, as discussed in detail below.

1. Agent

The Department proposed to add a definition to § 651.10 for *agent* to establish that an agent is a legal entity or person, such as an association of employers, or an attorney for an association, that is authorized to act on behalf of the employer for purposes of recruitment of workers through the clearance system and is not itself an employer or joint employer, as defined in this section, with respect to a specific job order. The Department has observed that individuals and entities meeting the proposed definition of *agent* often engage the ES clearance system by submitting clearance orders on behalf of *employers,* as defined in part 651, and control many aspects of *employers'* recruitment activities relating to clearance orders. Adding this proposed definition clarifies that *agents* (which include attorneys) are among the entities subject to discontinuation of services as a result of the proposed changes to part 658. Additionally, because an employer's agent for purposes of the ES clearance system is often the same agent that an employer uses for purposes of the H–2A labor certification process, the Department proposed a definition of *agent* at § 651.10 that aligns with the definition of agent in § 655.103.

Farmworker Justice, in comments joined by 40 signatories, including advocacy organizations and legal services providers, supported inclusion of the proposed definition, stating that to the greatest extent feasible, the § 651.10 definition should be consistent with that used in the H–2A regulations at § 655.103(b). Farmworker Justice suggested that the Department clarify that agents who assist in the preparation and submission of criteria clearance orders (clearance orders placed in connection with H–2A applications) on behalf of their principals must obtain

certificates of registration as farm labor contractors under the Migrant and Seasonal Agricultural Worker Protection Act (MSPA). They stated that criteria clearance orders, currently submitted using Form ETA–790/790A, are used to recruit U.S. workers for the positions for which H–2A workers are requested. In such situations, Farmworker Justice said, the agent is being paid by the employer for recruiting MSFWs, thereby falling squarely within the definition of farm labor contractor under MSPA.

Relatedly, Mid-Atlantic Solutions, LLC d/b/a ma´sLabor and AgWorks H2, LLC (ma´sLabor) and McCorkle Nurseries, Inc. suggested that the Department remove the reference to recruitment from the definition to avoid potential implications under the MSPA. Ma´sLabor stated that the qualifier, for purposes of recruitment of workers through the clearance system, was likely intended to refer to the employer's purposes in placing the job order, rather than the agent's—*i.e.,* the employer is placing a job order for purposes of recruitment and the agent is acting on the employer's behalf in the placement of the job order)—and that such language may inadvertently imply that an agent acting on behalf of an employer for the submission of a job order is itself, as the agent, engaged in the recruitment or solicitation or both of U.S. farmworkers. Ma´sLabor stated that because the Department considers recruitment and solicitation activities to be farm labor contracting activities under MSPA, an interpretation to this effect would mean that agents using the ES, in all cases, would be obligated to obtain a Farm Labor Contractor Certificate of Registration under MSPA.

Ma´sLabor further stated that not all agents are engaged in activities that would traditionally be construed as recruitment or solicitation of workers. Some agents play no representative role throughout the recruitment process, and they instead engage purely in document preparation services by recording the employer's intent on the relevant government forms. Others offer services in both document preparation and written or verbal communication with the applicable government agencies for processing purposes but stop short of any direct assistance with recruitment. Others, like ma´sLabor, offer comprehensive services wherein the agent is also authorized to conduct interviews with potential applicants and document hiring dispositions. Ma´sLabor stated that only the latter (*i.e.,* comprehensive) service can be construed as recruitment or solicitation or both and therefore only agents offering this range of services ought to

be carefully considered within MSPA's jurisdiction. Ma´sLabor suggested that the Department revise the proposed definition to state that an agent is a legal person or entity that is authorized to act on behalf of the employer for any purpose related to the employer's use of the clearance system, and is not itself an employer or joint employer, as defined in this section, with respect to a specific job order. Additionally, ma´sLabor suggested modifying the definition to more clearly delineate between recruitment conducted by an employer and recruitment conducted by the agent or attorney directly, by defining agent to mean a legal person or entity authorized to act on behalf of the employer for purposes of the employer's recruitment of workers. Ma´sLabor emphasized recruitment by "the employer" as distinct from recruitment by the agent, arguing the ES definition of agent should not imply that agents acting as recruiters on behalf of employers in the submission of job orders are acting as recruiters for MSPA purposes, and therefore subject to MSPA requirements, in all cases.

An agent and a law firm, USA Farm Labor, Inc. (USAFL) and the Hall Law Office, PLLC (Hall Global) (together, USAFL and Hall Global), agreed with ma´sLabor and further stated the proposed definition conflates the role of attorney and agent. They stated that an agent in the context of the H–2A Program refers to a company that provides specialized services focused on preparing, managing, and filing H–2A-related paperwork. While attorneys can be said to be agents because they are hired by a principal to act on the principal's behalf, attorney conduct is normally regulated by the highest court in various jurisdictions, and regulatory concerns with respect to agents and attorneys are different. The primary issue for attorneys is protecting the sanctity of the attorney-client relationship as well as the distinction between lawyer and client. Clients are entitled to zealous representation within the bounds of the law, which includes making arguments seeking the modification or reversal of existing law. By conflating attorney with agent, the commenters argued, the Department creates ambiguity as to whether it intends to respect, as required by law, 5 U.S.C. 500, that nothing in this definition nor elsewhere in the regulations supplants an attorney's duties under State law or their ability to zealously represent their client within the bounds of the law.

The Department acknowledges commenters' suggestions and concerns regarding potential MSPA implications raised by the proposed *agent* definition. The Department notes that the definitions set forth in § 651.10 govern the Wagner-Peyser ES and do not govern any obligations under the MSPA. Whether an agent meets the definition of a farm labor contractor under the MSPA is a fact-specific inquiry governed by the MSPA and its implementing regulations.

Relatedly, regarding opposition from ma´sLabor, McCorkle Nurseries, Inc., and USAFL and Hall Global regarding use of the word recruitment in the proposed agent definition, the Department declines to remove it. The Department acknowledges commenters' concerns but reiterates that these definitions are specific to 20 CFR part 651 and do not confer any obligations under MSPA. As discussed in the NPRM, the proposed definition of *agent* is meant to encompass those entities that act on behalf of employers that utilize the ES clearance system, including, for example, by controlling aspects of employers' recruitment activities relating to clearance orders. The inquiry of whether an entity is engaged in activities that bring them within the definition of farm labor contractor under the MSPA is fact-specific and must be addressed on a case-by-case basis under that law and its implementing regulations.

Finally, the Department disagrees with USAFL and Hall Global's concern that the proposed definition conflates the roles of attorneys and agents and may impede on an attorney's duty to provide zealous representation to their clients. An attorney who engages the ES system on behalf of an employer must do so in conformance with the requirements of the ES regulations and must advise their employer-client to use the ES system in conformance with the regulations. Zealous representation within the bounds of law is a fundamental component of the attorney-client relationship, which the Department presumes includes advising clients on compliance with all applicable laws and regulations. By including agents here, the Department does not intend to hold agents, including attorneys, accountable for the acts of the employers they represent. Rather, the inclusion of the definition of agent, and the inclusion of attorneys in that definition, recognizes that attorneys can and do serve as agents in interactions with the ES system, and is meant to hold them accountable for compliance and their own misconduct that meets the bases described at § 658.501, independent of any violation by the employers they represent (87 FR 61660, 61662 (Nov. 14, 2022)). The Department reiterates that agents who engage the ES clearance system should be subject to discontinuation, if appropriate, and that inclusion of attorneys is necessary to align the definition of agent here with the definition of agent in § 655.103. For these reasons and the reasons set forth in the NPRM, the Department adopts the definition for *agent,* as proposed.

2. Criteria and Non-Criteria Clearance Orders

The Department proposed to add definitions to § 651.10 for *criteria clearance order* and *non-criteria clearance order* because they are terms that are used in the ES regulations but were previously undefined. The Department proposed that the term *criteria clearance order* means a clearance order that is attached to an application for foreign temporary agricultural workers pursuant to part 655, subpart B, of this chapter; and the term *non-criteria clearance order* means a clearance order that is not attached to an application for foreign temporary agricultural workers pursuant to part 655, subpart B, of this chapter. By defining these terms, it will be clearer which orders must comply with both the requirements at part 653, subpart F, and part 655, subpart B, and which orders do not have to comply with the requirements at part 655, subpart B.

The Department received a comment from Farmworker Justice in support of the proposed definitions. Farmworker Justice agreed that clarification is needed regarding which provisions in part 653, subpart F, and part 655, subpart B, apply to the various agricultural clearance orders filed with the Department and with the SWAs. They suggested that the Department use this rulemaking to further clarify and unequivocally state that the normal and accepted standard articulated in § 655.122(b) applies only to job qualifications in criteria clearance orders, and that all other working conditions be assessed under prevailing practices as articulated in § 653.501(c)(2)(i). Farmworker Justice stated that U.S. workers have seen their working conditions consistently eroded in recent years because SWAs have evaluated the working conditions set out in criteria clearance orders under the normal and accepted standard in § 655.122(b) rather than the more rigorous prevailing practice standard required under § 653.501(c)(2)(i). Additionally, ma´sLabor stated that it had no substantive objections to the proposed definitions.

The Department appreciates these comments. The Department believes the

definition for *criteria clearance order* makes clear that such orders must comply with the requirements at part 655, subpart B (which in § 655.121 include the requirements at part 653, subpart F and at § 655.122). Moreover, the definition for *non-criteria clearance order* makes clear that such orders do not have to comply with the requirements at part 655, subpart B. The Department believes these definitions sufficiently distinguish between criteria and non-criteria clearance orders. For these reasons and the reasons set forth in the NPRM, the Department adopts the definitions, as proposed.

As to the request for clarification regarding application of the normal and accepted standard in § 655.122(b) and the prevailing practices standard in § 653.501(c)(2)(i) to criteria clearance orders, this request is beyond the scope of these changes, which are merely to adopt definitions for terms currently in use in the ES regulations, found at parts 651, 652, 653, 654, and 658. For information on the normal and accepted standard and the prevailing practices standard as they apply to criteria clearance orders, see, for example, §§ 655.103 and 655.122, the discussion of § 655.122(l)(3) below, and *Segura Portugal* v. *Louisiana Workforce Commission*, OALJ No. 2022–WPA– 00001 (OALJ Dec. 5, 2023) (holding that work rules in employer's criteria clearance order were not included within the meaning of prevailing working conditions under § 653.501(c)(2)(i)); see also ETA Handbook 398 (53 FR 22076, 22095– 22097 (June 13, 1988)).

### 3. Discontinuation of Services

The Department proposed to add to § 651.10 a definition for *discontinuation of services* because it is referenced throughout the ES regulations and is the subject of part 658, subpart F, but was previously undefined. Under the proposed *discontinuation of services* definition, the scope of services to which discontinuation applies includes any Wagner-Peyser Act ES service provided by the ES to employers pursuant to parts 652 and 653, and the scope of individuals and entities to whom discontinuation applies includes *employers,* as defined in part 651, and *agents, farm labor contractors, joint employers,* and *successors in interest,* as proposed to be defined in part 651.

The Department received supportive and opposing comments to the proposed definition. Farmworker Justice supported the proposed definition, stating that it would provide clarity to both SWAs and employers regarding which services are discontinued, and

which entities may be subject to the discontinuation of services described in 658, subpart F. Specifically, Farmworker Justice stated that the definition is broad in scope, which is crucial for SWAs to take meaningful enforcement action against entities that act or have acted on behalf of problem employers, or are simply a reconstitution of a prior bad actor under a new name. Farmworker Justice also stated that the proposed definition would clarify that discontinuation of services impacts all ES services in parts 652 and 653, including ES services in another State, thereby preventing bad actors from continuing to receive services, absent reinstatement, elsewhere or for non-criteria orders. Farmworker Justice recommended that the Department consider adding language to the definition to clarify that SWAs cannot process H–2A applications for employers whose services are discontinued.

Ma´sLabor stated they had no substantive objection to the proposed definition of discontinuation of services. However, USAFL and Hall Global stated that discontinuation of services should only apply to services not necessary for participation in the H–2A program. Wafla, an agricultural employer membership organization, expressed concerns that the proposed definition would include entities other than the employer. The organization contended that attorneys, agents, associations, joint employers, farm labor contractors, and any other entity that is not the principal employer to H–2A workers and that was not involved with a potential rule violation should not be subject to discontinuation of services. Wafla was also concerned that discontinuation of services to an agent would negatively affect the agent's other employer-clients, stating that if a SWA or DOL finds a problem with an agent, all of that agent's H–2 clients may be debarred from the program. Separately, the National Cotton Ginners Association and Texas Cotton Ginners' Association commented that though an employer may use an agent for recruitment services with the contracted stipulations that the agent/recruiter must follow all applicable labor rules, the employer has no ability to verify actions taken by these agents. They stated that the proposed rule allows SWAs to discontinue services to an employer due to potential violations that may be outside of the employer's control.

The Department agrees that broadening the scope of entities subject to discontinuation is crucial to ensuring meaningful application of the discontinuation of services provisions at

part 658, subpart F. However, the Department clarifies that the proposed changes are meant to hold agents, farm labor contractors, joint employers, and successors in interest accountable for their own compliance with ES regulations. They are not meant to hold entities such as agents, attorneys, or farm labor contractors accountable for the independent actions of the employers they represent. SWAs should not initiate a discontinuation action against an entity that has not met one or more of the bases for discontinuation under § 658.501(a). For example, if an employer is subject to discontinuation of services because it refused to cooperate in field checks conducted pursuant to § 653.503, as described at § 658.501(a)(7), but the employer's agent was not involved in the refusal, the SWA may not initiate or apply discontinuation of services to the agent. Conversely, if an agent is subject to discontinuation of services because it was found by a final determination by an appropriate enforcement agency to have violated an employment-related law and notification of this final determination has been provided to the Department or the SWA by that enforcement agency, as described at § 658.501(a)(4), but the enforcement agency did not also find that the employer engaged in violations, then the SWA would not have a basis to discontinue services to the employer under § 658.501(a)(4). However, it is possible that there may be cases where it is appropriate and necessary to discontinue services to an employer and its agent. For example, if an agent and employer both knowingly misrepresent the number of workers needed for a clearance order or both knowingly cause workers to work at locations or to complete duties that are not described on the approved clearance order, it would be appropriate to initiate discontinuation against the employer as well as the agent. The proposed definition allows SWAs to take appropriate action against noncompliant entities while allowing those entities who are not responsible for the action or behavior giving rise to the discontinuation action to continue receiving ES services; and the ability of the SWAs to pursue discontinuation against multiple types of entities aligns with the scope of entities subject to the debarment procedures in part 655, subpart B. The Department also notes that there may be cases where it is appropriate and necessary to discontinue services to more than one entity regarding the same or similar violation (for example, to the employer,

agent, farm labor contractor, joint employer, or successor in interest). Finally, the Department notes that a SWA's initiation of the discontinuation procedures against entities such as agents/attorneys would not necessarily impact the processing and clearance of an employer's pending job order, as in most cases the SWA will continue to provide services until the discontinuation action becomes final, including the disposition of any appeals filed by such agents/attorneys.

As to the commenter recommendation that discontinuation of services should only apply to services not necessary for participation in the H–2A program, the Department disagrees. Discontinuation has historically applied to ES services available under part 653, which includes access to the ARS. Prospective H–2A employers must use the ARS to recruit U.S. workers as a condition of receiving a temporary agricultural labor certification, and the H–2A regulations provide that employers and entities who file applications for temporary agricultural labor certification under 20 CFR part 655, subpart B must comply with the ARS requirements at part 653, subpart F. *See, e.g.,* § 655.121 and §§ 655.131–132. The Department, therefore, declines to adopt the recommendation.

Relatedly, the Department has considered the recommendation to add clarifying language that SWAs cannot process H–2A applications for employers with discontinued services. The Department declines to do so because it believes that the definition already includes effective language explaining that entities with discontinued services cannot participate in or receive any Wagner-Peyser Act ES services provided by the ES to employers pursuant to parts 652 and 653. Therefore, SWAs must reject both criteria and non-criteria job orders submitted by employers with discontinued services for either local recruitment or intrastate clearance, which would therefore preclude such employers from participating in the H–2A program.

The Department believes that the proposed changes will allow SWAs to better protect workers and that the regulations are sufficiently clear that discontinuation of services must only be applied to entities that meet the bases described at part 658, subpart F. Therefore, the Department adopts the definition for *discontinuation of services,* as proposed.

### 4. Employment-Related Laws

The Department proposed to revise the definition of *employment-related*

*laws* to clarify that the term means those laws and implementing regulations that relate to the employment relationship, such as those enforced by the Department's WHD, Occupational Safety and Health Administration (OSHA), or by other Federal, State, or local agencies. The pre-existing definition of this term did not include implementing regulations. Revising the definition clarifies its meaning and scope for ES staff who observe or process complaints relating to violations of employment-related laws, such as outreach workers, complaint system representatives, and those who conduct field checks.

The Department received supportive comments from the Washington State Employment Security Department and Washington State Department of Labor and Industries (Washington State) and Farmworker Justice. Washington State agreed that the new definition clarifies the meaning and scope of employment-related laws for SWA staff. Farmworker Justice stated that the proposed revision would help ES staff and characterized it as a common-sense clarification, not an actual change, to the scope of violations that require ES staff to proceed with discontinuation. Farmworker Justice further stated that a broad reading of the laws covered and agencies involved is necessary to accomplish meaningful enforcement, and that farmworker protections would be gutted if the associated implementing regulations were not also enforced.

Ma´sLabor stated it had no substantive objection to the proposed definition of employment-related laws. USAFL and Hall Global stated that the Department should clarify that employment-related laws apply only when their jurisdictional requirements and any other substantive limitations prescribed by statute or common law have been met. They also stated that the Department should clarify that the agency with primary jurisdiction over the relevant laws and implementing regulations retains primary jurisdiction. They expressed concern that SWAs might misinterpret laws or implementing regulations and sought clarification that the agency with jurisdiction over the implementing regulations would be the authority on how to apply those regulations, not the SWA.

The Department appreciates the comments and agrees that the proposed definition provides needed clarity for SWAs and meaningfully improves worker protections. The Department notes that while SWAs may assess an entity's compliance with employment-related laws in carrying out its

obligations under the ES regulations, for example by reviewing clearance orders to ensure their terms and conditions comply with employment-related laws, or by observing and referring apparent violations of employment-related laws to an appropriate enforcement agency, SWAs are not enforcement agents for employment-related laws (unless otherwise authorized). *See* 81 FR 56072, 56282 (Aug. 19, 2016). If the employment-related law at issue is not clear or otherwise does not allow the SWA to determine if there is a violation of the law, the SWA must consult with the relevant enforcement agency to ensure a consistent interpretation. The Department, therefore, agrees that the agency with jurisdiction over the applicable laws and implementing regulations would retain jurisdiction and be the final authority on how to apply those regulations, not the SWA. Regarding commenter concern that SWAs might misinterpret laws or implementing regulations, the Department notes that the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, at 2 CFR 200.303(a) and (b), broadly require SWAs to comply with Federal statutes, regulations, and the terms and conditions of their Federal award, and require that each SWA establish and maintain effective internal controls over its ES program, including controls that provide reasonable assurance that the SWA is managing the ES program in compliance with Federal statutes, regulations, and the terms and conditions of the applicable Federal award. Therefore, SWAs must have internal controls (for example policies and procedures) to ensure that their assessments and determinations regarding an entity's compliance with employment-related laws are correct, and if not the Department can take corrective action. For these reasons, the Department finalizes the definition of *employment-related laws* with the two changes discussed below.

Finally, to provide increased clarity, the Department is including in the final definition the terms "rules" and "standards" to make clear that employment-related laws include not only "regulations," but also any other administrative requirement carrying the force of law, that relates to the employment relationship. For example, the Occupational Safety and Health Act of 1970 authorizes OSHA to promulgate occupational safety and health standards pursuant to the requirements of sec. 6 of the Act, 29 U.S.C. 655. These standards, which relate to the

employment relationship and are enforced by OSHA, are properly within the scope of employment-related laws. The Department is including this additional language in the definition to minimize any risk of confusion that could be caused by the use of "regulations" alone and to clarify rather than expand the scope of this definition.

## 5. Farm Labor Contractor

The Department proposed to add to § 651.10 a definition for *farm labor contractor* as any person or entity, excluding agricultural employers, agricultural associations, or employees of agricultural employers or agricultural associations, who, for any money or other valuable consideration paid or promised to be paid, recruits, solicits, hires, employs, furnishes, or transports any MSFW. The Department proposed to add this definition because the term is used throughout the ES regulations, most notably in part 653, subpart F, which recognizes that farm labor contractors use the ES clearance system, but it has never been defined. Adding this proposed definition also clarifies the entities subject to discontinuation of services as a result of the proposed changes to part 658, subpart F. As with the term *agent,* because many farm labor contractors that use the ES clearance system also seek temporary agricultural labor certifications from OFLC as H–2ALCs under part 655, subpart B, the Department proposed a definition of *farm labor contractor* that both aligns with the definition of *H–2A labor contractor* at 20 CFR 655.103 and with the definitions under MSPA of *farm labor contractor* and *farm labor contracting activity* at 29 U.S.C. 1802 and 29 CFR 500.20 to maintain consistency between Departmental program areas.

Ma´sLabor stated that it had no substantive objections to the proposed definition. Farmworker Justice expressed concern that because the proposed definition is drawn from the definitions of *farm labor contractor* and *farm labor contracting activity* under MSPA, and MSPA does not include H–2A workers in its definition for *MSFWs* at 29 U.S.C. 1802(7), ES staff may mistakenly assume that H–2A workers would be excluded from the NPRM's definition of farm labor contractor due to its reference to MSFWs. Farmworker Justice stated that this is problematic because farm labor contractors who employ or furnish exclusively H–2A workers should also be subject to discontinuation under part 658 in appropriate circumstances. Farmworker Justice suggested that the Department clarify that the *MSFW* definition at

§ 651.10, which does not specifically exclude H–2A workers, is the applicable reference in the new *farm labor contractor* definition. Farmworker Justice stated that this would be consistent with longstanding Departmental interpretation that has included foreign workers legally authorized to work in the United States in the Wagner-Peyser Act definition of migrant farmworkers.

The Department clarifies that the reference to MSFWs in its proposed definition means *MSFW* as defined in § 651.10, and that definition does not exclude H–2A workers. Under § 651.10, the term *farmworker,* as it appears in the term *MSFW* (migrant or seasonal farmworker), means an individual employed in *farmwork;* and under § 651.10, the term *farmwork* is defined to also include any service or activity covered under the definition of *agricultural labor or services* at § 655.103(c). The Department notes that it added the terms *farmwork* and *farmworker* to § 651.10 in 2016 to align them with OFLC and WHD definitions and to clarify and expand the types of work covered. *See* 80 FR 20690, 20800 (Apr. 16, 2015). The term *farmworker at § 651.10* replaced the prior term *agricultural worker,* which the Department defined in 1980 to include certain farmworkers, whether citizens or not, who were legally allowed to work in the United States. *See* 45 FR 39454, 39457 (June 10, 1980). The Department did not include this work authorization language in its 2016 *farmworker* definition—not to make any substantive change—but to align the definition with other programs, and because it determined it unnecessary to mention immigration status for only a subset of programs. *See* 81 FR 56072, 56256 (Aug. 19, 2016). Accordingly, given the Department's longstanding interpretation, the term *MSFW* under § 651.10 does not exclude H–2A workers, and the proposed *farm labor contractor* definition here encompasses those contractors who interact with the ES clearance system for purposes of the H–2A program. The Department further notes that even where farm labor contractors only employ or furnish H–2A workers, they must first engage the ARS for recruitment of U.S. workers as a condition of receiving a temporary agricultural labor certification. Because entities who engage the ES system for temporary agricultural labor certification purposes are subject to ARS requirements (*see* § 655.121), the Department believes they should be subject to discontinuation of ES services (including the ARS), if applicable. For

these reasons, the Department adopts the definition for *farm labor contractor,* as proposed.

## 6. Joint Employer

The Department recognizes that joint employment relationships are common in agriculture, and that joint employers who submit clearance orders to the ARS are required to comply with the requirements in part 653, subpart F, including when filing a joint application for temporary agricultural labor certification under 20 CFR part 655, subpart B. *See* § 655.131. The Department, therefore, proposed to add a definition for *joint employer* to § 651.10 to clarify how the concept will be applied in the ES system and to clarify the entities subject to discontinuation of services as a result of the proposed changes to part 658, subpart F. The proposed definition is also intended to ensure consistency with recent changes to the Department's H–2A regulation, *see* 87 FR at 61793– 61794, and as with the definitions of *agent* and *farm labor contractor,* the proposed definition is modeled on the definition of joint employment at § 655.103 because of the connection between the ES system and H–2A labor certification program.

Farmworker Justice supported inclusion of the joint employer definition, stating that the proposed definition makes clear that, when a fixed-site employer or H–2ALC unlawfully permits another, non-petitioning employer not listed on the clearance order to employ an H–2A worker, or otherwise permits an H–2A worker to provide services to such a non-petitioning employer, both the petitioning employer and the non-petitioning employer jointly employ the worker. Ma´sLabor also stated that it had no substantive objections to the proposed definition.

The Department appreciates commenter support and adopts the definition for *joint employer,* as proposed.

## 7. Successor in Interest

The Department proposed to add to § 651.10 a definition for *successor in interest* that describes the inexhaustive factors that SWAs should use to determine if an entity is a successor in interest to another entity, and described successors in interest as any entity that is controlling and carrying on the business of a previous employer, agent, or farm labor contractor, regardless of whether such successor in interest has succeeded to all the rights and liabilities of the predecessor entity. The proposed definition allows SWAs and

stakeholders to better understand which entities may be subject to discontinuation as a result of the proposed changes to part 658, subpart F. To maintain consistency between the regulations governing the ES system and the regulations governing the H–2A labor certification program, the Department proposed to adapt the definition of successor in interest as proposed in § 655.104.

Washington State supported the proposed definition, stating that it will better position the SWA to identify such entities and determine if an entity so identified is subject to prior debarment orders when evaluating criteria clearance orders (Form ETA–790/790A). Farmworker Justice also agreed with inclusion of the definition and suggested that the Department devote resources to training SWAs on how to analyze the successor in interest factors to ensure that employers who have had services discontinued are not evading sanction with a simple rebrand. The Farm Labor Organizing Committee of the AFL–CIO (FLOC) endorsed the definition, stating that the proposed changes in § 651.10 and § 655.104 clarify the consequences to H–2A employers and labor contractors who try to avoid their responsibilities for violations of the law by transferring their operations to a new person or entity (usually an associate or family member), while all the time retaining control. In instances where farm labor contractors propose to furnish H–2A labor to farms as a replacement for farm labor contractors that have since been sanctioned or debarred or both, FLOC suggested that there be a presumption that the new farm labor contractor is a successor in interest of the discontinued predecessor; and the prospective new farm labor contractor should be required to prove that they are simply using the equipment and machinery of the previous labor contractor.

Ma´sLabor, McCorkle Nurseries, Inc., and an individual asked that the Department reconsider the scope of the definition, particularly the language that allows for construing entities as successors in interest regardless of whether they have succeeded to all the rights and liabilities of the predecessor entity. Ma´sLabor further explained that this language may prove problematic as it relates to asset purchase arrangements. Specifically, because an acquiring entity may be construed as a successor in interest regardless of whether it has succeeded to the rights and liabilities of the predecessor, and because the factors used to determine successorship include factors relating to the physical assets or core operations of

the business itself (for example, use of the same facilities, similarity in machinery, equipment, and production methods, and similarity of products and services), ma´sLabor stated that the proposed definition opens the door for asset purchases alone to trigger successor in interest obligations and liability. Ma´sLabor provided an example, where Farm A is debarred from the H–2A program and subsequently sells its farming property and all the fixtures, buildings, and equipment on its premises to Farm B. Ma´sLabor said it is conceivable that Farm B will be considered a successor in interest to Farm A simply by virtue of taking over the farming operation at the acquired property, and that this would be the case even if Farm B is a model employer that had nothing to do with Farm A's violations. Ma´sLabor stated this possibility would discourage potential acquisitions by good, compliant employers.

The Department appreciates commenter support for the *successor in interest* definition. The Department agrees that the new definition will help SWAs identify entities that reincorporate themselves into another entity with the same interests or operations so as to avoid discontinuation of ES services. Additionally, the Department agrees with providing SWAs training on how to analyze the successor in interest factors so as to avoid a scenario where the sale of property, fixtures, and equipment alone triggers joint employment concerns. The Department will issue further guidance on application of the new *successor in interest* definition. The Department declines to adopt any presumption that a new farm labor contractor or entity is a successor in interest of a discontinued predecessor. Successor in interest inquiries are factor driven and case specific, and the Department believes that the factors outlined in the new definition are sufficient to guide the inquiry. The discussion of the parallel provisions on successors in interest at § 655.104 further address commenters' concerns and provides additional explanation of the Department's reasons for adopting these factors, as well as the language on successor liability addressed below.

The Department has decided to relocate some of the proposed language in the definition describing the scope of liability of successors in interest for ES violations of predecessor entities, from § 651.10 to § 658.500. Relocating this language places the focus of the definition squarely on the factors that SWAs will consider in order to

determine whether an entity constitutes a successor in interest. The Department believes that the language on the liability of successors is more appropriate to include in part 658, subpart F, which similarly describes the situations in which entities are subject to discontinuation actions by SWAs. The discussion of § 658.500 below addresses the comments received on this language, as well as the Department's decision not to finalize the proposed introductory language of the *successor in interest* definition ("A successor in interest includes any entity that is controlling and carrying on the business of a previous employer, agent, or farm labor contractor . . ."). The Department adopts the remaining language in the *successor in interest* definition, as proposed.

### 8. Week

The Department proposed to add to § 651.10 a definition for *week* to clarify that a week, as used in parts 652, 653, 654, and 658, means 7 consecutive calendar days. The proposed definition allows for SWAs and employers to calculate time periods used in the ES regulations uniformly, including for wage calculations and other time-related procedures.

Ma´sLabor commented that they had no substantive objections to the proposed definition. The Department did not receive any other comments on this proposed change.

The Department appreciates the comment indicating that the H–2A employer agent organization did not object to the proposed definition. The Department adopts the definition of *week*, as proposed.

### C. 20 CFR Part 653—Services of the Wagner-Peyser Act Employment Service System

Part 653 sets forth the principal regulations of the ES concerning the provision of services for MSFWs consistent with the requirement that all services of the workforce development system be available to all job seekers in an equitable fashion and in a way "that meets their unique needs." 20 CFR 653.100(a). Part 653 also describes requirements for participation in the ARS. Subpart F provides the requirements that SWAs and employers must follow when employers seek access to the ARS by submitting clearance orders for temporary or seasonal farmwork. Section 653.501 provides the responsibilities of ES Offices and SWAs when they review clearance orders submitted by employers, and the process by which

they place approved clearance orders into intra- and interstate clearance.

## 1. Section 653.501(b), ES Office Responsibilities

The Department proposed to add a fourth paragraph to § 653.501(b), at § 653.501(b)(4), which would require ES staff to consult the OFLC and WHD H–2A and H–2B debarment lists, and an OWI discontinuation of services list, before placing a job order into intrastate or interstate clearance. The Department further proposed a new paragraph (b)(4)(i), which states that SWAs must initiate discontinuation of ES services if the employer seeking placement of a clearance order is on a debarment list, and new paragraph (b)(4)(ii), which states that SWAs must not approve clearance orders from employers whose ES services have been discontinued by any State. Finally, the Department proposed a new paragraph (b)(4)(iii) to make clear that the provisions in paragraph (b)(4) apply to all entities subject to discontinuation under part 658, subpart F, and not just to *employers* as defined in § 651.10. The Department's response to public comments received on § 653.501(b) is set forth below. For the reasons discussed in the NPRM and below, the Department adopts § 653.501(b), with edits.

Several organizations, including United Farm Workers (UFW) (joined by 59 signatories, including advocacy organizations and legal services providers), the UFW Foundation and UFW (hereinafter, the UFW Foundation), the North Carolina Justice Center, United Migrant Opportunity Service (UMOS), Pineros y Campesinos Unidos del Noroeste (PCUN), Central Coast Alliance United for a Sustainable Economy (CAUSE), and Green America expressed uniform support for requiring initiation of discontinuation procedures where an employer is on an H–2A or H–2B debarment list and for prohibiting clearance orders from employers who have been discontinued in another State. In contrast, several trade associations, including the Western Growers Trade Association, wafla, AmericanHort, Michigan Farm Bureau, Florida Strawberry Growers Association (FSGA), National Council of Farmer Cooperatives (NCFC), and the U.S. Apple Association (USApple), along with Willoway Plant Nursery, opposed or expressed concerns regarding the proposed changes, stating that they do not provide sufficient safeguards or an appeal process, particularly where a SWA mistakes one employer for another when consulting the debarment and discontinuation lists. These commenters

cautioned that even minor delays in processing a clearance order could result in irreparable harm to an employer, such as diminished crop yield and monetary loss. In circumstances where a SWA does not process a clearance order for an employer because that employer has the same or similar business name as another employer on the debarment or discontinuation lists, commenters stated that the Department must have safeguards in place for employers to demonstrate that they are not, in fact, the employer named on the lists.

Relatedly, Washington State requested that the Department ensure that the debarment and discontinuation lists are accurate, updated, and easily accessible. Washington State suggested that OFLC add an eligibility checker tool to its Foreign Labor Application Gateway system where employer names are searchable, the debarment and discontinuation lists are updated automatically, and the system alerts SWAs if employers are potentially ineligible due to debarment. They further suggested that the Department create a standard letter notifying applicants of the impact of debarment and making clear that SWAs are bound to deny clearance orders on this basis.

Finally, wafla opposed proposed new paragraph (b)(4)(iii), which clarifies that proposed § 653.501(b) applies to all entities subject to discontinuation, including agents, farm labor contractors, joint employers, and successors in interest as adopted in § 651.10 and § 658.500(b), and not just employers. Wafla stated that only principals should be subject to discontinuation, that moving beyond the employer-employee relationship penalizes third parties that may have had no fault in causing discontinuation, and that unrelated clients of third parties may unjustifiably experience the effects of discontinuation as a result.

The Department appreciates the views and recommendations of commenters that supported, opposed, and raised concerns with the proposed changes to § 653.501(b). Regarding commenter requests for adequate safeguards to ensure against SWAs mistaking one employer for another when consulting the debarment and discontinuation lists, the Department will issue guidance on SWA consultation of the lists, including guidance on identifying employers/ entities and *successors in interest* to employers/entities who are on the lists. Regarding the due process concerns raised by commenters, as discussed below, the Department believes that the clearance order review processes at § 653.501 and § 655.121, the

discontinuation of services procedures at part 658, subpart F, and the procedures for filing a complaint at part 658, subpart E, provide adequate process and safeguard against unwarranted or harmful delays in processing clearance orders.

First, under proposed paragraph (b)(4)(i), a SWA must initiate discontinuation of services pursuant to § 658.501(a)(4) if an employer seeking placement of a clearance order in the ARS is on the H–2A or H–2B debarment list. The employer may contest the SWA's notification of intent to discontinue services in accordance with proposed § 658.502(a)(4). In the specific circumstance raised by some commenters (*e.g.,* Michigan Farm Bureau, FSGA, AmericanHort), where an employer with the same or similar name incorrectly appears on a debarment list, the employer may contest the proposed discontinuation by submitting evidence that they are not, in fact, the employer listed on the applicable debarment list. During this time, the SWA must continue to process the employer's clearance orders, without delay, as no final determination on discontinuation has yet been issued and taken effect. Where the SWA ultimately issues a final determination to discontinue services under proposed § 658.503(a), if an employer appeals by timely requesting a hearing, the request stays the discontinuation pending the outcome of the hearing. The SWA must continue to process the employer's clearance orders, without delay, while the matter is on appeal.

Second, under paragraph (b)(4)(ii), SWAs must not approve clearance orders from employers whose ES services have been discontinued by any State. In the specific circumstance raised by commenters, where an employer believes they have been incorrectly identified as having been placed on the discontinuation of services list, the employer and the SWA may resolve any such discrepancy in the clearance order review processes described in § 655.121 (for criteria clearance orders) and § 653.501 (for non-criteria clearance orders). For criteria clearance orders, that process includes initial review, a deficiency notice, where applicable, an opportunity for an employer to respond, a final determination from the SWA, and allowance for employers to file an emergency Application for Temporary Employment Certification where they disagree with the SWA's final determination (*see* §§ 655.160, 655.164, and 655.171). For non-criteria clearance orders, under § 653.501, SWAs must review and approve clearance orders

within 10 business days of receipt of the order. Within that timeframe, SWAs should attempt to resolve any discrepancy regarding an employer's placement on the discontinuation of services list. For example, where Employer A Corp. files a non-criteria clearance order and a similarly named employer (*e.g.,* Employer A. Inc.) is on the discontinuation of services list, the SWA should review and consider relevant information, such as Federal Employer Identification Numbers (FEINs), Employer A, Inc.'s final determination on discontinuation, or any information provided by Employer A. Corp. indicating that they are not the named employer on the list, prior to approving or denying the clearance order. Where the SWA denies a non-criteria clearance order under § 653.501 because the employer is named on the discontinuation of services list, the employer may timely appeal the discontinuation or seek reinstatement of services under § 658.504. As discussed above, the Department will issue guidance on use of the discontinuation of services list when processing clearance orders.

The OWI discontinuation of services list will be publicly available online and regularly updated with information from States so employers can check the list before they submit their clearance order. In addition, the Department will further revise § 653.501(b)(4)(ii) to specify that employers may submit requests to the OWI Administrator to determine whether they are on the OWI discontinuation of services list. If the OWI Administrator indicates that the employer is not on the discontinuation of services list, then the SWA must approve the clearance order if all other requirements have been met.

Finally, as to consultation of either the debarment lists under proposed paragraph (b)(4)(i) or the discontinuation list under proposed paragraph (b)(4)(ii), the Department notes that where an employer believes a SWA has violated proposed paragraph (b)(4) when consulting the lists, the employer may file a complaint against the SWA under part 658, subpart E. Complaints against SWAs regarding ES regulations are processed pursuant to § 658.411(d). In sum, in all instances of consultation of the debarment and discontinuation lists, the Department believes that its clearance order review processes at § 653.501 and § 655.121, and its procedures at part 658, subparts E and F, provide sufficient safeguards against unwarranted and harmful delays in processing clearance orders, even where an employer believes they have been incorrectly placed, or incorrectly

identified as having been placed, on the lists.

Regarding Washington State's request that the Department ensure that debarment and discontinuation lists are accurate, updated, and easily accessible, the Department appreciates the request and suggested methods for doing so. The Department notes that it has proposed a 10-working-day requirement in § 658.503 and § 658.504 for SWAs to notify OWI of any final, effective determination to discontinue ES services, and any determination to reinstate services. As discussed in the NPRM, the Department believes that these requirements will help facilitate prompt implementation and maintenance of the discontinuation of services list, and prompt access to ES services for employers who have been reinstated. The Department will issue guidance on maintenance and use of the discontinuation list. The Department updates the debarment list promptly upon finalizing debarment of an employer from the H–2A program. An up-to-date debarment list is publicly available on the OFLC website.

The Department appreciates Washington State's suggestion that the Department create a standard letter notifying applicants of the impact of debarment and making clear that SWAs are bound to deny clearance orders on this basis. Depending on the violation at issue, debarment is undertaken by either OFLC or WHD, and the relevant debarring agency is responsible for communicating the consequences of such action to the entity it seeks to debar and will review its communication as it implements this final rule. The Department reiterates that under proposed § 501(b)(4)(ii), SWAs are not bound to deny clearance orders to employers who are debarred. Rather, SWAs are required to initiate discontinuation of services to employers who are on the Department's debarment lists. Only where the discontinuation of services has been finalized must the SWA deny an employer's clearance order.

Finally, regarding wafla's opposition to proposed new paragraph (b)(4)(iii), the Department disagrees that discontinuation should apply only to principals. As explained more fully below in Section V.D, to better protect workers, the Department believes that all entities who engage in the ES clearance system, including agents, farm labor contractors, joint employers, and successors in interest, should be subject to possible discontinuation. Moreover, in clarifying and expanding the entities subject to discontinuation, the Department is aligning the ES

regulations with existing H–2A regulations at part 655, subpart B, which already permit debarment of agents, farm labor contractors, joint employers, and successors in interest. Regarding wafla's concern about the possible effects of discontinuation on third parties and their clients, the Department believes any such effects are the same or similar as the effects of debarment on the same third parties in the existing H–2A context, and the Department did not receive comments and is not otherwise aware that there have been any unjustifiable effects to these entities under the debarment process.

### 2. Section 653.501(c), SWA Responsibilities

Section 653.501(c)(3) lists the assurances that each clearance order must include before the SWA can place it into clearance. The Department proposed to revise § 653.501(c) to require that, in the event the employer's date of need changes from the date the employer indicated on the clearance order, the employer must notify the SWA and all workers placed on the clearance order of the change at least 10 business days before the original start date. The Department further proposed that employers that fail to comply with these notice requirements must provide housing and subsistence to all workers placed on the clearance order who are already traveling to the place of employment, without cost to the workers, until work commences, and must pay all workers placed on the clearance order the applicable wages for each day work is delayed for a period of up to 2 weeks, starting with the originally anticipated date of need. The proposed revisions are meant to improve notification requirements and wage protections for workers, as well as align with current § 655.145(b) and proposed § 655.175 protections in the H–2A program regulations. To accomplish these changes, the Department proposed several specific revisions, which are discussed in detail below.

First, the Department proposed to revise § 653.501(c)(3)(i) to remove the requirement that the SWA must make a record of the notification and attempt to inform referred workers of the change in the date of need. The current language improperly incorporates a SWA requirement into the employer assurances and, as discussed below, the Department proposed to shift these responsibilities to the employer. The Department also proposed to move language in paragraph (c)(3)(i) regarding the employer's notice to the order-holding office to § 653.501(c)(3)(iv),

which contains other instructions the employer must follow when giving notice of changed terms and conditions of employment. The Department did not receive comments on these specific changes and adopts them, as proposed, with additional changes (the substitution of "placed" for "referred" and "14 calendar days" for "week") to conform to the other provisions of § 653.501(c) discussed below.

Second, the Department proposed to remove a redundancy in the first sentence of paragraph (c)(3)(iv), which currently states that the employer must expeditiously notify the order-holding office or SWA immediately. Because immediate notice is expeditious, the use of the word expeditiously is not necessary. The Department did not receive comments on this change and adopts it, as proposed.

Third, in paragraph (c)(3)(iv), the Department proposed that the assurance on the clearance order require that when there is a change to the start date of need, the employer, rather than the order-holding office or SWA, notify the office or SWA and each worker placed on the order. The Department further proposed that notification be in writing (email and other forms of electronic written notification are acceptable) at least 10 business days prior to the original date of need, and that the employer must maintain records of the notification and the date notification was provided to the order-holding office or SWA and workers for 3 years. In paragraph (c)(5), the Department similarly proposed to specify that the employer must notify the office or SWA and each worker placed on the order, to align this paragraph with paragraph (c)(3)(iv).

Wafla, Farmworker Justice, and Washington State supported shifting the notification requirement from the SWA to the employer. Wafla stated that given the variability of crops, crop maturation, weather, work schedules, or over-recruitment in agriculture, the employer knows the conditions on the ground and is capable and should be empowered to make this decision and provide the proposed notification. Farmworker Justice described it as a common-sense change where the employer, who has been in prior contact with the workers, either directly or through agents, is much more likely than the SWA to have the most current and effective contact information; and the employer, rather than the SWA, can more quickly reach workers, when time is critical, by going directly to the workers rather than roundabout through the SWA. Both Farmworker Justice and Washington State stated that the proposed change

reduces the burden on SWAs, whose resources, as Farmworker Justice stated, are reportedly already stretched thin. On the other hand, an individual who operates a family farm opposed the employer notification requirement, stating that it would be very difficult and expensive to contact workers individually within 10 days of the start date.

Several commenters raised concerns about employers providing effective notification to workers. Ma´sLabor, whose comments USAFL and Hall Global endorsed, stated that it would be unduly burdensome to require employers to notify workers in writing of a delay at least 10 business days before the original date of need because many U.S. applicants do not provide an email address and employers would need to notify workers by mail, which may not be feasible within 10 business days. Ma´sLabor said the notification requirement creates perverse incentives in that workers who are aware of its limitations may intentionally avoid giving an employer a means for written notice in order to guarantee payment if there is a delay. USAFL and Hall Global additionally cautioned the Department against imposing unnecessary formal notice requirements. They raised concerns with information overload and stated that workers often receive notice and ignore it. They stated that formal notice is not needed where the employer is working with the workers to get them to its workplace, and that any information conveyed in that scenario is a natural part of working together. They requested that the Department look at each formal notice that it demands to make sure it is really justified and necessary.

Farmworker Justice requested that the Department improve the notice requirements, stating that relying on employers to give notices raises concern as to whether meaningful and effective notice will actually be received. Farmworker Justice suggested that the Department require that notice be received, and that employers provide notices in languages spoken by workers. Farmworker Justice also requested employers be required to use the most reliable or speediest form of communication. For example, they suggested, if the employer has a worker's mailing address and phone number, then the employer should be required to send a text message or use a different available phone-based application that the worker may use. Farmworker Justice also noted that the Department did not propose to require employers to contact farm labor contractors or local recruiters if they are

not able to contact workers directly to ensure workers get the message.

In response to the ma´sLabor comments, the Department notes that employers may provide written notice to each worker who has been placed on the clearance order using postal mail, email, or other forms of electronic written notification, including by text message. Because employers have a variety of options available to provide the notice, and must use electronic means when the worker provides an email address or their phone number, the Department thinks that it will be a minimally burdensome requirement on employers in the event they are required to provide notice. In response to Farmworker Justice's comments, the Department considered requiring proof that workers have actually received the employer's written notification; however, the Department believes that it will not be possible or practicable for employers to be able to document proof of receipt in all cases. The Department notes that under the proposed changes, employers will be required to maintain records showing that the notification was provided. The Department believes that it is reasonable to expect that most workers will receive written notice sent through either postal mail or electronic written mail or other electronic means before they need to depart for the original date of need. Therefore, the Department is revising paragraphs (c)(3)(iv) and (c)(5) to indicate that employers must send written notification at least 10 business days before the original date of need.

The Department agrees with Farmworker Justice that it is important for employers to provide notifications in languages spoken by workers and is further revising paragraph (c)(3)(iv) to align employer notices with 29 CFR 38.9 language access requirements. The Department made similar changes more broadly to align part 653 with these obligations as part of the Wagner-Peyser Act Staffing Final Rule, 88 FR 82658 (Nov. 24, 2023), which recognized that language access is crucial for individuals with limited English proficiency. The Department reiterates the importance of these non-discrimination obligations and believes that providing notification to workers in accordance with 29 CFR 38.9 is necessary to ensure that workers receive effective notice that apprises them of delays in the start of work. Employers and SWAs may work together as necessary and appropriate to fulfill these obligations. Additionally, the Department is further revising paragraph (c)(3)(iv) to state that if a worker provides electronic contact

information, such as an email address or telephone number, the employer will send notice using one of the electronic contact methods provided. If the employer provides non-written telephonic notice, such as a phone call, voice message, or an equivalent, the employer will also send written notice using the email or postal address provided by the worker at least 10 business days prior to the original date of need.

However, the Department declines to require employers to contact farm labor contractors or local recruiters if they are not able to contact workers directly because it would be difficult to measure when an employer met its responsibilities in notifying workers. Moreover, the purpose of these changes is to streamline communication with workers by requiring direct communication between the employer and worker, and the suggestion to permit third parties to engage in the communication undermines the changes being made in this rule. The Department believes that the adopted changes will increase the likelihood that workers will receive required notices, while making the requirements achievable for employers. The Department also identified that it would help clarify that the notice requirements to which paragraph (c)(5) refers are notices assured in paragraph (c)(3)(iv) of this section.

The Department adopts the notice requirements in paragraphs (c)(3)(iv) and (c)(5) proposed in the NPRM, with further revision to clarify that the employer's written notice must be sent at least 10 business days prior to the original date of need, must be given in languages workers understand, and that the employer must provide electronic notification, if available. The Department has revised paragraph (c)(5) to refer to the assurance in paragraph (c)(3)(iv).

Fourth, in paragraphs (c)(3)(iv) and (c)(5), the Department proposed to require that notification be provided to workers placed on the order rather than eligible workers referred from the order. Relatedly, in paragraph (c)(5), the Department proposed to remove language stating that employers must pay only workers who are eligible pursuant to paragraph (d)(4).

Farmworker Justice supported the proposed change, stating that it reduces the burden on employers by clarifying that only workers who are placed on the order, rather than all workers referred, are covered by the notice requirements. Washington State similarly stated that the proposed change slightly reduces the burden on SWAs by clarifying that

neither SWAs nor employers need to notify SWA referrals of delays in start dates.

The Department appreciates commenter support and adopts this change, as proposed.

Fifth, in paragraphs (c)(3)(iv) and (c)(5), the Department proposed that where an employer fails to provide adequate notice of a change to the anticipated start date of need, the employer must provide housing and subsistence to all workers placed on the clearance order who are already traveling to the place of employment, without cost to the workers, until work commences.

The Department received several supportive comments regarding the proposal to require employers to provide housing and subsistence to workers. Wafla, an employer agent organization, agreed that the employer should provide housing and subsistence to all workers already traveling to the place of employment under these conditions. Catholic Charities USA (CCUSA) and the United States Conference of Catholic Bishops (USCCB) (together, CCUSA and USCCB) also agreed, noting that the proposal was designed to ensure workers are not deprived of basic needs because of delays. CCUSA and USCCB further stated that the provision would respect the reliance interests of workers and protect against financial hardships beyond their control. The Alliance to End Human Trafficking commented that the proposed regulation would help people who are otherwise vulnerable to trafficking to obtain the necessary support when disruptions to their employment occur through no fault of their own. CCUSA and USCCB and the Alliance to End Human Trafficking each indicated that the Department should finalize the change, as proposed.

On the other hand, McCorkle Nurseries, Inc. and ma´sLabor expressed concern regarding the housing requirement, stating that it would extend housing obligations to U.S. workers who were otherwise ineligible for employer-provided housing. Additionally, ma´sLabor opposed the subsistence requirement. Ma´sLabor stated that there was a contradiction in requiring subsistence to avoid financial hardship because, under the proposed rule, employers would also be required to pay workers up to 2 weeks of wages. Therefore, workers would be paid as if there were no delay to the start date and financial hardship would not exist. Ma´sLabor stated that because paying wages in this circumstance moots the need for meal subsistence, as workers will have the income to be able to

purchase food, the Department should either keep the wage guarantee or keep the subsistence requirement, but not both.

Regarding housing, the Department notes that employers would only be required to provide housing to workers who are eligible for housing under § 653.501(c)(3)(vi), which requires the availability of housing for only those workers, and when applicable, family members, who are not reasonably able to return to their residence in the same day. Because such housing is already required to be available and to meet applicable housing standards prior to the start date of work, the Department does not think that providing housing in the event of a delay in the start date will create a burden or hardship for the employer. To clarify the scope of this requirement, the Department is further revising paragraphs (c)(3)(iv) and (c)(5) to specify that employers must provide the housing *described in the clearance order* to all *migrant* workers placed on the clearance order who are already traveling to the place of employment, without cost to the workers, until work commences.

The Department has considered each comment regarding the proposed subsistence carefully. The Department recognizes the concern raised by ma´sLabor about the burden to employers when the benefit would not be otherwise available if there had been no delay in the start date. In light of this concern, the Department has decided not to finalize the subsistence provision. However, the Department remains concerned about workers being left in a worse position than they would have been had there been no delay. Accordingly, the Department is adding to paragraphs (c)(3)(iv) and (c)(5) that employers that fail to provide the required notice must pay all placed workers for the hours listed on the clearance order *and provide or pay all other benefits and expenses described on the clearance order.* This revision will ensure that workers receive the full monetary and non-monetary benefits they would have received if work had started on time. Therefore, if, for example, the clearance order includes as a benefit some form of payment for or access to food or meals, such as employer-provided lunches, an employer-organized food truck at the property, or simply employer-provided access to a grocer, then the worker would be entitled to those benefits to ensure they are kept whole.

Sixth, in paragraphs (c)(3)(iv) and (c)(5), the Department proposed that where an employer fails to provide adequate notice of a change to the

anticipated date of need, the employer must also pay workers for each day work is delayed up to 2 weeks starting with the originally anticipated date of need or provide alternative work. In paragraph (c)(5), the Department proposed that the employer pay the specified hourly rate of pay on the clearance order, or if the pay listed on the clearance order is a piece-rate, the higher of the Federal or State minimum wage, or if applicable, any prevailing wage. For criteria clearance orders, the employer would be required to pay the rate of pay specified at 20 CFR 655.175(b)(2)(ii). These proposed edits would align the wage requirement in this paragraph with proposed wage requirements in part 655, subpart B, as applicable. The Department also proposed language clarifying that alternative work must be stated on the approved clearance order.

Several organizations submitted supportive comments regarding the proposal to require employers pay up to 2 weeks of wages, when employers do not properly notify workers. The UFW Foundation, UFW, North Carolina Justice Center, UMOS, PCUN, CAUSE, and Green America noted that employers would have to pay such wages if the job started on time and said that the rule proposed a safety net during a particularly vulnerable time, when farmworkers have little or no savings and are awaiting their first paycheck. The UFW Foundation shared stories of multiple farmworkers who experienced delayed start dates, one up to 15 days, which caused the farmworkers to go into debt because their cost of living continued, despite their income being delayed. One farmworker described repeatedly traveling back and forth to the job site each day during a delay, where they were told work was not available that day. The farmworker spent time, energy, and money for gas during the delay. The farmworker further stated that workers return each day only to find they have been replaced, leaving them with no money to pay their mortgages or to purchase groceries. The Agricultural Workers Advocacy Coalition (AWAC) also supported the wage requirement, stating that numerous workers on the Eastern Shore have experienced significant delays in receiving wages at the start of their contracts and have had to go for lengthy periods without enough money to even buy food. Farmworker Justice said the increase to 2 weeks wages was warranted given incoming travel costs and potential economic harm to workers impacted by delay. The Alliance to End Human

Trafficking stated that the proposal would help people who are otherwise vulnerable to trafficking to obtain the necessary support when disruptions to their employment occur through no fault of their own. Marylanders for Food and Farmworker Protection stated the proposal promotes accountability, and CCUSA and USCCB stated that the proposed changes are designed to ensure workers are not deprived of basic needs because of delays.

USA Farmers, a national trade association that exclusively represents agricultural employers of H–2A foreign workers, opposed the 2-week wage requirement, calling it unreasonable. USA Farmers proposed that instead of requiring wage payment for up to 2 weeks, the Department instead should align the period of payment to correspond to the number of days the employer was late in providing the notice after the employer knew that start date would change. Ma´sLabor, whose comments USAFL and Hall Global endorsed, and McCorkle Industries, Inc. contended that there are already procedural protections to prevent financial hardship, including the preexisting guarantee of the first week wages as well as existing H–2A employer obligations under the three-fourths guarantee. They described the proposal to extend wages up to 2 weeks as unduly punitive and redundant. Ma´sLabor also stated that the requirement for wage payments to all workers placed on the clearance order extends the wage rate guarantee to H–2A workers, which it described as a drastic expansion of existing requirements. USAFL and Hall Global further stated that the Department did not disclose the reason why any change to the existing regulation was warranted and requested that the Department provide a factual basis for why one week of pay is not sufficient. Ma´sLabor noted that an employer requesting a delay to the start date is itself experiencing hardship and said that the Department must strike an appropriate balance of the equities. Ma´sLabor said that tipping the scales too heavily in favor of the workers by dramatically increasing the costs to employers is not equitable.

Wafla disagreed that an employer should be required to pay workers' wages when they do not meet the 10-business-day notice provision. Wafla said that some delays are due to surprise events, like an unexpected, unforeseeable weather storm or an act of God, and that such events should be considered as valid reasons to delay notification of workers after the 10 business days. The Agricultural Justice

Project stated that the wage requirement was fair but noted that this level of detail will make the application process even more daunting for smaller farms while larger business have designated staff or contracted specialists to handle these matters. They stated that honest employers will be penalized here because of the work of other unscrupulous employers who will find new loopholes or workarounds to evade these provisions, particularly where the chance of enforcement is low.

Regarding alternative work, Farmworker Justice said the proposed rule makes clear that alternative work must be in the approved job order, and that this is an important clarification to deter unsafe and uncompensated work. USA Farmers commented that it is not logical to limit alternative work to work described on the clearance order. USA Farmers contended that if the employer is offering work included in the job order, then there would be no need for the employer to delay the start date of work because the alternative work would already be a part of the job order. Ma´sLabor also commented that limiting alternative work to work described on the clearance order makes sense for H–2A workers who cannot perform duties outside the scope of the job order, but not for U.S. workers who are not subject to similar limitations. Ma´sLabor stated that it is unclear why the employer should be restricted to work activities within the scope of the job order for U.S. workers, and why an employer may not count other alternative work if the job duties anticipated are not available. Ma´sLabor contended that if an employer finds such alternative work, the work would also be compensable, and expressed concern that workers might receive double payment.

Regarding the methods for calculating wages, wafla expressed concern that the required wages would need to be hourly, piece rate, or any prevailing wage listed in the job order. Wafla asked how an employer can pay a piece rate to a worker when work has not yet started, and no piece rate has been established. Wafla suggested that the provision require only payment of the hourly rate listed in the job order and nothing more.

The Department agrees that expanding the wage payment requirement in the event of a delay, about which the employer failed to provide required notice, to 2 weeks is necessary for worker protection. As stated in the NPRM, the Department has made a policy decision that one week of wages is insufficient to protect workers from the financial hardships associated with a delayed starting date when such

delays were not communicated, particularly if a worker traveled for the job. Instead of adjusting the number of days wages must be paid to be equal to the number of days the employer's notice was late, as USA Farmers suggested, the Department is finalizing its proposed requirement that the number of days wages must be paid must be equal to the number of days work is delayed, up to 2 weeks. This helps ensure workers receive compensation commensurate with the amount of financial impact they experience due to the delay.

While it may add an additional cost, these requirements are not intended to be punitive to employers. Instead, the wage payment is designed to be protective for workers by ensuring that they are not disadvantaged due to circumstances beyond their control. The Department notes that in lieu of paying the 2 weeks' worth of wages, if the employer fails to comply with the notice requirements, employers can provide workers alternative work if such alternative work is listed on the approved clearance order. The Department has determined that this alternative effectively addresses the hardship concern by providing the worker a source of income, which would otherwise have been available but for the delay, while continuing to allow the employer flexibility to adjust their anticipated start date. Alternative work may be provided to help employers recover from unexpected weather events or acts of God. Finally, the requirement to pay up to 14 days of wages does not mean that workers will receive more money than they otherwise would have under the offered and agreed-upon terms of the clearance order, had the work begun on time. For example, if a delay lasts 10 days and the workers begin work on the 11th day, the employer, if having not provided adequate notice and not providing alternative work, is required to pay the worker only what they originally promised to pay.

As described in the discussion for parallel proposals in § 655.175, the Department disagrees that preexisting protections are sufficient to prevent financial hardship, including the preexisting requirements to pay one week of wages as well as existing H–2A employer obligations under the three-fourths guarantee. The requirements in § 653.501(c) ensure workers receive the first 2 weeks of wages at the beginning of the contract term and with the first scheduled paycheck. This helps avoid financial hardship workers might experience at the beginning of work, which is distinct from the three-fourths

guarantee described for criteria clearance orders in part 655. The Department also notes that the requirements in § 653.501(c) apply to both criteria and non-criteria clearance orders, so this provision provides a necessary protection to workers not otherwise covered by the requirements in the Department's H–2A regulations.

The Department notes that the option for an employer to provide alternative work is preexisting and the Department did not propose to change that part of the regulation, except to clarify that the alternative work must be in the *approved* clearance order. The addition of *approved* is intended to clarify the existing regulation but not to change its meaning. Regardless, the Department believes it is important to retain the option to provide alternative work and that any alternative work must be described in the clearance order. Maintaining this option provides employers with flexibility to employ workers through other duties that are useful to the employer, though not their primary or anticipated need. For example, if an employer files a clearance order for apple pickers, the employer might include a description of alternative work that explains workers may be required to perform related work to prepare or maintain growing areas or to prepare containers and other specific support activities. In the event of a delay related to weather conditions, where the employer failed to properly notify workers, the employer could offer alternative work that would help the business be ready for work to start or to recover from the weather condition that caused the delay. Such work would be considered alternative because the primary job duties for the workers would be apple picking but, if apple picking is not possible, workers could be offered work that supports the primary work activity or business. The Department maintains that it is necessary for the alternative work to be described in the clearance order so that potential applicants have adequate notice of the duties they may be asked to perform, which are material terms and conditions. Applicants may decide to apply or not to apply based on the alternative work described in clearance orders. For these reasons, the Department declines to revise the option to provide alternative work and the specification that any alternative work must be described on the clearance order.

Additionally, though the Department did not receive comments requesting the Department to align the language of § 653.501(c)(3)(iv) and (c)(3)(5) with the parallel requirements in part 655, the

Department has determined that it would be clearer to revise § 653.501(c)(3)(iv) and (c)(3)(5) so that the wage requirement is stated in days, instead of weeks, to be consistent with § 655.175. This revision does not change the proposed requirement.

The Department is finalizing the proposal to expand the period during which employers must pay the applicable wage to 2 weeks, from the current 1-week period, with one edit to describe the required 2-week period as 14 calendar days.

Finally, in paragraph (c)(5), the Department proposed new language instructing SWAs to process noncompliance with the employer's obligations in paragraph (c)(5) as an apparent violation pursuant to § 658.419. The Department did not receive comments on this change and adopts it, as proposed.

### 3. Section 653.501(d), Processing Clearance Orders

The Department proposed to remove paragraphs (d)(4), (7), and (8) in their entirety because, with the proposed change in paragraph (c) to have employers notify workers of any change in the start date, the requirement that the applicant holding office notify workers of any changes is no longer relevant or necessary.

Farmworker Justice supported the removal of paragraph (d)(4), stating that it eliminates an additional obstacle for U.S. workers in that previously they had to contact the ES Office to verify the original date of need to be eligible for the first week's pay. The Department did not receive any other comments.

The Department appreciates commenter support and adopts the removal of paragraphs (d)(4), (7), and (8), as proposed.

### D. 20 CFR Part 658, Subpart F—Discontinuation of Services to Employers by the Wagner-Peyser Act Employment Service

This subpart sets forth the regulations governing the discontinuation of Wagner-Peyser Act ES services to employers. The Department adopts revisions throughout this subpart to clarify the bases and process for discontinuing services. The Department also reorganizes these regulations to more accurately group subjects and to more logically arrange procedural steps, including when and how employers may request a hearing. Finally, the Department clarifies what ES services would be unavailable after discontinuation and the entities subject to discontinuation.

The Department believes that revising the regulations, as described below, provides SWAs the needed additional clarity to better implement the discontinuation provisions and would allow ETA, including its regional offices, to better monitor and support SWAs to ensure they initiate discontinuation of services as required by the regulations. This will improve worker protection by preventing noncompliant employers from using the ES service to obtain workers (including H–2A workers, as employers seeking to use the H–2A visa program must first file a clearance order through the ES) which, in turn, aids the Department in ensuring a fair labor exchange system for compliant employers, and meeting its statutory obligations to maintain and increase the usefulness of the ES system. Additionally, the proposed clarifications and improvements to the discontinuation procedures provide greater certainty to employers seeking to provide information to SWAs in response to a notice of intent to discontinue, or seeking to reinstate services, and protect employers' interests by ensuring that they receive informative and timely determinations from SWAs. Specific changes are discussed below.

1. General Comments

The Department received several supporting and opposing comments on the general revisions to discontinuation of services provisions in part 658. The National Women's Law Center said that improving protections for both H–2A and corresponding workers is key to ensuring that abusive employers do not take advantage of the H–2A program to discriminate against their non-H–2A workforce and exploit the vulnerability of H–2A workers. It described the changes proposed to the discontinuation of services provisions as key improvements. Farmworker Justice said that discontinuation provides vital protections for workers who want to receive what they are owed and work under improved conditions without losing their jobs altogether. According to Farmworker Justice, unlike debarment, which is a discretionary sanction, discontinuation of services is mandatory whenever an H–2A employer is determined to have violated an employment-related law. Farmworker Justice further said that the detailed provisions for reinstatement of services can ensure farmworkers impacted by the employer's violations receive restitution, which may not routinely occur in debarment cases, and also highlighted the importance of corrective action plans described in part 658.

Farmworker Justice also noted underapplication of the pre-existing discontinuation of services regulations by SWAs and said that, if properly applied, discontinuation of services would be a major deterrent to employers who might otherwise violate the law.

The U.S. Chamber of Commerce stated that it was concerned that the proposed revisions to the Wagner-Peyser ES regulations would have a significantly negative impact upon employers' ability to obtain and retain H–2A workers. The U.S. Chamber of Commerce said that the proposed revisions would incur additional processing costs, increase the likelihood of delays in obtaining workers, and create significant risks for business disruptions should employers run afoul of the new requirements in the middle of the seasons. The U.S. Chamber of Commerce stated that additional operating costs would affect American consumers in the form of higher food prices.

USA Farmers described the proposed regulations as an attempt to weaponize the Wagner-Peyser system against farmers and U.S. workers seeking agricultural employment and that the changes could block employers from utilizing the ARS for minor or unproven alleged violations of regulations and deny employers due process. USA Farmers contended that there is no rational need for the changes. USA Farmers stated that the Department already has a robust debarment program with due process rights. They argued that, as a result of this proposal, employers with violations that are not serious enough to warrant debarment by the Department will nonetheless effectively be debarred. USA Farmers also stated that the process to request a hearing and for SWAs to make decisions is flawed.

USAFL and Hall Global stated that the Department should defer adoption of the proposal and engage in detailed discussions with stakeholders. USAFL and Hall Global noted that discontinuation of services applies to the H–2A program and to non-H–2A related services and that, because the H–2A regulations mandate that a prospective H–2A employer access the interstate clearance system, discontinuation of services can amount to a permanent debarment of an employer.

The Northwest Horticultural Council (NHC) said that it is aware that many SWAs have limited resources and are often short staffed, which may contribute to the low use of discontinuation of services. NHC noted that many SWAs work closely with growers where clarification or questions may arise rather than simply discontinuing access to the services, which the commenter said it believes should be encouraged. NHC stated a concern that the proposed expansion of those subject to discontinuation of services, as well as the proposal to remove SWA discretion prior to discontinuation, will lead to delays in processing clearance orders for all employers, not just those subject to additional scrutiny. Additionally, NHC had concerns about limited employer recourse to the Department if there is ongoing conflict with the respective SWA.

The Department agrees with the comments from National Women's Law Center and Farmworker Justice, and believes that the changes are necessary to ensure worker protections, while offering adequate due process to employers. The Department notes that employers that comply with applicable laws and regulations should not experience delays or expenses related to these procedures because they will not have met the bases described at § 658.501 that mandate SWAs to initiate procedures for discontinuation of services. As described in greater detail in the following comment responses, the bases at § 658.501 in many cases describe that, to meet the basis for discontinuation, the employer must have *refused* to comply with the stated requirements. The bases that describe employer refusal to comply assume that the SWA has already attempted to resolve issues, which provided the employer with an opportunity to avoid initiation of discontinuation of services. For example, the SWA may be required to initiate discontinuation of services after the SWA attempted to informally resolve apparent violations under § 658.419 or complaints under § 658.411. The Department believes that the provisions of part 658, subpart F clearly explain that discontinuation of services is not the SWA's first response when it identifies apparent violations, or in response to complaints, except in cases where immediate discontinuation is warranted. The Department further notes that where immediate discontinuation is warranted, under § 658.502(b), the employer must also have met one of the stated bases at § 658.501(a), therefore, employers are not at risk of experiencing discontinuation of services for unsubstantiated claims, as some commenters suggested. The Department affirms that employers must comply with all applicable employment-related laws, as well as the full terms and

conditions of clearance orders, to employ workers through the ES system. The Department maintains that all ES regulations and employment-related laws are important and notes that the preexisting bases at § 658.501 similarly required SWAs to initiate discontinuation of services to employers who failed to comply with such requirements.

The Department will discuss comments specific to each of the proposed changes below but wishes to provide a response to these general comments to indicate that the interest of worker protection is compelling and supports the Department's determination to implement most of the changes, as proposed. The Department maintains that there are adequate procedural protections to protect the due process rights of employers, including several mechanisms to allow employers to respond to and resolve identified noncompliance, prior to discontinuation of services. The Department also maintains that the purpose and application of discontinuation of services is distinct from debarment actions, which more narrowly apply to certain programs. The proposed changes foster a culture of compliance between employers, workers, and SWAs, which is necessary to uphold the laws of the United States and their implementing regulations.

2. Section 658.500, Scope and Purpose of Subpart F

The Department proposed to revise § 658.500, which describes the scope and purpose of subpart F, to add language consistent with proposed revisions to § 658.503 that discontinued services include services otherwise available under parts 652 and 653. This revision clarifies the scope of services discontinued to include the labor exchange services—such as recruitment, career, and labor market information services—available to employers under part 652.

Farmworker Justice supported the proposed change, stating that it provides needed clarification that all job services in parts 652 and 653 are impacted by discontinuation. Additionally, the UFW Foundation, UFW, North Carolina Justice Center, UMOS, PCUN, CAUSE, and Green America expressed general support for inclusion of labor exchange services at part 652. On the other hand, USAFL and Hall Global stated that discontinuation of services should only apply to services *not* necessary for participation in the H–2A program, meaning discontinuation should only apply to the services available at part 652, and not part 653.

The Department appreciates commenter support for this clarification. Regarding the recommendation that discontinuation of services should only apply to services *not* necessary for participation in the H–2A program, the Department disagrees. Discontinuation has historically applied to ES services available under part 653, including access to the ARS. As explained above, prospective H–2A employers must use the ARS to recruit U.S. workers as a condition of receiving a temporary agricultural labor certification, and employers and entities who file applications for temporary agricultural labor certification under 20 CFR part 655, subpart B must comply with the ARS requirements at part 653, subpart F. *See, e.g.,* §§ 655.121 and 655.131655.133. The Department, therefore, declines to adopt the recommendation. and adopts this paragraph, as proposed.

The Department also proposed to add paragraph (b) to § 658.500, which would explain that for purposes of this subpart, employer refers to *employers,* as defined at § 651.10, and *agents, farm labor contractors, joint employers,* and *successors in interest,* as proposed to be defined at § 651.10. Proposed paragraph (b) therefore describes which entities may experience discontinuation of services. Each of these entities may engage in the ES clearance system by creating or submitting clearance orders, or by managing or utilizing workers placed on ES clearance orders. *Agents* and *farm labor contractors* often engage the ES clearance system by submitting clearance orders and controlling many aspects of recruitment activities relating to clearance orders. *Joint employers* may utilize workers placed on clearance orders in the same or similar manner as the *employer,* defined at § 651.10, with whom they jointly employ those workers, and each joint employer is responsible for the violations of the other joint employers. A *successor in interest* may have reincorporated itself from an *employer* whose ES services have been discontinued into another business entity that maintains the same operations or interests, allowing that entity to undermine the effect of the discontinuation of the original entity in contravention of the purpose of the discontinuation regulation. The revisions were proposed to clarify and expand the entities who engage the ES clearance system and are, thus, subject to discontinuation. Specifically, the proposed change would make it clear that agents, farm labor contractors, joint employers, and any successor in interest to an agent, farm labor contractor, or

joint employer, are subject to discontinuation of services.

Finally, as the proposed *agents, farm labor contractors, joint employers,* and *successors in interest* also seek temporary agricultural labor certifications from OFLC under part 655, subpart B, adding these entities here brings the discontinuation regulation in line with the existing H–2A regulations, which permit the debarment of agents, farm labor contractors, joint employers, and successors in interest, as well as fixed-site H–2A employers, and agricultural associations. For the reasons set forth in the NPRM and below, the Department adopts the proposed paragraph (b), with one addition.

The UFW Foundation, UFW, North Carolina Justice Center, UMOS, PCUN, CAUSE, and Green America all expressed support for greater accountability to third parties, stating one of the strongest protections in the proposed rule would be a series of changes that would strengthen enforcement actions against employers' agents, contractors, joint employers, and successors in interest. Similarly, the National Women's Law Center stated that the proposed rule would improve administration of the H–2A program, including discontinuation of services, to help prevent employers and their agents from abusing the H–2A program.

Several commenters expressed concern that the proposed changes would make third parties liable for the actions of employers, and employers liable for the actions of third parties. The Arizona Farm Bureau Federation, North Carolina Farm Bureau Federation, Inc., Golden Plain Farms, Inc., Western Range Association, and Roossinck Orchards, Inc. opposed the proposed changes, stating that they hold farmers responsible for violations committed by farm labor contractors, recruiters, attorneys, etc. Similarly, wafla stated that the inclusion of entities who are not the principal employer, have no clear control of day-to-day workplace conditions, and have nothing to do with potential rule violations giving rise to discontinuation is overbroad. The American Immigration Lawyers Association (AILA) opposed inclusion of successors in interest, stating that successors in interest are not responsible for issues created by former owners and should not have to answer for those issues merely by purchasing a business. The National Cotton Ginners Association and Texas Cotton Ginners' Association opposed the inclusion of agents, stating that the rule makes small agricultural business that rely on agents for recruitment services subject to

discontinuation because of potential violations by the agent that may be outside of the employer's control. The Mountain Plains Agricultural Service stated that the proposal extends enforcement of employment-related laws to agents that are not employers and not subject to said laws and regulations. Relatedly, the International Fresh Produce Association (IFPA), the Georgia Fruit and Vegetable Growers Association (GFVGA), U.S. Custom Harvesters, Inc., Texas International Produce Association (TIPA), NHC, the U.S. Chamber of Commerce, Titan Farms, LLC, Demaray Harvesting and Trucking, LLC, an individual, and an anonymous commenter all opposed the changes stating that they do not make clear who—whether the filing entity, the underlying employer, or both—will be subject to discontinuation of services when a SWA determines that a basis for discontinuation exists.

Additionally, commenters opposed the inclusion of agents and attorneys because of the legal and ethical duties they owe to their clients. USApple stated that agents and attorneys are legally and ethically bound to carry out their clients' intentions, and the proposed rule would allow for discontinuation of services to agents and attorneys where their client refuses to, for example, modify a job order. Similarly, ma´sLabor stated that agents and attorneys are not free to unilaterally take action that is contrary to the intent of the client, and if an employer disagrees in good faith with the SWA and instructs the agent or attorney not to modify an application in accordance with the SWA's instructions, the agent is therefore duty-bound to follow that instruction and push back against the SWA.

Several commenters asked that the Department consider the economic implications of the proposed changes and their potential effect on the industry. IFPA, GFVGA, U.S. Custom Harvesters, Inc., TIPA, NHC, the U.S. Chamber of Commerce, Titan Farms, LLC, Demaray Harvesting and Trucking, LLC, an individual, and an anonymous commenter all stated that agents and attorneys play an invaluable role in processing criteria clearance orders, certifications, and petitions for employers—particularly for small farm employers without staff or expertise to undertake the process. Discontinuation of services to third parties would impact farm employers across the country who, in good faith, rely on that third party and could not anticipate the SWA action. Because the timing for filing a clearance order and date of need is incredibly tight, under the proposed

rule, farmers will suffer significant financial losses caused by circumstances over which they have no control, leaving them with crops in the field and no harvesters to collect them. Additionally, farmers will have increased costs associated with hiring a new third party to file their clearance orders or redirect staff resources to undertake the task while the company is preparing for harvest.

Relatedly, wafla stated that discontinuation to an attorney or filing agent would negatively impact the other clients that attorney or agent serves, such that all of that attorney's or agent's clients would be debarred from the program. Ma´sLabor stated that discontinuation to an attorney or agent would preclude that agent or attorney from filing job orders in that State for its other clients. The Western Range Association stated that discontinuation to agents would be disconcerting to the entire industry because there are only two agents that the majority of ranchers in its service area use. USApple stated that discontinuation to an attorney or agent would reach much further than a single clearance order to affect many employers and upwards of hundreds, if not thousands, of workers. The Wyoming Department of Agriculture stated that discontinuation to any affiliate of the employer would result in a domino effect of reduced services and job opportunities for employees who work with agents, attorneys, or others due to their names being placed on the discontinuation list.

The Department reiterates that all entities who engage the ES clearance system, including agents (which include attorneys), farm labor contractors, joint employers, and successors in interest, should be subject to discontinuation, if appropriate. The proposed changes are meant to hold these entities accountable for compliance with ES regulations. They are not meant to hold, for example, agents, attorneys, or farm labor contractors accountable for the actions of the employers they represent, or vice versa. For example, if an employer is discontinued because, under § 658.501(a)(4), they are found by a final determination by OSHA or WHD to have violated an employment-related law, the discontinuation is not imputed to the employer's agent who had nothing to do with the violation. If an employer is discontinued because, under § 658.501(a)(1), they refuse to correct terms and conditions in the job order that are contrary to employment-related laws, and the employer's agent made a good-faith attempt to bring the employer's terms and conditions into compliance, the discontinuation is not

imputed to the employer's agent. Conversely, an agent or farm labor contractor's noncompliance would not necessarily be imputed to an employer. Thus, under the proposed rule, an agent, attorney, or farm labor contractor who is blameless would not be subject to discontinuation based on the acts of the employer, and an employer who is blameless would not be subject to discontinuation based on the acts of their agent, attorney, or farm labor contractor. As to joint employers and successors in interest, the Department reiterates that joint employers who utilize workers placed on clearance orders should be subject to discontinuation; and successors in interest, who maintain the same or similar operations as the former employer whose services have been discontinued, should also be subject to discontinuation.

Regarding the legal and ethical duties that agents and attorneys owe to their clients, the proposed changes do not interfere with those duties. For example, an agent or attorney who engages the ES system on behalf of an employer must do so in conformance with the requirements of the ES regulations and must advise their employer-client to use the ES system in conformance with the regulations. In the example provided by commenters, if an employer refuses to modify a job order to comply with employment-related laws, the agent or attorney will have presumably advised the employer to bring the terms or conditions in the job order into compliance. In that instance, and as noted above, a blameless agent or attorney would not be subject to discontinuation based on the acts of the employer.

The Department recognizes and acknowledges the critical role that agents and attorneys play in navigating the ES system for the employers they serve. The Department also recognizes that the discontinuation of services to an agent or attorney may have an economic impact on the industry, particularly for small farms that rely heavily on agent/attorney services. However, the Department considers requiring SWAs to discontinue services to agents and attorneys, where appropriate, necessary to protect the integrity of the ES system and protect users—both workers and employers—of the ES system. Without the ability to discontinue services to agents and attorneys, SWAs would have no mechanism to prevent agents or attorneys that violated ES regulations from accessing the ES system. The impact to the industry may be mitigated in light of other changes made to the

discontinuation regulations. Specifically, the discontinuation action will be stayed pending any appeal of a final SWA decision to discontinue services to an agent or attorney; alternatively, an agent or attorney can have services reinstated at any time if they have resolved the issues leading to the discontinuation. In addition, the Department reiterates that inclusion of agents, farm labor contractors, joint employers, and successors in interest is necessary to align the definition of agent here with the definition of agent in § 655.103; and that the economic effects of discontinuation to third parties are the same or similar as the effects of debarment on the same third parties in the existing H–2A context. Finally, as noted in the discussion of the *successor in interest* definition in § 651.10, the Department is relocating part of that proposed definition, on liability of successors in interest, to this section of part 658 ("A successor in interest to an employer, agent, or farm labor contractor may be held liable for the duties and obligations of that employer, agent, or farm labor contractor for purposes of recruitment of workers through the ES clearance system or enforcement of ES regulations, regardless of whether such successor in interest has succeeded to all the rights and liabilities of the predecessor entity.") As with the separate structure of § 655.104(a) and (b), the Department is separating the language relating to liability for discontinuation purposes from the definitional language of § 651.10 and has determined this liability language is more appropriately located in part 658, subpart F, which generally describes the situations in which entities are subject to discontinuation of services, Regarding the concerns commenters raised with the scope of successor liability and the language in proposed §§ 651.10 and 655.104, "regardless of whether such successor in interest has succeeded to all the rights and liabilities of the predecessor entity," the Department is retaining this and other proposed language on successors as part of § 658.500—and is not finalizing the remainder of the proposed sentence ("A successor in interest includes an[y] entity that is controlling and carrying on the business of a previous employer, agent, or farm labor contractor")—for the reasons stated in the discussion of § 655.104 below.

### 3. Section 658.501, Basis for Discontinuation of Services

Section 658.501 describes eight bases for which SWA officials must initiate discontinuation of services to employers. The Department proposed several edits to paragraphs (a)(1) through (7), except paragraph (a)(3), including a substantive revision to paragraph (a)(4).

In paragraph (a)(1), the Department proposed to state that SWA officials must discontinue services to employers who submit and refuse to correct or withdraw job orders containing terms and conditions contrary to *employment-related laws*. The existing regulation contains the terms *alter* and *specifications*. The Department proposed to change *alter* to *correct* to more clearly articulate that the employer must specifically correct the noncompliant term or condition rather than simply change the term or condition, which might not result in correction of the noncompliance. The Department also proposed to change *specifications* to *terms and conditions* to align the language in paragraph (a)(1) with the language used in § 653.501. For the reasons discussed in the NPRM and below, the Department adopts paragraph (a)(1) as proposed.

Several trade associations, including the Florida Fruit and Vegetable Association (FFVA), GFVGA, Western Growers, USA Farmers, USApple, NHC, Snake River Farmers' Association (SRFA), AmericanHort, NCFC, IFPA, wafla, and FSGA, along with ma´sLabor, USAFL and Hall Global, the Michigan Farm Bureau, McCorkle Nurseries, Inc., Northern Family Farms, LLP, Mountain Plains Agricultural Service, Willoway Nurseries, an individual, and an anonymous commenter, opposed or expressed concerns regarding the Department's proposal to change the word "alter" to "correct." These commenters stated that SWAs often misstate, misinterpret, or incorrectly apply the meaning of various employment-related laws when processing jobs orders. Some cautioned that SWAs do not have sufficient familiarity with applicable laws to make determinations as to whether the terms and conditions in an employer's job order comply with employment-related laws. Others stated that SWAs have limited resources to conduct fact investigations in making such determinations. One commenter noted that the NPRM does not indicate whether SWAs will receive training or guidance on applicable State and Federal laws.

Additionally, commenters raised concerns as to how disagreements between employers and SWAs under proposed paragraph (a)(1) will be resolved. Some stated that use of the proposed "correct" presumes that the SWA's interpretation of employment-

related laws is accurate, does not allow employers to challenge the SWA's interpretation, flips the burden of demonstrating a basis for discontinuation onto employers, and requires employers to prove a negative. Others stated that proposed paragraph (a)(1) is vague, does not allow employers to resolve disagreements with SWAs in good faith, and allows for discontinuation where the employer's alleged noncompliance with employment-related laws has not been adjudicated on the merits.

In the H–2A context, several commenters questioned the interplay between proposed paragraph (a)(1) and the emergency application procedures at §§ 655.121 and 655.134, which allow employers to appeal to a DOL Certifying Officer (CO) where they are unable to resolve outstanding deficiencies in the contents of H–2A job orders with the SWA. Because proposed § 658.501 describes the circumstances in which SWAs *must* initiate discontinuation, commenters asked whether every emergency application will automatically require initiation of discontinuation proceedings. Additionally, commenters asked whether employers would undergo discontinuation proceedings before the DOL CO resolves the emergency application; and whether the SWA would still be under an obligation to discontinue services after a CO has determined that a job order is, in fact, compliant with employment-related laws. Commenters stated that SWAs frequently assert that the contents of a job order are contrary to employment-related laws—only to have the CO overturn that determination in a subsequent emergency filing under § 655.134.

Finally, commenters opposed application of proposed paragraph (a)(1) to agents and attorneys. One commenter stated that proposed paragraph (a)(1) extends enforcement of employment-related laws to agents, who are not employers and, thus, not subject to said laws. Another commenter stated that application to agents and attorneys may unlawfully force agents and attorneys to violate legal and ethical duties to their clients by requiring them to change terms and conditions in job orders contrary to the express wishes of their clients. That commenter also expressed concern with the effect of proposed paragraph (a)(1) on agents and attorneys, stating that a SWA's incorrect interpretation of an employment-related law, and subsequent discontinuation of services, could lead to irreparable harm to that agent or attorney's business, and

to the clients who use the agent or attorney to file job orders.

Commenters suggested several changes to proposed paragraph (a)(1), including: (1) requiring an enforcement agency to make a predicate finding of a violation of an employment-related law; (2) limiting proposed paragraph (a)(1) to repeated failures to correct or withdraw job orders that have already been adjudicated; (3) allowing employers to contest discontinuation by demonstrating that the matter has not been adjudicated on the merits; (4) clarifying that failure to include State and local laws in a job order is not a basis to refuse to open a job order or discontinue services; (5) automatically staying discontinuation proceedings if an employer files an emergency application under § 655.121, § 655.134, or § 655.171 until the CO or Administrative Law Judge (ALJ) reaches a final determination on the merits; (6) automatically terminating discontinuation if a CO issues a Notice of Acceptance under § 655.143; (7) modifying § 658.504 to require reinstatement where a CO determines that the job order is compliant with employment-related laws; (8) allowing employers to appeal directly to an ALJ in lieu of a State hearing official; and (9) excluding application to agents and attorneys.

The Department appreciates commenters' views and recommendations. The Department emphasizes that its proposal to change the word *alter* to *correct* in paragraph (a)(1) is a clarifying edit that is not intended to make any substantive change to the regulation. As discussed above, the proposed change more clearly articulates that employers must correct terms and conditions in job orders that are contrary to employment-related laws, rather than simply change them. For example, § 653.501(d)(2) provides that SWAs may place an intrastate or interstate order seeking workers to perform farmwork for a specific farm labor contractor or for a worker preferred by an employer, provided the order meets ES non-discrimination criteria. It further states that an order would not meet such criteria, for example, if it requested a *white male crew leader* or *any white male crew leader.* In this example, were an employer to subsequently change this term from "white male crew leader" to "white crew leader," the employer has altered the term but has not corrected it to bring it in compliance with non-discrimination laws (including, *e.g.,* the requirement at § 653.501(c)(1)(ii) that clearance orders not contain an unlawful discriminatory

specification). The word *correct,* therefore, better aligns with the intent of paragraph (a)(1), which is to ensure that clearance order terms and conditions comport with employment-related laws and that SWAs take appropriate action where such terms and conditions are not corrected.

The Department further emphasizes that proposed paragraph (a)(1) does not impose any new requirements, and the discontinuation process is separate and distinct from the review process for criteria clearance orders (orders that are attached to H–2A applications) in § 655.121. That process includes an initial review, a deficiency notice, where applicable, an opportunity for an employer to respond, a final determination from the SWA, and an allowance for employers to file an emergency Application for Temporary Employment Certification when the SWA and the employer are unable to resolve outstanding deficiencies regarding the contents of criteria clearance orders. Where the SWA ultimately approves a criteria clearance order there would be no basis for the SWA to initiate discontinuation proceedings. Where the SWA disapproves the order and the employer files an emergency application, a CO will review and approve or deny certification (*see* § 655.160). Where the CO denies certification, and the employer does not appeal, the CO's written determination is final (*see* § 655.164). Where the employer appeals, an ALJ will issue a written determination (*see* § 655.171). Applicable here, only where there is a final determination from either the CO or ALJ that the terms and conditions in an employer's criteria clearance order are contrary to employment-related laws, and the employer refused to bring the terms and conditions into compliance, would the SWA have reason to initiate a discontinuation action.

For *non-criteria clearance orders* (orders that are not attached to H–2A applications), under § 653.501, SWAs must review and approve clearance orders within 10 business days of receipt of the order. Where a SWA reviews and approves the clearance order, there would be no basis for the SWA to initiate discontinuation proceedings. Where a SWA reviews and the terms and conditions of the order are contrary to employment-related laws, and the employer updates the order by correcting the terms and conditions, there would be no basis for discontinuation. However, where a SWA reviews and the terms and conditions of the order are contrary to

employment-related laws, and the employer refuses to bring the terms and conditions into compliance or to withdraw the clearance order, the SWA must initiate discontinuation of services under § 658.501(a)(1). Only where the SWA denies the clearance order because the employer refused to bring the terms and conditions into compliance, would the SWA have reason to initiate a discontinuation action.

As noted in the NPRM, the Department intends to increase the reach and utility of the discontinuation of services provisions, which SWAs have underutilized in recent years. While proposed paragraph (a)(1) does not include any substantive changes or new requirements, the Department recognizes and appreciates the concerns and recommendations raised by commenters—particularly those regarding effective and efficient resolution of employer and SWA disagreements, and the interplay of proposed paragraph (a)(1) and the H–2A emergency application process. In addition to the discussion above, the Department intends to issue further guidance on this basis for discontinuation.

Regarding application of proposed paragraph (a)(1) to agents and attorneys, the Department disagrees with commenter concerns. The Department reiterates that agents, attorneys, and other entities who engage the ES clearance system should be subject to discontinuation if they meet a basis for discontinuation; and that the effects and reach of discontinuation on agents/ attorneys will be the same or similar as the effect of debarment on agents/ attorneys in the existing H–2A context. As to the commenter concern that the proposal may unlawfully force agents and attorneys to violate legal and ethical duties to their clients by requiring them to change terms and conditions in job orders contrary to the express wishes of their clients, the Department emphasizes that paragraph (a)(1) is intended to ensure terms and conditions in clearance orders comply with employment-related laws. It does not require or compel agents/attorneys to violate any legal or ethical duties to their clients. To the extent an employer includes terms or conditions that violate employment-related laws, the employer's agent or attorney—who has professional and ethical duties relating to representation of the employer— would advise the employer to bring the term or condition into compliance. Discontinuation of services would not apply to an agent or attorney who attempted to bring the employer's terms and conditions into compliance. On the

other hand, a SWA would initiate discontinuation procedures where, for example, an agent/attorney instructs an employer to include in its clearance order a rate of pay that is contrary to employment-related laws and refuses to correct the rate of pay. An agent or attorney who is blameless would not be subject to discontinuation based on the acts of the employer, just as an employer who is blameless would not be subject to discontinuation based on the acts of their agent/attorney. Additionally, where there is, in fact, a good-faith disagreement with the SWA as to whether a term or condition complies, the procedures at § 658.502(a)(1) allow for submission of evidence to show that the terms and conditions are not contrary to employment-related laws; and the procedures at §§ 658.503 and 658.504 allow for appeal.

The Department proposed to reorganize paragraph (a)(2) for clarity by moving the language regarding withdrawal of job orders that do not contain required assurances to earlier in the sentence. The Department also proposed to remove language in paragraph (a)(2) that currently limits this basis for discontinuation to only those assurances involving *employment-related laws.* The Department proposed to remove this language because employers must provide all assurances described at § 653.501(c)(3), which include more than the assurance to comply with *employment-related laws.*

Wafla opposed the proposed removal of language that limits this basis for discontinuation to assurances involving *employment-related laws.* Wafla stated that the proposed change broadens the scope of discontinuation beyond employment related laws, and that discontinuation of services can be for any H–2A assurance violation.

The Department notes that the proposal did not broaden the scope of discontinuation beyond those assurances listed in § 653.501(c)(3). The proposed change to paragraph (a)(2) was made because the Department thought that discontinuation was appropriate where an employer refused to include any assurance required by subpart F of Part 653. The proposed change makes clear that employers must provide all assurances described at § 653.501(c)(3) when requesting the placement of a job order into clearance, and that SWAs must provide the same treatment to all required assurances (*i.e.,* the SWA will initiate discontinuation for employers' refusals), regardless of which assurance is involved. For these reasons and the reasons set forth in the NPRM, the

Department adopts paragraph (a)(2) as proposed.

The Department proposed to amend paragraph (a)(4) to add that SWA officials must initiate procedures for discontinuation of services for employers who are currently debarred from participating in the Department's H–2A or H–2B foreign labor certification programs. It proposed no changes to the regulatory text that states that SWA officials must initiate procedures for discontinuation of services to employers who are found by a final determination by an appropriate enforcement agency to have violated any employment-related laws and notification of this final determination has been provided to the Department or the SWA by that enforcement agency. The Department received numerous comments on proposed paragraph (a)(4), though the vast majority of them related to this existing language in § 658.501(a)(4) where no changes were proposed.

The Department also requested comments on whether the SWAs should also initiate discontinuation of services to employers who are debarred from participation in any of the Department's foreign labor certification programs. The Department did not receive many comments in relation to this question.

After careful consideration of the comments, the Department has adopted the proposed language without change. The comments are discussed in detail below.

In relation to the portion of (a)(4) that states that discontinuation of services must be initiated for employers who are found by a final determination by an appropriate enforcement agency to have violated any employment-related laws, the Department received many comments expressing opposition. IFPA, U.S. Custom Harvesters, Inc., GFVGA, NHC, USApple, TIPA, Titan Farms, LLC, wafla, Texas Cotton Ginners' Association, Wyoming Department of Agriculture, Burley and Dark Tobacco Producer Association, and a couple of individuals believed that the "new" proposal would result in discontinuation of services for minor infractions by employers who are acting in good faith to comply with regulations. For example, wafla expressed concerns that this proposal would allow discontinuation of services for minor paperwork violations, or a lack of documented safety meeting records. The commenters explained that there are a lot of regulations and stated that even the best employers have unintentional violations as a result of misunderstanding the requirements or conflicting guidance from government agencies.

The commenters also alleged that the discontinuation of services based on minor infractions would lead to delays in processing as well as the cost of time for agents/attorneys to respond to the discontinuation notice. Instead, they argued that discontinuation of services should be a result of willful violations that affect the health and safety of workers.

NCFC, Western Growers, AmericanHort, and Willoway Nurseries also objected to this provision. They explained that sometimes WHD may cite an employer for a violation but ultimately decide not to debar that employer, and in such a case, it argued that the SWA should not then effectively debar an employer by discontinuing services. They stated that if the Federal government, via WHD, already conducted an investigation and issued what it viewed to be an appropriate citation without debarment, then the SWA should not then subsequently try to issue another punitive sentence against the employer by discontinuing services.

The Department thanks the commenters for their concerns but believes they are unfounded. The provision of paragraph (a)(4) relating to a final determination by an appropriate enforcement agency to have violated any employment-related laws is not new—it has been a part of the regulations for over 40 years and the Department did not propose any changes regarding that aspect of paragraph (a)(4) in this rulemaking.

Regardless, the Department disagrees with the argument that more minor infractions, as opposed to willful violations, do not warrant a sanction such as discontinuation of services—if an employer has been found by an enforcement agency to have violated an employment-related law, then discontinuation is appropriate to protect the integrity of the ES system and protect workers. They may rebut the proposed discontinuation or apply for reinstatement after a final discontinuation order has been issued by, among other methods, providing evidence that they have adequately responded to any findings, including any restitution or payment of fines. The Department does not believe it unreasonable to require an employer, who has been found in a final determination to have violated an employment-related law to have to remedy the violation or appeal the discontinuation before they are permitted to recruit workers through the ES system. While the Department does not think that this provision will lead to any greater delays than may currently

occur under this pre-existing ground, as noted above the Department thinks that the benefit of the provision outweighs any potential delay that may occur.

Finally, the Department is also unconvinced by the notion that if an enforcement agency, such as WHD, decides to issue a final determination against an employer, but ultimately not debar the employer, this prevents or should prevent the SWA from discontinuing services. Debarment is not the same as a discontinuation of services—while discontinuation would preclude an employer's ability to access the H–2A program, they are different actions taken by different actors with different consequences under different authority. As discussed in the NPRM, the goal of discontinuation is to protect workers and the integrity of the ES system by preventing employers from using the system to recruit workers if they have misused the ES system or otherwise engaged in actions that are harmful to workers until they have corrected the issue(s) giving rise to their discontinuation. Sections 658.502 and 658.504 explain that an employer can respond to a proposed discontinuation or seek reinstatement if they have responded to the findings of an enforcement agency, including payment of restitution or fines, and establish that they have addressed or revised any policies, procedures, or conditions that gave rise to the violation(s). The ability to seek reinstatement is an important distinction from debarment, which is for a set period of time regardless of any remedial action taken by the debarred entity.

IFPA, GFVGA, NHC, and an anonymous commenter stated that this proposal to allow for discontinuation of services for an employment-law related violation was overly punitive because the underlying issue would have already been cited by another agency, and a final determination would have already been reached. They also argued that this went beyond the legal purview of the SWA in its review of the job orders.

The Department disagrees. Again, as noted above, the Department thinks that it is reasonable for an employer to have to remedy their violations before being allowed to receive services. Until those violations are remedied, it is appropriate and well within the purview of a SWA to discontinue ES services to better protect workers, and to maintain the proper functioning of the ES system by serving employers who demonstrate the ability to comply with State and Federal laws governing the employment relationship.

Wafla, USA Farmers, AgriMACS, Inc., and one individual argued that this proposal lacked due process, but it is unclear if this comment related specifically to provision (a)(4), or how this section lacks due process. USA Farmers elaborated that with regard to H–2A applications, the Department will not refuse to process them simply because an employer is under investigation by WHD, for example, but in this context, an employer would have their services discontinued without an appeals process.

The SWA must *initiate* discontinuation of services to employers who are found by a final determination by an appropriate enforcement agency to have violated employment-related laws, or those who have already been debarred. First, in both instances, employees would have had the opportunity to go through appropriate procedures, including, in the case of H–2A and H–2B findings (including those resulting in debarment), a robust appellate process. Second, this provision only relates to the *initiation* of the discontinuation of services. Employers will still have 20 working days to respond to the discontinuation notice pursuant to § 658.502 and may appeal a final determination regarding discontinuation of services pursuant to § 658.504. As discussed throughout the preamble, if a final determination regarding discontinuation is appealed then the effect of the discontinuation is generally stayed. The Department therefore thinks that this provides entities with ample due process protections.

U.S. Custom Harvesters, Inc., IFPA, GFVGA, NHC, TIPA, and one individual requested the Department identify a look back period so that they could know whether noncompliance adjudications or settlements from previous years would affect them.

In the NPRM, in the section of the preamble discussing § 658.501(b), the Department had asked commenters if SWAs should limit their examination of previous labor certifications or potential violations of a labor certification to a certain time period. 88 FR at 63763. The Department believes that this comment is more appropriately addressed in the section relating to § 658.501(b). To the extent the comment is relevant to this provision, while the Department did not propose a look-back period or suggest that it was contemplating adding such a provision, we note that H–2A and H–2B program debarments are time limited and that an employer whose services have been discontinued as a result of an H–2A or H–2B debarment can seek reinstatement once their period of debarment has ended.

An anonymous commenter opposed the new provision of the regulation that requires discontinuation for employers who are currently debarred from participating in the H–2A or H–2B foreign labor certification programs pursuant to § 655.73 or § 655.182 of this chapter or 29 CFR 501.20 or 503.24. They argued that this would be overly punitive and that debarment is a harsh enough punishment. They explained that if they were a farm that was dependent on H–2A workers and was debarred, and then subsequently not able to hire U.S. workers via the SWA, they would need to go out of business or alter their business significantly. Another anonymous commenter stated it did not support expanding or empowering SWA authority under a Federal program.

The Department does not believe it punitive to initiate discontinuation of services against a debarred H–2A or H–2B employer, but rather believes it is necessary to protect workers and effectuate the purpose of the ES system, which is to improve the functioning of the nation's labor markets by bringing together individuals who are seeking employment and employers who are seeking workers. As stated in the NPRM, the Department recognizes that many employers who use the ARS also seek temporary agricultural labor certifications from OFLC under part 655, subpart B. These employers may attempt to recruit workers through non-criteria orders in the ARS if they are prohibited from using the H–2A program as a result of their debarment. The Department does not want the ES system to facilitate placement of U.S. workers with employers whom the Department has determined should not be permitted to employ nonimmigrant workers through its H–2A and H–2B programs, particularly where the U.S. workers may perform similar work and, thus, be subject to the same or similar violations giving rise to the employer's debarment.

This requirement will protect workers who use the ARS by ensuring that ES offices do not place U.S. workers with H–2A/H–2B debarred employers during any such period of debarment. Debarment is a serious sanction that, in the case of H–2A employers for example, results from a finding not only that an employer violated a material term or condition of its temporary agricultural labor certification, but also that the violation is so substantial as to merit debarment, and it is imposed only after an employer has exhausted or forfeited an opportunity to respond to

the debarment action, appeal it, or both. Violations may be related to worker safety, failure to provide required wages or working conditions, failure to comply with recruitment requirements or participate in required investigations or audits, or failure to pay required fees, among other substantial violations. Entities that have committed such violations should be excluded from participation in the ES, and the Department is better able to protect U.S. workers by ensuring that they will not be placed with debarred employers that have substantially violated a material term or condition of their temporary agricultural labor certification.

The new regulatory provision would also ensure that the ES system would have more resources to assist law-abiding employers to recruit available U.S. workers for jobs because SWAs would spend less time and resources serving noncompliant employers, and law-abiding employers would receive referrals of qualified U.S. workers that might otherwise go to noncompliant employers.

UMOS, Green America, CAUSE, PCUN, North Carolina Justice Center, UFW, the UFW Foundation, and CCUSA and USCCB provided generalized support for the provision that requires the initiation of discontinuation of services against employers who are debarred from H–2A and H–2B labor certification programs without much further elaboration.

The Agricultural Justice Project and an individual supported expanding the provision to require SWAs to initiate discontinuation proceedings against employers who are debarred from any of the Department's other foreign labor certification programs. The Agricultural Justice Project stated that doing so will help stop repeat violators. An individual expressed the opinion that requiring a discontinuation of services against employers debarred from other programs would not have "any negative effect." Also, it would provide more consistent outcomes between DOL and SWA actions rather than allowing employers to circumvent debarment.

The Colorado Department of Labor and Employment did not directly oppose the expansion to include other debarred employers but noted that it would be difficult to initiate a discontinuation of services because they are not as knowledgeable about the rules and regulations that govern the programs not administered by the SWAs.

The Department thanks commenters for their supportive comments. As noted above, the Department will adopt the proposed regulation without change. It

is true that expanding the provision to require an initiation of discontinuation of services against an employer who is debarred from any foreign labor certification program may deter repeat violators, or those who attempt to circumvent debarment in one program by using another. However, at this time, the Department will not expand this provision to include employers who are debarred under any foreign labor certification program, only the H–2A and H–2B programs. The Department did not receive a significant number of comments in support of the expansion. Furthermore, the Department, as articulated above, has had more experience with H–2 employers who use or misuse the ES system and will therefore focus current efforts on employers that have been debarred from the H–2A and H–2B programs. Finally, the Department appreciates the comment from the Colorado Department of Labor and Employment and, should expansion be proposed again, will consider if additional guidance to SWAs will be needed.

Finally, the Department did receive some additional comments that offered conditional support, suggestions, or both. The Colorado Department of Labor and Employment lamented that enforcement agencies do not have a standard practice of sharing findings with the SWA. It suggested that if a debarment action is taken against an H–2A or H–2B employer, the Department should immediately inform the SWAs of said debarment. Another anonymous commenter suggested something similar as well.

Farmworker Justice echoed some of these concerns noting that SWA officials have informed them that they have been unable to discontinue services in some instances because they were not given the final investigative determinations by enforcement agencies. Farmworker Justice further explained that, allegedly, SWA officials have been told to file Freedom of Information Act (FOIA) requests for information on employers, but if they do not know which employers are being investigated, they cannot submit such a request. Farmworker Justice suggested that the Department adjust § 501(a)(4) to adopt more expansive language from § 501(a)(3) to trigger mandatory discontinuation of services whenever the SWA learns of a final determination from the enforcement agency, or via another manner.

Farmworker Justice also suggested the Department require its agencies to notify SWAs of final determinations where an employer was found to have violated an employment-related law or regulation.

In support of expanding discontinuation of services, Farmworker Justice noted that discontinuation, unlike debarment, can result in more farmworkers receiving restitution, and an employer adopting corrective action plans.

The Department thanks the commenters for their suggestions but declines to adopt further changes to the regulatory text. Many SWAs have existing relationships with the Department's enforcement agencies, and the Department will continue to engage with appropriate enforcement agencies to encourage the sharing of information with SWAs where appropriate to provide SWAs the information necessary to initiate a discontinuation action.

The Department notes that a SWA may also learn of a final determination of noncompliance issued by an appropriate enforcement agency through sources other than the enforcement agency (e.g., through a press release, a newspaper, or farmworker advocates). While the initial information the SWA receives from another source would not require the SWA to initiate discontinuation of services, the information might constitute an apparent violation, which § 651.10 defines as a suspected violation of employment-related laws or ES regulations by an employer that an ES staff member observes, has reason to believe, or regarding which an ES staff member receives information (other than a complaint as defined in this part). Under § 658.419(b), if the employer has filed a job order with the ES office within the past 12 months, the ES office must attempt informal resolution of the apparent violation as described at § 658.411. As a part of the SWA's informal resolution attempt, the SWA may contact the enforcement agency to confirm the final determination and, at that point, the enforcement agency may provide notice to the SWA of the final determination, which would prompt the SWA to initiate discontinuation of services.

The Department further notes that under § 658.501(a)(3), which the Department did not propose to revise, a SWA must initiate procedures for discontinuation of services to employers that the SWA finds, either through field checks or otherwise, to have either misrepresented the terms or conditions of employment specified on job orders or failed to comply fully with assurances made on job orders. Therefore, if a SWA obtains sufficient facts evidencing that an employer failed to comply fully with assurances made on job/clearance orders and, after reviewing the matter, determines that

discontinuation is warranted, it should initiate discontinuation even absent a final determination from an enforcement agency. For example, if a SWA has sufficient evidence that an employer violated a employment-related law relative to a clearance order and after reviewing or investigating the matter as appropriate, the SWA determines that the employer did not comply with the required assurance at § 653.501(c)(3)(iii) that the working conditions comply with applicable Federal and State minimum wage, child labor, social security, health and safety, farm labor contractor registration and other employment-related laws, the SWA should initiate discontinuation of services citing § 658.501(a)(3). This could occur in situations where the SWA has conclusive evidence of a violation. For example, there have been several recent cases where employers were on video threatening workers with physical violence in retaliation for workers asserting their employment-related rights. The Department notes that, in addition to initiating discontinuation of services, SWAs are required to refer unresolved apparent violations and complaints that involve employment-related laws to applicable enforcement agencies, as described at part 658, subpart E.

The Department is committed to providing protections for both U.S. workers and H–2A workers, as well as providing a fair and equitable ES system for employers. In light of the above-discussed comments, the Department adopts the proposed regulatory language at § 658.501(a)(4) without change.

The Department proposed to amend § 658.501(a)(5) by adding that this basis for discontinuing services includes employers who are found to have violated ES regulations pursuant to § 658.411 or § 658.419. This edit is intended to clarify that ES violations may also be found as a result of apparent violations that are described at §§ 651.10 and 658.419 (*i.e.,* violations that ES staff observe or about which they otherwise receive information).

USA Farmers opposed the inclusion of apparent violations, stating that, as proposed, a mere suspicion of a violation now constitutes a finding of a violation under proposed paragraph (a)(5). Washington State inquired generally as to whether the proposed changes in the H–2A program will result in additional findings during field checks or apparent violations or complaints. As to the H–2A program, they stated that while they provide business services and help ensure employer compliance through outreach and technical assistance, using

discontinuation of ES services when warranted, SWAs are not enforcement agencies with jurisdiction over H–2A program violations. SWAs should not be positioned as a substitute for timely and comprehensive WHD enforcement of potential violations of H–2A rules.

The Department appreciates the commenters' concerns. As noted in the proposed rule, the change in paragraph (a)(5) is a clarifying edit that does not make any substantive change or impose any new requirement. Section 658.411, entitled "Action on complaints," addresses complaints filed with the ES. However, under § 658.419, apparent violations are also documented and processed under the ES Complaint System (*see* part 658, subpart E), including, in some instances, pursuant to procedures in § 658.411. The Department's change just clarifies that ES violations triggering discontinuation may be found as a result of either the complaints or apparent violations that are processed in the ES Complaint System. The Department emphasizes that discontinuation under paragraph (a)(5) is limited to findings of violations of ES regulations only and does not require or compel SWAs to make formal findings regarding apparent violations of other employment-related laws. Nor does it allow SWAs to initiate discontinuation based on suspicion alone. Rather, the SWA must make formal findings as it relates to the apparent violation of ES regulations before the requirement to initiate discontinuation is triggered. As to apparent violations of employment-related laws, the Department notes that § 658.419 continues to provide for informal resolution and referral to appropriate enforcement agencies. Where an informal resolution of ES violations is reached that remedies the immediate violation and ensures future compliance, the Department does not think that discontinuation would be appropriate. Further, neither § 658.419 nor proposed paragraph (a)(5) impede on WHD's enforcement authority over the H–2A program or the enforcement authority of other appropriate agencies, and none of the changes made in this regulation are meant to give SWAs authority to enforce the requirements of the H–2A program. For these reasons and the reasons set forth in the NPRM, the Department adopts paragraph (a)(5), as proposed.

a. Section 658.501(a)(6)

The Department proposed to amend paragraph (a)(6) by clarifying that discontinuation of services on the basis of failure to accept qualified workers would be appropriate only for

employers placing criteria clearance orders. The requirement to accept qualified workers referred through the clearance system applies only to criteria clearance orders filed pursuant to § 655.121. For non-criteria clearance orders, the regulations at part 653, subpart F, do not require employers to hire all qualified workers referred through the ES, so this basis for discontinuation does not apply to non-criteria clearance orders.

USAFL and Hall Global commented that the final rule should modify paragraph (a)(6) to only permit SWAs to initiate discontinuation of services for employers that willfully refuse to accept qualified workers referred through the clearance system. As an example, they described a rancher who advertises a ranch hand job with an experience requirement. If the SWA refers a person who had experience but two decades in the past and in a different country, that person has no experience with modern U.S. production methods, and it is unclear whether that person is qualified. They explained that adding the word willfully would allow the employer to use its best good-faith judgment even in cases where the SWA or enforcement agency may disagree in similar good faith. They also contended that instead of qualified workers, the proposal should apply to workers who are able, willing, and qualified, and who will be available at the time and place needed to conform to 8 U.S.C. 1188.

The Department does not find it appropriate to add that an employer must willfully refuse to accept qualified workers, as the commenter described. The example the commenter provided describes a situation where a SWA or an enforcement agency may disagree with an employer regarding a worker's qualifications. While SWAs are responsible for making accurate determinations, under § 658.502(a)(6), the employer may present evidence to the SWA that workers were not qualified upon initial notification or during the 20 days that the employer has to respond to the SWA's intent to discontinue services. The Department also notes that the corresponding requirement in § 655.135(c)(3) requires that the employer must consider all U.S. applicants for the job opportunity until the end of the recruitment period, as set forth in § 655.135(d). Under § 655.135(c)(3), the employer must accept and hire all applicants who are qualified and who will be available for the job opportunity, and U.S. applicants can be rejected only for lawful, job-related reasons, and those not rejected on this basis will be hired. The requirements in part 655, subpart B do

not state or contemplate a willfulness standard. The Department declines to add a willfulness requirement here because it would not align with the requirements in part 655, subpart B.

The Department also declines to further revise § 658.501(a)(6) to expand the description of qualified workers. The Department notes, however, that as the change proposed and adopted by the Department is meant to clarify that § 658.501(a)(6) applies to criteria orders, SWAs should be applying this basis for discontinuation of services in light of the standards outlined in part 655, subpart B. Finally, the Department notes that proposed § 658.502(a)(6) allows employers to avoid discontinuation by providing evidence that the workers were not available or qualified.

The Department adopts paragraph (a)(6), as proposed.

b. Section 658.501(a)(7)

In paragraph (a)(7), the Department proposed to remove the words *in the conduct of,* which are currently present but do not add meaning and are therefore extraneous and unnecessary.

USAFL and Hall Global commented that the Department should revise paragraph (a)(7) to include a scienter element, which requires that an individual have both knowledge that an act or conduct is wrongful, and intent to act despite that knowledge. They contended that paragraph (a)(7) should begin with the words *bad faith refusal* and that the bad-faith standard should have a subjective and objective component. Citing Rule 11 of the Federal Rules of Civil Procedure, they stated that bad faith would not exist if the employer or legal counsel subjectively believed that the refusal was warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law, and that a reasonable person would agree that the refusal may be reasonably warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. They stated that a bad-faith standard would provide a mechanism to effectively petition to redress grievances and ensure that issues are resolved cooperatively early on rather than having an enforcement proceeding reversed.

The Department declines to adopt a bad-faith standard. The Department's proposed change to paragraph (a)(7) is a clarifying edit that does not make any substantive change. Additionally, the commenters' recommendation exceeds the scope of the Department's proposed change and, if adopted, would deprive

the full regulated community of its opportunity to comment. Even if it were not beyond the scope of the non-substantive clarifying edit, the Department thinks that implementing this suggestion would not be appropriate. The ES has a responsibility for conducting unannounced field checks on agricultural orders where U.S. workers have been placed, and employers utilizing ES services must assure that ES staff have reasonable access to workers so that ES staff can adequately fulfill their field check duties. *See* 45 FR 39454, 39455 (June 10, 1980). The field check provisions at § 653.503 reflect the Department's longstanding recognition that ES staff must abide by applicable laws when entering employer premises while employers must simultaneously allow the ES reasonable access to placed workers. *See id.* The Department believes that this balance of ES and employer obligations sufficiently mitigates against circumstances where, as the commenters describe, an employer's refusal to participate in a field check is warranted by existing law. As such, the Department does not view a ''bad faith refusal'' standard as necessary or appropriate. For these reasons, the Department adopts paragraph (a)(7), as proposed.

c. Section 658.501(a)(8)

Paragraph (a)(8) requires SWAs to initiate discontinuation of services to employers who repeatedly cause the initiation of discontinuation procedures pursuant to paragraphs (a)(1) through (7) of this section. The Department did not propose changes to paragraph (a)(8) in the NPRM but received several comments, discussed below.

The Michigan Farm Bureau, Western Growers, FSGA, NCFC, USApple, FFVA, AmericanHort, and Willoway Nurseries all stated that the Department should provide more clarity on what repeatedly causes the initiation of discontinuation of services under paragraph (a)(8). The commenters asked whether there is a prescribed number of times discontinuation must be initiated to be considered repeated. The commenters stated that the Department's intent and how the basis for discontinuation would be implemented is not clear. The commenters stated that employers are concerned that simple disagreements on terms and conditions and relevant labor laws might lead to SWAs initiating discontinuation services more often, which could also result in SWAs citing the basis in paragraph (a)(8) more frequently. USAFL and Hall Global also

stated that the Department should eliminate paragraph (a)(8) entirely.

Willoway Nurseries, Michigan Farm Bureau, FSGA, NCFC, FFVA, and AmericanHort asked how paragraph (a)(8) affects criteria employers that file emergency applications under part 655, subpart B. They asked whether each time an employer files an emergency H–2A application because of a dispute with the SWA, the SWA will initiate discontinuation of services, and argued that, if so, there will be increased discontinuation actions under § 658.501(a)(8).

The Department appreciates these comments. As the Department did not propose to revise paragraph (a)(8), the comments exceed the scope of this rulemaking. Making changes to this paragraph through this final rule would deprive the full regulated community of its right to comment on any changes. Therefore, the Department declines to revise paragraph (a)(8).

d. Section 658.501(b)

Current § 658.501(b) explains the circumstances and procedures for immediate discontinuation of services. The Department proposed to move paragraph (b) to §§ 658.502 and 658.503 to clarify that existing paragraph (b) is not an independent basis for discontinuation and to better align it with the discontinuation procedures in §§ 658.502 and 658.503. The Department did not receive any comments on this proposed change and adopts it, as proposed.

e. Section 658.501(c)

The Department proposed to redesignate current § 658.501(c), which recognizes the unique interplay between the ES and H visa programs, to § 658.501(b), with revisions. The proposed § 658.501(b) explained what a SWA would be required to do when it has learned that an employer participating in the ES system may not have complied with the terms of its temporary agricultural labor certification under, for example, the H–2A and H–2B programs. The current regulation states that SWA officials must engage in the *procedures* for discontinuation of services to employers pursuant to paragraphs (a)(1) through (8) of § 658.501. The Department proposed to clarify that SWA officials must determine whether the SWA must *initiate* discontinuation of services pursuant to § 658.501(a). The proposed change would clarify that SWAs cannot proceed with discontinuation procedures based solely on information that an employer *may* have violated the terms of its temporary agricultural labor

certification. Rather, SWAs must take that information and look to paragraph (a) to determine whether one of the bases for discontinuation applies. Once a SWA determines that one of the bases for discontinuation under paragraph (a) does apply, then the SWA *must* initiate discontinuation of services. Finally, as the proposed paragraph (b) would apply to both currently active and previous labor certifications, in the NPRM, the Department invited comments on whether it would be appropriate to limit the scope of previous labor certifications or potential violations of a labor certification to a particular time period.

The Department received comments from Willoway Nurseries, Michigan Farm Bureau, Western Growers, FSGA, NCFC, USApple, FFVA, and AmericanHort, who each opined that it would be appropriate to limit the scope of previous labor certifications or potential violations of a labor certification to the previous 3 years. The commenters cited that employers in the H–2A and H–2B program are only required to maintain records under those programs for 3 years. They said that a longer time period would frustrate fact finding because employers may not have records beyond 3 years. Additionally, the commenters noted, WHD generally limits the investigative period for its H–2 investigations to no more than 3 years and the FLSA has a 3-year statute of limitations for willful violations and 2-year statute of limitations for non-willful violations. USA Farmers stated that if the Department finalizes any of the suggested changes for discontinuation of services, as to prior labor certifications, the SWAs should use only violations that are finalized after the date of this final rule when making a decision about discontinuing services. They stated that prior to the NPRM, employers would not expect that a minor violation could result in discontinuation of servicers; and that oftentimes employers choose to just pay fines for alleged violations because challenging them will often cost more money in legal fees even if the challenge is successful. They stated that under the current system, an employer has no idea that a minor violation can effectively get them debarred from the H–2A program, and that using a prior violation that the employer had no way of knowing would be used to exclude them from the program is unjust.

The Department agrees with the commenters that it is appropriate to limit the scope of previous labor certifications or potential violations of a labor certification, which SWAs must consider in determining whether there is a basis under paragraph (a) for which

the SWA must initiate discontinuation of services. The Department also acknowledges that part 655 requires employers to retain certain records for not less than 3 years after the date of the certification. *See* § 655.122(j)(4) and (n); § 655.167(b); and § 655.173(b)(1)(i). Additionally, 2 CFR 200.334 generally requires SWAs to keep records pertinent to the ES program for 3 years from the date of submission of the final grant expenditure report. For these reasons, records necessary to determine if any basis under paragraph (a) is met should be available within a 3-year lookback. Finally, the Department does not find it appropriate to limit the applicability of proposed § 658.501(b) to violations that are finalized after the date of this final rule.

The Department noted in the preamble that this provision, which is substantively the same as the current regulation, would apply to both active and previous labor certifications. Regardless of whether an employer has already resolved a matter with, for example, WHD, including through a settlement, a SWA would have a basis to initiate a discontinuation of services if sufficient facts exist under § 658.501, but, as discussed below under § 658.502, an employer can respond to a proposed SWA's notice of intent to discontinue services by providing evidence that it has taken all actions required by the enforcement agency, including payment of restitution or fines, and that they have addressed or revised any policies, procedures, or conditions that gave rise to the violation(s). When considering an employer's response to a notice of intent to discontinue, SWAs will consider and assess the evidence provided by an employer that they have, in fact, corrected policies, procedures, or conditions responsible for the violation and that the same or similar violations are not likely to occur in the future. The Department notes that, in order to avoid discontinuation of services, the employer must provide the evidence requested in the SWA's notice of intent to discontinue services, as described in § 658.502.

Accordingly, the Department is revising proposed paragraph (b) to limit the scope of previous labor certifications or potential violations of a labor certification that prompt SWAs to determine whether there is a basis under paragraph (a) to initiate discontinuation of services to the 3 previous years. The Department is making additional changes to incorporate the existing obligations on SWAs and ES offices under part 655 and 29 CFR parts 501 and 503 to notify

OFLC and WHD upon receiving information that an employer may have committed fraud or misrepresentation in applying for a labor certification or may have violated its terms. The Department otherwise adopts changes to this section as proposed.

4. Section 658.502, Notification to Employers

Section 658.502 describes the notification and procedural requirements a SWA must follow when it intends to discontinue services to an employer. The Department proposed several changes throughout § 658.502 to clarify and streamline these requirements.

First, the Department proposed to revise the section heading to state that it relates to notification to employers of the SWA's intent to discontinue services. This change clarifies that this section relates only to initial notices proposing discontinuation and not to the final notices described in § 658.503. The Department did not receive comments on this change and adopts the section heading at § 658.502, as proposed.

Second, the Department proposed to add introductory language to the beginning of paragraph (a) to clarify that the procedures at paragraphs (a)(1) through (a)(8) relating to notification of intent to discontinue services apply where the SWA determines that there is an applicable basis for discontinuation under § 658.501(a), but do not apply to immediate discontinuation. The Department proposed additional revisions to paragraph (a) to clarify that the initial notices must provide the reasons for proposing discontinuation and must state that the SWA intends to discontinue services in accordance with this section. The proposed language removes the reference to part 654, to which discontinuation of services does not apply. The Department notes that if more than one basis under paragraph (a) applies, the SWA must initiate discontinuation under all applicable bases. The Department did not receive comments on these changes and adopts paragraph (a), as proposed.

Third, paragraphs (a)(1) through (7) provide specific notification requirements for each of the corresponding bases for discontinuation of services outlined in § 658.501(a)(1) through (7). The Department proposed to remove language in § 658.502(a)(1) through (7) that describes the applicable bases for discontinuation and instead cross-reference the applicable citations for clarity. For example, the Department proposed to revise § 658.502(a)(1) to state that the paragraph applies where

the proposed discontinuation is based on § 658.501(a)(1). This would replace current language that describes § 658.501(a)(1) and more clearly and succinctly directs the SWA to § 658.501(a)(1) as the applicable basis. The Department did not receive comments on these changes and adopts them throughout paragraphs (a)(1) through (7), as proposed.

Fourth, the NPRM proposed to remove language in § 658.502(a)(1) through (7) and § 658.502(b) and (d) providing employers the opportunity for a pre-discontinuation hearing—while maintaining the opportunity for employers to submit evidence contesting a SWA's notice of intent to discontinue services under § 658.502 and the opportunity for a post-discontinuation hearing in § 658.504. The Department proposed this change to better align the hearing procedures for discontinuation of services at part 658, subpart F, with the hearing procedures for the ES Complaint System at §§ 658.411(d) and 658.417, which allow for a hearing by a State hearing official only after the SWA issues a final decision on a complaint. This change also allows for a more efficient process without removing due process protections for employers and ensures that post-discontinuation hearings are decided on a more complete record. Having carefully considered the public comments, the Department adopts the language of the NPRM without change in the final rule.

The comments shared by several trade associations, employers/farmers, SWAs and H–2A consulting firms generally opposed the NPRM proposal to remove the option of a pre-discontinuation hearing asserting it would penalize employers by denying them access to the clearance system prior to the notice or opportunity to refute the alleged claims. USA Farmers asserted that the Department sought to weaponize the Wagner-Peyser system by creating a ''backdoor'' debarment process without meaningful due process. Other trade associations, such as IFPA and the U.S. Chamber of Commerce, as well as a couple of farm employers, submitted similar comments noting that the proposal took a guilty-first mentality and sharing the same due process concern. The American Farm Bureau Federation, for example, opposed the proposed change in the NPRM by arguing that failing to provide an employer the opportunity of a hearing before discontinuation would be burdensome and disruptive to the operation of any business, but it would be particularly injurious to America's farmers and ranchers.

Other commenters expressed similar concerns that the proposal would allow for immediate discontinuation, without notice or opportunity to refute claims against the employer or affiliate, and effectively debar employers from the H–2A program. The same commenters and others also worried that this proposal would cause an increase in notices sent without proper basis and cautioned that the proposed change might not protect employers from frivolous charges based on small infractions, such as failure to notify the ES of a delayed start date for a single employee. The lack of a pre-discontinuation hearing might place an employer or affiliate immediately on the discontinuation list and could cause a reduction of services and job opportunities for employees who work with agents, attorneys, or others due to their names being placed on the discontinuation list. A couple of commenters emphasized that the ability to present facts and information to refute the evidence the SWA is relying on to an impartial hearing officer is integral to an efficient clearance system.

Similarly, other commenters were concerned that the proposal would provide SWA officials sole discretion over an employer's ability to participate in the H–2A program. IFPA cautioned that removing the option of a pre-discontinuation hearing would lead to delays in processing clearance orders for all employers, not just those subject to additional scrutiny. Ma´sLabor urged the Department to adopt reasonable standards to protect due process, and also cautioned against conferring broad powers to SWAs while limiting an employer or agent's recourse in contesting or refuting the SWA's findings, since, it argued, such actions would likely result in irreparable harm to the impacted businesses. An anonymous commenter expressed concern that the proposal would shift the burden of proof to the employer to show program compliance, instead of the SWA demonstrating noncompliance prior to issuing a notice of discontinuation.

USA Farmers referred to a purported case involving a farm where the SWA pursued discontinuation of services based on what the commenter perceived to be mere allegations, which the commenter claimed had disastrous results for the farm and was an egregious denial of the farm's due process rights, but the commenter provided no further explanation or details of the case.

After reviewing these comments, the Department has decided to adopt the NPRM proposal without change. The Department believes that removing the

opportunity for a pre-discontinuation hearing allows SWAs to resolve discontinuation proceedings while providing sufficient due process expeditiously and fairly to employers. As discussed in the NPRM, the current process allows employers to bypass a formal decision from the SWA anytime they request a hearing and, because State administrative hearings may take several months to complete, inadvertently prolong any formal determinations. The proposed change allows for a more complete record than would result from an immediate appeal of a notice from the SWA proposing discontinuation as the record would include the employer's response to the proposed discontinuation, including relevant evidence and argument, as well as the SWA's final determination with the SWA's response to the employer's evidence and arguments.

The Department recognizes the commenters' concerns regarding due process, but the Department believes both the States and employers have sufficient time to address and resolve any disputes under the NPRM proposal. The Department's decision to remove the pre-discontinuation hearing is not injurious or disruptive to employers given that they still have the opportunity to submit rebuttal evidence to the SWA under the procedures in § 658.502 to resolve the SWA's initial findings. Once the SWA issues its final decision to discontinue services under the proposed § 658.503(a), the decision letter must specify the reasons for its final determination and state that the discontinuation of services is effective 20 working days from the date of the determination. The final determination also must notify employers that they may request reinstatement or appeal the discontinuation determination by requesting a hearing pursuant to § 658.504, and that a request for a hearing stays the discontinuation pending the outcome. The stay during the 20-day period allows SWAs to continue processing an employer's clearance orders, as no final determination on discontinuation has taken effect. A timely filing of an appeal also stays the discontinuation determination pending the outcome of the appeal. Contrary to the concerns of many commenters, the changes the Department is adopting will not result in the immediate discontinuation of services or limit employers' access to the clearance system; rather, the proposal provides sufficient due process to employers to refute any claims in the SWA's final determination, maintains employers' access to the ES system

pending resolution of a discontinuation action, and enables the development of a more complete record in the event of an appeal.

By staying the effect of discontinuation during an employer's appeal, the Department's process also provides the same due process rights to employers available in the current H–2A debarment procedures found at § 655.182(f)(3) and 29 CFR 501.20(e). Both sections grant stays in the debarment action so long as employers file timely appeals, and the stay continues through the appeal process. As with an H–2A debarment proceeding, an employer would not appear on a discontinuation list until final resolution of the discontinuation proceeding, including resolution of any appeals. Allowing employers to request a hearing only after issuance of a final determination is akin to the current OFLC process for H–2A labor certification applications under §§ 655.141 and 655.164, which provides employers the opportunity to remedy deficiencies in their applications before the CO issues a denial, but only allows employers to appeal after a denial has been issued, and not in response to a Notice of Deficiency (NOD). Providing for the opportunity to submit rebuttal evidence prior to the final determination and file an appeal after the final determination is also similar to the Department's audit resolution process for grant recipients under 2 CFR part 2900. The Department believes that the proposed discontinuation process is efficient, fair, and reasonable, and that because employers will have a full opportunity to contest the SWA's findings before they take effect, employers will be adequately safeguarded from the risk of erroneous deprivation of services.

As mentioned in previous sections, the Department also maintains that the purpose and application of discontinuation of services is distinct from debarment actions, which more narrowly apply to certain programs with different consequences under different authorities, though it notes that the process afforded employers under this regulation is similar to the process provided in a debarment proceeding. For these reasons, the Department adopts the changes to § 658.502(a)(1) through (7), as proposed.

Finally, in § 658.502(a)(1) through (7), the Department proposed changing the language that SWAs must notify employers that all *employment services* will be terminated to state that all *ES services* will be terminated. The proposed language would clarify that the services at issue are specific to the

ES. The Department did not receive comments on this change and adopts it throughout paragraphs (a)(1) through (7), as proposed.

In addition to the changes described above, the Department proposed further revisions to paragraphs (a)(1) through (7) to provide greater detail and specificity regarding the type of information that SWAs must provide to employers when proposing to discontinue services. The proposed changes ensure that SWAs adequately explain their reasons for proposing discontinuation, and that employers have sufficient factual detail to respond to the proposed discontinuation. In these paragraphs, the Department also proposed small changes for clarity, including rewording sentences so they use the active voice. Specific proposed changes are discussed below.

Ma ́sLabor and USAFL and Hall Global expressed general, overall support for these proposed changes, stating that they include a greater level of detail and specificity regarding what SWAs must provide to justify discontinuation of services, and that they support and concur with the Department's reasoning in making the changes. Western Growers, Michigan Farm Bureau, AmericanHort, Willoway Nurseries, FSGA, NCFC, USApple, and FFVA expressed concern that employers, agents, attorneys, agricultural associations, joint employers, farm labor contractors, and successors in interest would likely receive more notices of intent to discontinue services and recommended that the Department provide clear instruction to SWAs regarding information they must include in notices. Additionally, they stated that it is prudent that the Department is providing instruction to the SWAs regarding what must be in the notices.

The Department thanks commenters for their support for these proposed changes. Given the greater level of detail and specificity regarding what SWAs must provide to justify discontinuation of services, the Department agrees with commenters that additional guidance for SWAs will help facilitate effective implementation of the notice requirement. As discussed throughout this final rule, the Department will issue guidance on the discontinuation of services regulation, including the SWA notification requirements in § 658.502.

a. Section 658.502(a)(1)

The Department proposed to revise paragraph (a)(1) to replace references to *specifications* with *terms and conditions* to clarify that the notification specifically involves terms and conditions of the job order, to align this

paragraph with the proposed changes to § 658.501(a)(1), discussed above.

USAFL and Hall Global suggested that paragraph (a)(1)(i), which allows employers to submit evidence that the terms and conditions on clearance orders are not contrary to employment-related laws, should expressly permit legal argument. They further stated that SWAs should be allowed to invoke paragraph (a)(1) only when an agency with primary jurisdiction over the alleged violation has made a preliminary determination, with employer participation, that the language is in violation of employment-related laws. Additionally, they asked the Department to allow employers to contest and stay discontinuation pursuant to § 658.501(a)(1) by demonstrating that the matter has not yet been adjudicated on the merits. The commenters also added that the regulation should specify that the terms and conditions are those in § 655.122 and that the SWA may not add to them.

The Department appreciates the commenters' recommendations but declines to adopt them because they are beyond the scope of the non-substantive changes to this paragraph. Additionally, the Department believes a revision to expressly permit legal argument is unnecessary because submission of legal argument is not prohibited under § 658.502(a). The Department declines to specify that the terms and conditions in this paragraph mean only those terms and conditions in § 655.122 because §§ 658.501(a)(1) and 658.502(a)(1) apply to criteria and non-criteria orders, such that the terms and conditions in part 653, subpart F, and part 655, subpart B are applicable. Finally, as discussed above in the discussion of § 658.501(a)(1), the Department recognizes and appreciates the concerns and recommendations raised by commenters regarding effective and efficient resolution of employer and SWA disagreements under §§ 658.501(a)(1) and 658.502(a)(1). The Department intends to issue further guidance on discontinuation, including the notification and response procedures outlined in this paragraph. The Department adopts paragraph (a)(1), as proposed.

b. Section 658.502(a)(2)

In paragraph (a)(2), the Department proposed to add language explaining that SWAs must specify the assurances involved and must explain how the employer refused to provide the assurances. The Department also proposed a revision to paragraph (a)(2)(ii) to align this paragraph with the proposed changes to § 658.501(a)(2),

discussed above, regarding the scope of the required assurances.

USAFL and Hall Global stated that the regulation should specify in an appropriate section that the required assurances are those specified in § 655.135 and that the SWA may not add to them.

The Department declines to adopt the commenters' recommendation because it is outside the scope of the proposed changes in this paragraph. Additionally, the Department disagrees that assurances described in paragraph (a)(2) should be limited or otherwise pertain to those that are described in part 655, subpart B. Section 658.501(a)(2) states that the referenced assurances are those assurances required pursuant to the ARS for U.S. workers at part 653, subpart F, of this chapter. Accordingly, the assurances referenced in this paragraph are limited to those assurances listed in part 653, subpart F. The Department adopts paragraph (a)(2), as proposed.

c. Section 658.502(a)(3)

In paragraph (a)(3), to provide clearer direction to SWAs and better notice to entities receiving a notice, the Department proposed to add language stating that SWAs must specify the terms and conditions the employer misrepresented or the assurances with which the employer did not fully comply, and explain how the employer misrepresented the terms or conditions or failed to comply with assurances on the job order. In paragraph (a)(3)(iii), the Department proposed to remove the requirement that employers provide *resolution of a complaint which is satisfactory to a complainant referred by the ES,* replacing it with the requirement that an employer provide *adequate evidence that it has resolved the misrepresentation of terms and conditions of employment or noncompliance with assurance.* Evidence is adequate if the SWA could reasonably conclude that the employer has resolved the misrepresentation or noncompliance. The proposed change removes unnecessary and out-of-place language regarding ES complaints, which are addressed in paragraph (a)(5), and better aligns § 658.502(a)(3) with proposed § 658.501(a)(3). The Department also proposed combining paragraphs (a)(3)(iii) and (iv) to make clear that employers need to provide the information in paragraphs (a)(3)(iii) and (iv) together.

USAFL and Hall Global commented that the regulation should specify what *misrepresentation* means so that it identifies serious wrongdoing for which a serious penalty might be warranted and so that there is a uniform Federal standard as to its meaning. They stated that an employer in Michigan should be no better or worse than an employer in California. They suggested that the Department adopt the California misrepresentation standard because California offers wide-ranging worker protections and a large portion of H–2A workers work in that State. They stated that under the California standard, misrepresentation means: (1) a misrepresentation of a past or existing material fact; (2) without reasonable grounds for believing it to be true; (3) with intent to induce another's reliance on the fact misrepresented; (4) justifiable reliance thereon by the party to whom the misrepresentation was directed; and (5) damages. *See Petersen* v. *Allstate Indem. Co.,* 281 FRD. 413, 417 (C.D. Cal. 2012). They stated that this would allow the enforcement system to expend resources going after true and damaging misrepresentations rather than good-faith errors.

The Department declines to adopt the standard articulated in *Petersen* as it represents California's negligent misrepresentation standard (a misrepresentation made without reasonable ground for believing it to be true) and does not encompass intentional misrepresentation (a misrepresentation with knowledge of falsity). *See Nazemi* v. *Specialized Loan Servicing, LLC,* 637 F. Supp. 3d 856, 861 (C.D. Cal. 2022). The Department believes that any misrepresentation of the terms and conditions specified on the job order, whether intentional or negligent, is a basis for discontinuation. Job orders represent offers of employment and must include all material terms and conditions. Where a job order contains false, erroneous, or misleading statements regarding a term or condition of employment, for example an omission of a required job duty or an incorrect statement regarding rate or frequency of pay, potential workers are not fully apprised of the terms under which they might be employed and may rely (or reasonably be expected to rely) on the incorrect terms and conditions to their detriment. While this is important for all job orders, it is especially important in the case of intrastate and interstate clearance orders, through which employers recruit migrant farmworkers from outside of the commuting distance. Such workers rely on the accuracy of job orders to decide whether they will accept the offered employment, for which they must travel and are not able to return home within the same day, should they find that the employment is different than described. For criteria clearance orders, which represent most of the clearance orders SWAs process, H–2A workers travel from other countries for the advertised work and may have limited resources in the event of misrepresentation. Thus, it is critical that employers, agents, farm labor contractors, etc. do not misrepresent, intentionally or negligently, any terms or conditions on job orders. Finally, contrary to the commenter's concern, the Department thinks that this approach can be uniformly applied by the SWAs and is concerned that a multi-factor test could be inconsistently implemented or applied in States and, therefore, thinks that the commenter's suggestion will lead to less, not more, uniformity. The Department will issue guidance on § 658.501(a)(3) and § 658.502(a)(3) to ensure uniform application of these provisions.

Additionally, as discussed above, the Department intends for SWAs to initiate discontinuation proceedings against the party responsible for the misrepresentation. Where an employer reasonably relies on their agent or attorney regarding the contents of the clearance order, or the agent or attorney reasonably relies on an employer's description of the terms and conditions of the job, the Department does not anticipate that the SWA would initiate proceedings against those parties. While a SWA may initiate discontinuation against multiple parties, the ability for the SWA to initiate proceedings against only the party responsible for the misrepresentation will protect entities that act in good faith in the development and submission of clearance orders. For these reasons, the Department declines to adopt the California negligent misrepresentation standard suggested by commenters. The Department adopts paragraph (a)(3), as proposed.

d. Section 658.502(a)(4)

In paragraph (a)(4), the Department proposed to add language that SWAs must provide evidence of the final determination by an enforcement agency of a violation of an *employment-related law* or debarment with the notice of intent to discontinue services. For final determinations, the Department proposed adding language clarifying that the SWA must specify—as discussed in the final determination or debarment—the enforcement agency's findings of facts and conclusions of law as to the employment-related law violation(s). For final debarment orders, the Department proposed adding language requiring the SWA to specify the time

period for which the employer is debarred from participating in one of the Department's foreign labor certification programs.

The Department also proposed revisions to § 658.502(a)(4)(i) through (iii) to clarify and explain the evidence and assurances that the employer may provide to avoid discontinuation of services. In paragraph (a)(4)(i), the Department proposed to remove existing language stating that the employer may provide evidence that the enforcement agency reversed its ruling and that the employer did not violate employment-related laws; and to replace it with language stating that the employer may provide evidence that the determination at issue is not final because, for example, it has been stayed pending appeal, overturned, or reversed. The Department proposed a new paragraph (a)(4)(ii) that requires employers to submit evidence that their period of debarment is no longer in effect and that they have taken all actions required by the enforcement agency as a consequence of the violation. The proposed paragraph (a)(4)(ii)(B) incorporated existing language and was meant to more clearly encompass any and all actions required by final determination but does not substantively change what an employer has to show under current § 658.502(a)(4)(ii). The Department did not receive any comments on these proposed changes and adopts paragraph (a)(4), as proposed.

### e. Section 658.502(a)(5)

In paragraph (a)(5), the Department proposed new language to clarify that the SWA must specify which ES regulation the employer has violated and must provide basic facts to explain the violation. The proposed language ensures that SWAs provide sufficient factual detail regarding the ES violation at issue so the employer can respond. The Department did not receive comments on this change and adopts, paragraph (a)(5), as proposed.

### f. Section 658.502(a)(6)

The Department proposed to revise § 658.502(a)(6) to explain that SWAs must state that the job order at issue was filed pursuant to part 655, subpart B and specify the name of each worker who was referred and not accepted. The proposed revision would be consistent with the proposed change to § 658.501(a)(6) and would ensure that SWAs provide sufficient factual detail regarding the workers at issue so the employer can respond. In paragraph (a)(6)(iii), the Department proposed changing *and* to *or* to decouple

paragraph (a)(6)(iii) from the assurances required in existing paragraph (a)(6)(iv), as it is not necessary for employers that did not violate the requirement to provide assurances of future compliance. The Department proposed a new paragraph (a)(6)(iv), to add an option for the employer to show that it was not required to accept the referred workers, because the time period under 20 CFR 655.135(d) had lapsed, and a new paragraph (a)(6)(v), to add an option for the employer to show that, after initial refusal, it subsequently accepted and offered the job to the referred workers or to show that it had provided all appropriate relief imposed as a result of the refusal. Finally, the Department proposed to move existing paragraph (a)(6)(iv) to paragraph (a)(6)(vi) to maintain the requirement that the employer provide assurances that qualified workers referred in the future will be accepted; and add new language to clarify the assurance that is required depending on whether the period described in 20 CFR 655.135(d) has lapsed, as after the end of the period the employer would no longer be required to accept referred workers on the particular clearance order involved. This change would provide a means of ensuring future compliance with the requirement that employers submitting criteria clearance orders hire all qualified workers referred to the order, as described in part 655, subpart B.

Ma´sLabor and USAFL and Hall Global stated that they support the Department's proposal to add new paragraph (a)(6)(v), as written. They also supported the Department's proposal to require SWAs to provide the precise factual and legal basis, including concrete information regarding the specific job order and workers involved, for any initiation of discontinuation procedures.

The Department appreciates the supportive comments and adopts paragraph (a)(6), as proposed.

### g. Section 658.502(a)(7)

In paragraph (a)(7), the Department proposed clarifying edits that provide clearer direction to the SWA but that do not change the regulation's meaning, including rephrasing sentences and changing the pronoun used for employers to *it* instead of *he/she.* The Department did not receive comments on these clarifications and adopts paragraph (a)(7), as proposed.

### h. Section 658.502(a)(8)

The Department proposed to add a new paragraph (a)(8) to explain information the SWA must include in its notice to an employer proposing to

discontinue services where the decision is based on § 658.501(a)(8) (repeatedly causes the initiation of discontinuation of services). The Department proposed that the SWA must list and provide basic facts explaining the prior instances where the employer has repeatedly caused initiation of discontinuation proceedings to provide notice of the basis for the SWA's action and to facilitate the employer's response. The Department proposed that the SWA must notify the employer that all ES services will be terminated unless the employer within that time provides adequate evidence that the SWA's initiation of discontinuation in prior proceedings was unfounded. The proposed paragraph (a)(8) would replace existing paragraph (c), which discusses discontinuation based on § 658.501(a)(8) but does not include clear direction to the SWA and does not provide sufficient notice to employers to allow them to respond. The Department did not receive comments on these changes and adopts paragraph (a)(8), as proposed.

### i. Section 658.502(b) and (d)

The Department proposed to remove existing § 658.502(b) and (d) because these paragraphs pertain to the employer's pre-determination opportunity to request a hearing. As described in the discussion of § 658.502(a)(1) through (7) above, the Department proposed to eliminate the opportunity for an employer to request a hearing until after the SWA has provided its final notice on discontinuation of services to the employer. The Department received several comments regarding the removal of the opportunity for a pre-discontinuation hearing, which are summarized and addressed above. For the reasons fully explained in the discussion of § 658.502(a)(1) through (7), the Department adopts the NPRM's proposed removal of existing § 658.502(b) and (d) without modification.

The Department proposed a new § 658.502(b) to explain the circumstances that warrant immediate discontinuation of services. The proposed addition replaces existing § 658.501(b), in part, and states that SWA officials must discontinue services immediately, in accordance with § 658.503, without providing the notice of intent and opportunity to respond described in this section, if an employer has met any of the bases for discontinuation of services under § 658.501(a) and, in the judgment of the State Administrator, exhaustion of the administrative procedures set forth in

this section would cause substantial harm to workers. The prior version of § 658.501(b) stated that SWA officials *may* discontinue services immediately in these circumstances, whereas the proposed new § 658.502(b) states that SWAs *must* discontinue services immediately. Additionally, the prior § 658.501(b) allows for discontinuation when there would be substantial harm to a *significant number* of workers, whereas the proposed new § 658.502(b) requires immediate discontinuation when there would be substantial harm to workers. The Department proposed these changes because it thought that immediate discontinuation is warranted where the harm at issue would involve only one or a small number of workers, and that where such harm would occur, SWAs must be required to initiate discontinuation to prevent the harm from actually occurring to workers. Finally, this proposed paragraph clarified that immediate discontinuation is appropriate only when a basis under proposed § 658.501 exists *and* the SWA determines that substantial harm would occur; risk of substantial harm alone is not enough for a SWA to immediately discontinue services.

UMOS, Green America, CAUSE, PCUN, the North Carolina Justice Center, UFW, and the UFW Foundation expressed general support for *requiring* SWAs to immediately discontinue services in circumstances where it is warranted. In contrast, IFPA, GFVGA, NHC, Titan Farms, LLC, U.S. Custom Harvesters, Inc., Demaray Harvesting and Trucking, LLC, TIPA, the U.S. Chamber of Commerce, the American Farm Bureau Federation, USA Farmers, the Wyoming Department of Agriculture, wafla, an individual, and an anonymous commenter opposed the proposed changes to § 658.502(b), citing due process concerns. Specifically, they stated that the proposed changes do not define "substantial harm" and give State Administrators broad and vague discretion to determine what it means. They expressed concern that allegations of substantial harm to a single worker could give rise to immediate discontinuation, and that such allegations do not require any verification prior to immediate discontinuation. IFPA and TIPA both stated that the proposed changes pave the way for abuse by singularly disgruntled employees. Overall, commenters stated that the proposed changes curtail the rights of employers to meaningfully address allegations of substantial harm and will cause significant economic loss through delays or ultimate denial of access to the

H- 2A program. They stated that mandatory, immediate discontinuation must be substantiated, must be based on more than one claim by a single worker, must be reserved for egregious acts causing significant harm, and must provide an opportunity for review prior to discontinuation.

Regarding what constitutes *substantial harm,* as discussed in the NPRM, the Department envisions immediate discontinuation in situations involving significant health and safety issues, including, but not limited to, physical violence, sexual harassment, assault, coercion, and human trafficking. The Department envisions a SWA will also consider immediate discontinuation of services when employers cause substantial risk of injuries due to unsafe working conditions like heat stress, infectious disease, exposure to chemicals or pesticides, and work-related machinery. Thus, where the State Administrator determines that exhaustion of the administrative procedures set forth in this section would cause such harm, the Department thinks immediate discontinuation is warranted to protect the safety and welfare of workers.

As discussed above, the Department believes that immediate discontinuation is warranted even where the harm at issue would involve only one or a small number of workers. The Department understands commenters' concerns that the allegations of a single employee, such as a disgruntled employee, could lead to immediate discontinuation. However, the Department believes that its proposed changes to the immediate discontinuation regulation safeguard against these concerns. The Department reiterates that immediate discontinuation is appropriate only where a basis under proposed § 658.501 exists; and is reserved only for those situations where the State Administrator determines that substantial harm to at least one worker will occur if action is not immediately taken. Thus, even where a single employee makes an allegation, the SWA must *first* have sufficient factual information—*e.g.,* a finding via a field check that an employer has misrepresented the terms in its job order (§ 658.501(a)(3)) or a finding of violations of ES regulations (§ 658.501(a)(5))—to articulate a basis for discontinuation. The SWA must *then* have a sufficient basis, supported by factual detail, to support its determination that *not* taking immediate action would cause substantial harm to workers (*see* proposed § 658.503(b)). For example, the SWA may rely on observation or findings of substantial harm from field checks and determine

that such harm will continue if the SWA does not take immediate action. Similarly, the SWA may receive documentation or photos from public sources, such as newspapers, that an employer's working conditions have caused substantial harm to workers; and, after verifying or corroborating its accuracy, determine that such harm will continue if the SWA does not take immediate action. In all instances, there must be a basis for discontinuation that is supported by factual detail and a determination, with sufficient reasoning supported by factual detail, that exhaustion of administrative procedures would cause substantial harm. The Department will issue further guidance on immediate discontinuation, including the circumstances giving rise to immediate discontinuation.

As discussed in the NPRM and below, where a SWA issues a determination to immediately discontinue services, the discontinuation is effective the date of the notice. An employer's appeal will not stay the discontinuation, and the SWA will not process that employer's clearance orders during the period of discontinuation. Regarding commenter concerns that immediate discontinuation curtails the rights of employers to meaningfully address allegations of substantial harm, the Department emphasizes that, at any time following the issuance of the discontinuation notification, employers may rebut a SWA's determination via the reinstatement process (*see* proposed §§ 658.503(b) and 658.504). Regarding commenter concerns that immediate discontinuation will cause employers economic loss through delays or ultimate denial of access to the H–2A program, the Department believes that any delayed access to the ES Clearance System as a result of immediate discontinuation is warranted, as any burden employers face by not having access to ES services is outweighed by the Department's interest in protecting workers from the harmful, potentially dangerous situations giving rise to immediate discontinuation. Moreover, the Department notes that in lieu of an appeal, an employer subject to immediate discontinuation may request reinstatement from the SWA under proposed § 658.504(b). Thus, the burden to any employer is mitigated by the opportunity to request reinstatement, and the proposed 20-day timeframe for the SWA to respond to such a request may provide for timely and efficient resolution of an immediate discontinuation.

**5. Section 658.503, Discontinuation of Services**

Section 658.503 describes the procedural requirements a SWA must follow when issuing a final determination regarding discontinuation of services to an employer. The Department proposed to revise paragraph (a) to require that within 20 working days of receipt of the employer's response to the SWA's notification under § 658.502, or at least 20 working days after the SWA's notification is received by the employer if the SWA does not receive a response, the SWA must notify the employer of its final determination. When the SWA sends its notification, the Department proposed that it do so in a manner that allows the SWA to track receipt of the notification, such as certified mail. If the SWA determines that the employer did not provide a satisfactory response in accordance with § 658.502 the SWA's notification must specify the reasons for its determination, state that the discontinuation of services is effective 20 working days from the date of the notification, state that the employer may request reinstatement or a hearing pursuant to § 658.504, and state that a request for a hearing stays the discontinuation pending the outcome of the hearing. The Department proposed this stay pending appeal and the 20-working-day period to ensure that employers are provided an opportunity to challenge the SWA's determination before losing access to all ES services. Staying the effect of discontinuation during the pendency of an appeal is appropriate to allow for full adjudication and resolution of any issues related to the SWA's findings before they become final and binding on the employer and the ES system, mitigating the risk that an employer is erroneously deprived of access to services, similar to the procedures in § 658.502. Additionally, placing the effective date at the end of the 20-day period, rather than at the issuance of the notification, avoids depriving appealing employers of ES services for a short period of time prior to their request for hearing. This also makes for a more efficient process for SWAs and ETA, as these agencies would otherwise expend time and resources to effectuate a discontinuation that may be premature—if the employer requests a hearing a short time later, agencies would need to use additional resources to then stay the discontinuation they just effectuated. To facilitate implementation and maintenance of the proposed OWI discontinuation of services list, discussed above, the

Department proposed that the SWA must also notify OWI of any final determination to discontinue ES services, including any decision on appeal upholding a SWA's determination to discontinue services. Proposed § 658.503(a) removed language regarding pre-discontinuation hearings to correspond with proposed changes to § 658.502.

The Department did not receive comments that identified § 658.503(a). However, the Department received many comments regarding the proposal to remove pre-discontinuation hearings through revisions to § 658.502, which the Department discussed above in the response to that section. The Department finalizes the changes to § 658.503(a) as proposed.

**a. Section 658.503(b)**

The Department proposed to add a new § 658.503(b) to explain the procedures for immediate discontinuation of services and to incorporate them into the general discontinuation procedures at § 658.503. The proposed new paragraph (b) replaces existing § 658.501(b), in part, and states that the SWA must notify the employer in writing that its services are discontinued as of the date of the notice. The proposed provision would also require that the notification must also state that the employer may request reinstatement or a hearing pursuant to § 658.504, and that a request for a hearing relating to immediate discontinuation would not stay the discontinuation pending the outcome of the hearing. The proposed new § 658.503(b) adds that SWAs must specify the facts supporting the applicable basis for discontinuation under § 658.501(a) and the reasons that exhaustion of the administrative procedures would cause substantial harm to workers. The proposed addition ensures that employers have sufficient information regarding the SWA's rationale for immediate discontinuation and makes clear that employers have recourse to the State administrative hearing process or reinstatement process if a SWA immediately discontinues services. While discontinuation under a determination issued under § 658.503(a) is delayed until the employer's time to appeal the determination has ended, in proposing this provision the Department determined that the circumstances justifying a notice of immediate discontinuation also justify that the discontinuation be effective immediately, and that it remain in effect unless the employer is reinstated or the determination is overturned. As noted in the NPRM and as discussed above,

immediate discontinuation is reserved for those situations where the State Administrator determines that substantial harm to at least one worker will occur if action is not immediately taken. Delaying the effective date of the discontinuation would undermine the protection that the immediate discontinuation procedure is designed to provide. Finally, as with proposed § 658.503(a), to facilitate implementation and maintenance of the proposed OWI discontinuation of services list, discussed above, the Department proposed that the SWA must also notify OWI within 10 days of any determination to immediately discontinue ES services.

Wafla opposed the proposed change that would mean a request for a hearing does not stay discontinuation, stating that it allows SWAs to discontinue services without full due process. The Colorado Department of Labor and Employment asked that the Department provide examples of *information evidencing* that employers have made threats or perpetuated violence or other substantial harm, and whether a complaint or allegation alone is sufficient to immediately discontinue services. IFPA, GFVGA, TIPA, NHC, Titan Farms, LLC, and an individual asked that the Department substantiate its rationale for the proposed changes with evidence and verified data, particularly as it pertains to the Department stating that it received information regarding violations over the last several years. The commenters stated that the Department did not provide further information, such as whether that information included mere allegations by an unhappy employee, or whether the alleged incidents were isolated or represented a statistically valid percentage of violation to justify the proposed changes to immediate discontinuation.

The Department appreciates the commenters' concerns and requests for clarification. As to the Department's proposal that a request for a hearing will not stay discontinuation, the Department reiterates that employers who experience immediate discontinuation of services have recourse to the State administrative hearing process or reinstatement process. In instances that would give rise to an immediate discontinuation, the Department believes that its interest in protecting workers from the harmful, potentially dangerous situations giving rise to immediate discontinuation outweighs any burden employers may experience while services are discontinued. The burden to any employer is mitigated by the

opportunity to request reinstatement from the SWA, and that the proposed 20-day timeframe for the SWA to respond to such a request may provide for timely and efficient resolution of an immediate discontinuation.

As to the SWA's request for examples of information or evidence that would demonstrate substantial harm, the Department emphasizes that a complaint or allegation alone is insufficient to warrant immediate discontinuation. The State Administrator must have *information evidencing* that substantial harm to workers will occur if action is *not* immediately taken. For example, the SWA may rely on observation or findings of substantial harm from field checks and determine that such harm will continue if the SWA does not take immediate action. Similarly, the SWA may receive documentation or photos from public sources, such as newspapers, indicating that an employer's working conditions have caused substantial harm to workers; and, after verifying or corroborating its accuracy, determine that such harm will continue if the SWA does not take immediate action. The Department further reiterates that immediate discontinuation is appropriate only where there is a basis to discontinue services under § 658.501(a).

Finally, as to the request that the Department substantiate its rationale for the proposed changes, particularly as it pertains to the Department stating that it received information regarding violations over the last several years, the Department reiterates that the ability of SWAs to immediately discontinue services to employers due to substantial harm is not new. The Department confirms that SWAs have obtained conclusive evidence of employers in Virginia and Louisiana [10] threatening workers with physical violence in retaliation for workers asserting their employment-related rights, which could warrant immediate discontinuation of services. In these cases, evidence included video and audio recordings. For these reasons and the reasons set forth in the NPRM, the Department adopts § 658.503(b), as proposed.

b. Section 658.503(c) and (d)

The Department proposed to move current § 658.503(b), which requires the SWA to notify the relevant ETA regional office if services are discontinued to an employer subject to Federal Contractor Job Listing Requirements, to proposed new paragraph (c) and to make minor edits to use active voice and to improve clarity. The Department proposed to add paragraph (d) to require SWAs to notify the complainant of the employer's discontinuation of services, if the discontinuation of services is based on a complaint filed pursuant to § 658.411. This requirement would align with § 658.411(b)(2) and (d). The Department did not receive comments on these changes and adopts them, as proposed.

c. Section 658.503(e)

The Department proposed to add a new paragraph (e) to explain the effect discontinuation of services has on employers. The proposed new paragraph explains that employers that experience discontinuation of services may not use any ES activities described in parts 652 and 653, and that SWAs must remove the employer's active job orders from the clearance system and must not process any future job orders from the employer for as long as services are discontinued. The Department proposed that an employer's loss of access to ES services applies in all locations throughout the country where such services may be available. Through the NPRM, the Department solicited comments on the effect on both workers and employers of removing active job orders, particularly criteria orders.

The Department received a comment from wafla that disagreed that an employer's loss of access to ES services should apply in all locations throughout the country where such services may be available. Wafla said that the proposed change would allow SWA staff from different sides of the country to determine actions of other SWAs and alleged that this would cause due process concerns. They expressed concern that enforcement could be inconsistent and subjective between States. Wafla was also concerned that SWAs might initiate discontinuation of services to multistate employer organizations as a result of frontline supervisors or rogue individual management in different locations and said that national employers may not be aware of all supervisor actions in their companies. Wafla contended that if a violation is found in one State related to a supervisor or manager, the employer should have an opportunity to evaluate their management in different States without fear of one bad actor causing discontinuation of services, including access to the H–2A program for the entire company.

The Department believes it is necessary to establish that discontinuation of services in one State means that the employer cannot participate in or receive Wagner-Peyser Act ES Services provided by any SWA in any other State. The ES System is a national labor exchange service that facilitates job recruitment and placement across the States. The Department has an interest in ensuring proper, effective, and lawful use of the ES System, and the discontinuation provisions at part 658, subpart F are meant to prevent employers who do not comply with ES regulations from accessing ES services. As discussed in the NPRM, if the effect of discontinuation were limited to only the State that discontinued services, it would frustrate the purpose of discontinuation.

The Department disagrees that the proposed national effect of discontinuation would create inconsistencies or due process concerns. The regulations in part 658, subpart F prescribe uniform standards that all SWAs must follow, and against which the Department monitors and assesses SWA performance. If a SWA is not complying with the requirements in this part, the Department will take appropriate action. Moreover, the proposed OWI discontinuation of services list provides a mechanism to ensure that SWAs are not providing services to employers whose services have been discontinued, thereby facilitating consistent application of the discontinuation provisions across the States. The Department believes that these regulations provide sufficient due process as they provide employers several opportunities to address the SWA's action—first by responding to the SWA's initial notice under § 658.502, then by appealing the SWA's final determination by requesting a hearing or by requesting reinstatement (including requesting a hearing if the SWA denies the request for reinstatement) under § 658.504. If the employer requests a hearing, the SWA must follow procedures at § 658.417. As described at § 658.418(c), all decisions of a State hearing official must be accompanied by a written notice informing the parties that they may appeal the decision in writing with the ETA Regional Administrator, within 20 working days of the certified date of receipt of the decision. As noted above, if an employer requests a hearing in response to a SWA's decision to discontinue services, the discontinuation is stayed pending the outcome of the appeal, thereby

---

[10] *See, e.g.,* DOL, News Release, *Federal Court Orders Louisiana Farm, Owners to Stop Retaliation After Operator Denied Workers' Request for Water, Screamed Obscenities, Fired Shots* (Oct. 28, 2021), *https://www.dol.gov/newsroom/releases/whd/whd20211028-0.*

providing employers an opportunity to challenge the discontinuation *before* losing access to all ES services. Employers may also file complaints against the SWA or ETA regional office under part 658, subpart E if they believe the SWA's discontinuation of services procedures are not compliant with ES regulations. These complaints are processed pursuant to § 658.411(d).

Employers, including multistate employers, are responsible for ensuring that their staff do not perpetrate violations that cause SWAs to initiate discontinuation of services. If an employer identifies that an individual staff member is responsible for a violation that is not pervasive throughout the company, the employer has an opportunity to present that evidence along with remedial actions the employer has taken to resolve the violation and prevent future offenses, during the period described in § 658.502 or as part of a request for reinstatement pursuant to § 658.504.

The Department maintains that it is critical to worker protection for discontinuation of services to apply nationally to prevent discontinued employers from filing job orders or using other ES services without first resolving the violation at issue. Accordingly, the Department adopts paragraph (e), as proposed.

d. Section 658.503(f)

The Department proposed new paragraph (f) to explain that SWAs must continue to provide the full range of ES and other appropriate services to workers whose employers' services have been discontinued. The proposed new paragraph makes it clear that discontinuation of services to employers does not, and should not, negatively affect workers. SWAs must continue to provide necessary support to workers, including outreach to MSFWs, access to the ES and Employment-Related Law Complaint System, and all available ES services. The Department did not receive any comments on this provision and adopts the changes to paragraph (f), as proposed.

e. Section 658.504

Section 658.504 describes the procedural requirements for seeking reinstatement of ES services, which can be done either by requesting that the SWA reconsider its decision or by requesting a hearing. The Department proposed to restructure this section to more clearly explain how services may be reinstated, the timeframes in which the employers and SWA must act, and the circumstances under which services must be reinstated.

The Department proposed to revise paragraph (a) to make clear that employers have two avenues with which to seek reinstatement of services—via a hearing or a written request to the SWA at any time following the discontinuation. The revised paragraph (a) adds the new requirement that an employer who requests a hearing following discontinuation do so within 20 working days of the date of discontinuation.

The National Council of Agricultural Employers (NCAE), Ventura County Agricultural Association, Florida Citrus Mutual, and Labor Services International opposed the new requirement that the employer file an appeal within 20 working days of the SWA's final determination, stating that the requirement raises due process concerns and is arbitrary and capricious.

As discussed in the NPRM, the Department believes that both the State and the employer have an interest in timely and efficient adjudication of disputes. For example, SWAs have an interest in resolving discontinuation proceedings quickly and efficiently so that it can better protect workers who use the ES system and so that it uses Federal funds efficiently. Employers have an interest in quick and efficient access to the ES clearance system as part of their business operations, which includes efficient and timely resolution of discontinuation proceedings. The Department continues to think that providing 20 working days to appeal a final discontinuation determination balances the needs and interests of the SWAs and employers. In addition, the proposed 20-day requirement aligns with proposed § 658.503, which provides that a SWA's final determination is effective 20 working days from the date of notification, and that a timely appeal stays the discontinuation. Taken together, the stay pending appeal and the 20-day requirements in proposed §§ 658.503 and 658.504 ensure that employers who timely appeal can challenge a SWA's determination without losing access to ES services during the appeal process while ensuring timely and efficient adjudication of discontinuation matters. The Department further notes that the proposed 20-working-day requirement aligns with a similar requirement in the prior regulation as well as the new paragraph (b), which states that employers may request a hearing within 20 working days of a SWA's reinstatement determination. Finally, the Department notes that there is no time limit for requesting reinstatement

under § 658.504, so if an employer missed the 20-day deadline to appeal, they could seek reinstatement at any time and appeal an adverse reinstatement decision. For these reasons, the Department adopts § 658.504(a), as proposed.

f. Section 658.504(b)

The Department proposed to revise § 658.504(b) by combining the parts of § 658.504(a) and (b) into a new § 658.504(b) to more clearly explain the circumstances and procedures under which SWAs must reinstate services when an employer submits a written request for reinstatement. The Department proposed new paragraph (b)(1), which retains the current 20-day timeline in existing paragraph (b) within which the SWA must notify the employer whether it grants or denies the employer's reinstatement request. The proposed paragraph (b)(1) also requires that if the SWA denies the request, the SWA must specify the reasons for the denial and must notify the employer that it may request a hearing, in accordance with proposed paragraph (c), within 20 working days.

The Department also proposed to move current paragraph (a)(2), which describes the evidence necessary for reinstatement, to proposed paragraph (b)(2) to align with the overall restructuring of the section. The Department also proposed to remove the word *any* to require that the employer show evidence that all applicable specific policies, procedures, or conditions responsible for the previous discontinuation are corrected, instead of *any* policies, procedures, or conditions responsible for the previous discontinuation. The Department is concerned that the current language could permit reinstatement despite an employer not correcting all relevant policies, procedures, or conditions, which would be inconsistent with the purpose of discontinuation. Finally, the Department also proposed to change the pronoun used for employers to *it* instead of *his/her*.

Farmworker Justice supported the proposed changes to paragraph (b) and suggested that the Department provide examples of employer action that would constitute adequate evidence of corrective action and restitution, as described under proposed paragraph (b)(2). For example, under proposed § 658.504(b)(2)(i), Farmworker Justice suggested that the Department require that corrective action plans be disclosed in future job orders as evidence that policies, procedures, or conditions responsible for the previous discontinuation of services have been

corrected; that corrective actions plans be in English and in the native language of workers at the site; and that the Department create an anonymous tip line for workplaces subject to a corrective action plan to report any noncompliance with the plan. Farmworker Justice also suggested that the Department provide a nonexhaustive list of the types of restitution that may be available to employers under proposed § 658.504(b)(2)(i), and suggested liquidated damages paid to the workers for housing violations set on a scale based on the severity of the violation, damages paid to non-H–2A workers who were offered fewer hours than their H–2A counterparts, and damages to workers assigned non-agricultural duties.

The Department notes that it did not make any substantive edits to proposed paragraph (b). The Department's proposal was limited to restructuring paragraph (b) to more clearly explain how services may be reinstated. The Department moved existing paragraph (a)(2) to proposed paragraph (b)(2), and existing paragraph (b) to proposed paragraph (b)(1), with minor clarifying edits. While the Department appreciates the commenter's suggestions, they are outside of the scope of the proposed changes in this paragraph. Accordingly, the Department adopts paragraph (b), as proposed, without change.

g. Section 658.504(c)

The Department proposed to revise § 658.504(c) to explain the circumstances and procedures under which SWAs must reinstate services when an employer submits a timely, written request for a hearing. The proposed revisions maintain the procedures in existing paragraphs (a)(1), (c), and (d), but have reorganized them into the same paragraph for clarity. The Department also proposed to replace the abbreviated term *Federal ALJ* in the existing regulation with *Federal Administrative Law Judge,* commonly abbreviated as ALJ.

Ma´sLabor submitted comments that USAFL and Hall Global adopted. They recommended that the Department modify paragraph (c)(2) to also state that SWAs must reinstate services where a CO determines that a job order is compliant with all employment-related laws, as evidenced through the CO issuing a Notice of Acceptance. Ma´sLabor also said that the Department should modify the hearing procedures to allow the employer to appeal directly to an ALJ in lieu of a State hearing official and that, at minimum, the Department should permit an appeal to

an ALJ if the basis for the SWA's discontinuation is a dispute about Federal employment-related laws.

The Department declines to modify paragraph (c)(2) to require SWAs to reinstate services if a CO determines that the job order was compliant with all employment-related laws, as evidenced through the CO issuing a Notice of Acceptance. Such a change would exceed the scope of proposals that the Department made in this section and, were the Department to implement it in this final rule, it would deprive the public of its right to comment. The Department did not propose substantive changes in paragraph (c)(2); rather it proposed to maintain the procedures in existing paragraphs (a)(1), (c), and (d), and to reorganize them for clarity. The Department notes that an employer may provide evidence during a hearing or other appeal procedures that a CO issued a Notice of Acceptance related to a criteria clearance order. The Department also notes that employers may submit such evidence to SWAs during the 20-day response period before SWAs make a final determination to discontinue services, which is described at § 658.502. This evidence will be evaluated based on the particular facts and circumstances. As mentioned in other sections, the Department plans to provide guidance to SWAs regarding these procedures for discontinuation of services, including reinstatement.

Similarly, the Department declines to modify the hearing procedures to allow the employer to appeal directly to an ALJ in lieu of a State hearing official or to permit a direct appeal to an ALJ if the basis for the SWA's discontinuation is a dispute about Federal employment-related laws. These changes are also outside of the scope of the non-substantive clarifying edits to this paragraph. Regardless, the Department notes that the State hearing process is long established and remains necessary because States have an interest in hearing issues involving employers in their territories. Additionally, SWAs carry out requirements of the Wagner-Peyser Act ES, which is a Federal grant program, and have authority to apply the requirements of the Federal program. As described at § 658.504(c)(1), if the employer submits a timely request for a hearing, the SWA must follow the procedures set forth in § 658.417. Section 658.417(a) states that a State hearing official may be any State official authorized to hold hearings under State law. Examples of hearing officials are referees in State unemployment compensation hearings

and officials of the State agency authorized to preside at State administrative hearings. Pre-existing regulations at § 658.418(a)(4) further state that a State hearing official may render rulings as are appropriate to resolve the issues in question. While a State hearing official does not have authority or jurisdiction to consider the validity or constitutionality of the ES regulations or of the Federal statutes under which they are promulgated, the State hearing official does have jurisdiction to rule on employer compliance with Federal ES regulations.

For the reasons described above, the Department adopts § 658.504(c), as proposed.

h. Section 658.504(d)

The Department proposed a new paragraph (d) to require that SWAs notify OWI of any determination to reinstate ES services, or any decision on appeal upholding a SWA's determination to discontinue services, within 10 working days of the date of issuance of the determination.

The Department received a comment from the Colorado Department of Labor and Employment that asked how SWAs would know if an employer is reinstated in the State that discontinued services to the employer, and whether the discontinuation of services list will be updated when an employer is removed from the list.

The Department notes that the purpose of new paragraph (d), is to facilitate the Department's ability to update and keep the discontinuation of services list accurate. The list will be updated continually as SWAs notify ETA of determinations regarding discontinuation and reinstatement. SWAs will know if an employer has been reinstated because the employer will have been removed from the list. The Department expects that SWAs will regularly consult the discontinuation of services list and will provide further guidance regarding notification procedures relating to its maintenance and use. The Department adopts new paragraph (d), as proposed.

## VI. Discussion of Revisions to 20 CFR Part 655, Subpart B

### A. Introductory Sections

1. Section 655.103(e), Defining Single Employer Test

In the NPRM the Department proposed to define a new term, "single employer," to codify and clarify its long-standing approach to determine if multiple separate employers are operating as one employer for the purposes of the H–2A program. As

noted in the NPRM, the Department has encountered numerous instances over at least the last decade where it appears separate entities are using their corporate structure—intentionally or otherwise—to bypass statutory and regulatory requirements to receive a temporary agricultural labor certification or to circumvent regulations aimed at protecting workers in the United States. *See, e.g., Lancaster Truck Line,* 2014–TLC–00004, at *2–3, 5 (BALCA Nov. 26, 2013) (employer was "frank about separating the legal entities of his operation" from his father to "comply with the H–2A program's seasonal permitting restrictions" and the ALJ held the attempt to divide work did not demonstrate temporary need).

The Department received numerous comments both opposed to and in support of this proposal and will address the comments in turn. Several comments from advocacy organizations, States, an individual, U.S. House Members, and U.S. Senators expressed general support for the proposal without further elaboration. Numerous other commenters expressed at least some support for the additional definition and will be discussed further below. The remaining comments opposed the addition of the definition of the single employer test. After careful consideration, the Department will incorporate the proposed definition of the single employer test, also known as the integrated employer test, into the regulations without change.

This section discusses: (1) the definition and use by OFLC; (2) the authority by which the Department adds this definition to the regulation; (3) the Four Factor Test, various business structures, and NODs; (4) Board of Alien Labor Certification Appeals (BALCA) case law and "joint employers"; (5) other OFLC-related comments pertaining to the new definition; and (6) application of the test during enforcement by WHD.

a. Definition and Use by OFLC

As noted in the NPRM, the Department already applies a single employer test in the H–2A program in certain contexts. OFLC currently uses this test to determine if multiple nominally separate employers should be considered as one entity for the purposes of determining whether an applicant for labor certification has a temporary or seasonal need, and WHD uses this test to determine whether H–2A employers complied with program requirements. This test originated with the National Labor Relations Board (NLRB) and has been adopted by courts and Federal agencies under a wide

variety of statutes. *See South Prairie Const. Co.* v. *Local No. 627, Int'l Union of Operating Eng'rs, AFL–CIO,* 425 U.S. 800, 803 (1975) (NLRA); *see also Knitter* v. *Corvias Military Living LLC,* 758 F.3d 1214, 1215 (10th Cir. 2014) (Title VII); *Bristol* v. *Bd. Of Cty. Comm'rs,* 312 F.3d 1213, 1218 (10th Cir. 2002) (Americans with Disabilities Act (ADA)). As the Second Circuit has explained, the single employer test may be used to determine liability for employment-related violations, as well as to determine employer coverage. *Murray* v. *Miner,* 74 F.3d 402, 404 n.1 (2d Cir. 1996). The policy underlying the doctrine is "fairness . . . where two normally independent entities do not act under an arm's length relationship." *Id.* at 405. Consistent with judicial and administrative decisions, the Department has typically looked to four factors to determine whether the entities at issue should be considered a single employer for purposes of temporary need and compliance: (1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control (the "Four Factor Test"). *See, e.g., Sugar Loaf Cattle Co.,* 2016–TLC–00033, at *6 (BALCA Apr. 6, 2016) (citing to *Spurlino Materials LLC* v. *NLRB,* 805 F.3d 1131, 1141 (D.C. Cir. 2015)). The new definition incorporates the four factors noted above and, as under current practice, the Department will consider the totality of the circumstances surrounding the relationship among the entities, with no one factor determinative in the analysis. The factors will be discussed in further detail below.

The Department's main purpose in determining whether two or more entities are operating as one is preventing employers from utilizing corporate structure to circumvent the program's statutory and regulatory requirements. As such, the Department's focus when examining whether two or more employers are a single employer is both the relationship between the employers themselves and each employer's use of the H–2A program. *See Knitter* v. *Corvias Military Living LLC,* 758 F.3d 1214, 1227 (10th Cir. 2014) (Title VII case in which the court noted that "the single employer test focuses on the relationship between the potential employers themselves"). The Department emphasizes again that no one factor is determinative as to whether entities are acting as one.

The California Labor & Workforce Development Agency (California LWDA) supported the proposal and echoed the concerns of the Department

by explaining that it had "encountered numerous instances . . . where related entities use separate corporate structures to evade statutory and regulatory wage and hour requirements." As examples it noted that its Labor Commissioner's Office has discovered some agricultural employers who "attempt to insulate themselves from liability" via their multiple entities, as well as instances where businesses have separated their corporations to hire less than the minimum numbers of workers that would trigger minimum wage and overtime obligations. An individual also expressed support for the proposal and believes it will help ensure consistent application by BALCA. They nevertheless expressed concern that employers who are already exploiting the system via their corporate structures would develop other methods to continue to do so, and then suggested that there is no clear solution for the issue other than continuing to find the separate entities who are so intertwined as to be a single employer. The Department appreciates and shares the concern about corporations utilizing their structures to circumvent regulatory requirements and agrees that determining which separate entities are so intertwined as to be a single employer is a way to ensure statutory compliance.

As noted in the NPRM and adopted in this final rule, OFLC's COs will use the single employer test to determine if an employer's need is truly temporary or seasonal. As noted below in the *Authority* section, sec. 101(a)(15)(H)(ii)(a) of the INA permits only "agricultural labor or services . . . of a temporary or seasonal nature" to be performed under the H–2A visa category. 8 U.S.C. 1101(a)(15)(H)(ii)(a). Thus, as part of the Department's adjudication of applications for temporary agricultural labor certification, the Department assesses on a case-by-case basis whether the employer has established a temporary or seasonal need for the agricultural work to be performed. *See* 8 U.S.C. 1101(a)(15)(H)(ii)(a); 20 CFR 655.103(d), 655.161(a).

Some nominally distinct employers have agricultural operations such that when they apply for H–2A workers it appears that two or more separate entities are each requesting a different temporary agricultural labor certification. However, in reality, the workers on these certifications are employed by a single enterprise in the same AIE and in the same job opportunity for longer than the attested period of need on any one application.

For example, if Employer A has a need for two Agricultural Equipment Operators from February to December, and Employer B has a need for two Agricultural Equipment Operators from December to February at the same worksite, this may reflect a single year-round need for Agricultural Equipment Operators. *See, e.g., Katie Heger,* 2014–TLC–00001, at *6 (BALCA Nov. 12, 2013) ("Considering that the [two entities] appear to function as a single business entity and have identified sequential dates of need for the same work, their 'temporary' needs merge into a single year-round need for equipment operators."). In these situations, the two nominally separate employers may be applying for certification for, and advertising for, one continuous, sometimes permanent, job opportunity, which calls into question whether either employer has a temporary or seasonal need.

The issue of whether an employer or nominally distinct employers have truly established a temporary need only arises when employers are filing multiple applications for the same or similar job opportunities in the same AIE, such that the combined period of need is continuous or permanent. It should be noted that determinations by OFLC and WHD as to single employer status may differ based on the evidence and information available at the time of assessment, though generally the agencies expect to reach the same conclusions when assessing single employer status.

Authority

An anonymous commenter and the Cato Institute, a public policy organization, alleged that the Department had failed to document its authority for adding this definition to the regulations. In particular, the Cato Institute argued that the Department provided no legal justification and instead used "circular reasoning" to justify the new definition. An anonymous commenter argued that the Department must provide statutory authority based on the INA and the authority granted to the Department in relation to the H–2A program, rather than looking to the NLRB as justification.

The Department articulated its authority for this proposal in the NPRM (*see* 88 FR at 63769) but will nevertheless explain in more detail the legal basis for the addition of this regulatory text in this final rule. The INA permits H–2A nonimmigrant workers to come "temporarily to the United States to perform agricultural labor or services . . . of a temporary or seasonal nature," and authorizes the Secretary to issue regulations. 8 U.S.C. 1101(a)(15)(H)(ii). The Department must evaluate the temporary or seasonal nature of the work, pursuant to the statutory definition of H–2A workers. 8 U.S.C. 1101(a)(15)(H)(ii) (describing a nonimmigrant "who is coming temporarily to the United States"); 8 CFR 214.2(h)(5)(iv)(B) ("In temporary agricultural labor certification proceedings the Department of Labor separately tests whether employment qualifies as temporary or seasonal."); *see also* 52 FR 20496, 20497–20498 (June 1, 1987)[11] ("What is relevant to the temporary alien agricultural labor certification determination is the employer's assessment—*evaluated, as required by statute, by DOL*—of its need for a short-term (as opposed to permanent) employee. The issue to be decided is whether the employer has demonstrated a *temporary need for a worker* in some area of agriculture." (emphasis in original)). Furthermore, the Secretary is authorized to take enforcement action "to assure employer compliance with terms and conditions of employment under this section [8 U.S.C. 1188]." 8 U.S.C. 1188(g)(2).

Therefore, the Department has the authority to publish regulations with respect to the employers—as defined by DOL's long-standing definition discussed further below—who are applying for an H–2A labor certification and to determine the true nature of those employers' need for temporary workers, as well as whether the employment of such workers will have an adverse effect upon wages and working conditions of workers in the United States similarly employed.

A trade association, agents, and a policy organization argued that the Department is not allowed to model its definition of the single employer test after the definition used by the NLRB because the definitions arise in entirely different contexts and the NLRA does not cover agricultural workers. *See* 29 U.S.C. 152(3). An agent, ma´sLabor, pointed to BALCA's decision in *Mid-State Farms, LLC,* 2021–TLC–00115 (BALCA Apr. 16, 2021) for support of this proposition. The ALJ in that case noted that the single employer test was developed by the NLRB, and that the "concerns of the NLRB, or for that matter cases under Title VII, are not the same as those under the INA." *Id.* at *22. The ALJ also stated that "[t]he policy behind the use of the 'Single Employer Test' appears to be in favor of broadening jurisdiction in collective bargaining cases and widening the number of employers who fall under its dictates" and then declared that this "over-inclusive policy" is not appropriate for the H–2A program. *Id.* An anonymous commenter agreed with the ALJ's sentiment and argued that the single employer framework in the H–2A context is too broad and overinclusive. The Department disagrees.

This rulemaking abrogates *Mid-State Farms, LLC* to the extent that it found that the single employer test was inappropriate in the H–2A context. As discussed further below, the Department believes that the single employer test may actually be the most appropriate way to assess temporary or seasonal need in certain circumstances. The Department has authority to craft regulations relating to the H–2A program and has the authority to overturn ALJ decisions. 8 U.S.C. 1101(a)(15)(H)(ii); 5 U.S.C. 305 (providing for continuing review of agency operations); *see also* 85 FR 30608, 30611 (May 20, 2020) (final rule allowing the Secretary to review decisions issued by BALCA "lest disagreement on law and policy within the Department lead to protracted uncertainty and intractable problems"). The Department is not convinced by the ALJ's logic set forth in *Mid-State Farms, LLC* that because the single employer test originated in a different context, it may not be used in the context of foreign labor certifications. Nor is the Department convinced by the ALJ's policy-related conclusion that the test is not appropriate because allegedly it is used to broaden the jurisdiction of the NLRB and is "over-inclusive." *Mid-State Farms, LLC,* 2021–TLC–00115, at *22 (Apr. 16, 2021). The INA authorized the Secretary, not ALJs, to promulgate appropriate regulations, adopt appropriate legal standards, and make policy. 8 U.S.C. 1101(a)(15)(H)(ii); *see also supra* "*Authority.*"

Furthermore, while the single employer test included in the regulations may have originated with the NLRB, as noted above, the concept of a "single" or "integrated" employer evolved from common law, not statute.[12] It has been adopted by courts

[11] Interim Final Rule; Request for Comments, *Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States,* 52 FR 20496 (June 1, 1987) (1987 H–2A IFR).

[12] *See* Crandley, M., *The Failure of the Integrated Enterprise Test: Why Courts Need to Find New Answers to the Multiple-Employer Puzzle in Federal Discrimination Cases* (2000), 75 Ind. L. J., pp. 1041, 1052, 1057 (explaining that the test arose in the NLRB in the late 1940s and 1950s, and first appeared in Equal Employment Opportunity Commission (EEOC) administrative decisions in the 1970s). As noted below, 8 U.S.C. 1188 does not define "employer" and the common law definition applies. *See Nationwide Mut. Ins. Co.* v. *Darden,* (courts

and Federal agencies under a wide variety of statutes. *See supra "Definition and Use by OFLC."* While the Department agrees that the concept of a single or integrated employer may sometimes be utilized differently under the NLRA—or Title VII or the ADA—that does not preclude the Department from adopting the test for use in the H–2A context. For the reasons discussed in the NPRM and below, the Department thinks that this test is appropriate to assess the nature of an employer's need.

The Cato Institute stated that the term "employer" as used in the INA "clearly" does not apply to related businesses. It also argued that Congress could have defined "employer" to include other entities if it had chosen to do so. As an example, it pointed to how Congress articulated a definition of "employer" in the context of the H–1B program, or how Congress discussed the concept of a "joint employer" in the INA. It then stated that the "absence of this defining language limits the meaning of this term to its ordinary definition: the employer entity that has submitted the petition."

The Department agrees that the INA does not define the word "employer" in the context of the H–2A program at 8 U.S.C. 1101 and 8 U.S.C. 1188 and thus the common law definition is applied. "[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U.S. 318, 322 (1992) (quoting *Community for Creative Non-Violence* v. *Reid,* 490 U.S. 730, 739 (1989)). The common law definition for "employer" is the basis for the Department's regulatory definition of "employer." *See* 20 CFR 655.103(b); 84 FR 36168, 36174 (July 26, 2019) [13] (footnote omitted) ("Controlling judicial and administrative decisions provide that to the extent a federal statute does not define the term employer, the common law of agency governs whether an entity is an employer. Accordingly, the proposal continues to use the common law of agency to define the terms employer and joint employment for associations and growers that have not filed applications."); 73 FR 8538, 8555

(Feb. 13, 2008) ("The Department is proposing to include the definition of employee and to modify the definition of employer to conform these definitions to those used in other Department-administered programs. The definition of employee conforms to the Supreme Court's holding in *Nationwide Mutual Insurance* v. *Darden,* 503 U.S. 318, 322–324 (1992)."); *see also* 20 CFR 655.103(b) (defining an employee as "[a] person who is engaged to perform work for an employer, as defined under the general common law of agency"). Congress authorized the Secretary to implement the statute via regulations, and they do so by appropriately using the common law definition of the term. 8 U.S.C. 1101(a)(15)(H)(ii). The Department disagrees with, and does not accept, the Cato Institute's articulated definition—that an "employer" is the "entity that has submitted the petition"—a definition that is not included in the statute, not found in common law, is not a generally established meaning of the term, and is inconsistent with the Department's regulatory definition and historic practice in the H–2A program.

The Cato Institute argued that the Department may not define "employer" at all, stating that the Department must utilize DHS's definition of "employer." The commenter claims, with no support, that "DHS now has sole authority over deciding the outcome of a petition and who is a petitioner, meaning that DHS's definition of 'employer' governs the meaning of employer in section 218 [8 U.S.C. 1188]." The Cato Institute also argued that "INA section 218 clearly defines a petitioning employer . . ." but provides no citation for this definition. A definition of "petitioning employer" does not appear in INA sec. 218. *See* 8 U.S.C. 1188(i) (the "Definitions" section).

The Department is not convinced by the Cato Institute's arguments. While DHS does have authority to adjudicate the H–2A petition, Congress clearly envisioned that DOL would play a crucial role in the process as the Secretary issues certifications, assesses temporary need, and takes actions to ensure employer compliance with the terms and conditions of employment, including promulgating regulations to effectuate their responsibilities under the INA. 8 U.S.C. 1101(a)(15)(H)(ii); 8 U.S.C. 1188(a)–(g)(2). DHS did not reference its own definition of employer when it recognized the Department's nonexclusive responsibility to assess an employer's need as either seasonal or temporary. 8 U.S.C. 1188(a); 8 CFR 214.2(h)(5)(iv)(B) ("In temporary

agricultural labor certification proceedings the Department of Labor separately tests whether employment qualifies as temporary or seasonal."). Therefore, in carrying out this responsibility, the Secretary is authorized to adopt a common law definition of the term "employer."

In discussing the Department's authority in this space, the Cato Institute claimed that the Department may "only deny a certification" when certification would "adversely affect" workers in the United States similarly employed, or when workers in the United States are not able to perform the labor or services in the petition. In actuality, the Department may deny a certification for a number of reasons, as outlined in the statute at 8 U.S.C. 1188(b), and may only issue a certification if the "employer has complied with the criteria for certification" and "the employer does not actually have, or has not been provided with referrals of, qualified eligible individuals who have indicated their availability to perform such labor or services on the terms and conditions of a job offer which meets the requirements of the Secretary." 8 U.S.C. 1188(c)(3).

The Cato Institute argued that the Department's analysis of an application is limited to only the labor or services in the labor certification application it is currently adjudicating, and not to any other labor or services involved in other petitions or applications by separate employers. It stated that the Department may not identify adverse effects to workers in the United States similarly employed that were or are caused by job offers that are not the present employer-applicant's job offer. The Department disagrees with this characterization.

The statute does not limit the Department's review to one application or job offer. As discussed above, the Department must assess the employer's need for temporary workers when reviewing an application, an assessment that may require the Department to review other applications spanning more than one job opportunity, and looking to the same employer's filing history (and in the case of a single employer, the nominally distinct entities' filing histories) is part of analyzing an employer's need for said employment. This temporary need assessment is distinct from any adverse effect determination made by the Department.

It is well established that to analyze temporary need, the Department may look to other previously or simultaneously filed applications. 86 FR 71373, 71377 (Dec. 16, 2021) ("Similar

---

503 U.S. 318, 322 (1992) (" '[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.' ") (citations omitted).

[13] NPRM, *Temporary Agricultural Employment of H–2A Nonimmigrants in the United States,* 84 FR 36168 (July 26, 2019) (2019 H–2A NPRM).

to USCIS' approach [which is the same for all H–2A petitions, including H–2A sheep and goat herder petitions] . . . the Department's adjudication will be conducted on a case-by-case basis and will take into consideration the totality of the facts presented, of which past periods of need is but one element that is considered in determining whether an employer's need is truly temporary or seasonal.''); *see also* USCIS, *Policy Memorandum: Updated Guidance on Temporary or Seasonal Need for H–2A Petitions Seeking Workers for Range Sheep and/or Goat Herding or Production* (Feb. 28, 2020) (''USCIS evaluates all H–2A petitions based on the facts presented in the petitions as well as the past filings of the petitioner, as appropriate.''); [14] *see, e.g., Donald Parrish Dairy Inc.,* 2019–TLC–00006, at *4–5 (BALCA Dec. 19, 2018) (relying on previous certification to determine that employer had not proven that its need was seasonal). Having the ability to examine an employer's filing history is crucial to determining whether consecutive applications have been filed such that an employer truly has a temporary or seasonal need. 1987 H–2A IFR, 52 FR at 20498 (''DOL will take a careful look at repeated temporary alien agricultural labor certification applications for the same job''). If an employer files an application covering January to June, and another from June to December, the Department would only know about the sequential period of need and potential year-round employment if it may look at previous filing history. Furthermore, it would also be impossible to determine if multiple applications have been filed in the same AIE without the ability to look at other applications. 20 CFR 655.130(e)(2) (''[a]n employer may file only one *Application for Temporary Employment Certification* covering the same AIE, period of employment, and occupation or comparable work to be performed''). This approach is consistent with the above-referenced USCIS Policy Memorandum regarding the assessment of an employer's need.

The Cato Institute also argues that the purpose of the H–2A program is to ''secur[e] the border or stop[ ] illegal immigration'' and faults the Department for not mentioning this purpose in its stated justification for codifying the single employer test. The Department disagrees. The plain language of the

statute does not create any such obligation by DOL to secure the border or stop unauthorized immigration. *See* 8 U.S.C. 1188(a). Statutory construction begins with the statute and ends with the statute if the statute is unambiguous. *Rotkiske* v. *Klemm,* 140 S. Ct. 355, 360 (2019). Congress may have many different purposes when enacting a statute, but the particular provisions of the INA that relate to DOL's role in the H–2A program do not mandate the Department consider how to secure the border or stem unauthorized immigration.

For these reasons, the Department concludes that the above-mentioned commenters' assertions that the Department lacks authority to promulgate a definition of the single employer test in the context of the H–2A program are unfounded, and the Department adopts the definition as proposed.

**b. The Four Factor Test, Business Structures, and Notices of Deficiency**

As noted above, the four factors that the Department proposed to determine single employer status were: (1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control. The Department reiterates and expands upon the discussion of the factors in the NPRM below.

Regarding the ''common management'' factor, the ''relevant inquiry is whether there is 'overall control of critical matters at the policy level.' '' *K & S Datthyn Farms,* 2019–TLC–00086, at *6 (BALCA Oct. 7, 2019) (quoting *Spurlino Materials,* 805 F.3d at 1142). Shared day-to-day management may also indicate common management. *Spurlino Materials,* 805 F.3d at 1142. For example, where the same president, treasurer, and chief operating officer oversee the actions of multiple entities and resolve disputes, this suggests a common management between entities. *Pepperco-USA, Inc.,* 2015–TLC–00015, at *30–31 (BALCA Feb. 23, 2015).

Regarding the ''interrelation between operations'' factor, the Department may look to whether the entities operate at arm's length. *Id.* It may examine whether companies share products or services, costs, worksites, worker housing, insurance, software, or if they share a website, supplies, or equipment. *See, e.g., id.; Sugar Loaf Cattle Co.,* 2016–TLC–00033, at *6–7 (Apr. 6, 2016) (finding an interrelation of operations in part because the work locations were ''fundamentally at the same place''); *David J. Woestehoff,* 2021–TLC–00112,

at *11 (BALCA Apr. 2, 2021) (comparing employers' housing locations and worksites to analyze their relationship).

Regarding the ''centralized control of labor relations'' factor, the Department may look to whether the persons who have the authority to set employment terms and ensure compliance with the H–2A program are the same. *K & S Datthyn Farms,* 2019–TLC–00086, at *5 (Oct. 7, 2019) (noting the same manager signed different H–2A applications and this was a ''fundamental labor practice[ ], at the core of employer-employee relations for any business'').

Finally, regarding ''common ownership and financial control,'' the Department may look to the corporate structure and who owns the entities, whether it be, for example, a parent company or individuals. *See Pepperco-USA, Inc.,* 2015–TLC–00015, at *30–31 (Feb. 23, 2015) (two nominally distinct entities were owned by one parent company). It may also explore whether the owners of the entities at issue are related in some way. *See, e.g., JSF Enterprises,* 2015–TLC–00009, at *12–13 (BALCA Jan. 22, 2015) (entities owned in varying degrees by members of the same family); *Larry Ulmer,* 2015–TLC–00003, at *3–4 (BALCA Nov. 4, 2014) (two companies with similar names were owned by father and son); *Lancaster Truck Line,* 2014–TLC–00004, at *2–3 (Nov. 26, 2013) (father and son sought to separate a business in an attempt to meet seasonal need requirements); *see also Overlook Harvesting,* 2021–TLC–00205, at *13 (BALCA Sept. 9, 2021) (though analyzing the relationship using joint employment test, looking to the marital relationship between owners). These examples of analysis and lines of inquiry related to each of the factors are not exhaustive.

The Department received several comments on this aspect of the proposal. After consideration of the comments, discussed in detail below, the Department adopts the proposal without change.

One anonymous commenter, as well as USAFL and Hall Global, commented that the factors are inappropriately vague, open-ended, and that they are not defined within the text of the definitions. USAFL and Hall Global stated that these factors are ''superficial'' and that something as simple as a ''shared mailbox'' would lead OFLC to draw a conclusion that multiple employers' needs are the same need. An anonymous commenter lamented that these four factors would establish an unjustified ''limitless standard'' that would make it

---

[14] USCIS, *Policy Memorandum: Updated Guidance on Temporary or Seasonal Need for H–2A Petitions Seeking Workers for Range Sheep and/or Goat Herding or Production* (Feb. 28, 2020). *https://www.uscis.gov/sites/default/files/document/memos/2-PMH2A-SeasonalSheepGoatHerder_PolicyMemo.pdf.*

impossible to know if they have satisfied some or all of the factors.

The Department understands the concerns that this test and these factors do not establish a bright-line rule, which can present difficulties in administration. Tests that involve weighing factors are naturally fact-dependent, and reasonable people may disagree as to the outcome of the test. However, as noted previously, the single employer test has been used by administrative tribunals and Federal courts for decades. As stated above, DOL itself has been using this test already in the H–2A context as well. To date, the Department has found this to be a reasonable test that the Department has been able to apply fairly without overburdening employers.

USAFL and Hall Global suggested that rather than use the Four Factor Test, the Department should focus its inquiry on "economic substance," or in other words, whether there is a valid business reason for the corporate structure. Allegedly this "economic substance" analysis would help determine whether employers have only divided their business for "sham" reasons. The Cato Institute made a similar suggestion that if the Department were to keep the single employer test, it should be limited to times where evidence shows that the separation of business occurred solely to obtain a labor certification. USAFL and Hall Global claimed that this "economic substance" standard is administrable, easy to litigate, and protects business interests.

The Department disagrees with commenters that this "economic substance" type test would be easier to administer and litigate and declines to accept the suggestions. The Department must determine that an employer's need is temporary or seasonal regardless of whether there is a legitimate reason for dividing a business, therefore adopting this suggestion would be inconsistent with the INA. Furthermore, while it may be possible to determine in some cases whether the businesses have been separated to specifically meet H–2A requirements—*see, e.g., Lancaster Truck Line,* 2014–TLC–00004, at *2–3, 5 (Nov. 26, 2013), in which the employer was "frank about separating the legal entities of his operation" from his father to "comply with the H–2A program's seasonal permitting restrictions,"—it is rarely so clearly established, making a test based on whether there is or is not a "sham" reason for splitting a business *more* difficult to administer. What the Department is tasked with determining, and what is well-within its authority to administer, however, is whether or not the employer has a true temporary or seasonal need.

The Department understands that, as many commenters noted, there are legitimate business reasons for complex corporate structures, and that there are many family-owned and family-run farms that may form various entities for insurance, tax, inheritance, or other purposes, including risk management. One example provided was of a fixed-site grower who also created a labor contracting company to provide labor services to other growers. U.S. Custom Harvesters, Inc. gave an example of intertwined businesses that have both "seasonal custom harvesting needs" and "seasonal needs for their farm business." It expressed concern that these types of legitimate arrangements would be questioned as to their single employer status.

The fact that an employer is not trying to circumvent regulatory requirements, does not mean that it then automatically has a valid temporary or seasonal need for agricultural labor. Even if an employer, or single employer, has legitimate reasons for dividing their business(es) and then separately applying for H–2A workers, it is a statutory requirement that the H–2A work be of a temporary or seasonal nature, and therefore employers submitting an application for temporary agricultural labor certification are required to establish that they have a temporary or seasonal need for agricultural labor. 8 U.S.C. 1101(a)(15)(H)(ii)(a); 20 CFR 655.103(d), 655.161. Permitting employers with a permanent need to simply divide their business so that multiple entities can establish a temporary need, and thereby obtain a labor certification, would violate the statute. *See, e.g., Intergrow East, Inc.,* 2019–TLC–00073, at *5 (BALCA Sept. 11, 2019) ("An employer may not circumvent the temporary need requirement by using a closely related business entity to file an overlapping application").

Even if employers have genuine business needs for dividing their business and then separately applying for H–2A workers, this approach to filing labor certification applications is problematic. It undermines the statutorily required labor market test and the Department's ability to protect workers in the United States as each application, standing alone, does not fully convey the potential job opportunity to any applicant—for example, the job opportunity could be for 12 total months rather than 6 months with one employer and 6 months with only a nominally separate entity. It is possible that a U.S. worker would be interested in a job that could last a year, or even permanently, rather than only 6 months—a sentiment echoed by numerous supporters of this proposal. These supporters agreed that U.S. workers may be more interested in a year-round job, as opposed to numerous temporary job opportunities posted separately.

The Cato Institute argued that the Department cannot assert that there is harm to prospective U.S. workers who are unable to see the full nature of the job opportunity because the Department, in order to state that these workers are not aware of the full nature of the job opportunity, must make an assumption about the full nature of the job opportunity.

The Department disagrees with the commenter's assertion because it is the employer's burden to establish eligibility for this program. 8 U.S.C. 1361. If the employer cannot establish that it has truthfully disclosed the full nature of its job opportunity, then the employer has not established eligibility for the program. *Id.* Furthermore, even if the Department were to "assume" that a job opportunity is not as it seems, many commenters echoed and supported the ability of the Department to investigate and conclude that there may be impacts on the labor market test if the full nature of the job opportunity is not disclosed.

The Cato Institute also asserted that employers could "already hire U.S. workers without bureaucratic interference . . . [and] [t]he only reason that [an employer] would participate in the H–2A program is because they cannot find U.S. workers to do the jobs." The commenter did not provide evidence for their assertion, and it is unclear what conclusion the Department is supposed to draw from this statement, but to the extent that it is implying that an employer who applies for the program must automatically be eligible because it applied, the Department disagrees. Again, the statute requires petitioners to obtain a certification from the Secretary. The statute specifically notes that a certification may only be issued after an employer "has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)," thereby establishing that not only must an employer meet all the criteria and engage in recruitment, but also that Congress did not presume an employer would be automatically eligible for a certification simply because it applied to the H–2A program. 8 U.S.C. 1188(c)(3)(A)(i). The Secretary has an active role to play in recruitment

and for this recruitment to be meaningful, as noted above, the employer must truthfully disclose the full nature of its job opportunity. *See* 8 U.S.C. 1188(b); 8 U.S.C. 1188(g)(1)(A).

Americans for Prosperity Foundation, another public policy organization, in response to the idea that a single employer may not accurately convey the full nature of a permanent job opportunity because it has split the job between two nominally distinct companies, stated that prospective workers could simply "search through the [SWA] interstate employment system" to "have full view of all the H–2A job opportunities available by all employers." The Department points out that this would not solve the problem that the job opportunity the employer-applicant is putting forth in their application is not fully accurate, and furthermore, it should not be the responsibility of worker-applicants to piece together job postings from nominally distinct entities, nor may it even be possible for worker-applicants to tell from a job posting alone that any two employers are so intertwined as to be acting as a single employer.

The Cato Institute argued that it is legal for employers to split their businesses to comply with the law. The commenter went so far as to state that the Department requires certain employers—in its example H–2ALCs—to manipulate its need. The commenter further stated that "[a] contractor that continuously services all types of farms in the same area throughout the year will automatically have a year-round need in that area" and that if they want to "operate in the same area but service different crops, the owner must create a separate legal entity." The commenter wrote that it is a "good thing" for employers to arrange their businesses so that they comply with the law.

The Cato Institute has taken a presumably hypothetical example of an H–2ALC that has a full-time, permanent need and explained that it purposely manipulates its structure to find a loophole to a statutory requirement. The position that employers should be able to utilize existing loopholes to circumvent statutory requirements of temporary or seasonal need is not a convincing argument to rescind or amend the proposal. In fact, it is concerning to the Department. It is also concerning that the Cato Institute believes the Department is requiring employers to manipulate their corporate structures to qualify to use the program. The INA makes clear that employers may only use the H–2A program if they establish eligibility for the program, including that they have a temporary or

seasonal, as opposed to permanent, need; they are not entitled to use it as a matter of course. *See* 8 U.S.C. 1361; 8 U.S.C. 1188(b). Therefore, if an employer cannot qualify because their need is permanent, they are in no way required to manipulate their need; they simply do not qualify.

USAFL and Hall Global argued that the Department has not "take[n] into account reliance interests," presumably in relation to business and corporate structures. It explains that employers have tax, estate planning, and other legitimate reasons for dividing their businesses and that this creates "reliance interests." However, it is unclear exactly what "reliance interests" this commenter is referring to or how this proposal would affect employers. As previously noted, the Department has been utilizing some variation of the single employer test for nearly a decade, so there should be no change with regard to these "reliance interests." Also, regardless of how it structures its business or the reasons for doing so, as stated above, an employer must establish its temporary or seasonal need pursuant to the statutory requirements. To the extent the commenter is suggesting reliance interests in prior certifications, if an employer is denied certification for failure to establish a temporary need it does not matter that it was approved in the past, as a previous certification does not mandate approval of a subsequent application, especially when this past certification was in error, as each application must be evaluated on its own merits. *See Sussex Eng'g, Ltd.* V. *Montgomery,* 825 F.2d 1084, 1090 (6th Cir. 1987) ("It is absurd to suggest that . . . any agency must treat acknowledged errors as binding precedent"). If the employer did not have a seasonal or temporary need in the past, it should not have been certified.

The Department acknowledges again that there are legitimate reasons that agricultural employers structure their businesses the way they do, and also believes the vast majority of users are not attempting to manipulate the program, but that the Department nonetheless has a statutory responsibility to verify that the employers are eligible to participate in this program.

Should a CO suspect that an employer-applicant has an actual need that stretches longer than their stated need because the employer is a single employer with another entity or entities based on the four factors above, the COs may issue a NOD or NODs to clarify the status of said entities. To analyze

whether entities are a single employer, COs may request, via NOD, information necessary for this determination, including, but not limited to: (1) documents describing the corporate or management structure, or both, for the entities at issue; (2) the names of directors, officers, or managers and their job descriptions; (3) incorporation documents; or (4) documents identifying whether the same individual(s) have ownership interest or control. The COs may additionally ask for explanation as to: (1) why the businesses may authorize the same person or persons to act on their behalf when signing contracts, applications, etc.; (2) whether the businesses intermingle money or share resources; (3) whether workspaces are shared; and (4) whether the companies produce similar products or provide similar services. These lists of documentation or evidence are not exclusive, and the COs may request other information or documentation as necessary. An anonymous commenter and USAFL and Hall Global both expressed concern that these factors and related NODs would lead to a limitless inquiry into the business operations of employers and, as noted above, arguing that the Department has not provided justification as to why the factors are so open-ended and vague. Wafla stated that these factors and related NODs would lead to intrusive inquiries, responses for which would take "40 to 100 hours or more to compile." NHC believed that the Department was giving itself too much authority to ask for information and that it would cause an undue burden on employers. Many commenters felt that OFLC questioning an employer as to their single or integrated employer status would generate more NODs and delays in processing of applications, or even delays in the arrival of H–2A workers. Many also stated that this test would be overly burdensome for the whole industry, just to target a "few bad apples." An anonymous commenter criticized the Department's use of NODs and stated that the Department should ask for information about temporary or seasonal need before "rendering a decision." It is unclear what the commenter meant by this statement, as the NOD is the means by which the Department requests further information before rendering a final determination on a case.

The Department understands the concerns regarding NODs and delays in processing but believes the concern is exaggerated and that the benefits of an additional NOD or slight delay, if one

occurs, nevertheless outweigh the potential inconvenience. The Department may issue multiple NODs if the application or job order is incomplete, contains errors or inaccuracies, or does not meet the regulatory requirements. 20 CFR 655.141 and 655.142. If an employer has not demonstrated their eligibility or compliance with the regulations, the NOD is the opportunity for the employer to remedy the deficiencies. A NOD is not punitive, as suggested by one anonymous commenter; instead, it is a means by which employer-applicants are given the opportunity to remedy the deficiencies without the need to wait for a decision denying the application and a subsequent appeal, and without the need to start the application process over.

NODs may request information related to the four factors discussed above, but the Department does not intend to use the NOD to gather unnecessary business information or, as one anonymous commenter suggested, to engage in "a never-ending fishing expedition." Instead, the NOD is the employer's opportunity to submit what evidence it deems appropriate to establish its eligibility for the program. The Department may require the actual submission of materials that are required to be maintained by the regulations, materials that are commonly and routinely used by businesses such as tax documentation, or materials that should be readily available like an organizational chart. Generally, though, employers have some flexibility to provide documentation that establishes their own eligibility for the program. The factors for the single employer test are purposely open-ended to allow employers some choice with how to support, or refute, findings related to the said factors. Employer relationships are increasingly complex, and it would be difficult for the Department to outline every type of documentation or information that could be used to analyze these factors. It would also not be to the advantage of employers, who may have different types of documentation, to submit only specific types of documents, if the submission or maintenance of this documentation is not otherwise required, to prove that they do or do not satisfy the factors, provided that the alternative documentation actually demonstrates their eligibility.

Employers must establish their eligibility for the H–2A program, including that they have a temporary or seasonal need. Should the situation arise that an employer must establish that it is not a single employer with

another entity to establish that it does in fact have a temporary or seasonal need, the Department does not believe this to be an undue burden, as this is a statutory requirement. 8 U.S.C. 1101(a)(15)(H)(ii); 8 U.S.C. 1188(a)(1).

Furthermore, as stated in the NPRM and discussed further below, the Department has already been applying this single employer test for at least the last decade. As the Department has already been issuing NODs related to single employer status, there should only be a nominal increase in NOD issuance, *if* there is an increase at all. The Department only intends to utilize the single employer test for the purposes of determining temporary or seasonal need if the employer and its nominally distinct counterparts are applying for certifications in the *same* AIE, for the *same or comparable* job opportunities, for a period of time that would suggest the single employer does not have a temporary or seasonal need. *See* 20 CFR 655.130(e)(2) ("[a]n employer may file only one *Application for Temporary Employment Certification* covering the same [AIE], period of employment, and occupation or comparable work to be performed"). The Department does not intend to determine if every employer-applicant happens to be a single employer, or even a related employer, without any basis to do so.

### c. Single Employers, BALCA, and Joint Employers

As noted in the NPRM, OFLC used an informal, fact-focused method of inquiry, involving a comparison of case information (*e.g.,* owner and manager names, locations and AIEs, recruitment information, job descriptions, and other operational similarities across applications) for nearly a decade to address the issue of nominally separate entities using their corporate structure—either purposefully or not—to circumvent statutory requirements. In approximately 2015, OFLC began to frame its analysis using the single employer test (see above under *Definition and Use by OFLC*) to improve consistency and transparency and to address more complex business structures (*e.g.,* corporate organizations) filing H–2A applications through nominally different employers. *See Pepperco-USA, Inc.,* 2015–TLC–00015, at *2–5 (Feb. 23, 2015). Some commenters argued that, in fact, the single employer test was not a "long-standing" approach, with an anonymous commenter observing that the ALJ in the *Pepperco-USA* case described the test as "novel." The Department notes that *Pepperco-USA, Inc.* was decided in February 2015—

almost a decade ago—and it is no longer "novel." The Western Range Association opposed the addition of the definition and stated that they wished for the Department to continue to use "current practice." It is unclear what this commenter meant, as the current practice is and has been to utilize some form of the single employer test.

Historically, BALCA has affirmed many OFLC denials that either explicitly used the single employer test or used a similar analysis. *See, e.g., D & G Frey Crawfish, LLC,* 2012–TLC–00099, at 2, 4–5 (BALCA Oct. 19, 2012) (affirming the CO's denial and stating that "[employer's] ability to separate her operation into two entities does not enable her to hire temporary H–2A workers to fulfill her permanent need").[15] However, in more recent decisions, BALCA has sometimes rejected the single employer test, noting that it had not been promulgated through notice-and-comment rulemaking. *See Mid-State Farms, LLC,* 2021–TLC–00115, at *16 (Apr. 16, 2021) ("This court can find no published instance where the 'Single Employer Test' has been debated openly, subjected to public comment or accepted as official Department policy."). In response to these concerns, some ALJs have applied the "joint employer" test to analyze temporary

---

[15] Other decisions either explicitly applying the single employer test, or simply using a similar analysis include: *David J. Woestehoff,* 2021–TLC–00112, at *11 (Apr. 2, 2021) (ALJ looked to the four factors in the single employer test to determine if the entities were a single employer but was unable to determine if they were); *K.S. Datthyn Farms, LLC,* 2019–TLC–00086, at *4–6 (Oct. 7, 2019) (applying four-part NLRA and Title VII integrated employer test to determine whether two H–2A applicants for temporary labor agricultural certification were one integrated employer with single labor need); *Intergrow East, Inc.,* 2019–TLC–00073, at *5–6 (Sept. 11, 2019) (same); *Pepperco-USA, Inc.,* 2015–TLC–00015, at *26, 30–31 (Feb. 23, 2015) (see above); *JSF Enterprises,* 2015–TLC–00009, at *12 (Jan. 22, 2015) ("The four entities . . . fill the same need on a year round basis because of the interlocking nature of the business and regardless of the distinction in crops each harvests."); *Anthony Mock,* 2015–TLC–00008, at *6–8 (BALCA Dec. 30, 2014) (ALJ, while not mentioning the single employer test, looked to whether or not the two entities at issue were separate legal entities, and looked at whether there was shared ownership, employees, or assets); *Cressler Ranch Trucking,* 2013–TLC–00007, at *3 (BALCA Nov. 26, 2012) ("The Employer only disguises this need through subsequent applications from a separate entity with the same owner and slight alterations in the wording of the form ETA–9142. Accordingly, the CO reasonably concluded that the Employer failed to demonstrate a temporary need for agricultural labor or services, as required by 20 CFR 655.103(d)."); *see also Maroa Farms Inc.,* 2020–TLC–00110, at *13 (BALCA Sept. 4, 2020) (affirming the CO's decision on other grounds but noting that "an employer may not circumvent the temporary need requirement by using a closely related business entity to file an overlapping application").

need because a definition of "joint employment" is included in the regulations. *See, e.g., id.* at *26; *Overlook Harvesting,* 2021–TLC–00205, at *10 (Sept. 9, 2021) (adopting a modified "joint employer" test).

Many commenters, in agreeing with the logic of the ALJ in *Mid-State Farms, LLC,* opposed the addition of the single employer test and argued that the "joint employer" test was more appropriate as it was already defined in the regulations and BALCA had endorsed it. *See Mid-State Farms, LLC,* 2021–TLC–00115, at *25–26 (Apr. 16, 2021). Many commenters argued that the Department may not now adopt the single employer test because BALCA had "rebuffed" attempts to use the test. The Americans for Prosperity Foundation also cited *Mid-State Farms, LLC* and noted that BALCA had criticized the single employer test, stating that it had not been subject to notice and comment. USAFL and Hall Global argued that the Department lacks "clear criteria" for identifying applications that may have integrated enterprises and that there is seemingly no discernable way to know why some employers are questioned as to their status and others are not.

These commenters ignore that a lack of a regulatory definition pursuant to notice-and-comment rulemaking was a major reason BALCA "rebuffed" the single employer test in *Mid-State Farms, LLC.* As noted above, the Department disagrees with BALCA's conclusion in *Mid-State Farms,* but in any event, the Department here is engaging in the notice-and-comment rulemaking to enact the single employer or integrated employer test and to provide clear criteria to stakeholders, COs, and ALJs, such as the one in *Crop Transport,* who stated that "[i]t would be helpful . . . if meaningful regulatory criteria were promulgated through notice-and-comment procedures as to when ETA will consider two nominally separate entities as a single applicant for purposes of temporary [agricultural] labor certifications under the Act." *Crop Transport, LLC,* 2018–TLC–00027, at 6 n.6 (Oct. 19, 2018). The Secretary is authorized to establish policy and promulgate regulations. *See supra,* the *Authority* section. This rulemaking will provide more uniformity as to the application of the single employer test.

Many commenters argued that the Department proposed to change how to determine when two employers were jointly employing an employee by adding the single employer definition to the regulations. These comments mischaracterize the Department's proposal. The Department is not proposing to change the definition of

"joint employer" located in 20 CFR 655.103(b), or proposing to change how to determine if two employers are jointly employing an employee. As stated in the NPRM, "this proposal is not meant to eliminate or undermine appropriate use of the joint employment test." 88 FR at 63770. A "joint employer" is not necessarily a "single employer," nor is a "single employer" necessarily a "joint employer."

Joint employment under the H–2A program, generally, is "[w]here two or more employers each have sufficient definitional indicia of being a joint employer of a worker under the common law of agency." 20 CFR 655.103(b) (definition of "joint employment" at paragraph (i)).[16] This joint employment inquiry thus focuses on the relationship between the putative joint employer and the employee(s), while the single employer test focuses on the relationship between the nominally distinct employers. *See Knitter,* 758 F.3d at 1227 ("Unlike the joint employer test, which focuses on the relationship between an employee and its two potential employers, the single employer test focuses on the relationship between the potential employers themselves."). Joint employment assumes that the entities are separate while the single employer test asks whether "two nominally separate entities should in fact be treated as an integrated enterprise." *Id.* at 1226–27 (quoting *Bristol* v. *Bd. Of Cty. Comm'rs,* 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc)). "In the case of the single employer doctrine, the two entities are essentially the same entity. In the case of the joint employer doctrine, the two share control of the employee to such an extent that they both function as an employer, even though they are operationally distinct." *Bonilla* v. *Liquilux Gas Corp.,* 812 F. Supp. 286, 289 (D.P.R. 1993).

Determining whether two entities are joint employers, contrary to BALCA's assertion in *Mid-State Farms,* is unhelpful when assessing temporary or seasonal need where, for example, an employer splits their business between two seemingly separate entities in order to circumvent the requirement to establish a temporary or seasonal need. In those situations, employees are generally not employed at the same time, though there may be overlap between the periods of need, making the analysis of joint employment largely impractical. In assessing the temporary

or seasonal need of nominally distinct entities, the focus of the Department's analysis is not on the relationship between the employer and the employees, but rather between the employers themselves.

As an anonymous commenter noted, and another alluded to, *Mid-State Farms* claimed that "the leading BALCA decisions" applied a "joint employer analysis." However, upon closer examination, the cases the ALJ referenced in *Mid-State Farms* were analyzed using the factors of the single employer test, and furthermore, several of them may not have met the joint employer test. *Mid-State Farms, LLC,* 2021–TLC–00115, at 27. Specifically, *Mid-State Farms* cited the following cases that actually utilized some form of the single-employer test: *Larry Ulmer,* 2015–TLC–00003, at 4 (Nov. 4, 2014) ("Since the business entities of Larry Ulmer and Ulmer Farms are so intertwined, it would be reasonable to infer that they function as one and are attempting to circumvent the temporary employment requirement." (citations omitted)); *Lancaster Truck Line,* 2014–TLC–00004, at 1–3 (Nov. 25, 2013) (The companies shared the same FEIN, business address and owners, and "[e]mployer was frank about separating the legal entities of his operation in order to comply with the H–2A program's seasonal permitting restrictions."); *Katie Hegar,* 2014–TLC–00001, at 6 (Nov. 12, 2013) ("Considering that the [two entities] appear to function as a single business entity and have identified sequential dates of need for the same work, their 'temporary' needs merge into a single year-round need for equipment operators."); *Altendorf Transport,* 2013–TLC–00026, at 8 (Mar. 28, 2013) (employer's argument "does not overcome the interlocking nature of the business organizations...............The Employer has the burden of persuasion to demonstrate it and [the other entity] are truly independent entities."); *D & G Frey Crawfish, LLC,* 2012–TLC–00099, at 2, 4 (Oct. 19, 2012) (noting that two companies had the same owner, mailing address, and worksite location and offered similar job opportunities, and stating that "[employer's] ability to separate her operation into two entities does not enable her to hire temporary H–2A workers to fulfill her permanent need").

FFVA, a trade association, and ma´sLabor, an agent, expressed a preference for using the "joint employer" test, observing it would sufficiently prevent employers from circumventing the seasonal need requirements. As noted in the NPRM,

---

[16] Note that the regulations also define "joint employment" for specific filing contexts as well. 20 CFR 655.103(b) (definition of "joint employment" at paragraphs (ii) and (iii)).

**Federal Register** / Vol. 89, No. 83 / Monday, April 29, 2024 / Rules and Regulations

however, the Department is hesitant to only use the H–2A joint employer test in these situations because it may not capture instances, such as those outlined above, where employers who are not H–2A joint employers, but who are only nominally distinct, hire workers sequentially such that they are employing workers all year or permanently. Neither commenter, however, addressed this shortcoming of the joint employer test.

Ma´sLabor argued that the single employer test is "more restrictive" than the joint employer test. Wafla lamented that the Department formally adopting the single employer test will cause some employers who operate in the same AIE to no longer qualify for this program because they will no longer be able to demonstrate a temporary or seasonal need. If an employer is unable to demonstrate a temporary or seasonal need for workers, they are ineligible for the program; they also would have been ineligible before the promulgation of this rule.

As explained in the NPRM, joint employment can still be useful in analyzing temporary need in the H–2A program, and this proposal is not meant to eliminate or undermine appropriate use of the joint employment test. For example, there may be a situation where an employer applies for workers from January to April and then hires an H–2ALC or subcontractor for the months of May to December. It is possible that this relationship could be joint employment as defined in the regulations. If such an employer-applicant hires workers from January to April, and then jointly employs workers from May to December, this employer-applicant would have a year-round need. The use of the single employer test in temporary need analysis is meant to cover situations where employees may *not* be jointly employed, or not jointly employed for the entire alleged period of need. "Joint employer" is a concept also used in other aspects of the H–2A regulations, and again, the single employer test does not change or undermine the regulations regarding joint employers. *See, e.g.,* 20 CFR 655.131.

Farmworker Justice suggested that the Department specifically state in the regulations that the single employer test does not eliminate or undermine the joint employer test, and that the single employer test is about the relationship between the two different employers as opposed to a relationship between an employer and employee.

The Department appreciates the commenter's suggestions but declines to include them. The two definitions in the

H–2A regulations—joint employer and single employer test—are distinct, not exclusive; describe different types of corporate relationships (relationships between two or more employers, versus relationships between employers and employees); and have been sufficiently explained in the preamble, such that additional text in the definition in the regulations could be cumbersome and confusing. It is likewise redundant to note that the single employer test applies between employer-entities and not between an employer and employee. The preamble and articulated definition make this clear, and furthermore the Department does not believe it would be possible to apply the "single employer test" to an employer and employee. Finally, Farmworker Justice suggested including the words "nominally distinct" somewhere in the definition, although they did not specify where. The Department also believes this to be unnecessary for the reasons specified earlier in this paragraph, as well as the fact that this test is used to determine whether any two or more entities are a single employer.

In light of the BALCA case law criticizing the Department's lack of notice-and-comment rulemaking regarding the single employer test, BALCA case law inappropriately applying the joint employer test to single employer situations, and to codify its long-standing practice, the Department now incorporates the single employer definition as proposed into the regulations and notes that COs will use the definition to analyze the temporary or seasonal need of nominally separate entities.

### d. Other Comments on § 655.103(e)

#### i. Area of Intended Employment

One topic of concern that many commenters raised was whether the Department's assessment of temporary need would involve only those job opportunities in the same AIE. They suggested amending the definition of single employer such that it would read, in part, "[s]eparate entities *filing for the same or similar job opportunities in the same [AIE]* will be deemed a single employer." After consideration, the Department declines to add the requested text to the regulatory provision as it believes the language is redundant.

The regulations state that "[a]n employer may file only one *Application for Temporary Employment Certification* covering the same AIE, period of employment, and occupation or comparable work to be performed." 20 CFR 655.130(e)(2). It is already clear

from the regulations that employers are limited to *one* application for *one* AIE and period of employment, and the *same occupation or comparable* work. Therefore, there is no benefit to adding to the single employer definition that temporary or seasonal need be evaluated based on only one AIE, as this is how it is already assessed. There is no prohibition on employers filing for labor certifications in multiple AIEs if they can establish eligibility in each application.

Furthermore, such constraining language may hinder WHD's ability to apply the single employer test in the context of enforcement, as such additional language could be construed as requiring each nominally distinct entity to have filed applications for labor certifications to be deemed part of a single employer.

#### ii. Single Employer Status Is Not an Automatic Bar

It is possible for a singular employer to have multiple needs—it may have a need for different job opportunities or may have needs in different AIEs. One anonymous commenter, who stated they opposed this proposal, argued that DOL's "role here is to evaluate whether a need is temporary or seasonal, not to determine whether farms may be some, or any measure constitute a single or otherwise connected employer." As discussed extensively above, by adopting and applying the single employer test OFLC is assessing whether the employer's need is temporary or seasonal.

Multiple commenters, including an agent, an agricultural association, and trade associations, stated that the Department should move forward with caution so that the Fifth Amendment and due process rights are not violated but did not elaborate on how including this definition would violate the Fifth Amendment or any due process rights. It appeared, based on language used in the comments, though not always explicitly stated, that many commenters believe that the Department would be "accusing," penalizing, or punishing employers who happen to be single or integrated employers and automatically denying applications for temporary agricultural labor certification if that employer were deemed to be a single or integrated employer.

The Department wants to make clear that being found to be a single employer is *not* an automatic bar to utilizing the H–2A program. One agricultural organization believed that the Department was going to deem all employers in a single industry as a single employer. Others suggested that

sharing an office space, or the fact that entities may both be agricultural producers, would make them "single employer." This is not true. Just because an employer is related to, or is only nominally distinct from another company, does not mean that they are prohibited from using the H–2A program. Nor does it necessarily mean that they will be questioned as to their status via NODs.

The Department is not "accusing" any employers of wrongdoing simply by virtue of operating as a single employer with a nominally distinct entity. The single employer test is a means by which OFLC may ascertain an employer's true need for workers. Should entities who are acting as a single employer have distinct needs for workers, and assuming the applications are otherwise consistent with the regulations, the applications will not be denied simply because the employer is an integrated or single employer.

If the CO believes that an employer is unable to establish their temporary or seasonal need because they are a single employer, the employer will be given an opportunity through a NOD, if necessary, to explain their corporate structure and show their eligibility for the H–2A program and will still have the ability to appeal any final determination. The Department wants to make clear that the burden to establish eligibility for the H–2A program lies solely with the employer, and it is the employer, who even if found to be a single employer, must demonstrate its eligibility for the program. *See* 8 U.S.C. 1361. It is therefore unclear, with all these procedural protections in place, how adding this definition would violate due process.

iii. Clarifications

Many organizations expressed support for this proposal, but the Department wishes to clarify what appear to be some misconceptions in some of those comments surrounding the added definition. It appeared that a couple of organizations believed this proposal would group a wider range of entities together as one single employer than was intended, and the Department wants to reiterate two things. One, the single employer test is not the joint employer test and is not meant to undermine or replace the joint employer test. Two, the single employer test is to be used to determine if two or more separate entities are actually so intertwined as to be one entity for the purposes of determining temporary need and for enforcement purposes. It is not intended as a means by which to group any and all employers who have

business relationships together under one umbrella.

e. Enforcement by WHD

As stated in the NPRM, the definition of single employer will explicitly provide that the Department may apply this test for purposes of enforcing an H–2A employer's program obligations. As noted in the preamble to the NPRM, and consistent with BALCA and Federal case law, WHD already applies the single employer test in certain circumstances to determine whether the H–2A employer has complied with its program obligations. Over the past several years, WHD has increasingly encountered H–2A employers that utilize multiple seemingly distinct corporate entities under common ownership. The employers have divided their H–2A and non-H–2A workforces onto separate payrolls, paying the non-H–2A workers less than the H–2A workers. However, the H–2A and other workers generally work alongside one another, performing the same work, under the same common group of managers, subject to the same personnel policies and operations. In these circumstances, to determine whether the H–2A employer listed on the *H–2A Application* employed the non-H–2A workers in corresponding employment, the common law test for joint employment may not be a useful inquiry because the interrelation of operations makes it difficult to determine the relationship between each distinct corporate entity and the workers. The single employer test is a more useful inquiry because it focuses on the relationship between the corporate entities to determine whether they are so intertwined as to constitute a single, integrated employer such that it is appropriate and "fair" to treat them as one for enforcement purposes. Absent application of the single employer test, this burgeoning business practice might be used—whether intentionally or not—to deprive corresponding workers of the protections of the H–2A program by superficially circumventing an employment relationship with the H–2A employer as described herein, contrary to the statute's requirements. 8 U.S.C. 1188(a)(1). And while WHD already utilizes this test, the Department believes that explicitly noting in the regulations the potential applicability of this test for purposes of enforcement, and the factors the Department will consider in applying this test, will provide clarity for internal and external stakeholders and could also deter employers from intentionally seeking to circumvent the H–2A program's requirements in this manner. However,

as for purposes of temporary need, the Department is not replacing or superseding the definition of "joint employment" under the existing regulations. Rather, the single employer test would be used as an alternative to joint employment for purposes of enforcement, where appropriate.

The Cato Institute, in criticizing the authority of the Department to adopt this definition, commented that there is no "adverse effect" when employers have divided their H–2A and non-H–2A workforces onto separate payrolls, via nominally distinct companies, even if this allows the employer to pay H–2A workers more than other workers. They explained that this type of corporate structure is legal, and that the employment of H–2A workers was not adversely affecting the other workers because allegedly these other workers would not receive higher wages from these employers if the H–2A workers were not employed. In other words, the non-H–2A workers are no worse off because the company hired H–2A workers. The Department does not agree.

The Cato Institute's proffered hypothetical is completely inapposite because the hypothetical employer *has* in fact hired H–2A workers. What that employer would pay its other workers in the absence of H–2A workers is irrelevant to the topic at hand. Instead, the employer in this hypothetical is paying its non-H–2A workers less than it pays its H–2A workers to perform the same work, adversely affecting these workers. *Overdevest* v. *Walsh,* 2 F.4th 977, 984 (D.C. Cir. 2021) (finding the Department's corresponding employment regulations that require H–2A employers "to pay non-H–2A workers the same amount that they pay the H–2A workers when they are doing the same work" to be an "eminently reasonable" interpretation of the adverse effect mandate). The Cato Institute appears to argue that this hypothetical employer should be allowed to circumvent this requirement by splitting the payroll under nominally distinct entities despite operation of one single, integrated enterprise. Again, the argument that a business or businesses should be allowed to find loopholes to a regulatory system meant to protect workers in the United States is not a convincing one.

USAFL and Hall Global commented on the Department's application of the single employer test for enforcement purposes, stating that "the use of 'contractual' liability is ambiguous" and that questions of contract liability are typically matters of State law. USAFL and Hall Global posited that the

regulation thus impermissibly purports to "preempt state law rules governing attribution of contractual liability."

These concerns are unfounded. Significantly, the Department did not purport in the NPRM to apply the single employer test for purposes of attributing an entity's contractual "liability" under State contract law. *See* 88 FR 63770–63771. The Department has enforcement obligations under the H–2A program that are separate and distinct from any contractual liability that might arise under State law. As set forth in the NPRM and in this final rule, the Department has and will continue to apply the single employer test in the context of its "enforcement of contractual obligations," *id.* Such obligations "includ[e] requirements under 8 U.S.C. 1188 and 20 CFR part 655, subpart B, applicable to the employment of H–2A workers and workers in corresponding employment." 29 CFR 501.0; *see also* 8 U.S.C. 1188(g)(2) (authorizing the Department "to take such actions . . . as may be necessary to assure employer compliance with terms and conditions of employment under this section"). In this final rule the Department has simply made explicit the potential application of the single employer test in the context of DOL enforcement. *See* 88 FR 63770–63771. Such enforcement is pursuant to and under the authority of the H–2A statute and regulations and not pursuant to State common laws of contract. *Cf. Sun Valley Orchards, LLC* v. *U.S. Dep't of Labor,* No. 1:21–cv–16625, 2023 WL 4784204, *15 (D.N.J July 27, 2023), *appeal filed* (3d Cir. No. 23–2608) (finding DOL's administrative adjudication of H–2A enforcement cases to be Constitutional because such proceedings arise from the employer's "violations of DOL's regulations, deriv[e] from a federal regulatory scheme under the federal government's immigration related powers, and [are] integrally related to a particular Federal Government action").

### f. Conclusion

The Department sought comments relating to the impact this proposal may have on specific industries or types of employers, and while commenters discussed how this definition would affect agricultural organizations, sometimes with specific examples, there were no comments in response to the question of whether this would impact specific industries more than others. The Department now adopts the single employer definition as it relates to temporary need and contractual obligations without change.

### 2. Section 655.104, Successors in Interest

The Department proposed several revisions to its current regulations to clarify the liability of successors in interest and to streamline the procedures for applying debarment to a successor in interest to a debarred employer, agent, or attorney. As explained in the NPRM, since 2008 the Department's H–2A regulations have made explicit that successors in interest to employers, agents, and attorneys may be held liable for the responsibilities and obligations of their predecessors, including debarment, to prevent debarred entities from evading the effects of debarment. 73 FR 77110, 77116, 77188 (Dec. 18, 2008) (2008 H–2A Final Rule). However, the Department's current regulations governing debarment, as interpreted by the Administrative Review Board (ARB) and BALCA, are insufficient to effectively prevent program violators from "circumvent[ing] the effect of the debarment" as the Department originally intended. *Id.* at 77116. *See Admin.* v. *Fernandez Farms,* ARB No. 2016–0097, 2019 WL 5089592, at *2–4 (ARB Sept. 16, 2019) (holding that 29 CFR 501.31 requires WHD to issue a new notice of debarment to a successor before subjecting the successor to the predecessor employer's WHD order of debarment); *Gons Go, Inc.,* BALCA Nos. 2013–TLC–00051, –00055, –00063 (BALCA Sept. 25, 2013) (holding that 20 CFR 655.182 requires OFLC to first debar a successor of a debarred employer, by completing the full debarment procedures in § 655.182, before it may deny the successor's application for labor certification).

Accordingly, in the NPRM the Department proposed several revisions to its regulations to better effectuate its intent in 2008 when enacting its successor in interest regulations. Most significantly, the Department proposed a new § 655.104, *Successors in interest.* Proposed paragraph (a) clarified the liability of successors in interest and proposed paragraph (b) set forth the definition of a successor in interest. These proposed paragraphs were similar to—but slightly broader than—the first paragraph of the current definition of successor in interest at § 655.103(b). Proposed § 655.104(c) set forth streamlined procedural requirements to apply debarment to a successor in interest, explaining that when an employer, agent, or attorney is debarred, any successor in interest to the debarred employer, agent, or attorney would also be debarred. This proposed paragraph also set forth the procedures by which

a putative successor could request review of a CO's determination of successor status. The Department proposed corresponding revisions to §§ 655.103, 655.181, and 655.182 and 29 CFR 501.20. The proposals and the changes adopted in this final rule are discussed more fully below.

The Department received many comments on its proposed revisions to its successor in interest regulations. Various worker rights advocacy organizations, Members of Congress, and public policy organizations, among other commenters, fully supported the proposed revisions, stating that the changes would improve the Department's existing enforcement remedies by expanding the definition of a successor in interest and streamlining debarment proceedings. Several commenters supporting the proposed revisions underscored the need for stronger enforcement against successors in interest in general. For example, FLOC commented that it has become "all too common" for H–2A employers to "try to avoid their responsibilities for violations of the law by transferring their operations to a new person or entity, while all the time retaining control." FLOC also recommended additional revisions that would further strengthen debarment, such as applying a "presumption" of successor status to any H–2ALC hired by a farm to replace a debarred H–2ALC. Other commenters provided specific examples of entities that have evaded debarment under the current regulations through reconstituting under a different corporate entity with reshuffled ownership.

Along these lines, Farmworker Justice "urge[d] the Department to focus on overlap of the work actually being done, the workforce, and the product that comes from the work" when applying any revised regulations. Farmworker Justice and the Agricultural Worker Project of Southern Minnesota Regional Legal Services argued that "the Department must scrutinize whether the principals or managers of [new] entities are family members of recently debarred entities . . . [and] scrutinize addresses contained in applications for labor certification." These commenters underscored the need for robust training and support for Department officials responsible for determining successor status to capture these nuances, so that debarred entities are not able to evade enforcement through rebranding or nominal changes in ownership. Similarly, a couple of SWAs requested guidance on the role of SWAs in determining successor status.

On the other hand, several commenters, including employers, employer associations, and agents, objected to the proposed revisions, though the majority of these commenters took issue with only the proposed definition of a successor in interest, as discussed further below. However, FFVA, a trade association, opined that the debarment of successors as a general matter is unnecessary to meet the Department's goals of ensuring that debarred entities do not continue to operate in the H–2A program because the Department can apply joint employment principles to achieve these goals.

After consideration of the comments received, the Department adopts the proposed changes to its successor in interest regulations in this final rule, with modifications to the discussion of the liabilities of a successor at § 655.104(a) and to the definition of a successor at § 655.104(b). With respect to FFVA's comment on the necessity of debarring successors in interest to debarred employers, agents, and attorneys, the Department notes that application of debarment to a successor in interest is not a new concept in this final rule. As explained in the NPRM, since 2008 the Department's H–2A regulations have explicitly provided for debarment of successors in interest to debarred employers, agents, or attorneys. As explained in the 2008 rulemaking and in the NPRM, application of debarment to successors in interest is necessary to ensure that debarment is an effective remedy, and that debarred entities are not able to circumvent the effects of debarment and continue operating in the H–2A program, despite having been found to have committed substantial violations of the program's requirements. *See* 73 FR at 77116, 77188. It is also unclear how a joint employment analysis could achieve this same goal, as FFVA suggested without further explanation. The Department therefore disagrees with FFVA that debarment of successors is unnecessary to ensure that debarred entities do not evade the effects of debarment. As multiple commenters agreed, however, the Department concludes that changes to its existing successor regulations are needed to better effectuate the intent of the regulations.[17] The Department discusses

and responds to the specific comments received on each aspect of the proposal below.

a. Liability of Successors in Interest

Proposed § 655.104(a) set forth the liability of successors in interest, explaining that a successor in interest to an employer, agent, or attorney that has violated the H–2A program requirements may be held liable for the duties and obligations of the violating employer, agent, or attorney in certain circumstances. As discussed in the NPRM, the language in proposed § 655.104(a) is similar to the language in current § 655.103(b) defining a successor in interest, but the proposed language does not purport to limit application of the successorship doctrine to instances where the predecessor "has ceased doing business or cannot be located for purposes of enforcement," as under the current regulations. *Id.* at 63772.

The Department received only one comment on this specific proposed revision. Farmworker Justice applauded the change, explaining that this revision combined with other proposed revisions would better reflect that "[c]orporate succession, even when it is not based in fraud and deceit, is often far more complicated than, for example, Corporation A becomes Corporation B" and that "[f]irms often continue in existence while transferring some operations to a successor—liability attaches to that successor despite the original firm's continued existence." Farmworker Justice stated that the proposed revisions would close this "loophole." The Department agrees. As reflected in the case law applying the successorship doctrine in the labor and employment law context, a successor may be deemed liable in a variety of factual circumstances, including but not limited to mergers, acquisitions, transfers of assets, and transfers of operations. *See, e.g., Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 n. 5 (1973). Application of the successorship doctrine in the labor and employment law context is not limited to instances where the predecessor cannot be located or has ceased operating altogether. *Id.* The Department thus concludes that the revised language better reflects the weight of authority applying the successorship doctrine in the labor and employment context, and better achieves the Department's intent in enacting the successorship regulations in the first place. Therefore, the Department adopts proposed § 655.104(a), with one addition. For the reasons discussed below, the Department adds language from

proposed paragraph (b) to the end of paragraph (a) in this final rule, clarifying that a successor in interest is liable for the H–2A program liabilities and obligations of the predecessor regardless of whether the successor has succeeded to such liabilities or obligations.

b. Definition of Successors in Interest

Proposed § 655.104(b) set forth a definition of a successor in interest similar to, but modified from, the current definition of a successor in interest at § 655.103(b). However, this proposed paragraph included a new sentence, not found in the current regulation, providing that a successor in interest "includes an entity that is controlling and carrying on the business of a previous employer, agent, or farm labor contractor, regardless of whether such successor in interest has succeeded to all the rights and liabilities of the predecessor entity." 88 FR 63822. The Department explained that this new sentence, along with the proposed revisions in paragraph (a), was intended to capture successorship scenarios more accurately in the context of the H–2A Program. *Id.* at 63772. As discussed more fully below, the Department also proposed revisions to the list of nonexhaustive factors it would consider when determining a given individual's or entity's successor status.

The Department received various comments in support of the proposed revisions to the definition of a successor in interest. For example, the California LWDA stated that the proposed revisions more closely align with the successorship doctrine as well as with California's own efforts to increase enforcement against successor in interest. The Agricultural Worker Project of Southern Minnesota Regional Legal Services commented that these revisions are "necessary."

However, several commenters objected to the proposed definition, particularly inclusion of the new sentence that would describe a successor as "an entity that is controlling and carrying on the business of a previous employer, agent, or farm labor contractor, regardless of whether such successor in interest has succeeded to all the rights and liabilities of the predecessor entity." Commenters asserted that this language is overbroad and conflicts with the notion that the definition of a successor is a factor-driven inquiry. For example, ma´sLabor commented that this language would seemingly upset the fact-dependent "balancing test" under the current definition of successor in interest because "[b]y stating that an acquiring

---

[17] *See also* U.S. Gov't Accountability Office (GAO), GAO–15–154, *H–2A and H–2B Visa Programs: Increased Protections Needed for Foreign Workers* (2015; Rev. 2017), p. 41, *https://www.gao.gov/assets/gao-15-154.pdf.* (GAO 2015 Report) (describing challenges of imposing debarment where debarred entities "reinvent" themselves under current procedures).

entity may be construed as a successor in interest regardless of whether it has succeeded to the rights and liabilities of the predecessor, the Department opens the door for asset purchases alone to trigger successor in interest obligations and liability if the asset purchase involves any degree of continuity with the seller's original operation." Maʹ sLabor recommended that the Department retain the current definition of a successor in interest at § 655.103(b), opining that it is "sufficient to address the Department's stated objectives and has a balancing test that is clear and well-understood by the regulated community." Wafla, an employer association, commented that this language amounts to an "automatic assumption of guilt" that "binds a new employer to the decisions of the previous employer even if the new employer wants to comply with the law in ways the previous employer did not."

Similarly, NHC opined that debarment will likely leave an H–2A employer with few economic options but to sell or lease their farm, and in such instances, the purchaser or lessee (often a neighboring farm) typically will use the same land, equipment, and even staff, at least initially, to avoid disruption in operations. NHC expressed concern that under the proposed revised definition, even if the purchaser or lessee has no connection to the debarred employer, they could be considered a successor. NHC requested that the Department "revise this definition to clarify that purchasing or leasing entities with no connection with the debarred entity should not be considered successors-in-interest." Several other employers and employer associations made similar comments.

The Department appreciates these concerns. Insofar as these commenters argue that State laws of corporate succession or contractual limitations on liability should govern the successorship inquiry under the H–2A program, the Department disagrees. The successorship doctrine, as applied in the employment and labor law context, is an equitable inquiry, focused on continuity of the business identity. *See, e.g., Golden State Bottling Co.,* 414 U.S. at 182 n. 5. Whether a given entity is a successor is not dependent on the contractual arrangements between the entities, nor subject to State corporate laws of succession. *Id.* ("The refusal to [adhere to the strict corporate-law definition] is attributable to the fact that, so long as there is a continuity in the 'employing industry,' the public policies underlying the doctrine will be served by its broad application."); *see also Teed* v. *Thomas & Betts Power*

*Solutions, LLC,* 711 F.3d 763, 764–65 (7th Cir. 2013) (summarizing case law distinguishing application of successor doctrine in contexts of labor and employment law versus corporate-law, and demonstrating that disclaimer of successor lability is not a defense in the labor and employment law context). Thus, a determination of successor status in the labor and employment law context, including the H–2A program, is not dependent on whether the successor agreed to accept some or all of the predecessor's liabilities. Rather, the inquiry is circumstance specific. *Howard Johnson Co., Inc.* v. *AFL–CIO,* 417 U.S. 249, 264 n.9 (1974).

The Department intended its proposed revisions to the definition of a successor in interest to better reflect application of the successorship doctrine in the labor and employment law context, particularly the notion that successors may not disclaim successor liability through contractual agreement with the predecessor. However, the Department agrees with commenters that the proposed language in § 655.104(b) providing that a successor in interest includes "an entity that is controlling and carrying on the business of a previous employer, agent, or farm labor contractor" is itself seemingly at odds with the remainder of the proposed definition of a successor, and with application of the successor doctrine in the context of labor and employment law generally. The Department is concerned that this proposed sentence could have the unintended effect of placing an outsized focus on the degree of control exercised by the successor over the predecessor's operations. Instead, as the Supreme Court has explained, "[t]here is, and can be, no single definition of 'successor' which is applicable in every legal context." *Howard Johnson,* 417 U.S. at 262 n.9. Rather, in the labor and employment law context, "the real question in each of these 'successorship' cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative?" *Id.* The Court further detailed that "[t]he answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue." *Id.* The Department therefore concludes that the proposed language is unnecessary and potentially conflicts with its intent that the determination of a successor in any instance be a fact

specific inquiry, guided by multiple factors.

However, as explained above and reflected in the comments received on the proposal, in the labor and employment law context, a successor in interest's liability is not dependent on whether the successor has agreed to accept all of the liabilities and obligations of the predecessor. The Department continues to believe it is appropriate and useful to clarify this point in the regulatory text, but believes this clarification is better placed in § 655.104(a), which sets out the liability of successors in the H–2A program, rather than in paragraph (b) setting out the definition of a successor. As a result, § 655.104(a) of this final rule includes the language from proposed § 655.104(b), explaining that a successor is liable for the obligations and liabilities of the predecessor, "regardless of whether such successor in interest has succeeded to all the rights and liabilities of the predecessor." Section 655.104(b) in this final rule, providing the definition of a successor in interest, does not include the proposed first sentence, and instead defines successors in interest pursuant to a circumstance-specific inquiry (as under the current definition at § 655.103(b)), applying a nonexhaustive list of factors set out in the regulation.

With respect to those factors, proposed § 655.104(b) set out a revised list that the Department would consider when determining successor status of any given entity or individual. The proposed list of factors largely mirrored those used in the Department's current definition of successor in interest found at § 655.103(b), which incorporates the factors applied under Title VII of the Civil Rights Act and the Vietnam Era Veterans' Readjustment Assistance Act. Under the current definition of a successor in interest at § 655.103(b), however, the Department provides that, "[f]or purposes of debarment only, the primary consideration will be the personal involvement of the firm's ownership, management, supervisors, and others associated with the firm in the violation(s) at issue." § 655.103(b) (2024). The Department proposed in the NPRM to remove the "primary consideration" requirement, such that for purposes of debarment, personal involvement in the underlying violation would remain a consideration, but not the primary consideration. As the Department explained in the NPRM, it proposed this change because the current emphasis on this factor is unduly limiting and in tension with the general principle that no one factor

should be dispositive in determining successor status.

The Department received some comments objecting to the proposed revised list of factors. Ma´sLabor commented that the successor in interest framework in general is "murkier" when applied in the context of debarred agents and attorneys, given the nature of their role in the labor certification process, but that these concerns are somewhat alleviated under the current definition of successor in interest at § 655.103(b) with its focus on the personal involvement of those responsible for the underlying violation. Accordingly, ma´sLabor "encourage[d] the Department to retain . . . the qualification that, in the context of an agent or attorney, the primary consideration for purposes of debarment is the personal involvement in the violation(s) at issue."

The Department appreciates these concerns but notes that whether any given entity or individual is deemed a successor in interest is a highly fact-dependent inquiry that requires consideration of all circumstances; in some instances, certain factors will be more relevant or useful to the inquiry than in other instances. *See, e.g., Fall River Dyeing & Finishing Corp.* v. *NLRB,* 482 U.S. 27, 43 (1987) (the successor inquiry "is primarily factual in nature and is based upon the totality of the circumstances of a given situation"); *Cobb* v. *Contract Transport, Inc.,* 452 F.3d 543, 553–54 (6th Cir. 2006) ("[A]ll nine factors will not be applicable to each case. Whether a particular factor is relevant depends on the legal obligation at issue in the case. The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy."). The same is true in the H–2A context. For example, whether a new agent is a successor to a debarred agent will involve significantly different facts and considerations than whether the purchaser or lessee of farm equipment from a debarred farmer is a successor to the debarred farmer.

Similarly, courts have recognized that definitions of a successor in interest similar to the Department's proposed definition properly balance the interests of employers, workers, and the Federal policy at issue, with equity and fairness at the heart of the inquiry. *See, e.g., Cobb,* 452 F.3d at 553–54; *Leib* v. *Georgia-Pac. Corp.,* 925 F.2d 240, 241–47 (8th Cir. 1991); *see also Criswell* v. *Delta Air Lines, Inc.,* 868 F.2d 1093, 1094 (9th Cir. 1989) ("Because the origins of successor liability are equitable, fairness is a prime

consideration in its application."). The revised list of factors is intended to better promote the balancing of such interests, rather than reduce it, by ensuring that the inquiry is always reasonable and fact dependent. The Department concludes that the proposed revised list of factors at new § 655.104(b), which remove dependence on any one given factor in any certain circumstance, better reflects the weight of authority applying the successorship doctrine in the labor and employment law context. Therefore, the Department adopts the list of nonexhaustive factors at § 655.104(b) as proposed.

Relatedly, the Department agrees with those commenters that observed the need for sufficient training to Department officials responsible for identifying potential successors in interest and determining successor status, such that relevant facts and factors are considered on a case-by-case basis. The Department provides training that is needed to effectively perform various job duties and will train staff about the provisions of this rule, including how to appropriately use the enhanced data collection elements in § 655.130 to determine successorship status. With respect to the comment requesting clarification on the role of the SWA in identifying and determining successor status, the Department notes that the SWA will have a primary role in making this determination for purposes of discontinuation of ES services under 20 CFR part 658, discussed further in Sections V.B and V.C. However, determinations of successor status for purposes of enforcement and debarment under 20 CFR part 655, subpart B, and 29 CFR part 501 would be the responsibility of the Department.

c. Streamlined Procedures To Apply Debarment to Successors

The Department proposed various revisions to its current regulations to streamline the procedures for applying debarment to successors in interest, set forth in proposed §§ 655.104(c), 655.181, 655.182, and 29 CFR 501.20. Under proposed § 655.104(c), applications filed by or on behalf of a putative successor in interest to a debarred employer, agent, or attorney would be treated like applications filed by the debarred employer, attorney, or agent. If the CO determines that such an application was filed during the debarment period, the CO would issue a NOD under § 655.142 or deny the application under § 655.164, depending upon the procedural status of the application. The NOD or denial would be based solely on the applying entity's

successor status and would not address (nor would it waive) any other potential deficiencies in the application. If the CO determines that the entity was not a successor, the CO would resume with processing of the application under § 655.140. However, if the CO determines that the entity is a successor, the CO would deny the application without further review, pursuant to § 655.164. As with any other application denial, the putative successor could appeal the CO's determination under the appeal procedures at § 655.171, although review would be limited to whether the entity was, in fact, a successor in interest to a debarred employer, agent, or attorney. Accordingly, should a reviewing ALJ conclude that the entity was not a successor, the application would require further consideration and thus the ALJ would remand the application to OFLC for further processing.

Similarly, proposed § 655.104(c) also provided that the OFLC Administrator could revoke a certification that was issued, in error, to a successor in interest to a debarred employer, pursuant to § 655.181(a), and the entity could appeal its successor status pursuant to § 655.171. The Department explained in the NPRM that it currently may revoke a certification issued in error to a debarred employer or to a successor of a debarred employer under its current revocation authorities, but the Department proposed revisions to the grounds for revocation at § 655.181(a)(1) to clarify that fraud or misrepresentation in the application includes an application filed by a debarred employer (and, by extension, an application filed by a successor to a debarred employer). The proposed changes would simply clarify this existing authority. However, given the impact of revocation on both employers and workers, proposed §§ 655.104(c) and 655.181(a)(1) did not explicitly contemplate revocation of a certification issued in error, based on an application filed by a debarred agent or attorney or by successors to a debarred agent or attorney, as distinct from a debarred employer or successor in interest to a debarred employer. The Department invited comment on whether revocation may be warranted in such circumstances.

The Department also proposed revisions to § 655.182 governing debarment, corresponding to proposed § 655.104(c), to state clearly that debarment of an employer, agent, or attorney would apply to any successor in interest to that debarred employer, agent, or attorney. The Department also proposed corresponding revisions to the

procedures governing WHD debarments under 29 CFR 501.20, including a new proposed paragraph (j) that explicitly addressed successors in interest. Under the successorship doctrine, as discussed above, and under the proposed rule, WHD would not be required to issue a notice of debarment to a successor in interest to a debarred employer, agent, or attorney; rather, debarment of the predecessor would apply equally to any successor in interest. However, as provided in proposed paragraph (j), as a matter of expediency WHD could, but would not be required to, name any known successors to an employer, agent, or attorney in a notice of debarment issued under § 501.20(a).

The Department received only a few comments in opposition to or commenting specifically on these revised procedures. Wafla commented that the revised procedures, coupled with the revised definition of a successor, "would force a legitimate employer to prove its innocence in order to receive equal treatment under the law" and opined that the Department should only impose debarment on a successor if the successor also violates the H–2A program requirements. NCAE, AILA, and others urged the Department to exercise caution in its application of the proposed regulations, if finalized, to protect the due process rights of employers, agents, and attorneys.

The Department also received comments in support of these proposed revisions, observing that the revised procedures would better effectuate the Department's debarment authority. For example, the California LWDA stated that the "streamlined debarment process safeguards workers and compliant employers from those who violate H–2A requirements and hide behind shell companies and paper farms." Farmworker Justice opined that the proposed revisions are "logically sound and in line with successorship doctrine" and provide sufficient due process. Similarly, Farmworker Justice supported the proposed revision to § 655.181(a)(1) clarifying that OFLC may revoke a certification issued in error to a successor in interest to a debarred employer and explaining that "[s]ituations where successors to debarred predecessor employers attempt to apply for workers during a debarment should be treated as cases of fraud and/ or misrepresentation and warrant revocation under 20 CFR 655.181(a)."

The Department did not receive any comments in response to its request for input on whether revocation may be warranted under circumstances where a labor certification has been issued, in error, to an employer represented by debarred agent or attorney or a successor in interest to a debarred agent or attorney, although the Colorado SWA requested clarification on the effect of revocation of a labor certification on the visa process. The Colorado SWA also requested clarification as to when and whether WHD would name a known successor in interest in a debarment proceeding of a predecessor employer, agent, or attorney under 29 CFR 501.20(j).

After consideration of these comments, and for the reasons stated in the NPRM, the Department adopts these revised procedures as proposed. The Department concludes that the streamlined procedures are more consistent with the successorship doctrine than the Department's current procedures for imposition of debarment on successors while affording putative successors sufficient due process. These revised procedures also are more consistent with, and better effectuate, the Department's original intent in enacting its successor in interest regulations in 2008, namely "to ensure that violators are not able to re-incorporate to circumvent the effect of the debarment provisions," and "to prevent persons or firms who were complicit in the cause of debarment from reconstituting themselves as a new entity to take over the debarred employer's business." 73 FR 77116, 77188 (Dec. 18, 2008).

With respect to concerns for due process, rather than imposing a "presumption of guilt," the revised debarment procedures coupled with the revised definition of a successor in interest will better reflect application of the successorship doctrine in the context of labor and employment law, which is an equitable, fact-driven inquiry. *Howard Johnson*, 417 U.S. at 264. For similar reasons, the Department declines to adopt the suggestion received in a comment that the Department impose a presumption of successor status on any given entity. Rather, the Department will determine on a case-by-case basis whether a given individual or entity is a successor in interest to a debarred employer, agent, or attorney, with notice and opportunity for hearing on successor status given to the putative successor. However, where an entity is deemed to be a successor to a debarred employer, agent, or attorney, the Department need not obtain a new order of debarment against the successor to impose the predecessor's debarment on the successor, as that is the "whole point" of the successorship doctrine, namely that the liabilities of the predecessor attach to the successor. *Criswell*, 868 F.2d at 1095.

In response to the Colorado SWA's request for clarification under 29 CFR 501.20(j) as to when and whether WHD would name a known successor in interest in a notice of debarment, such a decision will be a matter of enforcement discretion. For example, where WHD issues a notice of debarment to a violating employer and, at that time, a successor entity already is known to WHD, WHD may decide to name the successor in the predecessor's notice of debarment. If so, the putative successor could request a hearing on its successor status through the administrative procedures under 29 CFR part 501, subpart C. The intent of this new paragraph (j), however, is to reflect that WHD is not *required* to name successors in a notice of debarment issued to a predecessor, even if known at the time of issuance, for OFLC to apply the revised procedures to that successor under 20 CFR 655.104(c), 655.181, and 655.182. For example, where WHD obtains a final order of debarment against an employer under 29 CFR 501.20, it would not be a defense to OFLC's denial of an application filed by a successor in interest to that debarred employer, under new 20 CFR 655.104(c), that WHD was aware of the existence of the successor entity at the time WHD issued the underlying debarment notice to the debarred employer.

Finally, with respect to revocations under 20 CFR 655.181(a)(1), the Department adopts that revised paragraph as proposed, for the reasons as stated in the NPRM and as reflected in Farmworker Justice's comment. However, as in the NPRM, the revised regulations do not explicitly contemplate revocation where a labor certification has been issued in error to an employer represented by a debarred agent or attorney or a successor in interest to a debarred agent or attorney, given the severity of debarment as a remedy and the impact of a revocation on the workers. However, as under current § 655.181(a)(1), the Department retains authority and discretion to revoke a labor certification due to fraud or misrepresentation in the application process. Whether the above circumstances would warrant revocation would be determined on a case-by-case basis. In response to the Colorado SWA's request for clarification of the effect of revocation of a labor certification on the petition and visa application processes, the regulations at § 655.181(c) impose certain obligations on the employer in the event of revocation, including inbound and

outbound transportation requirements and satisfaction of the three-fourths guarantee. In addition, pursuant to § 655.181(b)(5), the Department notifies DHS and the Department of State of each revocation; further consequences are subject to and pursuant to the authorities of those agencies.

3. Section 655.190, Severability

The NPRM proposed to add new and identical regulatory text at § 655.190 and § 501.10 stating that if any provision of the Department's H–2A regulations is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision will be construed so as to continue to give the maximum effect to the provision permitted by law. The proposed regulatory text further stated that where such holding is one of total invalidity or unenforceability, the provision will be severable from the corresponding part and will not affect the remainder thereof.

As the NPRM explained, the Department believes that a severability provision is appropriate because each provision within the H–2A regulations is capable of operating independently from the others, including where the Department proposed multiple methods to strengthen worker protections and to enhance the Department's capabilities to conduct enforcement and monitor compliance. The NPRM also emphasized that it is important to the Department and the regulated community that the H–2A program continue to operate consistent with the expectations of employers and workers, even if a portion of the H–2A regulations is held to be invalid or unenforceable.

Several commenters offered views on the proposed severability provision. Farmworker Justice suggested two revisions related to severability: (1) require that clearance orders include a severability clause specifying that if any part of a clearance order is found unenforceable, the rest remains in effect; (2) revise the proposed access-to-housing provision, at proposed § 655.135(n), to "clearly separate the access provisions for labor organizations from key service providers." As a rationale for the second suggestion, Farmworker Justice stated their view that access to housing for labor organizations and for key service providers have separate legal bases, citing *Cedar Point Nursery* v. *Hassid*, 141 S. Ct. 2063 (2021).

A few commenters objected to the proposed severability provision. One trade association, wafla, opposed the

severability provision because, in its view, the topics covered by the proposed rule are linked together and build on each other to achieve the same goal of improving protections for workers in temporary agricultural employment in the United States. Another trade association, NCAE, argued that the Department should withdraw the severability provision because, in its view, Congress did not intend for the Department to enforce parts of the H–2A regulations without other parts. The trade association added that, in its view, the executive branch— including the Presidents who have signed H–2A legislation and the administrations that have administered the H–2A program—have similarly intended that the regulations be enforced as a comprehensive set.

Finally, an agent, ma´sLabor, expressed the view that a severability provision would undermine the H–2A program's "balanc[ing]" of "interests" of "multiple stakeholders." This commenter identified several provisions that, it said, provided "examples of such interoperable and interdependent regulatory provisions." In particular, the agent asserted that § 655.122(i), which outlines the employer's obligations under the three-fourths guarantee, is inextricably intertwined with § 655.122(n) (relieving employers from the three-fourths guarantee where workers "abandon" employment or are "terminated for cause"); § 655.122(o) (modified three-fourths guarantee in the event of contract impossibility); and § 655.122(j) (requiring employers to track earnings records). The commenter added that § 655.122(l) (which requires employers to pay certain pay rates) would be rendered "ambiguous" if proposed § 655.120 (which would require monitoring and tracking of piece rate production) were invalidated. Ma´sLabor further asserted that proposed § 655.135(p) (respecting foreign labor recruitment) and § 655.137 (requiring disclosure of foreign labor recruitment) would "make little sense" absent § 655.135(j) and (k) (concerning foreign recruitment). The commenter further explained its position that the various recruitment provisions are "interdependent" such that "[t]he invalidation of one provision would undermine the integrity of the scheme as a whole," citing § 655.135(c) (cooperation with the SWA on accepting and processing applicants and referrals); § 655.135(d) (pertaining to duration of recruitment activities); §§ 655.150– 655.158 (specifying obligations concerning positive recruitment

activities); and § 655.167 (pertaining to document retention).

The Department adopts the severability provision as proposed in the NPRM, with a few minor, non-substantive changes to the language of the provision. This final rule substitutes "will" for "shall" for internal consistency and to incorporate plain language. This final rule also omits references to "subparts" and "subparagraphs" for internal consistency.

As an initial matter, with respect to this final rule, it is the Department's intent that all provisions and sections be considered separate and severable and operate independently from one another. In this regard, the Department intends that: (1) in the event that any provision within a section of this rule is stayed, enjoined, or invalidated, all remaining provisions within that section will remain effective and operative; (2) in the event that any whole section of this rule is stayed, enjoined, or invalidated, all remaining sections will remain effective and operative; and (3) in the event that any application of a provision is stayed, enjoined, or invalidated, the provision will be construed so as to continue to give the maximum effect to the provision permitted by law. It is the Department's position, based on its experience enforcing and administering the H–2A provisions of the INA, that the provisions and sections of this rule can function sensibly in the event that any specific provisions, sections, or applications are invalidated, enjoined, or stayed. Furthermore, the Department believes that it has balanced the interests of stakeholders in modifying this final rule in response to public comments, and that this rule covers a number of different topics, each of which furthers the Department's general goals of improving protections in the H– 2A program but which can stand independently as a legal and practical matter. For example, the worker voice and empowerment provisions adopted in this rule, along with other provisions, provide layers of protection to prevent adverse effect, and these layers of protection would remain workable and effective at preventing adverse effect even if any individual provision is invalidated.

Farmworker Justice urged the Department to require that clearance orders include a severability clause specifying that if any part of a clearance order is found unenforceable, the rest remains in effect. The Department declines to adopt this proposal. The severability provision in this final rule and a severability provision in a

clearance order would serve different goals and would implicate different legal considerations. For example, while the severability provision in this final rule would ensure continuity in the H–2A program should a particular provision be invalidated, a severability provision in a clearance order would be relevant only to the interactions between a single employer and its workers.

Farmworker Justice also proposed separating, at proposed § 655.135(n), housing-access provisions for labor organizations from housing-access provisions for key service providers. As explained below in the discussion of § 655.135(n), the Department has decided to modify the access-to-housing provision in response to comments, and, given these modifications, this comment is no longer applicable.

Some commenters suggested the Department abandon the proposed severability provision; the Department declines to do so. Whether a regulatory provision is severable turns on: (1) the agency's intent; and (2) whether other provisions "could function sensibly" even if an individual provision is invalidated. *Belmont Mun. Light Dep't v. FERC,* 38 F.4th 173, 188 (D.C. Cir. 2022). As explained above and below, the Department intends that the provisions of this rule be severable and, based on the Department's experience implementing the program, believes its remaining provisions could function sensibly even if one is invalidated.

One commenter, wafla, objected to the proposed severability clause because every provision in the NPRM is intended to serve the same goal of improving protections for workers in temporary agricultural employment in the United States. However, whether regulatory provisions serve the same goal is not dispositive of whether the provisions may "function sensibly" if a single provision is invalidated. Moreover, this objection would render difficult the incorporation of a severability provision in *any* regulation, as agencies routinely issue regulations to serve a particular unified goal. Additionally, this rule covers a wide range of diverse topics, each of which furthers the goals of improving protections in the H–2A program but which can stand independently as a legal and practical matter.

Another commenter, NCAE, focused on intent, asserting that Congress and the executive branch have historically intended that the regulations be enforced as a comprehensive set, but did not point to any authority demonstrating such intent. The Department believes that the goal of

enforcing the regulations comprehensively is not incompatible with the Department's stated intent that invalidated provisions be deemed severable. On the contrary, severing invalid provisions serves the aim of preserving the regulatory scheme and allowing the program to proceed even if one provision is deemed invalid.

Finally, although ma´sLabor cited concerns about balancing competing interests in asserting that a severability provision would "impair the proper functioning of the program [and] introduce conflicts and ambiguities," the Department believes that including a severability provision is the best way to balance those interests and promote certainty. Again, severing invalidated provisions permits the program to continue absent those provisions, and program continuity is in the interests of employers, workers, and the Department alike.

Ma´sLabor also responded to the NPRM's request for comments on whether specific parts of the rule could operate independently. The Department believes that the provisions in this rule, including the provisions ma´sLabor cited, can operate independently of each other.

The Department addresses in more detail ma´sLabor's characterization of § 655.122(i) (establishing the three-fourths guarantee) as inextricably intertwined with several other provisions. The Department disagrees with this characterization. Ma´sLabor asserted that without § 655.122(n), which relieves employers from the three-fourths guarantee where workers "abandon" employment or are "terminated for cause," workers will have an incentive to abandon work to secure payment promised under the three-fourths guarantee. To be sure, the NPRM proposed clarifications to the construction of "termination for cause" under § 655.122(n) (although the NPRM did not make any changes respecting abandonment), but even absent that clarification, the regulatory term "termination for cause" would still be subject to interpretation by an adjudicator, and would therefore still serve as a limitation on the three-fourths guarantee. Ma´sLabor further asserted that if § 655.122(o) (modifying the three-fourths guarantee in the event of contract impossibility) were invalidated, employers facing contract impossibility would sustain significant economic ramifications and argued that enforcement of the three-fourths guarantee would be "all but impossible" without the earnings record provision under § 655.122(j). This final rule does not propose any modifications to

§ 655.122(o) or § 655.122(j); therefore, should any provision of this final rule be invalidated that will not affect the validity of § 655.122(o) or § 655.122(j).

Similarly, the Department believes that the various protections for workers through the ES System can operate independently from the protections in Part 655. Additionally, the updates to the successor in interest provision at § 655.104 and the definition of single employer at § 655.103(b) operate independently from each other and from the new protections proposed at § 655.135(h), (m), and (n). The protected activities at § 655.135(h)(1)(v) and (vi) are, as the Department set forth in the NPRM, already protected by the existing regulations, and do not rely upon the existence of the other protected activities being added at § 655.135(h)(2). Furthermore, the addition of the explicit protection against passport withholding at § 655.135(o) does not rely upon the existence of the other worker protections being added to § 655.135. The provisions at § 655.135(j) and § 655.135(k), which the Department did not propose to change in this rulemaking, also do not rely upon the existence of new § 655.135(p) or § 655.137. Relatedly, new § 655.135(p) and § 655.137 do not mention § 655.135(j) and can operate even if the changes made to § 655.135(k) under the 2022 H–2A Final Rule were invalidated, as the version of § 655.135(k) under the 2010 H–2A Final Rule still requires contracts with third parties to prohibit the charging of fees from prospective employees. And, as discussed above, whether regulatory provisions serve the same objective is not dispositive of whether the provisions may "function sensibly" if a single provision is invalidated. The Department notes that although this preamble does not address every possible interrelationship between the various provisions included in this final rule, that does not imply that the Department believes that provisions not discussed are interdependent. Again, as explained, it is the Department's intent that each provision of this final rule be deemed independent and severable from other provisions.

Therefore, this final rule again states the Department's general intent that invalidated provisions should be severed.

### B. Prefiling Procedures

#### 1. Section 655.120(b), Offered Wage Rate

The Department proposed to clarify in the H–2A regulations the date on which an AEWR, for non-range occupations and wage sources, published in the

**Federal Register** will become effective. As noted in the NPRM, under the current regulations, the Department protects against adverse effect on the wages of workers in the United States similarly employed, in part, by requiring that an employer offer, advertise in its recruitment, and pay a wage that is the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, the Federal minimum wage, or the State minimum wage. If an updated AEWR for the occupational classification and geographic area is published during the work contract and becomes the highest applicable wage rate, the employer must pay at least that updated AEWR upon its effective date, as published in the **Federal Register**. 20 CFR 655.120(b)(3). In accordance with § 655.120(b)(2) and (3), the Department publishes the updated AEWR at least once annually in the **Federal Register**. One **Federal Register** notice (FRN) provides annual adjustments to the AEWR for the field and livestock workers (combined) occupational grouping based on the U.S. Department of Agriculture's (USDA) publication of the Farm Labor Reports (better known as the Farm Labor Survey, or FLS), effective on or about January 1st, and a second FRN will provide annual adjustments to the AEWR for all other non-range occupations based on the Department's Bureau of Labor Statistics' (BLS) publication of the Occupational Employment and Wage Statistics (OEWS) survey, effective on or about July 1st.[18] Each notice specifies the effective date of the new AEWR, which, in recent notices, has been not more than 14 calendar days after publication. The current regulatory text does not address when an AEWR published in a **Federal Register** would become effective.

The Department proposed to revise § 655.120(b)(2) to designate the effective date of updated AEWRs as the date of publication in the **Federal Register**. For further clarity, the Department also proposed to revise § 655.120(b)(3) to state that the employer is obligated to pay the updated AEWR immediately upon the date of publication of the new AEWR in the **Federal Register**. The Department sought comments on all aspects of this proposal. After careful consideration of the comments, the Department is finalizing the proposal without change, as explained below.

The Department received many comments both in support of and in opposition to the proposed changes. Several trade associations, including NCAE, NCFC, Western Growers, and FFVA, as well as an agent, ma´sLabor, opposed the proposal, asserting it abandoned the "longstanding" practice to delay the effective date of the AEWR, with some commenters noting delayed implementation has been in place "as recently as June 16, 2023," and a couple of commenters adding that the delayed implementation simplified program requirements by eliminating the need for payroll changes in the middle of a pay period. Several trade associations (USApple, TIPA, IFPA, U.S. Custom Harvesters, Inc., NHC, and SRFA) and one employer (Titan Farms, LLC) commented that the adjustment period was needed because monitoring the BLS and FLS websites is burdensome, especially for small employers that may lack the resources to regularly check those websites for updates. In addition, the National Association of State Departments of Agriculture asserted that many farms lack access to the internet and cannot view the announcement on the OFLC website or the notice in the **Federal Register**. An agent, ma´sLabor, acknowledged a delay to the effective date may deprive workers of earnings during the notice period, but noted workers are not "harmed by a modest delay in the implementation of new rates" because "workers willingly accepted the job at the advertised pay rate, which would have been the existing AEWR."

The Cato Institute, a public policy organization, wrote that the obligation to update AEWRs mid-contract constitutes a mandate imposed only on H–2A farmers, stating "U.S. workers and [unauthorized] workers do not get pay bumps in the middle of contracts—let alone the middle of a pay period." This commenter also asserted, without elaborating as to how or providing any form of support for its contention, that the proposal "makes planning for H–2A costs that much more difficult and incentivizes illegal employment." Several of the trade association commenters, the New York State Farm Bureau, American Farm Bureau Federation, Titan Farms, LLC, and AILA observed that advance notice of AEWR changes, a 14-day grace period prior to the effective date, or some other flexibility with respect to AEWR updates was necessary for various reasons. Some trade associations and an employer generally asserted payroll systems are not always simple adjustments, cannot always be accomplished by "just chang[ing] a few items in [the employer's] payroll

system," and may take weeks to adjust, while another commenter noted that agricultural employers, especially small employers, may need time to secure funds or sell assets because many of these employers do not have "immediate cash flow" to pay an updated AEWR due to "incredibly tight" operating margins. Several of the trade association commenters and an employer, Titan Farms, LLC, asserted it is not possible for employers to simply "include into their contingency planning certain flexibility" to account for AEWR adjustments because "variability in wage rates can cost a single employer thousands, if not millions, of dollars and it is impossible to 'contingency' plan accurately." The U.S. Chamber of Commerce expressed general concern that immediate effective dates for AEWR would impose an "administrative burden" by "forc[ing] employers to update the wages they need to pay" on the "date of publication in the **Federal Register**."

Several commenters urged the Department to alternatively retain the 14-day grace period or a longer grace period, commit to publish updated AEWRs on dates certain in December and July, permit employers to provide back pay at a later date, provide employers notice of upcoming FRN publications via email, or some combination of those suggestions. A couple of U.S. House Members stated that this proposed change is unnecessary and would be challenging or impossible for employers to meet. Another U.S. House Member called the change unnecessary. An employer stated that the proposed change would lead to involuntary noncompliance by employers because they cannot update wages quickly enough. SRFA and NHC asserted that the Department did not provide reasoning for why the **Federal Register** publication date is more appropriate than other dates, such as when the wage data are published. The Western Range Association asserted that it is unreasonable to expect immediate wage adjustments when the Department takes 45 days to calculate the AEWR. AILA suggested the Department should provide "a notification to employers via email" when the Department is preparing to publish in the **Federal Register** and "when the AEWR is updated." This commenter and NHC, NCFC, FFVA, Western Growers, and SRFA urged the Department to set annual dates certain for the effective date for each AEWR wage, which Western Growers asserted would allow "for expectations to be met, and a reasonable period of time to adjust

[18] 2022 H–2A Final Rule; Final Rule, *Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, 88 FR 12760 (Feb. 28, 2023) (2023 AEWR Final Rule).

payroll rates.'' IFPA, U.S. Custom Harvesters, Inc., TIPA, GFVGA, and Demaray Harvesting and Trucking, LLC said the Department should consider requiring that employees ''be back paid for the [AEWR] increase . . . while still giving an employer the flexibility to see the [FRN] and update systems accordingly.'' NCFC and the U.S. Chamber of Commerce suggested the Department should permit employers to provide retroactive payment to workers within 14 days of publication of notice in the **Federal Register**. New York State Farm Bureau urged the Department to ''exempt through an enforcement waiver, for a two-week period'' after publication of notice in the **Federal Register**, ''those farms who may need to move and adjust their payroll to pay the full back pay of affected employees.'' Finally, wafla urged the Department to make new AEWRs effective on the ''first day of the employer's next pay period.''

The Department also received many comments in support of the proposal to make AEWRs effective on the date they are published in the **Federal Register**. Federal elected officials and advocacy organizations supported the proposal as a way to provide clarity and ''make wages more predictable in the H–2A program.'' California LWDA, a SWA, supported the proposal because it would ''provide clarity regarding the effective dates of [AEWRs]'' and noted that it will help the SWA ''better determine when to issue notice of deficiencies when an employer is not paying the highest wage or the AEWR is incorrect'' because the SWA ''uses the **Federal Register** to determine the current and appropriate AEWR.'' Several advocacy organizations, Proteus, Inc., UMOS, Green America, and CAUSE, expressed support for the proposed rule noting specifically, among other items, the Department's proposal regarding the immediate implementation of the AEWR. The Economic Policy Institute (EPI), a public policy organization, supported the proposal as necessary to ''ensure that farmworkers are paid appropriately,'' asserting that farmworkers ''are likely being underpaid'' because the FLS-based AEWR ''are always one year behind,'' given the FLS data ''reflects average wages surveyed for the previous year.'' EPI also urged the Department to reject any suggestions to retain a delayed AEWR effective date, asserting that delayed implementation is not necessary because ''there are adequate public sources of information'' to provide employers early notice of forthcoming AEWR updates and the

Department ''will publish a notice directing employers to those sources.''

The Department additionally received comments from a Federal elected official, a workers' rights organization (Agricultural Justice Project), a few trade associations (NCAE, SRFA, and Michigan Asparagus Advisory Board), a couple of agents (ma´sLabor and Labor Services International), a public policy organization (EPI), and an anonymous commenter expressing general concerns related to the AEWR amounts or the methodology for calculating the AEWR. These comments are beyond the scope of this rulemaking and the Department's proposal regarding when updated AEWRs should become effective.

The Department appreciates the comments. After due consideration, the Department is adopting the proposed changes in this final rule. The proposed changes were intended to restore the longstanding practice in the H–2A program that workers be paid at least the updated AEWR, for all hours worked after the updated AEWR is published. The Department believes adoption of the proposed changes in this final rule is the best way to achieve that objective. As stated in the NPRM, the duty to pay an updated AEWR where it is higher than the other wage sources is not a new requirement, nor is the requirement to pay an increased AEWR immediately upon publication in the **Federal Register**. Between 1987 and January 2018, the Department required employers participating in the H–2A program to offer and pay the highest of the AEWR, the prevailing wage, any agreed-upon collective bargaining wage, or the Federal or State minimum wage at the time the work had been performed, effective upon the date of publication of new AEWRs in the **Federal Register**.[19] As noted in the NPRM, setting the effective date of updated AEWRs as the date of publication in the **Federal Register** is a return to longstanding prior practice. This change will ensure that agricultural workers are paid at least the most current AEWR when work is performed, thereby preventing the harm caused through even a modest delay. Moreover, the workers employed under the H–2A Application accepted terms and conditions of employment that include the employer's agreement to comply

with the obligation to pay an updated AEWR if a higher AEWR is published during the work contract period. Immediate implementation also better aligns with the Department's mandate to prevent adverse effect on the wages of workers in the United States similarly employed by keeping wages paid to H–2A workers and workers in corresponding employment consistent with wages paid to similarly employed workers. The Department therefore disagrees that a delay in payment of an updated AEWR would not harm workers or that workers do not or should not expect the employer to fulfill this obligation.

The Department acknowledges that this rule is a departure from more recent practice and the proposal in the 2019 H–2A NPRM, which allowed a minor period for wage adjustment after publication of the FRN. However, as noted in the 2022 H–2A Final Rule in which the Department declined to adopt the proposal to allow an adjustment period of up to 14 calendar days, ''employers participating in the H–2A program historically have been required to offer and pay the highest of the AEWR, the prevailing wage, or the Federal or State minimum wage at the time the work is performed'' and ''employers have been required to make these adjustments for many years and neither program experience nor comments on the NPRM demonstrated that a longer adjustment period would be necessary to avoid significant operational burdens on employers or the layoffs and crop deterioration cited by some commenters.''[20] Several commenters asserted, generally, that payroll adjustment may be difficult and require time to complete, but no commenter cited specific difficulties encountered when adjusting payroll systems to a new AEWR, and while one commenter did note it could take weeks to update payroll, this commenter provided no further explanation as to why that number of days, which is longer than even the 14-day period other comments suggested, would be necessary to make adjustments to payroll systems.

However, the Department is sensitive to commenter concerns that payroll systems may not allow adjustments to be made instantaneously and that some flexibility should be provided to permit difficult payroll adjustments and provide prompt retroactive payment. Under this final rule, where an employer's payroll systems permit pay to be adjusted in the middle of a pay period, it must immediately adjust them

---

[19] See, e.g., 1987 H–2A IFR, 52 FR 20496, 20521; *Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States; H–2A Program Handbook,* 53 FR 22076, 22095 (June 13, 1988) (''Certified H–2A employers must agree, as a condition for receiving certification, to pay a higher AEWR than the one in effect at the time an application is submitted in the event publication of the [higher] AEWR coincides with the period of employment.'').

[20] 87 FR at 61688.

to reflect the updated AEWR (where the updated AEWR is or remains the highest of all potential wage sources). However, where the employer is able to demonstrate to the Department that it is not possible for it to update payroll systems by the pay date, the employer may provide payment on the pay date for the following pay period. For example, consider a scenario where the Department publishes an AEWR update notice in the **Federal Register** on January 1st, which is the middle of a pay period for an employer whose workers are paid biweekly. The next pay date is January 5th. The AEWR remains the highest of the applicable wages. It is not, however, possible for the employer to update payroll in time for the January 5th pay date. In this example, the worker would be momentarily underpaid for the remainder of that pay period when they receive their paycheck for that pay period. This final rule requires that the employer cure that underpayment by providing the entirety of all back wages due, calculated beginning on January 1st, no later than the following pay date, along with the following pay period's wages calculated entirely at the new AEWR for the entire pay period.

The Department declines to adopt suggestions to provide a delayed implementation period for the reasons described above, permit payment of back wages beyond the manner discussed in the preceding paragraph, or publish AEWRs on a specific date each year or around the time the FLS or OEWS data publishes. Revising the effective date to coincide with BLS or USDA publications or on certain dates is not possible and would represent a substantial deviation from longstanding pre-2018 practice. If the Department were to tie the effective date to the FLS or BLS publication dates, doing so would deprive the stakeholder community of any advance notice prior to effectiveness as, in neither instance, is the wage data made public prior to publication. The Department does not control the publication of the FLS data. Separately, it is administratively impractical for the Department to publish AEWRs on the same date that BLS and USDA publishes the underlying data, given that the Department lacks early access to that data and given the resources required to draft an FRN. While the Department does not control the publication dates of BLS and USDA data, it does prepare the OFLC FRN expeditiously upon publication of the corresponding BLS and USDA data.

Moreover, as noted in the NPRM and by a public policy organization

commenter, EPI, employers have ample prior notice of upcoming changes to wage requirements in the H–2A program.[21] In particular, the vast majority of employers will be subject to the FLS wage and will continue to have the opportunity to view and assess the impact of the new AEWR rates prior to their publication by the OFLC Administrator in the **Federal Register** on or around January 1st.[22] Prior to that publication, USDA publishes its FLS in late November showing the wage data findings that become the new AEWR for the field and livestock workers (combined) occupational grouping.[23] The Department has no role in the development or finalization of the FLS wage rate findings and adopts them for each State or area without change as the AEWR. Employers can therefore review the FLS and know with certainty what the following year's AEWR wages will be several weeks before they become official.

Similarly, employers of workers subject to the OEWS will be able to view updated wages when BLS publishes its OEWS data each spring, which contains the wage data that become the new AEWR on or around July 1st for the small percentage of job opportunities that cannot be encompassed within the six SOC codes and titles in the FLS field and livestock workers (combined) reporting category. Moreover, the Department will provide employers advance notice of these AEWR changes through an announcement on the OFLC website. Specifically, and as mentioned in the NPRM, the Department will post a notice on the OFLC website when USDA publishes the FLS and when BLS publishes the OEWS data that will direct employers to the publicly available information.[24] Because the

Department does not control the publication schedule for the underlying data on which AEWR are based, it cannot commit to publishing AEWR FRNs on the same date each year. Once OFLC publishes the FRN updating the AEWR, however, OFLC also will post an announcement on its website to notify employers that the FRN containing updated AEWRs has been published, consistent with current practice. Finally, the Department also emails notice to stakeholders that have registered for OFLC's email updates when the AEWR changes. Taken together, these measures help ensure stakeholders have advance notice of new AEWRs to the extent possible and do not need to monitor the BLS and FLS websites themselves. The Department believes that the revisions contained in this final rule will clarify employer wage obligations, provide sufficient notice of AEWR updates, and ensure that agricultural workers are paid at least the AEWR in effect at the time the work is performed, without new or additional impact to employers' ability to budget and plan.

2. Sections 655.120(a) and 655.122(l), Requirement To Offer, Advertise, and Pay the Highest Applicable Wage Rate

In the NPRM, the Department proposed revisions to 20 CFR 655.120(a) and 655.122(l) to clarify that where there is an applicable prevailing piece rate, or where an employer intends to pay a piece rate or other non-hourly wage rate, the employer must include the non-hourly wage rate on the job order along with the highest hourly rate. Under this proposal, all potential wage rates must be listed on the job order notwithstanding the fact that it may not be possible to determine in advance which of these rates is the highest. Once work has been performed, the employer must then calculate and pay workers' wages using the wage rate that will result in the highest wages for each worker in each pay period.

As the Department explained in the NPRM, the current regulations at §§ 655.120(a) and 655.122(l) require an employer to "offer, advertise in its recruitment, and pay" the highest of the AEWR, prevailing wage rate, collective bargaining agreement (CBA) rate, or Federal or State minimum wage. While seemingly straightforward, this requirement has been difficult to apply in practice because, for instance, where there is an applicable prevailing piece

---

[21] 88 FR 63750, 63773–63774.

[22] *See, e.g.,* 2023 AEWR Final Rule, 88 FR 12760, 12766 (the Department's program estimates indicate that 98 percent of H–2A job opportunities are classified within the six Standard Occupational Classification (SOC) titles and codes of the field and livestock workers (combined) occupational grouping).

[23] USDA's National Agricultural Statistics Service publishes the Farm Labor report on its website at *https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/.* OEWS wages for each SOC code and geographic area are obtained using the Department's search tool or searchable spreadsheet, available at *https://flag.dol.gov.* BLS publishes OEWS data on its website, available at *https://www.bls.gov/oes/data-overview.htm.* An overview of the OEWS survey methodology is available at *https://www.bls.gov/oes/current/oes_tec.htm.* An explanation of the survey standards and estimation procedures is available at *https://www.bls.gov/opub/hom/oews/pdf/oews.pdf.*

[24] As noted in the NPRM, employers of a small number of field and livestock workers (combined) job opportunities in States or regions, or equivalent districts or territories, for which the FLS does not

report a wage (*e.g.,* Alaska and Puerto Rico) will not have similar direct access to the AEWR information prior to publication of the OFLC FRN. 88 FR 63773, 63773–63774.

rate, it is usually not possible to determine until the time work is performed whether the prevailing piece rate will be higher than the highest of the applicable hourly wage rates as this will depend on worker productivity. In such cases, OFLC currently only requires H–2A employers to list a wage offer that is at least equal to the highest applicable hourly wage—usually the AEWR—on job orders, consistent with BALCA decisions dating from 2009 to 2011 that concluded that under the regulations OFLC cannot require employers to include an applicable prevailing piece rate on the job order where OFLC does not know at the certification stage whether the prevailing piece rate will be higher than the hourly wage. *See, e.g., Golden Harvest Farm,* 2011–TLC–00442, at *3 (BALCA Aug. 17, 2011); *Dellamano & Assocs.,* 2010–TLC–00028, at *5–7 (BALCA May 21, 2010); and *Twin Star Farm,* 2009–TLC–00051, at *4–5 (BALCA May 28, 2009). The Department expressed concern with the uncertainty this practice can generate as to which rate or rates an employer must include as the required wage in a job order and pay to H–2A workers and workers in corresponding employment. Moreover, because the prevailing piece rate is not included on the job order, in most such instances, WHD is not able to enforce the prevailing piece rate. In other instances, such as when there is not a prevailing wage, employers sometimes voluntarily elect to pay a piece rate or other non-hourly wage but fail to include such rates on the job order, potentially misrepresenting the offered wage rate and failing to meet their recruitment obligations.

The Department proposed several changes to the existing regulations to address these issues. First, the Department proposed to retain the current list of wage rates in § 655.120(a), redesignated as § 655.120(a)(1)(i) through (v), and to add to this list, at paragraph (a)(1)(vi), ''[a]ny other wage rate the employer intends to pay.'' This proposed addition was intended to clarify an employer's obligation to include on the job order any wage rate it intends to pay that could end up being the highest applicable wage rate for any worker, in any pay period. The Department also proposed to add at § 655.120(a)(2) an explicit requirement that, where the wage rates in paragraph (a)(1) are expressed in different units of pay, the employer must list the highest applicable wage rate for each unit of pay in its job order and must advertise all of these wage rates in its recruitment. Under this proposal, where one of the

wage rates in paragraph (a)(1) is expressed as a piece rate and the others are expressed as hourly wage rates, the employer must list both the piece rate and the highest hourly wage rate on the job order. Where more than one of the wage rates in paragraph (a)(1) are expressed as non-hourly wage rates, the employer would be required to list the highest applicable wage rate for each potential unit of pay on the job order.

Next, the Department proposed corresponding changes at § 655.122(l), including replacing the list of wage rates with a cross-reference to § 655.120(a)(1), removing the current language in § 655.122(l)(1) that would be made redundant by the changes to § 655.120(a), and making other technical edits. In addition, the Department proposed to remove the current language at § 655.122(l)(2)(i) and (ii) that requires an employer to supplement workers' pay where a worker is paid by the piece and does not earn enough to meet the required hourly wage rate for each hour worked, but does not include an analogous requirement that an employer supplement workers' pay when a worker who is paid by the hour does not earn enough to meet the applicable prevailing piece rate. The Department proposed to replace this language with a new provision at paragraph (l)(1) explaining that the employer must always calculate and pay workers' wages using the wage rate that will result in the highest wages for each worker, in each pay period. Because employers would be required to pay whichever wage rate will result in the highest wages in a particular pay period, supplementing workers' pay to ensure that the required hourly wage is met would no longer be necessary. Proposed new paragraph (l)(2) explains that, where the wage rates set forth in § 655.120(a)(1) include both hourly and non-hourly wage rates, the employer must calculate each worker's wages in each pay period using the highest wage rate for each unit of pay and must pay the worker the highest of these wages for that pay period. Under this proposal, the employer would be responsible for evaluating the different wage rates applicable in each pay period of the growing season, including any mid-season increases in wage rate(s) that might not be reflected in the job order. Proposed paragraphs (l)(1) and (2) clarify that the wages actually paid cannot be lower than the wages that would result from the wage rate(s) guaranteed in the job order, so that, if there is a mid-season decrease in wage rate(s), the workers are still entitled to the higher wage rate(s) listed on the job

order. Further, where an employer includes in a single job order multiple activities or tasks, each of which have different applicable wage rates, the employer would be required to engage in the analysis set forth above with respect to each activity or task.

The Department explained that these proposed changes were intended to help ensure that employers' recruitment efforts reflect the correct applicable wage rates so as to more accurately determine whether there are U.S. workers who would be available and willing to accept the employment. Further, they were intended to help ensure that H–2A workers and workers in corresponding employment are paid the wages to which they are entitled (*i.e.,* the highest of the AEWR, prevailing hourly wage or piece rate, CBA rate, Federal minimum wage, State minimum wage, or any other wage rate the employer intends to pay). The Department noted that, because H–2A employers are already required to accurately track and record both hours worked and field tallies pursuant to § 655.122(j), employers should already have processes in place to accurately record information needed for compliance with the proposed changes to §§ 655.120(a) and 655.122(l), minimizing any additional administrative burden these proposed changes would place on employers.

The Department sought comments on this proposal, particularly with respect to how the proposal would work in practice; whether there are circumstances, such as when an employer includes multiple activities or tasks in a single job order, where further clarification would be needed on which wage rates must be listed in the job order and how to calculate the worker's wages; whether corresponding changes to the recordkeeping requirements at § 655.122(j) and (k) or to the requirements for SWAs' review of job orders at part 653, subpart F, would be needed; and whether the requirement to list the highest applicable wage rate for each unit of pay on job orders placed in connection with an H–2A application would render unnecessary the requirement at 20 CFR 653.501(c)(2)(i) that an employer that pays by the piece or other non-hourly unit calculate and submit an estimated hourly wage rate with the job order. The Department explained that it was considering making similar revisions to the regulations at §§ 655.210(g) and 655.211 to require employers to disclose all potentially applicable rates of pay in the job orders for herding and range livestock production occupations, as well as to the regulations at 20 CFR

653.501(c) to require employers to disclose all potentially applicable rates of pay in non-H–2A (or non-criteria) clearance orders, and sought comments on whether it should include these proposed revisions in any final rule.

Worker advocates were largely supportive of the proposal and commented that the proposed changes are necessary to ensure that workers are receiving the wages to which they are entitled. Farmworker Justice explained that the proposal, which clarifies that employers must offer and pay the prevailing piece rate when it would result in higher wages for a worker than the AEWR or other hourly wage offered, is needed "despite the clear language in the current regulation" because the approval of clearance orders that fail to offer to pay prevailing piece rates limits the Department's ability to enforce and collect legally required piece rate earnings. A joint comment from 43 U.S. House Members stated that the proposal would help "create stronger protections against exploitative practices commonly used by employers" and a joint comment from 15 U.S. Senators commended the Department for "taking this step toward ensuring fair and transparent wages for agricultural workers." Multiple worker advocacy organizations stated that the proposed changes around disclosure and consistency of wages are needed to address wage theft, and the UFW Foundation provided stories of workers' experiences with wage theft, such as employers orally promising to pay piece rates and then later paying an hourly wage rate that results in lower earnings.

These commenters also explained that the proposed changes are necessary to prevent an adverse effect on the wages of similarly employed workers in the United States. Using Washington State as an example of how permitting employers to offer only the hourly AEWR has had an adverse effect on the agricultural labor market, Farmworker Justice explained that experienced local workers will choose job opportunities that offer a market piece rate and thus, historically, employers have needed to offer these piece rates to attract experienced local workers. They further stated, "[a]llowing these employers to bring temporary foreign workers to do this work without requiring them to pay these piece rates has exactly the adverse effect on local working conditions that Congress directed the Department to prevent in the H–2A statute." Similarly, a joint comment from 15 U.S. Senators asserted that low wages discourage American workers from taking these "critical jobs" and that the H–2A program was not intended to "replace

American workers with cheap, exploited labor" to the detriment of workers and the economy as a whole.

Farmworker Justice explained that the proposal does not impose additional recordkeeping burdens on employers as employers already must track the number of hours worked and calculate workers' potential hourly earnings to ensure compliance with the AEWR and applicable minimum wage and employers already track production for business purposes.

The Department received comments from employers, trade association, and agents opposing the proposal. Several commenters, including FFVA and NCAE, asserted that the proposal is unnecessary because employers are already required to include any required wage rate in the job order. FFVA explained that the employers are already required to include piece rates in the job order both because of the requirement at § 655.120(a) and because of the prohibition against preferential treatment of H–2A workers at § 655.122(a). FFVA also asserted, without citation, that the current regulations provide employers sufficient flexibility by allowing employers to "temporarily suspend piece-rate pay when worker safety or crop conditions require it." In contrast, NCAE stated that, while applicable wage rates must already be disclosed, the Department "failed to recognize that whereas productivity incentive pay may be available with some employers, there is no 'prevailing piece rate'" and thus the proposal would require employers "to disclose that which does not exist." Western Growers indicated that the current regulation is "straightforward and sufficient to test the labor market and apprise workers of the wages they should expect to receive." A couple of commenters, SRFA and USAFL and Hall Global, stated that the proposal exceeds the Department's authority because it has not adequately connected the requirement to offer and pay an applicable prevailing piece rate to the need to prevent an adverse effect on the wages or working conditions of similarly employed workers in the United States. SRFA further stated that "[c]reating a system whereby U.S. employers are required to offer a more attractive and lucrative pay structure than the employer might otherwise pay goes far beyond the Secretary's statutory authority."

Many of the commenters opposed the proposal on the ground that it requires employers to offer and pay an applicable prevailing piece rate even when the employer does not wish to do so. For instance, the Cato Institute stated

that under the proposal H–2A employers "will no longer get to pick whether they pay a piece rate or not." SRFA asserted that the proposed change would be a "de facto mandate" that would require employers to pay by piece rate. Several commenters, including wafla, ma´sLabor, NHC, and the U.S. Chamber of Commerce, opined that the proposal would eliminate an employer's ability to change wage rates based on market and crop conditions, or whether they wish to incentivize (or disincentivize) workers to work quickly. Ma´sLabor asserted that prevailing piece rates are established based on survey results of employers already paying a piece rate and, therefore, do not accurately reflect wages in the marketplace. It suggested that employers should only be required to pay prevailing piece rates if they choose to use a piece rate compensation plan.

Commenters also asserted that complying with the proposal would be unduly burdensome, or even impossible. Employers and trade associations, including the U.S. Chamber of Commerce, USApple, and NHC, explained that the proposal would be confusing and difficult to implement because many employers use piece rates that vary based on the commodity, variety within that commodity, quality of the crop, and units of measurement of commodities. The U.S. Chamber of Commerce expressed concern that employers, especially smaller farms, would not be able to comply with these proposed changes because they do not have processes in place to accurately record the information required. Similarly, US Apple and NHC stated that employers are unlikely to have the existing staffing or software needed to implement the required changes. Wafla stated that only hourly rates should be required to be posted in the job order because piece rates cannot be determined before work starts.

Several commenters emphasized what they believed to be unintended consequences of the proposal. NCFC and AmericanHort stated that the proposal, if adopted, would "further incentivize employers to not pay piece rates where they do not have to" and "in areas where there is a prevailing piece rate that has been certified by the Department, it will drive employers away from planting crops that have a prevailing piece rate." FFVA concurred and stated that this "would likely reduce workers' wages, rather than ensuring they are higher, while reducing overall production for the employer."

In response to the Department's specific request, several commenters identified language in the proposal for

which further clarification would be helpful. The U.S. Chamber of Commerce, Western Growers, and AmericanHort explained that the Department's proposed language at § 655.122(l)(2)—*i.e.,* "the employer must calculate each worker's wages . . . using the highest wage rate for each unit of pay, and pay the worker the highest of these wages for that pay period. The wage actually paid cannot be lower than the wages that would result from the wage rate(s) guaranteed in the job offer"—is unclear and asked how this language would apply to employers that offer both hourly wages and piece rate wages in their job orders. Specifically, the U.S. Chamber of Commerce asked whether such employers would be required to pay a piece rate, where higher, "even if the worker did not work on a piece-rate basis" during the relevant time period. Farmworker Justice recommended several changes to the language of the proposal. Given the "history of misinterpretation" of the wage obligations of § 655.120(a), they recommended incorporating explicit references to piece rates in the language of the regulation by adding to paragraph (a)(1)(ii) the phrase "whether expressed as a piece rate or other unit of pay," and to paragraph (a)(2) the parenthetical "(including piece rates or other pay structures)."

The Department specifically sought comments on whether the requirement to list the highest applicable wage rate for each unit of pay on job orders placed in connection with an H–2A application would render unnecessary the requirement at 20 CFR 653.501(c)(2)(i) that an employer that pays by the piece or other non-hourly unit calculate and submit an estimated hourly wage rate with the job order. A private employer asserted that the requirement to submit an estimated hourly wage rate is burdensome, inaccurate, and unnecessary. Ma´sLabor asserted that removing the requirement to include estimated hourly wage would improve disclosures for workers and avoid misleading them as to their earning potential because it is difficult to estimate the expected hourly wage for an average worker.

In the NPRM, the Department explained that it was considering making similar revisions to the regulations at §§ 655.210(g) and 655.211 to require employers to disclose all potentially applicable rates of pay in the job orders for herding and range livestock production occupations, as well as to 20 CFR 653.501(c) to require employers to disclose all potentially applicable rates of pay in non-H–2A (or non-criteria) clearance orders, and

sought comments on whether these similar revisions should be made. Farmworker Justice expressed support for making similar revisions with respect to herders, reasoning that they should have the same job order transparency as farm labor workers. The Department received no other comments on these proposed revisions.

The Department received no comments on whether corresponding changes to the recordkeeping requirements at § 655.122(j) and (k) or to the requirements for SWAs' review of job orders at part 653, subpart F, would be needed.

While generally supportive, several worker advocacy organizations suggested that the proposal did not go far enough. Farmworker Justice recommended addressing the wages owed to misclassified H–2A workers who are assigned non-agricultural work for which higher prevailing wage rates should be paid (*e.g.,* landscaping or work at retail nurseries that falls under the ambit of the H–2B program and which would have potentially entitled a worker to a higher prevailing wage as set by the National Prevailing Wage Center (NPWC) if the work had been properly classified). Specifically, they suggested adding language explaining that the Federal minimum wage listed in paragraph (a)(1)(iv) "includes the appropriate NPWC prevailing wage in the case of misclassified workers," and stated that "[t]o do otherwise is inviting fraud" because, in such cases, employers who are caught are only required to reimburse back wages at the lower AEWR rate instead of the appropriate and typically higher NPWC prevailing wage rate. They noted that such misclassification adversely affects local workers and working conditions. American Industrial Hygiene Association (AIHA) stated that "regardless of whether or not the contract is for payment on a piece-work basis, there should be a limit on the number of working hours per day."

After considering the comments discussed above, the Department adopts with certain modifications the proposed revisions to §§ 655.120(a) and 655.122(l) to clarify that where there is an applicable prevailing piece rate, or where an employer intends to pay a piece rate or other non-hourly wage rate, the employer must include the non-hourly wage rate on the job order along with the highest hourly rate, and must pay workers' wages using the wage rate that will result in the highest wages for each worker in each pay period.

The Department believes that these clarifying changes are necessary to ensure that employers' recruitment

efforts reflect the correct applicable wage rates so as to more accurately determine whether there are U.S. workers who would be available and willing to accept the employment; that H–2A workers and workers in corresponding employment are paid the wages to which they are entitled under § 655.120(a), including any prevailing piece rate when it would result in higher earnings; and that the employment of H–2A workers does not adversely affect the wages or working conditions of similarly employed workers in the United States.

As set forth in the NPRM and above, and as evidenced by the numerous comments from employers, trade associations, and agents, the trio of BALCA decisions—*i.e., Golden Harvest Farm,* 2011–TLC–00442, at *3 (Aug. 17, 2011); *Dellamano & Assocs.,* 2010–TLC–00028, at *5–7 (May 21, 2010); and *Twin Star Farm,* 2009–TLC–00051, at *4–5 (May 28, 2009)—created significant confusion among the regulated community as to their obligations under §§ 655.120(a) and 655.122(l). *See, e.g.,* FFVA comment (opining that current regulations allow employers to "temporarily suspend piece-rate pay"), and NCAE comment (arguing that prevailing piece rates do not exist). Specifically, while these decisions restricted OFLC from requiring employers to include an applicable prevailing piece rate on the job order on the ground that OFLC does not (and cannot) know at the certification stage whether a prevailing piece rate will be higher than the hourly wage and, as a result, also limited WHD's enforcement abilities, these decisions did not negate the clear regulatory requirement that an employer "offer, advertise in its recruitment, and pay" the highest of the wage rates enumerated in § 655.120(a), including any applicable prevailing piece rate. Yet, because employers are able to avoid this obligation, it is not possible for the Department to determine whether there are local workers who would choose the job opportunity if an applicable prevailing wage rate were offered, or to ensure that the employment of H–2A workers at the offered wage rate, instead of a potentially higher prevailing piece rate, will not depress local wages or working conditions. Permitting employers unfettered flexibility to pay wages rates not listed in the job order similarly undermines the Department's labor market test and its ability to prevent an adverse effect on the wages or working conditions of similarly employed workers in the United States.

Accordingly, the Department adopts the clarifying language proposed in the

NPRM with minor edits. Specifically, the Department agrees with Farmworker Justice that their suggested additions to the regulatory text to explicitly reference piece rates are warranted given the history of misinterpretation and confusion among the regulated public.

The Department disagrees with commenters who asserted that the Department failed to adequately connect the requirement to offer and pay an applicable prevailing piece rate to the need to prevent an adverse effect on the wages or working conditions of similarly employed workers in the United States. In addition to the explanation provided in the NPRM and above, the comment from Farmworker Justice explained the mechanisms by which such an adverse effect can occur. The Department similarly disagrees with commenters who stated that piece rates should not be required in the job order because prevailing piece rates are determined based on the survey results of employers who already choose to offer piece rates (ma´sLabor), or because it is impossible to determine piece rates before the work is completed (wafla). Prevailing wage rates (whether hourly or by the piece) are determined by surveying a variety of agricultural employers; these surveys are not limited to employers that pay by the piece or by the hour. If a prevailing piece rate is issued, that unit of pay was used to compensate the largest number of U.S. workers whose wages were reported in the survey. *See* 20 CFR 655.120(c)(1)(v). Moreover, while it is not possible to determine at the certification stage whether an hourly wage rate or a piece rate will result in higher earnings, as this will vary based on a worker's productivity in the pay period, this does not mean that the piece rate itself cannot be identified and listed in the job order.

Nonetheless, the Department acknowledges the practical impact these clarifying changes will have on the regulated community, including, in some instances, the need to change their longstanding compensation practices and to ensure that they collect and maintain sufficient information to implement these changes (though the Department continues to believe that most employers do maintain the requisite information either for compliance with § 655.122(j) or for business reasons).

To assist the regulated community, the Department will consider issuing further guidance explaining an employer's obligations under §§ 655.120(a) and 655.122(l), particularly in instances where the relevant job order covers multiple crop activities or tasks for which there are different applicable piece rates.

In addition, the Department has determined that it is appropriate to make clarifying revisions to the regulations at §§ 655.210(g) and 655.211 to require employers to disclose all potentially applicable rates of pay in the job orders for herding and range livestock production occupations. Sections 655.210(g) and 655.211 include language analogous to that in § 655.120(a) and § 655.122(l). Specifically, the introductory text in § 655.210(g) has been redesignated to paragraph (g)(1) and revised to reflect that the employer must disclose any other wage rate it intends to pay if higher than the other potential wage sources listed in current § 655.210(g). Current § 655.210(g)(1) has been redesignated as § 655.210(g)(2), and revised to include reference to any other wage rate the employer intends to pay. Current § 655.210(g)(2) has been redesignated as § 655.210(g)(3). While the monthly AEWR will generally be the highest of these enumerated wage rates, in some cases an applicable State minimum wage, which may be expressed as an hourly wage rate, or another applicable wage rate (such as a higher monthly rate the employer intends to pay) may be higher. In addition, § 655.211(a)(1) has been revised to include reference to any other offered wage rate and the following language: "The employer must list all potentially applicable wage rates in the job order and must offer and advertise all of these wage rates in its recruitment."

Likewise, the Department has determined that it is appropriate to make such clarifying revisions to 20 CFR 653.501(c) to require employers to disclose all potentially applicable rates of pay in non-H–2A (or non-criteria) clearance orders. Because the SWAs are responsible for the review of both H–2A (criteria) clearance orders and non-H–2A (non-criteria) clearance orders, having analogous processes and requirements, where possible, is preferable, and the Department has revised 20 CFR 653.501(c)(1)(iv)(E) to require that intrastate and interstate clearance orders state both the hourly wage rate, if applicable, as well as any applicable piece rate or other non-hourly wage rate.

The Department has decided not to eliminate the requirement at 20 CFR 653.501(c)(2)(i) that an employer that pays by the piece, or other non-hourly unit, calculate and submit an estimated hourly wage rate with the job order. While some employers consider the inclusion of these estimated hourly wage rates in the job order to be burdensome or potentially confusing, these estimates provide additional information a potential job candidate may find relevant in evaluating whether to apply for a specific job opportunity.

Because the Department received no comments on whether corresponding changes to the recordkeeping requirements at § 655.122(j) and (k) or to the requirements for SWAs' review of job orders at part 653, subpart F, are needed, the Department declines to change these provisions at this time.

Finally, while the Department appreciates the suggestions from worker advocacy organizations that it address the wages owed to misclassified H–2A workers assigned to non-agricultural work for which higher prevailing wage rates should be paid, and limit the permissible number of working hours per day under the H–2A program, it declines to adopt either proposed change in this final rule as neither is within the scope of the current rulemaking.

### 3. Section 655.122, Contents of Job Offers

#### a. Paragraph (h)(4) Employer-provided Transportation

The NPRM proposed to revise § 655.122(h)(4) to require the provision, maintenance, and wearing of seat belts in most employer-provided transportation. Specifically, the NPRM proposed to prohibit an employer from operating any employer-provided transportation that is required by the U.S. DOT's FMVSS, including 49 CFR 571.208, to be manufactured with seat belts unless all passengers and the driver are properly restrained by seat belts meeting standards established by 49 CFR 571.209 and 571.210. In other words, the Department proposed that, if the vehicle was required by the U.S. DOT's FMVSS to be manufactured with seat belts, the employer would be required to retain and maintain those seat belts in good working order. The NPRM also proposed requiring that employers ensure that vehicles are not operated unless employees are wearing seat belts.

Additionally, the Department specifically sought comments in four areas: (1) whether there are any other factors or types of vehicles that it should consider when promulgating the regulations; (2) how this provision should interact with the limited exemption from the requirement under MSPA that vehicles have a seat securely fastened to the vehicle for each occupant found at 29 CFR 500.104(l),

which is also applicable to some H–2A employer-provided transportation; (3) whether employers ever retrofit vehicles with additional seats in such a way that complies with existing vehicle safety standards and how these vehicles should comply with proposed seat belt standards; and (4) whether it should require employers to enforce the wearing of seat belts.

The Department received numerous comments in support and in opposition to the proposal, and many commenters supported in part and opposed in part. Most opposition centered on the proposal that an employer should not operate the vehicle unless all passengers and the driver are properly restrained by a seat belt; this provision is discussed separately below. After consideration, the Department is adopting the proposal with minor modifications. Specifically, the Department has clarified that an employer must not allow any other person to operate employer-provided transportation unless seat belts are provided, maintained, and worn, and has replaced the word "shall" with "must." Additionally, the Department has replaced the term "DOT regulation" with "U.S. DOT's Federal Motor Vehicle Safety Standards," abbreviated as "FMVSS," to use the same terminology as U.S. DOT does when referencing their regulations.

Some commenters submitted comments relating to transportation safety that are outside the scope of this rulemaking. Specifically, Farmworker Justice suggested that the Department not accept workers' compensation insurance as acceptable for an H–2A employer to meet their obligations under 20 CFR 655.122(h). Ma´sLabor requested that the Department eliminate the requirement that the job offer include "a description of the modes of transportation (*e.g.,* type of vehicle)" from § 655.122(h)(4)(iii). Because the Department did not propose changes to these provisions in the NPRM, there are no such changes in this final rule.

Provision of Seat Belts in Vehicles Required by U.S. DOT's FMVSS to be Manufactured With Seat Belts

Worker rights advocacy organizations, unions, a couple of State government agencies, some Members of Congress, and some individual commenters expressed support for the proposal. Farmworker Justice and the Agricultural Justice Project stated that the requirement to provide seat belts was long overdue. Governmental commenters emphasized that the proposal was necessary due to the increased risks that agricultural workers face in transit. Specifically, a comment

from Members of Congress cited reports from BLS that 271 of 589 fatal workplace injuries suffered by agricultural workers in 2022 were caused by transportation-related incidents, and the California LWDA stated that Cal/OSHA regularly cites employers for agricultural transportation-related violations.

Many employers, associations, and some individuals stated that they did not oppose the proposal that employers be expected to provide seat belts in vehicles required by U.S. DOT's FMVSS to be manufactured with seat belts. However, many of these commenters requested exemptions, as discussed further below. Mountain Plains Agricultural Service stated that seat belt "use is important and should be available in the majority of vehicles and equipment during on-farm transportation. DOL's proposed change regarding this is redundant with OSHA regulations." Other employers and associations were silent on the proposal that employers provide and maintain seat belts in vehicles required to be manufactured with seat belts, expressing their opposition only to the proposed requirement that employers ensure that workers wear seat belts, which is discussed in more detail below.

The Wyoming Department of Agriculture and some agents and associations opposed the proposal to require the provision of seat belts. The Wyoming Department of Agriculture, Fuerza Consulting Solutions, and ma´sLabor observed that employers commonly use older vehicles that do not have seat belts for on-the-farm transportation, and stated that compliance for these entities would be difficult. Ma´sLabor and SRFA pointed out that the Department had previously opined that universal seat belt requirements would place an unreasonable economic burden on employers, and further said that the proposal may result in some employers completely forgoing the use of motor vehicles and turning to less regulated options such as all-terrain vehicles (ATVs), off-highway vehicles (OHVs), or motorcycles. Ma´sLabor further urged the Department to defer to the judgment of State and local authorities to interpret existing laws, and to allow H–2A employers to use the same exemptions from seat belt usage as those that apply to non-H–2A employers under State law. The Wyoming Department of Agriculture also opposed the Department's reasoning for making the change. Ma´sLabor and USA Farmers said that the proposal would result in enhanced safety standards for H–2A

workers, but not for other agricultural workers. USA Farmers further stated that the more reasonable course of action would be to propose regulations applicable to all farmworkers, not simply to H–2A workers who represent a fraction of farmworkers in the United States.

Many commenters agreed with the proposal but requested that exemptions be included in the final rule. Many associations and employers requested the inclusion of an exemption for on-the-farm transportation, arguing that rural transportation is not inherently dangerous or, even if it is, on-the-farm transportation does not pose the same risks as off-farm transportation. Most of these commenters suggested that vehicles primarily operated on private farm roads when the distance traveled does not exceed 10 miles be exempt from seat belt requirements. SRFA suggested that small employers (*i.e.,* those employing 10 or fewer workers) be exempt, and an individual commenter and FFVA similarly suggested that vehicles already in use be exempt from the seat belt requirements, as such exemption, in the commenters' view, would cushion growers from the economic impacts of the proposal.

Some commenters misunderstood the proposal as requiring the retrofitting of vehicles not originally manufactured with seat belts. For example, Burley and Dark Tobacco Producer Association stated that many of the surplus buses acquired by employers to transport workers to and from job sites do not have seat belts, and that retrofitting these vehicles with seat belts would be expensive. One anonymous employer asked why seat belts would be required on buses when school systems do not require them, and stated that it would cost $750 per small bus and $1,050 per large bus to install seat belts, for a total cost to this employer of $14,100. Many commenters requested a grace period (many recommended 6–12 months) to retrofit vehicles with seat belts.

One commenter suggested that the proposal be expanded. Farmworker Justice suggested that employers be required to equip all vehicles with seat belts, not just those that are required by U.S. DOT's FMVSS to be manufactured with seat belts. They reasoned that employers frequently use old school buses to transport workers and excluding this larger vehicle category creates a meaningful gap in vehicle safety. Farmworker Justice also suggested that the Department clarify that the seat belt standard applies to all transportation of H–2A workers, including between worksites, inbound/outbound transportation, interstate and

intrastate transportation between job sites, and that provided by farm labor contractors or third-party transportation agents.

The Department received very few comments on how the proposal to require the provision of seat belts should interact with the limited exemption from MSPA's general requirement that vehicles have a seat for each occupant, as well as whether employers ever retrofit vehicles with seats. Farmworker Justice stated that the MSPA limited exemption from seats found at 29 CFR 500.104(l) [25] should be inapplicable to H–2A employers. SRFA stated that it appreciated the consideration of a 10-mile exemption for certain seatless vehicles under 29 CFR 500.104(l), but most farm vehicles have seats and producers in the Western States have worksites spanning a mile radius far exceeding 10 miles. Farmworker Justice also stated that the rule should expressly prohibit the retrofitting of any vehicles with additional seats but did not identify whether they had ever seen such a situation.

Upon consideration, the Department adopts the language as proposed in this final rule with minor modifications and does not modify the requirement that employers provide seat belts in vehicles required by U.S. DOT's FMVSS to be manufactured with seat belts.

The Department appreciates the suggestion that all vehicles be equipped with seat belts, not just those required by U.S. DOT's FMVSS to be manufactured with seat belts, and recognizes the commenter's concern that some workers will continue to be transported without seat belts, most commonly in school buses with a Gross Vehicle Weight Rating (GVWR) exceeding 10,000 pounds. However, as stated in the NPRM, the Department believes that it is appropriate to rely on U.S. DOT's considerable research and expertise and, at this point, U.S. DOT's FMVSS do not require school buses with a GVWR exceeding 10,000 pounds to be manufactured with seat belts because of the vehicles' safety features, among other factors. Specifically, school buses use "compartmentalization" to

ensure that passengers are cushioned and contained by seats or padded restraining barriers in the event of a crash.[26] Additionally, U.S. DOT has stated that large school buses' greater weight and higher seating height than most other vehicles, high visibility to motorists, joint integrity of the bus body panels, and stringent fuel system integrity requirements contribute to the vehicles' safety record.[27] Furthermore, requiring seat belts in all employer-provided transportation, regardless of whether U.S. DOT's FMVSS required the vehicle to be manufactured with seat belts, would represent a substantial change from the proposal in the NPRM that would have significant economic impacts on some employers.[28] Therefore, the Department declines to adopt this proposal from Farmworker Justice's comment without providing the regulated community with a meaningful opportunity for notice and comment. The Department will continue to monitor vehicle safety conditions in the field and consult with U.S. DOT to consider whether the H–2A program should require seat belts in vehicles not manufactured with seat belts, including whether the conditions under which farmworkers are transported in large school buses are safe without seat belts. Also, as stated in the NPRM, if, at a later date, U.S. DOT were to amend the FMVSS to require school buses with a GVWR exceeding 10,000 pounds, or any other vehicle, to be manufactured with seat belts, § 655.122(h)(4) would automatically, and without further revision, similarly require the employer to provide and maintain seat belts in those vehicles. See 88 FR 63777–63778.

[26] See 73 FR 62744, 62745–62746 (Oct. 21, 2008), and 76 FR 53102 (Aug. 25, 2011).

[27] See National Highway Traffic Safety Administration (NHTSA), School Bus Safety: Crashworthiness Research (Apr. 2002) (discussing school bus occupant safety), https://www.nhtsa.gov/sites/nhtsa.gov/files/sbreportfinal.pdf.

[28] As stated in the NPRM, NHTSA has provided guidance for retrofitting school buses with seat belts. See Guideline for the Safe Transportation of Pre-school Age Children in School Buses, NHTSA (Feb. 1999). Cost estimates for retrofitting a school bus with seat belts vary, but are generally around $15,000 per bus, with one estimate as high as $36,000 per bus. See Stephen Satterly, School Bus Seat Belts: Opening a Dialogue, Safe Havens Int'l (Dec. 5, 2016), https://safehavensinternational.org/school-bus-seat-belts-opening-dialogue, Matthew Simon, Report: Adding Seatbelts Could Cost $15k per school bus, WSAW–TV (Sept. 1, 2016), https://www.wsaw.com/content/news/NewsChannel-7-Investigates-Report-Adding-seat-belts-could-cost-15K-per-school-bus-392104851.html; Mike Chouinard, Island District Holds Off School Bus Seatbelt Retrofits, N. Island Gazette (Oct. 7, 2020), https://www.northislandgazette.com/news/island-district-holds-off-school-bus-seatbelt-retrofits-1407935.

The Department also reminds employers that any bus exceeding 26,000 pounds GVWR that was not manufactured as a school bus or other category of bus explicitly excluded from seat belt requirements (transit bus, perimeter-seating bus, or prison bus) has been manufactured with seat belts pursuant to U.S. DOT's FMVSS if manufactured on or after November 28, 2016. See 78 FR 70416 (Nov. 25, 2013). Therefore, in these vehicles, the employer must provide and maintain seat belts.

Similarly, the Department declines to create exemptions from the seat belt standard for vehicles that U.S. DOT requires to be manufactured with seat belts. While many commenters sought the inclusion of an exemption from the seat belt requirement for on-the-farm transportation, sometimes suggesting using the same or similar parameters as found in the limited MSPA exemption from seats found in 29 CFR 500.104(l), the Department believes that it is inappropriate to universally exempt on-the-farm transportation from seat belt requirements. While the Department's enforcement experience demonstrates that many vehicle crashes occur on public roads, some crashes occur on property owned or leased by the grower. Additionally, it may be difficult for the Department to identify in an investigation which vehicles are solely used on the farm as opposed to being driven on public roads. The Department believes that it is similarly inappropriate to exempt small employers or vehicles currently in use from compliance with the seat belt requirements because the size of an employer or the current use of the vehicle has no bearing on the safety of the transportation provided.

Ma´sLabor and SRFA correctly noted that the Department had previously opined that requiring employers to provide seat belts would place an unreasonable economic burden on employers. However, as previously explained in the NPRM, the Department made this statement while promulgating MSPA regulations in 1983.[29] In the last 40 years, every State except New Hampshire has passed seat belt laws [30] and national seat belt usage increased from 14% in 1983 to 91.6% in 2022.[31]

[25] Transportation subject to this exemption is limited to those vehicles that are subject to the vehicle safety standards in 29 CFR 500.104 when those vehicles are primarily operated on private farm roads when the total distance traveled does not exceed 10 miles, so long as the trip begins and ends on a farm owned or operated by the same employer. See 29 CFR 500.102; 29 CFR 500.104(l). See also DOL, WHD Fact Sheet #50: Transportation Under the Migrant and Seasonal Agricultural Worker Protection Act (June 2016), https://www.dol.gov/agencies/whd/fact-sheets/50-mspa-transportation.

[29] See 48 FR 36736, 36738 (Aug. 12, 1983); 88 FR 63750, 63777.

[30] See Governors' Highway Safety Ass'n., Seat Belts, https://www.ghsa.org/issues/seat-belts (last accessed Feb. 8, 2024).

[31] Compare NHTSA, Seat Belts, https://www.nhtsa.gov/risky-driving/seat-belts#resources (last accessed Feb. 8, 2024) ("Seat Belts") (estimating that seat belt use by adult front-seat passengers was about 91.6 percent in 2022), with

Research has solidified the importance of the seat belt as an essential life-saving technology; NHTSA estimates that using a seat belt in the front seat of a passenger car can reduce fatal injury by 45 percent and reduce moderate to critical injury by 50 percent. The safety effect increases in a light truck, where seat belts reduce fatal injury by 60 percent and reduce moderate to critical injury by 65 percent.[32] Further, NHTSA estimates that 50 percent of those passenger vehicle occupants killed in crashes in 2021 were unrestrained.[33] Given the dramatic increase in use, expansions of State seat belt laws, and developments in safety research since 1983, the Department no longer believes that requiring employers to provide seat belts in 2024 places an unreasonable economic burden on employers. Even more, the Department's regulation requires seat belts only in vehicles that have been manufactured with seat belts and thus an employer's only expenses would be to fix any seat belts that have broken. In response to commenters who warned the Department that a seat belt requirement may motivate employers to provide transportation via less regulated modes of transport, such as ATVs, OHVs, and motorcycles, the Department believes that it is unlikely to be more cost effective for employers employing more than a few workers to purchase motorcycles or ATVs for workers in lieu of repairing seat belts in a 15-passenger van, for example. Additionally, the Department reminds employers that all employer-provided transportation must comply with all Federal, State, and local laws and regulations. *See* 20 CFR 655.122(h)(4).

Many commenters used the term "retrofit" when discussing seat belt installation, emphasizing the costs that would be passed onto growers, as well as the need for a grace period to permit sufficient time for such retrofitting. The Department clarifies that this final rule does not require employers to add seat belts to vehicles that were manufactured without them. The language adopted by the Department in this final rule references U.S. DOT's FMVSS,

including those found at 49 CFR 571.208, which vary based on the type of vehicle and the year of manufacture. If an employer transports workers in an old vehicle that was not required, at the time of manufacture, to have seat belts, the Department will not require an employer to install seat belts in that vehicle. However, it should be noted that, because U.S. DOT has required passenger cars and light trucks and vans to be manufactured with seat belts since the 1970s,[34] buses (excluding school buses) with a GVWR under 10,000 pounds to be manufactured with seat belts since 1991,[35] and school buses with a GVWR under 10,000 pounds to be manufactured with seat belts since 1976,[36] the Department anticipates that relatively few vehicles originally manufactured without seat belts remain in use. Employers' costs to come into compliance will consist of repairing or replacing any broken or damaged seat belts, which the Department anticipates will be less expensive and take less time than retrofitting vehicles that were never engineered for seat belt installation. The Department also declines to institute a grace period for employers to retrofit their vehicles, as no retrofitting will be required. The Department similarly believes that many vehicles will already have functional seat belts to comply with existing State laws, and that those vehicles with broken seat belts may be fixed relatively quickly, and therefore declines to institute a grace period for employers to repair broken seat belts.

Some commenters identified that the proposal would implement more stringent safety requirements for H–2A workers and workers engaged in corresponding employment than for other farmworkers in the United States. The Department continues to believe that it is appropriate to amend the H–2A regulations given the significant growth of the program and its increasing importance in agriculture in the United States.[37] The Department is tasked with, among other things, ensuring that the employment of H–2A workers does not adversely affect the wages and working

conditions of similarly employed workers in the United States. As discussed in greater detail below in Section VI.C.2.b, H–2A workers may have more limited recourse when placed in an inherently dangerous situation, such as being transported in a vehicle without seat belts, than workers in the United States similarly employed. As AIHA noted, H–2A workers are incentivized to continue employment even when presented with working conditions that are hazardous to their health and safety. Additionally, unbelted passengers in a vehicle pose significant risks to other passengers and the driver; studies have found that unrestrained occupants can become projectiles in a crash and increase the risk of death for other occupants.[38] An employer that only offers dangerous transportation (in this case, transportation without seat belts in a vehicle required by U.S. DOT's FMVSS to be manufactured with seat belts) has offered terms and working conditions below the minimum level at which a worker in the United States could be expected to accept. Given the accepted and established safety record of seat belts, the Department believes that it is appropriate to require seat belts in these vehicles as a baseline safety standard in the H–2A program to prevent adverse effect on similarly employed workers in the United States and to ensure that H–2A workers are employed only when there are not sufficient able, willing, and qualified workers available to perform the work.

In response to comments submitted by Farmworker Justice, the Department clarifies that vehicle safety standards found in § 655.122(h)(4), including the requirement that vehicles manufactured with seat belts have seat belts, apply to all employer-provided transportation of H–2A workers, including between worksites, inbound/outbound transportation, and interstate and intrastate transportation between job sites. If an employer contracts with

Transp. Research Bd. of the Nat'l. Acads., *Buckling Up: Technologies to Increase Seat Belt Use* (Oct. 2003), p. 5 (estimating that seat belt use was about 14 percent in 1984).

[32] *See* Kahane, C.J., NHTSA, *Lives Saved By Vehicle Safety Technologies and Associated Federal Motor Vehicle Safety Standards, 1960 to 2012 – Passenger Cars and LTVs – With Reviews of 26 FMVSS and the Effectiveness of Their Associated Safety Technologies in Reducing Fatalities, Injuries, and Crashes* (2015), DOT HS–812–069, pp. 107–11, *https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812069.pdf* (2015 NHTSA Report). *See also Seat Belts.*

[33] *See Seat Belts.*

[34] 2015 NHTSA Report, p. 89, *https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812069.pdf*; 49 CFR 571.210 S4.1; and 49 CFR 571.210 S4.2.

[35] 54 FR 46257 (Nov. 2, 1989).

[36] 41 FR 4018 (Jan. 28, 1976).

[37] The number of H–2A jobs certified in FY 2022 was more than seven times the number of those certified in 2005, and double the amount of those certified in 2016. *See* Castillo, M., USDA Economic Research Service, *H–2A Temporary Agricultural Job Certifications Continued to Soar in 2022* (Mar. 13, 2023), *https://www.ers.usda.gov/amber-waves/2023/march/h-2a-temporary-agricultural-job-certifications-continued-to-soar-in-2022/.*

[38] *See* Mayrose J., et al., *Influence of the unbelted rear-seat passenger on driver mortality: "the backseat bullet"* (Feb. 2005), Acad. Emerg. Med. 12(2), pp. 130–34, *https://pubmed.ncbi.nlm.nih.gov/15692133/* (finding that the risk of death for a belted driver in a head-on collision increased by 2.27 times if seated in front of an unbelted passenger instead of a belted passenger; Cummings P., Rivara F.P., *Car occupant death according to the restraint use of other occupants: a matched cohort study* (Jan. 21, 2004), J. Am. Med. Ass'n, 291(3), pp. 343–49, *https://pubmed.ncbi.nlm.nih.gov/14734597/* (finding that the risk ratio for death among belted occupants varied between 1.22 and 1.15 when exposed to an unbelted passenger and 1.09 based on the location of the belted and unbelted occupants; in other words, the restrained passenger was more likely to die when exposed to an unrestrained passenger in a vehicle crash).

another entity, such as a farm labor contractor, to provide transportation that is the employer's responsibility, such as transportation between the living quarters and worksite or inbound/outbound transportation, that transportation continues to be employer-provided and is subject to all the vehicle safety standards found in 20 CFR 655.122(h)(4), including the seat belt standards. To clarify that the employer cannot avoid responsibility for seat belt requirements by using a subcontractor to provide required transportation to workers, the Department has edited § 655.122(h)(4)(ii) in this final rule to prohibit an employer from allowing any other person to operate any employer-provided transportation required by U.S. DOT's FMVSS to be manufactured with seat belts unless workers are properly restrained by seat belts.

Upon consideration of the comments, the Department declines to modify the proposal to accommodate the limited MSPA exemption from seats found at 29 CFR 500.104(l). No commenter identified that they used the exemption, and SRFA confirmed that most vehicles have seats. Commenters who mentioned the exemption appeared to contemplate a blanket exemption from the seat belt requirement for on-the-farm transportation, which the Department declines to adopt and is discussed above. Based on the comments received, the Department concludes that employer usage of the limited exemption from seats found in 29 CFR 500.104(l) (for vehicles that are operated primarily on farm roads in trips not exceeding 10 miles, so long as the trip begins and ends on a farm owned or operated by the employer) is rare and therefore needs no accommodation in these regulations.

No commenters identified that they retrofitted vehicles with seats or saw such retrofitted vehicles. As such, the Department will not contemplate hypothetical compliance in that situation at this time.

Wearing of Seat Belts

The Department proposed to prohibit employers from operating vehicles manufactured with seat belts unless all passengers and the driver are properly restrained by seat belts. Associations, agents, and employers were unanimous in their opposition to the proposal that employers require the wearing of seat belts. These commenters stated that this requirement would be unreasonable, place an undue burden on employers, and infantilize workers. Commenters also stated that even if they checked for seat belt use before departure, they

would have no way to ensure that workers not remove the seat belt in transit. An individual and wafla stated that often the drivers are H–2A workers with no supervisory authority and would be unable to require the wearing of seat belts. SRFA, wafla, AILA, and an individual employer emphasized that employers would need to invest heavily in surveillance technology, such as cameras, to ensure that workers wear seat belts at all times. AILA suggested that the Department accept an employer as being in compliance if it has a sign posted advising the workers to wear seat belts. NHC similarly suggested that this provision be replaced with a requirement that employers provide training on proper use of seat belts. The Wyoming Department of Agriculture stated that this provision would expose employers to labor organization audits of seat belt use.

Worker rights advocacy organizations, unions, a couple of State government agencies, some Members of Congress, and individual commenters supported the proposal in its entirety, including that the employer not operate vehicles manufactured with seat belts unless all passengers and the driver wear seat belts. A couple of advocacy organizations submitted specific feedback supporting the proposal that employers require the wearing of seat belts. AIHA noted that making seat belts available without a requirement to wear the seat belts leads to low adoption of the practice of wearing them and that "if the goal of the [Department] is to decrease incidents of injury associated with transportation of [H–2A] workers, then required enforcement is one of the best ways to increase the use of seat belts." Farmworker Justice stated that oftentimes workers come from rural communities in Mexico where seat belt use may not be customary, and therefore employers should be required to verify that all passengers are wearing seat belts. The California LWDA noted that the proposed regulation aligned with the California regulation and that there are numerous OSHA decisions interpreting the regulations requiring the provision of personal protective equipment to also require use thereof.

The Department adopts the proposal without modification. The history of seat belt adoption shows that the provision of seat belts does not automatically result in their use; rather, enforcement and education is necessary for adoption. As previously explained in the NPRM, seat belt usage in the United States was very low before States required and national campaigns encouraged their use (compare 14%

usage in 1983 to 86% usage in 2012,[39] and up to 90% in 2020 ).[40] Seat belts do not serve their designed purpose when not worn, and, as noted above, an unbelted passenger poses a significant safety risk to other passengers in the vehicle in the case of a crash. As the objective of this regulatory change is to avoid degrading worker safety conditions to prevent adverse effect on similarly employed workers in the United States and to ensure that H–2A workers are employed only when there are not sufficient able, willing, and qualified workers available to perform the work, the Department believes that employers requiring their workers to wear seat belts is necessary to achieve this objective.

With respect to employer concerns that it is not possible for employers to ensure their workers wear seat belts, the Department notes that numerous other workplace safety and health laws and regulations require employers to shape and influence the behavior of their workers so that the employer may be in compliance. Consider, for example, regulations promulgated by OSHA, many of which mandate specific behaviors or the use of safety equipment by their workers. For example, 29 CFR 1928.51(b)(2)(i) requires an employer to ensure that a worker required to use a Roll-Over Protective Structure (ROPS) on a tractor not only use a seat belt, but that the employee tighten the seat belt sufficiently to confine the worker to the protected area provided by the ROPS. The employer is expected to comply with the OSHA standard; however, the Department anticipates that the employer is not fastening the seat belt themselves nor are they watching the worker each moment to ensure that the seat belt is fastened. Rather, the employer creates and communicates operating procedures to shape worker behavior to comply with the standard, including by issuing work rules to prevent the violation, communicating those rules to workers, taking measures to discover violations, and taking action when violations are discovered. *See, e.g., Burford's Tree, Inc.,* 22 BNA OSHC 1948 (No. 07–1899, 2010), aff'd without opinion, 431 F. App'x. 222 (11th Cir. 2011).

Similarly, regulations promulgated by the Food and Drug Administration (FDA) at 21 CFR 117.10 require an employer to take reasonable measures and precautions to ensure that, for example, all persons working in direct

---

[39] 2015 NHTSA Report, at 103.
[40] NHTSA, *Seat Belt Use in 2020 — Overall Results* (Feb. 2021), *https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813072.*

contact with food conform to hygienic practices while on duty, including: (1) maintaining adequate personal cleanliness; (2) washing hands thoroughly before starting work and after each absence from the work station; and (3) not eating food, chewing gum, drinking beverages, or using tobacco in areas where food may be exposed or where equipment or utensils are washed. As with OSHA regulations, compliance with these FDA regulations require employers to develop reasonable compliance plans to influence employee behavior.

Certainly, the Department does not expect employers to install expensive surveillance technology in vehicles to monitor compliance. However, it does expect employers to implement common-sense measures to ensure that workers are wearing seat belts while a vehicle is being operated. The Department expects that employers already have similar common-sense measures in place to comply with other regulatory safety requirements, such as those enforced by OSHA and the FDA.

With respect to the Wyoming Department of Agriculture's concern that this provision would expose employers to labor organization audits of seat belt use, this final rule does not grant the right to conduct audits to such organizations, but some organizations may conduct or attempt to conduct independent evaluations of employer compliance and make referrals when they encounter violations. However, the Department believes that this provision is no more likely than others in the H–2A regulations to result in organizations attempting to evaluate employer compliance. In all, the Department believes that the importance of mitigating unsafe working conditions far outweighs the inconvenience to an employer resulting from an outside organization surveying (or attempting to survey) an employer about compliance.

b. Paragraphs (i)(1)(i) and (ii) Shortened Work Contract Period

The Department proposed to remove the language at § 655.122(i)(1)(i) and (ii) that permitted the work contract period to be shortened by agreement of the parties with the approval of the CO, consistent with changes to the delayed start date procedure at § 655.175. The Department received one comment from a trade association that expressed general support for this minor change. The Department is adopting the proposal without revision in this final rule. These minor conforming changes will ensure these paragraphs are consistent with changes to delayed start of work requirements at new

§ 655.175(b), which permits only minor delays to the start of work and requires notice to workers and the SWA, but not CO approval, as discussed in the preamble explaining changes in that section.

The Department also received comments on this section that it has determined were beyond the scope of this rulemaking. A workers' rights advocacy organization expressed concern that providing workers the three-fourths guarantee at the end of the contract period results in financial hardship for workers and may incentivize employers to find pre-textual reasons to avoid fulfilling the obligation. The commenter urged the Department to revise the three-fourths guarantee at § 655.122(i) to require employers to guarantee and compensate workers for three-fourths of the work hours in each weekly or biweekly period. Alternatively, the commenter urged the Department to require employers provide a "basic 'per diem' to cover food costs during work stoppages exceeding 3 days at any time" during the employment period.

These suggestions would require amendments to § 655.122(i) or § 655.122(g) that would constitute major changes to the regulations that commenters and stakeholders could not have anticipated as an outcome of the proposed minor change to § 655.122(i)(1) or proposed changes to the delayed start date procedure at § 655.175(b), thus warranting additional public notice and opportunity for comment. As such, the Department declines to adopt the suggested changes. However, as the Department noted in the 2022 H–2A Final Rule, the three-fourths guarantee "is intended to address the normal variability of weather, crop readiness, and other circumstances in agricultural work" and "is not intended to allow an employer to include periods without work" for other reasons. 87 FR at 61774. The employer's job order must accurately reflect the actual hours that the employer intends to offer workers.[41]

c. Paragraph (l)(3) Productivity Standards as a Condition of Job Retention

The NPRM proposed that if the employer requires one or more productivity standards as a condition of job retention, such standards must be specified in the job offer and be no more than those required by the employer in

1977, unless the OFLC Administrator approves a higher minimum. Additionally, the NPRM proposed that if the employer first applied for temporary agricultural labor certification after 1977, such productivity standards must be no more than those normally required (at the time of the first *Application for Temporary Employment Certification*) by other employers for the activity in the AIE. Under the current regulations at § 655.122(l)(2)(iii), these conditions apply only to those employers paying a piece rate and requiring one or more productivity standards as a condition of job retention. The NPRM proposed to expand these conditions to all employers requiring one or more productivity standards as a condition of job retention, regardless of whether the workers are paid on a piece rate or hourly basis. The NPRM explained that this change was necessary so that all workers would be informed of the conditions that may serve as a basis for termination for cause, consistent with proposed changes to § 655.122(n), and to ensure that employers do not terminate workers for excessively high productivity standards.

Many individuals, public policy or other advocacy organizations, workers' rights advocacy organizations, unions, and State agencies, as well as some Members of Congress, unconditionally supported the proposal. These commenters agreed that the disclosure of this productivity-standard information would ensure that workers are informed of the material terms and working conditions of the job offer before accepting the job and noted the harm that increased productivity standards have on workers, regardless of whether workers are paid on an hourly or piece-rate basis. Specifically, Farmworker Justice noted that they have encountered workers who were required to work at such a rapid pace that the workers reasonably feared an increased incidence of accidents. Many commenters, including the North Carolina Justice Center, PCUN, and UMOS, also said that uncapped productivity standards would have the effect of dissuading U.S. workers from finding or keeping these jobs. A number of agricultural associations and employers, such as the Michigan Asparagus Advisory Board, TIPA, and NHC, agreed with the proposal on the condition that employers have the ability to adjust productivity standards if the crop or market conditions are different than anticipated at the time of the job offer.

Other employers and associations opposed the proposal. Some employers

---

[41] DOL, *WHD Fact Sheet #26E: Job Hours and the Three-Fourths Guarantee under the H–2A Program* (Nov. 2022), *https://www.dol.gov/agencies/whd/fact-sheets/26e-job-hours-three-fourths-guarantee-H-2A.*

opposed the proposal based on a mistaken perception that qualitative reasons for evaluation would not be acceptable. One anonymous employer misunderstood the proposal, believing that it would require employers to create productivity standards, and stated that creating a productivity standard would be impossible because of the needs of different crops and conditions (*e.g.,* fresh market versus juicing apples). AILA did not support or oppose the proposal but requested that the Department add a section for this information on the applicable forms. As explained more fully in the discussion below, this final rule will permit employers to consider qualitative reasons for discipline and termination and will not require employers to establish productivity standards if they choose not to do so.

Some commenters expressed concerns as to how the Department would determine whether a productivity standard is normal and accepted for the activity in the AIE. Wafla opposed the proposal, stating that the proposed guidelines for establishing productivity standards were unclear. Other commenters, including Titan Farms, LLC and NHC, characterized as problematic the requirement that productivity standards be frozen at the time an employer first used the program, stating that technological advancements have increased worker efficiency levels. While Farmworker Justice supported the proposal, they suggested that SWAs request documentation to substantiate the appropriateness of qualifications to ensure they do not approve arbitrary and inappropriate productivity standards.

This final rule adopts the language as proposed. After evaluating all comments, the Department continues to believe that the productivity standards that will be used as a basis for job retention are a core term and working condition that must be disclosed to workers in the job offer, regardless of whether those workers are paid on a piece-rate or hourly basis. Workers must know, before accepting a job, the criteria for which they may be later terminated, including any applicable productivity standards. As discussed further below and in the preamble corresponding with § 655.122(n), the employer may consider other applicable criteria for job retention, including an evaluation of work quality, but these criteria are not considered productivity standards. The Department also continues to believe that it is appropriate to require that productivity standards in the H–2A program not exceed the standards

normally required by other employers for the activity in the AIE when the employer first used the program (unless otherwise permitted by the OFLC Administrator, or if the standards reflect the standards the employer used in 1977, for employers that first used the program before 1977). This requirement will prevent productivity standards from constantly increasing arbitrarily, thus preventing potential unsafe working conditions and exclusion of U.S. workers from the agricultural workforce, while at the same time permitting reasonable adjustments by the OFLC Administrator when appropriate.

As described above, some opposition to this proposal resulted from a misunderstanding that employers would not be permitted to evaluate work quality for purposes of job retention and would be required to use productivity standards alone to address any performance issues. In § 655.122(n)(2) of this final rule, the Department clarifies language to state that a worker may be terminated for cause for a failure to satisfactorily perform job duties in accordance with the employer's reasonable expectations based on criteria described in the job offer. These criteria for evaluation may include a productivity standard, qualitative criteria, or both. Therefore, the Department clarifies that it will not require employers to use productivity standards to evaluate their workers if they do not choose to do so. However, any employer that uses a productivity standard to evaluate job performance must disclose that productivity standard in the job offer, pursuant to § 655.122(l)(3).

The Department stated in the preamble to the NPRM that, consistent with current guidance, productivity standards must be static, objective, and specifically quantify the expected output per worker. The NPRM further stated that vague standards, such as requiring workers to "perform work in a timely and proficient manner," "perform work at a sustained, vigorous pace," or "keep up with the crew" would not be acceptable productivity standards as they lack objectivity, quantification, and clarity, and would not be accepted as valid reasons for termination for cause.[42] In light of the changes to § 655.122(n)(2) in this final rule, specifically the allowance for consideration of qualitative criteria as a reason for termination for cause, the

Department believes that this statement requires further clarification. In this final rule, the Department maintains that productivity standards must be static, quantifiable, and specifically quantify the expected output per worker. Productivity standards must comply with § 655.122(l)(3) in this final rule, meaning they must be disclosed to the worker in the job offer and be no more than those required by the employer in 1977, unless the OFLC Administrator approves a higher minimum, or, if the employer first applied for temporary agricultural labor certification after 1977, no more than those normally required (at the time of the first *Application for Temporary Employment Certification*) by other employers for the activity in the AIE. As described above, qualitative criteria for evaluation are not productivity standards, as they are not quantifiable, and therefore will not fall within the scope of § 655.122(l)(3) in this final rule.

However, the Department will not permit the use of allegedly qualitative criteria for evaluation as a reason for termination for cause where they are exclusively a proxy for measures of quantitative output (*i.e.,* productivity standards) and, therefore, attempt to circumvent § 655.122(l)(3). For example, the standard "failure to keep up with the crew" exclusively measures quantitative output and thus would be an impermissible productivity standard because it is not static and does not quantify the expected output per worker. An employer using such a standard for evaluation would essentially be able to create different productivity standards at its discretion and without the knowledge of the worker, thus circumventing the purpose of § 655.122(l)(3). An employer wishing to evaluate the speed or quantity of work should disclose a productivity standard (or multiple productivity standards, if different standards apply to different crops or situations).

On the other hand, a genuinely qualitative or behavioral standard that incidentally affects productivity, such as a requirement that a worker know how to correctly use a tool or a prohibition on watching streaming video during work hours, would be permissible. While these standards may affect the speed and quantity of work performed (*e.g.,* a worker spending excessive time watching streaming video during work hours may harvest fewer apples than other workers), the underlying standard is not quantitative in nature and, therefore, would be acceptable. One anonymous employer identified that they often know "when a worker is working slower than the

---

[42] *See* 88 FR 63779; and OFLC, *Frequently Asked Questions, H–2A Temporary Agricultural Foreign Labor Certification Program, 2010 Final Rule, Round 9* (Oct. 30, 2015), *https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2A_FAQ_Round9.pdf.*

other workers[,] or when he is on his cell phone while others working beside him are working hard[,] or when he is deliberately obstructing the work of others.'' The first standard (''working slower than other workers'') would be an impermissible productivity standard, whereas rules or policies governing the other two standards (excessive use of a phone during work hours and obstructing the work of others) would be acceptable bases for discipline, including termination when appropriate, if all procedures in § 655.122(n) are followed.

The Department declines to allow employers to change productivity standards during the work contract period, as doing so would undermine the purpose of this provision. If an employer were to be permitted to modify the productivity standards at its discretion, workers would not have adequate notice of the productivity standards that they must meet. If an employer wishes to use productivity standards and believes that different productivity standards will be applicable in different situations (*e.g.,* fruit for fresh market versus fruit for juicing), the employer should disclose the applicable productivity standards in each of those situations.

The Department will continue to use its established procedures to determine whether productivity standards were normally required (at the time of the first *Application for Temporary Employment Certification*) by other employers for the activity in the AIE. The Department has previously defined ''normal'' as ''not unusual,'' and has clarified that ''normal'' in this context differs from prevailing. In other words, the Department does not require that a majority of employers in the AIE use the same productivity standard, only that the use of that productivity standard not be unusual. *See* 73 FR 77110, 77153–77154 (Dec. 18, 2008).

The Department significantly relies on SWAs' expertise in determining whether productivity standards are no more than those normally required (at the time of the first *Application for Temporary Employment Certification*) by other employers for the activity in the AIE. SWAs are familiar with the specific agricultural and labor conditions in their respective geographic areas and serve an essential role in reviewing job orders for sufficiency. *See* 87 FR at 61706–61707.

Consistent with § 655.122(b), SWAs or the Department may, at their discretion, request documentation from the employer to substantiate the appropriateness of any job qualification (including productivity standards). The Department has previously stated that this documentation may include the names of other employers that can verify the adequacy of the employer's requirement, information from the Cooperative Extension System, university personnel with expertise in agricultural sciences, or a prevailing practice survey. *See* 53 FR 22076, 22096–22097 (June 13, 1988). Although a prevailing practice survey may be used to demonstrate the appropriateness of a productivity standard, it is not required because productivity standards need only be normal, not prevailing. *See* 53 FR 22076, 22096.

Additionally, regardless of the year that the employer first applied for temporary agricultural labor certification (whether before or after 1977), the Department will consider requests for a higher minimum productivity standard upon receiving substantive written documentation showing that an increase is justified by technological, horticultural, or other labor-saving means. For example, the Department stated in the 2010 final rule that apple growers had been allowed to raise productivity standards to reflect the introduction of dwarf trees. *See* 53 FR 22076, 22083 (June 13, 1988) and 2010 H–2A Final Rule, 75 FR 6884, 6914.

#### d. Paragraph (l)(4); § 655.210(g)(4) Disclosure of Available Overtime Pay

The Department proposed to add a new paragraph at § 655.122(l) to explicitly clarify that the employer must specify in the job offer any available overtime premium wage rate(s) for overtime hours worked and the circumstances under which the wage rate(s) for such overtime hours would be paid. Under the Department's longstanding regulations, an H–2A employer must assure that it will comply with all applicable Federal, State, and local laws, including any applicable overtime laws, during the work contract period. *See* § 655.135(e). In addition, an H–2A employer must accurately disclose the actual, material terms and conditions of employment, including those related to wages, in the job order. *Id.* Sections 655.103(b), 655.121(a)(3), and 655.122(l).

Therefore, the Department proposed to revise the current wage disclosure requirements found at § 655.122(l) to expressly clarify in a new paragraph (4) that an employer must disclose in the job order any applicable overtime pay. Specifically, under proposed § 655.122(l)(4), whenever overtime pay is required by law or otherwise voluntarily offered by an employer, an employer would be required to disclose in the job order the availability of overtime hours, the wage rate to be paid for any overtime hours, and the circumstances under which overtime will be paid.[43] The proposed paragraph at § 655.122(l)(4)(iii) provided illustrative examples of circumstances that might apply, such as after how many hours in a day, week, or pay period the overtime premium wage rate will be paid, or if overtime premium wage rates will vary between worksites. However, an employer must accurately disclose the actual circumstances under which overtime would be paid. Similarly, the Department proposed to amend the pay disclosure requirements at § 655.210(g), governing the contents of job orders for herding and range livestock production occupations, to include a new paragraph (g)(3) that would require employers to disclose any available overtime pay, whether voluntarily offered by the employer or required by State or Federal law, and the details regarding such pay.

The Department largely received supportive comments regarding this proposal. Many of the comments, including those representing employers, employer associations, SWAs, State Attorneys General, U.S. Senators, U.S. House Members, and worker advocates, voiced support for the addition of this language to explicitly disclose to prospective workers the opportunity for overtime pay. One of these commenters, Marylanders for Food and Farmworker Protection, explained that ''[p]roviding workers with clear expectations promotes fairness and prevents exploitation.'' Another commenter, maʹsLabor, who voiced general support for this provision, acknowledged that workers need to know when overtime payment is applicable, and how much they may expect to be paid.

The Department also received some comments in opposition to this specific proposal, stating that overtime payment is already a required data element of the job orders and the new provision is generally unnecessary. The two prevailing sentiments in opposition were: (1) payment of piece rates complicate the employers' ability to properly disclose what overtime rate will be applicable; and (2) the lawful reason for applicable overtime payment is irrelevant to workers. Related to the former, wafla suggested that the proposal is administratively overburdensome and that, ''[t]he proposed language is problematic for employers because requiring some

---

[43] *See, e.g.,* Cal. Indus. Welfare Comm'n Order No. 14–2001 (as amended), Cal. Code Regs., tit. 8, § 11140.

actual calculation of the wage is impossible and not accurate particularly when considering piece rate.'' Wafla provided an alternative, more simplified example of required language: ''Overtime will be paid at 1.5 times the weekly regular rate of pay for any hours exceeding 40 hours.''

The New York State Farm Bureau explained, ''these piece rates vary due to factors often outside of farmers' control such as the weather, equipment, and type of commodity. This creates additional paperwork for farmers that are often hard to predict in order to include in a job order.'' Another complexity cited by the New York State Farm Bureau is due to a newly effectuated New York State law in which overtime for agricultural workers will be phased in over a period of 8 years, with a lowering threshold every other year.

Another commenter, ma´sLabor, did not object to the disclosure of overtime pay, if applicable, but opposed ''requir[ing] the employer to specify whether overtime is paid voluntarily by the employer or is required by law, and to cite the specific Federal, State, or local law requiring the payment of overtime pay.'' Ma´sLabor said ''[i]t is unclear why such disclosures are necessary, as the reason for overtime pay is completely irrelevant to prospective workers.'' Ma´sLabor also posited that explaining the legal requirements for applicable overtime pay would only serve to lengthen the job orders, confuse workers, and likely result in increased NOD findings from OFLC.

NCAE asserted that data compiled by the National Agricultural Worker Survey indicate that in jurisdictions where overtime pay is applicable, workers' net earnings have declined due to those overtime payment requirements.

With regard to the same proposal for the herding and range livestock production occupations, Colorado Legal Services submitted this comment, which was a copy of the letter it and other organizations previously submitted in response to the 2015 herder rulemaking NPRM and generally supported increased worker protections.

After consideration of all the comments received, the Department adopts the proposal and finalizes the new provisions at §§ 655.122(l)(4) and 655.210(g)(4) of this final rule. As discussed in the NPRM, the H–2A program does not mandate the payment of an overtime premium wage rate for hours worked exceeding a certain number in the day, week, or pay period. However, the FLSA's overtime

requirements, as well as various State and local laws that require overtime pay, apply independently of the H–2A program's wage requirements. Some H–2A workers and workers in corresponding employment may be entitled to overtime pay under one or more of these laws. Pursuant to these authorities, an H–2A employer already must disclose in the job order any available overtime pay, whether required under Federal, State, or local law, or otherwise voluntarily offered by the employer. As noted in the NPRM, despite these existing authorities, OFLC and WHD frequently encounter H–2A job orders that either omit disclosure of, or fail to accurately describe, applicable overtime pay. Accordingly, the Department believes these new provisions are necessary and will provide needed transparency to workers regarding the terms and conditions of the employer's job opportunity. Failure to clearly and fully disclose any available overtime pay in the job order harms prospective workers who may be more interested in the job opportunity if they are aware of the availability of overtime pay. Incomplete or nonexistent disclosures also hamper the Department's ability to effectively administer and enforce the H–2A program requirements.

The Department does not view this requirement as overly burdensome because the intent is to accurately disclose to the workers the availability of overtime pay, already a requirement under the existing regulations. However, the Department appreciates the opportunity to clarify that disclosure of the ''wage rate(s) to be paid'' under §§ 655.122(l)(ii) and 655.210(g)(4)(ii) may be in the form of a formula such as ''1.5 times the regular rate of pay'' and is not required to be a specific dollar amount. Of course, where the specific dollar amount of the premium rate is known, the employer is free to disclose this. For example, the Department agrees with wafla's comment suggesting that language such as ''[o]vertime will be paid at 1.5 times the weekly regular rate of pay for any hours exceeding 40 hours'' should be sufficient to satisfy the requirements of the §§ 655.122(l)(4)(i) through (iii) and 655.210(g)(4)(i) through (iii), as long as the language accurately describes the employer policy or the local, State, or Federal standard applicable.

Where the offer of overtime is pursuant to a Federal, State, or local law, the employer must explicitly disclose that as well, under §§ 655.122(l)(4)(iv) and 655.210(g)(4)(iv), for example by adding ''according to the Fair Labor Standards

Act'' or ''as required under California Industrial Welfare Commission Order 14–2001.'' Lastly, as it is the employer's responsibility to be aware of all laws to which it is subject, the employer should not incur an undue burden by disclosing what the law requires of it, or that it plans to voluntarily make overtime pay available to the worker.

Further, the comment suggesting that the net earnings of the worker are decreased by the requirement to pay overtime when required by law is not relevant to the Department's proposal adopted here. This final rule does not newly mandate the payment of overtime pay, but rather furthers the Department's intent to increase transparency by requiring the disclosure of available overtime pay when otherwise required by law or voluntarily offered by the employer.

As noted in the NPRM, this provision will align the Department's administration of the H–2A and H–2B programs more closely. The disclosures required under §§ 655.122(l)(4) and 655.210(g)(4) in this final rule are similar to the overtime disclosure requirement under the H–2B program regulations at 20 CFR 655.18(b)(6).[44]

Finally, the NPRM also proposed corresponding amendments to Form ETA–790A and Form ETA–9142A to include dedicated spaces for disclosure of any applicable overtime pay. The Department believes these revisions will improve the consistency and accuracy of disclosures of available overtime pay, thereby providing greater notice to prospective workers of the actual terms and conditions of the job opportunity and improving the Department's enforcement of any applicable overtime pay requirements.

e. Paragraph (n) Termination for Cause or Abandonment of Employment

The NPRM proposed to revise § 655.122(n) to define termination for cause. The Department stated that this revision was necessary because a worker who is terminated for cause no longer is entitled to the three-fourths guarantee (including meals and housing until the worker departs for other H–2A employment or to the place outside the United States from which the worker came (§ 655.122(i)); outbound transportation (§ 655.122(h)(2)); and, if a U.S. worker, to be contacted for work in

---

[44] See WHD Field Assistance Bulletin 2021–3, Overtime Obligations Pursuant to the H–2B Visa Program (Dec. 7, 2021), https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/fab_2021_3.pdf; Form ETA–9142B, H–2B Application for Temporary Employment Certification, Sec. F(b), https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/Form-ETA-9142B-1205-0509.pdf.

the next year (§ 655.153), each of which is an important protection that safeguards workers in the United States against adverse effect from the hiring of H–2A workers and ensures that H–2A workers are employed only when there are not sufficient able, willing, and qualified workers in the United States available to perform the work. Specifically, the NPRM proposed the creation of a new paragraph (n)(2) stating that a worker would be terminated for cause when the employer terminates the worker for failure to meet productivity standards or failure to comply with employer policies or rules. Further, the NPRM proposed that a worker would be terminated for cause only if six straightforward conditions—listed in in proposed paragraphs (n)(2)(i)(A) through (F)—were satisfied: the employee had been informed (in a language understood by the worker) of the policy, rule, or productivity standard, or reasonably should have known of the policy, rule, or productivity standard; if the termination is for failure to meet a productivity standard, such standard was disclosed on the job offer; compliance with the policy, rule, or productivity standard was within the worker's control; the policy, rule, or productivity standard was reasonable and applied consistently; the employer undertook a fair and objective investigation into the job performance or misconduct; and the employer engaged in progressive discipline to correct the worker's performance or behavior.

In 20 CFR 655.122(n)(2)(ii), the NPRM proposed to define progressive discipline as a system of graduated and reasonable responses to an employee's failure to meet productivity standards or failure to comply with employer policies or rules. The NPRM also clarified that disciplinary measures should be proportional to the failure but may increase in severity if the failure is repeated, and may include immediate termination for egregious misconduct. This paragraph further stated that, following each disciplinary measure, except where the appropriate disciplinary measure is termination, the employer must provide relevant and adequate instruction to the worker; must afford the worker reasonable time to correct the behavior or to meet the productivity standard following such instruction; and must clearly communicate to the worker that a disciplinary measure has been imposed.

In 20 CFR 655.122(n)(2)(iii), the NPRM proposed that termination for cause would not exist where the termination is contrary to a Federal, State, or local law; is for an employee's

refusal to work under conditions that the employee reasonably believes will expose them or other employees to an unreasonable health or safety risk; is because of discrimination on the basis of race, color, national origin, age, sex (including sexual orientation or gender identity), religion, disability, or citizenship; or, where applicable, where the employer failed to comply with its obligations under § 655.135(m)(4) to permit workers to designate a representative to attend a meeting that contributed to the termination.

In 20 CFR 655.122(n)(2)(iv), the NPRM proposed that an employer would bear the burden of demonstrating that any termination for cause meets the requirements of paragraph (n)(2). The NPRM proposed to redesignate language in current § 655.122(n) as a new paragraph (n)(3). Proposed paragraph (n)(4) listed the recordkeeping obligations associated with any termination for cause, including recordkeeping obligations in current § 655.122(n) related to notification to the NPC and DHS, and new recordkeeping obligations if a worker were to be terminated for cause.

The Department received a significant number of comments both in support and in opposition to the proposal. After reviewing comments, this final rule adopts the proposal with modifications, discussed below. This section will first discuss general comments and responses, and then will go into greater detail about comments relating to specific language in the proposed regulations.

### General Comments and Responses

Worker rights advocacy organizations, unions, commenters affiliated with academic institutions, workers, State labor and employment agencies, State Attorneys General representing 14 States, and some Members of Congress and individuals supported the proposal. An individual commented that this proposal would provide workers with an important safeguard against arbitrariness and injustice in the workplace, and another stated that the proposal would protect workers from being fired on a whim and would protect the livelihood of agricultural workers. Farmworker Justice stated that the proposal would make clear that arbitrary terminations, and terminations with no reasons given, are not for cause. Many of these commenters, including Farmworker Justice, the UFW Foundation, and a worker, echoed the Department's reasoning that clarification was necessary because of the serious consequences associated with a termination for cause, including

that a worker terminated for cause is no longer entitled to payment for outbound transportation (including meals and housing until the worker departs for other H–2A employment or to the place outside the United States from which the worker came) under § 655.122(h)(2); the three-fourths guarantee under § 655.122(i); and, if the worker is a U.S. worker, the right to be contacted for employment in the subsequent year as required by § 655.153. Commenters also identified that there were additional consequences associated with unjust termination. Farmworker Justice said that workers accepting an H–2A job often invest substantial resources in that job, including travel expenses and illegal recruitment fees, which are lost investments if the worker is terminated, and workers may lose access to other job opportunities. Farmworker Justice also stated that unjustly terminated U.S. workers may struggle to obtain unemployment benefits and find a subsequent job. The California LWDA also said that terminated workers may lose access to employer-provided housing. Many commenters, including 15 U.S. Senators and 11 State Attorneys General, also stated that a clear definition of termination for cause may encourage workers to exercise their rights because pretextual terminations would become more apparent.

Conversely, employers, farm bureaus, agricultural associations, the Wyoming Department of Agriculture, employer representatives, State Attorneys General representing 22 States, one Senator, and some U.S. House Members and individuals opposed the proposed regulation. Many of these commenters, including AILA and Georgia Farm Bureau, questioned the Department's reasoning, stating that the Department only cited a few real-life examples of this issue that were insufficient to demonstrate that the problem warranted a regulatory change. Other commenters, including the New York and California Farm Bureaus, emphasized that workers are a valuable part of an employer's operations and that most employers terminate workers rarely, and only after careful consideration. Titan Farms, LLC stated that they have a 95-percent return rate of workers each year and Northern Family Farms, LLP stated they have a 98-percent return rate of workers each year and a waitlist of potential workers seeking work on their farm. Some commenters stated that, in their view, the proposal implied that most users of the H–2A program were seeking to evade regulatory obligations.

The Department recognizes that most employers using the H–2A program seek to comply with regulatory requirements

and treat their workers with dignity and respect. Employers invest significant resources in workers and most do not make termination decisions lightly. Further, the Department believes that many employers, prior to the publication of the NPRM, already operate under procedures that largely meet the standards finalized in this rule. Most of the criteria described in proposed § 655.122(n)(2) are common-sense criteria (e.g., the worker knows the rule, the rule is reasonable, and compliance is within the worker's control) that many workplaces have already implemented to protect against liability under other laws (e.g., anti-discrimination laws, anti-retaliation laws, and unemployment insurance laws), or simply to be fair and equitable in the workplace. Other criteria, such as the requirement that the employer engage in progressive discipline before terminating workers, ensure that workers are not terminated for minor, isolated infractions. Employers who terminate or discipline only after thoughtful consideration to ensure a fair and equitable process will be minimally affected by the final rule.

Furthermore, the Department did not intend to suggest that most employers are seeking to evade program obligations. However, through its enforcement efforts, WHD regularly finds such conduct from employers. Sometimes WHD finds terminations that are predicated on unreasonable grounds. In a recent example, an H–2A worker was terminated for seeing a doctor after being instructed to do so by a crew leader. Other times, WHD finds that rules are created for the purpose of terminating a worker. For example, WHD found that an employer terminated a corresponding worker for allegedly stealing a can of soda from the employer's truck after the worker had been informed that the soda was theirs to take. Sometimes the reason for termination is simply pretext. In this same example, the termination of the corresponding worker occurred on the same day that an H–2A worker arrived, and the investigation determined that the employer was searching for an excuse to terminate the corresponding worker and replace them with the H–2A worker.

Other times, WHD finds that employers inconsistently enforce rules and neglect to notify workers of minor transgressions that will ultimately result in termination. For example, an employer terminated six corresponding workers and provided most with no reason for their termination, but then presented WHD with evolving reasons, including an entire crew allegedly not

performing well after weeks of training and workers taking unauthorized breaks. After settling on tardiness as the reason for termination, the employer could not provide any evidence of the tardiness, and the workers themselves did not recall that the employer counseled them for tardiness or informed them that tardiness was the reason for their termination. Although the employer eventually provided timecards documenting some tardiness, other workers similarly were tardy and were not terminated, suggesting that the reason for termination was pretextual.

Sometimes WHD finds that employers simply tell workers they are no longer needed for the season, or stop providing work so that the workers grow desperate and leave allegedly of their own volition (even though such a circumstance constitutes constructive discharge). Other times, employers may try to disguise the termination as job abandonment. On more than one occasion, WHD has found that employers have required workers to sign "voluntary" resignation forms when, in fact, the workers were terminated.

One commenter, the UFW Foundation, also provided examples of unjust terminations and discipline. For example, a Washington farmworker described that she and her husband were both terminated for "abandoning [their] work" after the supervisor told them to go home for a few hours, and a Georgia farmworker stated that her employer arbitrarily and selectively used productivity standards against new H–2A workers, inspecting the work of new H–2A workers and finding "bad grapes" to justify nonpayment of wages. The UFW Foundation also provided numerous examples of workers who were terminated because they asserted their rights. These types of schemes to evade program responsibilities are sufficiently common that the Department continues to believe that adoption of the proposal, with the modifications explained below, is warranted.

Many commenters, including the U.S. Chamber of Commerce, NCFC, and Willoway Nurseries, stated that the proposal would be too complex and burdensome to implement, particularly for small farms. Many of these commenters stated that the proposed regulations would require employers to maintain a large human resources (HR) team and contract with employment law attorneys to ensure compliance, thus increasing costs for growers. Wafla estimated that a small employer would need at least 80 hours to develop, train staff, and implement policies to comply with the proposal.

Commenters opposed the proposal for a variety of other reasons. NCFC, AmericanHort, Willoway Nurseries, Michigan Farm Bureau, and FSGA stated that the proposal was unworkable even for larger growers because corrections and instructions occur on the fly in the orchard or field. They asked if instructing someone on how to do their job was a disciplinary action or training.

U.S. Custom Harvesters, Inc. stated that the proposal was particularly difficult for custom harvesting operators because workers in that industry are often working without supervision in various locations. Some commenters, including USA Farmers, FFVA, and Seso, Inc., said that the parameters for termination were vague and subjective and would leave employers unsure as to whether they had complied with the proposed rule. Ma´sLabor, USA Farmers, McCorkle Nurseries, Inc., and an individual questioned whether the Department had exceeded its statutory authority. Wafla stated that employers need the right to terminate workers if they are not a good fit with the work culture and environment. NCFC, FFVA, AmericanHort, Willoway Nurseries, Michigan Farm Bureau, and FSGA stated that the regulation would chill an employer's ability to terminate so-called "toxic employees" and thus could expose employers to allegations of a hostile work environment. Ma´sLabor and an individual stated that the proposal stripped an employer of discretion on matters of worker misconduct. These commenters further provided the example of a worker who was openly insubordinate and obscene in the workplace, and they suggested that the employer would be required to coach the worker on how not to be insubordinate and obscene and only take further action if the behavior continued. Ma´sLabor characterized the proposal as a "get out of jail free" card. USA Farmers stated that the proposal would override American common law traditions of at-will employment, and the Cato Institute similarly stated that the proposal would terminate at-will employment on H–2A farms.

First, the Department seeks to clarify a possible misunderstanding about employers' current obligations to H–2A and corresponding workers. The Department has long maintained that regulating the employment decisions made by an employer using the H–2A program is necessary to achieve statutory objectives—specifically, to ensure that H–2A workers are employed only when there are insufficient qualified, able, and available U.S. workers to complete the work, and to

ensure that the employment of H–2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed, *see* 8 U.S.C. 1188(a)(1)—and has a long history of regulating in this space. For example, the job opportunity must remain open to U.S. workers until 50 percent of the work contract has elapsed (20 CFR 655.135(d)); U.S. applicants can be rejected only for lawful, job-related reasons (20 CFR 655.135(c)(3)); and the employer may not lay off a similarly employed U.S. worker unless all H–2A workers are laid off first (and even then only for lawful, job-related reasons) (20 CFR 655.135(g)). Under both the regulations currently in effect and those adopted in this final rule, an H–2A worker or corresponding worker terminated without cause is entitled to the three-fourths guarantee (and other rights as well). These long-established obligations mean DOL has always required employers to comply with certain requirements relating to hiring and terminating workers while using the H–2A program. The regulations adopted in this final rule continue in this same vein.

Second, many aspects of this proposal are not new and many employers likely already have developed policies for compliance. Since the inception of the H–2A program, and in the H–2 program before that, the Department has been required to make determinations as to what constitutes a for-cause termination.[45] While there have not previously been regulatory factors outlining the requirements for a for-cause termination, the Department previously stated in *Field Assistance Bulletin 2012–1* that "it is important to inquire into the circumstances surrounding the termination of the worker's employment . . . because of the potential for the employer to mischaracterize termination for cause, the underlying facts of any such assertion should be explored through interviews and any other relevant documentation that can be obtained."[46]

Historically, when determining whether a worker has been terminated for cause, the Department has reviewed

all relevant factors, including, for example, the reasonableness of the rule, consistent application of a rule among employees, and whether the employer fairly reviewed the misconduct or job performance. The Department similarly reviews all facts of the case when investigating allegations of retaliatory termination or improper discharge of U.S. workers in the H–2A program, as well as alleged violations of other laws that the Department enforces (*e.g.,* if a worker is terminated for taking leave to which they are entitled under the Family and Medical Leave Act).

In the examples listed earlier in this section, WHD cited violations, computed back wages, and assessed civil money penalties because workers were terminated not-for-cause and the employer failed to provide the required remedies. Factors that alerted WHD that the terminations were not-for-cause included items such as the reasonableness of the termination (*e.g.,* an employer tells a worker to see a doctor and then terminates them for doing so, or a worker was specifically informed that he could take a soda and then terminated for doing so), and consistent application among employees (*e.g.,* all workers are late, but only some were terminated for lateness). In these enforcement efforts, WHD applied the Department's understanding of what criteria signify termination-not-for-cause, and in the final rule, the Department codifies many of these criteria in regulation. Codifying these criteria will aid WHD's enforcement efforts and will allow employers to more fully understand the scope of their obligations and to better manage their workplaces.

These criteria are not unique to laws that WHD enforces. Similar, albeit not identical, criteria exist in other laws as well. State unemployment compensation laws, which should be familiar to most employers, generally define eligible recipients as having separated from work through no fault of their own (among other criteria).[47] Therefore, an employer challenging an unemployment claim is accustomed to showing that, for example, a worker was terminated because of willful misconduct, as opposed to a termination that was no fault of the worker. Many State laws deny unemployment benefits to workers discharged because they were in "knowing violation of a

reasonable and uniformly enforced rule,"[48] and, in interpreting their own laws, State courts may review factors such as whether a rule or policy was consistently enforced, whether the worker knew or should have known about the policy or rule, and whether the rule was reasonable. See, *e.g., Coahoma Cty.* v. *Miss. Emp. Sec. Comm'n,* 761 So. 2d 846, 849–50 (Miss. 2000) (finding that a worker was not engaged in misconduct because the rule was not fair and consistently enforced); *Rios Moreno* v. *Ariz. Dep't of Econ. Sec.,* 873 P.2d 703, 705 (Ariz. Ct. App. 1994) (finding that the worker was not engaged in misconduct because there was no evidence that he should have known of the rule he was claimed to have violated); *Caterpillar, Inc.* v. *Unemployment Comp. Bd. of Rev.,* 703 A.2d 452, 456–57 (Pa. 1997) (finding that a violation of a rule cannot be considered willful misconduct if the rule was applied in an unreasonable manner). There are significant parallels between unemployment insurance laws and the H–2A termination for cause provision. Under both, the employer may terminate workers for any lawful reason, but may have financial or other obligations to workers who are terminated for reasons outside of the worker's control, whether not-for-cause (under H–2A), or through no fault of the worker (under unemployment insurance laws). Additionally, in the context of Federal and State anti-retaliation and anti-discrimination protections, courts routinely cite inconsistent or disparate discipline as evidence of pretext for an unlawful termination. *See, e.g., Chattman* v. *Toho Tenax Am., Inc.,* 686 F.3d 339, 348–49 (6th Cir. 2012); *Gordon* v. *United Airlines, Inc.,* 246 F.3d 878, 8992–93 (7th Cir. 2001); *Graham* v. *Long Island R.R.,* 230 F.3d 34, 43 (2d Cir. 2000).

The Department acknowledges that some aspects of this final rule as adopted—specifically, the requirements that an employer engage in progressive discipline and maintain particular records (§ 655.122(n)(2)(i)(E) and (n)(4)(ii)–(iii))—may require some employers to develop new procedures for compliance. However, the Department believes that these aspects of the proposal complement the other provisions to ensure that any for-cause termination is sufficiently warranted by the disciplinary circumstances and that a record of those circumstances exists.

As explained in the NPRM, progressive discipline ensures that

---

[45] *See, e.g.,* Final Rule, *Temporary Employment of Alien Agricultural and Logging Workers in the United States,* 43 FR 10306, 10315 (Mar. 10, 1978) (1978 Final Rule) (employer need not pay outbound transportation for workers terminated for cause); 1987 H–2A IFR, 52 FR 20496, 20501, 20515 (where a worker is terminated for cause, the worker is not entitled to the three-fourths guarantee and the employer need not pay outbound transportation).

[46] WHD, Field Assistance Bulletin No. 2012–1, H–2A "Abandonment or Termination for Cause" Enforcement of 20 CFR 655. 122(n) (Feb. 28, 2012), *https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/fab2012_1.pdf.*

[47] *See* ETA, *Unemployment Insurance Fact Sheet, https://oui.doleta.gov/unemploy/docs/factsheet/UI_Program_FactSheet.pdf* (last accessed Feb. 8, 2024); ETA, *The Comparison of State Unemployment Insurance Laws* (2023), *https://oui.doleta.gov/unemploy/pdf/uilawcompar/2023/complete.pdf* (last accessed April 4, 2024).

[48] *See, e.g.,* Conn. Gen. Stat. Ann. § 31–236(a)(16)(B) (2022); Iowa Code § 96.5(2)(d)(2) (2023); Mass. Gen. Laws ch. 151A § 25(e) (2018).

workers are not harshly punished for minor, first-time infractions and reinforces the conditions for termination found in § 655.122(n)(2)(i), specifically that rules, policies, and productivity standards are communicated to the workers and are reasonable. *See* 88 FR 63783. A for-cause termination nullifies a worker's entitlement to important protections (§§ 655.122(h)(2), 655.122(i), and 655.153) that serve the statutory purpose of preventing adverse effect on the wages and working conditions of similarly employed workers in the United States, and ensuring that an employer only hires H–2A workers when there are insufficient able, willing, and qualified workers in the United States.[49]

The Department therefore has a responsibility pursuant to 8 U.S.C. 1188(a)(1) to ensure that an employer is relieved of these obligations only in situations where the employer has sufficient justification to terminate a worker for cause. The protections afforded by §§ 655.122(h)(2) (outbound transportation), 655.122(i) (three-fourths guarantee, including meals and housing until the worker departs for other H–2A employment or to the place outside the United States from which the worker came), and 655.153 (the right of a U.S. worker to be contacted for work in the next year) lose all meaning if any infraction or failure to meet performance standards, no matter how minor or occasional, results in the loss of those protections. A progressive discipline process applied in a rational and consistent manner to all employees with similar infractions ensures that consequences are commensurate with the severity of the infraction and that the most serious consequences (*i.e.,* termination) are reserved for the most serious offenses. However, a progressive discipline process also acknowledges that frequent minor infractions may compound the severity of misconduct and provides employers with the tools to manage their workforce, up to and including termination for a frequent violator of a relatively non-serious rule (*e.g.,* arriving late for work) if all the proposed criteria for for-cause termination have been met.

In response to criticisms both that the proposal was too complex and too vague, the Department recognizes that

the complexity of administrative and management procedures will vary among employers. Procedures developed by a small family farm with two employees will look very different than those developed by a corporation with thousands of workers. Owing to these differences, as well as to the unique circumstances in different regions and industries, the Department opts to maintain flexibility in the regulations for employers to develop their own progressive discipline system and maintain supporting records. While many commenters interpreted this flexibility as being too vague, the Department continues to believe that this flexibility allows employers to develop and implement the systems that work best for their businesses. A progressive discipline system need not be overly complex to comply with the Department's definition. In its enforcement, the Department will accept progressive discipline and recordkeeping systems as compliant so long as they conform with the regulatory requirements described in § 655.122(n)(2)(ii) and 655.122(n)(4). Similarly, the Department declines to identify certain behaviors as being worthy of termination or not as it believes that the circumstances surrounding these behaviors is crucial to determine the appropriate action and this final rule provides the employer with the appropriate framework to make these determinations, including by allowing for immediate termination for egregious misconduct, discussed in greater detail below.

The Department disagrees with commenters who stated that the proposal, and particularly progressive discipline, is inappropriate for use in agricultural settings or by small growers. Use of progressive discipline, and maintenance of the associated records, permeates the employment landscape in the United States, including in agricultural industries. Some organizations supporting the agricultural industry writ large or specific agricultural sectors provide resources and guidance to assist agricultural employers to implement progressive discipline systems that may be adaptable to H–2A program requirements. Some employers already disclose progressive discipline policies in their job orders [50] and one

anonymous employer commented that they already had a progressive discipline system. Similarly, a Departmental ALJ has previously held an employer liable for the three-fourths guarantee and transportation costs after finding that the employer terminated a worker without following the progressive discipline process that it disclosed in the job order.[51]

Some commenters characterized the recordkeeping provisions (especially pertaining to records of discipline that do not ultimately result in termination) as a significant portion of the perceived burden of the progressive discipline system. The Department emphasizes that recordkeeping need not be complex or take any particular format (although it should be understandable to the worker and to outside parties, such as WHD investigators). Therefore, the Department will accept recordkeeping in any format (*e.g.,* handwritten notes, computer spreadsheet, notation in worker file), so long as the content complies with the regulations. That is, the records must document each infraction and step of progressive discipline, any evidence the worker presented in their defense, any investigation related to the discipline, and any subsequent instruction afforded the worker, in compliance with § 655.122(n)(4)(ii). Additionally, the employer must provide a copy of this documentation (except for a record of any investigation related to the discipline) to the worker in a language understood by the worker within 1 week of the implementation of the disciplinary measure, in compliance with § 655.122(n)(4)(i)(E).

These records form an important part of the progressive discipline process; without the records, the employer would be unable to show the record of misconduct or failure to comply with

---

[49] *See* the NPRM for a more extensive analysis as to how the protections afforded by § 655.122(h)(2), § 655.122(i), and § 655.153 protect against adverse effect to the wages and working conditions of similarly employed workers in the United States and ensure that H–2A workers are only hired if there are insufficient workers who are able, willing, qualified, and available to do the work. *See* 88 FR 63781.

[50] See, *e.g.,* H–300–23035–750680: "Violation of these rules will be disciplined as follows First offense: Oral warning and correction. Second offense: Written warning and unpaid leave for balance of day. Third/Final Offense: immediate job termination." H–300–22333–610058: "The employer generally uses a 3-step disciplinary process: (1) verbal warning for first violation; (2)

written warning for second violation; and (3) termination upon third violation. Certain violations are so severe that they may result in termination without prior warning."

[51] *See In re John Peroulis & Sons Sheep, Inc.,* ARB Case No. 2013–0083, 2015 WL 4071576 (June 15, 2015), at *2, n. 5 (quoting the work contract as disclosing that "[t]ermination may be carried out by the employer but only after *two written warnings* (not necessarily for the same offense). The warnings will be written in a language understandable to the worker and the worker will be given an opportunity to sign the warning. Termination may be carried out without first having issued any warning if the employee's offense is of a severe or emergency nature such as a threat to the life, safety and/or health of the worker, livestock, or others; or, is the intentional destruction of property.") *See also In re John Peroulis & Sons Sheep, Inc.,* ALJ Case No. 2012–TAE–00006 (ALJ Mar. 19, 2013) (Order on Cross-Motions for Summary Decision); (ALJ June 27, 2013) (Decision and Order); re-issued on different grounds after remand (ALJ May 24, 2017) (Order on Remand).

performance expectations that ultimately resulted in the termination. While the Department recognizes many employers will be required to maintain disciplinary records even when workers are not terminated, these records are relevant for two reasons: (1) in case the misconduct or failure to meet performance standards eventually rises to the level or the frequency at which termination is necessary; and (2), to show consistent application of disciplinary procedures amongst the employer's agricultural workforce. These records may also provide the employer with exculpatory evidence if under investigation for illegally terminating a U.S. worker in violation of § 655.135(g), retaliating against a worker for engaging in a protected right in violation of § 655.135(h), or engaging in discriminatory behavior in violation of Federal or State anti-discrimination laws.

Comments on Specific Provisions

The paragraphs below describe and discuss the comments on specific provisions. In the NPRM, the Department did not propose substantive changes to language in § 655.122(n)(1) (which outlines the process for notifying authorities about the abandonment or termination for cause of a worker and the obligations of which the employer is relieved upon proper notification), but received one comment, and ultimately does not adopt changes to that paragraph in this final rule. The NPRM proposed in § 655.122(n)(2) to define termination for cause, establish six conditions to be satisfied in order for a termination for cause to exist, list reasons for termination that would not constitute termination for cause, and require the employer to bear the burden of demonstrating that any termination for cause meets these requirements. The Department received comments on these provisions, and this final rule clarifies the definition of termination for cause; finalizes five conditions, not six, that must be satisfied in order for a termination for cause to exist; clarifies among whom a policy, rule, or performance expectation must be consistently applied; adds a definition of egregious misconduct; lists additional reasons for termination that would not constitute termination for cause; and makes other minor edits as described in more detail below. The NPRM did not propose substantive changes to language in § 655.122(n)(3) (regarding when job abandonment begins), received one comment, and does not adopt changes in this final rule. The NPRM proposed some changes to recordkeeping obligations in § 655.122(n)(4) and received comments, and this final rule adopts the proposed language with a minor clarification.

Consequences for a Worker Terminated for Cause or Who Voluntarily Abandons Employment, § 655.122(n)(1)

The NPRM did not propose substantive changes to the language in this paragraph, which outlines the consequences for a worker who is terminated for cause or voluntarily abandons employment—namely, loss of access to the three-fourths guarantee; payment for outbound transportation; and, if a U.S. worker, the right to be called back for work the next year. Farmworker Justice suggested that the provision be expanded to require employers to "call-back" any H–2A workers who were not terminated for cause for the next year's contract. The Department declines to make this change as it did not propose any such revisions in the NPRM.

Definition of Termination for Cause, § 655.122(n)(2)

As described earlier in this section, the NPRM proposed that a worker would be terminated for cause when the employer terminates the worker for failure to meet productivity standards or for failure to comply with employer policies or rules. This final rule adopts the proposed regulation with modifications. Specifically, in this final rule, the Department removes the specific reference to "productivity standards" and defines termination for cause as occurring when the employer terminates the worker for failure to comply with employer policies or rules or satisfactorily perform job duties in accordance with reasonable expectations based on criteria described in the job offer.

Some commenters, including Northern Family Farms, LLP, McCorkle Nurseries, Inc., and NCAE, stated that the definition as proposed was too narrow because it did not allow for terminations for qualitative reasons. Commenters stated that qualitative evaluations are essential for an employer's ability to manage its workforce and hold workers to appropriate standards, and that growers producing fresh market produce (i.e., produce for sale in the grocery store) are likely to emphasize quality of work over quantity produced, which would be measured by a productivity standard. Ma´sLabor stated that the NPRM was ambiguous as to whether a failure to comply with employer policies or rules would allow for qualitative criteria.

The Department agrees with commenters that an employer's ability to manage their workforce by assessing work quality is essential. Not all work is quantifiable and, even when quantifiable, the quality of work performed may be of equal or greater importance than the speed at which it is performed. For example, a worker who harvests peaches such that every peach is bruised may not be performing up to the employer's standards, even if meeting outlined productivity standards. In the NPRM, the Department intended the term "employer policies and procedures" to include qualitative criteria for evaluation. However, commenters stated that the proposed regulatory language was unclear on this point. As such, the Department modifies the proposal to explicitly include qualitative criteria for evaluation, as explained more fully below. Ma´sLabor also stated that it was reasonable for the Department to require employers to articulate in the job offer the standards by which workers are measured, including the level of skill and care exhibited in the performance of duties (e.g., performing duties in a careful manner that protects the marketability of the crop). The Department agrees and has incorporated the agent's feedback into this final rule as described below.

The Department modifies the definition to allow for termination for cause if a worker fails to "satisfactorily perform job duties in accordance with reasonable expectations based on criteria listed in the job offer." The Department intends for the term "criteria" to be broad and encompass the components of a job offer, including job qualifications and requirements as described in § 655.122(b), and job duties. If terminating a worker for failure to satisfactorily perform job duties, the employer must be able to identify the specific criteria described in the job offer upon which they are basing the termination. If a job duty is not included in the job offer, failure to satisfactorily perform that job duty is not a valid reason for termination for cause. The Department includes the term "reasonable expectations" in the regulatory text to allow for some flexibility in applying broad or general criteria. The Department uses the same definition of "reasonable" as discussed in the preamble corresponding with proposed § 655.122(n)(2)(i)(D).[52]

After consideration of these comments, the Department removes the explicit reference to productivity standards in the adopted regulatory language. However, if an employer uses productivity standards to evaluate employees or as a condition of job

---

[52] Proposed § 655.122(n)(2)(i)(C).

retention or both, that employer would be required to describe this standard as one of the criteria in the job offer to comply with both this section and § 655.122(l)(3).

Ma´sLabor also suggested that the Department require that employers disclose behavioral attributes (such as not taking excessive breaks during productive hours, no loafing or recalcitrance, and an ability to maintain respectful and positive relations with supervisors and other workers) in the job offer when those attributes may serve as a basis for termination. The Department declines to make this change. The Department believes that such behavioral attributes better fit within the realm of policies and rules, and previously stated in the NPRM that policies and rules need not be disclosed in the job offer (although they must be clearly communicated to the workers). *See* 88 FR 63782. The Department continues to believe that it should not require all policies and procedures to be disclosed in the job offer, as policies and rules may be extensive and fill an entire sizable employee handbook. However, while the Department will not require it, an employer may include whatever policies and rules in the job offer that it deems appropriate, as long as they do not conflict with applicable law or regulation. As § 655.122(n)(2)(i)(A) requires that the worker be informed of the policy or rule, and § 655.122(n)(iv) states that the employer has the burden of showing that any termination for cause meets the requirements of paragraph (n)(2), inclusion of the policy or rule in the job offer will document to the Department's satisfaction that the worker was informed of the policy or rule, so long as the job offer was accurately communicated to the worker (usually via a copy of the work contract provided in compliance with § 655.122(q)). The Department notes that many job orders currently include policies and rules, such as policies pertaining to cell phone usage.

Conditions for Termination for Cause: Worker Knowledge, § 655.122(n)(2)(i)(A)

The first of these conditions is that the employee has been informed (in a language understood by the worker) of the policy, rule, or productivity standard, or reasonably should have known of the policy, rule, or productivity standard. The Department adopts the proposal with minor modifications for readability and conformance with changes to § 655.122(n)(2) as explained below.

There were no comments explicitly in opposition to this first criterion.

Farmworker Justice emphasized that this criterion is critical to any termination for cause provision and provided numerous suggestions as to how to strengthen this provision. These suggestions included requiring employers to inform workers in a variety of formats to ensure accessibility—including using images to communicate to workers with low literacy skills and large font size and easy-to-read fonts for workers with visual impairments—and they stated that workers need the opportunity to ask questions. Farmworker Justice also suggested that all policies and rules be individually provided in writing to the workers, that policies and rules not be permitted to be communicated solely in meetings or via posters, and that the employer has the burden to show that it has a policy and that any union received a copy of the policy. Farmworker Justice also urged the Department to interpret "reasonably should have known" narrowly and place the burden on the employer to show why a worker reasonably should have known about any rules or policies that were not explicitly communicated. The Department declines to make further changes to the regulation as it believes that this final rule addresses many of the commenter's concerns as discussed below.

The regulation as proposed and as finalized requires that the worker be informed (in a language understood by the worker), or reasonably should have known, of the policy, rule, or performance expectation. If an employer informs a worker of a policy or rule in such a way that the worker could not reasonably be expected to understand, the Department will not consider that worker to be informed of the policy or rule. The Department will review on a case-by-case basis whether the worker reasonably could be expected to understand the policy or rule in the way that it was communicated. The Department declines to require employers to provide all policies and rules in writing and individually to workers. The Department appreciates the commenter's concerns that information provided in meetings may be unclear and that workers may be reluctant to review posters and expects that many employers will provide many policies and rules in writing (*e.g.,* in an employee handbook or a list of rules). However, the Department believes that verbal notices, meetings, and posters may be effective avenues for employers to communicate important information to workers, and sometimes may be more effective than dissemination of a written

policy that the worker may not read. The Department will not consider a worker to be informed of a policy or rule if the communication occurs in a meeting where the worker is unable to hear or understand, or via a poster that workers are discouraged from reviewing or placed in a location that workers do not frequent. Additionally, the Department reminds employers that, in an investigation by the Department, WHD will confirm that the worker has been informed, or reasonably should have known, of the rule or policy—*i.e.,* the meeting or verbal notice occurred, the employer disseminated the written notification, or the employer posted the poster.

Additionally, the Department revises § 655.122(n)(2) to require that employers disclose in the job offer all criteria for evaluation, not just productivity standards. The work contract, which must be provided in writing no later than when an H–2A worker applies for the visa or the first day that a corresponding worker begins work, § 655.122(q), discloses the terms of the job offer and thus should include these criteria. The provision of this document while the H–2A worker remains in their home country allows them to review terms and conditions with trusted family, friends, or advisors. The Department believes that this will alleviate some of the commenter's concerns.

As stated in the preamble to the NPRM, if the employer does not explicitly communicate the policy or rule, the Department will review, in the event of a termination, on a case-by-case basis, whether a reasonable person would know that the policy or rule exists. For example, a reasonable person would know that conduct that is obviously illegal, such as unlawful sexual harassment or assault, can be a basis for discipline or termination. Similarly, a reasonable person would know that purposefully damaging the crop would be a basis for discipline or termination. *See* 88 FR 63782.

With respect to the suggestion that the regulation clarify that the employer has the burden of proof that it has informed workers of policies and rules, or that workers reasonably should have known of the policy or rule, § 655.122(n)(2)(iv), both in the NPRM and as adopted in this final rule, already communicates this. The Department declines to require an employer to provide any union with a copy of rules and policies as the Department believes that this would be a significant policy proposal warranting greater development and public feedback via the rulemaking process. However, a worker may share

documents related to their employment with whomever they wish, including unions, and an employer may not retaliate against a worker for having done so when such sharing constitutes protected activity under § 655.135(h) or is in furtherance of such protected activity. For example, if a worker seeks advice from a legal services provider or other representative regarding a proposed disciplinary action or deduction from wages, or consults with other workers regarding whether they are being paid the proper piece rate as required by the job order, such activity would be protected.

**Conditions for Termination for Cause: Compliance Is Within the Worker's Control, § 655.122(n)(2)(i)(B)** [53]

The Department proposed that the third criterion for termination for cause (second as adopted in this final rule) would require that compliance with the policy, rule, or productivity standard is within the worker's control. The Department adopts this proposal with a minor edit to change "productivity standard" to "performance expectations" to conform with edits to § 655.122(n)(2), and redesignates the paragraph as (n)(2)(i)(B).

No commenters explicitly opposed this criterion. Farmworker Justice asked the Department to provide additional details, examples, or both as to what would be evaluated to determine if compliance was within the worker's control. The Department will consider the following examples as illustrative of situations where compliance with a policy, rule, or performance standard may fall outside the worker's control: the appropriate tools or equipment are broken, faulty, or not provided; the crop is immature and not fully ready for harvest, but the worker is held to a productivity standard for a fully mature crop; workers are unable to meet productivity standards because of waiting time (*e.g.,* for fields to dry, or for the product to be weighed and measured); performance is evaluated on a per-crew basis instead of a per-worker basis, and a worker has no control over their coworkers' performances; and all residents of a housing unit are held responsible for housing policy violations committed by one worker. These examples are intended to be illustrative, not exhaustive.

Farmworker Justice also suggested that any disclosure of a productivity standard include a notice that workers with disabilities may request reasonable accommodation. The Department declines to make this change but will

make referrals to the Equal Opportunity Employment Commission as appropriate. Additionally, the Department notes that employers must comply with all applicable Federal, State, and local laws and regulations during the period of employment that is the subject of the *Application for Temporary Employment Certification.* 20 CFR 655.135(e).

**Conditions for Termination for Cause: Reasonableness and Consistent Application, § 655.122(n)(2)(i)(C)** [54]

The Department proposed that the fourth criterion (third as adopted in this final rule) would require that the policy, rule, or productivity standard is reasonable and applied consistently. This final rule adopts this proposal with minor edits to change "productivity" to "performance" to conform with edits to § 655.122(n)(2), to confirm that consistent application must occur amongst the employer's H–2A workers and workers in corresponding employment, and to redesignate the paragraph as § 655.122(n)(2)(i)(C).

Ma´sLabor stated that the term "applied consistently" left no room for consideration of degrees of severity in making termination decisions. Ma´sLabor stated that true congruency in employment decisions is impossible because the contributing factors are so varied. They suggested that the Department strike the term "applied consistently" and add qualifiers that expressly allow for discretion, such as degree of severity, whether the infraction is a first offense or a repeat violation, and whether termination considered other infractions or performance issues.

The Department believes that it is reasonable to require an employer to apply rules, policies, and performance standards (both qualitative and quantitative) consistently among its workforce. It is fundamentally unjust to hold some workers to a standard or rule with which other workers are not required to meet or comply. However, the consequences of failure to comply with rules or standards may vary depending on the employer's progressive discipline policy as required by § 655.122(n)(2)(ii). The Department believes that the language as adopted affords employers the flexibility to consider these additional qualifiers that ma´sLabor suggested, such as degree of severity and frequency of the offense, when determining the appropriate disciplinary measure. Two workers with equivalent disciplinary records who both are equally tardy, or who both have

equally failed to meet performance standards, should be subject to the same or equivalent discipline (or no discipline), depending on the employer's procedures. On the other hand, a worker who is 45 minutes tardy may face different consequences than a worker who is 3 minutes tardy. Similarly, as long as any disciplinary actions are undertaken as part of progressive discipline, a worker who is tardy every day may face different consequences than a worker who is tardy for the first time, and a worker with a legitimate excuse for tardiness may face different consequences than a worker without an excuse. In these examples, the employer has consistently enforced a rule (that workers should not be tardy) but is considering legitimate factors (such as severity of the violations, frequency of the infraction, and explanation from the worker) when determining appropriate disciplinary consequences. A progressive discipline system of the type that the Department proposed and adopts here, where discipline involves graduated and reasonable responses to worker misconduct or failure to meet performance standards and where disciplinary measures are proportional to the misconduct or failure but may increase in severity if the misconduct or failure is repeated, actually requires the employer to make determinations of the type the commenter suggested. The Department believes that this comment demonstrates the importance of a progressive discipline system as well as recordkeeping; an employer may impose a severe disciplinary measure after a relatively minor infraction because of a history of other offenses, but must be able to produce a record of those offenses.

AILA, ma´sLabor, wafla, and USA Farmers disagreed with the use of the term "reasonable," saying that the term is too subjective. Farmworker Justice supported the provision, but recommended that the Department define how a rule, policy, or standard is reasonable. Farmworker Justice also suggested that the Department define housing rules as being reasonable only when the purpose is to preserve the safety and health of the workers. The Department believes that the term "reasonable" is appropriate and sufficient in this provision and therefore declines to modify the regulation, and provides additional explanation in this section.

The Department will consider a policy, rule, or performance expectation to be reasonable where it clearly represents the employer's permissible interests, meaning that the rule has a

---

[53] Proposed § 655.122(n)(2)(i)(C).

[54] Proposed § 655.122(n)(2)(i)(D).

**33976**   **Federal Register** / Vol. 89, No. 83 / Monday, April 29, 2024 / Rules and Regulations

clear relationship to the employer's legitimate business needs. This definition is consistent with how some State courts have interpreted the term "reasonable" in the context of unemployment benefits. *See, e.g., Best Lock Corp.* v. *Review Bd. of Ind. Dep't of Emp. & Training Servs.,* 572 NE2.d 520 (Ind. Ct. App. 1991); *Snyder Indus., Inc.* v. *Otto,* 321 NW2d 77 (Neb. 1982). For example, the Department will not consider housing rules to be reasonable if they are unrelated to safety, health, legal, or other legitimate interests of the employer. Farmworker Justice stated that some workers have been terminated for "having too many cars at the labor camp"; the Department would not consider such a rule to be reasonable unless the employer can show that the number of cars at the labor camp affects the employer's legitimate interests.

An employer's interest will not be considered legitimate where it is contrary to Federal, State, or local law. For example, the Department will not consider rules to be reasonable if they unduly restrict workers' movement or communication in off-work time (*e.g.,* no cell phones permitted in the housing, or workers may only leave if escorted by a supervisor) or are discriminatory (*e.g.,* women—but not men—residing in housing must ensure that the residence is maintained in a clean and tidy manner). To be considered reasonable, it must also be possible to comply with a policy, rule, or performance expectation, meaning that a worker can feasibly follow the rule or policy, or meet the performance expectation, in the context of the specific circumstances. The Department will consider all facts of the situation when determining whether compliance with the rule, policy, or performance expectation is possible.

As stated earlier in this section, a requirement that rules and policies be reasonable and enforced consistently is not novel or unique to this final rule. Many State adjudicators examine the reasonableness and consistent enforcement of rules when determining when to award unemployment compensation, and selective enforcement of rules may also result in disparate treatment of similarly situated employees, thus indicating illegal discrimination. Even in the Department's H–2A enforcement, in the examples described earlier, lack of consistent application of rules or policies sometimes is used as evidence that the employer had terminated a worker not-for-cause. In other words, employers must already ensure that their rules are reasonable and consistently enforced.

Farmworker Justice encouraged the Department to codify in regulations that productivity standards must be static, quantifiable, and objective. The Department believes that clarification in the preamble is sufficient, and notes that productivity standards no longer appear in § 655.122(n) in this final rule (although they continue to appear in § 655.122(l)(3) and this topic is discussed further in the corresponding preamble). Some commenters, including IFPA, TIPA, GFVGA, NHC, Titan Farms, LLC, and an individual, commented that the term "applied consistently" was unclear in terms of the comparators (*i.e.,* among whom the rule should be consistently applied). Farmworker Justice suggested that the employer be required to show consistent applicability of a rule, policy, or standard across its corporate structure. This final rule clarifies that the rule, policy, or performance expectation must be applied consistently amongst the employer's H–2A workers and workers in corresponding employment. The Department believes that this is the appropriate class of comparators because these workers will be engaged in the same job duties at the same time. Policy and rule changes from year to year may occur, and therefore the Department does not think it necessary to require consistency over a longer period of time than that covered by an *Application for Temporary Employment Certification.* However, to the extent that workers do return year after year and encounter different policies, rules, and performance expectations, the employer should ensure the workers are aware of any changes to comply with § 655.122(n)(2)(i)(A). Where an employer has multiple *Applications for Temporary Employment Certification* and corresponding job orders covering different scopes of work at the same time, these groups of workers may be held to policies or performance expectations unique to the criteria listed in the job order (*e.g.,* a supervisor employed under one job order may be held to a different standard of conduct than a non-supervisor employed under a different job order, or a truck driver employed under one job order may be required to maintain a Commercial Driver's License whereas a harvester employed under a different job order may not). While the Department understands Farmworker Justice's desire for consistency in all levels of a corporate structure, such a requirement may require an employer to hold workers in very different positions to the same standard, potentially resulting in illogical outcomes and contradicting

the requirement found in § 655.122(n)(2) of this final rule that performance expectations be based on criteria listed in the job order.

Finally, Farmworker Justice stated that the employer should bear the burden of showing that policies, rules, and standards are applied consistently. The Department believes that this requirement is already incorporated in the regulations in § 655.122(n)(2)(iii), which provides that "the burden of demonstrating that any termination for cause meets the requirements" in § 655.122(n)(2) falls on the employer.

*Conditions for Termination for Cause: Fair and Objective Investigation, § 655.122(n)(2)(i)(D)* [55]

The Department proposed that the fifth criterion (fourth as adopted in this final rule) would require that the employer undertake a fair and objective investigation into the job performance or misconduct. In this final rule, the Department adopts the language as proposed but redesignates the paragraph as (n)(2)(i)(D).

Ma´sLabor stated that the terms "fair" and "objective" were unclear and subjective. Ma´sLabor requested that, absent a clear, unambiguous, and easily enforced and understood definition, this provision should be removed. Farmworker Justice supported the Department's proposal, but similarly requested clarification on what constituted a fair and objective investigation. The Department believes that these terms are clear given their common meanings and are often used in law without definition. *See, e.g., O'Rourke* v. *City of Lambertville,* 963 A.2d 339 (N.J. Super. Ct. App. Div. 2008); *Adamovich* v. *Pa. Dep't of Pub. Welfare,* 504 A.2d 952 (Pa. Commw. Ct. 1986). A fair and objective investigation means that an employer will evaluate the job performance or misconduct impartially and without favoritism, and that it will not assume that the worker engaged in misconduct or failed to meet performance expectations before reviewing relevant facts.

Farmworker Justice also requested that the Department require specific steps in a fair and objective investigation, including informing the worker of the process; giving written notice of the allegations; and providing the worker an opportunity to provide information in response. The Department declines to make this edit, as these steps are covered in this final rule at § 655.122(n)(2)(i)(E), which provides a definition of progressive discipline that includes components

---

[55] Proposed § 655.122(n)(2)(i)(E) in the NPRM.

such as, among other things, notification, instruction by the employer, and opportunity to correct conduct. Finally, Farmworker Justice suggested that any fair and objective investigation include a worker interview with a competent interpreter, if necessary. Farmworker Justice noted that sometimes a supervisor with a biased viewpoint serves as interpreter in investigatory interviews. The Department does not believe that a worker interview will always be a necessary component of a fair and objective investigation, and therefore declines to expressly incorporate this requirement into the regulation. However, the Department cautions employers that, if it determines a supervisor acted in bad faith when interpreting (*e.g.,* by deliberately mistranslating a worker's explanation to paint the supervisor in a better light), the Department may conclude that the employer did not conduct a fair and objective investigation. Additionally, this final rule requires an employer to permit any worker engaged in agriculture as defined and applied in 29 U.S.C. 203(f) to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action (*see* § 655.135(m)), and this representative may serve as an interpreter.

Conditions for Termination for Cause: Progressive Discipline, § 655.122(n)(2)(i)(E) [56]

The Department proposed that the sixth criterion (fifth in this final rule) would require that the employer correct the worker's performance or behavior using progressive discipline. Additionally, the Department proposed to define progressive discipline as a system of graduated and reasonable responses to an employee's failure to meet productivity standards or failure to comply with employer policies or rules. The Department further proposed that disciplinary measures should be proportional to the infraction, but may increase in severity if the infraction is repeated, and may include immediate termination for egregious misconduct.

The NPRM also proposed that, prior to each disciplinary measure, the employer must notify the worker of the infraction and allow the worker to present evidence in their defense. Following each disciplinary measure, except where the appropriate disciplinary measure is termination, the employer must provide relevant and adequate instruction to the worker and

afford the worker reasonable time to correct the behavior or meet the productivity standard following such instruction. The employer must document each disciplinary measure, the evidence the worker presented in their defense, and the resulting instruction, and must clearly communicate to the worker that a disciplinary measure has been imposed.

This final rule adopts this proposal with minor edits. Specifically, the Department edits "productivity standard" to "performance expectation" to conform with edits to § 655.122(n)(2), defines egregious misconduct in the regulation, clarifies that the infraction must be documented, and requires that the employer must provide a copy of documentation to the worker within one week of the disciplinary measure. Also, this final rule combines two separate paragraphs in the NPRM into one paragraph at § 655.122(n)(2)(i)(E). The Department received a substantial number of general comments, summarized above, both in support and in opposition to the inclusion of a progressive discipline condition. Comments on the regulatory language and specific components of a progressive discipline system are discussed in this section.

Farmworker Justice stated that an employer's progressive discipline policies should articulate steps with specific examples of proportionality regarding common rule violations, such as tardiness. Farmworker Justice also stated that the Department's regulations should require consideration of mitigating and extenuating circumstances and list out the types of egregious behavior that could lead to immediate termination and the mitigating factors that must be considered. The Department declines to incorporate additional requirements for an employer's progressive discipline system into the regulation. As previously mentioned, the Department opts to maintain flexibility in the regulations for employers to develop their own progressive discipline system that may include consideration of mitigating and aggravating factors and maintain supporting records. The Department believes that this flexibility protects workers while allowing employers to develop and implement the systems that work best for their businesses.

Farmworker Justice also suggested specific steps for a progressive discipline policy, including the requirements that an employer document each step in writing; prepare all documents contemporaneously; provide all documents to the worker

within a short period of time; provide documentation to a worker union; communicate the consequences of any future misconduct or failure to meet performance standards; and provide a contemporaneously created written notice to the worker. Sections 655.122(n)(2)(i)(E) and (n)(4) in this final rule already require an employer to document each disciplinary measure. The Department modifies § 655.122(n)(2)(i)(E) in this final rule to require an employer to provide a copy of the resulting documentation to the worker, in a language understood by the worker, within 1 week of the implementation of the disciplinary measure. Even if the disciplinary measure is a verbal warning (which is often the first step of a progressive discipline system), the regulations (both as proposed and as adopted) require the employer to later document that verbal warning. Therefore, it should not be overly burdensome to provide a copy of that documentation to the worker, although additional time may be required to translate the documentation. Additionally, the Department believes that 1 week is sufficient time for any relevant instruction to be provided or planned. Because of this change, the Department removes the regulatory requirement that the employer must "clearly communicate to the worker that a disciplinary measure has been imposed," as the provision of such documentation will communicate this concept.

The Department declines to modify the regulations to require that documentation be maintained contemporaneously. Some corrections in the field will be verbal and, therefore, may not be documented until a manager or foreperson returns to the office that evening or the next day. Therefore, these records would not be created "contemporaneously" in the strictest definition of the term. However, the requirement that documentation be provided to the worker within 1 week means that documentation must be created within 1 week. The Department will view with great skepticism any documentation of disciplinary records that occurs significantly after the infraction occurs.

The Department declines to require an employer to provide any union with a copy of disciplinary documentation as this would be a significant policy proposal warranting greater development and public feedback via the rulemaking process. However, the worker may share their own disciplinary records with whomever they wish, and an employer may not retaliate against the worker when such

---

[56] Proposed § 655.122(n)(2)(i)(F) and (n)(2)(ii).

sharing constitutes protected activity under § 655.135(h) or is in furtherance of such protected activity, as described above. The Department also declines to require that the employer communicate the consequences of any future rule or policy violation. The consequences for a future rule or policy violation may vary depending on, for example, the severity of the future infraction. Therefore, an employer may not be able to communicate with certainty the appropriate next step in the progressive discipline process until the infraction or failure to meet performance standards occurs. However, the Department encourages employers to maintain as transparent a process as possible, and notes that employers may communicate to workers what the consequences would be for any future infraction if it has already determined what those consequences would be (*e.g.,* if behavioral issues are so extensive and well documented that any future infraction, regardless of severity, will result in termination). This communication would constitute instruction to the worker as required by § 655.122(n)(2)(i)(E).

In the preamble to the NPRM, the Department identified egregious misconduct as "behavior that is plainly illegal or that a reasonable person would understand as being offensive, such as violence, drug or alcohol use on the job, or unlawful assault, as opposed to failure to meet performance expectations or productivity standards." 88 FR 63783. However, the Department did not include a definition of egregious misconduct in the proposed regulatory text of the NPRM. FLOC suggested that the Department define egregious misconduct in the regulations so that it is "limited to instances of serious or gross misconduct, such as those involving violence, threats of violence or willful destruction of property." The Department agrees that a regulatory definition of egregious misconduct is useful and has added a definition to § 655.122(n)(2)(i)(E) in this final rule. This definition included in this final rule is similar to what the Department included in the preamble to the NPRM, but provides additional detail. Specifically, the Department defines egregious misconduct as intentional or reckless conduct that is plainly illegal, poses imminent danger to physical safety, or that a reasonable person would understand as being outrageous. The Department believes that this definition is sufficiently broad so that it will encompass all circumstances for which the appropriate discipline for a first-time offense is termination, but

narrow enough that workers who commit minor infractions, or who commit infractions unintentionally and in a manner that cannot be considered reckless, will continue to be entitled to the progressive discipline protections in § 655.122(n)(2)(i)(E). Importantly, failure to meet performance expectations will never constitute egregious misconduct. The Department also emphasizes that an employer terminating a worker for cause for egregious misconduct must meet all other conditions outlined in § 655.122(n)(2)(i)(A) through (D) of this final rule.

As with the description of egregious misconduct in the preamble to the NPRM, the definition in § 655.122(n)(2)(i)(E) of this final rule includes conduct that is plainly illegal. Examples of plainly illegal conduct include battery and sexual assault.

The description of egregious misconduct in the NPRM preamble included conduct that a reasonable person would understand as being grossly offensive. In § 655.122(n)(2)(i)(E) of this final rule, the Department has clarified this definition by breaking it into two parts: conduct that poses imminent danger to physical safety, and conduct that a reasonable person would understand as being outrageous. Conduct that poses imminent danger to physical safety is behavior that could reasonably be expected to cause death or serious physical harm either to the worker or to others if not immediately stopped. An example of conduct that poses imminent danger to physical safety is a worker operating heavy machinery while drunk. Conduct that a reasonable person would understand as being outrageous is conduct that a reasonable person would understand as going beyond all possible bounds of decency to be regarded as atrocious and utterly intolerable. Examples of conduct that is outrageous include severe sexual harassment and racial harassment, and intentional destruction of property.

This definition of egregious misconduct also includes a requirement that the conduct be intentional or reckless. This aspect of the definition is important to ensure that workers are not penalized with immediate termination for cause for unintentional errors, unless those errors are so careless and without regard for safety, decency, or the law that the worker's judgment cannot be trusted in the future.

The Department also makes minor changes to this section for readability and to clarify that any documentation of the disciplinary measure must also record the infraction.

Conditions for Termination for Cause: Disclosure of Productivity Standards in the Job Order, Proposed § 655.122(n)(2)(i)(A).

The NPRM proposed that the second criterion for termination for cause would require that where termination is for failure to meet a productivity standard, such standard must be disclosed in the job offer. The Department does not adopt this proposal as it is now substantively included in the definition of termination for cause found in § 655.122(n)(2). Any comments are discussed in the preamble corresponding with that section and with § 655.122(l)(3).

Termination for Reasons That Are Not For-Cause, § 655.122(n)(2)(iii)

The NPRM proposed four different reasons that could never be considered termination for cause, including where the termination is contrary to law; for an employee's refusal to work under conditions that the employee reasonably believes will expose them or other employees to an unreasonable health or safety risk; because of discriminatory reasons; or where the employer failed to comply with its obligations under proposed § 655.135(m)(4) (finalized as § 655.135(m)) in an investigatory interview that contributed to the termination. This final rule adopts the proposal with minor modifications. Specifically, the Department adds "familial status" and changes "citizenship" to "citizenship status" as reasons for which an employer may not discriminate. The Department also changes "meeting" to "investigatory interview" to conform with changes to § 655.135(m).

Farmworker Justice suggested that the Department provide further clarifying examples as to where the termination is contrary to a Federal, State, or local law. The Department would consider terminations to be contrary to applicable law where, for example, the termination is in retaliation for the worker filing for workers' compensation benefits; in retaliation for a worker taking leave to which they are entitled by law; and for refusal to take a lie detector test. Farmworker Justice also recommended that "citizenship" be replaced with "citizenship status," and that "family status" be added. This final rule uses the term "citizenship status" because this term is used in 8 U.S.C. 1324b(a) prohibiting discrimination. This final rule also adds that discriminatory termination based on familial status will not be considered for cause; this change is consistent with State law in many

States [57] and the Department believes that workers should not be penalized for (or for not) being married or having children. Moreover, discriminatory termination based on familial status would not constitute a for-cause termination because it would not have a clear relationship to the employer's legitimate business needs. The Department also reminds employers that any termination that does not meet the standards in § 655.122(n)(2)(i) of this final rule will not be considered a for-cause termination, even if that termination is not for a reason explicitly prohibited in § 655.122(n)(2)(ii).

Farmworker Justice made a few suggestions that the Department declines to adopt for various reasons. Specifically, Farmworker Justice recommended that the Department clarify that termination is not for cause when done in retaliation against workers seeking improvements in worker housing. The Department declines to make this edit because this right exists under H–2A anti-retaliation regulations at § 655.135(h). Farmworker Justice also suggested that termination would not be for cause where the employer failed to comply with progressive discipline process. The Department believes that this final rule is already clear that termination for cause does not exist without progressive discipline (*see* finalized § 655.122(n)(2)(i)(E)). Farmworker Justice additionally suggested that the Department clarify that termination is not for cause where the employer has failed to provide reasonable accommodations required by the ADA and other State and Federal laws. The Department declines to make this edit because this final rule already states that a termination that is contrary to a Federal, State, or local law will not be considered for-cause.

Finally, Farmworker Justice suggested that the Department clarify, either in regulations or in other guidance, that refusing to lift excessive weight cannot be the basis for termination for cause because OSHA guidance recommends that workers not lift more than 50 pounds without assistance. The Department declines to make this edit because OSHA does not have a standard limiting how much a person may lift or carry; rather, the National Institute for Occupational Safety and Health (NIOSH) has a mathematical equation for calculating a recommended weight limit for one person, which is a

maximum of 51 pounds. [58] Given that this is a recommendation, not a requirement, and because agriculture often involves heavy lifting, the Department declines to explicitly state that refusing to lift weight in excess of 50 pounds cannot be the basis for termination for cause. However, WHD may still review, in the course of an investigation, whether a worker has refused to lift weight because they reasonably believed that doing so would expose them to an unreasonable health and safety risk.

The Employer Bears the Burden of Demonstrating That any Termination for Cause Meets Requirements, § 655.122(n)(2)(iv)

The Department proposed that the employer bear the burden of demonstrating that any termination for cause meets the requirements of § 655.122(n)(2). No comments necessitated changes to the regulatory language, but the Department makes one non-substantive edit for readability, specifically replacing "of this" with "in." Many agents, associations, and employers, including IFPA and GFVGA, opposed this provision, but did not provide a reason other than stating that employers did not terminate their employees to evade regulatory requirements. The California LWDA supported this provision because it aligned with their State policy and because the employer is the entity that drafts and implements the rules underlying the factors for termination.

Abandonment, § 655.122(n)(3)

The NPRM did not propose changes to regulatory language but proposed to redesignate the language describing abandonment in current paragraph § 655.122(n) to a new paragraph § 655.122(n)(3). The Texas Cotton Ginners' Association submitted comments suggesting that abandonment occur sooner than 5 days without reporting to work, but as the Department did not propose changes beyond renumbering, it did not consider this comment. The Department adopts the proposed redesignation in this final rule.

Recordkeeping, § 655.122(n)(4)(i)–(iii)

The NPRM proposed that, in addition to the records of notification of termination for cause or abandonment,

the employer maintain disciplinary and termination records. This final rule adopts the proposal with minor edits for clarity. Specifically, in paragraph § 655.122(n)(4)(i), the Department clarifies that the employer must document the infraction in addition to each step of progressive discipline. All comments on this provision are covered in the section describing general comments.

*C. Application for Temporary Employment Certification Filing Procedures*

1. Section 655.130, Application Filing Requirements

a. The Department Proposes To Require Enhanced Disclosure of Information About Employers: Owners, Operators, Managers, and Supervisors

The Department proposed to expand its collection of information about employers and the managers and supervisors of workers at places of employment by collecting additional information about the owner(s) of agricultural businesses that employ workers under the H–2A Application, the operators of the place(s) of employment identified in the job order, and the managers and supervisors of the workers performing labor or services at those place(s) of employment. OFLC currently requires an employer to disclose information about the identity of the employer and its agent or attorney; the places where work will be performed; and, when requested by the CO, the employer's use of a foreign labor recruiter. *See* § 655.135(k); Form ETA–9142A; Form ETA–790A; Form ETA–790A, *Addendum B*. Obtaining this information is necessary for the Department to assess the nature of the employer's job opportunity, monitor program compliance, and protect program integrity. For example, employers must identify in the H–2A Application and job order all places of employment and provide identifying information like the FEIN and DBA name on the Form ETA–9142A, Form ETA–790A, and Form ETA–790A, *Addendum B*.

In the NPRM, the Department proposed to require that each prospective H–2A employer, as defined at 20 CFR 655.103(b), provide the following information in relation to the owner(s) of each employer, any person or entity (if different than the employer(s)) who is an operator of the place(s) of employment, including an H–2ALC's fixed-site agricultural business client(s), and any person who manages or supervises the H–2A workers and workers in corresponding

---

[57] *See, e.g.,* 775 Ill. Comp. Stat. 5/1–102(A), 5/1–103(Q) (prohibiting employment discrimination based on marital status); Minn. Stat. § 363A.08 (prohibiting employment discrimination based on marital status and familial status).

[58] OSHA, *OSHA procedures for safe weight limits when manually lifting, https://www.osha.gov/laws-regs/standardinterpretations/2013-06-04-0* (last accessed Feb. 8, 2024), and NIOSH, *NIOSH Lifting Equation App: NLE Calc, https://www.cdc.gov/niosh/topics/ergonomics/nlecalc.html* (last accessed Feb. 21, 2024).

employment under the H–2A Application: full name, date of birth, address, telephone number, and email address.

The Department also proposed to revise the Form ETA–9142A to require that the employer provide additional information about prior trade or DBA names the employer used in the 3 years preceding its filing of the H–2A Application, if any, rather than collecting only the DBA name the employer currently uses. Accordingly, the Department proposed to revise and restructure § 655.130 by adding four new paragraphs, (a)(1) through (4), to specify the information employers must provide at the time of filing an H–2A Application.

In a new paragraph (a)(1), the Department proposed to retain the first sentence currently in § 655.130(a), which addresses the H–2A Application and supporting documentation the employer must submit. The Department proposed to move the second sentence of § 655.130(a), which contains language regarding collection of the employer's information—*i.e.,* FEIN, valid physical location in the United States, and means of contact for recruitment—to proposed paragraph (a)(2). In paragraph (a)(2), the Department proposed to explicitly require disclosure of the employer's name and additional employer information collection the Department proposed to require (*i.e.,* the identity, location, and means of contact for each owner). Proposed paragraph (a)(3) required the employer to provide the identity, location, and contact information of all persons or entities who are operators of the place(s) of employment listed in the job order, if different from the employer(s) identified under paragraph (a)(2), including an H–2ALC's fixed-site agricultural business client(s) who operate the place(s) of employment where the workers employed under the H–2A Application will perform labor or services. In addition, proposed paragraph (a)(3) required the employer to provide the identity, location, and contact information of all persons who will manage or supervise H–2A workers and workers in corresponding employment under the H–2A Application at each place of employment.

Proposed paragraph (a)(4) required the employer to continue to update the information required by the above paragraphs until the end of the work contract period, including extensions thereto, and retain this information post-certification and produce it upon request by the Department. To effectuate proposed § 655.130(a)(4), the Department proposed a new record

retention paragraph at § 655.167(c)(9) that would require the employer to retain the information specified in paragraphs (a)(2) and (3) of § 655.130 for the 3-year period specified in § 655.167(b).

The Department received comments both in support of and opposed to the proposed information collections from Federal elected officials, labor unions, workers' rights advocacy organizations, individuals, employers, trade associations, farm bureaus, and agents. After consideration of all comments, the Department is finalizing the proposals with minor changes, as explained below.

The Department received comments in support of the proposal from elected officials, workers' rights advocacy organizations, and labor unions. A joint comment from 15 U.S. Senators supported the proposed information collection as a way to "strengthen protections against abusive third parties by enhancing DOL's enforcement capabilities against supervisors, contractors, joint employers, successors in interest, and others who coordinate so closely with employers that they should be considered a single employer." Some workers' rights advocacy organizations, UFW Foundation, CAUSE, UMOS, and PCUN, and a couple of other advocacy organizations, Green America and the North Carolina Justice Center, asserted the proposal would provide the Department "more understanding of [an employer's] operation and seasonality of it, and ultimately, the ability to take enforcement actions against more people who are taking part in abusive and unlawful activities, including successors in interest." UFW included worker accounts of various abuses by agents, crew leaders, and foremen, including sexual assault, retaliatory pretextual terminations, withholding of food and water, and various types of threats against workers, and believed the proposed information collection would aid enforcement related to these egregious violations.

Farmworker Justice supported the proposed information collections as a necessary means to carry out vital program integrity and worker protection responsibilities. They cited numerous examples of debarred employers reconstituting with owners and managers switching roles to avoid enforcement, including cases in which family members have applied for certification for the benefit of another family member and owner of a debarred employer. They supported the collection of owner information, asserting it would be "obviously useful

in detecting fraud in the H–2A program, as it would allow the Department to more easily detect instances in which a single owner/operator uses multiple business entities in an attempt to skirt H–2A regulations or to continue seeking H–2A workers despite having been debarred." They believed the proposed information collections would assist in identifying employer reconstitution to subvert the law because "[o]verlapping management with the debarred employer is a giveaway" that the employer has "attempt[ed] to evade debarment by rebranding" and "obfuscat[ing] management structure." Farmworker Justice and the Agricultural Worker Project of Southern Minnesota Regional Legal Services commented that the manager and supervisor information would permit the Department to "scrutinize whether the principals or managers of those entities [filing for labor certification] are family members of recently debarred entities." Farmworker Justice also believed the proposals would assist the Department in conducting the single employer test at the filing stage because, they asserted, employers "often use overlapping job orders from two separate but jointly-owned and operated entities, so that the employer can keep H–2A workers at their place of employment year-round on alternating job orders." Finally, Farmworker Justice supported the collection of fixed-site grower information, asserting it is "useful in preventing the displacement of US workers by H–2A workers, particularly when a grower that employs domestic workers begins outsourcing its labor to an H–2ALC," in which case "it is impossible for the workers (or worker advocates) to determine whether the fixed-site grower is using H–2A workers because the grower's name never appears at all on the job order or supporting documentation." The Department values and appreciates these commenters' support and their informed perspectives on the need for and potential impact of the proposal.

In contrast, the Department received many comments from employers, trade associations, agents, a public policy organization, and an immigration lawyers' association expressing opposition to the proposal as an unnecessary breach of privacy that would expose employers to litigation risk, potentially expose the private information of employees to the public, and impose an unreasonable and unjustified information production burden at the filing stage.

Many comments from employers, agents, and trade associations asserted the Department failed to provide a

"rational basis" to conclude it needed the additional information, showing only that the information is helpful, not necessary. USA Farmers asserted the Department provided "no statutory authority for this extreme invasion of personal privacy and dramatic departure from the decades of operation of the H–2A program," the information is "not necessary or reasonable to further any legitimate purpose," and the Department "fail[ed] to provide any data whatsoever that describes the magnitude of the supposed problem it claims to be addressing." An employer, Willoway Nurseries, and several trade associations, including AmericanHort, Michigan Farm Bureau, and USApple, more specifically asserted the info collection proposal is "onerous and unnecessary to catch the 32 employers debarred from the H–2A program from reconstituting as another employer." USA Farmers asserted the Department need not collect this information at the filing stage because "during an investigation of an H–2A employer, the Department already routinely . . . collects information on any other businesses the employer operates."

Similarly, ma´sLabor asserted that the Department did not "offer any compelling reason why this information ought to be disclosed on the H–2A application itself, rather than merely as a document retention requirement on par with payroll and earnings records." Several trade associations—including AmericanHort, NCFC, FSGA, and FFVA—and Willoway Nurseries objected to collection of "information of all managers and supervisors" specifically, asserting it "is unnecessary at the application stage of the H–2A program and is easily and regularly attainable at the enforcement stage of the H–2A program." NHC added that employers who refuse to produce the information during a later investigation face consequences and this should be sufficient incentive.

While the Department appreciates the comments, the Department disagrees with employer, trade association, and agent assertions that the NPRM failed to explain the Department's need for this information generally or, specifically, its need for the information at the time the employer files the H–2A Application. As discussed above, as part of its review of an application, OFLC assesses whether the employer has a temporary or seasonal need for workers, including whether two facially distinct employers are a single employer, and the Department is authorized to enforce "employer compliance with terms and conditions of employment" in the H–2A program. 8 U.S.C. 1188(g)(2). The

Secretary has delegated the responsibility of issuing temporary agricultural labor certifications to OFLC [59] and has delegated responsibility for enforcement of the worker protections to the WHD Administrator.[60] The information the Department collects through the Form ETA–9142A, *H–2A Application for Temporary Employment Certification,* and all required supporting documentation, constitutes the information necessary for the Department to assess an employer's need and whether there is an insufficient number of qualified U.S. workers who are available to fill the employer's job opportunity, and that the wages and working conditions of workers in the United States similarly employed will not be adversely affected by the employment of H–2A workers. The Department also may use this information in post-adjudication audit examinations or in program integrity proceedings (*e.g.,* revocation or debarment actions) or in both, and WHD or other enforcement agencies may request this information from OFLC during an investigation or enforcement proceedings.

The NPRM explained that the new collections of information about owners, operators, managers, and supervisors would allow the Department to gain a more accurate and detailed understanding of the scope and structure of the employer's agricultural operation, which is essential to the Department's fulfillment of various obligations in the administration and enforcement of the H–2A program. The Department noted the additional information would enhance its enforcement capabilities by helping the Department identify, investigate, and pursue remedies from program violators; ensure that sanctions, such as debarment or civil money penalties, are appropriately assessed and applied to responsible entities, including individuals and successors in interest when appropriate; and determine whether an H–2A employer subject to investigation has prior investigative history under a different name. For example, contact information for owners, operators, and supervisors will assist the Department in locating the employer and workers for the purposes of conducting an investigation, presenting findings (either verbally or in

a written determination) and obtaining payment for back wages and civil money penalties following a final order of the Secretary. OFLC also may use this information in post-adjudication audit examinations or in program integrity proceedings (*e.g.,* revocation or debarment actions) or in both. The information will help OFLC verify that persons representing employers both in the labor certification process and in the process of recruiting, managing, or supervising workers are acting on behalf of the employers within the scope of the terms and conditions of the labor certification and any contracts or agreements with employers, and in compliance with the revised regulations and all employment-related laws, such as laws prohibiting discrimination, retaliation, or the imposition of unlawful recruitment or visa-related fees. The new information collections will also facilitate interagency information sharing and permit OFLC and WHD to share relevant identifying information with other agencies when necessary to aid an investigation or enforcement action.

The NPRM also explained the Department's need to collect the information at the time the employer files the H–2A Application, rather than require production of this information only in the event of an investigation or audit, and the Department will expand on those reasons here. During the application process, the new information collections will assist the Department in determining whether the employer has demonstrated a bona fide temporary or seasonal need, or, conversely, whether an employer has, through multiple related entities, sought to obtain a year-round H–2A labor force. As the Department noted in more detail above in the preamble to § 655.103(e) *Definition of single employer for purposes of temporary or seasonal need and contractual obligations,* some employers divide their business such that it appears two separate entities are each requesting a temporary agricultural labor certification when, in fact, the workers are in the same AIE engaged in the same job opportunity for longer than the attested period of need on any one application. Having information about the owners, operators, and managers at the filing stage will assist the Department in detecting potential nominally distinct employers who are acting as a single employer. It will also greatly assist the Department in discovering if an employer is acting as a single employer with a debarred non-petitioning entity, as the Department will already have the debarred entity's

---

[59] *See* Secretary's Order 06–2010, *Delegation of Authority and Assignment of Responsibility,* 75 FR 66268 (Oct. 27. 2010).

[60] *See* Secretary's Order 01–2014, *Delegation of Authority and Assignment of Responsibility to the Administrator, Wage and Hour Division,* 79 FR 77527 (Dec. 24, 2014).

data on record. As stated above in the preamble to § 655.103(e), the Department considers the totality of the circumstances surrounding the relationship among the entities, and no one singular detail—such as having the same owner—is determinative in the analysis.

The NPRM further noted that collection of prior DBA names and identifying information for people other than the employer at the time of filing would make it easier for OFLC and WHD to search across applications within a filing system database to identify instances in which employers have changed names, or roles, to avoid complying with program regulations or avoid monetary penalties or serious sanctions such as program debarment. The Department noted the information collected about owners, operators, and supervisors provided at the application stage may assist the Department to identify whether an individual or successor in interest should be named on any determination and therefore subject to any sanctions or remedies assessed. Although the NPRM did not provide ready data, it explained that in the experience of the Department, some H–2A employers have sought to avoid penalties and continue participating in the program despite having been debarred by reconstituting as a new legal entity while ultimately retaining the underlying business that was debarred from the H–2A program. Commenters including Farmworker Justice and the Agricultural Worker Project of Southern Minnesota Regional Legal Services also provided specific examples of entities that have evaded debarment under the current regulations through reconstituting under a different corporate entity with reshuffled ownership, as noted above and in the preamble discussing the Department's revisions to the successor-in-interest provision. In an audit or investigation of an employer, this information will allow the Department to better identify those persons with a financial stake in the certified H–2A employer. Collecting this information from all applicants at the time of filing, rather than only collecting this information during an audit or investigation, can be useful for other similar purposes as well, such as identifying instances when an H–2ALC Application indicates it is supplying an H–2A workforce to a debarred employer during the debarment period.

As previously mentioned, some trade association commenters supported collection of owner data as a means to prevent debarred employers from reconstituting to evade the law, but TIPA, McCorkle Nurseries, Inc., Titan Farms, LLC, and IFPA asserted the Department failed to provide a sufficient definition of owner and expressed concern that the "complex ownership structure" common to many agricultural operations due to high capital costs would make it difficult to provide information on owners and operators. Titan Farms, LLC, IFPA, and NHC asserted the Department's "failure to provide an adequate definition of what operator, manager, and supervisor would include" prevented "meaningful comment" on the proposal. Commenters including Titan Farms, LLC, IFPA, TIPA, U.S. Custom Harvesters, Inc., and Demaray Harvesting and Trucking, LLC similarly opposed collecting information about owners because it would place an "extensive administrative burden on employers" due to the imprecise definition of owner, complex ownership structure of many operations, and a potential requirement to include even landowners, rather than business owners.

NHC, Titan Farms, LLC, and IFPA expressed concern that the Department would require employers to collect information on leaseholders, shareholders and other investors, and other types of "owners" in various ownership situations, for which the Department has no need. AmericanHort and NCFC similarly expressed concern they would have to disclose information about silent partners and minority shareholders. Commenter including Titan Farms, LLC, IFPA, and NHC expressed concern that the Department would require disclosure of information on owners who "do not have a controlling interest or are [not] involved in any way with business decisions, including workforce decisions." USA Farmers similarly asserted collection of ownership information would be particularly burdensome if the collection includes "an owner who may have no involvement in the operation of the company" and USApple added that "[m]inority owners and other investment groups will have very little knowledge of the day-to-day business practices, and some invest in multiple entities." USApple expressed concern the Department would require disclosure of landlords if an association member rented land on which the business operates, which would be unnecessary because the landlord has no "information or authority over the operation." Ma´sLabor urged the Department to clarify how it expects employers to disclose owner information if the place of employment is "owned by a consortium of investors and entities, including multinational corporations and conglomerates with complicated business structures." Ma´sLabor also asked the Department to clarify how it expects employers to disclose this information if the place of employment is "owned by a private equity group" or "[a] multinational conglomerate with layers of holding companies and subsidiaries."

U.S. Custom Harvesters, Inc. and Demaray Harvesting and Trucking, LLC asserted the ownership disclosure requirement would be particularly burdensome for custom combine employers who only have information for a client's point of contact and "do not have access to additional information about that farm's ownership structure" because these employers "provide services for multiple farm owners and operators" while "operat[ing] on a disclosed itinerary." Demaray Harvesting and Trucking, LLC asserted the disclosure requirement would be particularly burdensome for farm labor contractors, because they do not have information about the full ownership structure of every employer to which they provide labor.

Some commenters, including Michigan Asparagus Advisory Board and an individual commenter, expressed similar concerns about the Department proposal to collect the name, date of birth, and contact information for managers and supervisors of H–2A workers. Titan Farms, LLC, IFPA, NHC, and TIPA expressed concern the proposal would require employers to disclose information on "potentially hundreds" of employees, "depending on the size of the operation." Western Range Association asserted the disclosure requirement would be particularly burdensome for employers of workers in herding and production of livestock on the range because many of these employers "operate on publicly-owned ground" and a requirement to "collect and track the names of every manager of the [Bureau of Land Management], Forest Service, State Government, or municipality would be difficult if not impossible. The records the employers would need to retain would be abundant and unreasonable to keep up to date."

Titan Farms, LLC, IFPA, NHC, and TIPA expressed concern that the duty to update this information would impose a substantial burden due to high "turnover rate within agriculture." USApple expressed concern about potential enforcement or other "ramifications for not having listed an individual due to employment changes

during processing" of the H–2A Application.

Willoway Nurseries and several trade associations, including Michigan Farm Bureau, FSGA, FFVA, and NCFC, also expressed concern about the Department's burden estimate calculations. Specifically, AmericanHort expressed concerns that the Department's "analysis under both of those acts of impact and burden is drastically low" and a "gross underestimation," which it asserted "is evidenced by the Department's claim that small businesses will be faced with a mere one-time cost of $54.00 to familiarize themselves with this rulemaking, and only $108.00 to complete the new application with all owner, manager, and supervisor information."

The Department also received a comment from Farmworker Justice that suggested several changes to strengthen the proposed provisions in this final rule. Farmworker Justice expressed concern that the NPRM did not propose to "collect information for fixed-site growers who may not be joint employers of the H–2A workers" and did "not require the applicant to list the actual business name of the operator of the fixed-site location, their trade names, or the names of owners." Farmworker Justice urged the Department to require employers "provide information for all owners and operators of fixed-site locations at which workers will perform work" to collect the DBA, business name, and owner name for all fixed-site places of employment, which Farmworker Justice asserted would be "obviously useful in detecting fraud in the H–2A program, as it would allow the Department to more easily detect instances in which a single owner/operator uses multiple business entities in an attempt to skirt H–2A regulations or to continue seeking H–2A workers despite having been debarred." Farmworker Justice also suggested the Department should require employers to "submit information detailing exactly what workers performed the work at the fixed-site in the previous year, how they were recruited for those jobs, and what efforts have been undertaken to pursue those recruitment avenues in the current year," which they asserted would prevent employers from using an H–2ALC to avoid the requirement to contact its former U.S. workers.

Farmworker Justice further urged the Department to revise paragraph § 655.130(a)(2) to "provide that the applicant must include information for *all* employers." Farmworker Justice also urged the Department to collect additional information, including

information about: (1) transportation providers, to better ensure they are properly licensed; (2) workers' compensation policyholders, so the Department knows whether the policyholder is a professional employer organization, in which case DOL should "follow up with the employer to ensure that coverage extends to workers in transit during the entire period of the clearance order"; (3) information about owners and operators of housing, to "allow workers and worker advocates to better understand whether the housing is in compliance"; and (4) "additional information from first-time employers and fixed-site growers" about their positive recruitment efforts prior to using the program, to ensure the employer does not alter this recruitment to avoid hiring U.S. workers in favor of H–2A workers. Finally, Farmworker Justice emphasized the need for the Department to collect and analyze information indicating family relationships in multiple filings for program integrity and enforcement purposes.

The Department appreciates and agrees with comments indicating a need for the Department to more clearly define the type of owner information sought and to clarify the level of due diligence expected of employers when providing this information, and the information related to supervisors and managers. The definitions of the terms "owner" and "operator," as well as the terms "supervisor" and "manager," are included in the Paperwork Reduction Act (PRA) information collection request (ICR) package that accompanies this final rule. Specifically, definitions for both "owner" and "operator" were proposed in the draft instructions for completing Form ETA–9142A and its appendices, which were published along with the NPRM and for which the Department also requested public comment. The proposed form instructions not only included proposed definitions of both terms but also provided an explanation of how the Department determined each proposed definition. After review of the public comments, the Department has revised the definitions to clarify that, for purposes of § 655.130, "owner" or "operator" means any person who owns or has a controlling operational role in the employer(s) and place(s) of employment. With respect to owners specifically, the Department will consider a person or entity an owner if the person or entity legally owns or is a owner with a controlling operational role in the employer's business. The Department will require the employer to

disclose the majority owners, defined as an owner with ownership of more than 50 percent of a business, and any owner who owns less than 50 percent of an organization, but exercises any decision-making responsibilities over the business. If the owner or operator of the place(s) of employment is a branch, subsidiary, or affiliate of a parent corporate or joint venture, the employer must list the owners and operators of the parent entity. As noted in the PRA package and form instructions for the NPRM and this final rule, the Department also expects the employer to provide information about operators of the place(s) of employment, defined as any person or entity who runs the agricultural business, making day-to-day management decisions. Finally, as explained in the NPRM and above, the Department is collecting this information to enhance the Department's ability to identify, investigate, and pursue remedies from program violators, including entities debarred from the H–2A program, and to that end, the Department also expects the employer to provide this information for any owner or operator of a business that is currently debarred from the H–2A program by OFLC, by WHD, or by a court of law, regardless of ownership stake or level of control.

The Department considers the totality of the circumstances surrounding the business formation and conduct of the owner in determining ownership of an entity. No one factor would be determinative in the analysis. Some examples that demonstrate ownership are official State, local, or Federal documentation (*e.g.,* articles of incorporation, business license, deed) of the ownership of an entity. Another example demonstrating entity ownership is whether a judicial or administrative decision or action makes a definitive determination about ownership of an entity.

If an individual or entity is listed as an owner or operator of the places of employment, or as the employing entity, on an official Federal, State, or local document, like incorporation documents, or judicial or administrative records like those that indicate transfer of ownership, the Department expects the employer to provide identifying information for these individuals or entities. In many cases, this information will be publicly available on State or local websites.

This final rule requires the employer to exercise due diligence when determining and disclosing primary owners and owners that exercise control over the entity that operates the place(s) of employment for the integrity and

enforcement purposes noted in the NPRM and this preamble. This final rule does not seek to take enforcement action against employers for failing to disclose every person or entity that may have an indirect or marginal stake in a complex organization and does not require the employer to disclose owner or operator information for any person or entity that does not fall into the above definitions, such as individual shareholders of corporate, cooperative, or joint arrangements that do not have a majority stake in or exercise control over the entity. Similarly, this final rule requires the employer to exercise due diligence, and demonstrate a good-faith effort, in gathering, disclosing, and updating as necessary the identity, location, and contact information of owners, operators, managers, and supervisors.

In response to comments specifically about disclosure of landlord information, the Department expects the employer to disclose this information if the landlord is an owner of the employer(s) or is an operator of the place(s) of employment who runs the agricultural business, making day-to-day management decisions. In response to the comments specifically expressing concern about disclosure of the required information where land is owned or operated by Federal, State, or local government, the Department expects the employer to provide the name of the Federal, State, or local agency or government entity that owns or operates the land or employs the managers or supervisors of workers employed under the H–2A Application.

The Department is not revising the proposed definitions of "manager" and "supervisor" in this final rule. As defined in the instructions and PRA package accompanying Form ETA–9142A, Appendix C, and in the preamble to this final rule, a manager is a person whose duties and responsibilities include formulating policies, managing daily operations, and planning the use of materials and HR with respect to the employment of H–2A workers. A supervisor is the person(s) who supervises and coordinates the activities of H–2A and corresponding agricultural, range, aquacultural, and related workers. The Department based these definitions on the O*NET definitions used for related occupational codes and believes these definitions are sufficient to ensure employers understand and comply with the requirement to disclose information about the managers and supervisors of H–2A and corresponding workers. In response to comments about the burden of production and the Department's

estimates, the Department has addressed these two issues in the supporting documentation in the PRA package the Department has prepared for this rulemaking under OMB Control Number 1205–0466, available at *https://www.reginfo.gov.*

While the Department appreciates the Farmworker Justice suggestion to expand the proposed information collection to include transportation providers, workers' compensation policy holders, owners and operators of housing, recruitment information from first-time employers and fixed-site growers, as well as the collection of family relationships, the Department declines to adopt these suggestions. The Department has determined that the collection of additional information items exceeds the scope of the proposed collections, which focus on the enhanced disclosure of information about employers, and if adopted, would deprive the full regulated community of its opportunity to comment. Even if the additional collections items did not exceed the scope of the proposed collections, the Department has determined that the collections, as proposed, are sufficient to accomplish the purpose as noted above and in the NPRM. The Department appreciates Farmworker Justice's concern regarding the use of family members in varying roles to avoid regulatory requirements and enforcement. However, the Department has determined that collection of information on the owners, operators, managers, and supervisors, in addition to information the Department already collects like point of contact, agent, and various other potential identifying information, is sufficient to ensure employers do not utilize family members to evade compliance with the law.

More specifically, the Department agrees with Farmworker Justice that family relationships in various roles across multiple applications can indicate potential noncompliance and attempts to evade the law or sanctions. However, the Department does not believe it is necessary for this final rule to more explicitly require the employer to disclose any potential owners, supervisors, managers, or operators with a family relationship to any owner or operator of the employer. The disclosure requirements in this final rule, combined with the existing requirement to disclose information like the identity of the agent and point of contact, address(es), occupation, and period of need, will be sufficient to assist the Department in identifying family relationships in filings that may indicate

fraud or other intentional failures to comply with the law.

In response to Farmworker Justice, the Department is clarifying language at § 655.130(a)(2) to specify that this provision applies to all employers of any worker employed under the *Application for Temporary Employment Certification.* The Department is not adopting the commenter's suggestions to collect additional information about fixed-site employers. Currently, on the Form ETA–790A, H–2ALCs must identify the name(s) and location(s) of each fixed-site agricultural business where the H–2A worker(s) will perform labor or services, and provide fully executed work contract(s) with each fixed-site agricultural business, which assists OFLC in determining compliance with all application filing requirements for H–2ALCs under § 655.132. This information is collected on the job order. As proposed in the NPRM, this final rule requires that each prospective H–2A employer, as defined at § 655.103(b), provide the following information in relation to the owner(s) of each employer, any person or entity (if different than the employer(s)) who is an operator of the place(s) of employment, including an H–2ALC's fixed-site agricultural business client(s), and any person who manages or supervises the H–2A workers and workers in corresponding employment under the H–2A Application: full name, date of birth, address, telephone number, and email address. The Department is adopting as proposed paragraph (a)(3), which requires the employer to provide the identity, location, and contact information of all persons or entities that are operators of the place(s) of employment listed in the job order, if different from the employer(s) identified under paragraph (a)(2), including an H–2ALC's fixed-site agricultural business client(s) that operate the place(s) of employment, and of all persons who manage or supervise any H–2A worker sponsored under the H–2A Application or any worker in corresponding employment. As noted above, employers must exercise due diligence when gathering, disclosing, and updating this information and be able to demonstrate good faith in their efforts to do so. The Department believes the additional information collected under this final rule will bolster the Department's enforcement capabilities with respect to H–2ALCs and fixed-site employers and will ensure the Department is able to accomplish the objectives explained above and in the NPRM.

The Department also received many comments from trade associations,

employers, and agents expressing concern about disclosure of personally identifiable information (PII) and the Department's assurances that it would protect this information from unauthorized disclosure. Ma´sLabor asserted that the proposed information collection was "morally and ethically objectionable," that it "raises major questions of compliance with privacy and data protection laws," and that the NPRM failed to adequately address "the implications of this disclosure requirement under the Privacy Act of 1974." Citing 5 U.S.C. 552a(e)(1), IFPA, TIPA, GFVGA, NHC, and Titan Farms, LLC noted that the Privacy Act permits Federal agencies to "maintain in their records only information about an individual 'relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President.'" USA Farmers generally asserted the proposed collections would violate "various state laws on the collection and dissemination of [PII]" and ma´sLabor stated the Department failed to consider the implications of State privacy laws in States like California, Colorado, Connecticut, Utah, and Virginia.

Many commenters, including Willoway Nurseries, FFVA, and NCFC, asserted that requiring an employer to provide "such an onerous amount of information just to file an application is unnecessary and starkly against the requirements of the Paperwork Reduction Act and the Small Business Regulatory Enforcement Fairness Act." USApple expressed concern that the Department did not explain how it would protect this information from "unlawful disclosure under [FOIA]." Finally, SRFA expressed concern that the Department provided only a general assertion that it would disclose information only according to the law and information sharing agreements and that was not sufficient to "assuage concerns the information would be subject to data breaches."

Some commenters expressed concern that the proposed information collections would violate the privacy of owners, operators, and employees, expose them to data breaches and potential harassment or security threats, and expose the employer to liability for non-consensual disclosure of their information or to potential immigration enforcement if the manager and supervisor is not authorized to work in the United States. Titan Farms, LLC, IFPA, TIPA, U.S. Custom Harvesters, Inc., and Demaray Harvesting and Trucking, LLC opposed the collection of owner information for similar reasons,

expressing concerns the collection would "infring[e] on owners' privacy rights," potentially "disclos[e] confidential business information," and "pose an extensive administrative burden on employers, without any documented regulatory value or authority." Ma´sLabor asserted "there may be compelling financial or public relations reasons for not disclosing ownership interests" and noted "[i]nstitutional or other passive investors may insist on anonymity as a strict contractual condition."

New York State Farm Bureau, Labor Services International, an individual commenter, TIPA, SRFA, and ma´sLabor opposed the proposal to collect information about managers and supervisors, asserting this disclosure would be a "direct violation," "serious invasion," and "egregious breach" of employee privacy and would constitute a "routine . . . unjustified disclosure of employee information." Ma´sLabor asserted the proposal would risk effectively "doxing" employees and putting them at risk of "potential harassment and threats from online sources, increasing the likelihood [they] will be the target of junk mail/spam, commercial solicitations, phishing emails" and other potential dangers. TIPA and SRFA asserted the proposal would expose employees to "retaliatory targeting" and would be "abjectly dangerous." AmericanHort, NCFC, and USApple expressed concern, specifically, that the Department would publish employees' PII on the public disclosure data on the OFLC website or on *Seasonaljobs.dol.gov* because entries in the disclosure data and the Seasonaljobs website are produced using scans of information in the employer's Form ETA–9142A and Form ETA–790A. Similarly, an individual commenter expressed concern that the proposal would "forc[e] employers to disclose the private information of their employees on the internet" because "any information provided on the face of the H–2A application is subject to public disclosure" and the commenter asserted this public disclosure would "endanger[ ] so many people."

Several commenters specifically expressed concern about disclosing PII about an employee without obtaining the employee's consent. Some commenters, including IFPA, Titan Farms, LLC, and TIPA, noted "employees have not chosen to participate in the H–2A program and should not be required to have their information disclosed to the government." Similarly, ma´sLabor asserted the proposed collection of manager and supervisor information

violated "a fundamental tenet of the employer-employee relationship that employees have a right to keep their personal information private and to require their consent before their employers disclose personal information." These commenters also expressed concern that disclosure may require some employers to breach employment or union contracts if they contain provisions prohibiting disclosure of an employee's information. USA Farmers asserted the Department lacks any reasonable basis to subject an employee to having their personal information delivered to the government and then made public merely because an employee works for an employer that participates in the H–2A program. An individual commenter expressed concern it would be unable to retain managers and supervisors if the Department required disclosure of their identifying information. Commenters including Titan Farms, LLC, IFPA, NHC, and TIPA expressed concern that non-consensual disclosures or disclosures in data breaches could expose employers to "risk of employment-based litigation" for the disclosure, though the commenters did not elaborate on what employment-based litigation might result. These commenters also expressed concern disclosing manager and supervisor information may expose employers or their employees to immigration enforcement, citing a high number of agricultural employees who are not authorized to work in the United States.

The Department is not requesting the disclosure of immigration status and therefore does not anticipate increased immigration enforcement by DHS as a direct result of this information collection. Also, as noted in the NPRM, the Department will collect, store, and disseminate all information and records in accordance with the Department's information sharing agreements and System of Records Notice (SORN), principles set forth by OMB, and all applicable laws, including the Privacy Act of 1974 (Pub. L. 93–579, sec. 7, 88 Stat. 1909 (1974)), Federal Records Act of 1950 (Pub. L. 81–754, 64 Stat. 585 [codified as amended in chapters 21, 29, 31, and 33 of 44 U.S.C.] (1950)), the PRA (44 U.S.C. 3501 *et seq.*), and the E-Government Act of 2002 (Pub. L. 107–347 (2002)).

As noted by commenters, the Privacy Act of 1974 requires the Department "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President." 5 U.S.C.

552a(e)(1). The Privacy Act also requires the Department "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. 552a(e)(2). In the NPRM and above, the Department explained at length the need for this information to accomplish its statutory mandates under the INA. Collection of this information directly from each owner, operator, manager, and supervisor for each H–2A Application would not be practicable because the Department will not know the identity of these persons or entities until the employer provides the information required under new § 655.130, and even assuming the Department knew these identities, it would be administratively infeasible for the Department alone to obtain this information directly from each person and entity while continuing to effectively review and process H–2A Applications within the relevant statutory deadlines.

Pursuant to Department policies, all PII collected on the H–2A Application is extended Privacy Act protections to the maximum extent practicable. In accordance with the Privacy Act, the Department publishes a SORN in the **Federal Register** when the Department creates or substantively modifies a system of records. The SORN addresses the authority underpinning the system of records, the measures the Department takes to safeguard information, the Department's record access and retention procedures, and the Department's routine uses for the records.[61] For the purposes of this rulemaking, the Department will modify the existing SORN, DOL/ETA–7, Foreign Labor Certification System and Employer Application Case Files. All PII the Department collects is protected by administrative, technical, procedural, and physical safeguards against unauthorized access and disclosure, and all PII the Department maintains is stored in a manner that is safe from access by unauthorized persons at all times. When the collected information is no longer needed, all electronic or paper information is erased or destroyed in accordance with applicable National Archives and Records Administration (NARA) approved record retention schedules.

The Department appreciates commenters' concerns that the

collection and retention of this information could require an employer to violate State-level privacy laws. However, commenters failed to note specific State law provisions that would prohibit the employer's production or retention of this information. Without this information, it is difficult to assess the commenters' concerns more closely, including whether the State laws apply to the proposed collection here. However, as discussed above and in the NPRM, the Department will collect, store, and disseminate all information and records in accordance with the Department's information sharing agreements and SORN, principles set forth by OMB, and all applicable laws. In addition, the Department has explained the critical need for this information and will collect and store this information in the same manner it collects and stores other information necessary to process H–2A Applications and administer the H–2A program. The Department expects the employer to fulfill its retention obligations with respect to this information the same way the employer is expected to retain all information specified in § 655.167 and records required under § 655.122.

In response to concerns about potential disclosures of this information, the Department reiterates that it may release this information if authorized under FOIA or may share the information with other agencies when authorized and necessary for criminal, civil, or administrative law enforcement and investigative purposes. The Department will only be required to provide PII under limited circumstances when authorized by law. Similarly, the Department will only provide this information in response to a FOIA request when there is no applicable FOIA exemption to permit the Department to withhold the information in full or in part, and the Department routinely processes incoming FOIA requests. The Privacy Act strictly limits the information that may be disclosed, but has several potentially relevant disclosure exemptions, such as those at 5 U.S.C. 552a, paragraphs (b)(2), (b)(7), and (b)(9)–(11).

As noted in the PRA package accompanying the NPRM, the Department may release this information when authorized in connection with appeals of denials before the Department's Office of Administrative Law Judges (OALJ) and Federal courts, in which case records may be released to the employers that filed such applications, their representatives, or to named foreign workers or their representatives. The Department also may release this

information in connection with the administration and enforcement of immigration laws and regulations, in which case the records may be released to such agencies as the Department's OIG or WHD, the Department of Justice (DOJ), DHS, or the Department of State. As noted above, more information about the Department's proposed changes to the H–2A information collection instruments, the Department's collection and use of this information, and the Department's estimate of the corresponding burden is available in supporting documentation in the PRA package the Department has prepared for this rulemaking under OMB Control Number 1205–0466, available at *https://www.reginfo.gov.* In addition, please refer to the Administrative Information section below for the Department's responses to comments regarding the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA).

The Department appreciates and takes seriously the comments related to privacy concerns, including comments regarding how the proposed collection would affect both the retention of managers and supervisors and immigration enforcement, but reiterates that pursuant to policy, all PII collected on the H–2A Application is extended Privacy Act protections to the maximum extent practicable. All PII the Department collects is protected by administrative, technical, procedural, and physical safeguards against unauthorized access and disclosure, and all PII the Department maintains is stored in a manner that is safe from access by unauthorized persons at all times. When the collected information is no longer needed, all electronic or paper information is erased or destroyed in accordance with applicable NARA approved record retention schedules.

Additionally, the Department will only provide PII under limited circumstances when authorized by law. The Department will not publish PII as part of its regular disclosure data. The Department will redact this information as it currently does for information such as Employer's FEIN, Attorney's FEIN, and Attorney's State Bar Number. Similarly, the Department will not publish this information on the Seasonaljobs websites, which is primarily used for the dissemination of information about agricultural job opportunities to job seekers.

Finally, the Department explained above and in the NPRM why there is a vital need to collect this information. The Department expects that employers will provide this information completely and accurately at the time of filing. As with information regarding

---

[61] *See* DOL/ETA–7, *Foreign Labor Certification System and Employer Application Case Files, https://www.dol.gov/agencies/sol/privacy/eta-7* (last accessed Apr. 9, 2024).

anticipated worksites or use of foreign labor recruiters, for example, the Department expects employers to make a good-faith effort in obtaining this vital information about the persons or entities that will manage or supervise the agricultural workers and those who own or operate places where those workers will be employed.

2. Section 655.135, Assurances and Obligations of H–2A Employers

a. Section 655.135, Introductory Language, WHD Authority

In the NPRM, the Department proposed a minor clarifying revision to the introductory language to § 655.135 to include explicit reference to compliance with 29 CFR part 501 as part of an H–2A employer's obligations. Previously, the introductory language in the regulations specified only that an employer seeking to employ H–2A workers must agree as part of the job order and Application that it will comply with all requirements under 20 CFR part 655, subpart B. Those requirements included compliance with WHD's investigative and enforcement authority under 29 CFR part 501, as specified in 20 CFR 655.101(b). The Department proposed revisions in the NPRM to make these obligations more explicit in § 655.135 and on the job order, to better ensure that both workers and employers are fully aware of WHD's authorities. The Department did not receive any comments on this proposed revision. Therefore, for the reasons set forth in the NPRM, the Department adopts the language as proposed.

b. Sections 655.135(h), (m), and (n), 655.103(b), Worker Voice and Empowerment

Before an employer may hire H–2A workers, it must apply for and obtain from the Department a certification that: (1) there are insufficient available U.S. workers who are able, willing, and qualified to perform the employer's job opportunity; and (2) the employment of H–2A workers in the job opportunity "will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. 1188(a)(1). Courts have long recognized that Congress delegated to the Department broad authority to implement the INA's prohibition on adverse effect at 8 U.S.C. 1188(a)(1)(B). *See, e.g., Overdevest,* 2 F.4th at 982–83; *AFL–CIO* v. *Dole,* 923 F.2d 182, 184–85 (D.C. Cir. 1991) (citing *AFL–CIO* v. *Brock,* 835 F.2d 912, 917 (D.C. Cir. 1987)); *see also Nat'l Council of Agric. Emps.* v. *U.S. Dep't of Lab.,* No. 22–3569, 2024 WL 324235, at *2 (D.D.C.

Jan. 29, 2024) (discussing the Department's regulatory authority under the H–2A program). The Department has historically understood the INA's adverse effect requirement both as requiring parity between the terms and conditions of employment provided to H–2A workers and other workers employed by an H–2A employer, and as establishing a baseline "acceptable" standard for working conditions below which workers in the United States would be adversely affected. *See, e.g.,* 1978 Final Rule, 43 FR at 10312, 10314; 1987 H–2A IFR, 52 FR at 20508, 20513; *see also Garcia-Celestino* v. *Ruiz Harvesting, Inc.,* 843 F.3d 1276, 1285 (11th Cir. 2016) (explaining that the regulations' provision of minimum "baseline benefits" to H–2A workers, including sound working conditions, "ensure[s] that foreign workers will not appear more attractive to the 'employer' than domestic workers, thus avoiding any adverse effects for domestic workers") (citations omitted). As courts have observed, the Department cannot seek to make jobs more attractive to U.S. workers, but instead must "neutralize any 'adverse effect' resultant from the influx of temporary foreign workers." *Williams* v. *Usery,* 531 F.2d 305, 307 (5th Cir. 1976).

As explained in the NPRM, the Department recognizes that some of the characteristics of the H–2A program, including the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer, create a vulnerable population of workers for whom it is uniquely difficult to advocate or organize regarding the terms and conditions of employment or to seek access to certain service providers. The Department also has significant enforcement experience with H–2A workers who have faced retaliation for asserting or advocating for their rights. The Department explained in the NPRM that it believed that this vulnerability of the H–2A workforce, and the ability of employers to hire this vulnerable workforce, may suppress or undermine the ability of farmworkers in the United States to negotiate with employers and advocate on their own behalf regarding working conditions in their shared workplaces, in light of the availability of the H–2A workforce. In other words, even if workers in the United States were to raise concerns regarding their terms and conditions of employment, under the current H–2A regulatory framework, employers may turn to the H–2A program for an alternative workforce that faces significant barriers to similar advocacy, thus undermining

advocacy efforts by or on behalf of similarly employed workers in the United States. In addition, in light of the barriers they face, H–2A workers are less able and less likely to advocate on behalf of themselves or their coworkers to seek compliance with the terms and conditions of employment set forth in the Department's regulations, employment below which will adversely affect workers in the United States.[62]

In the NPRM, the Department expressed its concern that the H–2A program currently does not provide sufficient protections for H–2A and corresponding workers to advocate on behalf of themselves or their coworkers regarding working conditions without fear of reprisal. Therefore, in the NPRM, the Department proposed changes to its regulations that would expand the H–2A anti-retaliation provision and include new employer obligations that would reduce or remove these barriers to worker empowerment.

In addition to seeking comment on the specific proposed revisions, discussed further below, the Department sought comment on whether H–2A workers are more vulnerable to labor exploitation than similarly employed workers in the United States, whether the existing worker protections are sufficient to prevent violations of the H–2A program, and whether agricultural workers in the United States have greater voice and empowerment to advocate regarding the terms and conditions of their employment. The Department received significant comments on these issues.

Those commenters that agreed that H–2A workers are a more vulnerable workforce than their counterparts in the United States cited a range of evidence in support of this conclusion, including

---

[62] 88 FR at 63787–88; *see also* CDM, *Ripe for Reform: Abuses of Agricultural Workers in the H–2A Visa Program* 4, 6 (2020) (CDM Report), *https:// cdmigrante.org/ripe-for-reform;* Farmworker Justice, *No Way to Treat a Guest: Why the H–2A Visa Program Fails U.S. and Foreign Workers* 7, 11, 17, 21–31 (2012) (Farmworker Justice Report), *https:// www.farmworkerjustice.org/wp-content/uploads/ 2012/05/7.2.a.6-No-Way-To-Treat-A-Guest-H-2A-Report.pdf* (Farmworker Justice Report); Jordan, M., *Black Farmworkers Say They Lost Jobs to Foreigners Who Were Paid More,* N.Y. Times (Nov. 12, 2021), *https://www.nytimes.com/2021/11/12/us/black-farmworkers-mississippi-lawsuit.html;* Polaris, *Labor Trafficking on Specific Temporary Work Visas, A Data Analysis 2018–2020* 13–18 (May 2022) (Polaris 2018–2020 Report), *https://polaris project.org/wp-content/uploads/2022/07/Labor-Trafficking-on-Specific-Temporary-Work-Visas-by-Polaris.pdf;* Daniel Costa et al., EPI, *Federal Labor Standards Enforcement in Agriculture* 3–6 (Dec. 2020) (EPI 2020 Report), *https://www.epi.org/ publication/federal-labor-standards-enforcement-in-agriculture-data-reveal-the-biggest-violators-and-raise-new-questions-about-how-to-improve-and-target-efforts-to-protect-farmworkers/.*

specific examples of worker experiences, data, and studies on the H–2A program. These comments reflect that the nature of the H–2A program makes these workers particularly vulnerable to retaliation and threats of retaliation, and that the existing worker protections are insufficient to ensure program compliance. For example, CCUSA and USCCB stated that several Catholic Charities agencies that serve migrant farmworkers across the country "report the regular and widespread occurrence of illicit and unjust practices" among H–2A workforces, including restrictions on mobility, worker isolation, and insufficient health care. The California LWDA, a State labor agency, stated that it has seen that "[f]armworkers experience a range of abusive labor practices, including underpayment of wages, inadequate implementation and enforcement of workplace safety measures, and substandard employer-provided housing conditions." With respect to H–2A workers in particular, the agency stated that in its experience "H–2A workers appear to be even more fearful to seek assistance or otherwise exercise their legal rights because they are more vulnerable to employer misconduct" than other farmworkers, citing a "grave imbalance of power between employers and H–2A workers because their visas, encompassing both their authorization for employment and right to remain in the United States, are tied to a single employer."

AIHA, an association committed to occupational health and safety, noted that, as compared to H–2A workers, similarly employed agricultural workers do not face threats of deportation, are not tied to a single employer, and "[t]hey are also more likely to be English-speaking, less likely to depend on the employer for housing, and less likely to lose future job opportunities." The National Women's Law Center echoed these same concerns, commenting that H–2A workers are dependent upon their employers to work and to remain in the United States: "If workers lose their H–2A employment, they must leave the country unless they can find another employer to sponsor them. As a result, H–2A workers will work to the limits of human endurance in an effort to please their employers, keep their jobs, and have the chance of being rehired in future years." CAUSE, which advocates on behalf of H–2A workers and other working-class and immigrant communities in California's Central Coast, stated that "H–2A workers who wish to stand up to unfair or illegal conduct have reason to fear retaliation in the form of discharge and deportation as well as denial of a job and visa in a future season."

Many commenters also stated that greater worker protections are needed to empower workers to advocate regarding working conditions without fear of retaliation and to prevent H–2A program violations. The UFW Foundation gathered and submitted with their comment the first-hand experiences of numerous farmworkers to demonstrate these needs. For example, the comment quoted an H–2A worker as saying that "most workers stay silent because of fear of not being allowed to come back" and another H–2A worker explaining that he didn't advocate for himself because "I know the consequences if I speak and I don't want to lose my job." Yet another H–2A worker stated that "we cannot ask for better treatment because they will simply return us to our country." A former H–2A worker reported that colleagues who complained about wages, housing, or other working conditions were punished.

Many commenters also cited a 2020 report from EPI which reflects a similar conclusion, noting that farmworkers' fear of retaliation and deportation can contribute to an underreporting of violations.[63] The GAO 2015 Report reflects this potential for underreporting as well, explaining that the dependency of H–2A workers on the employer for a visa and employment authorization creates disincentives for workers to report program abuses, leading to an underreporting of violations.[64]

The EPI 2020 Report also set forth that 70 percent of WHD investigations of farms found violations and that a farm employer's probability of being investigated in any year is 1.1 percent.[65] The National Women's Law Center stated, "less than one percent of agricultural employers are investigated per year, yet when WHD does investigate . . . it detects wage and hour violations 70 percent of the time, indicating that wage theft by employers is grossly undetected." In fact, in the previous 5 fiscal years, in 88 percent of WHD's H–2A investigations, WHD found employers in violation of the law. In H–2A cases where back wages are owed, the average worker is owed $746.[66] In its 2020 report, among other recommendations to address its findings, EPI encouraged the Department to "build on the good work done by advocates and unions to educate farmworkers about their rights and the process of reporting violations." [67] In its comment on the NPRM, EPI reiterated its conclusion from its 2020 report and also cited a more recent EPI study from 2023 that "found that violations of H–2A rules account for much higher shares of back wages owed and civil money penalties assessed than violations of other laws on farms, and now account for an overwhelming share of the back wages owed and civil money penalties assessed in agriculture that are the result of closed investigations." [68]

An individual commenter also noted that the recruitment of H–2A workers "is tainted by rampant abuses," including trafficking and labor exploitation. A group of 15 U.S. Senators identified labor trafficking as a major concern in the H–2A program, citing the Polaris 2018–2020 Report finding that the Human Trafficking Hotline identified 2,841 victims of labor trafficking who held an H–2A visa from 2018 to 2020, that 58 percent of those reported they had worked excessive hours, and that 41 percent reported their wages had been withheld or taken. The Alliance to End Human Trafficking noted that, in its experience, "traffickers thrive where vulnerability is high."

Commenters also observed that agricultural labor is dangerous, and these risks are compounded for H–2A workers who may be less likely to report safety concerns out of fear of reprisal. The California LWDA reported that "Cal/OSHA considers the agricultural industry a high hazard industry, an industry with the highest incidence of preventable occupational injuries and illnesses and workers' compensation losses." A group of State Attorneys General cited a report from Union of Concerned Scientists outlining the dangers of farmwork and how these dangers are likely to be increasing, particularly dangers related to climate change.[69] These State Attorneys General also cited to a NIOSH website that observed, based on BLS data, that agricultural workers report one of the highest fatal injury rates and also that there is "well-known underreporting of

---

[63] EPI 2020 Report at 13.

[64] GAO 2015 Report at 37.

[65] EPI 2020 Report at 18–19, 56.

[66] DOL, *Enforcement Data, https://enforcedata. dol.gov/homePage.php* (last accessed Apr. 1, 2024).

[67] EPI 2020 Report at 8.

[68] Daniel Costa & Philip Martin, EPI, *Record-low Number of Federal Wage and Hour Investigations of Farms in 2022* 12 (Aug. 22, 2023), *https:// www.epi.org/publication/record-low-farm-investigations/.*

[69] Union of Concerned Scientists, *Farmworkers at Risk* (2019), *https://www.ucsusa.org/sites/default/ files/2019-12/farmworkers-at-risk-report-2019-web.pdf.*

injury'' in the industry.[70] Specifically, according to NIOSH, in 2021, workers in the agriculture, forestry, fishing, and hunting industry experienced one of the highest fatal injury rates at 20 deaths per 100,000 full-time workers, compared to a rate of 3.6 deaths per 100,000 workers for all U.S. industries. The State Attorneys General comment also pointed out that ''workers trapped in abusive or coercive environments are less likely to take rests or complain about lack of adequate environmental protections, which enables dangerous health and safety violations to persist.'' Citing a study from the *Annual Review of Public Health,* AIHA noted that H–2A workers ''are incentivized to continue employment even when presented with working conditions and labor standards violations that are hazardous to their health and safety.'' [71]

Some commenters also noted that the proposed rule would benefit employers as well as workers. As one individual commenter noted, ''[a]n employer may be economically disadvantage[d] if it prefers not to cut wage and safety corners but its competitors do.'' Another individual commenter explained that ''consistent and fair treatment of workers across the country not only helps the worker, but helps the farmers who do the right thing in the first place.''

On the other hand, many commenters refuted that H–2A workers are a vulnerable workforce or that greater worker protections are needed to ensure program compliance. Several commenters, including IFPA, U.S. Custom Harvesters, Inc., TIPA, and Titan Farms, LLC, opined that the conditions the Department cited in the NPRM as underpinning the perceived vulnerability of H–2A workers— including the workers' dependence on one employer for employment, housing, food, water, and transportation—are conditions the Department ''itself has created'' through regulations and that it is ''unfathomable that the Department is utilizing its own extensive regulatory requirements as its rationale for more regulatory requirements on U.S. businesses.'' Several commenters,

including Western Growers, AmericanHort, and Willoway Nurseries, cited a number from a report of the Cato Institute observing that there are over 200 regulatory requirements in the H–2A program.[72] Several commenters suggested that ''[i]f the Department is concerned with the impact its regulation has on the workforce,'' the Department should consider ''revisions to the existing regulations to provide more flexibilities for the workers'' to make workers less vulnerable.

The Department disagrees that its regulations have created the conditions giving rise to the vulnerability of H–2A workers, such as the statutory dependency on a single employer for a visa, frequent geographic isolation, and language barriers described above. The Department's existing regulations and those included in this final rule are intended to empower workers to voice concerns regarding their terms and conditions of employment without fear of reprisal by employers, agents, recruiters, and other persons who may seek to exploit this dependence. In addition, the Department's regulations do not reduce worker flexibilities related to housing, transportation, meals, and other needs, but instead establish the minimum terms and conditions of employment under this unique program that are necessary to prevent adverse effect on similarly employed workers in the United States.

Several commenters also asserted that the H–2A program ''provides a significant financial opportunity for this critical workforce and their families, which is not accounted for by the Department within this proposal.'' For example, GFVGA observed that many workers return to the same employer year after year, and ''are eager to recruit friends and family members into the program.'' USA Farmers stated that H–2A workers are not more vulnerable but instead have ''more legal protections and benefits'' than U.S. farmworkers. In addition, many commenters felt that the Department's statements in the NPRM regarding the vulnerability of H–2A workers exhibited bias against agricultural employers. Several commenters, including NCFC and FFVA, noted that the ''vast majority of employers who use the [H–2A program] do so with an eye towards compliance.''

IFPA explained that over the years many ''employers have developed a deeper understanding of the program and as a result continue to adopt protocols to ensure compliance, more transparent and efficient recruiting practices, as well as incentive packages for workers to return.'' In support of this point, IFPA, NCAE, the U.S. Chamber of Commerce, and several other commenters cited a blog post from the Rural Migration News at the University of California-Davis. According to the commenters, that blog post—relying on the 2020 EPI report discussed above— stated that between 2005 and 2019, ''71 percent of all violations found on vegetable farms occurred on only 5 percent of all the U.S. vegetable farms.'' [73] These commenters asserted that this data suggests that the proposed regulations are unnecessary and the Department should instead focus on targeted enforcement against the ''bad apples.'' Similarly, citing the House Committee on Agriculture's Agricultural Labor Working Group Interim Report, wafla commented that the Department and SWAs should better utilize existing regulatory and enforcement tools rather than adopt the proposed worker voice and empowerment regulations.[74]

The Department appreciates the opportunity to state clearly that its mission is to promote and achieve compliance with labor standards to protect and enhance the welfare of the nation's workforce. The Department respects that the majority of H–2A employers seek to comply with the law. Unfortunately, despite these good intentions and as explained above, violations of the H–2A program requirements remain pervasive. Although the so-called ''bad apple'' employers may commit a large share of the violations WHD encounters in its investigations, the fact remains that when WHD investigates H–2A employers, it typically does not find full compliance with the law, with back wages averaging several hundred dollars owed per worker. But WHD cannot investigate every farm on which H–2A workers are employed. WHD's enforcement initiatives are data-driven and seek to target the agency's limited

---

[70] NIOSH, Agricultural Safety, *https://www.cdc.gov/niosh/topics/aginjury/default.html* (last accessed Apr. 2, 2024).

[71] Sally M. Moyce & Marc Schenker, *Migrant Workers and Their Occupational Health and Safety,* 39 Annual Rev. of Public Health 351 (2018), *https://www.annualreviews.org/docserver/fulltext/publhealth/39/1/annurev-publhealth-040617-013714.pdf; See also* Federico Castillo et al., *Environmental Health Threats to Latino Migrant Farmworkers,* 42 Annual Rev. of Public Health 257– 276 (2021), *https://www.annualreviews.org/docserver/fulltext/publhealth/42/1/annurev-publhealth-012420-105014.pdf.*

[72] David J. Bier, Cato Institute, Immigr. Rsch. & Pol'y Br. No. 17, *H–2A Visas for Agriculture: The Complex Process for Farmers to Hire Agricultural Guest Workers* 17–30 (Mar. 2020) (counting 209 unique regulatory requirements for the H–2A program between DOL, DHS, and Department of State regulations), *https://www.cato.org/publications/immigration-research-policy-brief/h-2a-visas-agriculture-complex-process-farmers-hire.*

[73] Rural Migration News, *The H–2A Program in 2022* (May 16, 2022), *https://migration.ucdavis.edu/rmn/blog/post/?id=2720.*

[74] House Comm. On Agric., Agric. Lab. Working Grp., Interim Report (Nov. 7, 2023), *https://agriculture.house.gov/uploadedfiles/house_committee_on_agriculture_-_alwg_interim_report_-_final_-_11.7.23.pdf.* Notably, this report also includes findings from a Labor Perspectives roundtable that reflect many of the same concerns identified in the comments on the NPRM regarding the barriers H–2A workers face to reporting program violations. *Id.* at 28–30.

resources where needed most. WHD also supplements its enforcement efforts through employer and worker outreach programs, understanding that it may reach a larger audience by leveraging advocacy organizations, employer associations, community-based organizations, and State and Federal agencies. For example, WHD partnered with the North Carolina Department of Labor's Agriculture Safety and Health Bureau to reach farmworkers in the Southeast. In recent years, WHD has also hosted regional multi-day virtual agricultural seminars educating hundreds of stakeholders—including employers, associations, agents, workers, and advocates—about their rights and obligations under the H–2A provisions of the INA and other laws enforced by the agency. In addition, the Department has developed websites in both English and Spanish, *www.MigrantWorker.gov* and *www.TrabajadorMigrante.gov,* that aim to educate workers about their rights, increase WHD's visibility, and streamline workers' ability to contact WHD with questions, concerns, or complaints.[75] Even so, as many commenters pointed out and as discussed above, a farm employer's probability of being investigated by WHD in any year is small. This final rule seeks to supplement these data-driven enforcement and outreach efforts by giving workers the tools they need to ensure that they are being properly paid and to advocate on their own behalf regarding working conditions, without fear of reprisal. And, as one individual commenter stated, "consistent and fair treatment of workers across the country not only helps the worker but helps farmers who do the right thing in the first place."

The Department also recognizes that the H–2A program benefits H–2A workers in many ways and that the program provides many workers with a financial opportunity that may not exist in their home communities. Many workers do return to the same employer year after year. But, as several commenters pointed out, this dynamic can lead to significant vulnerability for these workers—the fact that workers rely upon the same employer for such an important economic opportunity makes them less likely to speak up about working conditions or noncompliance; workers may not feel empowered to raise concerns with their employer for fear of retaliation, not only by their current employer, but by labor recruiters and other H–2A employers as well, and may lack resources to find other H–2A employment. The Department seeks, in this final rule, to empower workers to seek compliance and protection of their rights.

In addition, a number of commenters, including NCAE and IFPA, took issue with the Department's statement that the dangers and hardships inherent in agricultural labor and the lack of protections for worker organizing have contributed to worsening working conditions and led to a decreasing number of agricultural workers in the United States willing to accept such work. Citing data from USDA, IFPA asserted that the growth in the H–2A program is "more likely a result of an aging domestic agricultural work force and a decrease in the number of migratory farmworkers." The Department acknowledges these trends in the agricultural workforce but notes that regardless of the root cause, use of the H–2A program has grown dramatically over the past decade while overall agricultural employment in the United States has remained stable, meaning that fewer workers in the United States are employed as farmworkers.[76] This increasing reliance upon the H–2A program makes the entire agricultural workforce as a whole more vulnerable to abuse and exploitation for the reasons discussed above, and therefore greater worker protections are needed to ensure that workers feel safe and have the ability to ensure that their rights are being protected.

As several commenters noted, the Department's H–2A regulations already include numerous and substantial protections for workers, including various minimum terms and conditions of employment under the H–2A program that are necessary to prevent adverse effects on similarly employed workers. However, as the Department's enforcement experience and the above comments, data, and studies reflect, greater protections are needed to empower workers to speak up on their own behalf to enforce these terms and conditions of employment. As the American Federation of Labor & Congress of Industrial Organizations (AFL–CIO) stated in its comment, "[g]uaranteeing such wages and working conditions on paper means nothing if the H–2A workers are unable or unwilling because of fear and intimidation to take action if they are not paid the required wages or are otherwise abused." Workers' rights cannot be secured unless they are protected from all forms of discrimination resulting from any worker's attempt to advocate on behalf of themselves or their coworkers. The Department and courts have long recognized that such protections are necessary and essential to the effective functioning of a complaint-based enforcement system. *See, e.g.,* 88 FR at 63790; *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292 (1960) (agreeing with the Department's interpretation of the FLSA's anti-retaliation provision that "effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances"). As the comments and the Department's enforcement experience make clear, the current protections are not enough to prevent adverse effect. Therefore, after consideration of the comments received, the Department concludes that the H–2A workforce is uniquely vulnerable, and as a result, H–2A workers are less able and less likely to advocate on behalf of themselves or their coworkers to seek compliance with the terms and conditions of H–2A employment that the Department has determined are necessary to prevent adverse effect on the wages and working conditions of workers in the United States similarly employed. Additionally, the ability of employers to hire this uniquely vulnerable workforce may suppress the ability of agricultural workers in the United States to negotiate with employers and advocate on their own behalf regarding their terms and conditions of employment.

The Department proposed in the NPRM to prevent such adverse effect by revising the assurances and obligations of H–2A employers to include stronger protections for workers who advocate regarding their working conditions on behalf of themselves and their coworkers. Specifically, the Department proposed to broaden the provision at § 655.135(h), which prohibits unfair treatment, by adding a number of protected activities that the Department considered would play a significant role in safeguarding collective action— activities that workers must be able to

---

[75] *See www.MigrantWorker.gov* (English language version) and *www.TrabajadorMigrante.gov* (Spanish language version), at *https://www.dol.gov/general/ migrantworker* and *https://www.dol.gov/general/ trabajadormigrante. See also https://www.dol.gov/ agencies/whd/espanol* and *https://www.worker.gov/ es* for additional Spanish language Department resources for workers.

[76] According to USDA's Economic Research Service, employment of farmworkers in the United States has remained stable since the 1990s, but the number of positions certified in the H–2A program has increased sevenfold from 2005 to 2022. *See USDA, Farm Labor, https://www.ers.usda.gov/ topics/farm-economy/farm-labor* (last visited Apr. 2, 2024); USDA, *H–2A Seasonal Worker Program Has Expanded Over Time, https://www.ers. usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=104874* (last visited Apr. 2, 2024).

engage in without fear of intimidation, threats, and other forms of retaliation. The Department also proposed several new employer obligations at § 655.135(m) that would ensure H–2A employers do not interfere with workers' efforts to advocate regarding their working conditions, including a number of requirements that would advance worker voice and empowerment and further protect the rights proposed under § 655.135(h). The Department also proposed a new employer obligation at § 655.135(n) that would explicitly allow H–2A workers and workers in corresponding employment the right to invite or accept guests to worker housing and also would provide a narrow right of access to worker housing to labor organizations. Some of these provisions were limited to those workers who are engaged in agriculture as defined and applied in 29 U.S.C. 203(f)—that is, those who are exempt from the protections of the NLRA.

As detailed below in the section-by-section analysis, the Department is adopting several of its proposals relating to worker voice and empowerment in this final rule, modified as discussed in response to the comments received. The Department concludes that these provisions, which safeguard worker voice and empowerment, will prevent adverse effect on similarly employed workers in the United States by alleviating some of the barriers H–2A workers face when raising complaints about violations of their rights under the program and advocating regarding working conditions.

Many commenters opposing the proposed rule argued that the Department failed to provide a "rational basis" for its conclusion that the proposed worker voice and empowerment provisions will prevent the identified adverse effect on similarly employed workers in the United States. As IFPA phrased the issue, "[w]hat remains unanswered throughout the entire Department proposal is how greater access for labor organizations to foreign-citizen workers in the [H–2A] program will improve conditions for U.S. workers elsewhere." Similarly, wafla posited that the Department "assumes that unionization is the answer to additional worker protections." Commenters also observed that many employees may not wish to join a union and should not be forced to do so.

The Department welcomes the opportunity to clarify this point. This final rule does not provide for collective bargaining rights nor does the rule compel a worker to join a union. As

finalized, the rule does not grant any rights to labor organizations. Rather, as detailed below, the final rule does the following: clarifies and expands protections for engaging in protected activities, including exercising rights under State and local laws; offers new protections for workers engaged in FLSA agriculture to engage in concerted activity; provides limited access to representation in disciplinary proceedings; and ensures greater access for workers to key service providers and to information about workers' rights. The Department believes that each of these provisions, taken individually, will reduce the fear of retaliation and other barriers currently faced by the H–2A workforce when seeking to advocate on behalf of themselves and their coworkers regarding their working conditions or violations of their rights, if they so choose. Empowering workers in this way thus can improve compliance with the various terms and conditions of H–2A employment that the Department has separately determined are necessary to prevent adverse effect on similarly employed workers. The Department believes that these improved protections also will help place the H–2A workforce on more equal footing with similarly employed workers and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers.

The right to engage in concerted activity specifically, as described in greater detail in Section VI.C.2.b.viii below, is a demonstrated and powerful tool to empower worker voice to address working conditions, whether or not the workers' concerted activity results in formal representation by a labor union or other organized group. For example, in its comment, the AFL–CIO pointed to evidence that worker engagement in concerted activity "significantly increases the enforcement of a broad range of employment laws and thus prevents the exploitation of workers." It particularly noted the role that representation by labor unions has played in increasing the likelihood that workers will voice complaints and increasing the likelihood of inspections under the Occupational Safety and Health Act.[77] In its comment, FLOC also provided evidence that collective action by workers can help prevent adverse effect, particularly through improving employer compliance with the terms and conditions of employment under the H–2A program. For example, FLOC noted that it has negotiated CBAs

covering about 10,000 farmworkers in North Carolina, including many H–2A workers as well as non-H–2A workers. It also noted that although the H–2A regulations prohibit workers from paying recruitment fees, many H–2A workers are still illegally required by unscrupulous recruiters to pay such fees. FLOC stated that it "has to a large extent eliminated these fees for workers employed under its [CBA] . . . due to the extensive provisions in the [CBA] providing job protection for those H–2A workers who file complaints regarding their U.S. employment, including complaints concerning recruitment fees." FLOC explained that its CBA indirectly assists in enforcing the regulatory provision by barring the blacklisting of union members who complain about illegal recruitment fees. FLOC also noted that its negotiated CBA with the North Carolina Growers Association also requires that all disciplinary actions and terminations be subject to a "just cause" standard, and provides union staff with access to all employer housing facilities and work sites, in order to inspect working conditions and assist workers in enforcing compliance. The UFW also quoted one H–2A worker stating that having representation would be helpful because the employers "would stop threatening us all the time with returning us to our country and not giving us more work." It also cited evidence that many farmworkers regularly experience wage theft, especially regarding piece rates, and that concerted activity helps ensure that workers are paid the wages as promised in the job order. For example, one worker stated that after she worked on a piece rate basis for a month picking tangerines, the contractor refused to pay the workers because they did not have proof of how many tangerine bins they had picked. After the workers sought help from the UFW, the contractor finally paid the workers the wages they had earned. As reflected in the comments received, concerted activity by farmworkers can result in significantly fewer violations and improved compliance with laws even in non-union settings. As further detailed below, workers in several States have joined together to seek better enforcement of laws against sexual harassment, retaliation, and discrimination on farms, either by campaigning for voluntary agreements or by working with legal aid groups and/or government agencies to file complaints under applicable State laws and/or Federal anti-discrimination, minimum wage, and anti-human

---

[77] See David Weil, *Enforcing OSHA: The Role of Labor Unions*, 30 Indus. Rel. 20 (1991).

trafficking laws. Indeed, workers can engage in advocacy and concerted activities for the purpose of mutual aid and protection without engaging in or being represented by a labor organization. For example, although farmworkers in some States have been able to enforce their rights by joining unions, in other States they have chosen instead to band together in worker centers to campaign for voluntary agreements. *See, e.g.,* comments by FLOC, the UFW Foundation, the Farmworker Association of Florida, and CDM; *see also* the Campaign for Fair Food supported by the Coalition of Immokalee Workers in Florida. Farmworkers also have engaged in concerted, collective action through litigation to enforce their rights. *See, e.g., Garcia-Celestino,* 843 F.3d at 1285 (class action filed by H–2A workers in Florida bringing claims against labor contractor and fruit grower under FLSA, State minimum wage law, and State breach of contract law for failure to pay required wages); *Gonzalez-Rodriguez* v. *Gracia,* No. 5:21–CV–406, 2023 WL 2450170 (E.D.N.C. Feb. 6, 2023) (collective action filed under FLSA by H–2A workers who worked as both cooks and field workers in North Carolina alleging that employer failed to pay them, physically and sexually abused them, took possession of their passports and threatened violent retaliation if they attempted to escape); *Reyes-Trujillo* v. *Four Star Greenhouse, Inc.,* 513 F. Supp. 3d 761, 773–74 (E.D. Mich. 2021) (complaint filed by H–2A workers against grower under Federal and State laws alleging that employer and its labor contractor did not pay them properly and retaliated against workers who raised concerns by having them jailed and removed from the United States).

And as detailed in the NPRM and below, concerted activity under this rule need not include any formal organization of workers, as it includes employee activity "engaged in with or on the authority of other employees, and not solely by and [on] behalf of the employee himself," and can consist of two or more workers presenting joint requests or grievances to their employer, among other activities. 88 FR at 63793 (citations omitted). Concerted activity also encompasses workers' individual actions when they seek to initiate, induce, or prepare for group action, or when workers bring shared complaints to the attention of management or an enforcement agency. *Id.* As stated in the NPRM, activity for "mutual aid or protection" encompasses activities for which "there is a link between the

activity and matters concerning the workplace or employees' interests as employees." *Id.* (citations omitted). For example, as further detailed below, "concerted activity for mutual aid and protection" can be as simple as one worker speaking up for another, or two workers approaching their employer jointly, to complain about a lack of clean drinking water or inadequate or unsanitary toilet facilities in violation of OSHA field sanitation standards.[78] The Department also recognizes that there are many ways that workers can seek to advocate on behalf of their working conditions and seeks in this final rule to protect all such activities. Therefore, after consideration of the comments, the Department has modified the worker voice and empowerment provisions from those proposed in the NPRM. As described in greater detail below, in response to concerns raised by commenters, the Department will not finalize the proposals to require employers to provide a requesting labor organization with a list of employee contact information, nor the requirement that an employer disclose whether it will bargain in good faith over a neutrality agreement with a labor organization, nor the right of access to employer-furnished housing for labor organizations. The Department will finalize, with the modifications described below, the worker protections against unfair treatment at § 655.135(h) and the right to a representative in certain disciplinary proceedings at § 655.135(m). The Department also adopts a significantly modified version of the "captive audience meetings" provision at proposed § 655.135(m)(3). Finally, the Department will finalize the explicit right of H–2A or corresponding workers to invite or accept guests to worker housing.

A number of commenters argued that the Department lacks statutory authority to promulgate its proposed worker voice and empowerment regulations. Several trade associations, including FFVA and IFPA, commented that the Department's proposal unlawfully sought to make jobs more attractive to U.S. workers. These commenters also argued the Department lacks authority to establish a "baseline" of acceptable standards for working conditions below which workers in the United States would be adversely affected. Other commenters stated that the Department's proposals could not prevent adverse effect when many

agricultural workers in the United States lack collective bargaining rights. For example, wafla commented that the baseline of working conditions is "the absence of collective bargaining rights in agriculture" and that the Department therefore lacked authority to attempt to expand collective bargaining rights for H–2A workers. Commenters also asserted that the Department failed to properly consider the needs and rights of employers in developing these worker voice and empowerment proposals, noting that the H–2A statute requires the Department to balance the competing goals of providing U.S. employers with a needed workforce while preventing adverse effect on similarly employed workers in the United States. Relatedly, commenters stated that the Department selectively proposed to adopt only certain provisions of the NLRA, excluding protections built into the NLRA for employers to challenge unfair labor practices by unions.

The Department does not intend with this final rule to make jobs more attractive to U.S. workers. *See Williams,* 531 F.2d at 306–07 (Department may not set AEWR based on "attractiveness to workers"). Neither is the Department granting collective bargaining rights to H–2A and corresponding workers, nor regulating the conduct of unions. Instead, as described above, the Department seeks to prevent adverse effect on similarly employed workers by ensuring that workers have the tools to ensure that their rights under the H–2A program are not violated and to advocate regarding the terms and conditions of their employment, on more equal footing with similarly employed workers in the United States. Though such similarly employed workers may be excluded from the NLRA's protections, they may be less likely to face the unique vulnerabilities and forms of retaliation experienced by H–2A workers described above. The tools adopted in this final rule include the right for workers to engage in protected, concerted activity without fear of retaliation and additional worker protections to empower workers in order to engage in advocacy regarding the terms and conditions of employment. In adopting these provisions, the Department is exercising its long-recognized authority to establish the minimum terms and conditions of employment (*i.e.,* the "baseline" of working conditions) necessary to "neutralize any 'adverse effect' resultant from the influx of temporary foreign workers." *Id.; see also Garcia-Celestino,* 843 F.3d at 1285. As

---

[78] *See, e.g.,* DOL, *OSHA Fact Sheet #51: Field Sanitation Standards under the Occupational Safety and Health Act* (2008), *https://www.dol.gov/agencies/whd/fact-sheets/51-osh-act-field-sanitation.*

detailed below in the section-by-section analysis, the Department has determined that the worker voice and empowerment provisions adopted in this final rule are necessary to address a demonstrated imbalance of power between employers and H–2A workers and prevent adverse effect on similarly employed workers. The Department has considered the burden imposed on employers for each proposal and has determined that the provisions adopted in this final rule strike the necessary balance, such that the Department can satisfy its statutory mandate under 8 U.S.C. 1188(a)(1) when granting a labor certification to a prospective H–2A employer.

Many commenters also asserted that the Department's proposals would be preempted by the NLRA if finalized. As the Department explained in the NPRM, some of the provisions of the proposal, including some of those adopted in this final rule, are limited to persons who are engaged in FLSA agriculture (*i.e.,* as defined and applied in 29 U.S.C. 203(f)). This final rule provides, as described more fully below, certain protections for these workers to engage in concerted activity and provides certain rights necessary to safeguard collective action. The Department explained in the preamble of the NPRM that these provisions are not preempted by the NLRA because the NLRA's coverage extends only to workers who qualify as "employee[s]" under sec. 2(3) of that Act, and the NLRA's definition of employee expressly excludes "any individual employed as an agricultural laborer." 29 U.S.C. 152(3). Congress has provided that the definition of "agriculture" in sec. 3(f) of the FLSA also applies to the NLRA. *See, e.g., Holly Farms Corp.* v. *NLRB,* 517 U.S. 392, 397–98 (1996). Following the plain text of the statute, both Federal courts and the NLRB have long held that the NLRA does not apply to agricultural workers, worker organizing by agricultural workers, or unions "composed exclusively of agricultural laborers." *Di Giorgio Fruit Corp.* v. *NLRB,* 191 F.2d 642, 647 (D.C. Cir. 1951); *see also, e.g., Villegas* v. *Princeton Farms, Inc.,* 893 F.2d 919, 921 (7th Cir. 1990). Because the rights and protections relating to concerted activity in this final rule apply only to workers who fall within the NLRA and FLSA definitions of "agriculture," these provisions apply exclusively to workers who are exempt from the NLRA.

As the Supreme Court explained in *San Diego Building Trades Council* v. *Garmon,* 359 U.S. 236 (1959), the NLRA preempts regulation of activities that either are or arguably are "protected by § 7 of the [NLRA], or . . . an unfair labor practice under § 8." *Id.* at 244; *see also UAW–Labor Emp. & Training Corp.* v. *Chao,* 325 F.3d 360, 363 (D.C. Cir. 2003). Conduct may be "arguably" governed by sec. 7 or 8 of the NLRA when there is a plausible argument for preemption "that is not plainly contrary to [the Act's] language and that has not been authoritatively rejected by the courts or the Board." *Int'l Longshoremen's Ass'n* v. *Davis,* 476 U.S. 380, 395 (1986) (citations omitted). Because agricultural workers are expressly excluded from the NLRA by the plain text of the statute, agricultural worker concerted activity is neither protected by sec. 7 of the Act nor subject to sec. 8's limitations on unfair labor practices. *See* 29 U.S.C. 152(3); *see also Bud Antle, Inc.* v. *Barbosa,* 45 F.3d 1261, 1274 (9th Cir. 1994) ("If Bud's employees are 'agricultural laborers,' then the NLRA does not apply, and the company's conduct is not arguably prohibited under the Act."); *Villegas,* 893 F.2d at 921 (agricultural workers' retaliation claim not preempted by NLRA because they are excluded from the NLRA's protections); *Di Giorgio,* 191 F.2d at 647–49 (holding that NLRA sec. 8's prohibition on secondary boycotts did not apply to a farm union, because an organization composed exclusively of agricultural workers is not governed by the NLRA). Therefore, because this final rule's provisions relating to concerted activity apply only to agricultural workers, the conduct that is protected under those provisions is not even arguably governed by the NLRA and thus not preempted under *Garmon. Id.*

The NLRA also preempts regulation of employer or worker conduct that Congress intended to leave unregulated "to be controlled by the free play of economic forces." *Int'l Ass'n of Machinists & Aerospace Workers* v. *Wis. Emp't Relations Comm'n,* 427 U.S. 132, 140 (1976) (citation omitted). *Machinists* preemption applies to State or Federal regulation of "economic weapons" that would "frustrate effective implementation of the [NLRA's] processes." *Id.* at 147–48 (citations omitted). However, Federal courts have held repeatedly that Congress' exclusion of agricultural employees from the NLRA's protection indicates that Congress did not intend to occupy the field of agricultural labor relations and that labor regulations covering agricultural employees do not frustrate effective implementation of the NLRA. *See United Farm Workers of Am.* v. *Ariz. Agric. Emp't Rels. Bd.,* 669 F.2d 1249, 1257 (9th Cir. 1982) (NLRA does not preempt State regulation of agricultural laborers); *Willmar Poultry Co.* v. *Jones,* 430 F. Supp. 573, 577–78 (D. Minn. 1977) (same). Similarly, courts have held that *Machinists* preemption does not bar labor relations regulations that apply to other workers excluded from the NLRA. *See, e.g., Davenport* v. *Wash. Educ. Ass'n,* 551 U.S. 177, 181 (2007) (public employees); *Chamber of Commerce* v. *City of Seattle,* 890 F.3d 769, 793 (9th Cir. 2018) (independent contractors); *Greene* v. *Dayton,* 806 F.3d 1146, 1149 (8th Cir. 2015) (domestic service workers). Accordingly, the provisions of this final rule applicable only to agricultural employees excluded from the NLRA are not prohibited under *Machinists* preemption.

Many commenters attempted to distinguish *Garmon* and *Machinists,* and related cases, from the Department's proposed rule, opining that because the Department is a Federal agency, rather than a State, a different preemption analysis must apply. For example, Willoway Nurseries stated that the Department's preemption analysis "negates the point that Congress spoke as to what the Executive could do when it comes to agricultural workers, and they are exempt from the provisions of the NLRA." FFVA similarly opined that, "[w]hile states may be able to legislate where Congress has not 'occupied the field,' the U.S. Department of Labor, importantly, is not a state." The comment continued, "[r]egarding labor policy for agricultural workers, Congress was in no way silent as to a policy. The NLRA expressly excluded agriculture laborers from the provisions of the Act."

These commenters fail to recognize that, as the Supreme Court and circuit courts have made clear, both the *Machinists* and *Garmon* analyses apply to consideration of whether the NLRA preempts any laws or regulations, whether promulgated by the Federal government or by State governments. Over 30 years ago, the Supreme Court observed that "[t]he *Machinists* rule creates a free zone from which all regulation, whether federal or State, is excluded." *Golden State Transit Corp.* v. *City of Los Angeles,* 493 U.S. 103, 111 (1989) (citations omitted). The lower courts have recognized this as well. *See, e.g., Chamber of Commerce* v. *Reich,* 74 F.3d 1322 (D.C. Cir. 1996) ("Nor, as we have noted, is there any doubt that *Machinists* 'pre-emption' applies to federal as well as state action."). As set forth above, the Department's rule is not preempted under *Machinists.* Similarly, *Garmon* preemption is equally relevant to determining whether the NLRA preempts Federal or State laws or

regulations. *See, e.g., UAW–Labor Emp. & Training Corp.,* 325 F.3d at 363 (considering whether Department posting regulation was preempted by the NLRA under *Garmon*); *Nat'l Ass'n of Mfrs.* v. *Perez,* 103 F. Supp. 3d 7, 22 (D.D.C. 2015) (same). As the D.C. Circuit has explained, the relevant inquiry under *Garmon* is whether the activity in question is "arguably" protected or prohibited under the NLRA; this question applies equally to examine State and Federal laws and regulations. *UAW,* 325 F.3d at 363–65. And as explained above, the provisions of this final rule relating to self-organization are neither arguably protected nor arguably prohibited under the NLRA.

For the most part, though, commenters asserted that the Department's proposals would be preempted by the NLRA because, in their view, the Department lacks any authority to protect rights relating to self-organization and concerted activity for workers excluded from the NLRA. Commenters, including employers, trade associations, and a group of State Attorneys General, also contended that the Department exceeded its authority under the INA by regulating labor relations in the agricultural sector. In particular, these commenters pointed to the exclusion from the NLRA's protections of agricultural workers to demonstrate that the Department lacks authority for its proposed regulations. A comment from 22 State Attorneys General stated that the Department is "seeking to circumvent" Federal law "by granting foreign workers federal rights that no American agricultural worker has." The U.S. Chamber of Commerce stated that "nothing in INA § 1188's words or context suggests that Congress meant to enact a full-scale program of labor-management relations." The National Right to Work Legal Defense Foundation, Inc. stated that there is "no reasonable basis for concluding that [the INA] grants the Department sweeping authority to create substantive labor laws for agricultural employees." And the Michigan Farm Bureau stated, "Congress spoke as to what the Executive could do when it comes to agricultural workers, and they are exempt from the provisions of the NLRA."

In other words, these commenters argue that because the NLRA does not protect concerted activity involving agricultural workers, no other Federal law nor agency may do so. The D.C. District Court confronted and rejected a similar argument in *Nat'l Ass'n of Mfrs.* v. *Perez,* regarding a Departmental posting regulation, explaining that "[t]he Supreme Court has never found

that Congress intended for the NLRA to occupy the 'field' with respect to the regulation of labor concerns." 103 F. Supp. 3d at 25. The district court further explained that "Congress did not intend for the NLRA to wholly occupy the field with respect to labor regulation and thereby foreclose all other regulation of that area." *Id.* Importantly, the court also observed that the Department's regulation there was subject to the authority of the Procurement Act and not the NLRA. *Id.*

Here too, the Department is neither attempting to extend the full rights and benefits of the NLRA to agricultural workers nor attempting to devise a "full-scale program of labor-management," as the U.S. Chamber of Commerce asserted. Instead, as set forth above, the Department is issuing these regulations pursuant to its statutory authority under the INA to better protect against adverse effect on similarly employed workers caused by the use of the H–2A program. This final rule, as detailed more fully in the section-by-section analysis below, provides for certain rights and protections to better protect workers employed under the H–2A program and excluded from the NLRA's coverage to engage in concerted activity, including self-organization, to better protect against adverse effect in light of the unique vulnerability of this workforce described above. Accordingly, these provisions establish and clarify labor standards for workers employed under the H–2A program. The labor standards in this rule do not apply to agricultural workers beyond the scope of the H–2A program. While the Department recognizes and appreciates the significant labor needs of U.S. agricultural employers, it notes that employer participation in the H–2A program is voluntary. Employers that object to compliance with the requirements of this final rule need not participate in the H–2A program at all. However, those employers that do seek the benefits of the H–2A program— namely, the ability to employ H–2A workers—must agree, as a condition of receiving the necessary labor certification, to comply with the terms and conditions of employment that the Department has determined are necessary to prevent adverse effect on similarly employed workers. *Cf. Adm'r* v. *Azzano Farms, Inc.,* ARB No. 2020–0013, 2023 WL 3042229, at \*10 (ARB Mar. 30, 2023) (observing that the ARB has long recognized that employers that opt to participate in and obtain the benefits of the INA's temporary labor certification programs may not later disavow the requirements of those

programs). As detailed in this section, the Department has determined that certain additional or expanded requirements are necessary to prevent such adverse effect.

In addition, even within the context of the H–2A program, the Department's final rule does not require collective bargaining, employer recognition, or any other action by the employer in response to worker organizing. *Cf. Rest. Law Ctr.* v. *City of New York,* 90 F.4th 101, 118 (2d Cir. 2024) (concluding that a New York State law protecting workers from arbitrary terminations and reductions in work hours and providing for arbitration is not preempted by the NLRA under *Machinists*). Instead, as outlined above and further detailed in the section-by-section analysis below, this final rule clarifies and expands existing protections for workers engaging in protected activities, including exercising rights under State and local laws; offers new protections for workers engaged in FLSA agriculture to engage in concerted activity; provides limited access to representation in disciplinary proceedings; and ensures greater access for workers to key service providers and to information about workers' rights.

Finally, the rights and protections detailed herein, which are pursuant to and in furtherance of the INA's requirements, are mutually supplemental to those required under the NLRA; an employer subject to either act (or both acts, in certain cases, as discussed below) must comply with all applicable laws and neither precludes application of the other. *See Powell* v. *U.S. Cartridge Co.,* 339 U.S. 497, 518–520 (1950).

For example, as noted in the preamble to the NPRM, because certain provisions of this proposed rule would be limited to workers engaged in FLSA agriculture, the Department recognizes and intends that workers who are not engaged in FLSA agricultural labor (*e.g.,* those workers engaged in logging occupations) will not be covered by those provisions of this final rule. The vast majority of workers excluded from these protections, however, are covered by the NLRA and are thus already afforded a right to engage in concerted activity under that law. Nothing in this final rule alters or circumscribes the rights of workers already protected by the NLRA to engage in conduct and exercise rights afforded under that law.

A number of commenters also stated that the Department's proposed regulations would violate the major questions doctrine, as set forth by the Supreme Court in *West Virginia* v. *EPA,* in which the Court held an agency

''must point to clear congressional authorization for the power it claims,'' rather than a ''merely plausible textual basis,'' in ''certain extraordinary cases.'' 597 U.S. 697, 723 (2022) (citations omitted). The Department's final rule does not implicate the major questions doctrine. First, this is not a rule that asserts ''extravagant statutory power over the national economy,'' *id.* at 724. The Department does not seek to regulate employers generally with this rule, or even agricultural employers at large; this rule applies only to those agricultural employers that have opted to participate in the H–2A program. Accordingly, the labor standards and protections in this rule do not apply to agricultural workers beyond the scope of the H–2A program. While an increasing number of employers have chosen to participate in the H–2A program, the program still makes up only a small fraction of the agricultural workforce.[79]

Second, this is not a case where the agency relied on statutory language in the ''vague language of an ancillary provision.'' *West Virginia,* 597 U.S. at 724 (citation omitted). Nor has the Department relied on a ''long-extant statute'' to claim ''unheralded power.'' *Util. Air Regul. Grp.* v. *EPA,* 573 U.S. 302, 324 (2014). Nor is this a case in which the Department lacks ''comparative expertise in making [the relevant] policy judgments,'' *West Virginia,* 597 U.S. at 729 (citation omitted), or has asserted authority that falls outside its ''particular domain,'' *Ala. Ass'n of Realtors* v. *HHS,* 141 S. Ct. 2485, 2489 (2021). To the contrary, as previously noted, the relevant grant of authority at issue here at 8 U.S.C. 1188(a) is one that the Department has long relied on to establish program requirements that ensure that the employment of H–2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed, and is an area where the Department has significant expertise. *See, e.g.,* 2023 NPRM, 88 FR at 63787; 2010 H–2A Final Rule, 75 FR at 6948 (discussing the need to ''prevent[] the exploitation of foreign workers, with its concomitant

adverse effect on U.S. workers''); 2008 H–2A Final Rule, 73 FR at 77159 (noting that foreign workers ''may be subject to exploitation in ways that would adversely affect the wages and working conditions of U.S. workers by creating conditions resembling those akin to indentured servitude, driving down wages and working conditions for all workers, foreign and domestic''); 1987 H–2A IFR, 52 FR at 20508, 20513 (describing the ''minimum'' terms and conditions of employment necessary to prevent adverse effect). Since the inception of the H–2A program, these program requirements have included protections from retaliation for workers who exercise or assert their rights under the H–2A program, including by raising concerns or filing a complaint regarding the terms and conditions of their employment. 1987 H–2A IFR, 52 FR at 20517. Similarly, the Department has long required H–2A employers to provide workers with certain rights and benefits not required of other agricultural employers that do not utilize the H–2A program, such as the provision of meals or kitchen facilities and the provision of transportation and subsistence costs, on the basis that such requirements are necessary under the H–2A program to prevent adverse effect. *Id.* at 20513–16. This final rule simply continues the Department's long history of establishing the minimum terms and conditions of employment necessary under the H–2A program to prevent adverse effect on similarly employed workers. It does so by seeking to expand and improve the tools available to workers protected under the H–2A program to prevent exploitation and to ensure compliance with the law, in light of the Department's program experience and evidence described above demonstrating that the current framework of protections are insufficient to satisfy the Department's statutory mandate. In other words, this final rule does not purport to broadly grant collective bargaining rights to agricultural workers, nor to grant rights to labor organizations; rather, consistent with the Department's history of regulating under the H–2A program, this rule seeks to provide protections to workers in the H–2A program in order to prevent adverse effect.

### i. Section 655.103(b), Definitions

In support of the new employer obligations the Department proposed in the NPRM, the Department proposed adding two new definitions to § 655.103(b). For the reasons discussed below, in this final rule the Department adopts the proposed definition of ''key service provider'' with modifications

and adopts the definition of ''labor organization'' as proposed.

The Department proposed to define ''key service provider'' to mean a health-care provider; a community health worker; an education provider; an attorney; a legal advocate or other legal service provider; a government official, including a consular representative; a member of the clergy; and any other service provider to which an agricultural worker may need access. The list of service providers included in the proposed definition was intended to be illustrative and not exhaustive. The Department sought comment on the scope of this proposed definition, in particular as to whether it would be sufficient, whether other types of service providers should be included in the list of examples in the regulation, or whether this definition would be too broad.

The Department also proposed to define ''labor organization'' to mean ''[a]ny organization of any kind, or any agency or employee representation committee or plan, in which workers participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.'' The proposed definition is similar to the one used under the NLRA, with a key difference to reflect the nature of the H–2A program. While the proposed definition would thus incorporate many NLRA principles regarding the meaning of the term ''labor organization,'' the Department intended the range of organizations that would be considered labor organizations under these proposed regulations to be broader than under the NLRA because the Department's proposed definition would include organizations in which agricultural workers participate, whereas such organizations are excluded under the NLRA. The Department conveyed its belief that this broader definition is appropriate given the unique characteristics of the H–2A program and sought comment on the scope of the proposed definition. The Department also sought comment on whether the definition should include additional criteria or protections to ensure that any such organization would not be dominated, interfered with, or supported by employers, as would be prohibited by sec. 8(a)(2) of the NLRA, 29 U.S.C. 158(a)(2). The Department also welcomed comments on whether other terms introduced by the proposed regulations should be defined in 20 CFR 655.103(b) and on other definitions that the Department should consider.

---

[79] In 2022, direct on-farm employment amounted to 2.6 million jobs. *See* USDA, *Agriculture and its related industries provide 10.4 percent of U.S. employment, https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=58282* (last visited Apr. 4, 2024). By comparison, in 2022 the Department certified H–2A temporary labor certifications for around 370,000 jobs. *See* USDA, *Florida, California, and Georgia accounted for one-third of H–2A jobs in FY 2022, https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=106604#* (last visited Apr. 4, 2024).

The Department received several comments in support of the proposed definition of "key service provider" from farmworker advocates and labor unions, and several comments in opposition to the proposed definition from agricultural associations and agricultural employers.

Several commenters commended the proposed definition as appropriate and not overly broad. CCUSA and USCCB expressed gratitude for the Department's inclusion of "member of the clergy" within the definition of "key service provider," commending the Department on its explicit recognition of the important role played by clergy and religious representatives in the lives of H–2A workers.

Many commenters opposing the proposed definition said that the inclusion of the phrase "and any other service provider to which a worker may need access" would result in ambiguity and lead to confusion about the types of service providers the definition is intended to cover. Additionally, some commenters supported the addition of the provision but also urged the Department to consider adding other types of service providers to the illustrative list of examples in the definition, such as emergency responders, law enforcement officers, community outreach workers, and translators and interpreters. One commenter, the National Legal Aid & Defender Association (NLADA), asked the Department to clarify that it is the function and not the title of a service provider that determines whether the service provider falls within the definition.

The Department received comments in support of the proposed definition of "labor organization" from farmworker advocates and a SWA stating that the definition would provide clarity on the rights in the corresponding changes under the proposed rule. It also received comments in opposition to the proposed definition from agricultural associations, agricultural employers, and farm bureaus. Several commenters opposing the proposal commented that the proposed definition was overly broad, insufficiently clear, and would cause confusion among employers and workers alike about which organizations would be eligible for inclusion. Many pointed out that the Department's proposed definition was broader than the definition included in the NLRA. Some commenters recommended that the Department establish a directory of eligible labor organizations but did not suggest specific criteria for inclusion or exclusion in such a directory. Other commenters expressed that the

Department should not expand the proposed definition of "labor organization." The Department did not receive any comments regarding sec. 8(a)(2) of the NLRA, suggesting other needed definitions, or recommending other changes to existing definitions.

In response to comments about the definition of "key service provider," in the final rule, the Department revises the definition to improve clarity and to expand the list of illustrative examples. Specifically, the Department adds "a translator or interpreter," "an emergency services provider," and "a law enforcement officer" to the list of illustrative examples in the definition. The Department agrees with commenters that such service providers should be explicitly included, as the services they provide are indispensable to a population of workers that is so often geographically and culturally isolated. The Department declines to add "community outreach worker" as the meaning of this term may not be commonly understood; the Department, nevertheless, believes that such individuals fall within the other illustrative examples included in the definition. The Department also replaces the phrase "and any other service provider to which the worker may need access" with the phrase "and any other provider of similar services." The Department believes that this wording is clearer and avoids potential confusion about the meaning of "key service provider" while retaining the broad and inclusive meaning of the term. The Department also believes that this phrasing will properly convey that it is the function of the service provider and not the provider's title that determines inclusion under this definition, as suggested by commenters. The Department believes that this definition of "key service provider," particularly as applied under new § 655.135(h)(1)(v), will help to prevent adverse effect on similarly employed workers in the United States by ensuring that H–2A and corresponding workers can consult with and receive necessary services to assist them in ensuring employer compliance with the terms and conditions of employment and advocating regarding working conditions, including health and safety, without fear of retaliation.

Upon consideration of comments related to the definition of "labor organization," the Department adopts the definition as proposed in the NPRM. The definition will only be used in connection with the new protection under final 20 CFR 655.135(h)(2)(i) for "concerted activity" by persons engaged in agriculture as defined and applied in

29 U.S.C. 203(f). The Department believes that the proposed definition is sufficiently clear to provide a reasonable standard by which employers, workers, and labor organizations may determine the organizations to which the new provision refers. The Department also believes that this definition is sufficient to effectuate the rights under new § 655.135(h)(2)(i) intended to prevent adverse effect on similarly employed workers.

While the Department appreciates commenters' suggestions that the Department maintain a directory of eligible labor organizations, it does not believe that any such directory or list is necessary. The Department is not finalizing its proposals to provide employee contact information to labor organizations, to require H–2A employers to provide access to labor organizations, or to state whether they would agree to bargain with such an organization upon request over neutrality. Thus, this final rule does not create any independent rights or obligations for which such labor organizations would be "eligible," as originally proposed.

ii. Section 655.135(h), No Unfair Treatment

The Department proposed to expand the scope of what constitutes prohibited unfair treatment under § 655.135(h) to better protect workers who exercise certain rights or engage in self-advocacy from intimidation or discrimination, including protections for consulting with key service providers; for exercising rights under any applicable Federal, State, or local laws or regulations, including safety and health laws; and, for certain workers, for engaging in concerted activities for the purpose of mutual aid or protection relating to wages or working conditions. The Department also proposed to redesignate current paragraphs (h)(1) through (h)(5) as (h)(1)(i) through (h)(1)(iv) and (h)(1)(vi). These prohibitions on unfair treatment would continue to require an employer to assure that it "has not and will not intimidate, threaten, restrain, coerce, blacklist, or in any manner discriminate against, any person" who has engaged in certain enumerated protected activities pertaining to the H–2A program requirements, namely, filing a complaint, instituting a proceeding, testifying in a proceeding, consulting with an attorney or legal assistance program regarding any H–2A violation, or exercising or asserting any right or protection under the H–2A program. *See* 20 CFR 655.135(h) (2023). The Department also proposed three new

categories of protected activity. First, the Department proposed to protect consulting with a "key service provider" (as defined above) on any matter pertaining to the H–2A program requirements, in proposed new § 655.135(h)(v). Second, the Department proposed to explicitly protect exercising rights (including filing a complaint, instituting a proceeding, or testifying in any proceeding) under applicable Federal, State, or local laws or regulations, including safety and health laws, in proposed new § 655.135(h)(vii). Third, the Department proposed a new category of protected activity limited to persons engaged in FLSA agriculture, to protect them from intimidation or other discrimination if the person has engaged in activities related to self-organization, including: any effort to form, join, or assist a labor organization; a secondary activity such as a secondary boycott or picket; or other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or for refusing to engage in any or all of such activities. *See* proposed § 655.135(h)(2). To help inform workers of their rights under the H–2A program, the Department also proposed to include the protections that would be afforded under proposed § 655.135(h) in the disclosures required on the job order. The Department sought comments on each of these proposed provisions, which will be discussed separately below.

General Comments

The Department received many comments in support of its proposal to expand retaliation protections from Members of Congress, State Attorneys General, farmworker advocates, State agencies, legal aid organizations, farm labor unions, and others. These commenters noted that farmworkers in general, and H–2A workers in particular, are living and working in a foreign land, are often unfamiliar with their geographical surroundings and legal rights, often live in isolated environments where their access to information and resources is limited, and are entirely dependent on their employers due to their visa status. As noted above in Section VI.C.2.b, these factors make them particularly vulnerable to intimidation, retaliation, and coercion by employers when they seek to advocate for their rights.[80] They

noted that preventing employers from suppressing the exercise of those rights is critically important for H–2A workers and that the proposed changes would strengthen farmworkers' rights and ability to advocate for and enforce the minimum working conditions required under the H–2A program without fear of retaliation from employers.

Commenters cited numerous examples of farmworkers who have experienced threats, retaliation, or both from employers when they sought to assert their rights, file complaints, or pursue legal action. The UFW Foundation asserted that many farm employers have prohibited their workers from meeting with service providers, including legal services, medical providers, or other advocates, and that other farmworkers have been unable to access needed services for fear of retaliation, leaving many farmworkers unaware of or afraid to assert their rights. They noted that such tactics make it difficult for the Department or worker advocates to detect egregious violations such as wage theft, charging workers for recruiter fees, and other violations of employment-related laws, and to enforce existing worker protections under the H–2A program. Farmworker Justice noted that some employers have attempted to surveil workers and restrict their movements, which can intensify workers' isolation and fear of retaliation.

Another commenter cited a number of court cases in which H–2A workers have complained of retaliation, as well as studies showing that H–2A workers are unlikely to complain about unlawful and substandard working conditions because of fear. *See, e.g., West* v. *Butikofer,* No. 19–cv–1039, 2020 WL 5245226, at *2 (N.D. Iowa Aug. 18, 2020); *Arreguin* v. *Sanchez,* 398 F. Supp. 3d 1314, 1320, 1325 (S.D. Ga. 2019); *Ruiz* v. *Fernandez,* 949 F. Supp. 2d 1055, 1076 (E.D. Wash. 2013); *Lopez* v. *Fish,* No. 2:11–cv–113, 2012 WL 2126856, at *1 (E.D. Tenn. May 12, 2012). These commenters stated that better access to advocates and service providers would help correct these problems and ensure acceptable working conditions for both H–2A and other farmworkers. They supported strengthening protections against retaliation and making sure that these protections are clearly communicated at the beginning of the employment relationship, such as through the job order, to help ensure that employers who break the law and engage in intimidation do not go unpunished.

The Department also received several comments from agricultural associations and agricultural employers generally

opposing its proposals, as discussed above in Section VI.C.2.b, although very few specifically referenced the "unfair treatment" proposals. Other commenters contended that the proposed rules were overbroad, redundant, and unnecessary, that workers are already protected against retaliation by the existing rules, and that expanding the prohibitions would lead to unfounded accusations against employers.

Some commenters requested clarification or modification of the existing anti-retaliation protections. Farmworker Justice requested that the Department include broader language expressly protecting workers from retaliation for asking questions about pay; suggesting that restrooms be cleaned more frequently; or "exercising any right" or "opposing any practice" covered under Federal, State, or local laws; and asked the Department to clarify that "filing a complaint" in § 655.135(h)(1)(i) and proposed § 655.135(h)(1)(vii) should be interpreted broadly. A State agency suggested that the Department add the specific term "interfere with" to the list of prohibited adverse actions in § 655.135(h)(1), since "interference" with protected rights is a prohibited unfair labor practice under both the NLRA, 29 U.S.C. 158(a)(1) and the ALRA, Cal. Lab. Code § 1153, and also appears in California anti-retaliation statutes. The commenter also recommended adding a subsection that specifically prohibits discrimination against any person who has "assisted, or participated in any manner in an investigation, proceeding, or hearing under 8 U.S.C. 1188," opining that participating in or providing evidence in an investigation is not currently protected under the Department's existing language.

An employer agent suggested that in lieu of redesignating and expanding the "unfair treatment" framework as outlined in the NPRM, the Department should instead simply require employers to provide "assurances" that they will not discriminate or retaliate, and should also include "affirmative defenses" stating that an adverse employment action will not be deemed unfair treatment if the adverse employment action was for a lawful, job-related reason or the employer had no actual or constructive knowledge of the protected actions taken by the worker. This comment suggested that the absence of a requirement that the employer had actual or constructive notice of a worker's engagement in protected activity could create perverse incentives for fraud and abuse,

---

[80] *See* Farmworker Justice Report at 30–31 (noting that H–2A workers fear retaliation in the form of discharge, deportation, or the denial of a job in the future; H–2A workers work for short periods and often "lack the trust established among co-workers over a longer period of time"); CDM Report at 4–6.

especially where an employer may have legitimate, job-related reasons for discharging a worker. The comment contended that, under the existing language, any grievance or consultation would trigger legal protection from adverse employment action, even if the grievance or consultation does not concern any legally protected action or right, making it difficult or impossible for an employer to terminate a worker's employment even where they have a legitimate basis for doing so.

General Discussion

The Department adopts the proposed revisions with the modifications described in this section-by-section analysis. As explained in the NPRM and above, the Department continues to believe that these additional protections for unfair treatment and retaliation are necessary to prevent an adverse effect on the working conditions of workers in the United States similarly employed, as required under 8 U.S.C. 1188(a)(1), since workers must be free to file complaints and otherwise seek to enforce their rights without fear of retaliation or discrimination. The Department has long recognized that such protections are essential to the effective functioning of a complaints-based enforcement regime. *Mitchell* 361 U.S. at 292 (agreeing with the Department's interpretation of the FLSA's anti-retaliation provision and explaining that Congress "chose to rely on information and complaints received from employees seeking to vindicate rights" and "effective enforcement could thus only be expected if employees felt free to approach officials with their grievances"); WHD, Field Assistance Bulletin No. 2022–02, Protecting Workers from Retaliation (Mar. 10, 2022) (FAB 2022–02);[81] *see also Kasten* v. *St.-Gobain Performance Plastics Corp.,* 563 U.S. 1, 12 (2011) (explaining that the FLSA "antiretaliation provision makes [its] enforcement scheme effective by preventing 'fear of economic retaliation' from inducing workers 'quietly to accept substandard conditions.' ") (quoting *Mitchell,* 361 U.S. at 292). Based on both its enforcement experience and on the numerous comments citing examples of intimidation and retaliation against workers in the H–2A program, the Department believes that expanding the regulations' protections against unfair treatment is necessary to prevent adverse effect on the working conditions of workers in the United States.

For example, in the last few years alone, the Department has debarred and assessed penalties against H–2A employers that instructed workers to lie about their pay to investigators and threatened to kill, harm, punish, fire, blacklist, or deport workers for talking to authorities.[82] The Department also assessed penalties against at least two H–2ALC employers who confiscated workers' passports at three different farms to keep them from leaving their employment after they discovered that they were being underpaid.[83] In other recent cases, the Department charged a vineyard employer with unfair treatment violations after it retaliated against H–2A employees who asked why they were not being paid the required contract wage rate by dismissing them and sending them back to their home countries before the termination of the work contract.[84] In another instance, nine H–2A farmworkers filed a civil lawsuit against the employers for wage theft, underpayment, false imprisonment, and retaliation.[85] The Department has also recently obtained temporary restraining orders and preliminary injunctions against H–2A employers who, after workers requested more food and water,

threatened workers with a gun, shooting twice near the workers, and who have threatened to physically assault, harm, fire, and deport workers who complained or spoke to WHD investigators.[86] In many of these cases, investigators reported that workers sought to remain anonymous for fear of retaliation, and often refused to speak with or cooperate with investigators at the worksite for fear that their employer would find out; in one case, the employer interrupted an employee interview and sought to eject the investigator from the property. These examples are just a few among the many cases where WHD has investigated and uncovered retaliation by H–2A employers against workers who raised concerns regarding their rights under the program.

The Department did not propose any changes to the prohibited conduct or existing protected activities under current § 655.135(h), other than to redesignate current paragraphs (h)(1) through (h)(5) into paragraphs (h)(1)(i) through (h)(1)(iv) and paragraph (h)(1)(vii). Therefore, it declines to adopt any substantive changes suggested by commenters to those provisions and finalizes those redesignations as proposed. However, the Department seeks to clarify that the existing protections for "fil[ing] a complaint" in final § 655.135(h)(1)(i) and "exercis[ing] or assert[ing] . . . any right or protection" under the program in final § 655.135(h)(1)(vi) already protect a wide range of advocacy, including asking questions about pay, requesting compliance with health and safety requirements, opposing illegal practices, reporting criminal conduct, talking to WHD investigators, and participating in or providing evidence in an investigation. *See, e.g., Kasten,* 563 U.S. at 17 (holding that "filing any complaint" includes oral complaints under the FLSA); FAB No. 2022–02 at 9 (explaining that asking an H–2A employer to provide food and water is covered under the existing "no unfair treatment" provisions).

---

[81] Available at *https://www.dol.gov/sites/dolgov/files/WHD/fab/fab-2022-2.pdf.*

[82] Individuals associated with this employer also pleaded guilty to criminal charges for their role in the forced labor racketeering conspiracy. *See* DOJ, Press Release, *Owner of Farm Labor Contracting Company Pleads Guilty in Racketeering Conspiracy Involving the Forced Labor of Mexican Workers* (Sept. 27, 2022), *https://www.justice.gov/opa/pr/owner-farm-labor-contracting-company-pleads-guilty-racketeering-conspiracy-involving-forced;* DOJ, Press Release, *Three Defendants Sentenced in Multi-State Racketeering Conspiracy Involving Forced Labor of Mexican Agricultural H–2A Workers* (Oct. 27, 2022), *https://www.justice.gov/opa/pr/three-defendants-sentenced-multi-state-racketeering-conspiracy-involving-forced-labor-mexican.*

[83] *See* DOL, News Release, *US Department of Labor fines North Carolina employers $139K after they shortchanged farmworkers; seized passports, visas to intimidate them* (Nov. 16, 2023), *https://www.dol.gov/newsroom/releases/whd/whd20231116;* DOL, News Release, *Department of Labor debars labor contractor who threatened, intimidated farmworkers; assesses $62K in penalties for abuses of agricultural workers* (Oct. 23, 2023), *https://www.dol.gov/newsroom/releases/whd/whd20231023;* DOL, News Release, *US Department of Labor Investigation Results in Judge Debarring North Carolina Farm Labor Contractor for Numerous Guest Worker Visa Program Violations* (Mar. 16, 2021), *https://www.dol.gov/newsroom/releases/whd/whd20210316.*

[84] *See* DOL, News Release, *Corrected: US Department of Labor investigations of labor contractors, vineyard yield $231K in penalties, recover $129K in back wages for 353 agricultural workers* (Jun. 1, 2023), *https://www.dol.gov/newsroom/releases/whd/whd20230601-0.*

[85] *See Texas RioGrande Legal Aid, Press Release, Farmworkers Sue Kentucky Tobacco Farm for Wage Theft, Retaliation, and Overtime Violations* (Dec. 11, 2023), *https://www.trla.org/news-releases/farmworkers-sue-kentucky-tobacco-farm-for-wage-theft-retaliation-amp-overtime-violations.*

[86] *See, e.g.,* DOL, Press Release, *US Department Of Labor Alleges Tunica Fish Farm, Processing Plant, Owners Interfered With Federal Wage Investigation, Seeks Temporary Restraining Order* (Sept. 7, 2023), *https://www.dol.gov/newsroom/releases/whd/whd20230919-1; Su v. Battle Fish North,* Case No. 23–CV–00348, 2023 WL 6619595 (filed N.D. Miss. Sept. 7, 2023) (DOL Motion for Temporary Restraining Order and Preliminary Injunction); *Su v. Battle Fish North,* Case No. 23–CV–00348 (N.D. Miss. Sept. 27, 2023) (Order granting preliminary injunction); DOL, Press Release, *Federal Court Orders Louisiana Farm, Owners to Stop Retaliation After Operator Denied Workers' Request for Water, Screamed Obscenities, Fired Shots* (Oct. 28, 2021), *https://www.dol.gov/newsroom/releases/whd/whd20211028-0.*

iii. Section 655.135(h)(1)(v), Consulting With Key Service Providers

Recognizing that H–2A workers frequently face barriers in accessing certain services, as discussed in the NPRM, the Department proposed to broaden the range of service providers and advocates with whom consultation regarding the terms and conditions of employment under the H–2A program is explicitly protected. Specifically, the Department proposed to add a new paragraph (h)(1)(v) to the existing list of protected activities at § 655.135(h), which would protect consulting with a "key service provider," as defined in proposed § 655.103(b), regarding matters under the H–2A program. This proposal, like those in the existing list of protected activities at current § 655.135(h), would not be limited to persons engaged in FLSA agriculture. The Department noted that workers are already entitled to access and meet with many different service providers to discuss or assert rights under the H–2A program, without fear of retaliation under the Department's current regulatory framework. For example, under the current regulations, an employer may not retaliate against a worker because the worker goes to see a doctor to care for an injury the worker incurred while on the job, or because the worker consults a worker's rights advocacy organization regarding the employer's failure to pay the wages promised in the job order. *See, e.g.,* 20 CFR 655.135(e) and (h)(5). However, it proposed to make these rights explicit, and to include this express assurance on the job order (Form ETA–790A), in order to help ensure that workers will be aware of this protection. The Department stated that clarifying protections for consultation with such providers would increase the likelihood that workers will receive necessary services, help prevent the frequent isolation that renders workers more vulnerable to H–2A violations and other forms of labor exploitation, and better equip workers to enforce their rights under the program.

The Department received many comments in support of this proposal from farmworker advocates, State agencies, legal aid organizations, and others. In particular, the UFW Foundation asserted that farmworkers need better protections for consulting with key service providers such as health-care providers, education providers, legal services providers, clergy, governmental officials, or consular representatives. They cited many examples where employers have prohibited employees from meeting with such providers, including legal services and medical providers, and where workers have been unable to access needed services for fear of retaliation. For example, the comment highlighted "a [farmworker] from Oaxaca . . . [who] fainted because of the heat and he was fired after going to the doctor" and another farmworker of 35 years explained that he "was once fired unjustly due to me telling the foreman that I had a foot injury." Another farmworker was threatened with losing her job after she complained about the lack of water while working in extreme heat.

An H–2A farmworker in Washington stated that his employer prohibited him from meeting with a key service provider and that he feared retaliation if the employer found out about the meeting. Another H–2A farmworker in Washington mentioned that his employer also prohibited him from meeting with key service providers, and, if other workers did meet with providers, they had to do so covertly. An H–2A worker in Nevada stated that workers on his farm have to pay for each medical visit outside of their workplace, and, if the worker gets too sick, the employer sends them back to their home country so that the employer is not responsible for any medical bills. He also commented that two H–2A farmworker colleagues died in a car accident in October 2023 and their employer refused to do anything about it until the Mexican consulate intervened.

Another farmworker association, the Farmworker Association of Florida, commented that many farmworkers remain isolated and lack access to medical care, transportation, and necessary medications, and that guaranteed access to advocates and service providers would help correct these problems, reduce fear of retaliation, and improve working conditions. Farmworker Justice also strongly supported the proposal, commenting that H–2A workers need access to a variety of essential services, including access to medical care for routine appointments, care for chronic conditions, emergency medical attention, and access to legal service providers, consulates, and other advocates to obtain important information about their rights and legal representation when their rights are violated. They stated that workers are commonly prevented from filing for workers' compensation or obtaining medical care out of fear of retaliation, that some employers threaten to send workers home because they are injured and cannot work, and that other employers insist on going with workers to the doctor, or refuse to transport them to the doctor, to prevent the report of a workplace injury. Farmworker Justice also recommended that the provision should be expanded to include additional rights for legal service providers, emergency providers, and others. The Department received a few comments from trade associations and agents opposing the proposal as unnecessary, because workers already enjoyed the right to meet with legal services and medical providers, and because the right was already guaranteed in certain States.

The Department adopts the proposal without modification, for the reasons set forth in the NPRM, and because the comments demonstrated the need for this protection to be made explicit. Although such consultation is protected under the Department's current regulations, the comments demonstrate that workers are being prohibited from accessing these key service providers, and thus the Department believes it is necessary to clearly spell out this right for both workers and employers. This final rule will help increase the likelihood that workers receive the vital services that they need to ensure compliance with their rights and protections under the program and to advocate regarding working conditions. As explained above, workers must be free to exercise such rights without fear of retaliation to avoid adverse effect on similarly employed workers.

iv. Section 655.135(h)(1)(vii), Exercising Rights Under Federal, State, or Local Laws

The Department also proposed to clarify existing regulations by adding a new provision, § 655.135(h)(1)(vii), to explicitly protect complaints, proceedings, and testimony under any applicable labor- or employment-related Federal, State, or local law or regulation, including those related to health and safety. It explained that the proposal was intended to explicitly prohibit employers from retaliating against any person who files a complaint, institutes or causes to be instituted any proceeding, or testifies or is about to testify in any proceeding under or related to any applicable Federal, State, or local labor- or employment-related law, rule, or regulation. The Department noted that these activities are already protected under the Department's existing regulatory framework because existing 20 CFR 655.135(e) requires employers to comply with all applicable Federal, State, and local laws, and § 655.135(h)(1) and (5) prohibit retaliation against workers who assert

their rights under the H–2A program. However, the Department explained that making these rights explicit would better inform workers and employers of their rights and protections both under the H–2A program itself and under other applicable laws. To this end, the new provision would expressly protect workers who seek to enforce their rights under other worker protection laws, including Federal, State, or local laws and regulations that may apply to workers protected under the H–2A program (*see, e.g.,* the Occupational Safety and Health Act, 29 U.S.C. ch. 15, or the FLSA, 29 U.S.C. 201 *et seq.*) against retaliation.

As noted above, the Department received many comments generally supporting this proposal to expand retaliation protections, including comments from Members of Congress, State Attorneys General, farmworker advocates, State agencies, legal aid organizations, farm labor unions, and others. Many workers' rights advocacy organizations expressed support for the proposed provision protecting individuals who exercise rights under Federal, State, or local laws, for a variety of reasons. For example, a number of State Attorneys General commented that the provisions would promote access to information about worker rights, reduce their fear of retaliation, prevent employers from suppressing workers' exercise of those rights, encourage self-advocacy and organizing, and positively impact H–2A workforces. The California LWDA stated that it has encountered instances of employers retaliating against agricultural employees for filing charges or testifying in a proceeding related to State labor law violations, which the commenter said the rule would help prevent. The commenter cited numerous examples of retaliation arising under the ALRA, Cal. Lab. Code § 1153, noting that such retaliation "strikes at the very protections that the ALRA seeks to enforce by denying workers access" to processes and remedies administered by the California Agricultural Labor Relations Board (ALRB).[87] The commenter noted that

such cases demonstrate that farmworkers need protections not only when they file complaints or initiate proceedings under 8 U.S.C. 1188, but also when they file complaints under other applicable Federal, State, or local laws or regulations like the ALRA. Finally, the commenter also recommended adding language to specifically prohibit discrimination against any person who has "assisted, or participated in any manner in an investigation, proceeding, or hearing," noting that the Department's proposed language does not expressly protect persons who may not testify in a proceeding, but who have participated in or supported the investigation by providing evidence or being interviewed by the Department or a legal service provider. Given the heightened vulnerability that H–2A workers face, the commenter suggested that such protections would provide further protection for workers and encourage them to cooperate in government enforcement proceedings. Another commenter, CDM, highlighted the frequency of sexual harassment and discrimination in the H–2A program, asserting that H–2A employers and recruiters routinely violate U.S. anti-discrimination laws by discriminating based on race, color, age, sex (including pregnancy, sexual orientation, and gender identity), and national origin in both hiring and employment.[88] It asked that the Department make it easier to file complaints and improve remedies for H–2A workers and applicants who face discrimination. CDM also stated that the proposed protection was insufficient and asked the Department to create additional independent anti-discrimination protections for H–2A workers that would be enforceable both by the Department and by private rights of action.

A workers' rights advocacy organization, PCUN, strongly supported the proposal, stating that the organization works with dozens of farmworkers who have experienced retaliation for seeking better working conditions and that the proposed rule would be especially helpful for such workers. In particular, it noted that

farmworkers in Oregon recently experienced retaliation for seeking to enforce the new State OSHA regulations to protect workers from extreme heat (see footnote 79 for citations to these and other State employment regulations governing heat exposure). Workers contacted PCUN to report that they were laboring in over 100-degree heat and that the labor contractor they were working for did not provide them with water or shade. After the workers spoke out, they were all fired. This kind of retaliation is a major deterrent for workers to speak out when they see violations, including violations of labor law, discrimination on the basis of sex and immigration status, threats of violence, and issues of human trafficking, in addition to occupational health and safety standards.

The Department received a few comments opposing this and the other unfair treatment proposals as unnecessary or overly burdensome. For example, one commenter noted that such provisions duplicate existing laws and protections, and that this topic is already sufficiently covered by existing H–2A program requirements and by protections offered by the Department of State, various agencies within DHS, DOJ, and even multiple agencies among the 50 States. Another commenter suggested that in lieu of or in addition to expanding the "unfair treatment" framework to encompass the exercise of rights under any applicable Federal, State, or local laws as outlined in the NPRM, the Department should require employers to provide assurances or attestations that they do not discriminate.

The Department considered the comments and adopts the proposal to explicitly protect complaints, proceedings, and testimony under any applicable labor- or employment-related Federal, State, or local law or regulation, with the modifications described. The Department believes that making such protection explicit will help clarify and inform workers of their rights, reduce their fear of retaliation for seeking to exercise those rights, protect self-advocacy, and empower workers to enforce their existing rights to be free from discrimination and to a safe and healthy workplace, which in turn will better protect against adverse effect on similarly employed workers. As revised, the provision will expressly protect workers seeking to file complaints under Federal, State, or local anti-discrimination, health, or safety laws. This includes recently adopted regulations to protect against heat stress in States like California, Colorado,

---

[87] *See, e.g., H & R Gunlund Ranches, Inc.,* 39 ALRB No. 21 (2013) (finding that an employer violated the Act when it laid off a crew that had filed an unfair labor practice charge). The commenter also noted that many such investigations uncover violations of multiple Federal, State, or local laws or regulations, citing *Cinagro Farms, Inc.,* 48 ALRB No. 2 (2022) (Board found an unfair labor practice where the employer fired workers protesting misclassification and unpaid wages, and an independent violation where the employer misclassified employees as independent contractors in violation of the California Labor Code); *Gurinder S. Sandhu dba*

*Sandhu Bros. Poultry and Farming,* 40 ALRB No. 12 (2014) (finding that worker's sexual harassment complaints were protected concerted activity); *Oceanview Produce Co.,* 21 ALRB No. 8 (1995) (finding that employees engaged in protected concerted activity when they refused to sign employer's attendance form for a required safety training that never occurred).

[88] *See, e.g.,* CDM and Penn Law Transnational Legal Clinic, *Engendering Exploitation: Gender Inequality in U.S. Labor Migration Programs* (Jan. 2018), *https://cdmigrante.org/wp-content/uploads/2018/01/Engendered-Exploitation.pdf.*

Oregon, and Washington,[89] and will also protect workers' rights to organize, to engage in collective bargaining, and to be free of unfair labor practices in States like California and New York that have passed laws guaranteeing such rights under State law. *See, e.g.,* ALRA, Cal. Lab. Code § 1153 (West 2024); N.Y. Lab. Law §§ 701–718 (West 2024). The Department disagrees with commenters who contended that the proposal is unnecessary, given the ample evidence of ongoing retaliation and fear of retaliation provided by other commenters. However, the Department adopts the recommendation of commenters who suggested that the new provision include language expressly clarifying that individuals who assist or participate in an investigation or hearing under such laws are protected. As revised, the final provision will expressly protect such participation or assistance in proceedings arising under State employment laws and State labor laws such as those cited above, as well as safety and health laws, consistent with this rulemaking's stated goals of disclosure and ensuring that workers are aware of their rights. The Department has therefore modified the provision to add the specific terms "assisted or participated" (or is about to "assist or participate") in any "investigation" or "hearing," and to specifically reference "employment laws and labor laws" in addition to health and safety laws, as previously proposed. Thus, the revised provision will protect any person who has "[f]iled a complaint, instituted, or caused to be instituted any proceeding; or testified, assisted, or participated (or is about to testify, assist, or participate) in any investigation, proceeding, or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws" from unfair treatment on that basis. Finally, the Department declines to modify the proposal to include a private right of action in this provision (or any of the provisions at § 655.135(h)), since

it did not propose or seek comment on such a proposal.

v. Prohibitions on Seeking To Alter or Waive the Terms and Conditions of Employment, Including the Right to Communicate With the Department

In the preamble to the NPRM, the Department noted that its regulations, including § 655.135(h), have long protected a worker's ability to communicate with the Department. In addition, the Department noted that its H–2A regulations have long required employers to fully disclose in the job order the material terms and conditions of employment under the job opportunity and have long prohibited employers from seeking to later alter those terms and conditions. *See* 20 CFR 655.103(b), 655.122(b) and (q); 29 CFR 501.5.

The Department also shared its observation, however, that in recent years, there has been a troubling trend of H–2A employers imposing "side agreements" that purport to add or waive certain terms and conditions of employment as compared to those disclosed in the job order. For example, after terminating a group of workers without cause, one H–2A employer presented the workers with forms falsely asserting that the workers had left voluntarily, purporting to waive the workers' rights to the three-fourths guarantee. *Sun Valley Orchards,* 2021 WL 2407468, at *10–11. Other H–2A employers have required workers to sign arbitration agreements after the workers have arrived at the place of employment, without having disclosed such a requirement in the job order. *See, e.g., Martinez-Gonzalez* v. *Elkhorn Packing Co.,* 25 F.4th 613, 619 (9th Cir. 2022); *Magana-Muñoz* v. *West Coast Berry Farms, LLC,* No. 5:20–cv–02087, 2020 WL 3869188, at *5 (N.D. Cal. July 9, 2020); *Cisneros* v. *Alco Harvest, Inc.,* 97 Cal. App. 5th 456, 459 (Cal. Ct. App. 2023). These practices violate the H–2A regulations and may mislead workers regarding their rights under the H–2A program, including their ability to communicate with the Department. Therefore, the Department reiterated in the preamble to the NPRM, as it does here, its longstanding requirements relevant to these "side agreements."

First, the Department's H–2A regulations include robust disclosure requirements. Specifically, employers must disclose in the job order all material terms and conditions of employment. *See* 20 CFR 655.103(b) (defining "job order" as "[t]he document containing the material terms and conditions of employment"); 20 CFR 655.121(a)(4) (requiring H–2A job

orders to meet the requirements specified for agricultural clearance orders under 20 CFR part 653, subpart F); 20 CFR 653.501(c)(1)(iv) and (c)(3)(viii) (requiring agricultural clearance orders to include material terms and conditions of employment). Each job qualification and requirement listed in the job order must be bona fide, as well as normal and accepted among non-H–2A employers in the same or similar occupations. 20 CFR 655.122(b) (job qualifications and requirements). Finally, the employer must provide H–2A workers with a copy of the written work contract (at minimum, the terms of the job order) before the worker travels to the place of employment. Such written disclosure must be made to workers in corresponding employment no later than the first day work commences. 20 CFR 655.122(q) (disclosure of work contract).

These requirements ensure that employers seeking to employ H–2A workers are adequately and accurately testing the local labor market to determine the availability of U.S. workers for the actual job opportunity and are not imposing inappropriate requirements that discourage otherwise qualified U.S. workers from applying. *See* 2010 H–2A Final Rule, 75 FR at 6901, 6906–6908. These requirements also ensure that workers are apprised of the accurate terms and conditions of employment before accepting employment with the employer and, in the case of many workers, traveling great distances and at significant personal expense to do so. *Adm'r* v. *Frank's Nursery LLC,* ARB Nos. 2020–0015 and 2020–0016, 2021 WL 4155563, at *3–4 (ARB Aug. 25, 2021) (describing the importance of disclosure to workers of all material terms and conditions of employment before the worker accepts the job offer), *aff'd,* No. 21–cv–3485, 2022 WL 2757373 (S.D. Tex. July 14, 2022).

Thus, pursuant to these requirements, an employer may not seek to add new material terms and conditions of employment after the worker arrives at the place of employment, even if such terms and conditions would otherwise be permissible if they had been disclosed in the job order. For example, even if a mandatory arbitration agreement would be a permissible term and condition of employment for a particular H–2A job opportunity if disclosed in the job order, it is a violation of the H–2A regulations for the employer to impose such a material term and condition of employment on the workers if it was not disclosed in the job order. *See Frank's Nursery,* 2022 WL 2757373, at *3–4 (affirming WHD

[89] *See, e.g.,* Cal. Code Regs. tit. 8, § 3395 (Heat Illness Prevention in Outdoor Places of Employment) (2024); Colo. Rev. Stat. Ann. § 8–13.5–203 (Extreme overwork protections) (West 2024); *Or. Mfrs. & Com.* v. *Or. Occupational Safety and Health Division,* No. 1:22–cv–00875, 2022 WL 17820312, at *9 (D. Or. Dec. 20, 2022) (dismissing challenge to Oregon Administrative Rules that protect Oregon workers from exposure to excessive ambient heat temperatures and hazardous levels of wildfire smoke while at work); Wash. Admin. §§ 296–62–095–296–62–09560 (General Occupational Health Standards—Outdoor Heat Exposure), 296–307–097–WAC 296–307–09760 (Safety Standards for Agriculture—Outdoor Heat Exposure) (2024).

Administrator's determination of violation and assessment of a civil money penalty for employer's failure to disclose in the job order a drug testing policy); *see also Magana-Muñoz,* 2020 WL 3869188, at *5 (discussing the Department's regulatory requirements for H–2A job orders and concluding that an arbitration agreement is a material term or condition of employment that must be disclosed in the job order); *Cisneros,* 97 Cal. App. 5th at 460–61 (same); *cf. ETA* v. *DeEugenio & Sons #2,* OALJ No. 2011–TLC–00410, slip op. at 3–5 (OALJ June 13, 2011) (affirming CO's denial of labor certification because employer failed to demonstrate that arbitration and grievance clauses listed in job order were normal and accepted requirements among non-H–2A employers in the occupation); *ETA* v. *Bourne, et al.,* OALJ No. 2011–TLC–00399, slip op. at 9–11 (OALJ June 6, 2011) (same); *ETA* v. *Head Bros.,* OALJ No. 2011–TLC–00394, slip op. at 5–7 (OALJ May 18, 2011) (same); *but see ETA* v. *Frey Produce et al.,* OALJ No. 2011–TLC–00403, slip op. at 6 (OALJ June 3, 2011) (concluding arbitration is not a job "qualification or requirement").

Second, and in addition to the disclosure requirements, the Department's H–2A regulations prohibit any person from seeking to have a worker waive any right afforded under the H–2A program. 29 CFR 501.5. Thus, an employer may not—at any time— request that a worker waive or reduce any of the terms and conditions of employment disclosed in the job order or other rights under the H–2A program, such as the provision of meals as disclosed in the job order, the right to the three-fourths guarantee, the prohibition on the payment of fees, the right to file complaints under Federal, State or local laws, or the payment of the H–2A wage rate for hours spent engaged in corresponding employment. For example, through its enforcement experience, the Department has learned of H–2A employers presenting their entire workforces with side "opt-out" agreements under which the workers purport to waive their right to employer-provided meals on certain days, despite the employer's disclosure in the job order that meals will be provided every day. The regulations prohibit such practices. In addition, an employer may never seek to prevent a worker from engaging in activity protected under the H–2A regulations, such as filing a complaint with, speaking with, or cooperating with the Department or other Federal, State, or local agency

concerning the worker's rights. *See* 20 CFR 655.135(h); 29 CFR 501.4(a).

As explained in the NPRM, the Department is concerned that "side agreements" carry significant potential to mislead workers regarding their rights under the H–2A program, including the right to file complaints with and communicate with the Department. For example, an H–2A worker who is terminated without cause but is required to sign a form purportedly "resigning" from the job may believe—incorrectly—that they may no longer file a complaint with the Department to enforce their right to the three-fourths guarantee or their right to the cost of return transportation and subsistence. Another worker may misunderstand a "side" arbitration agreement as preventing the worker from filing a complaint with the Department before first submitting the issue to the employer's arbitration procedures, even though an employee who agrees to arbitrate a statutory claim is not waiving any substantive rights under the statute. *Gilmer* v. *Interstate/Johnson Lane Corp.,* 500 U.S. 20, 25 (1991). Moreover, an H–2A worker's agreement with their employer to arbitrate employment disputes does not limit the Department's ability to enforce the H–2A program's requirements. *Cf. EEOC* v. *Waffle House, Inc.,* 534 U.S. 279 (2002) (arbitration agreement between employer and employee did not bar EEOC enforcement action under the ADA); *Walsh* v. *Arizona Logistics, Inc.,* 998 F.3d 393, 397 (9th Cir. 2021) (arbitration agreement between employer and employee did not bar Department enforcement under FLSA). Accordingly, where an H–2A employer's job order discloses the existence of an arbitration clause that is otherwise permissible, the SWA and OFLC review the disclosure for actual or implied restrictions on workers' access to complaint systems and may require employers to include language in the job order affirmatively stating that the worker may not be prevented from filing complaints or communicating with the Department.

For efficiency and clarity, and to better inform workers of their rights under the H–2A program, the Department proposed in the NPRM to add standard language to the job order affirmatively stating that a worker may not be prevented from communicating with the Department or any other Federal, State, or local government agencies regarding the worker's rights. The Department also invited comments suggesting other means it could use to better inform workers of their rights and to better inform employers and workers

alike of the longstanding limitations on "side agreements."

The Department received comments in support and in opposition to this proposal. Farmworker Justice expressed concern that such agreements are often presented in writing even though a worker may not be able to read, and that even if a worker can read, these side agreements are often presented in English, rather than the worker's primary language. Farmworker Justice also stated that workers may be denied the opportunity to have someone review the side agreements with them prior to signing them or may be forced to sign these agreements through intimidation, yelling, threats, or other unlawful measures. This same commenter also noted that such side agreements may force workers to waive rights afforded to them under the H–2A program, or, in the case of arbitration agreements, may lead workers to believe that they do not have a right to communicate with the Department. Another commenter, CDM, expressed concern over the imposition of breach of contract fees and other severe penalties on H–2A workers who leave—or attempt to leave— employment before the scheduled conclusion of the work contract.

Commenters in opposition, which included agricultural employers and agricultural associations, raised several concerns. First, some commenters pointed to the Ninth Circuit decision in *Martinez-Gonzalez* v. *Elkhorn Packing Co., LLC,* asserting that an H–2A employee and employer may enter into a binding arbitration agreement not specifically disclosed in the H–2A job order. These same commenters also asserted that the U.S. Supreme Court has held that arbitration agreements in the employment context are valid and enforceable under the Federal Arbitration Act. Additionally, these commenters stated that if the Department wanted to review arbitration agreements as part of an employer's job order, it could do so by defining such agreements as a "material term and condition of employment." Commenters then asked the Department to specify what it would want to review with respect to an employer's arbitration agreement upon submission of a job order or temporary agricultural labor certification application. Additionally, one anonymous employer commented that it allows its U.S. workers to opt out of the H–2A contract.

For the reasons stated in the NPRM and as reflected in the comments in support of the proposal, the Department reiterates here its position prohibiting these side agreements. Similarly, the Department is including on the job

order the proposed standard language affirmatively stating that a worker may not be prevented from communicating with the Department or any other Federal, State, or local government agencies regarding the worker's rights. The Department believes that these clarifications will help prevent adverse effect on similarly employed workers in the United States by better informing workers of the terms and conditions of the job opportunity and of their rights under the program, improving employer compliance with the Department's longstanding requirements regarding disclosure of the terms and conditions of employment, and protecting workers from retaliation for asserting their rights under the program, including when communicating with any Federal, State, or local agency regarding those rights.

With respect to Farmworker Justice's concern regarding the disclosure of some "side agreements" in a language not understood by the worker, the Department notes that, in addition to the disclosure requirements discussed above, the employer must provide each worker a copy of the work contract "in a language understood by the worker as necessary or reasonable." 20 CFR 655.122(q).

In response to concerns from commenters opposed to this proposal, the Department clarifies that it did not take a position in the NPRM and does not take a position in this final rule on whether an undisclosed arbitration agreement may be valid under the Federal Arbitration Act or under any applicable State law. Rather, as in the NPRM, the Department reiterates its longstanding policy that under the Department's H–2A regulations, an arbitration agreement is a material term and condition of the job that must be disclosed in the job order and that it is a violation for the employer to impose such a material term and condition of employment on the workers if it is not included in the job order and disclosed in the work contract. The Ninth Circuit's decision in *Elkhorn* does not require a different conclusion. There, the court addressed only the enforceability of the arbitration agreement at issue under the doctrines of economic duress and undue influence. *Elkhorn*, 25 F. 4th at 629. The court did not consider whether failure to disclose the existence of the agreement in the job order constituted a violation of the H–2A regulations, nor did it consider the impact of any such violation on the enforceability of the agreement under the Federal Arbitration Act or California law. *Id.; see also Cisneros*, 97 Cal. App. 4th at 461 (distinguishing questions presented in

*Elkhorn* from question of whether failure to disclose arbitration agreement in H–2A job order violated the H–2A program regulations).

With respect to some commenters' assertions that the Department should amend its regulations to list arbitration agreements as a material term or condition that must be disclosed in the job order, the Department declines to do so, as such a revision is neither required nor practical. As described in the NPRM, the Department's H–2A regulations have long required an employer to include in the job order all material terms and conditions of the employer's specific job opportunity. While the regulations identify certain such materials terms and conditions, the regulations are not exhaustive and make plain that the employer must include those additional material terms and conditions of employment specific to the employer's job opportunity. *See, e.g.,* 20 CFR 655.121(a)(4) (incorporating requirements of 20 CFR part 653, subpart F) and 653.501(c)(iv) (providing nonexhaustive list of material terms and conditions of employment that must be disclosed in job order); *cf. Frank's Nursery*, 2021 WL 4155563, at *3–4 (concluding that drug testing—which also is not explicitly listed in the Department's regulations as a material term or condition of employment—is a material term or condition of employment that must disclosed on the job order). Similarly, the Department did not intend in the NPRM to suggest that H–2A employers must submit for SWA or CO review every arbitration agreement or other "side agreement." Employers that intend to seek such agreements from workers as a requirement or condition of employment must disclose their existence in the job order and work contract in sufficient detail to provide adequate disclosure to workers and to permit the Department to consider whether such agreements constitute normal and accepted requirements among non-H–2A employers in the occupation; employers need not submit the entire agreement to satisfy these requirements. As in the normal course of processing job orders and applications, the reviewing SWA or CO may require additional information from the employer, if necessary.

In response to the comment from an anonymous employer indicating that it allows its U.S. workers to opt out of the H–2A contract, the Department notes that under the H–2A regulations, an H–2A employer's non-H–2A workers engaged in corresponding employment are entitled to the required wage rate for time spent performing that work, and to

other benefits offered in the job order. *See, e.g.,* 20 CFR 655.103(b) (definition of corresponding employment); 20 CFR 655.122(l) (rates of pay); 20 CFR 655.122(i) (three-fourths guarantee). Moreover, in accordance with 29 CFR 501.5, it is unlawful for any person to seek to have an H–2A worker, a worker in corresponding employment, or a U.S. worker improperly rejected for employment or improperly laid off or displaced waive any rights afforded to that worker under the INA or under the H–2A regulations. Moreover, under 29 CFR 501.5, any agreement by a worker purporting to waive or modify any rights, even if entered into voluntarily, is void, with certain very limited exceptions.

### vi. Section 655.135(h)(2)(i), Activities Related to Self-Organization and Concerted Activity

At § 655.135(h)(2), the Department also proposed a new protected activity relating to self-organization and concerted activity, which would be limited to persons engaged in FLSA agriculture, namely those workers who are not eligible for protection under sec. 7 of the NLRA, 29 U.S.C. 157, because they are not "employees" as defined in 29 U.S.C. 152(3). As discussed above, the Department explained that these additional proposed protections are necessary to prevent an adverse effect on the working conditions of workers in the United States similarly employed. 8 U.S.C. 1188(a)(1). Specifically, the Department proposed at § 655.135(h)(2) to protect engaging in activities related to self-organization, including any effort to form, join, or assist a labor organization, as defined in proposed § 655.103(b); a secondary activity such as a secondary boycott or picket; or other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions. The Department also proposed to protect a person's refusal to engage in any such activities.

The Department explained that its enforcement experience has shown that the existing H–2A regulations currently do not provide sufficient protections for such workers to safely and consistently engage in self-advocacy to assert their rights, which adversely affects workers in the United States similarly employed. To address these concerns, the Department proposed to explicitly protect H–2A and corresponding workers engaged in FLSA agriculture who engage in concerted activity. The Department sought comments on whether the proposed additional protections would better empower and equip workers to enforce their existing

rights, thus reducing adverse effect on the working conditions of all similarly situated workers. The Department specifically sought comment on its proposed use of the terms "concerted activity" and "mutual aid or protection," which it explained were based upon the general body of case law from the Federal courts and the NLRB broadly construing similar language in sec. 7 of the NLRA; however, it recognized that these terms must ultimately be interpreted consistently with the statutory purpose of the INA and the H–2A program, including the need to prevent adverse effect on workers in the United States and in light of the H–2A program's unique characteristics. It also specifically sought comments on whether to include the terms "a secondary activity such as a secondary boycott or picket." Because the NLRA's prohibition on labor organizations engaging in secondary boycotts or pickets does not apply to the agricultural employees to whom the Department's proposed rule would apply (*see* 29 U.S.C. 158(b)(4)), the Department suggested that expressly protecting such activities would clarify workers' existing rights, prevent unnecessary confusion, avoid disputes, and help parties comply with their obligations under the proposed rule.

Many commenters endorsed the proposal to protect "concerted activity" as necessary to ensure effective enforcement and to avoid adverse effect on working conditions for all workers engaged in agriculture, noting that H–2A and other farmworkers frequently suffer from retaliation when seeking to engage in self-advocacy and organizing efforts. For example, Farmworker Justice commented that such additional regulatory safeguards against retaliation for engaging in concerted protected activity are essential to protecting and enforcing safe, fair, and legal working conditions, and that "affording employees the right to freely discuss workplace concerns without fear of reprisal assures self-enforcement and employer compliance" with their legal obligations. Farmworker Justice recommended that the regulations specifically protect workers' rights to discuss their workplace concerns among themselves and that employers be prohibited from taking any action to suppress these conversations, noting that ensuring the rights of agricultural workers to provide each other mutual aid and support can reinforce and improve enforcement. They further noted that the ability to confer and to engage in concerted protected activity with their coworkers to assert their legal

rights and safe working conditions is even more important to H–2A workers, because their legal and work permit status is tied to a single employer. PCUN noted that many farmworkers report never having seen a DOL or State labor or safety inspector during their time working in agriculture. PCUN supported the proposal because it would give farmworkers more information and agency in making decisions about whether they want to act collectively, give "modest protections" to farmworkers who wish to advocate for regarding their working conditions through the use of a union, and reduce unlawful interference from employers.

Other workers' rights advocacy organizations also expressed support for the proposed provision, stating that farmworkers are very concerned about retaliation for taking concerted action to organize and enforce their rights, that retaliation against workers is very common, and that such tactics both violate workers' freedom of association and reduce the ability of authorities to enforce labor laws. Several advocacy organizations commented that these additional proposed protections are important to address the intimidation that farmworkers routinely face and to equip them with agency to advocate regarding their working conditions. Many individual commenters expressed support for strengthening workers' rights to advocate and unionize, with one adding that such activity can help protect them from unjust firing and retaliation.

As described above in Section VI.C.2.b, FLOC commented that it has been able to achieve many improvements for agricultural workers through collective bargaining with employers covering about 10,000 farmworkers in North Carolina, including many H–2A workers. It commented that the proposed protections would greatly help H–2A farmworkers in their efforts to act collectively and to obtain remedies for likely violations of the H–2A program's requirements. A joint comment from several State Attorneys General also expressed support for the provision, reasoning that it would positively impact H–2A workforces, who are particularly at risk of coercion by employers, by preventing employers from suppressing their exercise of their rights. The California LWDA expressed support for the proposed protections, stating that similar protections in its State have led to both workers being better able to advocate regarding their working conditions and stronger enforcement of labor laws. This

commenter further recommended that the Department more closely align the proposed provision with language in the NLRA, removing references to wages and working conditions, arguing that such alignment would reduce litigation and allow relevant parties to rely on existing legal interpretations.

By contrast, many employers and trade associations opposed the proposal, for a variety of reasons. As described and addressed in Section VI.C.2.b, they contended that the Department's proposal exceeds its statutory authority, and that the Department failed to demonstrate how the proposed provision would prevent adverse effects on similarly employed workers in the United States, many of whom do not currently enjoy the protections the Department is proposing since they are excluded from the NLRA.

Wafla, a trade association, commented that the provision is redundant because Federal and State laws already protect individuals from threats, intimidation, restraint, coercion, and blacklisting; the commenter also expressed concern that the language defining concerted activity is too broad and that the protection could "morph from employee discussions among themselves into activity by labor union officials and labor advocates who could claim to represent workers without their explicit consent." The National Right to Work Legal Defense Foundation, Inc. commented that the proposed provision would be unworkable because the Department cannot provide an enforcement body or mechanism such as the NLRB, which administers the similar rights and obligations created by the NLRA. The commenter asserted that the Department has not explained how the "substantive rights and privileges" created by the proposed rule would be enforced. The commenter stated that, since the Department has no statutory authority to regulate union conduct or punish unions and their officials for their transgressions against employees, the proposal would be particularly unclear for employees who wish to refrain from supporting a union or engaging in union activity.

An agent requested that the Department amend its proposals under § 655.135(h) to include objective standards, notice provisions, and other revisions to ensure due process toward employers. They contended that employers should remain free to take adverse employment action for lawful, job-related reasons against workers who engage in protected activity as long as the adverse employment action is unrelated to the protected activity, the employer did not know about the

protected activity, or both. They pointed out that the proposed provision was so broad that it would be difficult or impossible for an employer to discipline any worker who has ever engaged in concerted activity, even where they have a legitimate basis for doing so. A couple of unions and several advocacy groups specifically took issue with the Department's statement in the NPRM that it did not intend for its proposal to preempt any applicable State laws or regulations that may regulate labor-management relations, organizing, or collective bargaining by agricultural workers. 88 FR 63795. These commenters urged the Department to clarify in both preamble and regulatory text that the proposal is, in fact, intended to preempt State laws that, in the commenters' views, are less protective than the proposed provision, specifically citing two provisions of North Carolina State law, N.C. Gen. Stat. sec. 95–79(b), which prohibit agreements by farmworker unions providing for deduction of union dues and certain agreements relating to litigation with agricultural producers. *See, e.g., Farm Labor Organizing Committee* v. *Stein,* 56 F.4th 339, 345–51 (4th Cir. 2022). By contrast, wafla commented that States are free to choose whether to create agricultural collective bargaining rights applicable to workers in their own States under our system of federalism, and the Department cannot set or enforce a national baseline that applies to H–2A workers in every State.

Many commenters opposed the proposal to explicitly protect workers' rights to engage in secondary activity. The U.S. Chamber of Commerce commented that the proposal violates the NLRA even though that law does not cover agricultural employees, contending that the NLRA would still prohibit a labor organization with mixed membership of agricultural and non-agricultural employees from engaging in a secondary boycott. Thus, the Chamber contended that the Department cannot protect individual workers who engage in such activity because the NLRA bans covered or "mixed" labor organizations from engaging in that activity. The Chamber also cited the legislative history of the secondary boycott provision in the NLRA, suggesting that Congress was concerned about the impact of labor disputes in the agricultural sector. Several other trade associations, including AmericanHort, NHC, USApple, the Michigan Farm Bureau, Western Growers, and FSGA, also opposed the proposal. Many of these commenters asserted that the

proposal to protect secondary activity, boycotts, and picketing was specifically preempted by the NLRA, that it exceeds the Department's statutory authority under the INA, and that the Department has failed to explain how the proposal would alleviate adverse effects on workers in the United States.

Other commenters, including a workers' rights advocacy organization and a labor union, expressed support for the proposal to specifically protect "secondary activity," but expressed concern that the term "secondary activity" is not defined in either the rule or the NLRA. These commenters recommended that the Department include a specific definition, set forth in the AFL–CIO's comment, in the final rule. The AFL–CIO also stated that protecting secondary activity would be appropriate given the "fissured structure" of the farm labor industry, where labor recruiters supply workers to farm labor contractors who, in turn, provide labor on farms, who later sell their products to food processors, restaurants, and grocery stores. The comment stated that this severely fissured structure leads to abuse of workers because it involves a complex, hidden supply chain where labor recruiters and labor contractors must compete with one another based on labor costs. Additionally, one employer expressed general support for allowing workers to boycott and picket.

The Department has considered the comments and adopts the provision with modifications as described below. After reviewing the comments, it is clear that the fear of retaliation against farmworkers for taking concerted action to organize and enforce their rights is very common, and that the lack of legal protections for most farmworkers, especially H–2A workers who are vulnerable for the reasons set forth in Section VI.C.2.b, particularly because they are tied to a single employer, has contributed to this problem. The Department believes that prohibiting discrimination against workers for engaging in such activity would help address the intimidation reported by farmworkers, and thereby empower workers to join together to take action to enforce their rights under the program. As detailed in the NPRM and above, H–2A and corresponding workers must be free to advocate on behalf of themselves and their coworkers regarding the terms and conditions of their employment, without fear of retaliation, to prevent adverse effect on similarly employed workers. The Department emphasizes that the activity that is being protected in this final rule is not "collective bargaining" or "unionization," but

instead is "concerted activity for mutual aid and protection," which encompasses numerous ways that workers can engage, individually or collectively, to enforce their rights. As discussed above in Section VI.C.2.b, farmworkers across the nation have engaged in a variety of concerted activity for mutual aid and protection to enforce their rights, including by banding together in worker centers to campaign for voluntary agreements and working with legal aid groups to file class action lawsuits.

As explained above in Section VI.C.2.b, providing additional protections for H–2A and corresponding workers to safely and consistently advocate on their own behalf regarding working conditions and assert their rights is necessary to ensure that the employment of H–2A workers does not adversely affect the wages and working conditions of similarly employed workers in the United States. Proposals to prohibit retaliation for self-advocacy and concerted activity thus fall within the Department's authority to ensure that foreign labor certification of H–2A workers does not adversely affect similarly employed workers in the United States. And, as explained in Section VI.C.2.b, this proposal is not preempted by the NLRA.

In addition, the Department disagrees that the proposed provision is redundant or unnecessary, that it would provide H–2A workers with more protection than other agricultural workers, that it would protect "labor union officials and labor advocates" rather than workers, or that it would create "new rights and privileges" for labor organizations. The provision is carefully crafted to apply only to "any person engaged in agriculture as defined and applied in 29 U.S.C. 203(f)" (*i.e.,* only those workers who are not already protected by sec. 7 of the NLRA), and it applies equally to H–2A and corresponding workers. By contrast, it does not apply to or create any rights for "labor union officials," "labor advocates," or labor organizations. It also does not purport to require recognition, collective bargaining, or any other action by an employer in response to worker organizing activity. Any such obligations, if they exist, would only apply in those States that have elected to apply their State labor relations programs to agricultural workers and would be unaffected by the new provision proposed by the Department. Instead, this new provision simply prohibits discrimination or retaliation against farmworkers who seek to self-organize or engage in other

concerted activity for mutual aid or protection.

Under the new provision, as explained in the NPRM preamble, an employer generally could not prohibit activities related to self-organization or other concerted activities for the purpose of mutual aid or protection that occur during nonproductive time, for example during lunch breaks, rest breaks, or while workers are riding as passengers in a vehicle when being transported between worksites. Nonproductive time also includes any noncompensable time, such as time after the end of the worker's workday. Similarly, the new provision is intended to permit workers to gather and converse for the purpose of mutual aid or protection in nonwork or common areas during nonwork hours, even if such areas are on employer premises, as explained in the NPRM preamble. For example, workers should generally be free to meet with one another after the end of their workday to discuss wages or working conditions in parking areas; common areas of worker housing, such as indoor or outdoor eating areas; recreational facilities; or other locations on the premises where workers would otherwise typically gather after work. In addition, although employers may establish reasonable work rules that limit discussions or meetings unrelated to the job while the worker is actively performing work, they may not apply or enforce work rules selectively to discourage worker self-organization or other concerted activities. For example, employers may place reasonable restrictions on employees' use of personal devices while in the field but may not apply such restrictions only to certain individuals who the employer suspects are engaged in organizing or other concerted activities, or only to those text messages or phone conversations that the employer perceives to be related to worker self-organization or other concerted activities. Similarly, employers may establish reasonable work rules limiting personal conversations during productive working hours where such conversations would affect productivity but may not selectively enforce such rules against workers for conversing about self-organization or other concerted activities. Such selective enforcement or discrimination in response to protected activity would likely violate this final rule as set forth in 20 CFR 655.135(h)(2)(i).

However, because of the breadth of activity that is protected under § 655.135(h)(2)(i) as concerted activity for mutual aid and protection, and in response to the commenters' concerns

that this provision may limit employers from taking disciplinary actions against employees for reasons unrelated to protected activity, the Department has clarified in the final regulatory text that § 655.135(h)(2) prohibits only those adverse actions that are taken because of the listed protected activities. In particular, the Department has revised the language at § 655.135(h)(2) to prohibit adverse actions against any person because such person has engaged in the protected activities set forth in that provision or has refused to engage in such activities. This revision is consistent with the Department's original language prohibiting discrimination and its intent to expressly prohibit intimidation, threats, restraint, coercion, blacklisting, discharging, or any other form of discrimination by an H–2A employer in retaliation against agricultural workers, including prospective or former workers, for engaging in protected activities and ensures due process for employers who are charged with such a violation. As recently explained by the Supreme Court, discrimination typically means "[t]o make a difference in treatment or favor (of one as compared with others)," or treating someone worse than another who is similarly situated. *Bostock* v. *Clayton Cty.,* 140 S. Ct. 1731, 1740 (2020) (construing Title VII's prohibition against discrimination, and quoting *Webster's Second* 745 (1954)); *see also Murray* v. *UBS Sec., LLC,* 144 S. Ct. 445, 453 (2024); *Burlington N. & Santa Fe Ry.* v. *White,* 548 U.S. 53, 59 (2006) ("'[T]he term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals.''). Finally, the Department notes that this revision does not require that protected activity be the sole reason for the action against an employee. Rather an employer will violate § 655.135(h)(2) whenever protected activity is a but-for cause of an adverse action against an employee. *See Bostock,* 140 S. Ct. at 1739 (explaining that an adverse action can have multiple but-for causes).

The Department declines the suggestion to delete the phrase "relating to wages or working conditions." As the Department explained in the NPRM, the use of the terms "concerted activity" and "mutual aid and protection" draws upon the general body of case law from the Federal courts and the NLRB broadly construing similar language in the NLRA. The Department adopts its proposed interpretations of "concerted activity" and "mutual aid and protection" in this final rule. *See* 88 FR 63793–63794. The Department believes

it is appropriate to interpret these terms broadly in order to protect workers' ability to advocate on behalf of themselves and their coworkers regarding the terms and conditions of employment without fear of retaliation, in order to prevent adverse effect. As explained herein and in the NPRM, such advocacy can take a number of forms and the Department concludes it would be contrary to its intent and purpose in adopting this new provision to protect only a narrow set of concerted activities. However, the Department's regulation must ultimately be interpreted consistently with the statutory purpose of the INA and the H–2A program, and thus the Department retains the reference to the general term "wages and working conditions," which it believes is broad and encompassing. For example, as discussed above, farmworkers who band together to protest unsafe housing or transportation, lack of clean drinking water or bathroom facilities, lack of accessible kitchen facilities, unfair or undisclosed deductions for food and beverages, or being offered poor quality or spoiled food would be covered, as would workers who jointly discussed or expressed concerns about their wages or an employer's failure to comply with health and safety laws.

In addition, the Department has modified the language in this final rule to remove the express reference to a "secondary activity such as a secondary boycott or picket." It recognizes the concerns expressed by commenters about the complexity of the concept of secondary activity as developed under decades of caselaw construing NLRA sec. 158(b)(4)(i) and (ii),[90] and has determined that the inclusion of such

---

[90] The term "secondary activity," as developed in the caselaw, generally regulates the activities of labor organizations, and refers to a key distinction under the NLRA between lawful "primary strikes and primary picketing," which are expressly protected, and threatening or coercive "secondary" conduct—that is, conduct aimed at a "secondary" or "neutral" employer, which is expressly prohibited. *See* 29 U.S.C. 158(b)(4). As explained by the NLRB, "[t]he NLRA protects the right to strike or picket a primary employer—an employer with whom a union has a labor dispute. But it also seeks to keep neutral employers from being dragged into the fray. Thus, it is unlawful for a union to coerce a neutral employer to force it to cease doing business with a primary employer. That is only one aspect, however, of a complex legal picture." NLRB, *Secondary boycotts (Section 8(b)(4)), https:// www.nlrb.gov/about-nlrb/rights-we-protect/the-law/ secondary-boycotts-section-8b4* (last accessed Feb. 22, 2024); *see also Di Giorgio Fruit Corp.* v. *NLRB,* 191 F.2d 642, 649 (D.C. Cir. 1951) (explaining that a Teamsters Local was engaged in "primary picketing" at the place of its members' own employment, in support of a strike against their employer, which is "called a primary activity in the language of labor law," and thus did not fall within the NLRA's ban against secondary activity.)

terms in this final rule would create unnecessary confusion and would not further the stated goals of clarity and disclosure. As the Supreme Court has recognized, the question of what constitutes secondary activity is "among the labor law's most intricate." *NLRB* v. *Local 825 Int'l Union of Operating Eng'rs,* 400 U.S. 297, 303 (1971). Thus, the Department has determined that including this term, even with the definition proposed by some commenters, could lead to uncertainty, and therefore is removing the term from this final rule. Instead, the Department seeks to clarify the breadth of activities that are protected as "concerted activities for the purpose of mutual aid or protection relating to wages or working conditions" of H–2A workers and similarly employed workers.

The Department generally agrees with the AFL–CIO and Farmworker Justice that otherwise lawful "peaceful expressive activity" by groups of individual workers, such as handing out flyers, leafleting, or picketing outside a grocery store that sells agricultural products derived from the labor of H–2A workers in order to discourage customers from buying those specific products, would generally be protected as "concerted activity for mutual aid and protection" under this final rule. Notably, this type of concerted activity has been deemed permissible even in the NLRA context. *See, e.g., NLRB* v. *Fruit and Vegetable Packers and Warehousemen, Local 760,* 377 U.S. 58, 71–73 (1964) (a labor union's engaging in peaceful expressive activity, such as consumer handbilling or picketing at a retail grocery store seeking to persuade customers not to buy apples that were produced by a certain agricultural employer, was not prohibited "secondary activity" under NLRA sec. 8(b)(4)(ii) where the activity did not "threaten, coerce, or restrain" anyone and was directed at customers rather than employees of the store); *see also Edward J. DeBartelo Corp.* v. *Florida Gulf Coast Building Trades Council,* 485 U.S. 568, 578 (1988) (peaceful consumer handbilling or leafleting by a labor union at the entrances to a shopping center urging consumers not to patronize those stores was protected under the First Amendment and was not an unfair labor practice under NLRA); *Wartman* v. *United Food and Commercial Workers Local 653,* 871 F.3d 638, 644 (8th Cir. 2017) (labor union did not violate NLRA by picketing grocery stores, even though the picketing effectively disrupted the stores' relationships with customers and suppliers, where union's objective was

to urge the public not to shop at the stores and to pressure the store owners to resolve a labor dispute but not to force or require any person to cease doing business with any other person); *but see 520 South Michigan Avenue Associates, Ltd.* v. *Unite Here Local 1,* 760 F.3d 708, 711 (7th Cir. 2014) (remanding for trial on whether certain activities engaged in by a labor union against a hotel were coercive and whether any such coercive conduct actually caused damages to the hotel or was protected under the NLRA or the First Amendment or both).

Thus, under this final rule, a group of workers engaged in a labor dispute who meet with the management of a grocery store to explain their labor dispute and seek to persuade the store to stop carrying the products sold by the workers' employer until the labor dispute is resolved would be engaged in protected concerted activity, as long as otherwise not prohibited by law. Similarly, in response to the comment from the AFL–CIO, the Department clarifies that, to the extent that individual workers are engaged in otherwise lawful peaceful leafleting or picketing at an agricultural worksite, including a "fissured workplace" (such as an employee of a farm labor contractor picketing on the premises of the farm where they work, which is owned by a grower or other entity that may or may not be a joint employer of the workers), such lawful activity is generally protected under this final rule, since the object of the activity is to affect working conditions at the workers' own place of work. These examples are intended to be illustrative and not exhaustive.

As explained in the NPRM, the Department intends to interpret the terms "concerted activity" broadly, to include concerted activities for the broad purpose of "mutual aid or protection" as well as for the narrower purpose of "self-organization," as long as the object of the activity is related to the workers' own wages and working conditions. *See, e.g., Eastex, Inc.* v. *NLRB,* 437 U.S. 556, 565–66 (1978) (explaining that the terms as set forth in NLRA sec. 7 are intended to protect workers from retaliation by their employers, even "when they seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship," such as through political or administrative action). And even though "some concerted activity bears a less immediate relationship to employees' interests as employees than other such activity[, and w]e may

assume that at some point . . . becomes so attenuated that an activity cannot fairly be deemed to come within the 'mutual aid or protection' clause," it is neither necessary nor appropriate to attempt to precisely delineate those boundaries here. *Id.* at 567–68.

As further discussed below, the Department does not intend to protect concerted activity that is currently prohibited by State law,[91] or to preempt, supersede, or otherwise interfere with the operation of State laws that authorize or regulate organizing, collective bargaining, unfair labor practices, or labor-management relations in the agricultural sector. Instead, it intends for this rule to complement State collective bargaining laws, not to conflict with them, as well as to ensure workers are able to engage in lawful concerted activity without being retaliated against in States without such laws. As under its existing unfair treatment provisions, the Department will thoroughly investigate any complaint and consider all the facts, including, among other things, relevant State laws, the nature of the adverse action, any judicial or administrative findings of unlawful conduct, and evidence relating to causation, before determining whether unlawful retaliation or discrimination has occurred.

Finally, as noted in the NPRM, the remedies provided for under this proposed regulation are not intended to be exclusive; if an agricultural worker has other remedies available under State or local law, the remedies contemplated under this proposal are not intended to displace them. 88 FR at 63792. In addition, the Department does not intend for this provision to preempt any applicable State laws or regulations that expressly protect agricultural workers or regulate labor-management relations, organizing, or collective bargaining in the agricultural sector. 88 FR at 63792, 63795. Several commenters, such as the AFL–CIO, FLOC, Comité de Apoyo a los Trabajadores Agrícolas, and CDM, asked

---

[91] For example, in New York, "[n]otwithstanding any other provision of law, "for farm laborers the term 'concerted activities' shall not include a right to strike or other concerted stoppage of work or slowdown." N.Y. Lab. Law § 703); *See also* N.Y. Lab. Law § 704–b(1)) ("It shall be an unfair labor practice for a farm laborer or an employee organization representing farm laborers to strike any agricultural employer."); *See also* Cal. Lab. Code §§ 1154(d)(2) and 1154.5 (making it an unfair labor practice for "a labor organization or its agents" to engage in secondary strikes, or boycotts; "publicity which includes picketing and has the effect of requesting the public to cease patronizing such other employer" permitted only by certified representative labor organizations; publicity other than picketing permitted only in certain circumstances).

the Department to "clarify" that it does intend for this regulation to preempt State laws that, in their view, are less protective than the proposed provision. They specifically cited two provisions of North Carolina's 2017 Farm Act, N.C. Gen. Stat. sec. 95–79(b), which prohibit certain agreements providing for deduction of union dues or litigation with agricultural producers or both. *See Farm Labor Organizing Committee* v. *Stein,* 56 F.4th 339, 345–51 (4th Cir. 2022) (finding that the provisions did not violate the equal protection clause or the First Amendment rights of the union or its members to expressive activity and to freedom of association, and were rationally related to legitimate state interests). In the commenters' view, the North Carolina statute directly conflicts with the proposed regulation protecting concerted activity, and the proposed regulation should therefore preempt the State law, as in *Maine Forest Products Council* v. *Cormier,* 51 F.4th 1 (1st Cir. 2022). That case held that a Maine statute prohibiting certain employment by non-U.S. residents was preempted by the INA and the H–2A regulations, because the H–2A program unmistakably conflicted with the restrictions imposed by the Maine law. *See also Rogers* v. *Larson,* 563 F.2d 617, 626 (3d Cir. 1977) (holding that a Virgin Islands statute prohibiting hiring of foreign workers was preempted by the INA for similar reasons).

It is generally true where State laws are "in conflict or at cross-purposes" with Federal law, such as the INA, "Congress has the power to preempt state law," *Arizona* v. *United States,* 567 U.S. 387, 399 (2012), and that courts have found preemption where it is impossible for a private party to comply with both State and Federal law (*i.e.,* conflict preemption) or where under the circumstances of a particular case the challenged State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress (*i.e.,* obstacle preemption). *Id.; Cormier,* 51 F.4th at 3 (citing *Arizona,* 567 U.S. at 399). Federal regulations can be just as preemptive as Federal laws. For example, in *Cormier,* the First Circuit recently held that the federally enacted H–2A program confers a right on private actors (either explicitly or implicitly) that unmistakably conflicted with the restrictions imposed by the Maine law, which prohibited Maine landowners from hiring anyone who is not a "resident of the United States," including an H–2A worker, to drive trucks "transport[ing] forest products" within the State. 51 F.4th at 3, 8. *See*

*also Dandamudi* v. *Tisch,* 686 F.3d 66, 80 (2d Cir. 2012) (State statute was obstacle to accomplishment and execution of the full purposes and objectives of Congress where it disqualified certain immigrants merely because of their immigration status); *Rogers* v. *Larson,* 563 F.2d at 626 (same, where Territorial law gave preference to citizens and permanent residents over lawful immigrants who were authorized to work). However, to find preemption, there must be a clear conflict between the two provisions, or at least a "direct and significant obstacle." In *Cormier,* the court held the Maine statute was "a blunt intrusion on the implicit federal right," and "constitutes a direct and significant obstacle to achieving the H–2A program's clear and manifest objectives," since it "would nullify the implicit federal right of the employer to hire foreign laborers on a temporary basis, and "thus rudely "interfere[s] with the careful balance struck by Congress." *Cormier,* 51 F.4th at 10 (quoting *Arizona,* 567 U.S. at 406). Furthermore, the State law was "in tension with the structure and purpose of the H–2A statutory provisions and would effectively give states a veto power over the federal program" by overriding "the specific H–2A work authorizations provided by federal law." *Cormier,* 51 F.4th at 11.

By contrast, courts have declined to find that all State employment laws relating to immigrants are preempted by the INA. *See, e.g., DeCanas* v. *Bica,* 424 U.S. 351, 355 (1976) (holding that a California State law restricting employment of unauthorized immigrants was not preempted by the INA); *LeClerc* v. *Webb,* 419 F.3d 405, 424 (5th Cir. 2005) (Louisiana Supreme Court rule that rendered "nonimmigrant aliens" ineligible to sit for the Louisiana Bar was not preempted by the H–1B provisions of the INA, since "the field of alien employment law tolerates harmonious state regulation"). "Federal regulation . . . should not be deemed preemptive in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *LeClerc* v. *Webb,* 419 F.3d at 423 (quoting *DeCanas,* 424 U.S. at 356). Indeed, *Cormier* itself notes that the H–2A regulations themselves specifically require compliance with all applicable employment-related laws that pertain to working conditions. 51 F.4th at 10 (citing 20 CFR 653.501(c)(3)(iii)). Here, unlike the Maine law at issue in *Cormier,* the Department does not believe that the North Carolina State law

presents a clear conflict or a "direct and significant obstacle" to the operation of the H–2A program or the specific regulation in question. The law does not appear to govern whether a farmworker in North Carolina may engage in protected concerted activity as outlined herein, or whether a North Carolina employer could discipline a worker for such activity, and unlike the Maine law at issue in *Cormier* would not "effectively give states a veto power over the federal program" or "override the specific H–2A work authorizations provided by federal law." 51 F.4th at 7–8. As noted in the preamble to the NPRM, the Department is cognizant that over a dozen States have enacted laws that regulate organizing, collective bargaining, labor-management relations, overtime, heat stress, tools, and other issues affecting agricultural workers.[92] It has carefully crafted its new protections for concerted activity to avoid creating conflicts with existing State laws and regulations that provide for a system of collective bargaining for farmworkers and/or explicitly prohibit retaliation against farmworkers for exerting other rights guaranteed by State laws or regulations.[93]

vii. Section 655.135(h)(2)(ii), Refusing To Attend or Participate in "Captive Audience Meeting" Related to Protected Activity

The Department proposed a new provision at § 655.135(m)(3) to prohibit employers from engaging in "coercive speech" intended to oppose workers' protected activity, such as organizing or advocating regarding their working conditions on behalf of themselves and their coworkers. Specifically, the Department proposed to prohibit employers from engaging in "coercive employer speech intended to oppose workers' protected activity" (sometimes

---

[92] *See, e.g.,* ALRA, Cal. Lab. Code § 1153; Colorado Agricultural Labor Rights and Responsibilities Act, Colo. Rev. Stat. 8–13.5–201 (state law requiring access and employer-provided transportation to "key service providers"); Arizona Agricultural Employment Relations Act, Ariz. Rev. Stat. Ann. § 3–3101–3125; Ariz. Rev. Stat. Ann. § 23–1381–1395; New York Farm Laborers Fair Labor Practices Act (2020) (amending New York Labor Law Code §§ 701–718, Chapter 31, Article 20. Or. Rev. Stat. secs. 658.405 through 658.511 (state laws requiring licensing and bonding of agricultural recruiters); Generally speaking, the Department supports such protections for farmworkers and believes that they can help to avoid adverse impact on the working conditions of workers in the United States by helping to improve such conditions for all workers.

[93] In addition, this final rule does not require employers to recognize any labor organization, to engage in collective bargaining, or to reach any CBA; rather, any such agreement would be governed and enforced solely under any applicable Federal, State, or local law.

referred to as "captive audience meetings" or "cornering"), in which the employer seeks to persuade workers not to engage in protected activity, unless the employer (a) explains the purpose of the meeting or communication; (b) informs employees that attendance or participation is voluntary and that they are free to leave at any time; (c) assures employees that nonattendance or nonparticipation will not result in reprisals (including any loss of pay if the meeting or discussion occurs during their regularly scheduled working hours); and (d) assures employees that attendance or participation will not result in rewards or benefits (including additional pay for attending meetings or discussions concerning their rights to engage in protected activity outside their regularly scheduled working hours). The proposal was modeled on the "*Johnnie's Poultry*" safeguards that were developed by the NLRB to ensure that workers are not coerced into cooperating with their employers in various situations. *See* 88 FR at 63798 (citing *Johnnie's Poultry Co.,* 146 NLRB 770, 774 (1964) (providing safeguards required when employers question employees about protected activity to prepare a defense against unfair-labor-practice charges); *Sunbelt Rentals, Inc.,* 374 NLRB No. 24 (2022) (reaffirming *Johnnie's Poultry* rule). The Department explained that it sought to balance workers' rights to engage in (or to refrain from engaging in) concerted activity, and employers' rights to engage in speech concerning any such activity, without unduly infringing on either party's expression. It also sought to prohibit employers from retaliating against a worker for attending or refusing to attend such a "captive audience" meeting or discussion, even if the meeting were to occur during their regularly scheduled working hours.

The Department sought comment on whether there would be other ways to better protect workers' rights to refrain from listening to employers' coercive speech, whether other safeguards or employer disclosures would be appropriate, and how to most appropriately tailor the prohibition to avoid infringing on employer's free speech rights while protecting workers' right to engage in protected activity.

The Department received a significant number of comments in strong opposition to proposed § 655.135(m)(3), many of which raised First Amendment concerns and contended that the proposed prohibition exceeded the Department's authority. The U.S. Chamber of Commerce, for example, contended that "the Department's proposal contains unconstitutional

restrictions on employers' free speech rights." Referring to this proposed provision and other proposed provisions relating to worker voice and empowerment, U.S. Representatives Foxx and Thompson opined that "Congress has given no authority to DOL to impose these mandates on H–2A employers," and that "[s]uch authority cannot be found in the Immigration and Nationality Act or the Fair Labor Standards Act." Wafla contended that "this proposed section silences employer free speech rights," and that "[t]he proposed rules, taken as a whole, are hypocritical because they recognize employee association and speech rights while gagging employers' free speech rights." The U.S. Chamber of Commerce noted that "mandatory work meetings in which an employer talks about unions . . . have long been lawful under the NLRA and, more important, protected by the U.S. Constitution." Commenters also contended that both the First Amendment and the NLRA protect employers' freedom to hold mandatory work meetings and to express their views, regardless of the subject matter, stating that NLRA precedent balances the interests of employers and employees by expressly protecting employer speech, except when the speech amounts to a "promise of benefit" or "threat of reprisal." The Chamber said that the Department cannot mean that all mandatory work meetings are inherently coercive and thus "it seems to mean that all meetings about unions are coercive," and that doing so "draws the Department into regulating the substance of an employer's speech—a subject it is constitutionally forbidden to touch."

USA Farmers opined that this proposal "lacks a valid legal basis and plainly violates an employer's First Amendment rights." USA Farmers also stated that "[a]n employer has the right to communicate with employees," and that "[a]n employer can also require employee attendance at meetings and such meetings are routinely counted as compensable time." It also suggested that any restrictions on speech should be applied evenly, not just to employers but to outside groups. The Cato Institute commented that the proposal was too broad because the proposed "speech restrictions apply not just during a union campaign but any time an employer opposes unionization." Many commenters, including IFPA, asked for clarification of the proposal, stating that it is not clear how or when employers would need to provide the required disclosures to employees, and that the proposal did not provide guidance

regarding the records that would be needed to verify such notice was given to workers.

Labor unions and worker advocates generally supported the proposal, stating that it would help to protect workers by preventing employers from trying to discourage workers from advancing their rights in the workplace and would help to ensure that the employment of H–2A workers does not adversely affect the working conditions of similarly employed workers in the United States. Farmworker Justice expressed support for the proposal, commenting that agricultural employers have a "unique ability" to control and require the attendance of H–2A workers at mandatory meetings, while the UFW shared personal anecdotes from farmworkers they have worked with, describing experiences with employers using captive audience meetings to stifle union activity.

Several elected officials and State agencies also supported the proposal, commenting that it would help to address the intimidation and isolation faced by farmworkers. For example, 11 State Attorneys General observed that this proposal, combined with other worker voice and empowerment proposals in the NPRM, would help protect workers from misinformation, retaliation, and coercive speech that hinders self-advocacy and organizing. The California LWDA said that employer captive audience meetings have detrimental effects on workers' ability to organize, reasoning that the proposed prohibition would protect both employers' speech rights and workers' rights to refrain from listening to coercive speech.

However, several of these commenters questioned the practical effect of the proposed rule without modification. For example, the AFL–CIO suggested that any final rule should clarify when employer speech should be deemed "coercive" and when it would be permissible. It suggested that the rule be revised to entirely prohibit employers from engaging in "speech addressed to H–2A workers intended to oppose those workers' protected activity" without providing express warnings. Farmworker Justice suggested that the proposal should also require "that the employer supplement any oral assurances in writing to the worker before the employer engages in a discussion of union activity or participation."

After consideration of the comments received, this final rule adopts a modified version of the proposal. This final rule does not adopt the language at proposed § 655.135(m)(3) prohibiting

coercive employer speech, but instead incorporates a version of that proposal into the protected activity framework at § 655.135(h)(2)(ii). The Department considered the objections voiced by many commenters, in particular those questioning whether the proposed prohibition as drafted would interfere with employers' speech. In addition, the Department notes that at least five States have enacted laws that target the same problem in a way that avoids concerns about potential infringement on the First Amendment rights of employers while protecting workers' rights as well. Four States, namely Connecticut (2022), New York (2023), Maine (2023), and Minnesota (2023), have recently joined Oregon (2010) [94] by enacting laws that do not prohibit mandatory captive audience meetings *per se,* but instead protect workers who leave or refuse to attend such meetings (or who refuse to listen to such speech) from being disciplined or fired. For example, the New York law prohibits employers from disciplining or discriminating against employees for refusing to attend employer-sponsored meetings, listen to speech, or view communications that are primarily intended to convey the employer's opinion about "religious or political matters," including the decision to join or support any labor organization. The Department therefore concludes that the interest underlying this proposal—*i.e.,* preventing employers from coercing or threatening farmworkers into attending meetings or listening to employer speech intended to oppose protected activity, under the implied threat of discipline if the farmworkers exercise their protected right not to listen to such speech—can be better served by instead adding a new protected activity to the proposed anti-retaliation provision at § 655.135(h)(2).

Therefore, the Department is not adopting the proposed language to prohibit coercive speech outright, but instead incorporates a version of the proposed provision into the list of protected activities in the "unfair treatment" provisions at § 655.135(h)(2)(ii). The final provision expressly prohibits employers from retaliating or discriminating against a worker for refusing to attend a "captive audience" meeting (or portion thereof), if the primary purpose of the meeting (or a certain portion of the meeting) is to communicate the employer's opinion concerning any activity protected under

these regulations. It also protects a worker from retaliation for refusing to listen to employer-sponsored speech or view employer-sponsored communications, if the primary purpose of the speech or communication (or that portion of the speech or communication) is to communicate the employer's opinion concerning any activity protected under these regulations, even if the meeting, speech, or communication occurs during their regularly scheduled working hours.

This protection is limited to those workers engaged in FLSA agriculture. As explained in the NPRM, the Department believes that "a worker's right to engage, or not engage, in self-organization and concerted activity under [final § 655.135(h)(2)(i)] [95] would include the worker's right to listen and the worker's right to refrain from listening to employer speech concerning the worker's exercise of those rights." 88 FR at 63797 (citing NLRA sec. 7). This modification is intended to permit H–2A employers to freely engage in speech regarding these topics, as requested by certain commenters, including employers, trade associations, Members of Congress, and a think tank. At the same time, the revision responds to comments by worker advocates urging the Department to protect workers' rights to refrain from listening to employer speech on these topics. Therefore, this final rule includes regulatory text to expressly protect those rights in § 655.135(h)(2)(ii).

As with the protection for "concerted activity" in 20 CFR 655.135(h)(2)(i), this provision is limited to those workers who are not already protected by sec. 7 of the NLRA. And as with the other protections against unfair treatment for concerted activity, this new protection will also be disclosed to workers through the job order and other worker outreach tools. The Department believes that this approach strikes a better balance between protecting workers' rights to engage in (or to refrain from engaging in) concerted activity and protecting employers' First Amendment right to engage in speech concerning any such activity, without unduly infringing on either party's expression. The Department acknowledges that employers generally have First Amendment rights to express any views, arguments, or opinions on any subject, including but not limited to the protected concerted activities outlined in 20 CFR 655.135(h)(2)(i), as long as they do not engage in unlawful threats or coercion. However, the Department also believes that workers enjoy First

Amendment rights to decline or refuse to attend mandatory employer-sponsored speeches or meetings concerning the exercise of their rights to engage in protected activities. Workers should therefore be free to leave (or refuse to attend) such a "captive audience meeting," and should not be threatened, disciplined, coerced, suffer other reprisals, or lose out on any reward or benefit if they exercise their protected rights not to listen to such speech or to attend such a meeting. As detailed above, the Department believes that ensuring that workers can individually or collectively advocate regarding their working conditions, without fear of reprisal, will better prevent adverse effect as required under 8 U.S.C. 1188(a)(1). As also detailed above, protecting the right to engage in (or to refuse to engage in) concerted activity is a demonstrated method to empower such worker advocacy. The Department also believes that protecting workers' rights to refuse to attend such "captive audience meetings" is an important aspect of the worker's right to engage in or refuse to engage in concerted activity, as set forth in new § 655.135(h)(2)(i). As the comments received on the "captive audience" proposal reflect, a worker must have the freedom to choose whether to listen to— or not to listen to—speech concerning the benefits or drawbacks of engaging in concerted activity to fully effectuate their right to engage in, or to refuse to engage in, such activity. The Department believes that expressly protecting a worker's right to refuse to attend or to leave such a meeting is the simplest and fairest method of ensuring that workers' participation is voluntary at all times.

Finally, consistent with the preamble discussion in the NPRM, this revised provision is not intended to affect attendance at mandatory meetings on subjects other than those involving workers' exercise of protected rights (*e.g.,* work assignments for the day, tools, job training, or safety instructions). The Department recognizes, as it did in the NPRM, that employers may and do regularly require workers to attend meetings on such work-related subjects. But if the employer announces a special meeting at the beginning or end of the workday to express their opinion regarding labor unions, health and safety complaints, or whether workers should communicate with government investigators, a worker may choose not to attend that meeting and may instead choose to continue performing their regularly assigned duties. Similarly, if the "primary

---

[94] *See, e.g.,* Conn. Gen. Stat. Ann. § 31–51q (2022), Me. Rev. Stat. Ann., tit. 26, § 600–B (effective Sept. 19, 2023); 2023 Minn. S.F. No. 3035, codified as Minn. Stat. Ann. § 181.531 (effective August 1, 2023); N.Y. Lab. Law § 201–d (McKinney 2023); Or. Rev. Stat. § 659.786(1) (2010).

[95] Proposed § 655.135(h)(2).

purpose'' of a regular 30-minute daily meeting is to discuss work assignments, but the employer changes topics and instead devotes the last 15 minutes to discussing whether workers should engage in certain protected activity, a worker would have the choice to leave that meeting at that point. Of course, the employer may choose to minimize any disruption by, for example, announcing that the first 10 minutes of the meeting will be about organizing, and allowing workers who object to wait elsewhere, then invite them into the meeting when they change topics and begin making work assignments. However, the employer is not required to do so. And if a retaliation complaint is received, WHD will thoroughly investigate all the facts and circumstances of the case (as it does with any complaint) before charging the employer with unfair treatment.

viii. Proposed § 655.135(m)

The Department proposed a new employer obligation at § 655.135(m) that included a number of protections intended to help prevent an adverse effect on the working conditions of workers in the United States similarly employed, 8 U.S.C. 1188(a)(1). The obligations under proposed § 655.135(m) would apply only to workers engaged in FLSA agriculture. Specifically, the Department proposed requirements that an employer provide to a requesting labor organization the contact information of H–2A workers and workers in corresponding employment employed at the place(s) of employment; permit a worker to designate a representative of their choosing to attend any meeting that may lead to discipline; refrain from captive audience meetings unless the employer provides certain information to ensure that any such meeting is not coercive; and attest either that they will bargain in good faith over the terms of a proposed labor neutrality agreement with a requesting labor organization or that they will not do so and provide an explanation for why they have declined. For the reasons explained below, the Department finalizes, with modifications, the proposal that employers must permit workers to designate a representative in certain disciplinary meetings. The Department does not finalize the proposal to provide a requesting labor organization contact information for H–2A and corresponding workers, nor does it finalize the proposal requiring employers to attest that they will bargain in good faith over a labor neutrality agreement or provide a reason for declining to do so. As explained

above in Section VI.C.2.b.vii, the Department has also withdrawn the proposal to prohibit all coercive employer speech or require that certain warnings be given to ensure that the workers have the opportunity to opt out of attending such speeches or meetings, and instead has finalized an alternative at § 655.135(h)(2)(ii) that protects a worker from retaliation for opting out of (or refusing to attend) such a "captive audience meeting'' or speech.

A. Section 655.135(m), Designation of Representative

In the NPRM, the Department proposed to require employers to permit a worker to designate a representative of their choosing to attend any meeting between the employer and the worker where the worker reasonably believes that the meeting may lead to discipline and to permit the worker to receive advice and assistance from the representative during any such meeting. As noted above, this proposal was limited to workers engaged in FLSA agriculture.

The NPRM set forth two rationales for the proposal. First, the Department believes that this obligation would help safeguard workers against unjust discipline (including termination) by giving workers the opportunity to secure a witness, advisor, or advocate in a potentially adversarial situation. Second, allowing H–2A workers and workers in corresponding employment the option to have a representative in these meetings (if they so choose) would allow them to better advocate for themselves regarding the terms and conditions of their employment and thereby prevent adverse effect on the working conditions of similarly employed workers in the United States. That is, the ability to have a representative's presence at such a meeting would enhance workers' ability to act in concert with their coworkers to protect their mutual interest in ensuring that their employer does not impose punishment unjustly.

In the preamble to the NPRM, the Department clarified that there was no limit to who a worker may designate as a representative. As the NPRM explained, it would be impractical to limit such representatives to union representatives, given low union density in agricultural workplaces, or to coworkers, because the temporary nature of H–2A work may limit the development of relationships with coworkers. For example, the worker may prefer to designate a representative who is not employed by the employer, such as a legal aid advocate, member of the clergy, or other key service provider.

The NPRM requested commenter feedback on a few specific questions. First, the Department sought comments regarding the scope of situations in which employers' obligations under the proposal would apply, including, for example, whether the obligation should apply in all situations that a worker may reasonably believe could involve or lead to discipline (such as where employers correct work techniques, give instructions, or provide training), or should apply only in situations more analogous to the "investigatory interviews'' addressed in *NLRB* v. *J. Weingarten, Inc.,* 420 U.S. 251, 267 (1975). The Department further sought comment on whether it should draw on sources other than *Weingarten* (and the line of cases applying *Weingarten*) in determining applicability of this obligation or should consider any other interactions between farm employers and their interactions with nonunionized agricultural workers. Second, the Department sought comments on how to ensure that workers are adequately informed of the employer's obligation to permit workers to request a representative and the circumstances under which this obligation would arise. Finally, the Department requested comments as to how to best implement this obligation in an agricultural setting, including those settings subject to §§ 655.200 through 655.235 (herding and livestock production workers).

Several commenters expressed support for the proposal. A group of State Attorneys General expressed the view that the proposal would have a positive impact on H–2A workers who face heightened risks of coercion and abuse by employers, adding that the proposal would prevent employers from suppressing workers from exercising their rights. A group of U.S. Senators also supported the proposal as one way to ensure that workers can advocate regarding their working conditions without fear. Similarly, an advocacy organization expressed the view that the proposal would bolster workers' ability to engage in concerted activity and would prevent unfair discipline by employers. A State government agency, California LWDA, observed that agricultural workers in California already enjoy a right to representation in investigatory or pre-disciplinary meetings and opined that access to such representatives should be extended to H–2A workforces.

Other commenters objected to the provision as a general matter or expressed concerns about certain aspects of the provision. A few trade associations questioned the

Department's authority for the proposal. For example, one commenter, FFVA, stated that the proposal lacks congressional authority, and another, USA Farmers, stated that the proposal lacks a valid statutory basis. Along similar lines, a few commenters expressed the view that the Department did not adequately explain how the proposal would protect workers in the United States from adverse effect. Other commenters stated that the proposal amounted to an attempt by the Department to selectively apply provisions of the NLRA to H–2A workers.

Because the NPRM proposed that the designated representative would not be limited to union representatives or coworkers, several commenters identified that this proposal would require employers to permit third parties unaffiliated with farming operations to enter the workplace. Some of these commenters expressed employer concerns about a requirement to permit unaffiliated third parties to enter the workplace. For example, several commenters—FFVA, AmericanHort, and Western Growers—expressed the view that the proposal would effect a physical taking of property under *Cedar Point,* 141 S. Ct. 2063. Other commenters, including FFVA, Western Growers, NCAE, and American Farm Bureau Federation, expressed concern that the provision would allow outsiders who may be unaware of food safety protocols in worksites where workers are harvesting or otherwise preparing food products. These commenters stated that the provision would therefore interfere with employers' obligations under the Food Safety Modernization Act and its implementing regulations and under the Global Food Safety Initiative, which FFVA stated requires producers to restrict site access to certain personnel trained in food safety protocols. Another trade association, the American Farm Bureau Federation, further commented that requiring H–2A employers to permit unaffiliated third parties onsite would increase liability risks and insurance costs for employers.

Many commenters opposed the rule on the grounds that it was vague and could unnecessarily delay disciplinary actions. Some trade associations expressed the view that the proposal would cause significant disruption to the workplace because the proposed definitions of "meeting" and "discipline" are vague, which could be interpreted to require employers to allow an employee to have a representative present for minor counseling or correction of job performance. One advocacy group, the Cato Institute, observed that the proposal does not include a requirement that the representative appear at the appointed time for the "meeting." Other commenters, including wafla and USA Farmers, stated that representation could take days or weeks to arrange in the setting of agricultural work and expressed concerned that the proposal would leave employers open to liability in cases where the behavior needing correction is dangerous to other employees. Commenters, including Cato and Mercer Ranch, Inc., similarly said that the proposal is vague and impractical. Another trade association expressed concern that involving additional parties in each disciplinary meeting could lead to breaches of confidential business information or further disputes or perceptions of unequitable treatment between employees.

After considering comments discussed above, the Department adopts the proposed revisions at § 655.135(m) with some modifications. First, this final rule provides that the employer's obligation will be limited to investigatory interviews analogous to investigatory interviews under *Weingarten.* However, this final rule maintains the approach, as described in the preamble to the NPRM, of permitting workers to designate the person of their choice as a representative, regardless of whether the designated representative is a union representative, a coworker, or someone else. Second, the Department deletes the final sentence of the provision which would have required employers to permit third-party designated representatives to physically access the worksite. In its place, the Department adds two new sentences clarifying that: (1) where the worker's designated representative is present at the worksite, the employer must permit the representative to attend the investigatory interview in-person; but (2) when the worker's designated representative is not present at the worksite, the employer must permit the representative to attend the investigatory interview remotely, by telephone or videoconference. Third, the Department makes non-substantive changes to the regulatory text to revise "workers" to read "a worker" or "the worker," for consistency with other parts of this final rule. Fourth, the provision is renumbered as § 655.135(m). The Department further explains the first and second modifications in turn.

First, in a modification to the provision as proposed in the NPRM, this final rule adopts from the NLRA context the principle that employees should have recourse to representatives in "investigatory interviews." As discussed in the NPRM, it is well-established that under the NLRA, in a workplace covered by a CBA, employers must grant an employee's request to have a representative present in an investigatory interview that the employee reasonably believes might result in disciplinary action. *See Weingarten,* 420 U.S. at 256, 267. In *Weingarten,* the Supreme Court concluded that denying a representative constitutes interference with an employee's right to engage in concerted activities for mutual aid or protection under sec. 7 of the NLRA. *Id.* An employee's request for a representative constitutes concerted activity because a representative's presence safeguards the interests of employees generally, not solely the interest of the requesting employee. *See id.* at 260–61. Courts have cited similar considerations in deeming reasonable the view that sec. 7 of the NLRA permitted nonunion workers to designate a coworker to provide assistance during investigatory interviews that may lead to disciplinary action. *See Epilepsy Found. of Ne. Ohio* v. *NLRB,* 268 F.3d 1095, 1100 (D.C. Cir. 2001).

The NPRM proposed that in the H–2A program, the employer's obligation would apply in the context of "meetings between the employer and a worker where the worker reasonably believes that the meeting may lead to discipline." Under the original proposal, the scope of situations in which this obligation would have applied is broader than the "investigatory interviews" in which a worker's right to a representative is recognized under sec. 7 of the NLRA. *See Weingarten,* 420 U.S. at 253, 257–58 (recognizing right to representative in "investigatory interview which the employee reasonably believed might result in disciplinary action").

After reviewing the comments, the Department adopts the "investigatory interview" concept from *Weingarten* and its progeny. The Department's decision to draw from a concept that developed in the NLRA context is similar to its decision to adopt language similar to sec. 7 in § 655.135(h)(2)(i). As in § 655.135(h)(2)(i), the Department adopts the "investigatory interview" concept from the NLRA context to enhance workers' ability to engage in concerted activities for the purpose of mutual aid or protection, thus helping to avoid adverse effects on similarly employed workers in the United States. In incorporating the term "investigatory

interview" in this final rule, the Department draws on the *Weingarten* body of case law but notes that the term must be interpreted consistently with the statutory purpose of the INA and the H–2A program, in light of the H–2A program's unique characteristics and the changes the Department is making in this final rule.

The Department also believes that adopting the "investigatory interview" concept is the best way to address several concerns raised by commenters while still maintaining protections for workers. In particular, trade associations expressed the view that the terms "meeting" and "discipline" in the NPRM proposal are vague, creating challenges for employers in determining when their obligation arises. Trade associations also expressed the view that "meetings" would capture an overly wide range of communications between employers and employees, thereby burdening employers. Adopting the "investigatory interview" concept addresses both these concerns because it clearly limits the obligation to a narrower and more clearly defined range of employer-employee communications. Moreover, adopting the "investigatory interview" concept from *Weingarten* will assist employers and employees in determining the scope of an employer's obligation under these regulations, because stakeholders may refer to a wide body of interpretive material applying *Weingarten,* including decisions by courts and the NLRB. The Department intends that the following core principles—taken from decisions applying *Weingarten*—should apply in determining the scope and application of "investigatory interviews" under these regulations. These core principles will apply to these regulations regardless of whether, in the future, courts or the NLRB limit the scope of the *Weingarten* right under sec. 7 of the NLRA.

As noted above, an "investigatory interview" arises in a "situation where [a worker] *reasonably believes* the investigation will result in disciplinary action." *Weingarten,* 420 U.S. at 257 (emphasis added). Therefore, whether a meeting or conversation constitutes an "investigatory interview" must be evaluated from an objective standard. *Consol. Edison Co. of New York, Inc.,* 323 NLRB 910 (1997). The question is whether a similarly situated worker would reasonably believe that discipline might result from the interview, considering all the circumstances. *Weingarten,* 420 U.S. at 257–58 & n.5; *Consol. Edison,* 323 NLRB 910. For example, "run-of-the-mill shop-floor conversation as, for example, the giving

of instructions or training or needed corrections of work techniques," generally do not constitute "investigatory interviews," since "[i]n such cases there cannot normally be any reasonable basis for an employee to fear that any adverse impact may result from the interview." *Weingarten,* 420 U.S. at 258. Moreover, an employee does not have a reasonable fear of discipline in a conversation where the employer merely announces a disciplinary decision that the employer has already made, *see Baton Rouge Water Works Co.,* 246 NLRB 995, 997 (1979), or where the employer states that the worker does not face discipline, *Gen. Elec. Co.,* 240 NLRB 479, 480 (1979).

However, the intent of the employer or its representative is not dispositive of whether an interaction constitutes an investigatory interview; that is, an interaction may constitute an "investigatory interview" even where the employer did not intend to seek discipline, so long as a similarly situated worker would reasonably believe that discipline might result. *Consol. Edison,* 323 NLRB 910. In that analysis, the individual worker's previous treatment by the employer (including prior discipline of the worker) is relevant to assessing whether a similarly situated worker would reasonably maintain such a belief. *See Verizon Cal., Inc. & Commc'ns Workers of Am., Loc. 9588, AFL–CIO,* 364 NLRB 1008, 1011–12 (2016); *E.I. Dupont De Nemours & Co., Inc.,* 362 NLRB 843, 843, 855–56 (2015).

The worker's request for a representative need not take a particular form or incorporate any particular words, so long as the request is sufficient to place the employer on notice that the worker desires a representative. *Montgomery Ward & Co.,* 269 NLRB 904, 905 n.3 (1984). Of course, the worker's explicit request for a representative is sufficient, *see, e.g., Consol. Edison,* 323 NLRB at 914; *Montgomery Ward,* 273 NLRB at 1227, but the request need not be explicit if it provides sufficient notice, such as, for example, where the worker asks the employer whether he needs assistance from a representative, *see, e.g., NLRB* v. *N.J. Bell Tel. Co.,* 936 F.2d 144, 145 (3d Cir. 1991).

A worker may make a request for a representative at any point during an investigatory interview. *See, e.g., Prudential Ins. Co. of Am.,* 251 NLRB 1591, 1591–92 (1980), *enforcement denied on other grounds,* 661 F.2d 398 (5th Cir. 1981). Before the interview, the employer must inform the worker about the subject matter of the interview and must permit the worker to consult with

the representative. *Pac. Tel. & Tel. Co.* v. *NLRB,* 711 F.2d 134, 136–37 (9th Cir. 1983). During the interview, the employer must permit the representative to provide active assistance and advice to the worker. *NLRB* v. *Texaco, Inc.,* 659 F.2d 124, 126 (9th Cir. 1981) (citing *Weingarten,* 420 U.S. at 262–63). The worker may designate the representative of his choice, absent extenuating circumstances. *Anheuser-Busch, Inc.* v. *NLRB,* 338 F.3d 267, 276–78 (4th Cir. 2003). Finally, once the worker has requested a representative, the employer has several options: (1) grant the request (including delaying the interview if necessary); (2) forgo the interview; or (3) offer the employee the choice between continuing the interview without a representative or having no interview at all. *NLRB* v. *N.J. Bell Tel. Co.,* 936 F.2d 144, 148–49 (3d Cir. 1991).

As explained, these core principles defining the scope of "investigatory interviews" under this final rule reflect decisions applying *Weingarten.* Under *Weingarten,* of course, the designated representatives are typically shop stewards or other union representatives. However, although the Department adopts *Weingarten's* "investigatory interview" concept, the Department maintains the NPRM's approach that, under the H–2A regulations, a worker who chooses to designate a representative in an investigatory interview is not limited to designating a union representative. Again, "investigatory interview" as used in this final rule must be interpreted consistently with the statutory purpose of the INA and the H–2A program, in light of the H–2A program's unique characteristics. In the H–2A context, due to low unionization rates in agricultural workplaces, limiting designated representatives to union representatives would severely curtail workers' ability to identify a representative. Also, the Department believes it is appropriate to permit a worker to designate a non-coworker as a representative because the temporary nature of H–2A work contracts means that it may be difficult for an H–2A worker to build trusted relationships with coworkers. This approach is consistent with the core principle that an employer must permit the worker to designate the representative of their choice. *Anheuser-Busch,* 338 F.3d at 276–78. In the NLRA setting, that principle protects the worker's ability to select the union representative of their choice, but in the H–2A context, that principle protects the worker's ability to select any representative of their choice.

The second modification to the NPRM involves removing the final sentence of the proposed provision requiring representatives to be guaranteed physical access to the worksite and adding two sentences pertaining to representatives' attendance at investigatory interviews. First, where the designated representative is present at the worksite at the time of the investigatory interview, the employer must permit the representative to attend the investigatory interview in person. The second sentence clarifies that where the designated representative is not present at the worksite at the time of the investigatory interview, the employer must permit the designated representative to "attend" an investigatory interview remotely, by telephone or videoconference.

The proposal to require a designated representative access to the worksite or property was intended to facilitate the worker's ability to designate the representative of their choice. The Department believes that removing that requirement and substituting the new modified requirements will continue to serve that goal, while also mooting employers' concerns about the entry of unaffiliated third parties on employer worksites, liability risks, and food safety obligations, and their assertion that the entry of unaffiliated third parties raises "takings" concerns under *Cedar Point.* Clarifying that representatives may attend remotely also ensures that the worker may designate the representative of their choice. *See Anheuser-Busch,* 338 F.3d at 276–78. With remote attendance as an option, a worker may more easily obtain participation from their representative of choice, even if the representative is not local. Also, if the employer, worker, and worker's representative are all amenable, this final rule does not prohibit a worker's representative who is not usually present at the worksite from attending a scheduled investigatory interview in person. In other words, if the employer schedules an investigatory interview for a future date and agrees to the in-person participation of a worker's representative who is not usually present at the worksite (*e.g.,* a key service provider such as a member of the clergy), that representative may attend the investigatory interview in person. The Department notes that the final rule's requirement that the employer "must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview" applies equally where the representative participates remotely and where the representative participates in person.

As explained, the Department believes that these modifications will address comments stating the language proposed in the NPRM was vague or unclear. The Department believes that its modifications to the regulatory language will also mitigate implementation concerns raised in the comments. For examples, the modifications will address employers' concerns that the language proposed in the NPRM could prevent employers from providing minor counseling or routine corrections of job performance. Under the core principles outlined above, investigatory interviews normally do not include giving instructions or providing corrections of work techniques. Typically, the Department will consider that an employer's obligation under § 655.135(m) will arise when the employer's representative (such as an owner, manager, or supervisor) seeks to question a worker, the questioning is part of an investigation, and the worker reasonably believes that they might face discipline. Along similar lines, the modifications address concerns that the proposal would expose employers to liability for dangerous circumstances. Under the core principles, investigatory interviews do not include interactions where the employer announces a disciplinary decision that the employer has already reached. In certain situations implicating safety considerations, employers routinely impose discipline without conducting an interview; for example, where an employer's representative witnesses conduct such as unsafe operation of a vehicle or machinery. Nothing in this final rule prevents an employer from intervening to stop a dangerous situation. However, any situation where an employer seeks to question a worker, and the worker believes that questioning may result in discipline, constitutes an investigatory interview.

The modifications will also mitigate concerns that the proposal would lead to wasted time on the worksite (on the rationale that arranging a representative could take days or weeks to arrange) and that the proposal did not explain what employers should do if a representative is not available or does not timely appear. Under the core principles, if an employer is concerned about delays in arranging a representative, the employer has the option to forgo the interview or offer the employee the choice between continuing the interview without a representative or having no interview at all. Should the employer opt to forgo the interview, an employer may impose discipline without conducting an interview so long as any resulting termination complies with the requirements of for cause termination as described further below. Or, if applicable in actual fact, the employer may tell the worker that the interview will not lead to discipline and may in that case proceed with an interview without a representative present. The Department believes that these options for employers will significantly mitigate delays.

However, where the employer requires an investigatory interview to undertake a fair and objective investigation into job performance or misconduct in compliance with § 655.122(n)(2)(i)(D) and the worker requests a representative, the employer must allow a reasonable delay for the representative to join the investigatory interview (either in person or remotely). The Department will look at all facts and circumstances when determining what constitutes a reasonable delay, including, for example, whether the designated representative is engaged in time-sensitive work that cannot be paused, is assigned to work in a different location, or cannot readily be contacted due to lack of telephone service in remote areas. The Department will also consider the time sensitivity of the employer's need to conduct the investigatory interview. Moreover, the Department emphasizes that the employer must not consider the worker's request for a representative in any way in the employer's decision whether to impose discipline. Additionally, employers must adhere to the core principle requiring that employers inform workers of the subject of the interview and employers must not intimidate or coerce workers into declining a representative. For example, an employer does not fulfill its obligation under § 655.135(m) where the employer misrepresents the subject of the interview, or where the employer relays to a worker that the worker will avoid discipline if they decline a representative, but that the worker may face discipline if it requests a representative.

The Department further underscores that, should the employer eventually seek to terminate a worker for cause under 20 CFR 655.122(n) based on such discipline, or based on a series of infractions, the employer must establish that it satisfied the five conditions specified in § 655.122(n), including that it undertook a fair and objective investigation into the performance or misconduct and that it engaged in progressive discipline. Where an employer opts to forgo an investigatory

interview after a worker requests a representative, the Department will examine whether the investigation was fair and objective even absent the investigatory interview. Moreover, more generally, because § 655.135(m) is an employer obligation, the Department may take enforcement action against an employer that unlawfully fails to permit a worker to designate a representative.

The changes to the regulatory text respecting remote attendance of representatives will also mitigate employers' concerns about delays. Because the regulations now provide for remote attendance by representatives, in the case of remote participation, employers need not delay an investigatory interview until such representatives arrive in person. Moreover, consistent with the regulatory text and the core principles outlined above, if the worker designates a representative who is not immediately available, the worker may select an alternative representative, including a representative who is available to attend remotely. Under the core principles, the worker may select the representative of their choice, but if there are extenuating circumstances, the employer need not delay the interview. The Department will consider such extenuating circumstances to include where the designated representative's failure to timely appear causes undue delay. As explained above, the Department will consider all facts and circumstances in analyzing whether longer delays are reasonable.

The Department believes that requirements of new § 655.135(m), as modified from the NPRM as discussed above, will help to protect against adverse effect on similarly employed workers. As explained above, the Department believes that protecting workers' right to engage in concerted activity will better prevent adverse effect caused by use of the H–2A program. Allowing H–2A workers and workers in corresponding employment the option to have a representative in an investigatory interview (if they so choose) under new § 655.135(m) will enhance workers' ability to act in concert with their coworkers to protect their mutual interest in ensuring that their employer does not impose punishment unjustly. The protections in new § 655.135(m) also will help safeguard workers against unjust discipline (including termination and infractions that may lead to termination) by giving workers the opportunity to secure a witness, advisor, or advocate in a potentially adversarial situation. These protections thus will bolster the clarifications made regarding a

termination for cause under § 655.122(n) of this final rule—clarifications that are intended to protect a worker's entitlement to protections under other regulatory provisions that prevent adverse effect (§§ 655.122(h)(2), 655.122(i), and 655.153).

Finally, the Department has considered the question it posed in the NPRM about the best means to ensure that workers are informed of employer's obligation to permit workers to designate a representative in an investigatory interview. The Department did not receive comments on this subject, but upon reflection, the Department concludes that the best means to ensure that workers are adequately informed of this obligation is to require that employers include notification in the job offer. Therefore, the Department has included on the job order, in the conditions of employment and assurances to which an employer must agree, a statement regarding the requirements of new § 655.135(m).

### B. Proposed § 655.135(m)(1), Employee Contact Information

The Department proposed in § 655.135(m)(1) to require employers to provide to a requesting labor organization an electronic list of employee contact information for all H–2A workers and workers in corresponding employment engaged in agriculture as defined under the FLSA and employed at the place(s) of employment included within the employer's H–2A Application. 88 FR at 63795–63796, 63825. The Department proposed to require the employer to update the list once per certification period, if requested by the labor organization. *Id.* The Department explained in the NPRM that this provision was intended to bolster the ability of workers to effectively self-organize and to engage in concerted activity protected under proposed § 655.135(h)(2), by providing workers with access to information regarding the arguments both for and against organization and with information and resources necessary to engage in concerted activity regarding working conditions. *Id.* at 63795. The proposal was modeled on the NLRB's voter list requirements under the NLRA. *Id.* at 63795–96 (citing 29 CFR 102.62(d), 102.67(l); *RadNet Mgmt., Inc.* v. *NLRB,* 992 F.3d 1114, 1122–23 (D.C. Cir. 2021) (provision of contact information to labor organizations is fundamental to effective exercise of organizing rights).

The Department received a significant number of comments in strong opposition to proposed § 655.135(m)(1). The majority of these comments cited

the potential risks to workers' privacy and safety posed by sharing this information without the employee's consent. Many commenters, including trade associations, an agent, and an individual employer, observed that employers would have little if any means to verify the legitimacy of an organization requesting the employee contact information under this provision. As a result, an employer could inadvertently provide sensitive and private employee contact information to illegitimate third parties. Even where the request came from a bona fide labor organization, commenters noted that such an organization may not have received a majority of support from the workers nor have successfully petitioned for an election from a governing labor board. For example, citing *Excelsior Underwear, Inc.,* 156 NLRB 1236, 1245 (1966), the National Right to Work Legal Defense Foundation, Inc. stated that the NLRB requires disclosure of voter lists ''only after an election has been directed'' in light of the organizational interests at stake, namely that a ''real question concerning representation exists.'' Relatedly, several commenters expressed concern with the potential liability to employers for providing worker information without the worker's explicit consent, in the event of an abuse of that information by the third party. These commenters requested that, if finalized, the provision include an opt-out mechanism for employees and a disclaimer of liability for employers, or some mechanism for pre-registration or other vetting of the requesting organizations by the Department. Many commenters also objected to the proposal due to the potential burden on employers to comply with the proposed provision, since multiple labor organizations could request the list each season, along with one update per season. For similar privacy-related and employer-burden reasons, many commenters opposed any expansion of the proposed provision to include a provision of employee contact information to other organizations. Finally, the North Carolina Farm Bureau Federation, Inc. and U.S. Representatives Foxx and Thompson each opined that the proposal was unconstitutional, citing respectively First Amendment and separation of powers concerns.

The Department also received some comments in support of the proposal, citing the need for workers to have access to information regarding their rights. For example, 11 State Attorneys

General observed that this proposal, combined with other worker voice and empowerment proposals in the NPRM, would "connect workers to important information about their employers and their rights." A group of U.S. Senators observed that the worker voice and empowerment proposals, including the employee contact information proposal, would "ensur[e] workers can advocate for and seek out better working conditions without fear." Some of the comments in support of the proposal, however, reflected similar concerns as noted above regarding worker privacy and recommended that any final rule include some verification or enforcement mechanism. For example, the AFL–CIO suggested that any final rule include a proviso that "[t]he requesting labor organization shall not use the list for purposes other than seeking to represent H–2A workers or otherwise assisting them in relation to their terms and conditions of employment and related matters." Farmworker Justice suggested a similar caveat. On the other hand, the California LWDA advised against including an "opt out" mechanism in any final rule as a means to mitigate the privacy concerns, noting the potential for abuse of such a mechanism.

After consideration of the comments received, the Department has decided not to adopt the proposed employee contact information provision in this final rule. The Department believes that the interest underlying this proposal (*i.e.,* workers' access to information about their rights) is better furthered through other provisions of this final rule, including § 655.135(n), regarding access to worker housing, § 655.135(h)(1)(v), protecting employees from retaliation for inquiring about or asserting their rights or consulting with key service providers, and § 655.135(h)(2)(i), protecting persons engaged in FLSA agriculture from retaliation for engaging in activities related to self-organization. These protections also will be disclosed to workers through the job order and through other employee outreach tools.

However, as discussed in the NPRM, a worker's ability to gather and share coworkers' contact information, both amongst other workers and with labor organizations, is itself concerted activity, and therefore is protected activity under § 655.135(h)(2) of this final rule. *Quicken Loans, Inc.* v. *NLRB,* 830 F.3d 542, 545 (D.C. Cir. 2016) (citing *Beth Israel Hospital* v. *NLRB,* 437 U.S. 483, 491 (1978) and *Eastex, Inc.* v. *NLRB,* 437 U.S. 556, 565 (1978) (rights to organization and to engage in concerted activity "necessarily

encompass employees' rights to communicate with one another and with third parties" about organization and working conditions). For example, a worker who gathers coworkers' contact information and shares that information with a union so that the union can contact the workers regarding the benefits of unionization is engaging in protected, concerted activity and self-organization. Under § 655.135(h)(2)(i), as adopted in this final rule, an employer may not retaliate against the worker for gathering or sharing this information.

### C. Proposed § 655.135(m)(4), Commitment To Bargain in Good Faith Over Proposed Labor Neutrality Agreement

The Department proposed adding a new provision at 20 CFR 655.135(m)(4) that would require an H–2A employer to attest either that they will bargain in good faith over the terms of a proposed labor neutrality agreement with a requesting labor organization, or that they will not so bargain and provide an explanation for why they have declined to do so. The Department also proposed that the employer's response must be disclosed in the job order. The Department stated that the goal of this proposal was to provide workers and worker advocacy groups with this information about employers to enhance transparency. 88 FR at 63798–63799.

Commenters that supported the proposal, such as the UFW Foundation, stated that they appreciated the transparency it would provide. For example, a comment by several State Attorneys General stated that the required disclosures would allow workers to use the information to assess job opportunities. California LWDA believed the proposal would increase workers' access to information about job opportunities and workers' rights.

Many commenters, however, opposed the proposal. Although the Department stated that an employer's choice whether to bargain over any labor neutrality agreement, and whether to ultimately enter any labor neutrality agreement, would be entirely voluntary, several commenters, including wafla and USA Farmers, raised concerns that the proposal would compel speech from employers, in violation of the First Amendment.

Commenters also questioned whether the Department's proposal would prevent adverse effect. For example, USA Farmers, a national trade association representing agricultural employers, claimed that the information that the Department sought was "wholly irrelevant to an employer's request for a

temporary [agricultural] labor certification" under the H–2A program and "has nothing whatsoever to do with an employer's need for temporary labor or with preventing adverse effect." A number of trade associations that represent H–2A employers, such as IFPA, TIPA, and GFVGA, questioned the Department's authority for the proposal, stating that the INA "does not grant the authority to advance labor organization, rather the authority is intended to prevent the adverse effect" on workers in the United States. The National Right to Work Legal Defense Foundation, Inc. claimed that the Department lacked a statutory basis for the proposal.

A number of commenters also expressed confusion with the proposal's requirements. For example, wafla, a trade association, argued that it would "require an employer to disclose their hypothetical position on labor organizing" without the benefit of a specific request from a labor organization. USA Farmers noted that it would not be possible for an employer to reasonably respond to the Department's request because of the potential unknown scenarios that might arise in the future. Employers and groups representing employers also raised concerns about facing enhanced enforcement from the Department if they chose to decline to bargain on the job order.

After consideration of the comments and the concerns raised by a number of commenters, the Department has decided not to finalize the proposal. The Department also believes that a number of other provisions of this final rule, such as the expanded rights of access to worker housing at § 655.135(n), the protections surrounding termination for cause at § 655.122(n), and disclosures regarding productivity standards and overtime wage rates at § 655.122(l)(4), will adequately serve the proposal's stated goals of transparency and disclosure of information for workers.

### ix. Section 655.135(n), Access to Worker Housing

In the NPRM, the Department proposed the addition of a new provision, § 655.135(n), governing access to worker housing, intended to protect the rights of association and access to information for H–2A workers and workers in corresponding employment and to address the isolation that contributes to the vulnerability of some H–2A workers.

The Department explained that, due to the temporary nature of their work and dependency on a single employer for work, housing, transportation, and

necessities, among other factors, H–2A workers are particularly vulnerable to labor exploitation, including violations of H–2A program requirements, dangerous working conditions, retaliation, and labor trafficking. Geographic isolation and employer-imposed limitations on workers' movements and communication exacerbate this vulnerability. The Department discussed studies by nongovernmental organizations highlighting the vulnerability faced by H–2A workers, as well as some employers' use of isolation and monitoring—including rules or practices limiting workers' ability to leave employer-furnished housing, leaving workers in remote areas without transportation or means of communication, deliberately limiting workers' access to their support systems, and confiscating workers' personal cellular phones and passports—as a means of controlling workers and forcing them to accept substandard and illegal working conditions.[96] The Department explained that it was proposing the new provision at § 655.135(n), governing access to worker housing, to protect workers' rights to association and access to information both to make them less susceptible to labor exploitation, including trafficking, and to interrupt factors that impose barriers to workers advocating or complaining regarding working conditions and thus have an adverse effect on workers in the United States similarly employed.

In light of these serious concerns, the Department proposed two distinct, but complementary, protections: § 655.135(n)(1), which would protect the right of workers in employer-furnished housing to invite guests to their living quarters and nearby common areas, and § 655.135(n)(2), which would provide a narrow right of access to labor organizations as a backstop to the protections of § 655.135(n)(1).

Specifically, the proposed § 655.135(n)(1) would provide that workers residing in employer-furnished housing must be permitted to invite, or accept at their discretion, guests to their living quarters and/or to the common areas or outdoor spaces near such housing during time that is outside of workers' workday and subject only to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas. The

proposed regulation would explicitly permit workers to invite guests or to accept (or reject) visitors wishing to speak with them. As explained in the NPRM, this protection would recognize that workers do not relinquish their rights to association or access to information simply by virtue of residing in employer-furnished housing. Further, it would prevent employers from using the statutorily required provision of housing as a means to isolate or control their workforce by blocking their access to information and assistance from the outside. The Department explained that, because the right to invite or accept visitors would be limited to housing areas and to time that is outside of workers' workday, it did not anticipate that this proposal would disrupt employers' business operations. As proposed, § 655.135(n)(1) would apply to all housing furnished pursuant to the employer's statutory and regulatory obligations. The Department explained that while it anticipated that this protection would be the most beneficial for workers who reside in housing that is geographically isolated, it recognized that even workers whose housing is more centrally located may be isolated by virtue of employer policies that limit their ability to leave housing or to interact with the public, even during time that is outside of workers' workday, and would benefit from a protected right to invite and accept visitors. Because workers typically reside in shared quarters, the Department proposed to permit reasonable restrictions designed to protect worker safety or to prevent interference with other workers' enjoyment of the housing.

Recognizing that the effectiveness of proposed § 655.135(n)(1) may be limited where H–2A workers are unaware of, or afraid to exercise, their right to invite or accept visitors in employer-furnished housing, the Department proposed a second requirement at § 655.135(n)(2) that would provide a narrow right of access to labor organizations. The Department explained that labor organizations would have an incentive to report concerns of labor exploitation to the Department or other law enforcement agencies, as well as to provide information to workers on their rights under the H–2A program and to engage in self-organization. Under the proposed § 655.135(n)(2), where employer-furnished housing for H–2A workers and workers in corresponding employment who are engaged in FLSA agriculture is not readily accessible to the public, a labor organization would be permitted to access the common

areas or outdoor spaces near worker housing for the purposes of meeting with workers during time that is outside of workers' workday for up to 10 hours per month.

The Department proposed to include the protections that would be afforded under proposed § 655.135(n) in the disclosures required on the job order to help inform workers of their rights under this proposal. Additionally, the Department proposed corresponding edits to § 655.132(e)(1) to address instances in which the employer-furnished housing is provided by the fixed-site agricultural business ("grower") as part of its agreement with an H–2ALC. Under the current provision, where housing is owned, operated, or secured by the grower, the H–2ALC is required to include with its H–2A Application proof that the housing complies with the applicable standards set forth in § 655.122(d) and certified by the SWA. The Department proposed to add to this provision the requirement that the H–2ALC also provide with its H–2A Application proof that the grower has agreed to comply with the requirements of proposed § 655.135(n). The Department explained that, in doing so, it sought to ensure that the protections for access to worker housing would be met even where the H–2ALC fulfills its obligation to furnish housing through its agreement with its client grower.

The Department sought comments on all aspects of this proposal. With respect to the proposed § 655.135(n)(1), the Department asked whether this provision should be limited to workers residing in certain types of employer-furnished housing or in certain locations. The Department also sought comments on what would constitute reasonable or unreasonable restrictions and other means of balancing different workers' interests in shared housing and on visitor policies that may unduly hinder workers' rights to invite or accept guests. With respect to the proposed § 655.135(n)(2), the Department sought comments on the proposed limitations placed on labor organizations' right of access, including the cap of 10 hours per month, and how to understand when worker housing is not readily accessible to the public; how the proposal would apply when workers engaged in FLSA agriculture share housing with workers not engaged in FLSA agriculture (§ 655.135(n)(2) applies only with respect to the former); whether the right of access in this provision should be expanded to provide similar access to some or all key service providers as defined in proposed § 655.103(b); and, if so, whether the

[96] 88 FR at 63750, 63799–63801 & nn.80–81 [citing Polaris 2018–2020 Report; CDM Report; Farmworker Justice Report; *U.S.* v. *Patricio,* No. 5:21-cr-00009 (S.D. Ga.)].

Department should limit the scope of the catchall term "any other service provider to which an agricultural worker may need access." With respect to the proposed corresponding edits to § 655.132(e)(1), the Department sought comments on what would constitute the requisite proof that an H–2ALC would be required to submit with its application, as well as alternative means of ensuring compliance with the access protections where housing is provided directly by a grower. In addition, the Department sought comments on whether and how the protections of proposed (n) should apply with respect to workers housed pursuant to §§ 655.230 (housing for work performed on the range in herding and range production of livestock occupations) and 655.304 (mobile housing for workers engaged in animal shearing or custom combining).

As described in more detail below, this proposal received general support from some legislators and many worker advocacy groups and individuals. For example, a joint comment of 15 U.S. Senators expressed support for the access provision, stating that in combination with the rest of the proposed rule, this would ensure workers can advocate for better working conditions without fear. The Alliance to End Human Trafficking explained that H–2A workers' isolation and vulnerability increases their risk of being subject to labor exploitation or trafficking and that the provision would help reduce this risk by protecting H–2A workers' rights of association and access to information. Farmworker Justice and NLADA explained that farmworker housing is often physically isolated from the surrounding community, creating "conditions in which workers are vulnerable to abuse and may be denied their rights," and expressed support for the Department's proposal to increase workers' access to information about their rights and to recognize their rights to have visitors and to access essential services. Numerous individuals submitted public comments supporting the access provision, particularly the protection in paragraph (n)(1) of workers' right to invite guests to employer-furnished housing. Additionally, Farmworker Justice and NLADA noted that in some areas, rights of access to farmworker housing have already been established under State law or interpretations of Federal law and asked the Department to ensure that any regulatory provisions regarding access are minimum standards and are not intended to

preempt any more expansive or permissive State access requirements.

Employers, trade associations, and agents were generally opposed to the access provision, though this opposition was largely directed at the narrow right of access for labor organizations in paragraph (n)(2).

Protecting Workers' Right To Invite Guests to Housing Areas

Worker advocacy organizations generally supported the proposed language of paragraph (n)(1), which was intended to protect the right of workers in employer-furnished housing to invite guests to their living quarters and nearby common areas. Advocacy organizations, such as the North Carolina Justice Center, UMOS, PCUN, the National Women's Law Center, and the UFW Foundation, explained that this provision would help address isolation and vulnerable living situations among H–2A workers. Farmworker Justice, the UFW Foundation, and AWAC described instances in which employers prohibited visits from service providers, labor organization representatives, and family, or retaliated against workers who met with such outside parties. The UFW Foundation explained that while some States already recognize the right of farmworkers to invite or accept guests, "a federal rule clearly protecting that right is long overdue." Individuals also expressed support for this provision on a variety of grounds, including that it would allow workers to build connections with the surrounding community, access legal and medical services, and feel secure in their homes, and would "facilitate liberty and the pursuit of happiness."

While expressing support for the proposed provision, several worker advocacy groups, including Farmworker Justice and AWAC, explained that merely requiring that workers be allowed to invite guests would be an insufficient means of preventing worker isolation because many workers would be afraid to exercise this right. Both organizations suggested the Department should protect access for a range of service providers.

Some employers and trade associations also expressed support this aspect of the proposal. For example, USApple described it as "reasonable," noting that most employers permit the occupants (*i.e.,* the workers) to determine who may visit and have policies in place for guests, such as specified hours and check-in procedures. The National Cotton Ginners Association and Texas Cotton Ginners' Association stated that "the requirement to allow access to

housing by non-employees must be tempered by recognizing that the employer is responsible for meeting all housing requirements." For instance, allowing workers to invite guests could result in guests staying overnight without the employer's knowledge and, potentially, in violation of occupancy requirements.

While most of the opposition to this proposal was reserved for the limited right of access for labor organizations, some commenters also opposed the proposed language in paragraph (n)(1) intended to protect the right of workers in employer-furnished housing to invite guests to their living quarters and nearby common areas. One employer, McCorkle Nurseries, Inc., objected to what it characterized as "mandatory access to worker housing for guests." Several other employers stated that they must be able to limit access to employer-furnished housing for workers' safety but noted that most employers already permit guests during specified hours or allow family members to pick up and drop off workers for visits. Several trade associations, including NHC, IFPA, and GFVGA, stated that they do not support "blanket access" for guests in employer-provided housing and that it is imperative to give employers the discretion to impose restrictions on guest access, but that it is common for growers providing housing to provide access to a specific place on the housing property to meet guests, such as a common area or parking lot. These organizations also noted that allowing guests increases both the risk of disruptions at workers' homes and employers' liabilities, such as potential injuries, nuisance complaints, and insurance costs. Seso, Inc. opined that without procedural safeguards around the meaning of workers' right to "invite or accept" guests, there is the "obvious potential for rampant abuse," and Americans for Prosperity Foundation speculated that allowing employees to invite guests could result in union representatives "pos[ing] as bona fide job seekers," "get[ting] hired for the sole purpose of sowing discord," and then "invit[ing] their labor contacts on the property." The Wyoming Department of Agriculture opined that the proposal would prohibit employers from "providing any level of restrictions or guidance to their employees regarding who they bring on their premises" and "allow undocumented friends or family to stay" in the housing.

The Department sought comment on whether the protections in proposed § 655.135(n)(1) should be limited to workers in certain types of employer-

furnished housing or in certain locations. Farmworker Justice and NLADA responded that these protections "should apply without qualification to all H–2A workers," explaining that H–2A workers often have difficulty accessing information and services due to limited transportation, limited English language proficiency, and a lack of integration into a local community, and that even workers in housing that is less physically or geographically isolated may be isolated by virtue of employer policies either intended to isolate workers or which have that effect.

The Department also sought commenters' feedback on the types of visitor policies that would be reasonable to protect worker safety and to balance different workers' interests in shared housing versus those that may unduly hinder workers' rights to invite or accept guests. Farmworker Justice and NLADA reasoned that any determination of what constitutes a reasonable restriction must recognize that H–2A workers' legal status ties them to a single employer, making them uniquely vulnerable. These commenters explained that restrictions that interfere with workers' privacy rights or make them vulnerable to undue influence or retaliation, such as requiring visitors to provide prior notice or submit to surveillance during their visit, would not be reasonable. Similarly, these commenters opined that restrictions that have the effect of making visitation difficult would be unreasonable. For instance, they reasoned, while restricting visitors' shared access to sleeping quarters during "sleeping hours" may be reasonable where there are alternate private places to meet, it would generally not be reasonable if it "unfairly and unreasonably limits a worker's ability to meet with their guest at the time outside work hours of that worker's choosing." These commenters also asserted that no restriction of emergency services should be considered reasonable and that the final rule should require employers to assist workers in contacting and accessing emergency services, particularly in areas that are difficult to access or where language barriers exist. The California LWDA emphasized the need to ensure that such reasonable restrictions are "narrowly construed" and recommended minor edits to the language of proposed paragraph (n)(1) to provide that workers' right to invite or accept guests is "subject only to reasonable restrictions to protect workers from immediate risks to their physical safety or prevent significant interference with other workers' enjoyment of these areas."

Wafla stated that owners and operators of worker housing should be allowed to set reasonable rules and limits regarding visitors on the property, including rules governing sleeping hours and locations of visits; workers should work within these visitation rules or conduct visits offsite.

### Narrow Right of Access for Labor Organizations

Commenters supporting this provision stated it was necessary due to H–2A workers' relative isolation. For instance, California LWDA expressed support for granting a narrow right of access to labor organizations, stating that because H–2A workers living on their employers' property are isolated, providing labor organizations access to workers in areas near their homes is "an important and necessary tool to provide workers with information about their right to organize." The Concerned Law Students of the University of Georgia also noted that this provision would make it easier for labor organizations to contact workers and protect them from retaliation. AFL–CIO explained that allowing access by labor organizations when H–2A workers are both working and living on the farm will "ensure that H–2A workers are not insulated from outside entities who can apprise workers of their rights and help them enforce their rights, thereby protecting them from exploitation."

Some commenters expressed opposition to this provision on the ground that it unfairly favors unions over employers. A couple of U.S. House Members opined that it would interfere with the important work that takes place on farms. Ma´sLabor and USApple stated that labor organizations should only be granted access after being invited by workers. Wafla criticized the Department for not proposing a mechanism by which labor organizations could be sanctioned if they engage in intimidation or coercion. Several trade associations, including GFVGA, NHC, and employers expressed concern that the provision would burden employers that would have to determine which organizations—potentially more than one—are entitled to the proposed right of access and monitor their access. Organizations such as AmericanHort and USApple noted that it is not clear how the Department would enforce the provision.

Other commenters opposed providing a narrow right of access for labor organizations on the grounds that doing so would conflict with existing legal precedent or requirements. The U.S. Chamber of Commerce, NCAE, and other trade associations argued that the provision would constitute a *per se* physical taking of property under *Cedar Point,* 141 S. Ct. 2063. Multiple trade associations, such as NCAE, FFVA, GFVGA, NHC, and wafla, and some employers warned that this proposed right of access would conflict with farms' food safety and biosecurity protocols required by either the Food Safety Modernization Act of 2011 or the Global Food Safety Initiative. For example, FFVA stated that these generally accepted practices require employers to restrict access to only authorized personnel who are trained in practices to ensure food safety.

### Access for Key Service Providers

The Department received many comments in response to its question on whether the right of access in proposed § 655.135(n)(2) should be expanded to provide a similar right of access to some or all "key service providers," as defined in proposed § 655.103(b). In particular, Farmworker Justice and AWAC emphasized the critical role that service providers play in ensuring that workers' basic needs are met. Noting the vulnerable nature of H–2A workers (*see* Section VI.C.2.b), these commenters described H–2A workers' need to access a variety of essential services during their period of employment, including routine and emergency medical care, legal information and representation, and consular services. AWAC emphasized that in rural areas, workers also depend on churches, food banks, educators, and other providers for assistance in meeting their basic needs.

These commenters all raised the need for such service providers to have an independent right of access, explaining that relying on workers' right to extend invitations alone would be insufficient because workers are often unaware of their rights or the available services and agencies, or are afraid to exercise their rights due to a fear of retaliation. AWAC stated that, in the rural areas it serves, workers often feel trapped in remote labor camps and understand from the presence of camp gates and "Private Property" or "No Trespassing" signs that they are not permitted contact with outside guests. According to the commenter, workers' isolation and lack of access to information is exacerbated by the fact that internet and cell phone service are extremely limited in these areas. Farmworker Justice cited to testimony from the passage of Oregon's farmworker housing access protections, which described egregious incidents such as armed camp guards interfering with workers' access to legal services

employees, workers not being permitted to see close family members, and a Catholic priest and nun witnessing or experiencing interference while trying to connect workers to medical care. They also cited a recent example of a farmworker who became ill and died after being unable to access emergency medical services.

Advocacy organizations such as CDM, Migration that Works, and NLADA stated that service providers' access should not be limited by what they called the "arbitrary restrictions" that apply to labor organizations' access under proposed § 655.135(n)(2), such as the 10-hour-per-month limit or the requirement that the housing not be readily accessible to the public. Farmworker Justice explained that the First Amendment jurisprudence governing service providers' access— *see, e.g., Schneider* v. *New Jersey,* 308 U.S. 147, 152 (1939); *Martin* v. *City of Struthers, Ohio,* 319 U.S. 141, 144 (1943); *Rivero* v. *Montgomery Cty.,* 259 F. Supp. 3d 334, 346 (D. Md. 2017)— differs from that governing labor organizations.

Some trade associations concurred in the importance of service providers' access. For example, the National Cotton Ginners Association and Texas Cotton Ginners' Association stated that "workers should have the ability to reasonably allow access of housing to 'key service providers' such as health care-providers or community health workers."

Job Order Disclosure and Corresponding Edits to § 655.132(e)(1)

The California LWDA supported the Department's proposal to include the paragraph (n) protections that are adopted in the disclosures required on the job order to help inform workers of their rights. It also supported the Department's proposed corresponding edits to § 655.132(e)(1) to address instances in which the employer-provided housing is provided by the grower as part of its agreement with an H–2ALC by requiring the H–2ALC to include proof that the grower has agreed to comply with the requirements of § 655.135(n), and suggested that a written statement agreeing to compliance could constitute the requisite proof. Farmworker Justice and NLADA likewise supported the Department's proposed corresponding edits to § 655.132(e)(1), calling these "necessary and appropriate." They stated that an H–2ALC could meet this requirement by submitting a grower's acknowledgement of its responsibility to comply with the protections of § 655.135(n).

Wafla opposed the corresponding edits to § 655.132(e)(1) because it would require growers to comply with the requirements of paragraph (n) where an H–2ALC meets its obligation to furnish housing through an agreement with the grower.

Workers Housed Pursuant to §§ 655.230 and 655.304

Farmworker Justice and NLADA expressed support for applying the protections of proposed paragraph (n) with respect to workers housed pursuant to §§ 655.230 (housing for work performed on the range in herding and range production of livestock occupations) and 655.304 (mobile housing for workers engaged in animal shearing or custom combining), noting that these workers are even more isolated than other H–2A workers and are entirely dependent on their employers for access to food and water, medical care, and other basic essential needs. According to the commenters, these workers have also been subject to some of the most egregious reports of abuse and exploitation—including assault and battery, false imprisonment, denial of medical care, withholding of food and water, confiscating documents, visa fraud, wage theft, and labor trafficking. In light of the workers' extreme isolation and vulnerability, these commenters asserted that the protections of paragraph (n) are necessary to enable these workers to access needed service providers. Further, these commenters suggested that the Department revise § 655.210(d)(2) to require employers to provide these workers—who are often outside of cell phone service range with their whereabout known only by their employer—with a means to communicate directly with emergency responders at all times, such as a satellite phone, as well as a GPS tracking device or locator to allow them to provide their coordinates to emergency or other services.

The Department did not receive any comments specifically opposing the application of the protections in paragraph (n) to workers housed pursuant to §§ 655.230 and 655.304, though, in its opposition to the proposed narrow right of access for labor organizations, the Western Range Association stated that workers employed in the range production of livestock are often housed in remote locations, not on private property, and thus "the employer may not have control of who is allowed on the property."

After considering the totality of the comments discussed above in this Section VI.C.2.b.ix, the Department adopts this proposal with significant modifications. As explained below, the Department finds it appropriate to retain the language of paragraph (n)(1) recognizing workers' right to invite guests, but to eliminate the language of paragraph (n)(2) providing a narrow right of access for labor organizations. The resulting paragraph is redesignated as paragraph (n). To paragraph (n), the Department adds additional language clarifying what is meant by workers' ability to "accept" guests. The Department also adopts the corresponding edits at § 655.132(e)(1), and confirms that the protections of § 655.135(n) will apply equally to workers housed pursuant to §§ 655.230 (housing for work performed on the range in herding and range production of livestock occupations) and 655.304 (mobile housing for workers engaged in animal shearing or custom combining). As detailed above in Section VI.C.2.b, the Department has serious concerns regarding H–2A workers' unique vulnerabilities, which make them significantly more likely to accept employers' noncompliance with H–2A and other legal requirements and place them at a greater risk of serious abuse, labor exploitation, and trafficking. Workers' isolation and lack of information regarding their rights exacerbate these vulnerabilities. In this rule, the Department seeks to protect workers' rights to association and access to information to prevent labor exploitation, including trafficking, and to interrupt factors that impose barriers to workers advocating or complaining regarding working conditions and thus have an adverse effect on workers in the United States similarly employed.

Removal of Narrow Right of Access for Labor Organizations

In light of the significant concerns raised by commenters regarding proposed paragraph (n)(2)'s narrow rights of access for labor organizations, the Department withdraws this portion of its proposal. In particular, the Department found persuasive commenters' operational concerns regarding employers' ability to determine which organizations would be entitled to access and how to appropriately monitor such access; the potential cumulative impact should multiple labor organizations seek access to employer-furnished housing areas; and the Department's authority to resolve any disputes between employers and labor organizations that may arise. Additionally, the Department has determined that it could address workers' isolation and the resultant

risks of labor exploitation and worsening working conditions through a more tailored measure.

While the Department appreciates and has fully considered the other concerns raised by commenters, particularly those related to potentially conflicting legal authority or obligations, it does not believe these raised significant barriers to the implementation of the proposed right of access for labor organizations. Most notably, *Cedar Point,* 141 S. Ct. 2063, which was cited by many commenters opposing this provision, did not address the circumstances at issue here—namely, agricultural workers, *who by virtue of residing on employer property,* are subject to extreme isolation and generally inaccessible to labor organizations or others who may wish to communicate or associate with the workers. *See also Lechmere, Inc.* v. *NLRB,* 502 U.S. 527, 534 (1992) (where "'the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them,' employers' property rights may be 'required to yield to the extent needed to permit communication of information on the right to organize'" (citing *NLRB* v. *Babcock & Wilcox Co.,* 351 U.S. 105, 113 (1956))); *Cedar Point,* 141 S. Ct. at 2080–81 (Kavanaugh, J. concurring) (characterizing the *Babcock* Court's interpretation of the NLRA to afford union organizers access to company property only when "needed"—*i.e.,* when employees live on company property and union organizers have no other reasonable means of communicating with the employees—as consistent with a *Cedar Point* exception).

Similarly, the Department does not believe that the requirements of the FDA Food Safety Modernization Act of 2011 [97] are incompatible with guest access to employer-furnished *housing* areas. While whole-heartedly agreeing with commenters on the importance of this legislation and food safety requirements more generally, the Department believes that employers can balance reasonable guest access to housing areas with the need to have more restrictions in place with respect to the actual worksites. Moreover, based on the comments the Department received, many employers *do* manage to balance their obligations to ensure food safety and to permit reasonable guest access.

Protecting Workers' Right To Invite Guests to Housing Areas

As explained in the NPRM and above, the Department has serious concerns regarding the isolation of H–2A workers and how this isolation, when combined with these workers' unique vulnerabilities, render them particularly at risk of being subject to workplace abuses, labor exploitation, and trafficking. The Department's regulatory change governing the right to invite guests to worker housing is intended to protect workers' rights to association and access to information. The Department believes that this change will help protect workers against abuse, exploitation, and trafficking, and lessen barriers to workers' ability to advocate or complain regarding working conditions, as detailed above. Thus, the change should help prevent adverse effects on workers in the United States similarly employed.

These concerns are shared by many of the commenters. Many worker advocacy organizations shared stories of workers subject to extreme isolation, as well as abuse and exploitation. *See, e.g.,* AWAC comment (describing workers' isolation due to physical isolation of worker camps and the deliberate assertion of "no entry" policies by owners; cultural and linguistic isolation; near-total absence of transportation and resultant inability to leave the camp area, even for critical medical care; the lack of internet access and irregularity and unreliability of cellphone service; and workers' fear of retaliation due in part to their dependency of their employer); Farmworker Justice comment (describing workers' vulnerability due to dependency on employer and isolation due to location of housing, lack of transportation and often cell phone reception, fear of retaliation, and employer policies, as well as instances in which workers' family members and church representatives experienced difficulty accessing the workers); and UFW Foundation comment (describing workers' isolation and numerous instances of worker abuse and retaliation against workers).

Indeed, most commenters, including employers, appeared to support workers' right to invite guests to employer-provided worker housing areas, provided that employers may put in place reasonable restrictions necessary to protect the health and safety of their workers and help balance the competing needs of workers in shared housing. To address these concerns, the Department adopts the language in proposed paragraph (n)(1) recognizing the right of workers residing

in employer-furnished housing to invite, or accept at their discretion, guests to their living quarters and/or the common areas or outdoor spaces near such housing during time that is outside of the workers' workday. The paragraph that contained this language is redesignated as paragraph (n). The Department disagrees with comments that suggested that this would provide unrestricted access for workers' guests, noting that it adopts the proposed language permitting "reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas." The Department declines the California LWDA's suggestion that the Department narrow this language permitting reasonable restrictions, believing that the proposed language strikes the right balance of protecting workers' right to invite guests with the property owner's right to adopt reasonable guest policies.

After considering the comments received, the Department believes that the reasonableness of rules governing guest access must be determined by those rules' effect on workers' rights of association and access to information in light of all the available facts. For example, several employers raised concerns that the language of paragraph (n)(1) would allow workers to invite friends or relatives to stay overnight or even to reside with them in worker housing for extended periods. Although it will evaluate questions on a guest policy's reasonableness based on the specific facts before it, the Department believes that, under many circumstances, an employer policy prohibiting overnight guests would be reasonable. Where such a policy would raise concern is in instances where evidence suggests that an employer is using the policy as a pretext to limit visitation, either more generally or with respect to specific individuals. For instance, a guest policy restricting visitation during "sleeping hours," broadly defined as 7:00 p.m. to 7:00 a.m. and encompassing the time that most workers and their guests are likely to be off work and available, would most likely be considered unreasonable. Similarly, a restriction on bringing guests into shared sleeping quarters may be reasonable where there are alternate spaces in the housing area in which to have a private conversation, but would be less so if a worker were forced to meet with a service provider in a crowded common area where the conversation could be overheard. Moreover, the Department will consider any restriction of the access of

---

[97] Public Law 111–353, 124 Stat. 3885 (Jan. 4, 2011).

emergency medical personnel to be unreasonable.

The Department remains concerned that the effectiveness of the protection adopted may be limited where H–2A workers are unaware of, or afraid to exercise, their right to invite or accept visitors in employer-furnished housing, particularly in light of its decision to withdraw proposed paragraph (n)(2), and similar concerns raised by commenters. Worker advocacy organizations such as Farmworker Justice, AWAC, and NLADA described the importance of third parties, such as key service providers, having an independent right of access as a means of addressing these concerns and bolstering workers' right to invite guests. Several of these organizations also emphasized the need to broaden the range of service providers or entities with such access.

Rather than create a specific right of access for key service providers, the Department has added language to the regulatory text clarifying workers' right to accept guests. A worker cannot choose to accept (or reject) a visitor if the worker has no way of knowing that a potential visitor wishes to communicate with them. *See Rivero,* 259 F. Supp. 3d at 345 ("Migrant farmworkers' right to receive information . . . would have little force if it did not also implicitly (or . . . explicitly) protect providers' right to contact the workers."). Therefore, the Department has added the following language explaining this connection: "Because workers' ability to accept guests at their discretion depends on the ability of potential guests to contact and seek an invitation from those workers, restrictions impeding this ability to contact and seek an invitation will be evaluated as restrictions on the workers' ability to accept guests." The Department believes this language will help ensure that all potential visitors— whether family or friends, key service providers, labor organizations, or others—are able to contact workers, express their interest in communicating, and seek an invitation from one or more workers. For example, a representative from a local church who wishes to invite workers to worship and to share information on the services the church provides and does not have the workers' telephone numbers would be able to enter the employer's property, make their way to the employer-furnished housing, knock on the door or otherwise approach workers to see if they would like to receive the information the church representative wishes to share, and perhaps leave a note or flyer for a worker or workers who are not present

in the employer-furnished housing. The potential guests' ability to permissibly enter employer-furnished housing to contact and seek an invitation from one or more workers will vary depending on the location and layout of the housing and other relevant facts. This language will also be incorporated into the job order to provide clarity to both workers and employers.

Paragraph (n) is intended to protect workers' First Amendment rights as a means of both preventing the isolation that can lead to serious instances of labor exploitation and trafficking and advancing the Department's statutory duty of preventing adverse effect. Agricultural workers in the United States, including H–2A workers and workers in corresponding employment, enjoy fundamental First Amendment rights, including the rights of association and to receive information from those who wish to provide it. *Rivero* v. *Montgomery Cty.,* 259 F. Supp. 3d 334, 355 (D. Md. 2017) (explaining that H–2A workers, who are lawful residents of the United States, "are entitled to unfettered exchange of information just as much as any other individual in a community," and do not "forfeit their constitutional rights by living on their employer's premises"); *see also, e.g., Petersen* v. *Talisman Sugar Corp.,* 478 F.2d 73, 82–83 (5th Cir. 1973) (holding that property owner that housed migrant farmworkers on its property "must accommodate its property rights to the extent necessary to allow the free flow of ideas and information" between the migrant farmworkers and the labor and faith-based organizers that wished to visit them); *Mid-Hudson Legal Servs., Inc.* v. *G & U, Inc.,* 437 F. Supp. 60, 62 (S.D.N.Y. 1977) (legal service providers had First Amendment right to enter migrant community on farm property at reasonable times for the purpose of discussing with its inhabitants the living or working conditions prevalent at the farm); *Folgueras* v. *Hassle,* 331 F. Supp. 615, 623 (W.D. Mich. 1971) (explaining that property owner who opened up portions of his property as the living areas for those working on his farm does not have the right to censor the associations, information, and friendships of the migrants living in his camps); *see also Rivero,* 259 F. Supp. 3d at 345–48 (discussing the right of service providers and other visitors "to impart information and opinions" to these workers in their homes); *Martin* v. *City of Struthers,* 319 U.S. 141, 141 (1943) ("For centuries it has been a common practice in this and other countries for persons not specifically

invited to go from home to home and knock on doors or ring doorbells to communicate ideas to the occupants or to invite them to political, religious, or other kinds of public meetings."). While these rights must be balanced against the rights of property owners, a "farm owner should not be able to wield his property rights through trespass law to completely suppress the exchange of ideas and information that might benefit the workers he houses and, potentially, the public as a whole." *Rivero,* 259 F. Supp. 3d at 355. Given the myriad factors that isolate H–2A workers, from the often remote location of farmworker housing, cultural and linguistic barriers, lack of transportation and, often, internet and cell phone reception, the Department finds that there are not reliable alternate avenues of communication available that would justify limiting workers' right to invite or accept guests into their homes. *See Rivero,* 259 F. Supp. 3d at 355 & n.15 (noting that H–2A workers "lead lives especially tethered to their employer"); *Asociacion de Trabajadores Agricolas de Puerto Rico* v. *Green Giant Co.,* 518 F.2d 130, 140 (3d Cir. 1975) (explaining that First Amendment protections would extend to situations involving improper isolation of workers and mistreatment of migrant workers). This is particularly true given the importance of preventing serious instances of labor exploitation and trafficking and the Department's statutory duty of preventing adverse effect.

Job Order Disclosure and Corresponding Edits to § 655.132(e)(1)

As noted above, the Department proposed to include the paragraph (n) protections in the disclosures required on the job order to help inform workers of their rights and to make corresponding edits to § 655.132(e)(1) to require an H–2ALC that meets its obligation to furnish housing through an agreement with a grower to include proof that the grower has agreed to comply with the requirements of § 655.135(n). The Department believes that these steps will inform workers of their rights and help ensure compliance with the new requirements at § 655.135(n) and hereby adopts them. The Department believes that a written statement from the grower agreeing to comply with the requirements at § 655.135(n) would constitute the requisite proof an H–2ALC would be required to submit with its *Application* under § 655.132(e)(1).

Workers Housed Pursuant to §§ 655.230 and 655.304

As noted above, the Department sought comments on whether and how the protections of proposed paragraph (n) should apply with respect to workers housed pursuant to §§ 655.230 (housing for work performed on the range in herding and range production of livestock occupations) and 655.304 (mobile housing for workers engaged in animal shearing or custom combining). The Department agrees with the commenters that addressed this issue that the protections adopted in paragraph (n) should apply equally to workers housed pursuant to §§ 655.230 and 655.304. As the relevant requirements of §§ 655.132(e)(1) and 655.135 apply equally with respect to employers who house workers pursuant to §§ 655.230 and 655.304, no further regulatory changes are required. *See* §§ 655.215(a) (requiring compliance with §§ 655.130 through 655.132 unless otherwise specified), 655.303(a) (same), and 655.130(a) (requiring all H–2A applicants to agree to the assurances and obligations of § 655.135). In response to the concern that employers may not have the ability to control who is allowed on the range land on which workers work and reside, the Department notes that such employers can make arrangements with property owners to ensure that access is provided pursuant to § 655.135(n), just as H–2ALCs who meet their obligation to furnish housing through contractual arrangements with growers will now need to do. While the Department appreciates the suggestion by Farmworker Justice and NLADA that it revise § 655.210(d)(2) to require employers to provide such workers with the means to communicate directly with emergency responders at all times, such as a satellite phone as well as a GPS tracking device or locator, it declines to adopt this suggestion in this final rule. As the Department did not propose changes to § 655.210(d) in the NPRM, it did not get sufficient comments to determine whether this suggestion is feasible.

No Preemption of Greater Protections

As explained in the NPRM and herein, the Department is aware that farmworker housing access protections already exist in some parts of the country under State law or by virtue of Federal First Amendment jurisprudence. This final rule is intended to establish minimum standards for access to employer-provided housing in the H–2A program. It is not intended to preempt or curtail any other more expansive access protections, whether established under the First Amendment to the United States Constitution, and/or other Federal, State, or local law. Accordingly, in addition to enforcement of § 655.135(n) by the Department, H–2A workers, workers in corresponding employment, and those seeking to visit them in or near employer-provided housing may also be able to assert their rights through private litigation or complaints to State government agencies.

x. Section 655.135(o), Passport Withholding

In the NPRM, the Department proposed adding a new paragraph (o) to § 655.135 to better protect workers from potential labor trafficking by directly prohibiting an employer from confiscating a worker's passport, visa, or other immigration or government identification documents. Under the proposal, the only exceptions to this prohibition would be where the worker has stated in writing: that the worker voluntarily requested that the employer keep these documents safe, that the employer did not direct the worker to submit such a request, and that the worker understands that the passport, visa, or other immigration or government identification document will be returned to the worker immediately upon the worker's request. Even in such cases, the worker must be able to have ready access to the document, at least during regular business hours and at a location that does not meaningfully restrict the worker's ability to access the document.

As set forth in the NPRM, H–2A workers are extremely vulnerable to labor exploitation, and an employer taking or holding a worker's passport is an egregious act that can be a strong indication of such exploitation. Labor trafficking, including the restriction of a worker's movements, harms not only the worker who is trafficked but also the agricultural workforce in the area by subjecting workers to depressed working conditions. While the current regulation at § 655.135(e) requires an employer to comply with all applicable Federal, State, and local laws, including the TVPA's prohibition on destroying or confiscating a passport, immigration document, or government identification document while committing or with the intent to violate certain trafficking offenses, 18 U.S.C. 1592(a), WHD has encountered difficulty enforcing this prohibition absent a trafficking conviction. Accordingly, to protect workers subject to this practice from potential labor trafficking, as well as protect other agricultural workers from the resulting adverse effects on working conditions pursuant to 8 U.S.C. 1188(a)(1), the Department proposed to flatly prohibit the taking or withholding of a worker's passport, visa, or other immigration or government identification documents against the worker's wishes, independent of the requirements of other Federal, State, or local laws. In addition, the Department proposed to include the failure to comply with this prohibition among the violations that may subject an employer to debarment under § 655.182 and 29 CFR 501.20. To help inform workers of their rights under this proposal, the Department proposed to include the prohibition on the withholding of passports, visas, and other immigration or government identification documents in the disclosures required on the job order. Finally, the Department explained that nothing in the current regulation at § 655.135(e), nor in the proposed § 655.135(o), is intended to prohibit an employer or agent from facilitating a prospective H–2A worker's submission of the worker's passport, visa, or other identification documents to the United States Government for purposes of visa application, processing, or entry to the United States, provided that the worker voluntarily requests the employer's assistance in these processes and that the documents are returned to the worker immediately upon return by the United States Government.

The Department sought comments on this proposal, particularly regarding whether the Department should include any other requirements for application of the proposed exception to this prohibition, and whether the Department should include any additional exceptions to this prohibition.

The vast majority of comments the Department received on this proposal were supportive. Trade associations, including IFPA and NHC; a workers' rights advocacy organization, the AWAC; Washington State; and several private employers expressed support for the proposed prohibition on passport withholding, without offering further rationale. One employer stated that it had no objection to the proposal.

Numerous commenters, including the National Women's Law Center, Marylanders for Food and Farmer Protection, and Proteus, Inc., expressed general support for the proposal on the ground that it could help prevent human trafficking. Individuals commented that the proposal would protect workers from coercion and exploitation, as well as scams and other abuses. One individual expressed

support, saying that passport confiscation gives an employer too much leverage over an employee.

Advocacy organizations and legislators expressed similar support, citing studies of labor trafficking in the H–2A program and specific instances of labor trafficking and reasoning that the proposal would provide urgently needed protections. For example, the UFW Foundation cited a report by Polaris, the organization that operates the National Human Trafficking Hotline, that identified over 2,800 H–2A workers who experienced labor trafficking from 2018 to 2020 [98] and provided stories from five H–2A workers who experienced passport withholding. The Alliance to End Human Trafficking stated that, in its work with migrant workers, it has found that withholding of travel documents is a common method of coercion used by traffickers. Similarly, CCUSA and USCCB expressed support for the proposal, identifying restrictions on mobility, including restricting workers' access to their passports and other documents, as a pattern often seen by those engaged in pastoral outreach to migrant farmers. Several other workers' rights advocacy organizations, including Migration that Works, UMOS, CDM, and the North Carolina Justice Center, described the anecdotal experiences of specific H–2A workers whose travel documents were confiscated by employers and who were subsequently subjected to abusive working conditions. A joint comment from 15 U.S. Senators stated that prohibiting employers from confiscating or holding a worker's passport, visa, or other identification would prevent labor trafficking, and a joint comment from 43 U.S. House Members described the proposal as an urgently needed precaution.

A variety of commenters expressed support based on the workability of the proposal. Farmworker Justice noted that the requirement is not so complex or overly broad as to hamper legitimate and consensual document safekeeping by employers. Specifically, according to Farmworker Justice, the exception will "still allow workers to provide their passports or documents to their employers if they so wish, and will allow for employers to help facilitate any submission of these documents to the U.S. Government for the purposes of visa application, entry to the United States, or any other proper purpose." AILA expressed similar support, stating that employees must have unfettered access to their documents, but it can be

helpful to allow employers to safeguard employee documents. SRFA commented that, although allowing honest employers to help safeguard employees' documents can protect them from problems that arise from document theft, damage, or loss, the proposal strikes a reasonable balance between safeguarding and ensuring access. CDM expressed strong support for the prohibition on passport withholding, including the proposal to make this violation a ground for debarment under § 655.182 and 29 CFR 501.20, and also urged the Department not to broaden the proposed exceptions to this prohibition "as their narrowness is critical to ensuring that these proposed changes can achieve their goal of preventing forced labor through this type of coercion."

While supporting the proposal, several commenters suggested that it does not go far enough to protect workers. Farmworker Justice stated that concerns remain about similar abuses like Social Security number and mail withholding. An individual called the proposal "necessary but insufficient," recommending that the Department create an independent body to which workers can report abuses without fear of reprisal or deportation and that can conduct unannounced inspections and levy sanctions against noncompliant employers.

Finally, some commenters addressed the potential overlap of the proposal with the existing TVPA prohibition at 18 U.S.C. 1592(a), which is incorporated into the H–2A regulations via § 655.135(e). CCUSA and USCCB explained that the proposed prohibition on passport withholding is a "more direct approach" than finding a violation of § 655.135(e) based on a violation of the TVPA and "would be easier for the Department to enforce, including through potential debarment, and would provide clearer expectations for employers and workers alike." While stating that document confiscation is already prohibited by law, a couple of university professors said it would be helpful to include the specific prohibition in the H–2A regulations because it would enhance enforceability, ensure all program actors are aware of the prohibition, and promote a "whole of government" approach. The trade associations NCAE and Florida Citrus Mutual expressed support for the proposed prohibition on passport withholding, while stating that it is redundant with existing regulations, and the agent ma´sLabor stated that it did not object to the proposal as it "simply mirrors existing law." Another agent, Mountain Plains

Agricultural Service, stated that existing law makes it "very clear" that passport withholding is prohibited and questioned what the proposal would accomplish. While agreeing that employers should not withhold employee passports, the trade association, wafla, stated that the proposal is duplicative and unnecessary.

After considering the comments discussed above, the Department adopts the proposed prohibition on passport withholding as proposed in the NPRM.

As explained in the NPRM and above, the withholding of a worker's passport, visa, or other immigration or government identification documents is an egregious restriction of a worker's movements and may be indicative of labor exploitation or trafficking. Not only does this harm the specific workers whose documents are taken, it harms the agricultural workforce more broadly by subjecting workers to depressed working conditions. While a few commenters questioned the necessity of the proposal given the TVPA's existing prohibition on the destruction or confiscation of passports and other immigration and government identification documents, the Department continues to believe that the addition of a direct prohibition at § 655.135(o) will enhance its enforcement and ensure that workers and employers alike are aware of the prohibition. The majority of comments received support the Department's position on the importance and necessity of adding § 655.135(o), and thus the Department has determined that this addition is necessary to better help prevent such exploitation and trafficking, as well as to prevent an adverse effect on the working conditions of similarly employed workers in the United States as is required by 8 U.S.C. 1188(a)(1)(B).

The Department notes that this prohibition applies equally to a worker's immigration documents that may be provided by the U.S. Government to the employer or employer's agent in the first instance. For example, after approving an employer's petition (Form I–129) to extend an H–2A worker's period of authorized employment, USCIS typically attaches the worker's new arrival/departure record (Form I–94) to the Form I–129 approval notice that USCIS provides to the employer and relies on the employer to give the Form I–94 to the worker. In such instances, an employer's failure to give the Form I–94 to the worker would constitute a violation of § 655.135(o) unless the employer is keeping the document safe at the worker's request and meets the

---

[98] Polaris 2018–2020 Report, at 7, 10. *See also* 2023 NPRM, 88 FR at 63750, 63799.

requirements of that exception (*i.e.,* the worker provided a written statement indicating that the worker voluntarily requested that the employer keep this immigration document safe, that the employer did not direct the worker to submit such a request, and that the worker understands that the immigration document will be returned to the worker immediately upon the worker's request). While the Department appreciates the suggestions that it should address similar abuses, such as Social Security number and mail withholding, and that it should create an independent body to which workers can report violations, it declines to adopt either in this final rule. Neither suggestion is within the scope of the current rulemaking, and there is insufficient detail to determine whether the Department has the authority to implement the latter suggestion. The Department notes that, in addition to reporting violations to WHD, workers may report such violations to the applicable SWA, which has the authority to investigate, resolve, or refer worker complaints to enforcement agencies as appropriate, as well as to remove access to services for noncompliant employers. Workers may also access resources and assistance through DHS's Blue Campaign website, *https://www.dhs.gov/blue-campaign,* which includes information on reporting suspected human trafficking to law enforcement and getting help from the National Human Trafficking Hotline.

3. Section 655.137, Disclosure of Foreign Worker Recruitment.

a. Summary of Proposal in §§ 655.137, 655.135(p), and 655.167(c)(8)

The Department proposed new disclosure requirements to enhance foreign worker recruitment chain transparency and bolster the Department's capacity to protect vulnerable agricultural workers from exploitation and abuse, as explained more fully below. Pursuant to its authority under the INA, the Department regulates the conduct of U.S. employers using foreign labor certification programs and doing business with foreign labor recruiters. 8 U.S.C. 1188(c)(3)(A)(i); 8 U.S.C. 1188(g)(2). The INA authorizes the Department to promulgate regulations governing recruitment. 8 U.S.C. 1188(c)(3)(A)(i). The Department may only issue a labor certification to an employer that has "complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)." *Id.* The INA states that "[t]he Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section." 8 U.S.C. 1188(g)(2).

As the Department has noted in prior rulemaking, though there are limits to the liability the Department can impose on employers for the actions of recruiters abroad, the Department can regulate the conduct of recruiters in the H–2A program through enforcement of employer obligations to foreign workers, such as enforcement of the prohibition on the imposition of recruitment fees. 2010 H–2A Final Rule, 75 FR at 6926. Specifically, employers must contractually forbid any foreign labor contractor or recruiter (or any agent of such foreign labor contractor or recruiter) whom the employer engages, either directly or indirectly, in international recruitment from seeking payments or other compensation from prospective employees in both the H–2A and H–2B programs, at 20 CFR 655.135(k) and 655.20(p), respectively. The Department's H–2B regulations at §§ 655.9 and 655.20(aa) additionally require employers to provide copies of their agreements with foreign labor recruiters and disclose information about the foreign labor recruiters that have or will be engaged in the recruitment of H–2B workers in connection with the employer's applications.

In the NPRM, the Department proposed similar additional foreign labor recruiter disclosure requirements in the H–2A program to require the employer to identify any foreign labor recruiters, provide copies of the agreements between the employer and recruiter, and ensure the agreement clearly prohibits the foreign labor contractor or recruiter from seeking or receiving payments or other compensation from prospective employees. Specifically, the Department proposed a new § 655.137, *Disclosure of Foreign Worker Recruitment,* a new related assurance at § 655.135(p), and a new § 655.167(c)(8) that provides applicable document retention requirements.

The proposed new provisions at § 655.137 govern what information and documentation an employer must provide at filing regarding foreign worker recruitment, as well as how it must maintain and update that information. These proposed provisions also cover how the Department may disseminate or publish the information it receives. Paragraph (a) proposed that if the employer engaged or plans to engage an agent or foreign labor recruiter, directly or indirectly, in international recruitment, the employer, and its attorney or agent, as applicable, must provide copies of all contracts and agreements with any agent or recruiter or both, executed in connection with the job opportunity, a requirement that is also covered by a new assurance proposed at § 655.135(p). These agreements must contain the contractual prohibition against charging fees as set forth in § 655.135(k). In paragraph (b), the Department proposed to require that applications must contain all recruitment-related information required in the *Application for Temporary Employment Certification,* as defined in § 655.103(b), including the identity and location of all persons and entities hired by or working for the recruiter or agent, and any of the agents or employees of those persons and entities, to recruit prospective foreign workers for the H–2A job opportunity.

Paragraph (c) of § 655.137 proposed that employers must continue to keep the foreign labor recruiter information referenced in paragraphs (a) and (b) up to date until the end of the work contract period, with this updated information available in the event of a post-certification audit or upon request by the Department. Proposed § 655.167(c)(8) governs applicable employer document retention requirements. The Department likewise proposed sharing the foreign worker recruitment information it received from employers with any other Federal agency, as appropriate for investigative or enforcement purposes, as set forth in § 655.130(f). Finally, the Department proposed in paragraph (d) to maintain a publicly available list of agents and recruiters (including government registration numbers, if any) who are party to the agreements employers submit, as well as the persons and entities the employer identified as hired by or working for the recruiter and the locations in which they are operating.

As explained in the NPRM, the Department proposed these changes because disclosure of information about the recruitment chain will assist the Department to carry out its enforcement obligations, protect vulnerable agricultural workers and program integrity, and ensure equitable administration of the H–2A program for law abiding employers. Determining the identity and location of persons hired by or working for the recruiter or its agent to recruit or solicit prospective H–2A workers—effectively acting as sub-

recruiters, sub-agents, or sub-contractors—bolsters program integrity by aiding enforcement of provisions like § 655.135(k), which prohibits the seeking or receiving of recruitment fees. In addition, the information collection would require additional disclosures relating to foreign worker recruitment that will bring a greater level of transparency to the H–2A worker recruitment process. By maintaining and making public a list of agents and recruiters, the NPRM observed that the Department will be in a better position to map international recruitment relationships, identify where and when prohibited fees are collected, ensure that contractual prohibitions on collecting prohibited fees are bona fide, and, when contractual prohibitions are not bona fide or do not exist, implement sanctions against and collect remedies from the appropriate entity. Workers will be better protected against fraudulent recruiting schemes because they will be able to verify whether a recruiter is in fact recruiting for legitimate H–2A job opportunities in the United States. A list of foreign labor recruiters will enhance transparency and aid enforcement by facilitating information sharing between the Departments and the public, and assist OFLC, other agencies, workers, and community and worker advocates to better understand the roles of recruiters and their agents in the recruitment chain, while permitting a closer examination of applications or certifications involving recruiters who may be engaged in improper behavior.

The NPRM also noted that information about the identity of the international and domestic recruiters of foreign labor will assist the Department in more appropriately directing its audits and investigations. For example, in the course of its enforcement, WHD sometimes reviews allegations from H–2A workers that they have been charged recruitment fees. Those workers, however, are frequently unaware of the contractual arrangements between the individuals alleged to have charged those fees and the recruitment agencies for which they may serve as sub-agents or sub-recruiters, and may only know the names, partial names, or nicknames of such individuals. The information required under § 655.137 will improve WHD's ability to identify individuals charging fees, connect such individuals' relationships with recruitment agencies contracted by the employer, determine whether all entities had contractually prohibited cost-shifting as required under § 655.135(k), and hold the appropriate parties responsible. Such

information will also improve WHD's ability to plan enforcement actions if, for example, a sub-recruiter working for multiple agencies or serving multiple employers is found, as a matter of practice, to be charging prohibited fees or otherwise engaging in conduct in violation of the requirements of the H–2A program. Finally, enhancing tools to strengthen enforcement of the prohibition on the collection of prohibited fees and other recruitment abuses ensures that employers who comply with the H–2A program requirements are not disadvantaged by the actions of unscrupulous employers, such as those who pass recruitment fees on to workers.

The Department received comments both in support of and opposed to the proposal. After consideration of the comments received, the Department is adopting the proposals with a minor technical change, as discussed in more detail below.

*General Support:* The Department received some comments that were generally supportive of the new disclosure requirements. Many Federal elected officials and a State government expressed support for the proposal to increase transparency in the recruitment process, with some Federal elected officials noting that the current process has ''enabled third party recruiters to charge prospective H–2A workers exorbitant fees, indebting workers who come here just to make ends meet,'' and others noting that the proposals will ''not only improve worker protections, but . . . also bring the H–2A program in line with the H–2B program.'' Some Federal elected officials further observed that ''[s]imilar protections . . . already exist for H–2B workers; DOL's rule simply extends these protections to H–2A workers.'' Concerned Law Students of University of Georgia, a student group, submitted a comment noting that ''[g]reater recruitment transparency should help enforcement officials and advocates find and eliminate the roots of the problem.'' PCUN, CAUSE, UMOS, UFW Foundation, and Green America and North Carolina Justice Center, workers' rights advocacy and public policy organizations, respectively, expressed support for how these changes would ''bolster DOL's enforcement capacity against exploitative and abusive recruiters.'' Another workers' rights organization, AWAC, ''strongly endorse[d] . . . [the] additional transparency [and] protections in recruitment practices and hiring process,'' contained within the proposed rule. The Agricultural Justice Project, UMOS, and Marylanders for

Food and Farmworker Protection were supportive, with Marylanders for Food and Farmworker Protection noting specifically that ''[e]nhanced transparency . . . is crucial for preventing recruitment fraud.'' CCUSA and USCCB was also broadly supportive of this rulemaking effort, stating that ''[i]ncreased oversight of the H–2A recruitment process through the proposed provisions is commendable, as it aims to provide more protection to prospective workers through enhanced transparency.'' Additionally, many individuals expressed general support for the proposal. The Department values and appreciates these commenters' general support and their unique and informed perspectives on the need for and potential impact of the proposal.

b. Section 655.137(a), Collecting Contracts/Agreements; Prohibition on Fees

Consistent with §§ 655.9(a) and 655.20(aa) in the H–2B program, the Department proposed new provisions at §§ 655.137(a) and 655.135(p) to require an employer and its attorney or agent, as applicable, to provide a copy of all agreements with any agent or recruiter that the employer engages or plans to engage in the recruitment of prospective H–2A workers, regardless of whether the agent or recruiter is located in the United States or abroad. This proposed requirement to disclose agreements with recruiters would encompass all agreements, whether written or verbal, involving the whole recruitment chain that brings an H–2A worker to the employer's certified H–2A job opportunity in the United States. The Department received several comments on this proposal. The Department's responses to these comments are provided below. Following full consideration of these comments, the Department has decided to retain the proposal in this final rule, with one minor technical change. The Department has revised proposed § 655.137(a) to include language clarifying the paragraph applies where an employer engages or plans to engage a foreign labor recruiter. This technical correction is consistent with the Department's practice in the H–2B program, the Department's proposal to require disclosure of agreements where the employer engages or plans to engage a foreign labor recruiter, and the Department's proposed language at § 655.135(p), which requires the employer provide a copy of all agreements with any agent or recruiter whom it engages or plans to engage in the recruitment of H–2A workers.

A couple of employers, including Titan Farms, LLC, and some trade associations, including TIPA, IFPA, GFVGA, USApple, and NHC, supported sharing recruitment agreements with the Department, but only if "all confidential business information is redacted." Wafla opposed this aspect of the proposal because sharing the agreements may expose "trade secrets, pricing information, or other unique information that cannot be made public" and suggested that the Department request these agreements only if "[it] suspects an issue . . . during a post-certification inspection." Similarly, the U.S. Chamber of Commerce, a trade association, opposed collection of the agreements because they may contain "sensitive, proprietary business information."

The Department appreciates the concerns cited by commenters and reiterates that confidential business information or sensitive data will not be disclosed to the public. Consistent with the handling of such contracts in the H–2B program, "[a]greements between the employer and the foreign labor recruiter will not be made public unless required by law." 2015 H–2B IFR, 80 FR 24042, 24057 (Apr. 29, 2015).[99] The Department notes that in all the years it has been collecting these contracts in the H–2B program, it is not aware of an instance where the confidential terms or business information was disclosed to the public.

Collecting the contracts and agreements allows the Department to verify that the contractual prohibition required by § 655.135(k) has been included. As noted in the NPRM, the Department remains concerned about workers being charged fees unlawfully. A recent report published by Polaris, an organization working to combat labor trafficking, notes that abuses by foreign labor recruiters continue, with workers reporting unlawful fees charged by "foreign labor recruiters, their employers, or their direct supervisors at their jobs," and that additional transparency in the recruitment chain is needed to ensure the Department can identify, investigate, and hold accountable those employers and other entities who engage in abusive and unlawful behavior at various stages of the international recruitment process.[100]

In their comment, Farmworker Justice, citing a 2018 CDM report,[101] stated that 58% of workers recruited from Mexico "reported paying a recruitment fee that on average amounted to $590 per worker" and almost half of these workers "needed to take out a loan to cover illegal recruitment fees and other pre-employment expenses." The commenter expressed concern that in other cases, "individuals purporting to be recruiters who have no relationship with an actual H–2A employer often charge prospective foreign workers for the chance to get a job that does not even exist." A different workers' rights advocacy organization, the North Carolina Justice Center, stated that some workers are "explicitly coached by the recruiter to lie about the [recruitment] fee at their consular interview," further noting that "the person charging and collecting the fee is a step or two removed from the U.S. based employer and is not directly in touch with the employer." This commenter expressed support for the Department's proposal as a way to "make it easier to recover illegal fees in the future, and hopefully, motivate employers to take more proactive steps to make sure that no one in their recruiting pipeline is charging illegal fees." The UFW Foundation cited accounts of workers who were charged exorbitant fees of as much as $10,000 to obtain H–2A employment. These comments reflect the Department's concerns regarding unlawful collection of fees and reiterate to the Department the need to collect the foreign labor recruiter information to shed light on the process of recruitment, as well as to aid in the enforcement of the regulations.

The NPRM did not propose to change, and this final rule retains, § 655.135(k), which will continue to require the employer to contractually prohibit in writing any agent or recruiter (or any agent or employee of such agent or recruiter) whom the employer engages, either directly or indirectly, from seeking or receiving payments from any prospective employees. The specific language covers subcontractors. In addition, the required contractual prohibition applies to the agents and employees of the recruiting agent, and the prohibition against charging workers recruitment-related fees encompasses both direct and indirect fees. As such, the written contract(s) the employer

submits under this final rule must contain this contractual prohibition on charging fees and the prohibition language must include the quoted language specified in § 655.135(k).

A workers' rights advocacy organization, CDM, citing an account from a Florida worker, also urged the Department to prohibit recruiters or employers from requiring that workers, or people acting on behalf of workers, sign promissory notes or pay breach of contract fees. To this end, the commenter recommended amending § 655.135(j) so that "payments" include any payment provided by the employee, a relative, or any person acting on the employee's behalf. It also suggested that "payment" include requiring that any employee, relative, or person acting on the employer's behalf "sign a negotiable instrument or grant a security interest in any collateral." It further alleged that this amendment would bring the rule into "alignment with DHS's proposed revisions to 8 CFR 214.2(h)(5)(xi), which would clarify that fees prohibited in H–2A recruitment include breach of contract fees and penalties."

The Department agrees with CDM that it is important to clearly and explicitly prohibit breach of contract fees from being collected from prospective employees, but did not propose the suggested change in the NPRM and the Department does not believe such a change is necessary for enforcement of breach of contract fees. The Department takes the opportunity to clarify, however, that the existing contractual fee prohibition language is broadly interpreted and § 655.135(k) already requires employers to prohibit, in writing, foreign labor contractors or recruiters from receiving payments or compensation from prospective employees, and includes language that employers must include in contracts with foreign labor contractors or recruiters. The required contractual prohibition against recruitment-related fees applies to the agents and employees of the recruiting agent, and the prohibition against charging workers recruitment-related payments encompasses both direct and indirect fees. As such, the written contract(s) the employer submits under this final rule must contain this contractual prohibition on charging fees and the prohibition language must include the language specified in § 655.135(k): "Under this agreement, [name of foreign labor contractor or recruiter] and any agent or employee of [name of foreign labor contractor or recruiter] are prohibited from seeking or receiving payments from any prospective employee of [employer name] at any

---

[99] Interim Final Rule, *Temporary Non-Agricultural Employment of H–2B Aliens in the United States,* 80 FR 24042 (Apr. 29, 2015) (2015 H–2B IFR).

[100] Polaris, *Human Trafficking on Temporary Work Visas: A Data Analysis 2015–2017* 13 (2018), *https://polarisproject.org/wp-content/uploads/2019/01/Human-Trafficking-on-Temporary-Work-Visas.pdf.*

[101] CDM, *Recruitment Revealed, Fundamental Flaws in the H–2 Temporary Worker Program and Recommendations for Change* 16,18 (2018), *http://www.cdmigrante.org/wp-content/uploads/2018/02/Recruitment_Revealed.pdf.*

time, including before or after the worker obtains employment. Payments include but are not limited to any direct or indirect fees paid by such employees for recruitment, job placement, processing, maintenance, attorney fees, agent fees, application fees, or any fees related to obtaining H–2A labor certification.''

Consistent with the H–2B program, this final rule requires employers to provide a copy of the agreement at the time the employer files the H–2A Application. Employers, and their attorneys or agents, as applicable, are expected to provide these names and geographic locations to the best of their knowledge at the time the application is filed. The Department expects that, as a normal business practice, when completing the written agreement with the primary recruiting agent or recruiter, the employer and, if applicable, the employer's authorized attorney or agent, will ask whom the recruiter plans to use to recruit workers in foreign countries, and whether those persons or entities plan to hire other persons or entities to conduct such recruitment, throughout the recruitment chain.

At the time of collection, the Department will review the agreements to obtain the names of the foreign labor recruiters and government registration and license numbers, if any (for purposes of maintaining a public list, as described below), and to verify that these agreements include the required contractual prohibition against charging fees.[102] The Department may further review the agreements during the course of an audit examination or investigation.

---

[102] The Department uses all available tools to ensure that prohibited fees are not collected by employers, agents, recruiters, or facilitators. The Department has previously stated that an employer must make it abundantly clear that the recruiter and its agents are not to receive remuneration from the worker recruited in exchange for access to the job opportunity. For example, evidence showing that the employer paid the recruiter no fee or an extraordinarily low fee, or continued to use a recruiter about whom the employer had received numerous credible complaints, could be an indication that the contractual prohibition was not bona fide. *See* 2010 H–2A Final Rule, 75 FR at 6925–6926. The Department has similarly stated that, if it determines "that the employer knew or reasonably should have known that the H–2A worker paid or agreed to pay a prohibited fee . . . to a foreign labor contractor or recruiter, the employer can still be in violation of 20 CFR 655.135(j). However, should the circumstances demonstrate that the employer made a good faith effort to ensure that prospective workers were not required to pay prohibited fees (such as inquiry of both workers and agents/recruiters/facilitators regarding payment of such fees), the Department will take the circumstances into consideration in determining whether a violation occurred." WHD, Field Assistance Bulletin No. 2011–2, *H–2A "Prohibited Fees" and Employer's Obligation to Prohibit Fees* (May 6, 2011), *https://www.dol.gov/agencies/whd/field-assistance-bulletins/2011-2.*

Certification of an employer's application that includes such an agreement does not indicate general approval of the agreement or the terms therein. Where the required contractual prohibition is not readily discernible, the Department may request further information to ensure that the contractual prohibition is included in the agreement.

To reiterate, agreements between the employer and the foreign labor recruiter will not be made public unless required by law. Consistent with the Department's current practice in the H–2B program, this final rule allows the Department to obtain the agreements, but the Department will only share with the public the identity of the recruiters, not the agreements in their entirety.

### c. Section 635.137(b), Information Collection, and (c), Retention

The NPRM proposed at §§ 655.137(b) and 655.135(p) to require an employer and its attorney or agent, as applicable, to disclose to the Department the identity (*i.e.,* name and, if applicable, identification number) and geographic location of persons and entities hired by or working for the foreign labor recruiter and any of the agents or employees of those persons and entities who will recruit or solicit prospective H–2A workers for the job opportunities offered by the employer. As the NPRM explained, these proposed new provisions are consistent with the H–2B provisions at §§ 655.9(b) and 655.20(aa). As in the H–2B program, the NPRM proposed to interpret the term 'working for' to encompass any persons or entities engaged in recruiting prospective foreign workers for the H–2A job opportunities offered by the employer, whether they are hired directly by the primary recruiter or are working indirectly for that recruiter downstream in the recruitment chain. 2015 H–2B IFR, 80 FR at 24057. If the recruiter has a valid registration number or license number that is issued by a government agency and authorizes the recruiter to engage in the solicitation or recruitment of workers, the proposal required the employer to provide this unique identification information.

The NPRM also proposed that the Department will gather the additional recruitment chain information when the employer files its application and will require the employer to submit a Form ETA–9142A, *Appendix D,* that mirrors the Form ETA–9142B, *Appendix C,* used in the H–2B program, and collects information about the identity and location of the recruiter(s) and recruitment organization(s) the employer used or will use to recruit

foreign workers. In addition, the Department proposed at § 655.137(c), and in corresponding language in the new assurance provision at § 655.135(p), to require the employer to update the foreign worker recruitment information disclosed in accordance with paragraphs (a) and (b) of § 655.137 with any changes to foreign labor recruiter contracts, loss or revocation of registration number, or changes to the names and locations of people involved in recruitment after filing the H–2A Application, and to continue to make these updates until the end of the work contract period. Under the proposal, the employer must maintain updates to the foreign labor recruiter information disclosed at the time of filing the H–2A Application and be prepared to submit the record to the Department, upon request. Finally, to make clear the employer's record retention obligation, proposed § 655.167(c)(8) required the employer to maintain the foreign worker recruitment information required by proposed § 655.137(a) and (b) for a period of 3 years.

The Department received several comments on this proposal. After careful consideration of the comments, the Department has decided to retain the proposal in this final rule, as explained below.

Many trade associations, individuals, employers, a State government agency, and agents opposed the collection of this information. They asserted that the proposal would impose an undue burden on employers to identify all links in a foreign recruitment chain, may lead to penalties for employers for the actions or inaccurate statements of recruiters abroad, and may expose recruiting agency employees to risks in their country of origin. Some trade associations (NHC, IFPA, TIPA, and USApple) and an employer (Titan Farms, LLC) expressed concerns regarding limited employer resources, with NHC noting specifically that employers "do not have the resources, nor practical ability, to identify and maintain the information required under this section." GFVGA, USApple, IFPA, TIPA, and an employer, Titan Farms, LLC, asserted that many employers, especially small employers, "rely on their agent's network to recruit and may not have access to the foreign recruiter's name and geographic location." The Western Range Association, an agent, noted disclosure would be difficult at the time of filing because employers "may not know what country they will be requesting a worker from" and they may "change their minds and request workers from a different country" than initially

planned. This commenter suggested that collection of recruiter information at the DHS petition stage would be more effective. Wafla, a trade association, supported requiring the disclosure of only the foreign recruiter's name and owner on the application but opposed any further disclosure requirements. In particular, it stated that the additional disclosure requirements would be difficult because "[s]ome recruiters have 10–100 employees" and it could take "two to three hours of additional preparation time" to gather this information and then "type it into FLAG." The Georgia Farm Bureau, a trade association, noted that "any such evidence of this would take place between the prospective employee and third-party recruiters. Much of the information required to be reported by employers is not guaranteed to be provided by a foreign third-party entity." Fuerza Consulting Solutions incorrectly contended that the desired information was already collected during the audit process, rendering the proposed changes unnecessary.

The U.S. Chamber of Commerce, IFPA, TIPA, NHC, USApple, GFVGA, and an employer, Titan Farms, LLC, asserted that the Department provided "no guidance on how an employer should come to identify the foreign recruiter information" and "no definition of what level of due diligence is required of the employer." Wafla expressed concern that the NPRM failed to clarify if the employer must "vet the information" provided by a recruiter to ensure "the information provided by the foreign recruiter is [not] false" or if employers must "travel to a foreign country to verify the information" or face potential liability or penalty. Some trade associations and employers opposed the obligation to update recruitment information throughout the contract period because the employer, in the words of NHC, "would be relying on the foreign recruiter to communicate [updated] information to them." AILA, an immigration lawyers' association, asserted that the collection of information on recruiting agency employees is unnecessary because the actions of these employees are legally imputed to their employer, the recruitment agency, and thus disclosing only the recruitment agency is sufficient.

The Department appreciates these comments and understands the concerns about time and burden to collect the information; the need for employers to understand their information disclosure, retention, and production obligations; the ability to access this information and the timing

of the collection, including the obligation to update information; and concerns about how the Department will safeguard confidential and sensitive information. The collection of this information adds transparency and helps in locating individuals for enforcement purposes. As GAO has explained, "[w]ithout accurate, accessible information about employers, recruiters, and jobs during the recruitment process, potential foreign workers are unable to effectively evaluate the existence and nature of specific jobs or the legitimate parties contracted to recruit for employers, potentially making them more vulnerable to abuse." [103] The new provisions in this final rule are also consistent with the assessment of organizations investigating migrant worker abuse globally. For example, the United Nations Office on Drugs and Crime, in a 2015 report entitled "The Role of Recruitment Fees and Abusive and Fraudulent Practices of Recruitment Agencies in Trafficking in Persons," noted that recruitment systems are often "opaque," and that a "[l]ack of evidence" contributes to low levels of trafficking convictions for recruiters and recruitment agencies.[104]

The obligation to obtain information on recruiters and downstream employees or contractors of the recruiters is something employers or agents should already be doing. As the Department has noted, by submitting an H–2A Application, the employer "is assuring the federal government that it has contractually forbidden those parties who will recruit workers on its behalf from seeking or receiving payments from prospective workers for costs which are to be borne by the employer." [105] Making this assurance necessarily requires that "the employer (either directly or through its agent) has taken affirmative, specific action to contractually prohibit such parties from seeking or from receiving such

payments." [106] With these actions already a part of the H–2A filing process, identifying this foreign recruiter information should not be unfamiliar to employers and collecting and maintaining records of the same would not be burdensome. The disclosure of this information to the Department, including disclosing information beyond the foreign recruiter's name and owner, should therefore also not be unduly burdensome. In response to the comment that noted disclosing only the recruitment agency is sufficient because the actions of employees are legally imputed to their employer, the Department believes that it is necessary for all parties involved in the recruiting process to be identified. Identifying each individual who will be recruiting allows for more complete disclosure as to who is legitimately recruiting for jobs and for that information to be made available to the public, including potential H–2A workers. Additionally, complete disclosure of recruiters, their employees, and any downstream recruiters will assist WHD in its investigations to identify who is collecting prohibited fees when such fees are collected.

The Department, however, understands that recruitment arrangements may not be finalized at the time of filing or may change after filing. The Department is only requiring that employers provide the information available to them at the time of filing with the understanding that an employer's recruiting arrangements may change after that. Similarly, the Department understands that it may not be possible for the employer or agent to capture everyone involved in the recruitment process and that they may receive inaccurate statements from those downstream from the employer. The Department only expects that employers or agents make reasonable efforts to obtain the requested information, and in the event of an audit or investigation, the extent of the employer's good-faith efforts may be considered. *See also* 20 CFR 655.182(e)(4) and 29 CFR 501.19(b)(4) (the OFLC and WHD Administrators already consider "efforts made in good faith" in other contexts).

Lastly, the Department takes seriously concerns with safeguarding confidential and sensitive information and will collect this information in accordance with the Privacy Act of 1974, the Department's SORN, FOIA disclosure requirements, and the PRA, as explained in the PRA package submitted in conjunction with this final rule. The

---

[103] GAO 2015 Report, at 33–34.

[104] U.N. Office on Drugs and Crime, *The Role of Recruitment Fees and Abusive and Fraudulent Recruitment Practices of Recruitment Agencies in Trafficking in Persons* 23, 47 (2015) *https://www.unodc.org/documents/human-trafficking/2015/Recruitment_Fees_Report-Final-22_June_2015_AG_Final.pdf*; *See also* International Labour Organization, *Fair Recruitment Initiative, https://www.ilo.org/global/topics/fair-recruitment/fri/lang-en/index.htm* (last visited Apr. 3, 2024); International Labour Organization, *General principles and operational guidelines for fair recruitment and Definition of recruitment fees and related costs* (2019), *https://www.ilo.org/global/topics/fair-recruitment/WCMS_536755.*

[105] WHD, Field Assistance Bulletin No. 2011–2, *H–2A* "*Prohibited Fees*" *and Employer's Obligation to Prohibit Fees* (May 6, 2011), *https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/fab2011_2.pdf.*

[106] *Id.*

Department has collected this information in the H–2B program under the 2015 H–2B IFR without any reported incidents of privacy breach and without any indication that the requirement imposes an excessive burden on employers that would outweigh the benefits of enhanced transparency in the foreign labor recruitment process.

### d. Section 635.137(d), Registry List

As in the H–2B program, the Department proposed at § 655.137(d) to publicly disclose, in a public registry, the names of the agents and foreign labor recruiters used by employers, as well as the identities and locations of all the persons or entities hired by or working for the primary recruiter in the recruitment of prospective H–2A workers, and the agents or employees of these entities. The Department also proposed to state explicitly that it may share the foreign worker recruitment information it receives from employers with any other Federal agency, as appropriate for investigative or enforcement purpose, as set forth in § 655.130(f). The Department received both comments supporting and opposing the proposal to publish a foreign labor recruiter list on the OFLC website. After full consideration of the comments, the Department has decided to retain § 655.137(d) without change in this final rule, as explained below.

Many commenters supported the concept of a public recruiter list but asserted that the Department must create a more transparent, easily searchable system that would permit workers to verify that recruiters are connected to legitimate job opportunities and do not charge illegal fees. Farmworker Justice supported the proposed public labor recruiter list to help "enforce the removal of program access after fraud" is identified. However, they expressed concern that the recruiter list would be inadequate if modeled after the existing recruiter list in the H–2B program. They stated that the existing recruiter list "is an English language spreadsheet housed on an English language website that lists foreign recruiter names and their companies, recruitment regions, and a 14-digit case number for the clearance orders that they are associated with" and thus is opaque and inaccessible to workers, who often do not speak English and typically conduct their research into recruiters and jobs using a smartphone. The commenter further claimed that worker advocacy organizations themselves were unable to match employer case numbers from the recruiter list "to clearance orders using

the Case Number search field on" the Seasonaljobs website.

The commenter recommended changes to the Seasonaljobs website to allow workers to "log on and view information" about recruiters and the jobs they are connected to, in the same way they use Seasonaljobs to learn about other elements of "specific jobs . . . , including job duties, pay, work location, expected hours, and employer information," which the commenter asserted would provide workers with "real-time information that could help them avoid abusive recruiters and recruitment scams." This suggestion was endorsed by CDM, and largely echoed by another workers' rights advocacy organization, Migration that Works, that encouraged the Department to create "an accessible way to verify that an individual claiming to be a recruiter represents the employer and the job offer they purport to represent," and suggested that the Department "combin[e] the employment information already available on *Seasonaljobs.dol.gov* with the recruiter registry, making this information available to all prospective workers at the time of recruitment in Spanish and other languages." This commenter further suggested that the Department require employers to continually update recruiter information throughout the recruitment process and require disclosure in a standardized format to aid searchability.

The Department will update the H–2A Foreign Labor Recruiter List on a quarterly basis and will post an announcement on the OFLC website when updates are available. As with the H–2B recruiter list, any person with internet access, including U.S. and foreign workers, can access the public recruiter list and identify the H–2A Application numbers connected to recruiters in the list. The Department appreciates the suggestions regarding the H–2B Foreign Labor Recruiter List's format and will consider these suggestions but notes that the format of the forthcoming recruiter list is not something that would require amendments to the regulatory language in this final rule. However, as explained above, the Department will require employers in this final rule to continue to keep the foreign labor recruiter information requested in § 655.137(a) and (b) up to date until the end of the work contract period and make this updated information available in the event of a post-certification audit or upon request by the Department. 20 CFR 655.137(c). Similar to the H–2B list, the H–2A list will be posted on the Department's website in a standardized

format. In addition, the H–2A Foreign Labor Recruiter List will contain the government registration number, if applicable, of agents and recruiters to further enhance transparency of the recruitment process for prospective H–2A workers.

The Department declines to publish foreign labor recruiter information using Seasonaljobs for the same reasons it declined to adopt commenter suggestions to publish foreign worker demographic data on Seasonaljobs in the 2022 H–2A Final Rule. The intended use of the information published on Seasonaljobs differs from the intended use of OFLC's forthcoming H–2A Foreign Labor Recruiter List. The Foreign Labor Recruiter List in the context of the H–2B program is "a list of people and entities that employers have indicated that they engage or plan to engage to carry out the recruitment of prospective H–2B workers" that facilitates information sharing and helps to ensure "workers are better protected against fraudulent recruiting schemes by enabling them to verify whether a recruiter is in fact recruiting for legitimate H–2B job opportunities . . . ."[107] The H–2A Foreign Labor Recruiter List will serve the same function in the H–2A context. In contrast, Seasonaljobs "is a recruitment tool designed for broad dissemination of available temporary or seasonal job opportunities to U.S. workers . . . [that] provides information for job seekers, including work locations, duties to be performed, qualifications required, and dates of employment............. automate[s] the electronic advertising of H–2A job opportunities and ensures copies of H–2A job orders are promptly available for public examination." 2022 H–2A Final Rule, 87 FR at 61749.

An agent, maˊsLabor, writing in opposition to the proposed change, argued that recruiters based in foreign countries often exist as alternatives to "violence by cartels, cayotes, and other criminal enterprises" involved in trafficking migrant workers and that making their identities public could make them the target of threats and violence by these organizations. An employer, McCorkle Nurseries, Inc., registered a similar concern.

The Department appreciates the comments and concerns expressed therein. The comments, however, were submitted without any supporting evidence. Absent more particular evidence of specific harms that will

[107] OFLC, *2015 H–2B Interim Final Rule FAQs, Round 16: Foreign Labor Recruiter List, https:// www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/ Round-16_Foreign_Labor_Recruiter.pdf.*

result from the Department's publishing this information, as the Department currently does in the H–2B program, the Department cannot weigh the previously noted benefits of adding transparency to the recruitment process against generalized and unsubstantiated concerns about potential consequences of disclosing this information on the H–2A Foreign Labor Recruiter List.

e. Miscellaneous Comments

The Department received a few other comments that were generally supportive of the Department's efforts but also provided suggestions for further improvement. They are discussed below.

CDM supported the Department's proposals but urged the Department to require H–2A employers ''affirmatively vet and monitor'' all recruiters used, which the commenter suggested could be accomplished by requiring employers to hire a recruitment compliance officer who would monitor recruitment efforts and investigate and address unlawful recruitment fees. The commenter suggested that the Department require that employers create and retain reports documenting the findings of the recruitment compliance officer.

Several State Attorneys General urged the Department to play a more active role in regulating the recruitment of foreign workers and counseled the Department to model the final rule provisions on regulatory schemes used in States like California and Washington. These commenters noted that California's labor commissioner administers a program charged with the registration and supervision of foreign labor contractors that includes additional requirements specific to recruiters. The commenters urged the Department to create and maintain a similar program that would require registration of foreign labor recruiters and prohibit employers from using recruiters that are not subject to registration and oversight, either by the Department or in the countries in which they operate. Finally, these commenters urged the Department to make it explicit in the final rule that the Department will share recruiter information with State-level enforcement agencies, as necessary.

The Department declines to adopt the suggestion to require that each employer hire a compliance officer and conduct compliance reporting and the suggestion to create and implement a system under which foreign labor recruiters would register with the Department. Requiring employers to hire compliance officers and conduct routine foreign labor recruitment compliance reporting

would constitute a substantial change to the current regulations that was not proposed in the NPRM, and adoption in this final rule would preclude commenters from providing meaningful input. Similarly, the NPRM did not contemplate either the creation of a system to register and monitor foreign labor recruiters or the explicit sharing of recruiter information with State-level enforcement agencies. Both such proposals would require not only additional opportunity for stakeholder comment, but also a more thorough consideration of the costs, the additional information sharing requirements and monitoring systems, and the potential administrative, jurisdictional, and legal implications of their adoption; with respect to sharing recruiter information with enforcement agencies at the State level, the Department will do so as is permitted and required by law.

The Alliance to End Human Trafficking, an advocacy organization, likewise endorsed the Department's proposed rule while advocating for more changes in this area. This advocacy organization urged the Department to enhance enforcement by focusing efforts more specifically on human and labor trafficking as a ''key component'' of overall H–2A program compliance efforts. It suggested increased training for agency employees on addressing human trafficking and the creation of a mechanism to provide H–2A workers with information in multiple languages about human trafficking and how to report violations or request help. This commenter recommended that the Department sanction employers, as well as ''downstream entities/contractors and subcontractors,'' if they either falsify or withhold documents, or deceive workers about the terms and conditions of employment. This commenter further suggested that the Department issue model language for employers to include in recruitment agreements that would prohibit recruitment-related fees. This commenter also urged the Department to provide guidance for reimbursing workers who have been charged unlawful recruitment-related fees.

The Department appreciates the commenter's suggestions about additional staff training related to human trafficking and establishing requirements to provide H–2A workers with information about human trafficking and how to report violations or request help. However, these suggestions go beyond the scope of the current proposal, which focuses on increased transparency related to

foreign labor worker recruitment. With respect to the request for sanctions and specific guidance regarding reimbursement for workers who have been unlawfully charged recruitment fees, the Department already cites violations, assesses penalties, and collects back wages, when appropriate, from an employer who has sought or received fees from workers in violation of § 655.135(j), or contracted with a foreign labor recruiter without contractually forbidding that foreign labor recruiter from collecting fees in violation of § 655.135(k). The Department can, and regularly does, debar employers from future participation in the program after finding that those employers have violated § 655.135(j) or § 655.135(k). *See* 29 CFR 501.20(d). Additionally, in 2011, the Department issued Field Assistance Bulletin No. 2011–2 providing further guidance on H–2A prohibited fees and the employer's obligation to prohibit fees.[108] This guidance clarifies that WHD may hold the employer responsible for fees collected by a person acting on the employer's behalf, which may include an employee of the employer (*e.g.,* a foreperson collects the fees) or a foreign labor recruiter. The Department reiterates that § 655.135(k) already requires employers to prohibit, in writing, foreign labor contractors or recruiters from receiving payments or compensation from prospective employees and includes specific language that employers must include in contracts with foreign labor contractors or recruiters.

The Department also currently cites violations and assesses penalties against employers who have misrepresented or failed to comply with the terms and working conditions that were disclosed to the workers, and against employers who have failed to provide a written copy of the work contract, in a language understood by the worker, no later than the time the worker applies for the visa or, for a corresponding worker, no later than the day the work commences, in violation of § 655.122(q). While the Department had previously prohibited the confiscation of passports, it has further clarified and made explicit at § 655.135(o) in this final rule that an employer may not hold or confiscate a worker's passport, visa, or other immigration or government identification document except for specific circumstances, and that such

---

[108] *See* WHD, Field Assistance Bulletin No. 2011–2, *H–2A ''Prohibited Fees'' and Employer's Obligation to Prohibit Fees* (May 6, 2011), *https://www.dol.gov/agencies/whd/field-assistance-bulletins/2011-2.*

confiscation constitutes a reason for debarment. With regard to the suggestion that the Department similarly sanction entities downstream from the employer for misrepresenting terms and working conditions or falsifying or withholding documents, the Department declines to adopt this suggestion at this time because these actions were not proposed in the NPRM and the public was not given an opportunity to provide input.

SRFA, a trade association, asked the Department to clarify what is meant by "agent or recruiter." Specifically, the commenter noted that the definitions at § 655.103 do not define the term "recruiter" and further explained that it is unclear how the definition of "agent" is applied within the context of §§ 655.137(a) and 655.135(p). The commenter asked the Department to clarify if it will consider "a fulltime employee of the applicant employer (as defined in § 655.103(b)) in a capacity that, under normal conditions and in the course of normal daily work, does not actively undertake traditional recruitment activities [as] an 'agent' or a 'recruiter' for purposes of clauses §§ 655.137(a) and 655.135(p)." For example, the commenter asks if the employer would be required to disclose the name of one of its employees if that employee, for no fee, provided the employer names of H–2A-eligible foreign workers for potential employment and if the employer would be required to obtain an agreement from the employee that prohibits the imposition of fees and provide the Department a copy of this agreement at the time of filing.

Similarly, AILA urged the Department to revise the "definition of foreign labor recruiters in §§ 655.137(a) and 655.135(p)" to clarify "whether DOL considers a full-time employee employed by the applicant employer (as defined in § 655.103(b)) in a capacity that, under normal conditions and in the course of normal daily work, does not actively undertake traditional recruitment activities [as] an 'agent' or 'recruiter' for purposes of" §§ 655.137(a) and 655.135(p).

The Department declines to either define "recruiter" in the regulatory text or modify the definition of "agent" at this time. As the Department explained in the 2015 H–2B IFR, the duty to disclose information encompasses "any persons or entities engaged in recruiting prospective foreign workers for the H–2B job opportunities offered by the employer, whether they are hired directly by the primary recruiter or are working indirectly for that recruiter downstream in the recruitment chain."

2015 H–2B IFR, 80 FR at 24057. Regarding the definition of "agent," the Department believes the commenters' concerns are misplaced. The proposal requires employers to disclose the names of recruiters and downstream employees of the recruiter when the employer has "engaged" the recruiter "directly or indirectly, in international recruitment." In cases where an *employee* of the employer has conducted recruitment on the employer's behalf, the Department will consider the *employer* to have conducted its own recruitment of foreign workers and will not require the employer to disclose the employee's contact information. The employer would remain bound by the prohibition against seeking or receiving prohibited payments from prospective employees, including recruitment-related fees at 655.135(j).

### f. Foreign Government Sharing/SORN

The Department also received comments regarding whether to allow the sharing of recruitment information, including the contracts and agreements between agents or recruiters and employers, with foreign governments that have territorial jurisdiction over the agent or recruiter at issue for investigative or enforcement purpose. In particular, the Department sought comments on the potential benefits of sharing this information, the scope of the content that should be shared, whether confidential business information is often included in recruiter agreements, and whether the Department should disclose the information or agreements to foreign governments in any circumstances.

As discussed above with regard to the disclosure of information of recruiters generally, the Department believes sharing this information where appropriate would not only increase transparency throughout the international recruitment chain, but also help hold accountable those foreign labor recruiters who engage in improper conduct.

Trade associations and a couple of farmers generally opposed the sharing of foreign labor recruiter information with foreign governments, with employer Titan Farms, LLC alongside trade associations IFPA, TIPA, and GFVGA expressing concern that this could impact farmers and businesses "beyond the purpose of this rulemaking," including "food safety, trade impacts, and foreign enforcement at business operations within the foreign country," but did not articulate how this information would have these impacts. Another advocacy organization, the U.S.

Chamber of Commerce, opposed such sharing and stated employers would be "loathe to share such sensitive business information," without specifying if this information referred to those in contracts and agreements or any information-sharing with foreign governments. Farmworker Justice expressed support for sharing information with foreign governments but noted that they did not believe this would meaningfully address alleged fraud in foreign labor recruitment. Wafla believed the information should be shared only if the U.S. suspected a violation of international law, noting the information contained in the agreements needed to remain confidential otherwise.

In light of commenters' general opposition, and only limited support, the Department declines at this time to amend the regulatory text to allow for the sharing of foreign labor recruiter information, including the contracts and agreements among agents, recruiters, and employers, with foreign governments. However, the Department still believes that open lines of communication and transparency are important. Therefore, the Department intends to modify the relevant SORN, which details how the Department collects and maintains information, to allow for the sharing of foreign labor recruiter information that will be available to the public with the foreign government that has jurisdiction over a foreign labor recruiter for appropriate investigative or enforcement purposes. The Department emphasizes that the contracts and agreements between the employers and the foreign labor recruiters will not be made public, or disclosed to foreign governments, unless otherwise required by law. The Department believes this strikes a respectful balance between the privacy concerns of commenters and the need for open lines of communication with our international partners.

### D. Labor Certification Determinations

#### 1. Section 655.167, Document Retention Requirements of H–2A Employers

The Department proposed a technical change to § 655.167(c)(6) to update this paragraph's outdated cross-reference to the regulatory citation for the definition of "work contract." The Department proposed another technical change to § 655.167(c)(7) to add "to" before "DHS."

As discussed above, the Department proposed a new record retention paragraph at § 655.167(c)(8) that would require the employer to maintain the foreign worker recruitment information

required by § 655.137(a) and (b) for a period of 3 years. The Department received some comments related to the burden of retaining this information and keeping the information up-to-date. The Department responded to these comments in the preamble to § 655.137 above. The Department also proposed a new § 655.167(c)(9) that would require the employer to retain the additional employment and job-related information specified in § 655.130(a)(2) and (3) for the 3-year period specified in § 655.167(b). As noted above, the Department received one comment specifically addressing this document retention requirement. The Department addressed this comment in the preamble to § 655.130. The Department is adopting this proposal with one change, consistent with § 655.130(a)(3), to clarify that the employer must retain information about all managers and supervisors of workers employed under the H–2A Application, notwithstanding whether those managers or supervisors are employed by the employer or another entity. The Department also proposed new paragraphs at § 655.167(c)(10) and (11) to require records of progressive discipline and termination for cause, as discussed more fully in the preamble to § 655.122(n).

The Department proposed a new paragraph (c)(12) that requires the employer to retain evidence demonstrating the employer complied with new § 655.175(b)(2)(i), which requires employers with an unforeseen minor start date delay to notify the SWA and each worker to be employed under the approved H–2A Application of the delay. The Department did not receive comments on this obligation and has adopted the proposal, without change, in this final rule.

### E. Post-Certification

#### 1. Section 655.175, Post-certification Changes to Applications for Temporary Employment Certification

The Department proposed a new § 655.175, as well as a related recordkeeping obligation at § 655.167(c)(12) and conforming changes to § 655.145(b), to clarify employer obligations in the event of a delay in the start of work. The changes distinguish post-certification delays to the start of work from pre-certification requests to change the total period of employment and they also extend existing compensation protections from § 653.501 to all H–2A and corresponding workers. In the current regulations, § 655.145(b) addresses both the process an employer must follow to

request a minor change to the total period of employment before the CO has made a final determination and the process an employer must follow to request a post-certification delay in the start date of work. Under existing paragraph (b), an employer seeking a minor change to the period of employment must request approval from the CO, show that the delay was caused by unforeseeable circumstances, and demonstrate that the crops or commodities will be in jeopardy prior to the expiration of an additional recruitment period. Paragraph (b) also requires an employer seeking a post-certification delay in the start of work provide housing and subsistence to workers who had already begun traveling to the place of employment, and the Wagner-Peyser Act regulations at § 653.501(c) separately require the employer to provide notice of the delay to the SWA and compensation to workers where the employer failed to comply with notice requirement.

For clarity, the NPRM proposed to revise § 655.145(b) to address only pre-determination amendments to the period of employment and proposed to relocate the provisions that address post-certification delays to the start of work from § 655.145(b) to a new provision at § 655.175, within the section of the regulations that would broadly address post-certification activities. To further distinguish the topics, the Department proposed to continue to use the term "amendment" in § 655.145(b) to refer to minor changes requested by the employer before the CO's determination and to use the term "delay" in proposed § 655.175 to refer to a post-certification delay in the start of work. The Department additionally clarified that post-certification changes are not permitted unless specified in this subpart (*i.e.,* post-certification extensions continue to be permitted under § 655.170).

Proposed § 655.175 included several changes to modify the post-certification requirements for delays in the start of work and to strengthen protections for workers in the event they are not provided adequate notice of the delay. The Department proposed to define a "minor" delay in the start of work as a delay of 14 calendar days or fewer. Consistent with proposed § 653.501(c) and current § 655.170(a), the Department proposed to eliminate the requirement that the employer must request CO approval for a minor delay to the start of work. Instead, the Department proposed to require employers to notify the SWA and each worker to be employed under the approved H–2A Application of the

delay, at least 10 business days before the certified start date, and to retain evidence of notification to workers for 3 years. As such, under this proposal, the contractual start date would not change as it would under the current process requiring CO approval to change the start date of employment.

The Department proposed to extend the compensation protections at § 653.501(c)(5) to H–2A and corresponding workers by requiring the employer to compensate workers during the delay period when the employer fails to provide notice to workers. Specifically, where the employer fails to provide timely notification to workers, proposed § 655.175(b)(2)(ii) would require the employer to compensate workers at the rate of pay required under subpart B for each hour of the offered work schedule in the job order that work is delayed, for a period up to 14 calendar days. The Department proposed to require that the employer fulfill this obligation to the worker by no later than the first date the worker would have been paid had they begun employment on time. The Department proposed to consider compensation paid to workers under paragraph (b)(2)(ii) to be hours offered to the worker when determining an employer's compliance with the § 655.122(i) three-fourths guarantee obligation. The Department also proposed to permit an employer to reduce the compensation owed under paragraph (b)(2)(ii) by an amount equal to any wages paid to the worker(s) for work performed during the delay period specified in paragraph (b)(2)(ii), provided the wages are paid timely and the work is otherwise authorized by law. However, the Department did not propose to permit the employer to credit wages for unauthorized work, including work performed by H–2A workers outside the location or duties certified in the job order. Finally, proposed § 655.175(b)(1) modified the existing subsistence obligations, which are currently outlined in § 655.145(b), by requiring employers to provide daily subsistence to all workers who are already traveling to the place of employment, upon their arrival and without cost to the workers until work commences, except for days when the employer provides workers compensation under proposed paragraph (b)(2)(ii). Proposed paragraph (b)(1) also would remind employers of their obligations under the contract, including housing as required under § 655.122(d).

The Department received many comments on these proposed changes from individuals, workers' rights advocacy organizations, labor unions,

public policy organizations, legal aid organizations, employers, trade associations, agents, Federal elected officials, SWAs, and an immigration lawyers' association. Most of these comments were generally supportive of the proposed modification of employer obligations in the event of a delay in the start of work, clarification of the definition of minor delay, and changes to the procedures to provide workers notice of the delay. Farmworker Justice requested stronger employer requirements related to notice of the delay to workers and to housing and subsistence obligations. Several trade associations and agents requested revisions to clarify an employer's obligations in the event of government processing delays and to provide additional flexibility related to post-certification delays in the start date.

A comment submitted by an agent, ma´sLabor, and endorsed by other commenters generally supported the definition of 'minor delay' as a delay of 14 calendar days or fewer. Trade association and employer commenters like IFPA, U.S. Custom Harvesters, Inc., and Titan Farms, LLC supported "the clear delineation of what constitutes a minor delay" and believed the proposal struck "a balance of the reality of agricultural production which inherently is hard to predict, subject to weather patterns, and crop growth." Similarly, wafla was "generally supportive of [the] idea" of clarifying post-certification amendments, supported defining 'minor delay' as 14 calendar days or fewer, noted it "aligns with 'short-term' extensions of two weeks," supported elimination of CO review of start date delay requests, and endorsed changes that require "employer notification . . . to the SWA and each worker at least 10-days before the certified start date."

Ma´sLabor urged the Department to broaden the "unforeseeable circumstances" definition and remove the requirement that the circumstances jeopardize crops or commodities. Ma´sLabor asserted that circumstances may delay work before crops or commodities exist, such as where catastrophic flooding requires the employer to "prepar[e] a new field for planting" and delays the start date of work. Ma´sLabor suggested the final rule should "partially mirror the standards utilized in contract impossibility requests" at § 655.122(o) to permit delays caused by "external circumstances that do not directly or precisely result in the crops themselves being in jeopardy." Ma´sLabor noted that a "start date delay is far less extreme than a measure than contract impossibility"

and asserted it does not make sense to "have a more stringent standard for the former than currently exists for the latter." Specifically, ma´sLabor urged the Department to revise § 655.175(b) to replace the language "due to circumstances that could not have been foreseen, and the crops or commodities will be in jeopardy prior to the expiration of an additional recruitment period" with the broader language "due to unforeseeable circumstances beyond the control of the employer." The Department received similar comments from McCorkle Nurseries, Inc.

The Department declines to adopt a broad standard that would permit a delay in the start of work in any circumstance the employer determines is unforeseeable and necessitates a delay. This final rule retains the standard OFLC has applied historically under § 655.145(b) and proposed to retain in § 655.175(b). The Department intends for post-certification delays in the start of work under § 655.175(b) to be rare and limited to situations where unforeseen circumstances necessitate a minor delay after the Department has certified the H–2A Application and the employer's crops or commodities would be in jeopardy prior to the expiration of an additional recruitment period. The Department acknowledges that the actual day work begins may vary due to such factors as travel delays or crop conditions at the time the employer expects work to begin. The need for flexibility has been accounted for by permitting minor delays in limited circumstances under § 655.175(b) and by providing for emergency filing procedures in cases where an employer faced with exigent circumstances necessitating a longer delay must withdraw the application and file a new application under § 655.134. However, such flexibilities must be measured against the need to ensure employers provide accurate start dates to the Department and the need to ensure H–2A and corresponding workers are provided employment and compensation under the terms included in the work contract.

When filing an H–2A Application, the employer represents that it has a need for full-time workers during the entire certification period. It is important to the integrity of the H–2A program to have policies in place to ensure that employers have accurately stated their temporary need and the terms and conditions of employment to prospective U.S. workers, H–2A workers, and corresponding workers. The first date the employer identifies on the job order and H–2A Application is used as the date on which work will

start for purposes of recruitment and for calculating program requirements (e.g., the positive recruitment period under § 655.158). As the Department has noted in prior rulemaking, "[c]hanges to start dates, especially as the practice has become more common, also raise a concern that U.S. workers who might indeed be available for work on the new start date were not given the chance to apply originally." 2008 H–2B FR, 73 FR 78019, 78046 (Dec. 19, 2008). In addition, "[t]o the extent that employers more accurately describe the amount of work available and the periods during which work is available, it gives both U.S. and foreign workers a better chance to realistically evaluate the desirability of the offered job." 2012 H–2B FR, 77 FR 10038, 10073 (Feb. 21, 2012); 2015 H–2B IFR, 80 FR at 24066. Accurate start dates help to ensure "U.S. workers will not be induced to abandon employment [or] to seek full-time work elsewhere at the beginning of the season . . . because the employer overstated the number of employees it actually needed to ramp up" operations. 2012 H–2B FR, 77 FR at 10073. Similarly, it helps to ensure U.S. workers will not be "induced to leave employment at the beginning of the season . . . due to limited hours of work because the employer misstated the months during which it reasonably could expect to perform the particular type of work involved in that geographic area." *Id.* As Farmworker Justice commented—and the Department agrees—"[a]ll workers consider the dates of employment in choosing between job options and may further suffer an opportunity cost for having foregone alternative work at home in reliance on a particular start date for the new employment."

As under the current regulations, this final rule permits an employer to delay the start of work for a brief period in a limited set of unforeseeable circumstances, instead of filing a new H–2A Application, if crops or commodities would be in jeopardy prior to an additional recruitment period. This final rule, however, does not require the employer to obtain CO approval for a minor delay request and requires compensation under § 655.175(b)(2)(ii) only where the employer fails to provide the notice required under paragraph (b)(2)(i). The current limitation on the circumstances in which an employer may delay the start of work rather than file a new application is necessary to ensure employers provide accurate start dates at the time of filing and to protect workers from the adverse effects of a delay in the start of work. The

Department has not encountered difficulties in administering this standard when adjudicating employer requests under current § 655.145(b). The Department believes this limitation remains necessary, especially given that this final rule eliminates the process for requesting and adjudicating an employer's request for a minor delay of the start date of work under § 655.175(b). Broader language permitting the employer to delay the start of work, without CO approval, in any case where an employer determines unforeseen circumstances require delaying work, would be overly broad and ambiguous and likely would make § 655.175(b) less clear to employers and more difficult for the Department to enforce. It would also be less effective in ensuring accurate start dates are indicated at the time of filing and recruitment, and it would be insufficient to protect the interests of U.S. job seekers, who may be available to accept the job on a different start date, or H–2A and corresponding workers, who expect to begin work at the time and place specified in the work contract.

The Department also disagrees with commenters' characterization of the § 655.122(o) contract impossibility standard as broader or more flexible than the standard in § 655.175(b) and disagrees with commenters' assertion that a broader or more flexible standard at § 655.175(b) is necessary or more consistent with the policy aims of § 655.175(b) and § 655.122(o). The contract impossibility provision requires the employer to not only show the "services of the worker are no longer required for reasons beyond the control of the employer due to fire, weather, or other Act of God," but also that these specific circumstances "make[] the fulfillment of the contract impossible." The Department does not believe it is necessary to specifically reference "fire, weather, or other Act of God" in § 655.175(b) because the language "circumstances that could not have been foreseen" is broad enough to encompass each type of potential circumstance. The limitation on delays under § 655.175(b) (formerly § 655.145(b)) to situations in which crops or commodities would be in jeopardy prior to an additional round of recruitment and the § 655.122(o) requirement to show that circumstances make it impossible to fulfill the work contract serve similar functions and aim to prohibit the abuse or overuse of what the Department considers to be drastic measures in response to unforeseeable exigent circumstances.

The Department disagrees as well with commenters' assertion that it is necessary to broaden § 655.175(b) to encompass all exigent circumstances that may necessitate a delay after OFLC has certified the H–2A Application. If, as hypothesized by one commenter, the employer had to undertake remedial measures to "prepare the ground for planting activities" after "catastrophic flooding" before planting crops, the employer may withdraw its application and file a new application under the emergency procedures provision at § 655.134. In fact, the extent of damage contemplated by the example in those comments is unlikely to meet the definition of "minor delay" in § 655.175(b) because the necessary delay would likely be greater than the maximum 2-week minor delay provided for in that regulatory provision. The emergency procedures provision at § 655.134 permits an employer to use the emergency application filing process where the employer shows there is good and substantial cause to waive the required time period for filing an H–2A Application and the CO has determined there is "sufficient time to test the domestic labor market on an expedited basis." The factors that may constitute good and substantial cause are nonexclusive, but the Department has clarified that these situations involve "the substantial loss of U.S. workers due to Acts of God or similar unforeseeable man-made catastrophic events (*e.g.,* a hazardous materials emergency or government-controlled flooding), unforeseeable changes in market conditions, pandemic health issues, or similar conditions that are wholly outside of the employer's control." 2019 H–2A NPRM, 84 FR at 36205. The Department has noted, for example, that "if unusually heavy storms and rains occur after the employer submits its [H–2A Application], the employer can assess impacts on crop conditions and its temporary need and may determine it is appropriate to reduce staffing levels for the job opportunity described on the pending [Application] and file an emergency situation [Application] to address its need for labor or services under the new circumstances." 2022 H–2A Final Rule, 87 FR at 61768.

The Department also received comments from SWAs, trade associations, agents, elected officials, and workers' rights advocacy organizations regarding the proposed requirement that employers contact workers and the SWA, rather than the OFLC CO, to provide notice of the delay. Most comments were supportive of the proposal. Farmworker Justice

supported the proposal as "a common-sense change" because the employer "has been in prior contact with the workers, either directly or through agents" and "is much more likely than the SWA to have the most current and effective contact information." They added that the proposal would relieve some of the burden on SWAs that must prioritize allocation of limited resources. California LWDA supported the proposal to require employers notify workers of the delay directly, asserting it would be more effective than the current approach that requires employers and workers to contact the SWA.

Some commenters suggested specific changes to the proposal to ensure notice of the delay is timely and can be understood by the worker who receives it. Washington State expressed concern that the proposed rule did not contain a requirement to "notify SWAs of post-certification changes" and urged the Department to "include a requirement that employers notify SWAs of post-certification changes at the same time they notify [the Department]." Farmworker Justice urged the Department to strengthen the notice requirement by requiring that the notice of delay be provided in the primary language spoken by the worker; clarifying that workers "must actually receive the notice" and it is not sufficient for employers to show "merely that notice be sent out;" requiring employers "use the most reliable or speediest form of communication" such as requiring "electronic or telephonic correspondence" instead of slower methods like postal mail that workers may not receive before departing; and requiring employers "reach out to farm labor contractors or local recruiters, if unable to reach workers themselves, to ensure workers get the message."

A comment submitted by ma'sLabor and endorsed by several other commenters opposed any written contact requirement because "[m]any U.S. applicants do not provide an email address, meaning an employer would be forced to notify workers by mail[,] which may not be feasible given the time constraints." The commenters stated that, in many instances, "the employer is only given a phone number and perhaps a physical address" and in such cases the employer "cannot satisfy the Department's [written] notice requirement." The commenters also asserted postal mail is not an effective means to communicate a last-minute delay to the start date because workers may not receive notice in time if the Department uses the date the employer

sends the notice by postal mail and, conversely, the employer must send the postal mailing more than 10 days prior to the delay if the Department uses the date the workers receive notice of the delay. The commenters objected to any overnight mail delivery requirement as costly and noted that it would still require employers to send the notice more than 10 days prior to the start date.

In response to Washington State, the Department notes that the NPRM and this final rule require the employer to notify both workers and the SWA that the start of work is delayed. In response to workers' rights advocacy organization commenters and a trade association, the Department agrees that electronic notice of delays will be most effective given the time-sensitive nature of the notice. This final rule requires the employer to provide notice by email, telephone, or both if the worker provides an email address and telephone number. If the worker does not provide an email address or phone number, the employer must provide written notice using the worker's postal address or other contact information. The Department also agrees that the notice to workers must be in a language that workers can read and understand. The Department has revised proposed § 655.175(b)(2)(i) to require the employer send notice to each worker in a language understood by the worker, as necessary or reasonable. This is consistent with existing work contract disclosure requirements at § 655.122(q), which the Department has noted are necessary to ensure an employer "provide[s] the terms and conditions of employment to a prospective worker in a manner permitting the worker to understand the nature of the employment being offered and the worker's commitment under that employment." 2009 H–2A NPRM, 74 FR 45906, 45916 (Sept. 4, 2009). The Department is not adopting the workers' rights advocacy organization suggestion to require that the employer confirm all workers received the notice of delay by reaching out to labor contractors and recruiters to locate workers who do not respond. This would impose an undue burden on employers, in part due to the same time sensitivity concerns that necessitate an electronic notice requirement. The Department recognizes that sending a notice of delay by mail may not ensure that the worker receives notification of the delay. Late notice, however, may still be preferable to no notice at all where no more expedient means are not available. For this reason, notice by mail may not be utilized if communicating via email, telephone, or both is a viable option. An employer

who does not possess electronic means of contacting a worker will not be required to send a notice by mail earlier than it is required to send an electronic notification. The Department recognizes that the unexpected nature of circumstances that justify a delayed start date may not permit the employer to send postal notice that reaches a worker at least 10 days before the date of need. It may also be difficult for the Department to define the scope and level of due diligence imposed by the requirement and to later enforce such a requirement. However, the Department notes that the employer remains obligated to comply with the terms and conditions of the certified H–2A *Application for Temporary Employment Certification* beginning on the first date of need certified, including employer-provided housing, as well as subsistence under § 655.175(b)(1), if the worker does not receive the notice.

The Department also received comments both in support of and in opposition to the proposal to require that employers compensate workers, for a period of up to 14 calendar days, in the event of a delay in the start of work if the employer fails to provide the notice required by paragraph (b)(2)(i). Forty-three Federal elected officials supported the proposal to require compensation for up to 14 days in the event of a delay without proper notice, stating generally that the proposal will help to "protect[ ] against exploitative practices commonly used by employers, especially as it relates to worker pay." Farmworker Justice noted that employers must provide compensation to U.S. workers in the event of a delay under § 653.501(c) and stated there is "no legitimate reason to exclude H–2A workers, who often travel further, absorb greater costs, and have fewer alternative options such as finding interim employment elsewhere." They asserted this provision "is particularly important in light of the number of complaints farmworker legal services providers have received from H–2A workers who have no food and no money for days to weeks at the start of the job when no work is available, notwithstanding the promised start date on the clearance order." The UFW Foundation cited accounts from eight farmworkers detailing the ways delayed start dates had caused severe financial hardship to workers and UFW, and other commenters like the North Carolina Justice Center stated the Department's proposals would help to provide "a safety net during a particularly vulnerable time, when farmworkers have little or no savings

and are awaiting their first paycheck." Similarly, Farmworker Justice supported the proposal as a necessary protection for foreign workers who "incur significant incoming travel expenses and fees, sometimes while paying high interest rates, including transportation to the U.S. consulate, hotel costs while waiting for their consular appointment, transportation costs to the worksite, visa fees, border crossing fees, and daily subsistence while en route with travel sometimes taking ten or more days." They added that delayed start dates also burden U.S. workers who "incur significant inbound travel expenses when traveling from their homes to remote worksites, only to find that the start of work has been delayed." They noted, "[a]ll workers consider the dates of employment in choosing between job options and may further suffer an opportunity cost for having foregone alternative work at home in reliance on a particular start date for the new employment."

Farmworker Justice also supported the Department's proposal to consider only employer offers of work that are within the scope of the approved job order, stating this is a necessary "clarification to deter unsafe or undercompensated work" not approved in the job order. Ma´sLabor supported the proposal to permit employers to credit the required compensation toward the employer's three-fourths guarantee obligation at § 655.122(i) because it will help "mitigate the financial burden associated with the requirement" and avoid "potential 'double dipping' that would result" if employers are required to compensate workers for the delay and then also must provide "compensation under the three-fourths guarantee for the same two weeks if there is a shortfall."

In contrast, several comments submitted by trade associations, agents, and employers expressed opposition to the compensation proposal, in whole or in part. Ma´sLabor expressed concern that the proposed changes at § 653.501(c) and new § 655.175 failed to consider that "an employer requesting a delay to the start date is itself experiencing hardship of some sort" and the proposal "tip[s] the scales too heavily in favor of the workers by *dramatically* increasing the costs to employers." Labor Services International asserted, generally, that the proposal will create "communication chaos" and an "administrative nightmare" and expressed concern employers will be required to provide compensation for delays in the start of work caused by a government delay in processing,

especially delays in "availability of consular appointments." FFVA specifically expressed concern employers will be required to compensate workers for minor delays caused by "the government's failure to timely approve H–2A workers to cross the border," such as when worker entry into the U.S. is delayed "for multiple days without any notice" to the employer due to "unannounced section 221g investigations" by the State Department. The commenter urged the Department not to require compensation in cases where the delay is "caused solely by the government." Alternatively, the commenter urged the Department not to require compensation "until 7 days after the initial start date . . . , and only for those workers who have departed for the job opportunity," which the commenter asserted would "allow practical flexibility for employers [and] account for the very real delay caused by the government, while considering the protections needed for workers who have already left their homes for the job."

The Cato Institute opposed the proposal because it would provide benefits and compensation not received by workers outside of the H–2A program and asserted this would incentivize employment of undocumented workers by "rais[ing] the cost of the H–2A program relative to illegal hiring." NCAE supported clarifications of the post-certification delay process, generally, but "oppose[d] a requirement to pay for work not performed." The commenter provided a hypothetical in which an employer's start of work is delayed due to a hurricane pushing predators into an orange grove and it may take longer than the employer anticipated to dry the grove or clear it of predators, in which case, the commenter expressed concern, "due to this 'Act of God' " the proposed compensation obligation would require the employer "to make payment for work that was never performed," which "may jeopardize the enterprise." AILA noted that brief start date delays due to weather and other unforeseen circumstances are common in agriculture and the commenter urged the Department "not to require additional compensation obligations for employers in this context." Ma´sLabor opposed extending to H–2A and corresponding workers the compensation benefits currently provided to U.S. workers under § 653.501 because it would be a "dramatic expansion of the existing requirements."

As noted above, under existing regulations, if an employer seeking to employ workers under either a criteria (H–2A) or non-criteria (non-H–2A) job order fails to timely notify the SWA of a start date change it must pay hourly wages to U.S. farmworkers who followed SWA contact procedures. *See* § 653.501(c)(3)(i) and (c)(5). Section 655.175(b)(2)(ii) in this final rule extends this obligation to H–2A workers and corresponding workers under the H–2A Application to ensure workers are compensated for anticipated hours not offered at the beginning of the work contract, similar to § 653.501(c), and applies in conjunction with the existing three-fourths guarantee at § 655.122(i), which ensures workers receive compensation for anticipated hours not offered during the contract period. The obligations in § 655.175(b)(2)(ii) will apply only in circumstances where the employer's start of work is delayed due to unforeseeable circumstances and crops or commodities would be in jeopardy prior to an additional recruitment period, and the compensation obligation will apply only where the employer fails to provide workers notice of the delay under paragraph (b)(2)(i). The procedure at § 655.175(b) will not apply when a worker's arrival and start of work is delayed due to, for example, government delays in scheduling appointments and interviews at the U.S. embassy or consulate. As the Department has explained under the current regulations, the "provision for requesting a delayed start date applies when the employer wishes to delay the start date of all workers covered by the [H–2A Application]," and it "does not cover minor travel delays or slower than expected processing times at USCIS or a U.S. Consulate for workers coming from outside the U.S.; however, these delays should not delay any other worker's start date or the employer's start date of work."[109] The same is true under new § 655.175. The provisions at § 655.175(b) will apply only where the work under the approved H–2A Application will not begin on the certified first date of need but instead will be delayed for a period of no more than 14 calendar days. In a situation where the employer faces exigent circumstances and does not know how long the start of work will be delayed, such as when the employer does not know how long it will take to prepare an orange grove after a hurricane, the employer may withdraw the application and file a new application using

[109] DOL, *OFLC FAQs, Round 6* (Feb. 29, 2012), *https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/h-2a_faq_round6.pdf.*

emergency procedures at § 655.134, if applicable.

Wafla expressed concern the proposal would require employers to compensate workers under a piece rate in some cases, which would not be possible where no work has been performed due to a delay. The commenter urged the Department to revise proposed § 655.175(b)(2)(ii) by removing the language "same rate of pay required under this subpart B" and adding reference to an hourly rate. The Western Range Association expressed concern the compensation proposal would impact "employers who pay monthly salaries under the 'special procedures' in 20 CFR 655.200 *et seq.* in a way that it would not for farms that pay on an hourly basis" and the commenter noted that where one of these employers experiences a start date delay, the employer's "season is usually pushed back or additional hours are worked in order to catch up for the delay."

The Department agrees with the trade association commenter that paragraph (b)(2)(ii) should not reference production-dependent compensation rates like piece rates, which cannot be calculated during a delay in the start of work, and agrees the provision should reference only an hourly rate. The Department has revised paragraph (b)(2)(ii) to require the employer provide compensation at the highest applicable hourly rate. The Department has also revised paragraph (b)(2)(ii) to provide that an employer that is subject to the wage rates at § 655.211(a) and fails to provide the required notice of delay must compensate workers during the delay at the hourly rate that is the highest of the agreed-upon collective bargaining wage rate, the applicable hourly minimum wage imposed by Federal or State law or judicial action, the monthly AEWR, or any other wage rate the employer intends to pay. If that rate is expressed as a monthly rate, such as the monthly AEWR, the employer must prorate the monthly rate as necessary to compensate the worker for each hour during the delay period in accordance with § 655.175(b)(2)(ii). Employers of workers in the herding and production of livestock on the range are subject to a monthly AEWR due to "difficulties in tracking and paying an hourly wage rate to workers." 2015 H–2A Herder FR, 80 FR at 62987. Herder employers are subject to the "standard H–2A pay frequency, and the [2015] Final Rule requires that payments be made at least twice monthly." *Id.* at 62986. The Department noted that "calculating the twice-monthly payment can be easily accomplished by evenly dividing the required monthly rate into

two payments.'' *Id.* In addition, prorating the monthly wage rate is already permitted in certain circumstances under § 655.210(g)(2). The Department does not believe it will be any more difficult for employers to determine the rate it must pay a worker for a period of up to 2 weeks during which the start date is delayed and to provide this compensation on this same date it would have provided workers the first of 2 monthly payments had work begun on time.

The Department also received comments from workers' rights advocacy organizations, labor unions, SWAs, individuals, and elected officials in support of the proposed changes to the housing and subsistence obligations, though some commenters suggested additional protections. Farmworker Justice supported the housing and subsistence provisions and noted this existing requirement has ''helped encourage a correct assessment of the start date.'' Washington State supported the proposal to require employer-provided housing during the delay but noted the NPRM did not require the employer to provide meals or money for meals during the delay. The SWA expressed concern this existing regulatory ''gap'' ''has caused considerable hardship for workers'' in situations where the employer provides kitchen facilities during the delay period but does not provide workers groceries or money and transportation to purchase groceries. The SWA urged the Department to require employers to provide workers meals, or provide money and transportation to buy groceries, during the delay period. An individual commenter urged the Department to go further in this final rule and require employers provide a ''minimum standard compensation package'' to workers even where the employer provides notice of the delay.

The Department declines to adopt the suggestion to require employers provide workers a daily per diem payment or a total compensation package during any delay period and is adopting the proposed housing and subsistence provision at § 655.175(b)(1) without change. The Department believes the requirements to provide or reimburse workers subsistence in the same amount required during travel, together with the notice and compensation obligations in § 655.175(b)(2) and three-fourths guarantee obligation at § 655.122(i), will ensure workers are not disadvantaged by a delay in the start of work and will place workers in the position they would have been in had work begun on time. Employers also must comply with all other requirements of the certified

H–2A Application, including housing under § 655.122(d), beginning on the first date of need certified. However, the Department appreciates the comments and encourages stakeholders to review the Department's existing, extensive guidance relating to travel-related subsistence requirements under § 655.122(h) and the provision of meals under § 655.122(g).[110]

This final rule adopts the proposal to extend to H–2A and corresponding workers the existing obligation, at § 653.501(c), to compensate workers for the delay if the employer fails to provide notice of the delay to workers. These provisions will ensure that, in rare cases a worker who is already en route to the worksite despite the employer's provision of 10 business days' notice or does not receive such notice (and therefore, is not entitled to compensation under § 655.175(b)(2)), the worker will still receive subsistence costs no later than the first date the worker would have been paid had work started on time. The Department has concluded these provisions best balance the need for agricultural employers to respond to unforeseeable exigent circumstances and the need to ensure workers receive compensation and benefits under the anticipated terms and conditions of employment and do not suffer financial hardship due to a minor delay in the start of work.

The Department also received some comments that were beyond the scope of this rulemaking. Ma´sLabor urged the Department to revise § 655.175 by adding a provision that would permit custom combine employers to ''add worksites and customers to its itinerary [after certification] provided that such worksites/customers are within the previously-approved [AIEs]'' and suggested the new provision should incorporate language from an FAQ the Department published in February 2013. Specifically, ma´sLabor urged the Department to add a new § 655.175(c) that states an employer certified under §§ 655.300 through 655.304 that ''performs work in multiple [AIEs] . . . may augment its scheduled itinerary with additional worksites located within the previously approved [AIEs],'' provided the employer maintains an up-to-date itinerary and retains copies of contracts or agreements with previously undisclosed fixed-site businesses. These commenters also urged the Department

to permit additional pre-certification amendments, such as requests to ''add, modify, or remove a job requirement from the Application after the Notice of Acceptance has been issued.'' Specifically, the commenters suggested the Department should add a new § 655.145(c) that would permit pre-certification changes ''including but not limited to changes or additions to job duties, job requirements in accordance with § 655.122(b), productivity standards, or worksite or housing locations,'' if approved by the CO.

The Department declines to adopt the commenters' suggestions. Adding provisions permitting the addition of worksites after certification would not be a regulatory change that could have been anticipated by the public and the public would therefore not have been aware it is a proposal on which comments should be offered. The comment is, therefore, beyond the scope of this rulemaking, and the Department declines to adopt the suggestion at this time. However, the Department notes that it addressed special procedures and post-certification changes to H–2A Applications for custom combine employers in the 2022 H–2A Final Rule. That rule rescinded special procedures contained in informal guidance (Training and Employment Guidance Letters), codified procedures for employers that employ workers engaged in custom combining according to a planned itinerary across multiple AIEs, and ''provide[d] appropriate flexibilities for employers engaged in these unique agricultural activities that are substantially similar to the processes formerly set out in administrative guidance letters.'' 2022 H–2A FR, 87 FR at 61663.

Similarly, revising § 655.145 to permit additional pre-certification application amendments, as suggested, would be a major change to the regulation that commenters and stakeholders could not have anticipated as an outcome of the minor proposed changes to that section or the substantive proposed changes to the provisions governing post-certification start date delays at new § 655.175, thus warranting additional public notice and opportunity for comment. As such, the Department declines to adopt the suggestion in this final rule. However, when addressing similar comments in the 2022 H–2A Final Rule, the Department concluded that ''allowing applicants to request corrections to applications without restrictions would run counter to the Department's efforts to modernize the temporary agricultural labor certification process'' and noting that employers who wish to make

---

[110] *See, e.g.,* OFLC, *Meal Charges and Travel Subsistence, https://www.dol.gov/agencies/eta/foreign-labor/wages/meals-travel-subsistence* (last accessed Feb. 8, 2024); DOL, *WHD Fact Sheet #26D: Meal Obligations for H–2A Employers, https://www.dol.gov/agencies/whd/fact-sheets/26d-meal-obligations-H-2A* (last accessed: Feb. 8, 2024).

application changes outside of those permitted in § 655.145 may file a new H–2A Application to accommodate the changes needed, utilizing emergency filing procedures at § 655.134, if applicable. *Id.* at 61750.

After considering all comments, the Department is adopting the proposals with some revisions to paragraphs (b)(2)(i) and (b)(2)(ii), as noted above. As under the current regulations, this final rule permits delays in the start of work only when such a delay is minor and due to unforeseen circumstances and the employer's crops or commodities will be in jeopardy prior to expiration of an additional recruitment period. Paragraph (b) limits minor delays to delays of no more than 14 calendar days from first date of need.

Paragraph (b)(2)(i) requires the employer to notify the SWA and each worker to be employed under the approved *Application for Temporary Employment Certification* of the delay at least 10 business days before the certified start date of need and § 655.167(c)(12) requires the employer to retain evidence demonstrating the employer notified the SWA and each worker of the delay for a period of 3 years. This final rule requires the employer to contact the worker in writing, in a language understood by the worker, as necessary or reasonable, using the contact information the worker provided to the employer. If the worker provides electronic contact information, such as an email address or telephone number, the employer must send notice using that email address and telephone number and must send notice using both if the worker provides contact information in both formats. The employer may provide notice to the worker telephonically, provided the employer also sends written notice to the email or postal address provided by the worker. If the worker does not provide an email address or phone number, the employer must provide written notice using the worker's postal address or other contact information.

Paragraph (b) provides that in the event of a minor delay (no more than 14 calendar days), the employer must provide to all workers who are already traveling to the place of employment, upon their arrival and without cost to the workers until work commences, daily subsistence in the same amount required during travel under § 655.122(h)(1), except for days for which the worker receives compensation under § 655.175(b)(2)(ii) of this section. The employer must fulfill this subsistence obligation to the worker no later than the first date the worker would have been paid had they

begun employment on time. Paragraph (b)(1) also includes a reminder to employers that, even in the event of a minor delay in the start of work, the employer must continue to comply with all other requirements under the certified H–2A Application, including, but not limited to, the provision of housing as described in the job order. The Department has made a minor revision to this paragraph and paragraph (b)(ii) to remove introductory clauses that reference the 14-calendar-day minor delay period, as this language is necessary only in paragraph (b) and inclusion of the language in subordinate paragraphs may create confusion or uncertainty regarding an employer's obligation to provide subsistence until work commences under paragraph (b)(1) or compensation for anticipated hours during the delay under paragraph (b)(2)(ii).

Under paragraph (b)(2)(ii), if the employer fails to provide the timely notification required under paragraph (b)(2)(i) of this section to any worker(s), the employer must pay the worker(s) the highest of the hourly rates of pay at § 655.120(a) (or, if applicable, the rate required under § 655.211(a)(1)), for each hour of the offered work schedule in the job order, for each day that work is delayed, for a period up to 14 calendar days. The employer must provide this compensation on the date workers anticipated they would receive their first paycheck had the work begun on time. Under paragraph (b)(2)(ii), the employer's wage obligation will apply in any case where the employer fails to provide notice of the delayed start of work at least 10 business days prior to the certified start date. This obligation will apply in conjunction with the three-fourths guarantee at § 655.122(i), which will continue to require employers to offer workers employment for a total number of work hours equal to at least three-fourths of the workdays of the total period, beginning with the first workday after the arrival of the worker at the place of employment or the advertised contractual first date of need, whichever is later. However, under § 655.175(b)(2)(iii), compensation paid to a worker under paragraph (b)(2)(ii) of this section for any workday included within the time period described in § 655.122(i) will be considered hours offered to the worker when determining an employer's compliance with the § 655.122(i) three-fourths guarantee obligation. The employer may reduce the compensation owed to any worker(s) under § 655.175(b)(2)(ii) by the amount of wages paid to the worker(s) for work

performed within the time period described in paragraph (b)(2)(ii), insofar as such wages are paid timely and such work is covered by the job order or otherwise authorized by law. The employer may not credit toward the three-fourths guarantee any wages for unauthorized work, including work performed by H–2A workers outside the location or duties certified in the job order.

Paragraph (a) reminds employers that post-certification changes are not permitted unless specified in this subpart (*e.g.,* post-certification extensions continue to be permitted under § 655.170). Paragraph (a) also reminds employers that they must continue to comply with the terms and conditions of employment contained in the *Application for Temporary Employment Certification* and job order with respect to all workers recruited in connection with its certification. Employers are reminded as well that sanctions and remedies for an employer's failure to comply with the obligations required under this section may include, as appropriate, the recovery of such compensation, the assessment of civil money penalties, revocation of the approved certification under § 655.181, and, if warranted, debarment of the employer under § 655.182.

The Department has determined the new start date delay process at § 655.175(b) strikes an appropriate balance between the employer's need to respond to unforeseen exigent circumstances and the needs of agricultural workers to be apprised of changes to the terms and conditions of the job opportunity and compensated in accordance with the terms of employment the workers accept. The provisions related to compensation and subsistence will effectively address the hardship concern (discussed above in the preamble to § 653.501(c)) by providing workers a source of income should the employer fail to provide such workers sufficient notice of a delay in the start of work, while continuing to allow the employer flexibility to delay the start of work for up to 14 calendar days if necessitated by circumstances that could not have been foreseen and the crops or commodities will be in jeopardy prior to the expiration of an additional recruitment period. The new compensation obligation in situations where workers are not notified of a start date delay will better protect agricultural workers from financial hardship they are likely to experience should they travel or otherwise rely on the information included in the job order, only to discover upon arriving

that work is not available to them. As workers' rights advocacy organizations noted in response to the NPRM, delayed start dates are harmful to workers, who value predictability and certainty in employment start dates, particularly where they turn down other work or must travel far to make themselves available to work at the time and place advertised in the job order. Farmworkers have expenses beyond housing and meals and cannot afford to lose expected pay for up to 2 weeks, should the actual start date be later than the first date of need offered. The beginning of the certification period is a particularly vulnerable time for workers, who may have little or no savings as they await a first paycheck; delays in the start of work and resulting first paycheck exacerbate this vulnerability and can lead to financial hardships. Providing up to 2 weeks of compensation, due at the time workers anticipate receiving their first paycheck had the work begun on time, provides a safety net for workers to support themselves when work is not available. Imposing these pay obligations in the event workers are not notified of a delayed start of work also may help to ensure growers accurately disclose the first date of need in the job order. The new provisions in this final rule also will increase the likelihood that workers will receive timely notification of any delay in the start of work and that employers maintain accurate records of notices they provide.

Limiting "minor" delays to delays of 14 calendar days or fewer eliminates ambiguity and aligns this provision with the conceptually similar provision at § 655.170(a), which limits "short-term" extensions to 2 weeks and does not require CO approval. As is the case for non-minor delays, where the anticipated delay would be more than 2 weeks or indefinite and cannot be considered "minor," the employer may withdraw the application and refile, using emergency processing under § 655.134, as applicable, to engage in recruitment for the job opportunity, which will begin on a newly identified start date. If the employer cannot employ workers under the terms and conditions promised beginning on the certified start date and can only offer a fraction of the work hours in the 2 weeks following the certified start date (*e.g.*, the employer can offer only a single day of work, followed by several days without work or a similar offer of only minimal hours upon the worker's arrival, followed by an extended rest period), the Department will consider the employer's start date delayed and

the employer will be required to comply with proposed § 655.175(b), including all housing, subsistence, and compensation obligations and the obligation to provide notice of the delay to workers and the SWA.

*F. Integrity Measures*

1. Section 655.182, Debarment

The NPRM proposed to revise 20 CFR 655.182 to shorten the time to submit rebuttal evidence to OFLC as well as shorten appeal times for debarment matters. The Department proposed these changes to increase the speed with which debarments would become effective by decreasing the time for parties to submit rebuttal evidence to OFLC, appeal Notices of Debarment to the OALJ, or appeal debarment decisions to the ARB from the OALJ. The Department received over 35 comments on this section and, for the reasons explained below, has decided not to adopt the proposal to reduce rebuttal and appeal times for debarment matters.

The Department proposed to amend § 655.182(f)(1) and (2) by reducing the period to file rebuttal evidence or request a hearing in response to a Notice of Debarment from 30 calendar days to 14 calendar days. The NPRM indicated that if the party received a Notice of Debarment but did not file rebuttal evidence, the Notice of Debarment would take effect at the end of the 14-calendar-day period unless the party requested, and the Administrator granted, an extension of time to submit rebuttal evidence. The Department proposed limited circumstances for granting an extension of time. The NPRM also proposed a reduction in time from 30 calendar days to 14 calendar days for employers to appeal a final determination of debarment and for any party to request the ARB to review the decision of the ALJ. In the NPRM, the Department reasoned that reducing these timeframes would lead to faster final agency adjudications that would more efficiently prevent H–2A program violators from accessing this program. As a result of a more expedited debarment process, workers in the United States would be protected from further harm.

The Department received comments both opposed to and in favor of these proposals. The comments supporting the proposed changes expressed general agreement with the NPRM's proposals to enhance integrity measures in the H–2A program but did not offer any specific explanation.

Many trade organizations, employers, and individuals expressed concerns that

the shortened time frame could negatively impact a party's ability to defend themselves and their due process rights by limiting the time to review and gather all evidence needed to prepare and submit a rebuttal or file an appeal. Most of the same commenters worried that the shortened timeframe could infringe on a party's ability to obtain new counsel or consult counsel. Some commenters went as far as to say these likely outcomes went against the main goal of the NPRM, which sought to bolster program integrity and help protect workers from further harm. These commenters, and other SWAs, employers, and trade organizations, reasoned that parties should be afforded a broader timeframe to consider options and evaluate the evidence given the gravity and severe penalty imposed with a debarment action and argued the proposal would likely increase appeal filings, thereby creating backlogs in processing times.

Several trade associations argued that due process concerns were heightened during farmers' busy season given the time-sensitive and perishable nature of agricultural operations and products. Another commenter believed the likely result of the proposed change would incentivize a greater number of appeals that would result in an additional administrative burden for all parties.

To guard against any due process concerns, the Department proposed permitting parties to request an extension of time to submit rebuttal evidence. Several commenters, including trade associations and an individual employer, believed the standard to obtain an extension was too high in the NPRM and would only be granted in limited circumstances but did not explain why. Several commenters, including trade associations and an individual employer, offered an alternative approach that would require a party to notify the Department if it planned to file rebuttal evidence or request a hearing within the 14-day period but allowed parties the full 30 days from the Notice of Debarment or final determination of debarment to provide rebuttal evidence or request a hearing.

Having carefully considered the public comments, the Department does not adopt the proposal to shorten rebuttal and appeals time for debarment matters in the final rule. Although the proposed reduction in time would expedite the debarment process, the Department recognizes the due process concerns expressed by most commenters and has decided to retain the current regulatory timeframes. Given the severe penalty imposed by a

debarment action, the Department appreciates the comments emphasizing that it is important to safeguard an employer's due process rights and allow sufficient time to hire or consult counsel, if desired, and obtain the evidence needed for a rebuttal or to request a hearing. The Department also appreciates the comments from several agricultural organizations that noted that the shortened timeframe additionally could adversely impact farmers during their busy season given the nature of their work and products. Therefore, the Department has decided not to adopt such a change at this time for the reasons described above. Similarly, the Department, as described in the discussion of 29 CFR 501.20, has decided not to adopt the proposed changes to WHD's regulations governing the timeframe to appeal WHD debarment determinations.

After considering the commenters' alternative approach requiring notice to be filed within the 14-day period, but allowing 30 days to file a rebuttal or request a hearing, the Department declines to adopt the alternative approach for two reasons. First, since the Department is not adopting the NPRM proposal, there is no need to consider the alternative offered by several commenters. Second, the Department believes the alternative approach would unnecessarily complicate the rebuttal and debarment appeals process by increasing the administrative burden in tracking and processing these cases. Specifically, the alternative suggestion would increase the administrative burden on the Department, and potentially delay OFLC processing of these cases, by requiring additional tracking of: (1) employers who notify the Department of their intent to file rebuttals and a subsequent determination of whether the rebuttals were timely filed or not filed; and (2) employers who notify the Department of their intent to request a hearing and a determination of whether the requests were timely filed or not ultimately filed. The suggestion also would require modifications to the Department's electronic processing system, which currently does not have the functionality to track such notifications.

## VII. Discussion of Revisions to 29 CFR Part 501

The Department proposed various revisions to the regulations at 29 CFR part 501, which set forth the responsibilities of WHD to enforce the obligations of employers under the H–2A program. The Department proposed these amendments concurrent with and to complement the changes ETA proposes to its regulations in 20 CFR part 655, subpart B, governing the certification of temporary employment of nonimmigrant workers employed in temporary or seasonal agricultural employment. As with the proposed revisions to ETA's regulations, the proposed revisions to 29 CFR part 501 focused on strengthening protections for agricultural workers and enhancing the Department's capabilities to monitor program compliance and take necessary enforcement actions against program violators.

### A. Section 501.3, Definitions

In the NPRM, the Department proposed to define the terms *key service provider* and *labor organization* in § 501.3(a) to conform to the proposed definitions of these terms in 20 CFR 655.103(b) and for the reasons set forth in the discussion of proposed 20 CFR 655.135(h). The Department also proposed to remove the definition of the term *successor in interest* from § 501.3(a), to conform to and for the reasons described in the discussion of proposed 20 CFR 655.104. Finally, the Department proposed to add a new § 501.3(d), defining the term *single employer,* to conform to and for the reasons described in the discussion of proposed 20 CFR 655.103(e).

For the reasons described in the preamble discussion of 20 CFR 655.103(b), this final rule adopts the definition of *labor organization* as proposed. This final rule also adopts the definition of *key service provider* in 29 CFR 501.3(a) with the same modification as explained in the preamble discussing 20 CFR 655.103(b). For the reasons described in the discussion of 20 CFR 655.104, this final rule removes the definition of the term *successor in interest* from 29 CFR 501.3(a) as proposed. Additionally, this final rule adopts new § 501.3(d) as proposed, defining the term *single employer* to conform to and for the reasons described in the above discussion of 20 CFR 655.103(e).

### B. Section 501.4, Discrimination Prohibited

In the NPRM, the Department proposed to revise § 501.4(a) to conform to the changes proposed to 20 CFR 655.135(h) that would expand and strengthen the Department's existing anti-retaliation provisions. The reasons for this proposal are described fully in the preamble discussion of 20 CFR 655.135(h). The Department did not propose any revisions to § 501.4(b) regarding WHD investigations and enforcement of § 501.4.

For the reasons described in the preamble discussion of the revisions to 20 CFR 655.135(h), this final rule adopts the proposed revisions to 29 CFR 501.4(a) with the same modifications as outlined in the preamble discussion of 20 CFR 655.135(h).

### C. Section 501.10, Severability

As set forth in the discussion of proposed 20 CFR 655.190, the Department proposed a new § 501.10 stating that if any provision is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision will be construed so as to continue to give the maximum effect to the provision permitted by law. The proposed regulatory text further stated that where such holding is one of total invalidity or unenforceability, the provision will be severable from the corresponding part and will not affect the remainder thereof.

As the NPRM explained, the Department believes that a severability provision is appropriate because each provision within the H–2A regulations can operate independently from one another, including where the Department proposed multiple methods to strengthen worker protections and to enhance the Department's capabilities to conduct enforcement and monitor compliance. The NPRM also emphasized that it is important to the Department and the regulated community that the H–2A program continue to operate consistent with the expectations of employers and workers, even if a portion of the H–2A regulations is held to be invalid or unenforceable.

For the reasons described in the preamble discussion of the revisions to 20 CFR 655.190, the Department adopts the severability provision at § 501.10 with minor modifications.

### D. Sections 501.20, 501.33, 501.42, Debarment and Revocation

The Department proposed revisions to WHD's debarment and revocation regulations at §§ 501.20, 501.33, and 501.42, to align with the proposed changes to ETA's revocation and debarment regulations at 20 CFR 655.181 and 655.182. These proposals and the Department's final determinations in this rule are described briefly here, and are described fully in the section-by-section analysis of 20 CFR part 655, subpart B.

#### 1. Timeline To Appeal

For consistency with and conformance to the Department's

proposal under 20 CFR 655.182 to expedite debarment processing, the Department proposed to shorten the timeframe to appeal any WHD determination seeking debarment from 30 calendar days to 14 calendar days. In shortening the appeal timeframes for matters involving debarments, the Department sought to bolster program integrity and help protect workers from further harm they might suffer as a result of substantial violations.

The Department received comments both in favor of and opposed to this proposal. The comments supporting the proposal expressed general agreement with the provision to enhance integrity measures in the H–2A program but did not offer any specific explanation for their support of this proposal.

The Department received several comments from agricultural employers, agricultural associations, agents, think tanks, and others opposing this proposal. Commenters in opposition expressed concern that this shortened appeals period would not allow adequate time for employers to secure counsel and gather rebuttal evidence. Many of these same commenters stated that during busier times of the year, some agricultural employers may not be available to receive or respond to a notice in a timely fashion. Some commenters raised concerns that shortening the timeline may impact employers' due process rights. In light of these challenges and the severe implications of debarment, commenters urged the Department to abandon this proposal. Other commenters recommended that the Department consider implementing a staggered approach, whereby employers would be required to request a hearing within 14 calendar days of receiving notice but, under 20 CFR 655.182, would have a full 30 calendar days from the date of the notice to gather evidence and present a rebuttal. Additionally, one commenter suggested that, as an alternative to a reduction in appeal times for all of WHD's determinations seeking debarment, the Department consider reducing the amount of time an employer has to respond to a notice only for certain egregious cases, such as those involving forced labor, trafficking, or other criminal violations.

After consideration of the comments received, the Department will not make this change to the appeals process at this time and will not finalize the proposal. As discussed in the preamble to 20 CFR 655.182, the Department is sensitive to commenters' assertions that some agricultural employers may face challenges in receiving and responding to notices of debarment within the proposed expedited timeline. The Department is committed to ensuring that respondents have an adequate opportunity to prepare and present appeals and is mindful of the need to balance this commitment with its interest in streamlining the debarment process. Therefore, this final rule retains the 30-day appeals period for all WHD determinations, including those determinations that include a notice of debarment.

### 2. Passport Withholding

The Department proposed adding a new paragraph (o) to § 655.135 to better protect workers from potential labor trafficking by directly prohibiting an employer from confiscating a worker's passport, visa, or other immigration or government identification documents. The Department also proposed to include the failure to comply with this prohibition among the violations that may subject an employer to debarment under § 655.182 and 29 CFR 501.20. As explained fully in the preamble discussion of new 20 CFR 655.135(o), the Department received numerous comments in response to its proposal to directly prohibit an employer from confiscating a worker's passport, the vast majority of which were in support of the proposal. For the reasons set forth in the preamble discussion of new 20 CFR 655.135(o), the Department adopts this provision as proposed, and includes a violation of the new § 655.135(o) as a violation for which the Department may seek debarment under § 655.182 and 29 CFR 501.20.

### 3. Successors in Interest

The Department proposed revisions to existing § 501.20(a) and (b) to conform to proposed 20 CFR 655.104 and 655.182 regarding the effect of debarment on successors in interest. The Department also proposed a new § 501.20(j). As explained fully in the preamble discussion of new 20 CFR 655.104, the Department received several comments both for and against its proposals relating to successors in interest, including the proposed new § 501.20(j). For the reasons set forth in the preamble discussion of new 20 CFR 655.104, the Department adopts the proposed revisions to 29 CFR 501.20(a) and (b), and new paragraph (j), as proposed. Under this final rule, a WHD debarment of an employer, agent, or attorney applies to any successor in interest to that debarred entity, and WHD need not issue a new notice of debarment to a successor in interest to a debarred employer, agent, or attorney. However, as reflected in new § 501.20(j), WHD is permitted, but not required, to identify any known successor(s) in interest in a notice of debarment issued to an employer, agent, or attorney.

### E. Section 501.33, Request for Hearing

As the Department explained in the NPRM, the current regulations at 29 CFR 501.33(b) provide that the party requesting a hearing before the OALJ must "[s]pecify the issue or issues stated in the notice of determination giving rise to such request" and "[s]tate the specific reason or reasons the person requesting the hearing believes such determination is in error." 29 CFR 501.33(b)(2) and (3). Despite these provisions, parties frequently attempt to raise new issues at later stages of proceedings, whether before the OALJ, the ARB, or a Federal court, that were not raised in the party's request for a hearing. Under relevant case law, however, issue exhaustion requirements are applicable and appropriate under the H–2A administrative review procedures and, as a result, issues not raised in a request for hearing to the OALJ may be deemed waived. See 88 FR at 63809. Under the current regulatory framework, the Department and courts expend significant resources considering or defending against newly raised issues that are ultimately deemed to have been waived. Similarly, parties have asserted that they lacked notice that issues not raised in a request for hearing before the OALJ may be deemed waived.

Accordingly, the Department proposed to revise § 501.33(b)(2) to state that any issue not raised in a party's request for a hearing before the OALJ "ordinarily will be deemed waived" in any further proceedings. The proposed revisions were intended to clarify that issue exhaustion requirements apply to H–2A enforcement proceedings, to better inform parties of the potential consequences of failing to raise an issue in a request for review, and to better preserve agency and judicial resources. The proposed language was modeled on similar provisions in OSHA's whistleblower regulations governing the procedures for administrative review of OSHA's findings in those contexts. See, e.g., 29 CFR 1982.110(a).

The Department received only one comment on this specific proposal, from an H–2A agent, ma´sLabor. Ma´sLabor acknowledged that "[t]he Department may impose reasonable limitations to avoid expending significant issues or preserving judicial resources" but "urge[d] the Department to reconsider" the proposal to allow for some mechanism by which parties may raise new issues after the filing of an initial request for hearing, consistent with

principles of due process, fairness, and equity.

The Department adopts the proposed revisions to § 501.33(b)(2) with one modification to clarify the appropriate standard for issue exhaustion under these regulations. As explained in the NPRM, issue exhaustion requirements already are applicable and appropriate under the H–2A administrative review procedures. *See WHD* v. *Sun Valley Orchards, LLC,* ARB No. 2020–018, 2021 WL 2407468, at *7 (ARB May 27, 2021), *aff'd sub nom. Sun Valley Orchards, LLC* v. *Dep't of Labor,* No. 1:21–cv–16625, 2023 WL 4784204 (D.N.J. July 27, 2023), *appeal filed* No. 23–2608 (3d Cir. Sept. 5, 2023); *In re Sandra Lee Bart,* ARB No. 2018–0004, 2020 WL 5902444, at *4 (ARB Sept. 22, 2020); *see also Carr* v. *Saul,* 141 S. Ct. 1352, 1358 (2021) ("Typically, issue-exhaustion rules are creatures of statute or regulation" but where the "regulations are silent, . . . courts decide whether to require issue exhaustion based on an analogy to the rule that appellate courts will not consider arguments not raised before trial courts.") (quotation omitted). Absent a statutory or regulatory mandate that issues not exhausted will or must be deemed waived, however, reviewing tribunals regularly exercise discretion to determine whether "exceptional" or "special" circumstances permit consideration of a newly raised issue. *See Ross* v. *Blake,* 578 U.S. 632, 639 (2016) (comparing mandatory and discretionary issue exhaustion requirements). Likewise, under OSHA's whistleblower regulations governing issue exhaustion, the ARB regularly considers whether to permit consideration of newly raised issues under special circumstances. *See, e.g., Williams* v. *QVC, Inc.,* ARB No. 2020–0019, 2023 WL 1927097, at *4 n.43 (ARB Jan. 17, 2023) (construing pro se litigant's petition for review broadly to include issues not specified in petition despite issue exhaustion requirements under parallel provision at 29 CFR 1980.110); *Furland* v. *Am. Airlines, Inc.,* ARB Nos. 09–102, 10–130, 2011 WL 3413364, at *7 n.5 (ARB July 27, 2011) (ARB retained authority under parallel regulation at 29 CFR 1979.110(a) to hear issue on appeal not specifically listed in petition for review but consistently advanced before ALJ).

In the NPRM, the Department intended to make explicit the existing application of discretionary issue exhaustion principles to H–2A enforcement proceedings. 88 FR at 63809. This revision was intended to better inform parties of the potential consequences of failing to include issues for review in a request for hearing, and thus ultimately to reduce the instances in which parties attempt to raise new issues in later stages of the proceedings. *Id.* By use of the language "ordinarily will be deemed waived" in the NPRM, the Department intended to retain the discretion currently afforded reviewing tribunals in determining whether a particular issue may be raised at a later stage in the proceeding, consistent with the principles of due process and equity raised in the comment. The Department did not intend to propose a mandatory waiver rule. However, considering ma´sLabor's comment, the Department recognizes it may have suggested otherwise in the NPRM and therefore replaces the phrase "ordinarily will" with "may" in this final rule. The revised language better reflects the discretionary nature of issue exhaustion under these regulations, whereby waiver is the general rule, though tribunals, in their discretion, may consider whether "special" or "exceptional" circumstances exist. *Ross,* 578 U.S. at 640. In addition, the Department notes that this revised language is more consistent with the language used in OSHA's more recently promulgated whistleblower regulations, which OSHA adopted to address similar concerns as raised here by ma´sLabor. *See, e.g.,* 89 FR. 69115 (Nov. 9, 2015); 77 FR 40494 (July 10, 2012).

## VIII. Administrative Information

*A. Executive Order 12866: Regulatory Planning and Review, Executive Order 14094: Modernizing Regulatory Review, and Executive Order 13563: Improving Regulation and Regulatory Review*

Under Executive Order (E.O.) 12866, OMB's Office of Information and Regulatory Affairs (OIRA) determines whether a regulatory action is significant and, therefore, subject to the requirements of the Executive Order and review by OMB. Regulatory Planning and Review, 58 FR 51735 (Oct. 4, 1993). Section 3(f) of E.O. 12866, as amended by E.O. 14094, defines a "significant regulatory action" as an action that is likely to result in a rule that: (1) has an annual effect on the economy of $200 million or more, or adversely affects in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, Territorial, or Tribal governments or communities; (2) creates serious inconsistency or otherwise interferes with an action taken or planned by another agency; (3) materially alters the budgetary impacts of entitlement, grants, user fees, or loan programs, or the rights and obligations of recipients thereof; or (4) raises legal or policy issues for which centralized review would meaningfully further the President's priorities or the principles set forth in the Executive Order. Modernizing Regulatory Review, 88 FR 21879, 21879 (Apr. 11, 2023). OIRA has reviewed this rule and designated it a significant regulatory action under E.O. 12866. The Secretary of Homeland Security, in consultation with the Secretary of Labor and Secretary of Agriculture, has approved this rule consistent with section 301(e) of the Immigration Reform and Control Act of 1986, 8 U.S.C. 1188 note.[111]

E.O. 13563 directs agencies to, among other things, propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; the regulation is tailored to impose the least burden on society, consistent with achieving the regulatory objectives; and in choosing among alternative regulatory approaches, the agency has selected those approaches that maximize net benefits. Improving Regulation and Regulatory Review, 76 FR 3821, 3821 (Jan. 21, 2011). E.O. 13563 recognizes that some costs and benefits are difficult to quantify and provides that, where appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts. *Id.*

Outline of the Analysis

Section VIII.A.1 describes significant issues raised in the public comments. Section VIII.A.2 describes the need for the rule. Section VIII.A.3 describes the process used to estimate the costs of the rule and the general inputs used, such as wages and number of affected entities. Section VIII.A.4 explains how the provisions of the rule will result in quantified costs and transfer payments and presents the calculations the Department used to estimate them. In addition, Section VIII.A.4 describes the unquantified transfer payments and unquantified cost savings of the rule and a description of qualitative benefits. Section VIII.A.5 summarizes the estimated first-year and 10-year total and annualized costs and transfer payments of the rule. Section VIII.A.6 describes the regulatory alternatives that were considered during the development of the rule.

---

[111] Although this provision vests approval authority in the "Attorney General," the Secretary of Homeland Security now may exercise this authority. *See* 6 U.S.C. 202(3)–(4), 251, 271(b), 291, 551(d)(2), 557; 8 U.S.C. 1103(c) (2000).

Summary of the Analysis

The Department estimates that the rule will result in costs and transfer payments. As shown in Exhibit 1, the rule is expected to have an annualized quantifiable cost of $1.96 million and a total 10-year quantifiable cost of $13.74 million, each at a discount rate of 7 percent.[112] The rule is estimated to result in annualized quantifiable transfer payments from H–2A employers to H–2A employees of $12.66 million and total 10-year transfer payments of $88.92 million at a discount rate of 7 percent.[113]

EXHIBIT 1—ESTIMATED MONETIZED COSTS AND TRANSFER PAYMENTS OF THE FINAL RULE

[2022 $millions]

|  | Costs | Transfer payments |
|---|---|---|
| Undiscounted 10-Year Total .................................................................... | $18.35 | $123.42 |
| 10-Year Total with a Discount Rate of 3% ............................................ | 16.08 | 106.46 |
| 10-Year Total with a Discount Rate of 7% ............................................ | 13.74 | 88.92 |
| 10-Year Average ...................................................................................... | 1.84 | 12.34 |
| Annualized at a Discount Rate of 3% .................................................... | 1.89 | 12.48 |
| Annualized at at a Discount Rate of 7% ................................................ | 1.96 | 12.66 |

The total quantifiable cost of the rule is associated with rule familiarization and the provisions requiring additional information disclosure on the H–2A Applications. Transfer payments are the results of the elimination of the effective date delay for updated AEWRs. See the "Costs" and "Transfer Payments" subsections of Section VIII.A.4 (Subject-by-Subject Analysis) below for a detailed explanation.

The Department was unable to quantify some costs, transfer payments, cost savings, and benefits of the rule. Unquantified costs include costs to employers to reinstall or repair seat belts in vehicles used for worker transportation to comply with this final rule and costs to newly included entities whose ES services can be discontinued. Unquantified transfer payments include compensation to workers under § 655.175(b)(2)(i)–(ii) in cases where the start of work is delayed without sufficient notice and clarifying that applicable prevailing piece rates and other non-hourly wage rates should be included in the job order where such rates have the potential to be the highest wage rate of those listed at § 655.120(a), § 653.501(c), or § 655.210(g). Unquantified cost savings include the Department's ability to deny labor certification applications filed by or on behalf of successors in interest to debarred employers, agents, or attorneys. Unquantified benefits include better protection from inappropriate termination, protection for worker advocacy, reduction in risk of injury during employer-sponsored transportation, and reduction in improper holding of passports or other immigration documents. The Department describes them qualitatively in Section VIII.A.4 (Subject-by-Subject Analysis).

1. Significant Issues Raised in Public Comments

Several commenters submitted feedback in response to the NPRM's regulatory impact analysis or otherwise addressing the potential impact of this rulemaking on affected entities. Commenters, including IFPA, GFVGA, and the Michigan Asparagus Advisory Board, contended that the Department did not quantify benefits. As explained in Section VIII.A.4.d, the Department considered various benefits of this rule, but due to data limitations, the Department was not able to quantitatively estimate the benefits. The commenters that requested additional robust benefit quantification did not provide any information or data that would help the Department quantitatively assess the benefits of this rule, either. As a result, the Department qualitatively discusses the benefits, but nonetheless believes that the benefits outweigh the costs of this rule.

Several commenters, such as trade associations and individual employers, submitted feedback that the estimate of the time burden for rule familiarization was an underestimate. As explained in Section VIII.A.4.a, the Department considered these comments and has increased the time burden associated with rule familiarization cost to 4 hours on average. The Department used the words per minute (WPM) approach to estimate the time to read and understand the regulatory text by assuming a reading speed of 238 words per minute.[114] Because the regulatory text contains over 12,500 words, the Department estimates that employers will need about 1 hour to read and understand this text.[115] The Department assumes that not all employers will read the entire final rule preamble, although some may review portions of it in an effort to better understand particular provisions. As such, the Department quadrupled the time required to read the regulatory text to account for the fact that some employers will read some sections of the preamble, as relevant, in addition to the regulatory text, alongside compliance assistance materials provided by the Department.

Several commenters, including trade associations and individual employers, submitted feedback that the time burden costs of the rule were underestimated, including those related to wage costs, labor contractors, rule familiarization, and application additions. The Department notes that, while some H–2A employers may not directly employ an HR specialist to conduct these tasks, many use HR service providers for consulting on regulatory and HR matters and, therefore, using the wage rate for an HR specialist is appropriate. As explained in Section VIII.A.4.a, the Department considered all of the comments received on this cost component and, as discussed above, revised the time burden associated with rule familiarization cost.

These commenters also stated that the time burden estimate of the provisions requiring additional information disclosure on the H–2A Applications

---

[112] The rule will have annualized quantifiable cost of $1.89 million and a total 10-year quantifiable cost of $16.08 million at a discount rate of 3 percent in 2022 dollars.

[113] The rule will have annualized quantifiable transfer payments from H–2A employers to H–2A employees of $12.48 million and total 10-year transfer payments of $106.46 million at a discount rate of 3 percent in 2022 dollars.

[114] Marc Brysbaert, *How Many Words Do We Read Per Minute? A Review and Meta-Analysis of Reading Rate*, PsyArXiv (Apr. 12, 2019), *https://*

*doi.org/10.31234/osf.io/xynwg*. We use the average speed for silent reading of English nonfiction by adults.

[115] 12,500 ÷ 238 = 53 minutes, and the Department used 1 hour for employers to read and understand the regulatory text.

was underestimated but did not provide any information or data that would help the Department assess how to modify the time costs of the provisions. The Department did not change its estimate of time burden for these provisions because most of the information required should be readily available to employers and they should likely maintain and update them in their personnel records system or files. Given the data available and the lack of additional information from commenters, the Department did its best to quantify costs, transfers, and benefits. For costs, transfers, and benefits that were not quantifiable, the Department provided qualitative discussions and sought public comments and input. The Department believes that these time burden estimates are appropriate because they represent an average impact across all impacted employers.

American Farm Bureau Federation submitted feedback that the estimated growth rates regarding the H–2A program were low, which reduced the estimated costs of the rule. The Department has updated the growth rate analyses with 2022 H–2A certification data, and the corresponding estimates of H–2A program growth metrics have increased. The Department believes that these growth rate estimates are appropriate because they utilize the most recently available data on the H–2A program.

NHC submitted feedback that the estimated time burdens of the rule for employers were underestimated because they did not consider time costs of revising payroll systems, worker productivity tracking, productivity loss from third-party participation in disciplinary meetings, losses due to more injured workers, and costs of retrofitting employer transportation. The trade association stated that employee contract changes would cost a large grower more than 275 hours per year. The Department quantifies average costs, transfers, and benefits for all impacted entities, not just large employers. For costs and benefits that were not quantifiable, the Department provided qualitative discussions and sought public comments and input. Neither this commenter nor other commenters, however, provided any information or data that would help the Department better quantitatively assess the relevant costs.

Wafla submitted feedback that the estimated time burden for application additions, specifically the additional disciplinary steps, was underestimated. However, it did not provide any information or data that would help the Department better quantitatively assess

the average time costs for all impacted entities. The Department contends that the progressive disciplinary process to terminate H–2A workers for cause may not occur for every employer and, as a result, has sought to quantify the average time burden for application additions across all employers using available data.

### 2. Need for Regulation

The Department adopts provisions in this final rule that will strengthen protections for agricultural workers and enhance the Department's enforcement capabilities against fraud and program violations. The Department has determined that these revisions will help prevent exploitation and abuse of agricultural workers and ensure that unscrupulous employers do not gain from their violations or contribute to economic and workforce instability by circumventing the law. It is the policy of the Department to maintain robust protections for workers and to vigorously enforce all laws within its jurisdiction governing the administration and enforcement of nonimmigrant visa programs. As set forth above in detail in sections V through VII, the Department has determined through program experience, recent litigation, comments on prior rulemaking, and reports from various workers' rights advocacy organizations that the provisions in this final rule are necessary to strengthen protections for agricultural workers; ensure that employers, agents, attorneys, and labor recruiters comply with the law; and enhance the Department's ability to monitor compliance and investigate and pursue remedies from program violators. For example, in 421 investigations of agricultural employers using the H–2A program in FY 2022, the Department assessed more than $3.6 million in back wages and more than $6.3 million in civil money penalties. Evidence revealed in recent Department investigations suggests that H–2A workers continue to be vulnerable to human trafficking.[116] H–2A workers also continue to be vulnerable to retaliation when asserting their rights or

engaging in self-advocacy.[117] Meanwhile, recent vehicle crashes involving agricultural workers demonstrate the need for transportation safety reform.[118]

The rule aims to address some of the comments that were beyond the scope of the 2022 H–2A Proposed Rule and concerns expressed by workers' rights advocacy groups, labor unions, and organizations that combat human trafficking. It also seeks to respond to recent court decisions and program experience indicating a need to enhance the Department's ability to enforce regulations related to foreign labor recruitment, to improve accountability for successors in interest and employers who use various methods to attempt to evade the law and regulatory requirements, and to enhance worker protections for a vulnerable workforce, as explained further in the section-by-section discussion above. The Department has also made adjustments to the proposed regulations after consideration of the comments received, including declining to adopt the proposals to reduce submission periods for appeal requests for OFLC and WHD debarment matters and submittal of rebuttal evidence to OFLC, to require employers to provide labor organizations with employee contact information and access to employer-furnished housing, and to require employers to attest to whether they will bargain in good faith over the terms of a proposed labor neutrality agreement.

The Department intends for this rulemaking to better protect the rights,

---

[116] See, e.g., DOJ, Press Release, *Owner of Farm Labor Contracting Company Pleads Guilty in Racketeering Conspiracy Involving the Forced Labor of Mexican Workers* (Sept. 27, 2022), *https://www.justice.gov/opa/pr/owner-farm-labor-contracting-company-pleads-guilty-racketeering-conspiracy-involving-forced;* DOJ, Press Release, *Three Defendants Sentenced in Multi-State Racketeering Conspiracy Involving Forced Labor of Mexican Agricultural H–2A Workers* (Oct. 27, 2022), *https://www.justice.gov/opa/pr/three-defendants-sentenced-multi-state-racketeering-conspiracy-involving-forced-labor-mexican.*

[117] See, e.g., DOL, News Release, *Federal Court Orders Louisiana Farm, Owners to Stop Retaliation After Operator Denied Workers' Request for Water, Screamed Obscenities, Fired Shots* (Oct. 28, 2021), *https://www.dol.gov/newsroom/releases/whd/whd20211028-0;* DOL, News Release, *US Department of Labor Fines North Carolina Employers $139K After They Shortchanged Farmworkers; Seized Passports, Visas to Intimidate Them* (Nov. 16, 2021), *https://www.dol.gov/newsroom/releases/whd/whd20231116;* DOL, News Release, *Department of Labor Debars Labor Contractor Who Threatened, Intimidated Farmworkers; Assesses $62K in Penalties for Abuses of Agricultural Workers* (Oct. 23, 2023), *https://www.dol.gov/newsroom/releases/whd/whd20231023;* DOL, News Release, *US Department of Labor Investigation Results in Judge Debarring North Carolina Farm Labor Contractor for Numerous Guest Worker Visa Program Violations* (Mar. 16, 2021), *https://www.dol.gov/newsroom/releases/whd/whd20210316;* DOL, News Release, *Corrected: US Department of Labor Investigations of Labor Contractors, Vineyard Yield $231K in Penalties, Recover $129K in Back Wages for 353 Agricultural Workers* (Jun. 1, 2023), *https://www.dol.gov/newsroom/releases/whd/whd20230601-0.*

[118] See, e.g., DOL, News Release, *U.S. Department of Labor Urges Greater Focus on Safety by Employers, Workers as Deaths, Injuries in Agricultural Transportation Incidents Rises Sharply* (Sept. 20, 2022), *https://www.dol.gov/newsroom/releases/whd/whd20220920-0.*

health, and safety of agricultural workers as well as to prevent adverse effect on workers similarly employed in the United States and to safeguard the integrity of the H–2A program, while continuing to ensure that responsible employers have access to willing and available agricultural workers and are not unfairly disadvantaged by employers that exploit workers and attempt to evade the law.

### 3. Analysis Considerations

The Department estimated the costs and transfer payments of this final rule relative to the existing baseline (*i.e.,* the current practices for complying, at a minimum, with the H–2A program as currently codified at 20 CFR part 655, subpart B, and 29 CFR part 501).

In accordance with the regulatory analysis guidance articulated in OMB's Circular A–4 [119] and consistent with the Department's practices in previous rulemakings, this regulatory analysis focuses on the likely consequences of the rule (*i.e.,* costs, benefits, and transfer payments that accrue to entities affected). The analysis covers 10 years (from 2025 through 2034) to ensure it captures major costs, benefits, and transfer payments that accrue over time. The Department expresses all quantifiable impacts in 2022 dollars and uses discount rates of 3 and 7 percent, pursuant to Circular A–4 published on October 9, 2003.

Exhibit 2 presents the number of affected entities that are expected to be impacted by this final rule.[120] The average number of affected entities is calculated using OFLC H–2A certification data from FY 2016 through FY 2022. Exhibit 3 presents the number of workers who are expected to be impacted by this final rule. The exhibit contains the number of certified H–2A workers from FY 2012 through FY 2022.

### EXHIBIT 2—NUMBER OF UNIQUE EMPLOYERS BY YEAR

| FY | Number |
|---|---|
| 2016 | 6,713 |
| 2017 | 7,187 |

[119] OMB Circular No. A–4, *Regulatory Analysis* (2023).

[120] OFLC, *Performance Data, https:// www.dol.gov/agencies/eta/foreign-labor/ performance* (last visited Feb. 8, 2024).

### EXHIBIT 2—NUMBER OF UNIQUE EMPLOYERS BY YEAR—Continued

| FY | Number |
|---|---|
| 2018 | 7,902 |
| 2019 | 8,391 |
| 2020 | 7,785 |
| 2021 | 9,442 |
| 2022 | 10,571 |
| Average | 8,284 |

### EXHIBIT 3—HISTORICAL H–2A PROGRAM DATA

| FY | Workers certified |
|---|---|
| 2012 | 85,248 |
| 2013 | 98,814 |
| 2014 | 116,689 |
| 2015 | 139,725 |
| 2016 | 165,741 |
| 2017 | 199,824 |
| 2018 | 242,853 |
| 2019 | 258,446 |
| 2020 | 275,430 |
| 2021 | 317,619 |
| 2022 | 371,619 |

#### a. Growth Rate

The Department estimated growth rates for certified H–2A workers based on program data presented in Exhibit 3 and estimated growth rates for unique H–2A employers based on program data presented in Exhibit 2.

The compound annual growth rate (CAGR) for certified H–2A workers using the program data in Exhibit 3 is calculated as 15.9 percent. This growth rate, applied to the analysis timeframe of 2025 to 2034, would result in more H–2A certified workers than projected employment of workers in the relevant H–2A SOC codes by BLS.[121] Therefore, to estimate realistic growth rates for the analysis, the Department applied the growth rate for unique employers, assuming the growth rate for unique employers and workers should be similar. The Department used FY 2016–2022 data on unique employers, where the use of FY 2016 as the first year is

[121] Comparing BLS 2032 projections for combined agricultural workers (SOC 45–2000) with a 14.8-percent growth rate of H–2A workers yields estimated H–2A workers about 178 percent greater than BLS 2032 projections. The projected workers for the agricultural sector were obtained from BLS's Occupational Projections and Worker Characteristics, *https://www.bls.gov/emp/tables/ occupational-projections-and-characteristics.htm.*

due to data availability on calculated unique employers. The Department calculated a CAGR based on FY 2016 unique employers (6,713) and the FY 2022 unique employers (10,571). The result is an estimate of 7.9 percent.[122]

The estimated annual growth rates for unique employers (7.9 percent) and workers (7.9 percent) were applied to the estimated costs and transfers of this final rule to forecast participation in the H–2A program.[123]

#### b. Compensation Rates

In Section VIII.A.4 (Subject-by-Subject Analysis), the Department presents the costs, including labor, associated with the implementation of the provisions of the rule. Exhibit 4 presents the hourly compensation rates for the occupational categories expected to experience a change in the number of hours necessary to comply with the rule. The Department used the mean hourly wage rate for a private sector HR Specialist (SOC code 13–1701).[124] Wage rates are adjusted to reflect total compensation, which includes nonwage factors such as overhead and fringe benefits (*e.g.,* health and retirement benefits). We use an overhead rate of 17 percent [125] and a fringe benefits rate based on the ratio of average total compensation to average wages and salaries in 2022.[126] We then multiply the loaded wage factor by the wage rate to calculate an hourly compensation rate. The Department used the hourly compensation rates presented in Exhibit 4 throughout this analysis to estimate the labor costs for each provision.

[122] Calculation: 7.9% = $(10{,}571 \div 6{,}713)^{(1 \div 6)} - 1$.

[123] Proposed forecasted estimates of H–2A employer participation: 11,419 in 2023; 12,335 in 2024; 13,325 in 2025; 14,394 in 2026; 15,548 in 2027; 16,796 in 2028; 18,143 in 2029; 19,599 in 2030; 21,171 in 2031; and 22,869 in 2032.

[124] BLS, *National Occupational Employment and Wage Estimates: 13–1701* (May 2021), *https:// www.bls.gov/oes/current/oes131701.htm* (last visited Feb. 8, 2024).

[125] Cody Rice, U.S. Envtl. Prot. Agency, *Wage Rates for Economic Analyses of the Toxics Release Inventory Program* 7 (June 10, 2002), *https:// www.regulations.gov/document?D=EPA-HQ-OPPT-2014-0650-0005.*

[126] BLS, News Release, *Employer Costs for Employee Compensation – December 2022* (Mar. 17, 2023), *https://www.bls.gov/news.release/archives/ ecec_03172023.pdf.* Ratio of total compensation to wages and salaries for all private industry workers: $40.23 \div 28.37 = 1.418$.

### EXHIBIT 4—COMPENSATION RATES
[2022 dollars]

| Position | Grade level | Base hourly wage rate | Loaded wage factor | Overhead costs | Hourly compensation rate |
|---|---|---|---|---|---|
| (a) | | (b) | (c) | (d) | (d = a + b + c) |
| HR Specialist ..................... | N/A ............... | $35.13 | $14.75 ($35.13 × 0.42) | $5.97 ($35.13 × 0.17) | $55.79 |

#### 4. Subject-by-Subject Analysis

The Department's analysis below covers the estimated costs, transfer payments, and qualitative benefits of this final rule. In accordance with Circular A–4, the Department considers transfer payments as payments from one group to another that do not affect total resources available to society. This final rule estimated the cost of rule familiarization and application additions and transfer payments associated with the elimination of the delayed effective date for updated AEWRs.

#### a. Costs

The following section describes the quantified and unquantified costs of this final rule.

#### i. Quantified Costs

The following sections describe the quantified costs of rule familiarization and the provisions requiring additional information disclosure on the H–2A Application.

#### A. Rule Familiarization

When the rule takes effect, H–2A employers will need to familiarize themselves with the new regulations. Consequently, this will impose a one-time cost in the first year. New employers in each subsequent year will need to familiarize themselves with current regulations regardless of this final rule.

To estimate the cost of rule familiarization, the Department applied the growth rate of H–2A employers (7.9 percent) to the number of unique H–2A employers (8,284) to determine the number of unique H–2A applicants impacted in the first year. For subsequent years, the number of new employers was estimated by multiplying the previous year's employer count by the growth rate of H–2A employers (7.9 percent) and then subtracting that value from the previous year's total employer count. Exhibit 5 details the number of new employers for each year of the analysis.

### EXHIBIT 5—NUMBER OF NEW EMPLOYERS BY YEAR

| FY | Total employers | New employers |
|---|---|---|
| 2025 .......... | 8,938 | N/A |
| 2026 .......... | 9,645 | 706 |
| 2027 .......... | 10,406 | 762 |
| 2028 .......... | 11,229 | 822 |
| 2029 .......... | 12,116 | 887 |
| 2030 .......... | 13,073 | 957 |
| 2031 .......... | 14,106 | 1,033 |
| 2032 .......... | 15,220 | 1,114 |
| 2033 .......... | 16,422 | 1,202 |
| 2034 .......... | 17,720 | 1,297 |

The number of unique H–2A employers in the first year (8,947), and the new H–2A employers in subsequent years (see Exhibit 5), was multiplied by the estimated amount of time required to review the rule (4 hours). This number was then multiplied by the hourly compensation rate of an HR specialist ($35.13 per hour) and the loaded wage factor and the overhead rate for the private sector (1.59). This calculation results in a total undiscounted cost of $3,954,528 over the 10 years after the rule takes effect. The annualized cost over the 10-year period is $429,662 and $479,217 at discount rates of 3 and 7 percent, respectively.

#### B. Additional Information Disclosure on the H–2A Application

Once the rule takes effect, H–2A employers will need to submit additional information on the H–2A Application, which will impose a yearly cost as the time associated with filling out this information is required for every application for certification. The additional information includes the names, addresses, business phone numbers, and dates of birth for the owner(s) of each employer, each operator of the place(s) of employment, and all managers and supervisors of workers employed under the H–2A Application; DBA information; and information about the identity and location of any foreign labor recruiter the employer engaged, directly or indirectly, in international recruitment, as well as all persons and entities hired by or working for the recruiter or agent, and any of the agents or employees of those persons and entities.

To estimate the yearly cost of the application additions, the Department applied the growth rate of H–2A employers (7.9 percent) to the current number of unique certified H–2A employers (8,284) to determine the number of unique H–2A employers in the first year (8,938). The number of unique certified H–2A employers in the first year is then multiplied by the growth rate again to determine the number of unique certified H–2A employers in the second year. This process is repeated each year to determine the total number of unique certified H–2A employers every year during the study period. Since it is assumed that only a single HR specialist per employer will incur the additional time investment, the estimated total yearly cost can be calculated by multiplying the total number of unique certified H–2A employers (8,938) by the HR specialist hourly wage rate ($35.13 per hour), the loaded wage factor and the overhead rate for the private sector (1.59), and the estimated additional time taken to gather and enter the information on a yearly basis (2 hours on average). Lastly, this value is multiplied by the growth rate of unique employers (7.9 percent) to the $n$th power, with $n$ being equal to the period year. The result is $999,543 in the first year, an undiscounted average cost over a 10-year period of $1,439,694, and discounted annualized costs of $1,455,791, and $1,476,738 at rates of 3 and 7 percent, respectively.

#### ii. Unquantified Costs

#### A. Transportation: Seat Belts for Drivers and Passengers

As part of this final rule, employers will have to ensure seat belts are provided for drivers and passengers in transportation vehicles used to transport H–2A and corresponding workers that were required by U.S. DOT's FMVSS to be manufactured with seat belts. This could impose both a one-time and annual cost to those employers who had previously lawfully modified or removed seat belts in such vehicles and

would be required to reinstall or repair seat belts to comply with this final rule through the cost of reinstalling or repairing the necessary seat belts and the decreased fuel efficiency of transportation vehicles caused by the additional weight of the seat belts. The Department estimates the cost of installing a driver's seat belt to be $26.60 per seat belt and the cost of installing a passenger seat belt to be $17.44 per seat belt.[127] The Department does not have data to estimate the number of seat belts to be reinstalled or repaired, or (in the alternative) vehicles that would need to be purchased, to provide seat belts for drivers and passengers in the above scenario. The Department requested public comments on data and information that would support estimating the cost of reinstalling or repairing seat belts but received no responses.

### B. Discontinuation of Services to Employers by the ES System

The final rule clarifies and expands the scope of entities whose ES services can be discontinued to include agents, farm labor contractors, joint employers, and successors in interest. Because the final rule expands the scope of applicable entities that may experience discontinuation of services, the Department does not have preexisting data available on costs to those entities, and the Department is not able to quantify potential increased costs for them. However, the Department recognizes that some commenters contend that employers might incur costs related to delays in processing clearance orders, including administrative costs, legal fees, and productivity losses. The Department cannot quantify these specific costs because each employer's circumstances will be unique. Additionally, it is possible that the number of discontinuation-of-services actions SWAs initiate might increase due to the changes in the final rule that clarify when and how the procedures apply. However, because the procedures were not frequently used previously and because the number of actions will depend on actual employer compliance, it is not possible to estimate the related potential burden.

### b. Unquantified Cost Savings

The following section describes the unquantified cost savings of this final rule.

#### i. Successors in Interest

Once this final rule takes effect, the Department will be able to deny labor certification applications filed by or on behalf of successors in interest to debarred employers, agents, or attorneys. Currently, the Department must first issue a separate notice of debarment to the successor in interest, and go through a lengthy administrative hearing and review process, before it may deny an application filed by or on behalf of a successor. The rule will, therefore, result in cost savings to the Department from not having to go through the process to debar successors in interest but instead applying the predecessor's debarment to the successor. The Department lacks detailed data on the length of time necessary to enter a proposed order of debarment against successors under the current regulations, as well as the annual number of successor debarments, and as a result is unable to accurately quantify this cost savings.[128]

#### c. Transfer Payments

The following section describes the transfer payments of this final rule.

#### i. Quantified Transfer Payments

This section discusses the quantifiable transfer payments related to the elimination of the 2-week effective date delay for AEWR publication. The Department considers transfers as payments from one group to another that do not affect total resources available to society. The transfers measured in this analysis are wage transfers from U.S. employers to H–2A workers. H–2A workers are migrant workers who will spend some of their earnings on consumption goods in the U.S. economy but likely send a large

fraction of their earnings to their home countries.[129] Therefore, the Department considers the wage transfers in the analysis as transfer payments within the global economic system.

### A. Elimination of the effective date delay for updated AEWRs

Currently, the Department publishes the AEWR as soon as data are available, typically in the middle of December for AEWRs based on FLS data.[130] There is then a 2-week delay until the AEWR is effective, typically January 1st of the following year. Once the rule takes effect, the 2-week delay until the AEWR is effective will be removed and the AEWR will be effective immediately upon publication in the **Federal Register**. Therefore, employers that employ workers during the 2-week period from mid-December to early January will see a transfer to employees

---

[127] These costs were calculated by inflation-adjusting the 2008 cost of types of seat belts listed in NHTSA, *Final Regulatory Impact Analysis: FMVSS No. 208, Lap/Shoulder Belts for All Over-The-Road Buses, and Other Buses with GVWRs Greater Than 11,793 kg (26,000 lb)* (Sept. 2013), *https://www.regulations.gov/document/NHTSA-2013-0121-0002*.

[128] The Department lacks such information because each debarment action is unique and the facts of each situation dictate how long a debarment action will take. At the time of drafting this final rule, there are currently 35 debarred H–2A entities and 59 debarred H–2B entities, which, as a result of the cross-program debarment provisions at 20 CFR 655.73(i), also debar those entities from filing applications in any other DOL-administered immigration programs such as the H–2A program. Any of those entities could potentially file one or more applications each year for one or more successor in interest employers or as successor in interest agents or attorneys or both. Due to the variables mentioned above, the Department is unable to estimate how many such filings may be submitted in any given period of time nor to estimate how complex each debarment action would be if the Department were to seek debarment against the successor.

[129] Elimination of the effective date delay for updated AEWRs will also result in wage transfers from U.S. employers to workers in corresponding employment, but the Department is not able to quantify this transfer due to the lack of data for workers in corresponding employment and their wages. In particular, the Department does not collect or possess sufficient information about the number of corresponding workers affected and their wage payment structures to reasonably measure the transfers to corresponding workers. Employers are not required to provide the Department, on any application or report, the estimated or actual total number of workers in corresponding employment. Although each employer, as a condition of being granted a temporary agricultural labor certification, must provide the Department with a report of its initial recruitment efforts for U.S. workers, including the name and contact information of each U.S. worker who applied or was referred to the job, such information typically reflects only a very small portion of the total recruitment period, which runs through 50 percent of the certified work contract period, and does not account for any other workers who may be considered in corresponding employment and already working for the employer. Because the report of initial recruitment efforts for U.S. workers only captures information from a limited portion of the recruitment period and does not account for workers already employed by the employer who may be in corresponding employment, the Department is not able to draw on this information to meaningfully assess the total number of corresponding workers affected or their wage payment structures, without which the Department is unable to reasonably measure the transfers to corresponding workers. The Department sought public comment on how these wage transfer impacts can be calculated but received no comments.

[130] New AEWRs based on OEWS data currently become effective on or around July 1st for the small percentage of job opportunities that cannot be encompassed within the SOC codes for AEWRs that are based on the FLS field and livestock workers (combined) data. The use of OEWS data to calculate AEWRs in limited circumstances was the result of a change made under the Department's 2023 AEWR Final Rule. *See* 88 FR 12760, 12764–65 (Feb. 28, 2023). The analysis here is limited to FY 2020 and FY 2021 H–2A certification data, during which period the AEWR was calculated based only on FLS data, and thus, the analysis focuses on the 2-week period from mid-December to early January that is associated with the publication and effective dates of FLS-based AEWRs under current practice.

due to the elimination of the 2-week delay of wage increases from the publication date of updated AEWRs.

To estimate the transfer, the Department first uses FY 2020 and FY 2021 H–2A certification data to calculate the weighted average increase in AEWR from one year to the next.[131] The Department weights the average by the number of workers in each State with employment between December 14th and the end of the year to account for regional differences in employment during December. The result is an average increase in the AEWR by $1.09.[132] The Department then calculates the average number of days worked between December 14th and the end of the year (11.87) using the FY 2020 and FY 2021 H–2A certification data. The Department estimates the average annual number of workers with work during this period using the H–2A certification data (89,208).[133]

The Department determines the total amount of the transfers by multiplying the 2-year weighted AEWR difference for end-of-year employment (1.09), the 2-year average number of days worked between December 14th and the end of year (11.87), the average number of work hours in a day (7.4),[134] and the number of H–2A workers during this period (89,208). To determine the

[131] OFLC, *Performance Data, https://www.dol.gov/agencies/eta/foreign-labor/performance* (last visited Feb. 8, 2024).

[132] Because FY 2020 and FY 2021 H–2A certification data do not reflect the wage increases due to the 2023 AEWR Final Rule, as explained in a previous footnote, the transfer payments estimated in the analysis are likely understated in that they may not account for the main change under that rule, namely the limited job opportunities that would be subject to updated AEWRs based on the OEWS data. *See* 88 FR at 12764–65. The 2023 AEWR Final Rule became effective on March 30, 2023, and, therefore, the Department does not have any readily available FY H–2A certification data to estimate wage transfer payments after the publication of the 2023 AEWR Final Rule. The Department, moreover, sought public comment on how these wage transfer impacts can be calculated but received no comments. However, the 2023 AEWR Final Rule explained that the Department anticipates a very limited number of H–2A job opportunities would be subject to the OEWS-based AEWR, as the majority of H–2A job opportunities are and will continue to remain subject to FLS-based AEWRs. *See* 88 FR at 12766, 12799. As such, the Department considers the impacts of the potential underestimation here to be *de minimis* because of the low incidence of job opportunities assigned the OEWS AEWR pursuant to the 2023 AEWR Final Rule.

[133] The Department uses the growth rate of H–2A workers (7.9 percent) to produce proposed forecasted estimates of H–2A workers: 96,247 in 2023; 103,840 in 2024; 112,033 in 2025; 120,873 in 2026; 130,410 in 2027; 140,699 in 2028; 151,800 in 2029; 163,777 in 2030; 176,699 in 2031; and 190,641 in 2032.

[134] The Department analyzed FY 2020 and FY 2021 certification data for end-of-year employers that reported anticipated hours per day, resulting in an average of 7.4 hours per day.

transfers for every year in the 10-year period, the total number of H–2A workers during the period is multiplied by the growth rate of H–2A workers (7.9 percent). The same process is repeated for every year in the period. The total undiscounted average annual transfers associated with this provision is $12,342,109 and the discounted annualized transfers are $12,480,377 and $12,660,319 at discount rates of 3 and 7 percent, respectively. The Department also conducted a sensitivity analysis using the CAGR of 15.9 percent for H–2A workers. The resulting total undiscounted average annual transfers is $18,135,595, and the discounted annualized transfers are $18,037,709 and $17,901,328 at discount rates of 3 and 7 percent, respectively.

### ii. Unquantified Transfer Payments

This section discusses the unquantifiable transfer payments related to compensation during a minor delay in the start of work and piece rates.

### A. Compensation During a Minor Delay in the Start of Work Under §§ 655.175(b)(2)(ii) and 653.501(c)(5)

Currently, if an employer fails to notify the SWA of a start date change at least 10 days ahead of the originally anticipated date of need, it must offer work hours and pay the first week's wages to each farmworker referred through the ARS who followed the procedure to contact the SWA for updated start date information. If an H–2A employer delays the start of work after workers have departed for the place of employment, the employer must provide housing and subsistence to these workers until work commences. After this final rule takes effect, employers that do not notify both the SWA and the workers at least 10 business days before the anticipated start date will also be required to pay workers the hourly rate for each day work is delayed for a period of up to 14 calendar days, and, for workers placed on clearance orders via the ARS, will be required to provide housing to placed migrant workers until work commences, and to provide or pay workers all other benefits and expenses described on the clearance order, in addition to wages at the applicable rate, for up to 14 days, or provide alternative work approved on the clearance order, resulting in a transfer from employers to employees. The Department is unable to quantify this transfer because it lacks detailed data on the prevalence of job delays, the number of employees impacted by these delays, and the number of hours impacted by the delays on average, or

the number of hours employers must spend contacting employees, and as a result is unable to accurately quantify this transfer.

### B. Piece Rates

This final rule clarifies language within 20 CFR 655.120(a) and 655.122(l) to make clear that the employer is required to advertise and pay the highest of the AEWR, prevailing hourly wage or piece rate, CBA rate, Federal or State minimum wage, or any other wage rate the employer intends to pay. The final rule makes analogous changes to 20 CFR 653.501(c) and 655.210– 655.211, which govern the required wage rates for non-H–2A (non-criteria) clearance orders and clearance orders for herding and range livestock production occupations, respectively. The Department is unable to quantify these transfers because it lacks data on the frequency of instances when employers will have to pay higher wages as a result of including and considering applicable piece rates or other non-hourly wage rates in job offers. Specifically, from the comments received in response to the substantive proposal, it appears that some employers are already paying the applicable prevailing piece rates to be in compliance with the requirements of 20 CFR 655.120(a) and 655.122(l); in such cases, there would be no transfer. The Department sought public comment on how these wage transfer impacts can be calculated but did not receive comments on this issue.

### d. Unquantified Benefits

### i. Termination for Cause

This final rule requires that workers only be terminated for cause for failure to comply with employer policies or rules or to satisfactorily perform job duties in accordance with reasonable expectations based on criteria listed in the job offer, and only if the termination was justified and reasonable. The designation of a termination as being for cause strips workers of essential rights to which they would otherwise be entitled—specifically, the three-fourths guarantee, payment for outbound transportation, and, if a U.S. worker, the right to be contacted for re-hire in the following season—and, therefore, it is essential that workers not be deprived of these rights using inconsistent or unfair procedures. This final rule will require fairness in disciplinary and termination proceedings if the termination were to be designated as being for cause, which will prevent workers from being unjustly stripped of certain rights under the H–2A program. The Department

lacks data on the numbers of terminations for cause each year and whether those terminations were justified and reasonable, and the number of hours required by employers to document termination proceedings as defined by this rule.

### ii. Protections for Worker Advocacy and Self-Organization

The Department's final rule will provide stronger protections for workers covered by the H–2A program to advocate regarding their working conditions on behalf of themselves and their coworkers and will prevent employers from suppressing this activity. These protections will help prevent adverse effect on the working conditions of similarly employed agricultural workers in the United States and will increase the likelihood of worker advocacy and organizing while protecting those workers from intimidation and retaliation by employers. Worker advocacy organizations may also complement the Department's enforcement efforts in preventing wage-related violations and in ensuring workplace safety and health. In sum, protection for worker advocacy and self-organization provides unquantifiable benefits to workers under the H–2A program.

Although the Department lacks data on how to quantify the benefits of such improved compliance with existing worker protections, the final regulations should increase workers' dignity and safety and should help ensure that workers under the H–2A program can assert their rights without the unique risks associated with retaliation, thus helping to avoid an adverse effect from the H–2A program on similarly employed workers in the United States.

### iii. Transportation: Seat Belts for Drivers and Passengers

Once this final rule takes effect, employer-provided transportation will be required to have seat belts available for all workers transported, if those vehicles were required by U.S. DOT's FMVSS to be manufactured with seat belts. Seat belt use reduces the severity of crash-related injuries and deaths. The Department lacks data on the baseline number of crashes, whether those vehicles involved in crashes were equipped with seat belts and the occupants were using seat belts, and subsequent injuries or fatalities involving vehicles transporting H–2A workers, and, therefore, is not able to estimate the benefit from reduced fatalities or injuries.[135] The benefit from reducing even a single fatality or serious injury is significant. The value of a statistical life (VSL) that would measure the benefit of avoiding a fatality is estimated to be $11.8 million.[136] Recent NHTSA reports suggest avoiding injury crashes can be highly beneficial, with estimates that avoiding a critical injury crash is worth $3.8 million (32 percent of a fatality) and avoiding minor injuries is worth $63,000 (0.5 percent of a fatality), respectively.[137]

### iv. Protection Against Passport and Other Immigration Document Withholding

To better protect this vulnerable workforce from potential labor trafficking, the Department adopts revisions to flatly prohibit an employer, including through its agents or attorneys, from taking or withholding a worker's passport, visa, or other immigration or identification documents against the worker's wishes, independent of any other requirements under other Federal, State, or local laws,

in a new provision at 20 CFR 655.135(o). This new provision will help ensure that H–2A workers are less likely to be subject to labor exploitation and, thus, it safeguards the health, safety, and dignity of those workers and also prevents the depression of working conditions for the local agricultural workforce.

### 5. Summary of the Analysis

Exhibit 6 summarizes the estimated total costs and transfer payments of this final rule over the 10-year analysis period. The Department estimates the annualized costs of the rule at $1.96 million and the annualized transfer payments (from H–2A employers to employees) at $12.66 million, each at a discount rate of 7 percent. Unquantified transfer payments include the clarified employer obligation to include in the job order applicable prevailing piece rates and other non-hourly wage rates where such rates have the potential to be the highest wage rate of those listed at § 655.120(a), as well as the employer's obligation to compensate workers for a period of up to 14 calendar days where the employer delays the start date and fails to provide at least 10 business days' notice, as required under §§ 655.175(b)(2)(i)-(ii) and 653.501(c)(5). Unquantified cost savings include the Department's ability to deny labor certification applications filed by or on behalf of successors in interest to debarred employers, agents, or attorneys. Unquantified benefits include better protection from inappropriate termination, protection for worker advocacy, reduction in risk of injury during employer-sponsored transportation, reduction in improper holding of passports or immigration documents, and enhanced integrity and enforcement.

---

[135] BLS reported that 271 of 589 fatal workplace injuries suffered by agricultural workers in 2022 were caused by transportation-related incidents. However, the Department lacks data on the number of fatal workplace injuries that were caused by not wearing a seat belt or the number of vehicles involved in transportation-related incidents that were not equipped with seat belts.

[136] The VSL is used by U.S. DOT to value fatalities associated with vehicle crashes. The VSL is based upon the base year's VSL adjusted for the annual change in the Consumer Price Index. U.S. DOT, *Departmental Guidance on Valuation of a Statistical Life in Economic Analysis* (2021), *https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-on-valuation-of-a-statistical-life-in-economic-analysis* (last visited Feb. 8, 2024).

[137] These figures are based on MAIS4 (severe) and MAIS1 (minor) injury-per-crash costs estimated by NHTSA in Table 1–9 Summary of Comprehensive Unit Costs. NHTSA, *The Economic and Societal*

*Impact of Motor Vehicle Crashes,* 2019 (Revised) (Feb. 2023), *https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813403.*

EXHIBIT 6—ESTIMATED MONETIZED COSTS AND TRANSFER PAYMENTS OF THE FINAL RULE

[2022 $millions]

| | Costs | Transfer payments |
|---|---|---|
| 2024 | $2.99 | $8.56 |
| 2025 | 1.24 | 9.24 |
| 2026 | 1.33 | 9.97 |
| 2027 | 1.44 | 10.76 |
| 2028 | 1.55 | 11.60 |
| 2029 | 1.67 | 12.52 |
| 2030 | 1.81 | 13.51 |
| 2031 | 1.95 | 14.57 |
| 2032 | 2.10 | 15.72 |
| 2033 | 2.27 | 16.96 |
| Undiscounted 10-Year Total | 18.35 | 123.42 |
| 10-Year Total with a Discount Rate of 3% | 16.08 | 106.46 |
| 10-Year Total with a Discount Rate of 7% | 13.74 | 88.92 |
| 10-Year  Average | 1.84 | 12.34 |
| Annualized with a Discount Rate of 3% | 1.89 | 12.48 |
| Annualized with a Discount Rate of 7% | 1.96 | 12.66 |

### 6. Regulatory Alternatives

The Department considered two regulatory alternatives to provisions adopted in this final rule. The Department discusses below the advantages and disadvantages of these regulatory alternatives.

First, the Department considered a regulatory alternative to this final rule's provision in 20 CFR 655.120(b) to make updated AEWRs effective on the date of publication in the **Federal Register**. Under the alternative proposal, the AEWRs would become effective 7 calendar days after publication in the **Federal Register**. This proposal would have been a compromise between the immediate effective date finalized in this rule and the current effective date, which can be as many as 14 calendar days after the Department publishes the updated AEWR in the **Federal Register**. The benefit of the alternative proposal is that it would continue to provide employers a short window of time to adjust payroll or recordkeeping systems or make any other adjustments that may be necessary after the Department's announcement of updated AEWRs, while providing a shorter adjustment window than under the current rule.

However, the Department has determined the disadvantages of a 7-calendar-day implementation period for updated AEWRs outweighed any potential benefits. Although this alternative would require employers to begin paying agricultural workers at least the newly required higher wage within a calendar week of the date the updated AEWRs are published in the **Federal Register**, it would not require the employer to pay the updated AEWR for work performed during the 7-calendar-day delayed implementation period. Further, unlike the up to 14-day period in the current rule, the 7-calendar-day period would not correspond with a typical 2-week pay period; potentially creating more logistical challenges than it avoids. As the Department has explained in prior rulemaking, the duty to pay an updated AEWR during the employment period if it is higher than other required wage sources is not a new employer obligation. The Department recognizes that AEWR adjustments may alter employer budgets, but the Department believes the difference in the impact [138] on budget and payroll planning between the immediate effective date and a 7-day period after publication is outweighed by the benefits to agricultural workers noted above. Moreover, as the Department noted in the 2010 H–2A Rule, employers are aware of the annual AEWR adjustment, and the Department encourages employers to continue to include the annual adjustment in their contingency planning to allow flexibility to account for any possible wage adjustments.[139]

Second, the Department considered a regulatory alternative to the application filing requirements. Under this regulatory alternative, H–2A employers would not be required to fill out additional information about owners, operators, managers, and supervisors on the H–2A Application. Instead, this alternative would have required the employer to attest that it will collect this information and retain it for a period of 3 years from the date of certification or final determination and would provide the information upon request by the Department. This alternative would have been slightly less burdensome to H–2A employers because the employer would not need to provide this information at the time of filing each H–2A Application; rather, they would need to retain the information and produce it if requested during an audit or investigation.

However, the Department has determined the application filing and information disclosure requirements in this final rule, combined with the existing requirement to disclose information like the identity of the agent and point of contact, address(es), occupation, and period of need, will be necessary to assist the Department for reasons explained in the preamble discussion of § 655.130 above. This information will also assist the Department in ensuring employers do not evade penalties or regulatory requirements and will permit the Department to more effectively hold employers accountable for failures to comply with the law.

### B. Regulatory Flexibility Analysis, Small Business Regulatory Enforcement Fairness Act, Executive Order 13272: Proper Consideration of Small Entities in Agency Rulemaking

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601 *et seq.,* as amended by SBREFA, Public Law 104–121, requires agencies to determine whether regulations will have a significant economic impact on a substantial number of small entities. The Department certifies that this final rule does not have a significant economic

---

[138] The wage transfer under this alternative would be approximately up to half of the impact of this final rule's provision to make updated AEWRs effective on the date of publication in the **Federal Register** ($13.69 million at a discount rate of 7 percent).

[139] *See* 2022 H–2A Final Rule, 87 FR at 61688 (quoting 2010 H–2A Final Rule, 75 FR at 6901).

impact on a substantial number of small entities. Therefore, a final regulatory flexibility analysis is not required. The factual basis for this certification is set forth below.

1. Significant Issues Raised in Public Comments, Including by the Small Business Administration Office of Advocacy

Several commenters, like Willoway Nurseries, Michigan Farm Bureau, and American Farm Bureau Federation, submitted feedback that the estimate of time burden for rule familiarization for small businesses was an underestimate, suggesting that small businesses lack HR specialists and that the time burdens were underestimated. The Department notes that while some H–2A small business employers may not directly employ an HR specialist to conduct these tasks, many use HR service providers for consulting on regulatory and HR matters and, therefore, the wage rate for an HR specialist is appropriate for H–2A small business employers. As explained in Section VIII.A.4.a, the Department has increased the time burden associated with rule familiarization to 4 hours. The Department believes these changes to the time estimate are appropriate because they represent more accurately the costs incurred by small businesses.

American Farm Bureau Federation submitted feedback that the number of small businesses and impacted industries was not accurately captured in the NPRM's RFA analysis. As explained in Section VIII.B.2 below, the Department has revised its RFA analysis

methodology to include data from the Census Bureau's Statistics of U.S. Businesses (SUSB)[140] to add additional evidence on the scope of impact to small businesses in agriculture industries. The Department notes that a broader industry level (2-digit North American Industry Classification System (NAICS)) was used due to limitations in the publicly available data of 4-digit NAICS industries cited by the commenter (1112, 1113, 1114, 1121, 1122, 1123, 1125, and 1129).[141]

2. Description of the Number of Small Entities to Which This Final Rule Will Apply

a. Definition of Small Entity

The RFA defines a "small entity" as a: (1) small not-for-profit organization; (2) small governmental jurisdiction; or (3) small business.[142] The Department used the entity size standards defined by the Small Business Administration (SBA), in effect as of December 19, 2022, to classify entities as small.[143] SBA establishes separate standards for individual 6-digit NAICS industry codes, and standard cutoffs are typically based on either the average number of employees or the average annual receipts. Small governmental jurisdictions are defined as the governments of cities, counties, towns, townships, villages, school districts, or special districts with populations of less than 50,000 people.[144]

b. Number of Small Entities

The Department collected employment and annual revenue data

from the business information provider Data Axle[145] and merged those data into the estimated costs for small businesses from the H–2A certification data for FY 2020 and FY 2021. This process allowed the Department to identify the number and type of small entities in the H–2A certification data as well as their annual revenues. The Department determined the number of unique employers in the FY 2020 and FY 2021 certification data based on the employer name and city. Using these data allows the Department to estimate the per-provision cost of this final rule as a percent of revenue by firm size. The Department identified 9,927 unique employers (excluding labor contractors). Of those 9,927 employers, the Department was able to obtain data matches of revenue and employees for 2,615 H–2A employers in the FY 2020 and FY 2021 certification data. Of those 2,615 employers, the Department determined that 2,159 were small (82.5 percent). These unique small entities had an average of 11 employees and average annual revenue of approximately $3.6 million. Of these small unique entities, 2,139 of them had revenue data available from Data Axle. The Department's analysis of the impact of this proposed rule on small entities is based on the number of small unique entities (2,139 with revenue data).

To provide clarity on the agricultural industries impacted by this regulation, Exhibit 7 shows the number of unique H–2A small employers with certifications in the FY 2020 and FY 2021 certification data within each NAICS code at the 6-digit level.

EXHIBIT 7—NUMBER OF H–2A SMALL EMPLOYERS BY NAICS CODE

| 6-Digit NAICS | Description | Number of employers | Percent | Size standard |
|---|---|---|---|---|
| 111998 .......... | All Other Miscellaneous Crop Farming ............................................ | 611 | 29 | $2.5 million. |
| 444240 .......... | Nursery, Garden Center, and Farm Supply Stores ............................. | 162 | 8 | $21.5 million. |
| 561730 .......... | Landscaping Services ......................................................................... | 135 | 6 | $9.5 million. |
| 445230 .......... | Fruit and Vegetable Markets .............................................................. | 127 | 6 | $9.0 million. |
| 424480 .......... | Fresh Fruit and Vegetable Merchant Wholesalers ............................. | 78 | 4 | 100 employees. |
| 111339 .......... | Other Noncitrus Fruit Farming ............................................................ | 78 | 4 | $3.5 million. |
| 112990 .......... | All Other Animal Production ................................................................ | 57 | 3 | $2.75 million. |
| 424930 .......... | Flower, Nursery Stock, and Florists' Supplies Merchant Wholesalers | 47 | 2 | 100 employees. |
| 424910 .......... | Farm Supplies Merchant Wholesalers ............................................... | 39 | 2 | 200 employees. |
| 484230 .......... | Specialized Freight (except Used Goods) Trucking, Long-Distance .. | 37 | 2 | $34.0 million. |
|  | All Other ............................................................................................. | 768 | 36 |  |
|  | Total .................................................................................................... | 2,139 | 100 |  |

[140] See U.S. Census Bureau, *Statistics of U.S. Businesses* (Sept. 19, 2023). *https://www.census.gov/programs-surveys/susb/data.html.*

[141] See U.S. Census Bureau, *Economic Census: NAICS Codes & Understanding Industry Classification Systems* (Sept. 28, 2023), *https://*

*www.census.gov/programs-surveys/economic-census/year/2022/guidance/understanding-naics.html.*

[142] 5 U.S.C. 601(6).

[143] SBA, *Table of Small Business Size Standards Matched to North American Industry Classification*

*System Codes* (Dec. 19, 2022), *https://www.sba.gov/document/support—table-size-standards.*

[144] 5 U.S.C. 601(5).

[145] See Data Axle, *Business Data, https://www.data-axle.com/our-data/business-data* (last visited Apr. 4, 2024).

The Department also collected employment and annual revenue data for the NAICS Agricultural major industry [146] from SUSB [147] and merged those data into the estimated costs for small businesses from the H–2A certification data for FY 2020 and FY 2021. The Department assumes that NAICS sectors related to H–2A employment (1112, 1113, 1114, 1121, 1122, 1123, 1124, 1125, and 1129) have similar representation in size distribution as the broader 2-digit industry. The Department believes it is a reasonable assumption for the analysis because the broader 2-digit industry completely covers the 4-digit NAICS industries (1112, 1113, 1114, 1121, 1122, 1123, and 1129). The size distribution in the broader 2-digit industry mirrors the average size distribution in the 4-digit NAICS industries (1112, 1113, 1114, 1121, 1122, 1123 and 1129). No small businesses are left out for estimating impact on small entities in the affected NAICS industries. This assumption allows the Department to conduct a robust analysis of the most inclusive set of small businesses, which includes the number of firms, number of employees, and annual revenue by firm size. Using these data allows the Department to estimate the per-provision cost of this final rule as a percent of revenue by firm size.

### 3. Projected Impacts to Affected Small Entities

The Department has estimated the incremental costs for small entities from the baseline (*i.e.,* the current practices for complying, at a minimum, with the H–2A program as currently codified at 20 CFR part 655, subpart B, and 29 CFR part 501) to this final rule. As discussed in previous sections, the Department estimates impacts using historical certification data and, therefore, simulates the impacts of this final rule to each actual employer in the H–2A program rather than using representative data for employers within a given sector. The Department estimated the costs of (a) time to read and review this final rule, (b) time required to collect and maintain additional information for the application additions provision and add that information to H–2A applications, and (c) wage transfers due to the removal of the 2-week effective date delay from the AEWR publication. The estimates included in this analysis are consistent with those presented in the E.O. 12866 section.

The Department estimates that 2,139 unique small entities will incur a one-time cost of $223.43 to familiarize themselves with the rule and an annual cost of $111.71 to collect and maintain information due to the additional disclosure requirements associated with this final rule.[148]

In addition to the cost of rule familiarization and the cost of information and record keeping due to application additions, each small entity may have an increase in wage costs due to the revisions to the effective date of the AEWR. To estimate the wage impact for each small entity, we followed the methodology presented in the E.O. 12866 section. For each certification of a small entity, the Department calculated total wage impacts of this final rule in calendar year (CY) 2020 and CY 2021 based on each certification for employment between December 14th and the end of the year and the annual increase in the AEWR. The Department estimates the wage impact to all small entities is $826 on average in the first year.[149] Many of the small entities have no wage impact from this final rule because they do not have workers employed at the end of December.

Exhibit 8 shows the estimated cost per small entity for each year of the analysis. The first-year cost per small entity is estimated at $1,143 at a discount rate of 7 percent. The annualized cost per small entity is estimated at $1,553 at a discount rate of 7 percent. These estimates are *average costs,* meaning that some small entities will have higher costs while other small entities will have lower costs, regardless of firm size.

EXHIBIT 8—ESTIMATED COST TO SMALL ENTITIES

| Year | Rule familiarization | Application additions | End of year wage impact | Average total cost per employer |
|---|---|---|---|---|
| 1 | $223.43 | $111.71 | $808 | $1,143 |
| 2 | 223.43 | 111.71 | 872 | 1,207 |
| 3 | 223.43 | 111.71 | 941 | 1,276 |
| 4 | 223.43 | 111.71 | 1,015 | 1,350 |
| 5 | 223.43 | 111.71 | 1,095 | 1,430 |
| 6 | 223.43 | 111.71 | 1,181 | 1,516 |
| 7 | 223.43 | 111.71 | 1,264 | 1,610 |
| 8 | 223.43 | 111.71 | 1,375 | 1,710 |
| 9 | 223.43 | 111.71 | 1,483 | 1,819 |
| 10 | 223.43 | 111.71 | 1,600 | 1,936 |
| First-year cost ($), 7% discount rate | | | | 1,143 |

[146] Due to omissions in collected data, 6-digit and 4-digit NAICS code data were not available. *See* U.S. Census Bureau, *Economic Census: NAICS Codes & Understanding Industry Classification Systems* (Sept. 28, 2023). *https://www.census.gov/programs-surveys/economic-census/year/2022/guidance/understanding-naics.html.*

[147] *See* U.S. Census Bureau, *Statistics of U.S. Businesses* (Sept. 19, 2023). *https://www.census.gov/programs-surveys/susb/data.html.*

[148] Calculation: ($35.13 + $35.13(0.42) + $35.13(0.17)) × 4 = $223.43. $35.13 (1.59) × 1 = $55.86. $35.13 (1.59) × 2 = $111.71.

[149] In CY 2020 the average wage impact to all small entities is $620, and in CY 2021 it is $1,032.

Because CY 2020 and CY 2021 H–2A certification data do not reflect the wage increases due to the 2023 AEWR Final Rule, the transfer payments estimated in the analysis are likely understated. As explained in a previous footnote, the transfer payments are likely understated in that they may not account for the main change under the 2023 AEWR Final Rule, namely the limited job opportunities that would be subject to updated AEWRs based on OEWS data. *See* 88 FR at 12764–12765. Because the 2023 AEWR Final Rule became effective on March 30, 2023, the Department does not have readily available calendar year H–2A certification data to estimate wage transfer payments after the publication of that rule. While the Department sought public comment on how these wage transfer impacts can be calculated, it received no comments. However, the 2023 AEWR Final Rule explained that the Department anticipates a very limited number of H–2A job opportunities would be subject to the OEWS-based AEWR, as the majority of H–2A job opportunities are expected to remain subject to FLS-based AEWRs. *See* 88 FR at 12766, 12799. The Department therefore considers the impacts of the potential underestimation to be *de minimis* because of the low incidence of job opportunities assigned the OEWS AEWR under the 2023 AEWR Final Rule.

EXHIBIT 8—ESTIMATED COST TO SMALL ENTITIES—Continued

| Year | Rule familiarization | Application additions | End of year wage impact | Average total cost per employer |
|------|------|------|------|------|
| | Annualized cost ($), 7% discount rate | | | 1,553 |

The Department used the following steps to estimate the cost of this final rule per small entity as a percentage of annual receipts. First, the Department used SBA's Table of Small Business Size Standards to determine the size thresholds for small entities within the agricultural industry.[150] Next the Department obtained data on the number of firms, number of employees, and annual revenue by industry and firm size category from SUSB.[151] The Department used the Gross Domestic Product deflator to convert revenue data from 2017 dollars to 2022 dollars.[152] Then, the Department divided the estimated first-year cost and the annualized cost per small business

(discounted at a 7-percent rate) by the average annual receipts per firm to determine whether this final rule will have a significant or substantial economic impact on small businesses in each size category. The Department used a total cost estimate of 3 percent of revenue as the threshold for a significant individual impact and set a total of 20 percent of small entities incurring a significant impact as the threshold for a substantial impact on small entities. A threshold of 3 percent of revenues has been used in prior rulemakings for the definition of significant economic impact.[153] This threshold is also consistent with that sometimes used by other agencies.[154]

Exhibit 9 provides a breakdown of small entities by the proportion of revenue affected by the costs of this final rule. Of the 2,139 unique small entities with revenue data in the FY 2020 and FY 2021 certification data, only 0.7 percent of employers are estimated to have more than 3 percent of their total revenue impacted in the first year based on 2020 data and only 2.0 percent of employers are estimated to have more than 3 percent of their total revenue impacted in the first year based on 2021 data. In addition, no individual NAICS code sector has an impact greater than 3 percent of revenue.

EXHIBIT 9—COST IMPACTS AS A PROPORTION OF TOTAL REVENUE FOR SMALL ENTITIES

| Proportion of revenue impacted | 111998 | 444240 | 561730 | 445230 | All Other | Total |
|------|------|------|------|------|------|------|
| **2020, by NAICS Code** | | | | | | |
| <1% ........................................ | 593 (97.1%) | 162 (100.0%) | 132 (98.5%) | 127 (100.0%) | 1,078 (97.6%) | 2,093 (97.8%) |
| 1%–2% ..................................... | 13 (2.1%) | 0 (0.0%) | 2 (1.5%) | 0 (0.0%) | 13 (1.2%) | 28 (1.3%) |
| 2%–3% ..................................... | 2 (0.3%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (0.2%) | 4 (0.2%) |
| 3%–4% ..................................... | 1 (0.2%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.1%) | 2 (0.1%) |
| 4%–5% ..................................... | 1 (0.2%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 4 (0.4%) | 5 (0.2%) |
| >5% ......................................... | 1 (0.2%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 6 (0.5%) | 7 (0.3%) |
| Total >3% ................................ | 3 (0.5%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 11 (1.0%) | 14 (0.7%) |
| **2021, by NAICS Code** | | | | | | |
| <1% ........................................ | 561 (91.8%) | 161 (99.4%) | 129 (96.3%) | 127 (100.0%) | 1,059 (95.9%) | 2,038 (95.3%) |
| 1%–2% ..................................... | 23 (3.8%) | 1 (0.6%) | 4 (3.0%) | 0 (0.0%) | 18 (1.6%) | 46 (2.2%) |
| 2%–3% ..................................... | 7 (1.1%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 5 (0.5%) | 12 (0.6%) |
| 3%–4% ..................................... | 4 (0.7%) | 0 (0.0%) | 1 (0.7%) | 0 (0.0%) | 4 (0.4%) | 9 (0.4%) |
| 4%–5% ..................................... | 5 (0.8%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 3 (0.3%) | 8 (0.4%) |
| >5% ......................................... | 11 (1.8%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 15 (1.4%) | 26 (1.2%) |
| Total >3% ................................ | 20 (3.3%) | 0 (0.0%) | 1 (0.7%) | 0 (0.0%) | 22 (2.0%) | 43 (2.0%) |

Exhibit 10, below, presents results of the analysis using the SUSB data, which show that for the first-year and annualized costs, small businesses in the agriculture industry are not estimated to have a significant economic impact (3 percent or more) for any

entities. The largest proportion of revenue from first-year costs is estimated to be 1.91 percent of the average receipts per firm and the annualized costs are estimated to be 2.60 percent of the average receipts per firm for the smallest firms with revenue

below $100,000. Furthermore, it is very unlikely that agricultural employers with revenue below $100,000 will request H–2A workers as their small revenue will not be sufficient to pay the H–2A worker(s) and cover other operating costs.

[150] SBA, *Table of Small Business Size Standards Matched to North American Industry Classification System Codes*, (Mar. 17, 2023), *https://www.sba.gov/document/support-table-size-standards*. The size standards, which are expressed in either average annual receipts or number of employees, indicate the maximum allowed for a business in each subsector to be considered small.

[151] U.S. Census Bureau, *Statistics of U.S. Businesses* (May 10, 2022), *https://www.census.gov/programs-surveys/susb/data.html*.

[152] U.S. Bureau of Economic Analysis, *Table 1.1.9. Implicit Price Deflators for Gross Domestic Product, https://apps.bea.gov/iTable/?reqid=19&step=2&isuri=1&categories=survey* (last visited May 30, 2023).

[153] *See, e.g.,* Final Rule, *Increasing the Minimum Wage for Federal Contractors*, 79 FR 60634, 60706 (Oct. 7, 2014); Final Rule, *Discrimination on the Basis of Sex*, 81 FR 39108, 39151 (June 15, 2016); NPRM, *National Apprenticeship System Enhancements*, 89 FR 3118, 3252 (Jan. 17, 2024).

[154] *See, e.g.,* Final Rule, *Medicare and Medicaid Programs; Regulatory Provisions to Promote Program Efficiency, Transparency, and Burden Reduction; Part II,* 79 FR 27106, 27151 (May 12, 2014) (Department of Health and Human Services rule stating that under its agency guidelines for conducting regulatory flexibility analyses, actions that do not negatively affect costs or revenues by more than 3 percent annually are not economically significant).

EXHIBIT 10—AGRICULTURE, FORESTRY, FISHING, AND HUNTING INDUSTRY

[Small business size standard: $2.25 million–$34.0 million]

| | Number of firms [1] | Number of firms as percent of small firms in industry [2] | Annual receipts ($ million) [3] | Average receipts per firm ($) [4] | First-year cost per firm with 7% discounting | First-year cost per firm as percent of receipts [5] | Annualized cost per firm with 7% discounting | Annualized cost per firm as percent of receipts [6] |
|---|---|---|---|---|---|---|---|---|
| Enterprises with receipts below $100,000 ............ | 4,042 | 18.03 | $242 | $59,803 | $1,143 | 1.91 | $1,553.04 | 2.60 |
| Enterprises with receipts of $100,000 to $499,999 ... | 8,582 | 38.27 | 2,592 | 302,003 | 1,143 | 0.38 | 1,553 | 0.51 |
| Enterprises with receipts of $500,000 to $999,999 ... | 3,703 | 16.51 | 3,127 | 844,419 | 1,143 | 0.14 | 1,553 | 0.18 |
| Enterprises with receipts of $1,000,000 to $2,499,999 ................... | 3,686 | 16.44 | 6,781 | 1,839,700 | 1,143 | 0.06 | 1,553 | 0.08 |
| Enterprises with receipts of $2,500,000 to $4,999,999 ................... | 1,370 | 6.11 | 5,634 | 4,112,289 | 1,143 | 0.03 | 1,553 | 0.04 |
| Enterprises with receipts of $5,000,000 to $7,499,999 ................... | 455 | 2.03 | 3,153 | 6,929,380 | 1,143 | 0.02 | 1,553 | 0.02 |
| Enterprises with receipts of $7,500,000 to $9,999,999 ................... | 208 | 0.93 | 2,101 | 10,101,550 | 1,143 | 0.01 | 1,553 | 0.02 |
| Enterprises with receipts of $10,000,000 to $14,999,999 ................. | 193 | 0.86 | 2,545 | 13,188,869 | 1,143 | 0.01 | 1,553 | 0.01 |
| Enterprises with receipts of $15,000,000 to $19,999,999 ................. | 79 | 0.35 | 1,520 | 19,242,856 | 1,143 | 0.01 | 1,553 | 0.01 |
| Enterprises with receipts of $20,000,000 to $24,999,999 ................. | 60 | 0.27 | 1,357 | 22,619,811 | 1,143 | 0.01 | 1,553 | 0.01 |
| Enterprises with receipts of $25,000,000 to $29,999,999 ................. | 28 | 0.12 | 710 | 25,343,408 | 1,143 | 0.00 | 1,553 | 0.01 |
| Enterprises with receipts of $30,000,000 to $34,999,999 ................. | 17 | 0.08 | 475 | 27,948,978 | 1,143 | 0.00 | 1,553 | 0.01 |

[1] Source: U.S. Census Bureau, Statistics of U.S. Businesses.
[2] Number of firms ÷ Small firms in industry.
[3] Source: U.S. Census Bureau, Statistics of U.S. Businesses.
[4] Annual receipts ÷ Number of firms.
[5] First-year cost per firm with 7% discounting ÷ Average receipts per firm.
[6] Annualized cost per firm with 7% discounting ÷ Average receipts per firm.

Based on the above analysis and results provided in both Exhibit 9 and Exhibit 10, the Department certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

### C. Paperwork Reduction Act

In order to meet its statutory responsibilities under the INA, the Department collects information necessary to render determinations on requests for temporary agricultural labor certification that allow employers to bring foreign labor into the United States on a seasonal or other temporary basis under the H–2A program. The Department uses the collected information to determine if employers satisfy their statutory and regulatory obligations. This information is subject to the PRA, 44 U.S.C. 3501 *et seq.* A Federal agency cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless it is approved by OMB under the PRA and

displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information that does not display a valid Control Number. *See* 5 CFR 1320.5(a) and 1320.6. The Department has OMB approval for its H–2A program information collection under Control Number 1205–0466.

In accordance with the PRA, the information collection requirements that must be implemented as a result of this regulation must receive approval from OMB. Therefore, the Department submitted a clearance package in connection with the NPRM that contained proposed revisions to the information collection pending OMB approval under 1205–0466.

In this package, the Department proposed changes to the forms used to collect required information (*i.e.,* Form ETA–9142A and appendices; Form ETA–790/790A and addenda) to conform to proposed revisions to the Department's H–2A regulations. The

Department also introduced new appendices to the *Application for Temporary Labor Certification,* Form ETA–9142A. Appendix C will facilitate satisfaction of additional filing requirements by identifying information, such as name, location, and contact information, for owners and operators of places where work is performed and the people who manage and supervise workers under the H–2A Application, as discussed above. Additionally, employers must continue to keep this information updated throughout the work contract period, and in the event of audit will provide the updated information to the Department. Appendix D will satisfy new filing requirements for foreign labor recruiters. Specifically, the Department now requires the employer to disclose the identity (*i.e.,* name and, if applicable, identification/registration number) and geographic location of persons and entities hired by or working for the foreign labor recruiter that the employer engages or plans to engage in the recruitment of prospective H–2A

workers, regardless of whether the agent or recruiter is located in the United States or abroad. Additionally, the Department has revised Form ETA–790A, *Addendum B,* to collect more detailed information about employers and the places of employment at which workers will provide the agricultural labor or services described in the job order. More information about the Department's changes to the H–2A information collection instruments and the Department's collection and use of this information is available in supporting documentation in the PRA package the Department has prepared for this rulemaking.

These modifications reflect the regulatory changes proposed in the NPRM and adopted in this final rule, such as consistent use and clarification of defined terms and revised assurances.[155] The public was given 60 days to comment on the information collection and the comment period closed on November 14, 2023.[156]

During the 60-day comment period, the Department received some comments on the proposed form revisions. A farm owner and many trade associations, including Michigan Farm Bureau and NCFC, indicated that the burden numbers presented by the Department were low; however, none of those commenters provided an alternative burden number or a justification as to why the Department's burden numbers were inaccurate. Therefore, in this final rule, the Department's estimates of the time burden to complete the information collection will remain the same as estimated in the NPRM. Commenters primarily addressed aspects of the information collection while discussing the proposed regulations. After considering public comments submitted in response to the NPRM, the Department has adopted certain proposals, with some changes, as discussed in the preamble above, but has retained the proposed changes for the information collection in this final rule.

In response to comments, as described below, the Department has made additional modifications to the forms implemented with this final rule to clarify certain requirements, reflect the provisions of this final rule (*e.g.,* collection of additional employer information), and conform to similar collections (*e.g.,* manner of collecting name information). In addition to editing language on the forms, the Department has modified some data collection fields after considering public comments. Many commenters addressed the Department's proposal to collect information about owners, operators, managers, and supervisors, which is now reflected in this final rule and will be implemented using *Appendix C,* and will require an employer to submit contact information (address, phone, and email, if applicable) about owners, operators, managers, and supervisors. Although many commenters questioned the necessity of this requirement at the filing stage, the Department will retain this requirement because, as noted in the preamble to § 655.130 above, gathering this information at the time of filing, rather than only in the event of an investigation or audit, will assist the Department to gain a more accurate and detailed understanding of the scope and structure of the employer's agricultural operation, which is essential to the Department's fulfillment of various obligations in the administration and enforcement of the H–2A program. The information will assist the Department in determining whether two ostensibly separate employers are in fact one entity filing multiple applications, and whether they have demonstrated a bona fide temporary or seasonal need as required by the INA, 8 U.S.C. 1101(a)(15)(H)(ii)(a). Collection at the time of filing also will assist the Department in determining whether an employer has filed as a single employer with a debarred entity, as the Department will already have the debarred entity's data on record. Obtaining this information at the time of filing also enables OFLC and WHD to search across applications within a filing system database to identify instances in which employers have changed names, or roles, to avoid complying with program regulations or avoid monetary penalties or program debarment. Furthermore, the information collected about owners, operators, and supervisors at the application stage may assist the Department to identify whether an individual or successor in interest should be named on any determination and, therefore, subject to any sanctions

or remedies assessed. Finally, as noted above, collecting this information from all applicants at the time of filing, rather than only collecting the information during an audit or investigation, can be useful for other similar purposes as well, such as identifying instances when an H–2ALC Application indicates that an applicant intends to supply an H–2A workforce to a debarred employer during the debarment period.

Additionally, commenters expressed concerns about publication of the required contact information of an owner, operator, manager, or supervisor. The Department, as discussed in the above preamble, will only collect, store, and disseminate all information and records in accordance with the Department's information sharing agreements and SORN, principles set forth by OMB, and applicable laws, including the Privacy Act of 1974 (Pub. L. 93–579, 7, 88 Stat. 1896, 1909), Federal Records Act of 1950 (Pub. L. 81–754, 64 Stat. 583, 585 [codified as amended in scattered sections of 44 U.S.C.]), the PRA (44 U.S.C. 3501 *et seq.*), and the E-Government Act of 2002 (Pub. L. 107–347 (2002)).

As a result, the forms implemented with this final rule align information collection requirements with the Department's regulation and continue its ongoing efforts to provide greater clarity to employers on regulatory requirements, and to standardize information collection to reduce employer time and burden preparing applications. Overall, the revisions discussed above place no undue public burden to respond to the information collection required under this final rule from that proposed in connection with the NPRM.

The information collection change in requirements associated with this final rule are summarized as follows:

*Title:* H–2A Temporary Agricultural Employment Certification Program.

*Agency:* DOL–ETA.

*Type of Information Collection:* OMB Control Number 1205–0466.

*Affected Public:* Individuals or Households, Private Sector—businesses or other for-profits, Government, State, Local and Tribal Governments.

*Form(s):* ETA–9142A, *H–2A Application for Temporary Employment Certification;* ETA–9142A—*Appendix A;* ETA–9142A—*Appendix B, H–2A Labor Contractor Surety Bond; Appendix C, ETA–9142A; Appendix D, ETA–9142A;* ETA–9142A—*H–2A Approval Final Determination: Temporary Agricultural Labor Certification;* ETA–790/790A, *H–2A Agricultural Clearance Order;* ETA–790/ 790A—*Addendum A;* ETA–790/790A—

---

[155] *See* 2023 NPRM, 88 FR 63750.

[156] On October 26, 2023, in response to several requests, the Department published a letter on regulations.gov declining to extend the 60-day comment period for the NPRM that expired on November 14, 2023. The Department found that 60 days would be a reasonable and adequate amount of time to provide notice and an opportunity to comment on the NPRM to this rule. As a result, the Department encouraged all interested parties to submit comments electronically on *https:// www.regulations.gov* (RIN 1205–AC12) by 11:59 p.m. ET on November 14, 2023. Letter from Rajesh D. Nayak, Asst. Sec'y for Pol'y, DOL (Oct. 16, 2023), *https://www.regulations.gov/document/ETA-2023-0003-0040.*

Addendum B; ETA–790/790A—Addendum C; ETA–232, *Domestic Agricultural In-Season Wage Report.*

*Obligation to Respond:* Required to Obtain or Retain Benefits.

*Total Annual Respondents:* 467,843.

*Annual Frequency:* On Occasion.

*Total Annual Responses:* 14,586.

*Estimated Time per Response (averages):*

—Forms ETA–9142A, Appendix A, Appendix B, Appendix C, and Appendix D—3.63 hours per response.

—Forms ETA–790/790A—.70 hours per response.

—Form ETA–232—3.30 hours per response.

*Estimated Total Annual Burden Hours:* 102,864.74.

*Total Annual Burden Cost for Respondents:* $0.

*Title of Collection:* Agricultural Recruitment System Forms Affecting Migrant and Seasonal Farmworkers.

*Type of Review:* Revision of a Currently Approved Information Collection.

*OMB Control Number:* 1205–0134.

*Description:* The NPRM proposed to revise Agricultural Clearance Order Form, Form ETA–790B, which will be attached to the Agricultural Clearance Order Form, Form ETA–790 (see OMB Control Number 1205–0466). Form ETA–790B is only used for employers who submit clearance orders requesting U.S. workers for temporary agricultural jobs that are not attached to requests for foreign workers through the H–2A visa program (non-criteria clearance orders). ETA included the estimated burden to the public for the completion of Form ETA–790 as it relates to those employers seeking to place non-criteria job orders through the ARS in addition to the estimated burden for Form ETA–790B because employers would fill out both forms. The Department must update Form ETA–790B to implement changes at § 653.501(c)(3)(iv) regarding assurances that employers must make on clearance orders. The Department has also made changes to align Form ETA–790B with the structure of Form ETA–790A. *Affected Public:* State Governments, Private Sector: Business or other for-profits, not-for-profit institutions, and farms.

*Obligation to Respond:* Required to Obtain or Retain Benefits.

*Estimated Total Annual Respondents:* 7,568.

*Estimated Total Annual Responses:* 7,568.

*Estimated Total Annual Burden Hours:* 6,622.

*Estimated Total Annual Other Burden Costs:* $0.

*Regulations Sections:* Subpart F of part 653.

*Agency:* DOL–ETA.

Interested parties may obtain a copy of the information collection revisions submitted to OMB on the OIRA website at *https://www.reginfo.gov/public/do/PRAMain.* From that page, select Department of Labor from the "Currently under Review" dropdown menu, click the "Submit" button, and find the applicable control number among the ICRs displayed, or use the search bar at the top right of the page and type in the OMB Control Number (1205–0134).

## D. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

The Congressional Review Act (CRA) was included as part of SBREFA, Public Law 104–121, 110 Stat. 847, 868 (codified at 5 U.S.C. 801 *et seq.*). OIRA has determined that this final rule does not meet the criteria set forth in 5 U.S.C. 804(2). DOL has complied with the CRA's reporting requirements and has sent this rule to Congress and to the Comptroller General as required by 5 U.S.C. 801(a)(1).

## E. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) (Pub. L. 104–4, codified at 2 U.S.C. 1501 *et seq.*) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. UMRA requires Federal agencies to assess a regulation's effects on State, local, and Tribal governments, as well as on the private sector, except to the extent the regulation incorporates requirements specifically set forth in law. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any regulation that includes any Federal mandate in a proposed or final agency rule that may result in $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. A Federal mandate is any provision in a regulation that imposes an enforceable duty upon State, local, or Tribal governments, or upon the private sector, except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program.

This final rule does not result in unfunded mandates for the public or private sector because private employers' participation in the program is voluntary, and State governments are reimbursed for performing activities required under the program. The requirements of title II of the UMRA, therefore, do not apply, and the Department has not prepared a statement under the UMRA.

## F. Executive Order 13132 (Federalism)

This final rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with sec. 6 of E.O. 13132,[157] it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

The Department has reviewed this final rule in accordance with E.O. 13175 [158] and has determined that it does not have Tribal implications. This rule does not have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Tribal governments.

## List of Subjects

### 20 CFR Part 651

Employment, Grant programs—labor.

### 20 CFR Part 653

Agriculture, Employment, Equal employment opportunity, Grant programs—labor, Migrant labor, Reporting and recordkeeping requirements.

### 20 CFR Part 655

Administrative practice and procedure, Foreign workers, Employment, Employment and training, Enforcement, Forest and forest products, Fraud, Health professions, Immigration, Labor, Passports and visas, Penalties, Reporting and recordkeeping requirements, Unemployment, Wages, Working conditions.

### 20 CFR Part 658

Administrative practice and procedure, Employment, Grant programs—labor, Reporting and recordkeeping requirements.

---

[157] E.O. 13132, *Federalism,* 64 FR 43255 (Aug. 10, 1999).

[158] E.O. 13175, Consultation and Coordination with Indian Tribal Governments, 65 FR 67249 (Nov. 9, 2000).

*29 CFR Part 501*

Administrative practice and procedure, Agricultural, Aliens, Employment, Housing, Housing standards, Immigration, Labor, Migrant labor, Penalties, Transportation, Wages.

For the reasons stated in the preamble, the Department of Labor amends 20 CFR parts 651, 653, 655, and 658 and 29 CFR part 501 as follows:

**Title 20: Employees' Benefits**

**Employment and Training Administration**

## PART 651—GENERAL PROVISIONS GOVERNING THE WAGNER-PEYSER ACT EMPLOYMENT SERVICE

■ 1. The authority citation for part 651 continues to read as follows:

**Authority:** 29 U.S.C. 49a; 38 U.S.C. part III, 4101, 4211; Secs. 503, 3, 189, Pub. L. 113–128, 128 Stat. 1425 (Jul. 22, 2014).

■ 2. Amend § 651.10 by:
■ a. Adding definitions of "Agent", "Criteria clearance order", and "Discontinuation of services", in alphabetical order;
■ b. Revising the definition for "Employment-related laws"; and
■ c. Adding definitions for "Farm labor contractor", "Joint employer", "Non-criteria clearance order", "Successor in interest", and "Week" in alphabetical order.

The additions and revision read as follows:

### § 651.10  Definitions of terms used in this part and parts 652, 653, 654, and 658 of this chapter.

*       *       *       *       *

*Agent* means a legal entity or person, such as an association of employers, or an attorney for an association, that is authorized to act on behalf of the employer for purposes of recruitment of workers through the clearance system and is not itself an employer or joint employer, as defined in this section, with respect to a specific job order.

*       *       *       *       *

*Criteria clearance order* means a clearance order that is attached to an application for foreign temporary agricultural workers pursuant to part 655, subpart B, of this chapter.

*       *       *       *       *

*Discontinuation of services* means that an employer, agent, farm labor contractor, joint employer, or successor in interest, as defined in this section, cannot participate in or receive any Wagner-Peyser Act employment service provided by the ES to employers

pursuant to parts 652 and 653 of this chapter.

*       *       *       *       *

*Employment-related laws* means those laws and implementing rules, regulations, and standards that relate to the employment relationship, such as those enforced by the Department's WHD, OSHA, or by other Federal, State, or local agencies.

*       *       *       *       *

*Farm labor contractor* means any person or entity, other than an agricultural employer, an agricultural association, or an employee of an agricultural employer or agricultural association, who, for any money or other valuable consideration paid or promised to be paid, recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal farmworker (MSFW).

*       *       *       *       *

*Joint employer* means where two or more employers each have sufficient definitional indicia of being an employer of a worker as defined in this section, they are, at all times, joint employers of that worker. An employer that submits a job order to the ES clearance system as a joint employer, is a joint employer of any worker placed and employed on the job order during the period of employment anticipated, amended, or otherwise extended in accordance with the order.

*       *       *       *       *

*Non-criteria clearance order* means a clearance order that is not attached to an application for foreign temporary agricultural workers pursuant to part 655, subpart B, of this chapter.

*       *       *       *       *

*Successor in interest*—The following factors, including those as used under Title VII of the Civil Rights Act and the Vietnam Era Veterans' Readjustment Assistance Act, may be considered in determining whether an employer, agent, or farm labor contractor is a successor in interest; however, these factors are not exhaustive, and no one factor is dispositive, but all of the circumstances will be considered as a whole:

(1) Substantial continuity of the same business operations;
(2) Use of the same facilities;
(3) Continuity of the work force;
(4) Similarity of jobs and working conditions;
(5) Similarity of supervisory personnel;
(6) Whether the former management or owner retains a direct or indirect interest in the new enterprise;
(7) Similarity in machinery, equipment, and production methods;

(8) Similarity of products and services;
(9) The ability of the predecessor to provide relief; and
(10) For purposes of discontinuation of services, the involvement of the firm's ownership, management, supervisors, and others associated with the firm in the violation(s) at issue.

*       *       *       *       *

*Week* means 7 consecutive calendar days.

*       *       *       *       *

## PART 653—SERVICES OF THE WAGNER-PEYSER ACT EMPLOYMENT SERVICE SYSTEM

■ 3. The authority citation for part 653 continues to read as follows:

**Authority:** Secs. 167, 189, 503, Public Law 113–128, 128 Stat. 1425 (Jul. 22, 2014); 29 U.S.C. chapter 4B; 38 U.S.C. part III, chapters 41 and 42.

■ 4. Amend § 653.501 by:
■ a. Adding paragraph (b)(4);
■ b. Revising paragraph (c)(1)(iv)(E);
■ c. Revising paragraphs (c)(3) introductory text, (c)(3)(i) and (iv), and (c)(5); and
■ d. Removing and reserving paragraphs (d)(4), (7), and (8).

The additions and revisions read as follows:

### § 653.501  Requirements for processing clearance orders.

*       *       *       *       *

(b) * * *

(4) Prior to placing a job order into intrastate or interstate clearance, ES staff must consult the Department's Office of Foreign Labor Certification and Wage and Hour Division debarment lists, and the Department's Office of Workforce Investment discontinuation of services list.

(i) If the employer requesting access to the clearance system is currently debarred from participating in the H–2A or H–2B foreign labor certification programs, the SWA must initiate discontinuation of services pursuant to part 658, subpart F, of this chapter.

(ii) If the employer requesting access to the clearance system is currently discontinued from receiving ES services under § 658.503 of this chapter by any State, the SWA must not approve the clearance order for placement into intrastate or interstate clearance. Employers may submit written requests to the OWI Administrator to determine whether they are on the OWI discontinuation of services list. If the OWI Administrator indicates that the employer is not on the discontinuation of services list then the SWA must

approve the clearance order, as long as all other requirements have been met.

(iii) For purposes of this paragraph (b)(4), "employer" has the meaning given in § 658.500(b) of this chapter.

(c) * * *

(1) * * *

(iv) * * *

(E) The hourly wage rate, if applicable, and any non-hourly wage rate offered, including a piece rate or base rate and bonuses and, for any non-hourly wage rate, an estimate of its hourly wage rate equivalent for each activity and unit size;

\* \* \* \* \*

(3) SWAs must ensure that the employer makes the following assurances in the clearance order:

(i) The employer will provide to workers placed through the clearance system the number of hours of work cited in paragraph (c)(1)(iv)(D) of this section for the 14 calendar days beginning with the anticipated date of need, unless the employer has amended the date of need at least 10 business days prior to the original date of need (pursuant to paragraph (c)(3)(iv) of this section).

\* \* \* \* \*

(iv) The employer will notify the order-holding office or SWA immediately upon learning that a crop is maturing earlier or later, or that weather conditions, over-recruitment, or other factors have changed the terms and conditions of employment. If there is a change to the date of need, the employer will notify the order-holding office or SWA, and each worker who has been placed on the clearance order using the contact information the worker provided to the employer, in writing (email and other forms of electronic written notification are acceptable) at least 10 business days prior to the original date of need. Notification to workers must be made in accordance with the language access requirements of 29 CFR 38.9 for workers with limited English proficiency. If a worker provides electronic contact information, such as an email address or telephone number, the employer will send notice using one of the electronic contact methods provided. If the employer provides non-written telephonic notice, such as a phone call, voice message, or an equivalent, the employer will also send written notice using the email or postal address provided by the worker at least 10 business days prior to the original date of need. The employer will maintain records of the notification and the date notification was sent to the order-holding office or SWA and workers for

3 years. Consistent with paragraph (c)(5) of this section, if the employer does not properly send notification to the order-holding office or SWA and workers at least 10 business days prior to the original date of need, the employer will provide the housing described on the clearance order to all migrant workers placed on the clearance order who are already traveling to the place of employment, without cost to the workers, until work commences. The employer will pay all placed workers for the hours listed on the clearance order and will provide or pay all other benefits and expenses described on the clearance order for each day work is delayed up to 14 calendar days or provide alternative work.

\* \* \* \* \*

(5) If there is a change to the anticipated date of need and the employer fails to notify the order-holding office or SWA and all workers placed on the clearance order at least 10 business days prior to the original date of need, as assured in paragraph (c)(3)(iv) of this section, the employer must provide housing to all migrant workers placed on the clearance order who are already traveling to the place of employment, without cost to the workers, until work commences, and must pay all placed workers the specified hourly rate of pay, or if the pay is piece-rate, the higher of the Federal or State minimum wage, or an applicable prevailing wage, or for criteria orders the rate of pay required under part 655, subpart B, of this chapter, and must provide or pay all other benefits and expenses described on the clearance order for each day work is delayed up to 14 calendar days starting with the originally anticipated date of need or provide alternative work if such alternative work is stated on the approved clearance order. If an employer fails to comply under this paragraph (c)(5) the order-holding office must process the information as an apparent violation pursuant to § 658.419 of this chapter and may refer an apparent violation of the employer's payment obligation under this paragraph (c)(5) to the Department's Wage and Hour Division.

\* \* \* \* \*

## PART 655—TEMPORARY EMPLOYMENT OF FOREIGN WORKERS IN THE UNITED STATES

■ 5. The authority citation for part 655 continues to read as follows:

**Authority:** Section 655.0 issued under 8 U.S.C. 1101(a)(15)(E)(iii), 1101(a)(15)(H)(i) and (ii), 8 U.S.C. 1103(a)(6), 1182(m), (n), and (t), 1184(c), (g), and (j), 1188, and 1288(c) and

(d) ; sec. 3(c)(1), Pub. L. 101–238, 103 Stat. 2099, 2102 (8 U.S.C. 1182 note); sec. 221(a), Pub. L. 101–649, 104 Stat. 4978, 5027 (8 U.S.C. 1184 note); sec. 303(a)(8), Pub. L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 323(c), Pub. L. 103–206, 107 Stat. 2428; sec. 412(e), Pub. L. 105–277, 112 Stat. 2681 (8 U.S.C. 1182 note); sec. 2(d), Pub. L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); 29 U.S.C. 49k; Pub. L. 107–296, 116 Stat. 2135, as amended; Pub. L. 109–423, 120 Stat. 2900; 8 CFR 214.2(h)(4)(i); 8 CFR 214.2(h)(6)(iii); and sec. 6, Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

Subpart A issued under 8 CFR 214.2(h).

Subpart B issued under 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1184(c), and 1188; and 8 CFR 214.2(h).

Subpart E issued under 48 U.S.C. 1806.

Subparts F and G issued under 8 U.S.C. 1288(c) and (d); sec. 323(c), Pub. L. 103–206, 107 Stat. 2428; and 28 U.S.C. 2461 note, Pub. L. 114–74 at section 701.

Subparts H and I issued under 8 U.S.C. 1101(a)(15)(H)(i)(b) and (b)(1), 1182(n), and (t), and 1184(g) and (j); sec. 303(a)(8), Pub. L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 412(e), Pub. L. 105–277, 112 Stat. 2681; 8 CFR 214.2(h); and 28 U.S.C. 2461 note, Pub. L. 114–74 at section 701.

Subparts L and M issued under 8 U.S.C. 1101(a)(15)(H)(i)(c) and 1182(m); sec. 2(d), Pub. L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); Pub. L. 109–423, 120 Stat. 2900; and 8 CFR 214.2(h).

■ 6. Amend § 655.103 by:

■ a. In paragraph (b), adding the definitions of "Key service provider" and "Labor organization" in alphabetical order and removing the definition of "Successor in interest"; and

■ b. Adding paragraph (e).

The additions read as follows:

### § 655.103  Overview of this subpart and definition of terms.

\* \* \* \* \*

(b) * * *

*Key service provider.* A health-care provider; a community health worker; an education provider; a translator or interpreter; an attorney, legal advocate, or other legal service provider; a government official, including a consular representative; a member of the clergy; an emergency services provider; a law enforcement officer; and any other provider of similar services.

*Labor organization.* Any organization of any kind, or any agency or employee representation committee or plan, in which workers participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

\* \* \* \* \*

(e) *Definition of single employer for purposes of temporary or seasonal need and contractual obligations.* Separate

entities will be deemed a single employer (sometimes referred to as an "integrated employer") for purposes of assessing temporary or seasonal need and for enforcement of contractual obligations if they meet the definition of single employer in this paragraph (e). Under the definition of single employer, a determination of whether separate entities are a single employer is not determined by a single factor, but rather the entire relationship is viewed in its totality. Factors considered in determining whether two or more entities consist of a single employer include:

(1) Common management;

(2) Interrelation between operations;

(3) Centralized control of labor relations; and

(4) Degree of common ownership/financial control.

■ 7. Add § 655.104 to read as follows:

### § 655.104   Successors in interest.

(a) *Liability of successors in interest.* Where an employer, agent, or attorney has violated 8 U.S.C. 1188, 29 CFR part 501, or this subpart, a successor in interest to that employer, agent, or attorney may be held liable for the duties and obligations of the violating employer, agent, or attorney in certain circumstances, regardless of whether such successor in interest has succeeded to all the rights and liabilities of the predecessor employer, agent, or attorney.

(b) *Definition of successors in interest.* The following factors, including those as used under Title VII of the Civil Rights Act and the Vietnam Era Veterans' Readjustment Assistance Act, may be considered in determining whether an employer, agent, or attorney is a successor in interest; however, these factors are not exhaustive, and no one factor is dispositive, but all of the circumstances will be considered as a whole:

(1) Substantial continuity of the same business operations;

(2) Use of the same facilities;

(3) Continuity of the work force;

(4) Similarity of jobs and working conditions;

(5) Similarity of supervisory personnel;

(6) Whether the former management or owner retains a direct or indirect interest in the new enterprise;

(7) Similarity in machinery, equipment, and production methods;

(8) Similarity of products and services;

(9) The ability of the predecessor to provide relief; and

(10) For purposes of debarment, the personal involvement of the firm's ownership, management, supervisors, and others associated with the firm in the violation(s) at issue.

(c) *Effect of debarment on successors in interest.* When an employer, agent, or attorney is debarred under § 655.182 or 29 CFR 501.20, any successor in interest to the debarred employer, agent, or attorney is also debarred. No application for H–2A workers may be filed by or on behalf of a successor in interest to a debarred employer, agent, or attorney, subject to the term limits set forth in § 655.182(c)(2). If the CO determines that an application for H–2A workers was filed by or on behalf of a successor in interest to a debarred employer, agent, or attorney during the period of debarment as set forth in § 655.182(c)(2), the CO will issue a Notice of Deficiency (NOD) pursuant to § 655.141 or deny the application pursuant to § 655.164, as appropriate depending upon the status of the H–2A application, solely on the basis that the entity is a successor in interest to a debarred employer, agent, or attorney. If the OFLC Administrator determines that a certification for H–2A workers was issued to a successor in interest to a debarred employer, the OFLC Administrator may revoke the certification pursuant to § 655.181(a). The employer, agent, or attorney may appeal its status as a successor in interest to the debarred entity, pursuant to the procedures for appeals of CO determinations at § 655.171.

■ 8. Amend § 655.120 by revising paragraphs (a) and (b)(2) and (3) to read as follows:

### § 655.120   Offered wage rate.

(a) *Employer obligation.* (1) Except for occupations covered by §§ 655.200 through 655.235, to comply with its obligation under § 655.122(l), an employer must offer, advertise in its recruitment, and pay a wage that is at least the highest of:

(i) The AEWR;

(ii) A prevailing wage rate, whether expressed as a piece rate or other unit of pay, if the OFLC Administrator has approved a prevailing wage survey for the applicable crop activity or agricultural activity and, if applicable, a distinct work task or tasks performed in that activity, meeting the requirements of paragraph (c) of this section;

(iii) The agreed-upon collective bargaining wage;

(iv) The Federal minimum wage;

(v) The State minimum wage; or

(vi) Any other wage rate the employer intends to pay.

(2) Where the wage rates set forth in paragraph (a)(1) of this section are expressed in different units of pay (including piece rates or other pay structures), the employer must list the highest applicable wage rate for each unit of pay in its job order and must offer and advertise all of these wage rates in its recruitment. The employer's obligation to pay the highest of these wage rates is set forth at § 655.122(l)(2).

(b) * * *

(2) The OFLC Administrator will publish a notice in the **Federal Register**, at least once in each calendar year, on a date to be determined by the OFLC Administrator, establishing each AEWR. The updated AEWR will be effective as of the date of publication of the notice in the **Federal Register**.

(3) If an updated AEWR for the occupational classification and geographic area is published in the **Federal Register** during the work contract, and the updated AEWR is higher than the highest of the previous AEWR; a prevailing wage for the crop activity or agricultural activity and, if applicable, a distinct work task or tasks performed in that activity and geographic area; the agreed-upon collective bargaining wage; the Federal minimum wage; or the State minimum wage, the employer must pay at least the updated AEWR beginning on the date the updated AEWR is published in the **Federal Register**.

*     *     *     *     *

■ 9. Amend § 655.122 by revising paragraphs (h)(4), (i)(1)(i) and (ii), (l), and (n) to read as follows:

### § 655.122   Contents of job offers.

*     *     *     *     *

(h) * * *

(4) *Employer-provided transportation.* (i) All employer-provided transportation must comply with all applicable local, State, or Federal laws and regulations, and must provide, at a minimum, the same transportation safety standards, driver's licensure, and vehicle insurance required under 29 U.S.C. 1841, 29 CFR 500.104 or 500.105, and 29 CFR 500.120 through 500.128.

(ii) The employer must not operate, or allow any other person to operate, any employer-provided transportation that is required by the U.S. Department of Transportation's Federal Motor Vehicle Safety Standards, including 49 CFR 571.208, to be manufactured with seat belts, unless all passengers and the driver are properly restrained by seat belts meeting standards established by the U.S. Department of Transportation, including 49 CFR 571.209 and 571.210.

(iii) The job offer must include a description of the modes of transportation (*e.g.,* type of vehicle) that will be used for inbound, outbound, daily, and any other transportation.

(iv) If workers' compensation is used to cover transportation in lieu of vehicle insurance, the employer must either ensure that the workers' compensation covers all travel or that vehicle insurance exists to provide coverage for travel not covered by workers' compensation and it must have property damage insurance.

(i) * * *

(1) * * *

(i) For purposes of this paragraph (i)(1), a workday means the number of hours in a workday as stated in the job order and excludes the worker's Sabbath and Federal holidays. The employer must offer a total number of hours to ensure the provision of sufficient work to reach the three-fourths guarantee. The work hours must be offered during the work period specified in the work contract.

(ii) In the event the worker begins working later than the specified beginning date of the contract, the guarantee period begins with the first workday after the arrival of the worker at the place of employment, and continues until the last day during which the work contract and all extensions thereof are in effect.

*       *       *       *       *

(l) *Rates of pay.* Except for occupations covered by §§ 655.200 through 655.235, the employer must pay the worker at least the highest wage rate set forth in § 655.120(a)(1).

(1) The employer must calculate workers' wages using the wage rate that will result in the highest wages for each worker in each pay period. When calculating wages based on an hourly wage rate, the calculation must reflect every hour or portion thereof worked during a pay period. The wages actually paid cannot be lower than the wages that would result from the wage rate(s) guaranteed in the job order.

(2) Where the wage rates set forth in § 655.120(a)(1) include both hourly and non-hourly wage rates, the employer must calculate each worker's wages, in each pay period, using the highest wage rate for each unit of pay, and pay the worker the highest of these wages for that pay period. The wage actually paid cannot be lower than the wages that would result from the wage rate(s) guaranteed in the job offer.

(3) If the employer requires one or more minimum productivity standards of workers as a condition of job retention, such standards must be specified in the job offer and be no more than those required by the employer in 1977, unless the OFLC Administrator approves a higher minimum, or, if the employer first applied for temporary agricultural labor certification after 1977, such standards must be no more than those normally required (at the time of the first *Application for Temporary Employment Certification*) by other employers for the activity in the area of intended employment.

(4) If applicable, the employer must state in the job order:

(i) That overtime hours may be available;

(ii) The wage rate(s) to be paid for any such overtime hours;

(iii) The circumstances under which the wage rate(s) for overtime hours will be paid, including, but not limited to, after how many hours in a day or workweek the overtime wage rate will be paid, and whether overtime wage rates will vary between places of employment; and

(iv) Where the overtime pay is required by law, the applicable Federal, State, or local law requiring the overtime pay.

*       *       *       *       *

(n) *Termination for cause or abandonment of employment.* (1) If a worker is terminated for cause or voluntarily abandons employment before the end of the contract period, and the employer notifies the NPC, and DHS in the case of an H–2A worker, in writing or by any other method specified by the Department in a notice published in the **Federal Register** or specified by DHS not later than 2 working days after such termination for cause or abandonment occurs, the employer will not be responsible for providing or paying for the subsequent transportation and subsistence expenses of that worker under this section, and that worker is not entitled to the three-fourths guarantee described in paragraph (i) of this section, and, in the case of a U.S. worker, the employer will not be obligated to contact that worker under § 655.153.

(2) A worker is terminated for cause when the employer terminates the worker for failure to comply with employer policies or rules or to satisfactorily perform job duties in accordance with reasonable expectations based on criteria listed in the job offer.

(i) An employer may terminate a worker for cause only if all of the following conditions are satisfied:

(A) The employee has been informed (in a language understood by the worker), or reasonably should have known, of the policy, rule, or performance expectation;

(B) Compliance with the policy, rule, or performance expectation is within the worker's control;

(C) The policy, rule, or performance expectation is reasonable and applied consistently to the employer's H–2A workers and workers in corresponding employment;

(D) The employer undertakes a fair and objective investigation into the job performance or misconduct; and

(E) The employer corrects the worker's performance or behavior using progressive discipline, which is a system of graduated and reasonable responses to an employee's failure to satisfactorily perform job duties or comply with employer policies or rules. Disciplinary measures should be proportional to the misconduct or failure to meet performance expectations but may increase in severity if misconduct or failure to meet performance expectations is repeated, and may include immediate termination for egregious misconduct, meaning intentional or reckless conduct that is plainly illegal, poses imminent danger to physical safety, or that a reasonable person would understand as being outrageous. Prior to each disciplinary measure, the employer must notify the worker of the infraction and allow the worker to present evidence in their defense. Following each disciplinary measure, except where the appropriate disciplinary measure is termination, the employer must provide relevant and adequate instruction to the worker, and must afford the worker reasonable time to correct the behavior or to meet the performance expectation following such instruction. The employer must document each infraction and corresponding disciplinary measure, evidence the worker presented in their defense, and resulting instruction, and provide a copy of this documentation to the worker (in a language understood by the worker) within 1 week of the implementation of the disciplinary measure.

(ii) A worker is not terminated for cause where the termination is: contrary to a Federal, State, or local law; for an employee's refusal to work under conditions that the employee reasonably believes will expose them or other employees to an unreasonable health or safety risk; because of discrimination on the basis of race, color, national origin, age, sex (including sexual orientation or gender identity), religion, disability, familial status or citizenship status; or, where applicable, where the employer failed to comply with its obligations under § 655.135(m) in an investigatory interview that contributed to the termination.

(iii) The employer bears the burden of demonstrating that any termination for

cause meets the requirements in paragraph (n)(2).

(3) Abandonment will be deemed to begin after a worker fails to report to work at the regularly scheduled time for 5 consecutive working days without the consent of the employer.

(4) The employer is required to maintain records described in this section for not less than 3 years from the date of the certification.

(i) Records of notification to the NPC, and to DHS in the case of an H–2A worker, of termination for cause or abandonment.

(ii) Disciplinary records, including the infraction and each step of progressive discipline, any evidence the worker presented in their defense, any investigation related to the termination, and any subsequent instruction afforded the worker.

(iii) Records indicating the reason(s) for termination of any worker, including disciplinary records as described in paragraph (n)(4)(ii) of this section and § 655.167.

\*     \*     \*     \*     \*

■ 10. Amend § 655.130 by revising paragraph (a) to read as follows:

§ 655.130   Application filing requirements.

\*     \*     \*     \*     \*

(a) *What to file.* (1) An employer that desires to apply for temporary agricultural labor certification of one or more nonimmigrant workers must file a completed *Application for Temporary Employment Certification,* all supporting documentation and information required at the time of filing under §§ 655.131 through 655.137, and, unless a specific exemption applies, a copy of Form ETA–790/790A, submitted as set forth in § 655.121(a).

(2) The *Application for Temporary Employment Certification* must include the employer's legal name, trade name(s), and a valid FEIN as well as a valid place of business (physical location) in the United States and a means by which it may be contacted by prospective U.S. applicants for employment. For each employer of any H–2A worker sponsored under the *Application for Temporary Employment Certification* or any worker in corresponding employment, the *Application for Temporary Employment Certification* must include the identity, location, and contact information of that entity.

(3) For each place of employment identified in the job order, the *Application for Temporary Employment Certification* must include the identity, location, and contact information of all

persons and entities, if different than the employer(s), who are the operators of the place of employment, and of all persons who manage or supervise any H–2A worker sponsored under the *Application for Temporary Employment Certification* or any worker in corresponding employment, regardless of whether those managers or supervisors are employed by the employer or another entity.

(4) If the information specified in paragraphs (a)(2) and (3) of this section changes during the work contract period, the employer must update its records to reflect the change. The employer must continue to keep this information up to date until the end of the work contract period, including any extensions. The employer must retain the updated information in accordance with § 655.167(c)(9) and must make this updated information available in the event of a post-certification audit or upon request by the Department. The Department may share the information it receives from employers with any other Federal agency, as appropriate for investigative or enforcement purpose, as set forth in paragraph (f) of this section.

\*     \*     \*     \*     \*

■ 11. Amend § 655.132 by revising paragraph (e)(1) to read as follows:

§ 655.132   H–2A labor contractor filing requirements.

\*     \*     \*     \*     \*

(e) \* \* \*

(1) All housing used by workers and owned, operated, or secured by the fixed-site agricultural business complies with the applicable standards as set forth in § 655.122(d) and certified by the SWA and that the fixed-site agricultural business has agreed to comply with the requirements at § 655.135(n); and

\*     \*     \*     \*     \*

■ 12. Amend § 655.135 by revising the introductory text and paragraph (h) and adding paragraphs (m) through (p) to read as follows:

§ 655.135   Assurance and obligations of H–2A employers.

An employer seeking to employ H–2A workers must agree as part of the *Application for Temporary Employment Certification* and job offer that it will abide by the requirements of this subpart and of 29 CFR part 501 and must make each of the following additional assurances:

\*     \*     \*     \*     \*

(h) *No unfair treatment.* (1) The employer has not and will not intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against, and has not and

will not cause any person to intimidate, threaten, restrain, coerce, blacklist, or in any manner discriminate against, any person who has:

(i) Filed a complaint under or related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;

(ii) Instituted or caused to be instituted any proceeding under or related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;

(iii) Testified or is about to testify in any proceeding under or related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;

(iv) Consulted with an employee of a legal assistance program or an attorney on matters related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;

(v) Consulted with a key service provider on matters related to 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188;

(vi) Exercised or asserted on behalf of themself or others any right or protection afforded by 8 U.S.C. 1188 or this subpart or any Department regulation in this chapter or 29 CFR part 501 promulgated under 8 U.S.C. 1188; or

(vii) Filed a complaint, instituted, or caused to be instituted any proceeding; or testified, assisted, or participated (or is about to testify, assist, or participate) in any investigation, proceeding, or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws.

(2) With respect to any person engaged in agriculture as defined and applied in 29 U.S.C. 203(f), the employer has not and will not intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against, and has not and will not cause any person to intimidate, threaten, restrain, coerce, blacklist, or in any manner discriminate against, any person because such person:

(i) Has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or has refused to engage in any or all of such activities; or

(ii) Has refused to attend an employer-sponsored meeting with the employer or its agent, representative or designee, if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected by this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart.

\* \* \* \* \*

(m) *Designation of representative.* With respect to any H–2A worker or worker in corresponding employment engaged in agriculture as defined and applied in 29 U.S.C. 203(f), employed at the place(s) of employment included in the *Application for Temporary Employment Certification,* the employer must permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview. Where the designated representative is present at the worksite at the time of the investigatory interview, the employer must permit the representative to attend the investigatory interview in person. Where the designated representative is not present at the time and place of the investigatory interview, the employer must permit the representative to attend the investigatory interview remotely, including by telephone, videoconference, or other means.

(n) *Access to worker housing.* Workers residing in employer-furnished housing must be permitted to invite, or accept at their discretion, guests to their living quarters and/or the common areas or outdoor spaces near such housing during time that is outside of the workers' workday subject only to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas. Because workers' ability to accept guests at their discretion depends on the ability of potential guests to contact and seek an invitation from those workers, restrictions impeding this ability to contact and seek an invitation will be evaluated as restrictions on the workers' ability to accept guests.

(o) *Passport withholding.* During the period of employment that is the subject of the *Application for Temporary Labor Certification,* the employer may not hold or confiscate a worker's passport,

visa, or other immigration or government identification document *except* where the worker states in writing that: the worker voluntarily requested that the employer keep these documents safe, the employer did not direct the worker to submit such a request, and the worker understands that the passport, visa, or other immigration or government identification document will be returned to the worker immediately upon the worker's request.

(p) *Foreign worker recruitment.* The employer, and its attorney or agent, as applicable, must comply with § 655.137(a) by providing a copy of all agreements with any agent or recruiter whom it engages or plans to engage in the recruitment of H–2A workers, and the identity and location of the persons and entities hired by or working for the agent or recruiter and any of the agents and employees of those persons and entities, to recruit foreign workers. Pursuant to § 655.130(a), the agreements and information must be filed with the *Application for Temporary Employment Certification.* The employer must update this documentation in accordance with § 655.137(c).

■ 13. Add § 655.137 to read as follows:

### § 655.137 Disclosure of foreign worker recruitment.

(a) If the employer engages or plans to engage an agent or foreign labor recruiter, directly or indirectly, in international recruitment, the employer, and its attorney or agent, as applicable, must provide copies of all contracts and agreements with any agent and/or recruiter, executed in connection with the job opportunity, as specified in § 655.135(p). These agreements must contain the contractual prohibition against charging fees as set forth in § 655.135(k).

(b) The employer, and its attorney or agent, as applicable, must provide all recruitment-related information required in the *Application for Temporary Employment Certification,* as defined in § 655.103(b), which includes the identity and location of all persons and entities hired by or working for the recruiter or agent, and any of the agents or employees of those persons and entities, to recruit prospective foreign workers for the H–2A job opportunity.

(c) The employer must continue to keep the foreign labor recruiter information referenced in paragraphs (a) and (b) of this section up to date until the end of the work contract period. The employer must retain the updated information in accordance with § 655.167(c)(8) and must make this

updated information available in the event of a post-certification audit or upon request by the Department. The Department may share the foreign worker recruitment information it receives from employers with any other Federal agency, as appropriate for investigative or enforcement purpose, as set forth in § 655.130(f).

(d) The Department of Labor will maintain a publicly available list of agents and recruiters (including government registration numbers, if any) who are party to the agreements employers submit, as well as the persons and entities the employer identified as hired by or working for the recruiter and the locations in which they are operating.

■ 14. Amend § 655.145 by revising the section heading and paragraph (b) to read as follows:

### § 655.145 Pre-determination amendments to applications for temporary employment certification.

\* \* \* \* \*

(b) *Minor changes to the period of employment.* The *Application for Temporary Employment Certification* may be amended to make minor changes in the total period of employment before the CO issues a final determination. Changes will not be effective until submitted in writing and approved by the CO. In considering whether to approve the request, the CO will review the reason(s) for the request, determine whether the reason(s) are on the whole justified, and take into account the effect any change(s) would have on the adequacy of the underlying test of the domestic labor market for the job opportunity. An employer must demonstrate that the change to the period of employment could not have been foreseen, and the crops or commodities will be in jeopardy prior to the expiration of an additional recruitment period. Upon acceptance of an amendment, the CO will submit to the SWA any necessary modification to the job order.

■ 15. Amend § 655.167 by revising paragraphs (c)(6) and (7) and adding paragraphs (c)(8) through (12) to read as follows:

### § 655.167 Document retention requirements of H–2A employers.

\* \* \* \* \*

(c) \* \* \*

(6) The work contract or a copy of the *Application for Temporary Employment Certification* as defined in § 655.103(b) and specified in § 655.122(q).

(7) If applicable, records of notice to the NPC and to DHS of the abandonment of employment or

termination for cause of a worker as set forth in § 655.122(n).

(8) Written contracts with agents or recruiters as specified in § 655.137(a) and the identities and locations of persons hired by or working for the agent or recruiter and the agents and employees of these agents and recruiters, as specified in § 655.137(b).

(9) The identity, location, and contact information of all persons who are the owners of each employer, as specified in § 655.130(a)(2), and the identity, location, and contact information of all persons and entities who are the operators of the place of employment (if different than the employers) and of all persons who manage or supervise any H–2A worker sponsored under the *Application for Temporary Employment Certification* or any worker in corresponding employment, as specified in § 655.130(a)(3).

(10) If applicable, disciplinary records, including each step of progressive discipline, any evidence the worker presented in their defense, any investigation related to the termination, and any subsequent instruction afforded the worker.

(11) If applicable, records indicating the reason(s) for termination of any worker, including disciplinary records described in § 655.122(n)(4)(ii) and this section, relating to the termination as set forth in § 655.122(n).

(12) If applicable, evidence demonstrating the employer notified the SWA and each worker of an unforeseen minor delay in the start date of need, as specified in § 655.175(b)(2)(i).

\*     \*     \*     \*     \*

■ 16. Add § 655.175 to read as follows:

### § 655.175 Post-certification changes to applications for temporary employment certification.

(a) *No post-certification changes.* The *Application for Temporary Employment Certification* may not be changed after certification, except where authorized in this subpart. The employer is obligated to comply with the terms and conditions of employment contained in the approved *Application for Temporary Employment Certification* and job order with respect to all workers recruited in connection with its certification.

(b) *Post-certification changes to the first date of work.* Where the work under the approved *Application for Temporary Employment Certification* will not begin on the first date of need certified and will be delayed for a period of no more than 14 calendar days, due to circumstances that could not have been foreseen, and the crops or commodities will be in jeopardy prior to the expiration of an additional

recruitment period, the employer need not withdraw an approved *Application for Temporary Employment Certification*, provided the employer complies with the obligations at paragraphs (b)(1) and (2) of this section.

(1) In the event of a delay, the employer must provide to all workers who are already traveling to the place of employment, upon their arrival and without cost to the workers until work commences, daily subsistence in the same amount required during travel under § 655.122(h)(1), except for days for which the worker receives compensation under paragraph (b)(2)(ii) of this section. The employer must fulfill this subsistence obligation to the worker no later than the first date the worker would have been paid had they begun employment on time. Employers must comply with all other requirements of the certified *Application for Temporary Employment Certification* beginning on the first date of need certified, including but not limited to housing under § 655.122(d).

(2)(i) In the event of a delay, the employer must notify the SWA and each worker to be employed under the job order associated with the approved *Application for Temporary Employment Certification* of the delay at least 10 business days before the certified start date of need. The employer must notify the worker in writing, in a language understood by the worker, as necessary or reasonable, using the contact information the worker provided to the employer. If the worker provides electronic contact information, such as an email address or telephone number, the employer must send notice using that email address and telephone number. The employer may provide telephonic notice, provided the employer also sends written notice using the email or postal address provided by the worker. The employer must retain evidence of such notification under § 655.167(c)(12).

(ii) If the employer fails to provide timely notification required under paragraph (b)(2)(i) of this section to any worker(s), the employer must pay such worker(s) the highest of the hourly rates of pay at § 655.120(a), or, if applicable, the rate required under § 655.211(a)(1), for each hour of the offered work schedule in the job order, for each day that work is delayed, for a period up to 14 calendar days. The employer must fulfill this obligation to the worker no later than the first date the worker would have been paid had they begun employment on time.

(iii) For purposes of an employer's compliance with the three-fourths guarantee under § 655.122(i), any

compensation paid to a worker under paragraph (b)(2)(ii) of this section for any workday included within the time period described in § 655.122(i) will be considered hours offered to the worker.

■ 17. Amend § 655.181 by revising paragraph (a)(1) to read as follows:

### § 655.181   Revocation.

(a) \*  \*  \*

(1) The issuance of the temporary agricultural labor certification was not justified due to fraud or misrepresentation in the application process, including because the certification was issued in error to a debarred employer, including a successor in interest, during the period of debarment as set forth in § 655.182(c)(2);

\*     \*     \*     \*     \*

■ 18. Amend § 655.182 by revising paragraphs (a), (b), and (d)(1)(viii) to read as follows:

### § 655.182   Debarment.

(a) *Debarment of an employer, agent, or attorney.* The OFLC Administrator may debar an employer, agent, or attorney from participating in any action under 8 U.S.C. 1188, this subpart, or 29 CFR part 501 subject to the time limits set forth in paragraph (c) of this section, if the OFLC Administrator finds that the employer, agent, or attorney substantially violated a material term or condition of the temporary agricultural labor certification, with respect to H–2A workers; workers in corresponding employment; or U.S. workers improperly rejected for employment, or improperly laid off or displaced.

(b) *Effect on future applications.* (1) No application for H–2A workers may be filed by or on behalf of a debarred employer, or by an employer represented by a debarred agent or attorney, subject to the term limits set forth in paragraph (c)(2) of this section. If such an application is filed, it will be denied without review.

(2) No application for H–2A workers may be filed by or on behalf of a successor in interest to a debarred employer, agent, or attorney, subject to the term limits set forth in paragraph (c)(2) of this section. If the CO determines that such an application is filed, the CO will issue a NOD pursuant to § 655.141 or deny the application pursuant to § 655.164, as appropriate depending upon the status of the *Application for Temporary Employment Certification,* solely on the basis that the entity is a successor in interest to a debarred employer, agent, or attorney. The employer, agent, or attorney may appeal its status as a successor in

interest to the debarred entity, pursuant to the procedures for appeals of CO determinations at § 655.171.

*   *   *   *   *

(d) * * *

(1) * * *

(viii) A violation of the requirements of § 655.135(j), (k), or (o);

*   *   *   *   *

■ 19. Add § 655.190 to read as follows:

### § 655.190   Severability.

If any provision of this subpart is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision will be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is one of total invalidity or unenforceability, in which event the provision will be severable from this part and shall not affect the remainder thereof.

■ 20. Amend § 655.210 by revising paragraph (g) to read as follows:

### § 655.210   Contents of herding and range livestock job orders.

*   *   *   *   *

(g) *Rates of pay.* (1) The employer must offer, advertise in its recruitment, and pay a wage that is at least the highest of the following rates in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof:

(i) The monthly AEWR, as specified in § 655.211;

(ii) The agreed-upon collective bargaining wage;

(iii) The applicable minimum wage imposed by Federal or State law or judicial action; or

(iv) Any other wage rate the employer intends to pay.

(2) The offered wage shall not be based on commissions, bonuses, or other incentives, unless the employer guarantees a wage that equals or exceeds the monthly AEWR, the agreed-upon collective bargaining wage, the applicable minimum wage imposed by Federal or State law or judicial action, any agreed-upon collective bargaining rate, or any other wage rate the employer intends to pay, whichever is highest, and must be paid to each worker free and clear without any unauthorized deductions.

(3) The employer may prorate the wage for the initial and final pay periods of the job order period if its pay period does not match the beginning or ending dates of the job order. The employer also may prorate the wage if a worker is voluntarily unavailable to work for personal reasons.

(4) If applicable, the employer must state in the job order:

(i) That overtime hours may be available;

(ii) The wage rate(s) to be paid for any such overtime hours;

(iii) The circumstances under which the wage rate(s) for overtime hours will be paid, including, but not limited to, after how many hours in a day or workweek the overtime wage rate will be paid, and whether overtime wage rates will vary between-place(s) of employment; and

(iv) Where the overtime pay is required by law, the applicable Federal, State, or local law requiring the overtime pay.

*   *   *   *   *

■ 21. Amend § 655.211 by revising paragraph (a) to read as follows:

### § 655.211   Herding and range livestock wage rate.

(a) *Compliance with rates of pay.* (1) To comply with its obligation under § 655.210(g), an employer must offer, advertise in its recruitment, and pay each worker employed under §§ 655.200 through 655.235 a wage that is at least the highest of the monthly AEWR established under this section, the agreed-upon collective bargaining wage, the applicable minimum wage imposed by Federal or State law or judicial action, or any other wage rate the employer intends to pay. The employer must list all potentially applicable wage rates in the job order and must offer and advertise all of these wage rates in its recruitment.

(2) If the monthly AEWR established under this section is adjusted during a work contract, and is higher than the agreed-upon collective bargaining wage, the applicable minimum wage imposed by Federal or State law or judicial action in effect at the time the work is performed, and any other wage rate the employer offered to pay, the employer must pay at least that adjusted monthly AEWR upon the effective date of the updated monthly AEWR published by the Department in the **Federal Register**.

*   *   *   *   *

## PART 658—ADMINISTRATIVE PROVISIONS GOVERNING THE WAGNER-PEYSER ACT EMPLOYMENT SERVICE

■ 22. The authority citation for part 658 continues to read as follows:

**Authority:** Secs. 189, 503, Pub. L. 113–128, 128 Stat. 1425 (Jul. 22, 2014); 29 U.S.C. chapter 4B.

■ 23. Revise § 658.500 to read as follows:

### § 658.500   Scope and purpose of subpart.

(a) This subpart contains the regulations governing the discontinuation of services provided by the ES to employers pursuant to parts 652 and 653 of this chapter.

(b) For purposes of this subpart only, where the term "employer" is used, it refers to employers, agents, farm labor contractors, joint employers, and successors in interest to any employer, agent, farm labor contractor, or joint employer, as defined at § 651.10 of this chapter. A successor in interest to an employer, agent, or farm labor contractor may be held liable for the duties and obligations of that employer, agent, or farm labor contractor for purposes of recruitment of workers through the ES clearance system or enforcement of ES regulations, regardless of whether such successor in interest has succeeded to all the rights and liabilities of the predecessor entity.

■ 24. Revise and republish § 658.501 to read as follows:

### § 658.501   Basis for discontinuation of services.

(a) SWA officials must initiate procedures for discontinuation of services to employers who:

(1) Submit and refuse to correct or withdraw job orders containing terms and conditions that are contrary to employment-related laws;

(2) Submit job orders and refuse to provide assurances, or refuse to withdraw job orders that do not contain assurances, required pursuant to the Agricultural Recruitment System for U.S. Workers at part 653, subpart F, of this chapter;

(3) Are found through field checks or otherwise to have either misrepresented the terms or conditions of employment specified on job orders or failed to comply fully with assurances made on job orders;

(4) Are found by a final determination by an appropriate enforcement agency to have violated any employment-related laws and notification of this final determination has been provided to the Department or the SWA by that enforcement agency, including those who are currently debarred from participating in the H–2A or H–2B foreign labor certification programs pursuant to § 655.73 or § 655.182 of this chapter or 29 CFR 501.20 or 503.24;

(5) Are found to have violated ES regulations pursuant to § 658.411 or § 658.419;

(6) Refuse to accept qualified workers referred through the clearance system for criteria clearance orders filed pursuant to part 655, subpart B, of this chapter;

(7) Refuse to cooperate in field checks conducted pursuant to § 653.503 of this chapter; or

(8) Repeatedly cause the initiation of the procedures for discontinuation of services pursuant to paragraphs (a)(1) through (7) of this section.

(b) If an ES office or SWA has information that an employer participating in the ES may have committed fraud or misrepresentation in connection with its current or prior temporary labor certification or may not have complied with the terms of such certification, under, for example the H–2A and H–2B visa programs, SWA officials must notify the OFLC National Processing Center and the Wage and Hour Division of the alleged noncompliance as applicable under § 655.185 and 29 CFR 501.2, 501.6, 503.3, and 503.7. If the circumstances occurred within the previous 3 years, SWA officials must determine whether there is a basis under paragraph (a) of this section for which the SWA must initiate procedures for discontinuation of services.

(c) [Reserved]

■ 25. Revise § 658.502 to read as follows:

**§ 658.502   Notification to employers of intent to discontinue services.**

(a) Except as provided in paragraph (b) of this section, where the SWA determines that there is an applicable basis for discontinuation of services under § 658.501(a)(1) through (8), the SWA must notify the employer in writing that it intends to discontinue the provision of ES services in accordance with this section and must provide the reasons for proposing discontinuation of services.

(1) Where the decision is based on § 658.501(a)(1), the SWA must specify the date the order was submitted, the job order involved, and the terms and conditions contrary to employment-related laws and the laws involved. The SWA must notify the employer in writing that all ES services will be terminated unless the employer within 20 working days:

(i) Provides adequate evidence that the terms and conditions are not contrary to employment-related laws;

(ii) Withdraws the terms and conditions and resubmits the job order in compliance with all employment-related laws; or

(iii) If the job is no longer available, makes assurances that all future job orders submitted will be in compliance with all employment-related laws.

(2) Where the decision is based on § 658.501(a)(2), the SWA must specify the date the order was submitted, the job order involved, the assurances involved, and explain how the employer refused to provide the assurances. The SWA must notify the employer that all ES services will be terminated unless the employer within 20 working days:

(i) Resubmits the order with the required assurances; or

(ii) If the job is no longer available, makes assurances that all future job orders submitted will contain all assurances required pursuant to the Agricultural Recruitment System for U.S. Workers at part 653, subpart F, of this chapter.

(3) Where the decision is based on § 658.501(a)(3), the SWA must specify the terms and conditions the employer misrepresented or the assurances with which the employer did not fully comply, and explain how the employer misrepresented the terms or conditions or failed to comply with assurances on the job order. The SWA must notify the employer that all ES services will be terminated unless the employer within 20 working days:

(i) Provides adequate evidence that terms and conditions of employment were not misrepresented;

(ii) Provides adequate evidence that there was full compliance with the assurances made on the job orders; or

(iii) Provides adequate evidence that it has resolved the misrepresentation of terms and conditions of employment or noncompliance with assurances and provides adequate assurance that specifications on future orders will accurately represent the terms and conditions of employment and that there will be full compliance with all job order assurances.

(4) Where the decision is based on § 658.501(a)(4), the SWA must provide evidence of the final determination, including debarment. For final determinations, the SWA must specify the enforcement agency's findings of facts and conclusions of law as to the employment-related law violation(s). For final debarment orders, the SWA must specify the time period for which the employer is debarred from participating in one of the Department's foreign labor certification programs. The SWA must notify the employer that all ES services will be terminated unless the employer within 20 working days:

(i) Provides adequate evidence that the enforcement agency's determination is not final because, for example, it has been stayed pending appeal, overturned, or reversed; or

(ii) Provides adequate evidence that, as applicable:

(A) The Department's debarment is no longer in effect; and

(B) The employer has completed all required actions imposed by the enforcement agency as a consequence of the violation, including payment of any fines or restitution to remediate the violation; and

(iii) Provides assurances that any policies, procedures, or conditions responsible for the violation have been corrected and the same or similar violations are not likely to occur in the future.

(5) Where the decision is based on § 658.501(a)(5), the SWA must specify which ES regulation, as defined in § 651.10, the employer has violated and must provide basic facts to explain the violation. The SWA must notify the employer that all ES services will be terminated unless the employer within 20 working days:

(i) Provides adequate evidence that the employer did not violate ES regulations; or

(ii) Provides adequate evidence that appropriate restitution has been made or remedial action taken; and

(iii) Provides assurances that any policies, procedures, or conditions responsible for the violation have been corrected and the same or similar violations are not likely to occur in the future.

(6) Where the decision is based on § 658.501(a)(6), the SWA must indicate that the employer filed the job order pursuant to part 655, subpart B, of this chapter, and specify the name of each worker the SWA referred and the employer did not accept. The SWA must notify the employer that all ES services will be terminated unless the employer within 20 working days:

(i) Provides adequate evidence that the workers were accepted; or

(ii) Provides adequate evidence that the workers were not available to accept the job; or

(iii) Provides adequate evidence that the workers were not qualified; or

(iv) Provides adequate evidence that the workers were referred after the time period described in § 655.135(d) of this chapter elapsed; or

(v) Provides adequate evidence that:

(A) After refusal, the employer accepted the qualified workers referred; or

(B) Appropriate restitution has been made or other remedial action taken; and

(vi) Provides assurances that qualified workers referred in the future will be accepted or, if the time period described in § 655.135(d) of this chapter has lapsed, provides assurances that qualified workers referred on all future criteria clearance orders will be accepted.

(7) Where the decision is based on § 658.501(a)(7), the SWA must explain how the employer did not cooperate in the field check. The SWA must notify the employer that all ES services will be terminated unless the employer within 20 working days:

(i) Provides adequate evidence that it did cooperate; or

(ii) Immediately cooperates in the conduct of field checks; and

(iii) Provides assurances that it will cooperate in future field checks.

(8) Where the decision is based on § 658.501(a)(8), the SWA must list and provide basic facts explaining the prior instances where the employer has repeatedly caused initiation of discontinuation proceedings. The SWA must notify the employer that all ES services will be terminated unless the employer within 20 working days provides adequate evidence that the SWA's initiation of discontinuation in prior proceedings was unfounded.

(b) SWA officials must discontinue services immediately in accordance with § 658.503, without providing the notice described in this section, if an employer has met any of the bases for discontinuation of services under § 658.501(a) and, in the judgment of the State Administrator, exhaustion of the administrative procedures set forth in this section would cause substantial harm to workers.

■ 26. Revise § 658.503 to read as follows:

§ 658.503 Discontinuation of services.

(a) Within 20 working days of receipt of the employer's response to the SWA's notification under § 658.502(a), or at least 20 working days after the SWA's notification has been received by the employer if the SWA does not receive a response, the SWA must notify the employer in writing of its final determination. If the SWA determines that the employer did not provide a satisfactory response in accordance with § 658.502(a), the SWA's notification must specify the reasons for its determination and state that the discontinuation of services is effective 20 working days from the date of the notification. The notification must also state that the employer may request reinstatement or appeal the determination by requesting a hearing pursuant to § 658.504, and that a request for a hearing stays the discontinuation pending the outcome of the hearing. If the employer does not request a hearing, the SWA must also notify the ETA Office of Workforce Investment of any final determination to discontinue ES services within 10 working days of the

date the determination becomes effective.

(b) Where the SWA discontinues services immediately under § 658.502(b), the SWA's written notification must specify the facts supporting the applicable basis for discontinuation under § 658.501(a), the reasons that exhaustion of the administrative procedures would cause substantial harm to workers, and that services are discontinued as of the date of the notification. The notification must also state that the employer may request reinstatement or appeal the determination by requesting a hearing pursuant to § 658.504, and that a request for a hearing relating to immediate discontinuation does not stay the discontinuation pending the outcome of the hearing. Within 10 working days of the date of issuance, the SWA must also notify the ETA Office of Workforce Investment of any determination to immediately discontinue ES services.

(c) If the SWA discontinues services to an employer that is subject to Federal Contractor Job Listing Requirements, the SWA must notify the ETA regional office immediately.

(d) If the SWA discontinues services to an employer based on a complaint filed pursuant to § 658.411, the SWA must notify the complainant of the employer's discontinuation of services.

(e) If the SWA discontinues services to an employer, the employer cannot participate in or receive Wagner-Peyser Act ES Services provided by the ES, including by any SWA, to employers pursuant to parts 652 and 653 of this chapter. From the date of discontinuance, the SWA that issued the determination must remove the employer's active job orders from the clearance system. No SWA may process any future job orders from the employer or provide any other services pursuant to parts 652 and 653 of this chapter to the employer unless services have been reinstated under § 658.504.

(f) SWAs must continue to provide the full range of ES and other appropriate services to workers whose employers experience discontinuation of services under this subpart.

■ 27. Revise § 658.504 to read as follows:

§ 658.504 Reinstatement of services.

(a) Where the SWA discontinues services to an employer under § 658.502(b) or § 658.503, the employer may submit a written request for reinstatement of services to the SWA or may, within 20 working days of receiving notice of the SWA's final determination, appeal the

discontinuation by submitting a written request for a hearing.

(b) If the employer submits a written request for reinstatement of services to the SWA:

(1) Within 20 working days of receipt of the employer's request for reinstatement, the SWA must notify the employer of its decision to grant or deny the request. If the SWA denies the request for reinstatement, it must specify the reasons for the denial and notify the employer that it may request a hearing, in accordance with paragraph (c) of this section, within 20 working days.

(2) The SWA must reinstate services if:

(i) The employer provides adequate evidence that the policies, procedures, or conditions responsible for the previous discontinuation of services have been corrected and that the same or similar circumstances are not likely to occur in the future; and

(ii) The employer provides adequate evidence that it has responded to all findings of an enforcement agency, SWA, or ETA, including payment of any fines or restitution to remediate the violation, that were the basis of the discontinuation of services, if applicable.

(c) If the employer submits a timely request for a hearing:

(1) The SWA must follow the procedures set forth in § 658.417; and

(2) The SWA must reinstate services to the employer if ordered to do so by a State hearing official, Regional Administrator, or Federal Administrative Law Judge as a result of a hearing offered pursuant to paragraph (c)(1) of this section.

(d) Within 10 working days of the date of issuance, the SWA must notify the ETA Office of Workforce Investment of any determination to reinstate ES services, or any decision on appeal upholding a SWA's determination to discontinue services.

**Title 29: Labor**

**Wage and Hour Division**

**PART 501—ENFORCEMENT OF CONTRACTUAL OBLIGATIONS FOR TEMPORARY ALIEN AGRICULTURAL WORKERS ADMITTED UNDER SECTION 218 OF THE IMMIGRATION AND NATIONALITY ACT**

■ 28. The authority citation for part 501 continues to read as follows:

**Authority:** 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1184(c), and 1188; 28 U.S.C. 2461 note; and sec. 701, Pub. L. 114–74, 129 Stat. 584.

■ 29. Amend § 501.3 by:

■ a. In paragraph (a), adding the definitions of "Key service provider" and "Labor organization" in alphabetical order and removing the definition of "Successor in interest"; and

■ b. Adding paragraph (d).

The additions read as follows:

### § 501.3  Definitions.

(a) * * *

*Key service provider.* A health-care provider; a community health worker; an education provider; a translator or interpreter; an attorney, legal advocate, or other legal service provider; a government official, including a consular representative; a member of the clergy; an emergency services provider; a law enforcement officer; and any other provider of similar services.

*Labor organization.* Any organization of any kind, or any agency or employee representation committee or plan, in which workers participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

*       *       *       *       *

(d) *Definition of single employer for purposes of temporary or seasonal need and contractual obligations.* Separate entities will be deemed a single employer (sometimes referred to as an "integrated employer") for purposes of assessing temporary or seasonal need and for enforcement of contractual obligations if they meet the definition of single employer in this paragraph (e). Under the definition of single employer, a determination of whether separate entities are a single employer is not determined by a single factor, but rather the entire relationship is viewed in its totality. Factors considered in determining whether two or more entities consist of a single employer include:

(1) Common management;

(2) Interrelation between operations;

(3) Centralized control of labor relations; and

(4) Degree of common ownership/ financial control.

■ 30. Amend § 501.4 by revising paragraph (a) to read as follows:

### § 501.4  Discrimination prohibited.

(a)(1) A person may not intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against any person who has:

(i) Filed a complaint under or related to 8 U.S.C. 1188 or this part;

(ii) Instituted or causes to be instituted any proceedings related to 8 U.S.C. 1188, 20 CFR part 655, subpart B, or this part;

(iii) Testified or is about to testify in any proceeding under or related to 8 U.S.C. 1188, 20 CFR part 655, subpart B, or this part;

(iv) Consulted with an employee of a legal assistance program or an attorney on matters related to 8 U.S.C. 1188, 20 CFR part 655, subpart B, or this part;

(v) Consulted with a key service provider on matters related to 8 U.S.C. 1188, 20 CFR part 655, subpart B, or this part;

(vi) Exercised or asserted on behalf of themselves or others any right or protection afforded by 8 U.S.C. 1188, 20 CFR part 655, subpart B, or this part; or

(vii) Filed a complaint, instituted, or caused to be instituted any proceeding, or testified, assisted, or participated (or is about to testify, assist or participate) in any investigation, proceeding or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws.

(2) With respect to any person engaged in agriculture as defined and applied in 29 U.S.C. 203(f), a person may not intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against, and may not cause any person to intimidate, threaten, restrain, coerce, blacklist, or in any manner discriminate against, any person because such person:

(i) Has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or has refused to engage in any or all of such activities; or

(ii) Has refused to attend an employer-sponsored meeting with the employer or its agent, representative or designee, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart; or listen to speech or view communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart.

*       *       *       *       *

■ 31. Add § 501.10 to subpart A to read as follows:

### § 501.10  Severability.

If any provision of this part is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision will be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is one of total invalidity or unenforceability, in which event the provision will be severable from this part and will not affect the remainder thereof.

■ 32. Amend § 501.20 by revising paragraphs (a), (b), (d)(1)(viii), and adding paragraph (j) to read as follows:

### § 501.20  Debarment and revocation.

(a) *Debarment of an employer, agent, or attorney.* The WHD Administrator may debar an employer, agent, or attorney from participating in any action under 8 U.S.C. 1188, 20 CFR part 655, subpart B, or this part, subject to the time limits set forth in paragraph (c) of this section, if the WHD Administrator finds that the employer, agent, or attorney substantially violated a material term or condition of the temporary agricultural labor certification, with respect to H–2A workers, workers in corresponding employment, or U.S. workers improperly rejected for employment, or improperly laid off or displaced, by issuing a Notice of Debarment.

(b) *Effect on future applications.* (1) No application for H–2A workers may be filed by or on behalf of a debarred employer, or by an employer represented by a debarred agent or attorney, subject to the time limits set forth in paragraph (c)(2) of this section. If such an application is filed, it will be denied without review.

(2) No application for H–2A workers may be filed by or on behalf of a successor in interest, as defined in 20 CFR 655.104, to a debarred employer, agent, or attorney, subject to the term limits set forth in paragraph (c)(2) of this section. If the CO determines that such an application is filed, the CO will issue a Notice of Deficiency (NOD) pursuant to 20 CFR 655.141 or deny the application pursuant to 20 CFR 655.164, as appropriate depending upon the status of the *Application for Temporary Employment Certification*, solely on the basis that the entity is a successor in interest to a debarred employer, agent, or attorney. The employer, agent, or attorney may appeal its status as a successor in interest to the debarred entity, pursuant to the procedures for appeals of CO determinations at 20 CFR 655.171.

*       *       *       *       *

(d) * * *

(1) * * *

(viii) A violation of the requirements of 20 CFR 655.135(j), (k), or (o);

*       *       *       *       *

(j) *Successors in interest.* When an employer, agent, or attorney is debarred

under this section, any successor in interest to the debarred employer, agent, or attorney is also debarred, regardless of whether the successor is named or not named in the notice of debarment issued under paragraph (a) of this section.

■ 33. Amend § 501.33 by revising paragraph (b)(2) to read as follows:

**§ 501.33   Request for hearing.**

\*   \*   \*   \*   \*

(b) \* \* \*

(2) Specify the issue or issues stated in the notice of determination giving rise to such request (any issues not raised in the request may be deemed waived);

\*   \*   \*   \*   \*

**José Javier Rodríguez,**
*Assistant Secretary for Employment and Training, Labor.*

**Jessica Looman,**
*Administrator, Wage and Hour Division.*

[FR Doc. 2024–08333 Filed 4–26–24; 8:45 am]
**BILLING CODE 4510–FP–P; 4510–FR–P; 4510–27–P**