UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

*Electronically filed*

| | |
|---|---|
| RICHARD BARTON, *et al.* | |
| Plaintiffs | |
| v. | Civil Action No. 5:24-cv-000249-DCR |
| U.S. DEPARTMENT OF LABOR, *et al.* | |
| Defendants | |

---

**MEMORANDUM IN SUPPORT OF INTERVENING STATE PLAINTIFFS'
MOTION FOR A § 705 STAY AND PRELIMINARY INJUNCTION**

---

The Department of Labor's final rule, "Improving Protections for Workers in Temporary Agricultural Employment in the United States," 89 Fed. Reg. 33,898 (Apr. 29, 2024) ("Final Rule") imposes new and extraordinary conditions on American farmers seeking to employ temporary foreign agricultural workers. Among other things, the Final Rule requires that farmers allow foreign workers to engage in "collective action and concerted activity." To enforce these new conditions, the Department of Labor ("Department") demands that State Workforce Agencies ("SWA") discontinue vital employment services to farmers who refuse to comply.

On September 12, the Department began enforcing the Final Rule for all work to be completed in States not covered by the preliminary injunction issued in *Kansas v. U.S. Department of Labor*, No. 2:24-cv-00076, 2024 WL 3938839 (S.D. Ga. Aug. 26, 2024). *See* Doc. 15, PageID.310. Kentucky, Alabama, Ohio, and West Virginia are not

covered by the *Kansas* injunction, so the requirements of the Final Rule now apply to their farmers and SWAs. Under Section 5 of the Administrative Procedure Act, "the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Because the Final Rule will subject them to irreparable harm, the Intervening State Plaintiffs ask this Court to grant relief from the Final Rule while this case proceeds, in the form of a § 705 stay and a preliminary injunction.

## BACKGROUND

### I.    The H-2A Visa Program

The Immigration and Nationality Act, as amended by the Immigration Reform and Control Act, allows foreign migrant workers to come temporarily to the United States to perform agricultural labor or services. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). These workers receive H-2A visas. Employers wishing to hire these H-2A workers must petition the U.S. Attorney General for approval. *See* 8 U.S.C. § 1184(c)(1). The limited role of the Secretary of the Department of Labor in the H-2A visa program is to certify that (1) there are not sufficient American or lawful permanent resident workers to perform the necessary work and (2) foreign workers will not adversely affect the wages and working conditions of workers in the United States who are similarly employed. *See* 8 U.S.C. § 1188(a)(1). If the Secretary certifies to both conditions, the Attorney General may approve the petition for H-2A workers. *Id.*

2

Employers seeking to hire H-2A workers must also submit job orders to the SWA serving the area where the job is to be performed. *See* 20 C.F.R. § 655.121. The SWA must review the job order for compliance with related regulations. *See* 20 C.F.R. § 655.121(e)(2). As part of the SWAs' duty under the Wagner-Peyser Act, 29 U.S.C. § 49 *et seq*., if the SWA approves the job order, "the SWA must promptly place the job order in intrastate clearance and commence recruitment of U.S. workers" and then "refer each U.S. worker who applies" to the farmer. *See* 20 C.F.R. § 655.121(f), (g); *Flores v. Rios*, 36 F.3d 507, 512 (6th Cir. 1994). However, under 29 C.F.R. § 500.1(f), "[t]he facilities and services of the U.S. Employment service, including State agencies, authorized by the Wagner-Peyser Act may be denied to any person found . . . to have violated any employment-related laws." The Final Rule mandates that, if a farmer is found to have violated the Final Rule, the SWA must deny him any employment-related services, including critical recruitment services.

## II.    The National Labor Relations Act

The National Labor Relations Act ("NLRA") established statutorily protected rights to collective bargaining for some employees. 29 U.S.C. § 157. However, agricultural workers are not covered by the NLRA: "The term 'employee' . . . shall not include any individual employed as an agricultural laborer[.]" 29 U.S.C. § 152(3). With this language, Congress made it explicitly clear the NLRA does not extend collective bargaining rights to migrant workers who come temporarily to the United States to perform agricultural labor or services under the H-2A visa program.

### III.    The Final Rule

With the Final Rule the Department completely ignores its limited role in the H-2A visa program. Worse, it assumes power under the NLRA that it does not have—in a manner that conflicts with explicit prohibitions in the NLRA.

One of the major provisions of the Final Rule, according to the Department, is adding new "[p]rotections for [w]orker [v]oice and [e]mpowerment. 89 Fed. Reg. at 33,901. Specifically, the new protections include requiring all employers seeking to hire H-2A visa workers to not retaliate against an H-2A worker for engaging in "collective action and concerted activity." *See* 89 Fed. Reg. at 33,901, 33,992, 34,062. The Final Rule also requires agricultural employers to permit workers "to designate a representative to attend any investigatory interview that the worker believes might result in disciplinary action," *id.* at 34,063, and to allow workers residing in employer-furnished housing "to invite, or accept at their discretion, guests" subject only to "reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas," *id.* To enforce these radically new conditions, the Final Rule mandates that SWAs "must initiate procedures for discontinuation of [employment] services to employers who" do not comply. *Id.* at 34,065–66.

The requirements of the Final Rule are immediately enforceable in Kentucky, Alabama, Ohio, and West Virginia. *See* Doc. 15, PageID.310. Therefore, to avoid irreparable harm under this unlawful Rule, the Intervening State Plaintiffs seek a § 705 stay and a preliminary injunction.

4

## LEGAL STANDARD

The Intervening State Plaintiffs ask this Court to "postpone the effective date" of the Final Rule under 5 U.S.C. § 705 and to issue a preliminary injunction against associated enforcement. Both routes to relief allow the Court to "preserve status or rights pending" completion of the proceedings by pausing the Final Rule's effect. 5 U.S.C. § 705; *see also* Fed. R. Civ. P. 65.

When deciding whether to issue a preliminary injunction and a § 705 stay, a court considers four factors: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citations omitted); *Tennessee v. Cardona*, No. 2:24-cv-072, 2024 WL 3019146, at *7 (E.D. Ky. Jun. 17, 2024) ("[A] motion for a stay under § 705 is judged by the same standard as a motion for a preliminary injunction" (citing *Ohio v. Nuclear Reg. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987)). The four factors are "balanced against one another and should not be considered prerequisites[.]" *Leary*, 228 F.3d at 736. Yet, the likelihood of success on the merits "is often dispositive." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020); *see Anderson v. Kentucky One Health, Inc.*, No. 3:17-cv-359, 2017 WL 4273107, at *2 (W.D. Ky. Sept. 26, 2017) (explaining that a movant's likelihood of success on the merits is "[t]he principal consideration for courts when determining whether to grant a preliminary injunction"); *District of Columbia v. U.S.*

5

*Dep't of Agriculture*, 444 F.Supp.3d 1, 20–21 (D.D.C. 2020) (denying the plaintiffs' motion for a § 705 stay and preliminary injunction after determining the plaintiffs had not shown a likelihood of success on the merits).

## ARGUMENT

**I.    Intervening Plaintiff States are likely to succeed on the merits of their claims.**

### A. The Final Rule exceeds the Department's authority.

The Administrative Procedure Act ("APA") requires courts to hold unlawful and set aside agency action that is "not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706. The Final Rule is both "in excess" of its statutory authority and "not in accordance with law."

Congress conferred general rulemaking authority to carry out the H-2A visa program on two agencies: the Department of Homeland Security and the U.S. Attorney General. *See* 8 U.S.C. § 1103(a)(3), (g)(2). It did not give the same general rulemaking authority to the Department of Labor. Yet, the Department promulgated the Final Rule as if it had such general rulemaking authority.

According to the Department, with the Final Rule, the Department is "exercising its long-recognized authority to establish the minimum terms and conditions of employment (i.e., the 'baseline' of working conditions) necessary to 'neutralize any adverse effect resultant from the influx of temporary foreign workers.'" 89 Fed. Reg. at 33,992 (quoting *Williams v. Usery*, 531 F.2d 305, 306–07 (5th Cir. 1976)). In reality, the Final Rule is a radical departure from any "long-

6

recognized authority" of the Department. Specifically, the Final Rule expands such minimum terms and conditions to include, *inter alia*, that an employer (1) cannot take action with respect to an H-2A worker for engaging in "collective action and concerted activity," *see* 89 Fed. Reg. at 33,901, 33,992, 34,062; (2) must not operate or allow anyone else to operate employer-provided transportation unless all passengers are wearing seat belts, *see id*. at 34,060; (3) must permit workers "to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action," *id*. at 34,063; and (5) must allow workers residing in employer-furnished housing "to invite, or accept at their discretion, guests . . . subject only to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas," *id*. Far from being an exercise of long-recognized authority, these conditions exceed the clearly delineated authority of the Department and conflict with law.

### 1.  *The Final Rule is in excess of statutory authority.*

The requirements that the Final Rule imposes on agricultural employers—and on SWAs that must enforce them by discontinuing the provision of employment services—do not fall within the limited authority Congress granted to the Department. A court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 183 (2004). The text of the enabling statute is clear that Congress gave the Department limited and specific rulemaking authority.

The Secretary's specific role in the H-2A visa program is quite narrow. Chief among these specified duties is to certify that, for each job where an employer seeks to use H-2A workers, there is a need for foreign workers because there are insufficient domestic workers and that bringing foreign workers will not negatively impact similarly-situated domestic workers. *See* 8 U.S.C. § 1188(a). Related to this duty, Congress authorizes the Secretary to "require by regulation, as a condition of issuing the certification, the payment of a fee to recover the reasonable costs of processing applications for certification." 8 U.S.C. § 1188(a)(2). Congress also directs the Secretary to grant the certification necessary for an employer to hire H-2A workers if the "employer has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)." 8 U.S.C. § 1188(c)(3)(A)(i). Additionally, Congress gave the Secretary authority to "issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock[.]" 8 U.S.C. § 1188(c)(4). But none of these come close to justifying the requirements in the Final Rule.

Indeed, for example, the Final Rule's requirement that employers ensure that all individuals riding in employer-provided transportation wear seat belts is wholly unrelated to fees for certification applications, to housing requirements, or to criteria for recruitment. Similarly, the Department does not—and cannot—explain how requiring employers to permit an H-2A worker to designate a representative to attend any interview related to potential discipline could be justified by the limited grant of

authority to require by regulation a fee for certification applications, to set criteria for recruitment, or to issue regulations to address housing requirements.

More fundamentally, nothing in the text of 29 U.S.C § 1188 gives the Department authority to promulgate regulations establishing requirements on employers as conditions to issuing the certification. Section 1188(a)(1) is not a grant of regulatory authority; it is a prohibition on the Attorney General approving petitions to bring H-2A workers unless the Department provides the required certification. The only role for the Department under 8 U.S.C. § 1188(a)(1) is either to certify or not certify.

And although section 1188(a)(2) authorizes the Secretary of Labor to regulate, it is a narrow and explicitly defined regulatory authority: "The Secretary of Labor may require by regulation, as a condition of issuing the certification, the payment of a fee to recover the reasonable costs of processing applications for certification." 8 U.S.C. § 1188(a)(2). The Department cannot use that very limited grant of authority to authorize the non-payment related conditions imposed by the Final Rule. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency may add pages and change the plot line.'" (cleaned up, citation omitted)). Indeed, Congress itself established the conditions for denial of the certification. *See* 8 U.S.C. § 1188(b). By doing so, it is clear Congress did not delegate generally the job to establish conditions to the Department.

9

Earlier this year, a district court in Georgia found that "the 'best reading' of § 1188, in its entirety, is that Congress granted the DOL authority to issue regulations to ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." *Kansas v. U.S. Dep't of Labor*, 2024 WL 3938839, at *5. To do so, the court relied on a D.C. Circuit case that found the Department's methodology for computing the adverse effect wage rate (which is the minimum wage that employers must offer American and foreign workers) was a valid exercise of the Department's authority under § 1188. *Id*. at *6; *AFL-CIO v. Dole*, 923 F.2d 182, 183 (D.C. Cir. 1991). While the D.C. Circuit did not explain its reasoning by identifying a particular statutory provision that gave the Department authority, it makes sense that wage setting would fall within the Department's authority under 8 U.S.C. § 1188(c)(3)(A)(i), which allows the Secretary to prescribe criteria for recruitment. *Dole* may have been correct in the fact-specific context of that case, but here, where requirements of the Final Rule cannot be shown to have similar connections to the statutory text, *Dole*'s rationale does not apply. And the D.C. Circuit's description of the authority given to the Department as a "rather broad congressional delegation," *Dole*, 923 F.2d at 187, does not justify overriding long-recognized statutory interpretation principles. *See BedRoc Ltd*., 541 U.S. at 183 ("The preeminent canon of statutory interpretation requires [the court] to presume that the legislature says in a statute what it means and means in a statute what it says there." (cleaned up and quotations omitted)).

Here, where the statute is unambiguous as to what authority Congress has given the Department, this Court need go no further to determine the Department has exceeded its statutory authority in promulgating the Final Rule.

### 2. The Final Rule is not in accordance with the NLRA.

Even if the enabling statute were not clear as to the limits of the Department's authority, the text of the NLRA is clear that the Department cannot impose the requirements relating to collective action in the Final Rule.

Under the NLRA, certain employees—but not agricultural workers—"shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. § 157. The NLRA also provides that it is an "unfair labor practice" for an employer to "dominate or interfere with the formation or administration of any labor organization" and "to encourage or discourage membership in any labor organization" by "discriminat[ing] in regard to hire or tenure of employment or any term or condition of employment[.]" *Id*. at § 158(a)(2)–(3).

Congress expressly chose not to extend these provisions to agricultural workers. Congress defined "employee" to include "any employee . . . unless the Act explicitly states otherwise," and then said explicitly, "[t]he term 'employee' . . . shall not include any individual employed as an agricultural laborer." *Id*. at § 152. Since

11

H-2A workers are agricultural laborers, they are not covered by the employee rights provisions of the NLRA.

The Department recognized this, yet proceeded to use the Final Rule to circumvent Congress. In the Department's overview of the Final Rule, it explained that, "[f]or those workers engaged in agriculture . . . who are exempt from the protections of the National Labor Relations Act (NLRA) . . . , the Department also revises § 655.135(h) to include some new protections to safeguard collective action and concerted activity for mutual aid and protection[.]" 89 Fed. Reg. at 33,901. Then in language strikingly similar to the NLRA, the Final Rule demands farmers allow H-2A workers to engage in "'concerted activity for mutual aid and protection,' which encompasses numerous ways that workers can engage, individually or collectively, to enforce their rights." 89 Fed. Reg. at 34,005; *compare with* 29 U.S.C. § 157 (protecting covered employees' right to "engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection"). The Final Rule also prohibits employers from "discharg[ing], or in any manner discriminat[ing] against . . . any person because such person . . . [h]as engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection[.]" *Id*. at 34,062; *compare with* 29 U.S.C. § 157 (establishing that covered employees have the "right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection") *and* 29 U.S.C. § 158(a)(1) (making it an unfair labor

practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the[ir] rights").

In doing so, the Final Rule impermissibly creates, by administrative regulation, rights and protections for H-2A workers "not previously bestowed by Congress." *See Kansas*, 2024 WL 3938839, at *8 (finding the Final Rule "provides for agricultural workers' right to participate in concerted activity to further their interests. That is a right that Congress has not created by statute"). Indeed, it is not just that Congress has not *yet* bestowed such rights on H-2A workers; rather Congress has already explicitly said it is *not* bestowing such rights on H-2A workers as agricultural laborers. *See* 29 U.S.C. § 152(3); *see also Kansas*, 2024 WL 3938839, at *8 ("[T]he NLRA exhibits Congress's intent to *refrain* from affording agricultural workers the right to participate in such concerted activity.").

The Department cannot make law on its own. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 283 (2002) (explaining that to determine whether a federal right exists, courts must "determine whether Congress intended to create a federal right" (emphasis omitted)); *Dixon v. United States*, 381 U.S. 68, 74 (1965) ("The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law[.]" (citation omitted)); *United States v. Grimaud*, 220 U.S. 506, 517 (1911) (explaining that statutes conferring power on executive officers to make rules and regulations cannot confer legislative power).

And this Court owes no deference to a Department interpretation that contradicts Congress' policy decisions and directions. Rather, courts "must reject administrative constructions of the statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32 (1981); *see also Flores*, 36 F.3d at 514 ("'[T]he clear meaning of statutes as written' ultimately trumps the policy of 'judicial deference to a reasonable statutory interpretation by an administering agency.'" (quoting *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476 (1992)); *Loper Bright Enters. v. Raimond*o, 144 S. Ct. 2244, 2261 (2024) (finding the APA "makes clear that agency interpretations of statutes . . . are *not* entitled to deference. Under the APA, it thus 'remains the responsibility of the court to decide whether the law means what the agency says'" (citation omitted)).

Therefore, the Final Rule should be vacated under the APA. When the APA requires courts to set aside federal agency action that is not in accordance with law, it "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *See FCC v. Nextwave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). The Final Rule's extension of collective activity rights to agricultural workers when Congress explicitly excluded agricultural workers from the employees given such rights in the NLRA means the Final Rule is clearly not in accordance with law.

**B. The Final Rule impermissibly commandeers State SWAs.**

Under the anti-commandeering doctrine, the Federal Government may not compel the States or the officers of the States to implement, administer, or enforce federal regulatory programs. *See Printz v. United States*, 521 U.S. 898, 925–6, 935 (1997). "It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Id.* at 928. And this sovereignty cannot be intruded upon by requiring the States either to enact policy or to enforce policy. *See id.* Indeed, where the Federal Government "reduc[es the States] to puppets of a ventriloquist" by requiring them to administer and enforce federal laws and regulations, the "preservation of the States as independent and autonomous political entities" is more "undermined" than when the Federal Government requires the States to make policy. *See id.* "Neither the Constitution nor the Administrative Procedure Act authorizes administrative ventriloquism." *Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-162, 2024 WL 1402443, at *2 (W.D. Ky. Apr. 1, 2024).

The Final Rule amounts to administrative ventriloquism. The Department has established requirements for employers seeking H-2A workers and demands that States, through their SWAs, enforce those requirements by mandating SWAs discontinue employment services if employers fail to comply with the requirements of the Final Rule. *See* 89 Fed. Reg. at 34,065. The federalist system of government established in the Constitution bars such commandeering. The Constitution intentionally divided power between the States and the federal government, and

15

measures that deviate from that form should be invalidated. *See Printz*, 521 U.S. at 933 (citation omitted).

The Federal Government also cannot direct the States to do what it could not—including withholding constitutionally-protected rights like due process. The Final Rule eliminates the opportunity for a hearing prior to the SWAs discontinuing employment services for violations of the regulatory requirements. 89 Fed. Reg. at 33,928. Under the Final Rule, the SWA will issue its final decision to discontinue services and notify the employer "that the discontinuation of services is effective 20 working days from the date of the determination." *Id.* The decision must notify employers they "may request reinstatement or appeal the discontinuation determination by requesting a hearing." *Id.* A request for a hearing will automatically stay the discontinuation pending the outcome. *Id.* According to the Department, this process "provides sufficient due process," *id.*, and in particular, the Department asserts that the automatic stay means the process "provides the same due process rights available in the current H-2A debarment procedures," *id.* at 33,929.

"The basic elements of procedural due process are notice and opportunity to be heard." *Arch of Ky., Inc. v. Dir., OWCP*, 556 F.3d 472, 478 (6th Cir. 2009). To satisfy constitutional due process requirements, a person who the government seeks to deprive of liberty, property, or privileges is entitled, at a minimum, to notice of the Government's evidence and an opportunity to rebut it. *See Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 797 (6th Cir. 2018). Specifically, "some form of hearing is required

before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

To the extent the process the Final Rule mandates for SWAs to follow results in deprivation of the employment services offered pursuant to the Wagner-Peyser Act without a hearing first, it would violate due process. *See id.*; *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982) (discussing the "interests" of residents in the "federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act of 1952"). Just as the Federal Government cannot violate due process, neither can the States. And the Federal Government cannot commandeer the SWAs to do its unlawful work.

### C. The Final Rule is arbitrary and capricious.

The APA demands that agency action be set aside if it is arbitrary and capricious. 5 U.S.C. § 706(2)(A). An agency decision is arbitrary and capricious when the agency:

> has relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *see also Kentucky Waterways Alliance v. Johnson*, 540 F.3d 466, 474 (6th Cir. 2008) (same).

The Final Rule is arbitrary and capricious first because the Department relied on factors Congress did not intend it to consider. When Congress enacted protections

17

for collective action for some employees, it explicitly said it was not extending such rights to agricultural workers. *See* 29 U.S.C. § 152(3). The Department was fully aware of this, and still attempted to use the Final Rule to protect collective action by H-2A workers. *See* 89 Fed. Reg. at 34,003 (explaining that the "new protected activity [in the Final Rule] relating to self-organization and concerted activity . . . would be limited to persons engaged in FLSA agriculture, namely those workers who are not eligible for protection under sec. 7 of the NLRA, 29 U.S.C. 157, because they are not 'employees' as defined in 29 U.S.C. 152(3)"). The APA does not permit the Department to so flagrantly disregard the intent of Congress.

Further, the result of allowing the Department to provide protections for collective bargaining actions to H-2A workers under the Final Rule would produce a result so implausible it could not be ascribed to a difference in view. The Final Rule requires employers to allow H-2A workers to engage in collective action under the auspices of doing so "to better protect against adverse effect on similarly employed workers in the United States." *See* 89 Fed. Reg. at 33,901. But the consequence of failing to allow H-2A workers to engage in collective action is the discontinuation of employment services through the SWAs. *See id.* at 34,065 (requiring SWAs to initiate procedures for discontinuation of services to employers). The employment services the SWAs offer are to help provide the agricultural employers with *American* workers. This means the result of the Final Rule would be to stop SWAs from connecting American workers with employers who need workers. That is a

contradictory—and therefore, certainly implausible—result under the enabling statute.

The Final Rule is also arbitrary and capricious because the Department fails to articulate a rational connection between the facts and the Final Rule. *See Motor Vehicle*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"). The Department attempts to justify requiring the recognition of collective action by H-2A workers by asserting that H-2A workers are more vulnerable than American workers. Therefore, according to the Department, H-2A workers need greater protections because without the additional protections, employers will choose to hire the vulnerable H-2A workers rather than American workers. *See* 89 Fed. Reg. at 33,987. But the Department offers no evidence for this bald assertion. *See id.* at 33,987 (saying the Department "*believed* that this vulnerability of the H-2A workforce, and the ability of employers to hire this vulnerable workforce, *may* suppress or undermine the ability of farmworkers in the United States to negotiate with employers and advocate on their own behalf[.]" (emphasis added)). There can be no "rational connection between the facts found and the choice made," *see Motor Vehicles,* 463 U.S. at 42, when there were no facts found.

More importantly, federal law clearly directs the Department to certify—for *every* request for H-2A workers—that there are insufficient American workers. 8 U.S.C. § 1188. If there are, in fact, American workers who could be hired by the employer—that is, workers the employers are declining to choose in favor of the

"vulnerable" foreign workers—then the Department's statutorily-mandated responsibility is to not issue the certification so the U.S. Attorney General can disapprove the petition for H-2A workers. *See id*. That the Department ignores this duty under the law and instead attempts to expand protection for collective action by H-2A workers shows a clear disconnect between the facts and the agency action. The Final Rule is, therefore, arbitrary and capricious.

*    *    *

The text of the enabling statute is clear that the Department does not have authority to issue the Final Rule. Even if it were not, the obvious conflict between the Final Rule and the NLRA, as well as the commandeering of SWAs and the arbitrary and capricious nature of the Rule, mean the Final Rule must be vacated under the APA. The Plaintiffs are therefore likely to be successful on the merits.

## II.  Intervening State Plaintiffs will suffer irreparable harm.

Irreparable harm is an injury "that cannot be fully compensated by money damages." *Tennessee v. Cardona*, 2024 WL 3019146, at *39 (citing *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). The Sixth Circuit has repeatedly recognized that compliance costs qualify as irreparable harm. *See id.*; *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (explaining that the federal government's sovereign immunity means States cannot recover compliance costs from federal agencies).

The Final Rule imposes compliance costs on the Intervening State Plaintiffs. It mandates that SWAs initiate discontinuation of employment services if certain new

20

requirements imposed by the Final Rule are not met. *See* 89 Fed. Reg. at 34,065. Additionally, SWAs must collect complaints from H-2A visa holders who believe employers are not complying with the Final Rule. *See id.* at 34,025. There necessarily will be some time and manpower spent on rule familiarization by SWAs to comply with these and other duties under the Final Rule. Indeed, the Department acknowledges in the Final Rule that there will be "quantifiable" costs "associated with rule familiarization." 89 Fed. Reg. at 32,044. The Department also acknowledges that, in recent years, "SWAs have infrequently used" the discontinuation of services regulations relative to the number of complaints and alleged violations. *See id.* at 33,903.

The time and resources spent familiarizing and complying with the Final Rule are significant compliance costs that will be incurred by each of the SWAs in Kentucky, Alabama, Ohio, and West Virginia. Declarations from Alabama and West Virginia note that the Final Rule will require the SWAs to update their standard operating procedures and policies relating to the review of job orders. Declaration of Ricky Littleton, Alabama Department of Workforce, Exhibit 1 at 5; Declaration of Scott Adkins, Workforce West Virginia, Exhibit 2 at 3–4. And SWA personnel will need to be trained on such changes. Littleton Declaration, Exhibit 1 at 5; *see also id.* at 3 ("[Alabama's SWA] will have to expend additional time and resources to familiarize staff with the Final Rule's requirements, as the Rule imposes significant policy changes that are required to be implemented."); Adkins Declaration, Exhibit 2 at 4. The Final Rule also imposes "an immediate and increased monitoring burden"

on the SWAs as they must determine if an employer is debarred. *See* Adkins Declaration, Exhibit 2 at 4. The additional burdens imposed by the Final Rule will force SWAs, which have limited resources, either to forego performing other duties, *see id.*, or to hire additional staff, *see* Littleton Declaration, Exhibit 1 at 6. Specifically, Alabama's SWA estimates it will need one to two additional staff members working at 40 hours per week to comply with all the requirements of the Final Rule. *Id.*

Because the Intervening State Plaintiffs would not be able to recover these costs, they have demonstrated irreparable harm. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.").

## III.   The remaining factors weigh in favor of a § 705 stay and a preliminary injunction.

When the Government is the opposing party, the third and fourth factors— whether the non-moving party would be harmed and whether staying or enjoining the government action is in the public interest—of the standard merge. *Tennessee*, 2024 WL 3019146, at \*42 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "[T]he public interest lies in a correct application" of the law. *Id.* (quoting *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006)). As already explained, the Final Rule exceeds the authority of the Department and conflicts with the NLRA. Therefore, it is in the public interest to stay and enjoin the Final Rule. The Department will not be harmed in being estopped from enforcing an unlawful rule. Moreover, a stay and an injunction will not impose any burden on the

Department's ability to conduct its certification role under 8 U.S.C. § 1188. *See Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7 (2008) (looking at whether a preliminary injunction would "impose a significant burden" on the non-moving party). Therefore, the remaining factors weigh in favor of granting a § 705 stay and a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should grant interim relief to the Plaintiffs.

Respectfully submitted,

**RUSSELL COLEMAN**
Attorney General

*/s/ Lindsey R. Keiser*
Justin D. Clark
Aaron J. Silletto
Victor B. Maddox
Lindsey R. Keiser
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Justind.Clark@ky.gov
Aaron.Silletto@ky.gov
Victor.Maddox@ky.gov
Lindsey.Keiser@ky.gov

*Counsel for the Commonwealth of Kentucky*

**STEVE MARSHALL**
Attorney General

*/s/ Robert M. Overing*
Robert M. Overing*
Deputy Solicitor General
Robert.Overing@AlabamaAG.gov
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400

*Counsel for the State of Alabama*

**DAVE YOST**
Attorney General

*/s/ T. Elliot Gaiser*
T. Elliot Gaiser*
Solicitor General
Office of the Ohio Attorney General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
Thomas.Gaiser@ohioago.gov

*Counsel for the State of Ohio*

**PATRICK MORRISEY**
Attorney General

*/s/ Michael R. Williams*
Michael R. Williams**
Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg. 1, Room E-26
1900 Kanawha Blvd. E.
Charleston, West Virginia 25305
304-558-2021
michael.r.williams@wvago.gov

*Counsel for the State of West Virginia*

\*        *Pro Hac Vice* application forthcoming
\*\*      Admitted *Pro Hac Vice*


## CERTIFICATE OF SERVICE

I certify that on October 15, 2024, the above document was filed with the CM/ECF filing system, which electronically served a copy to all counsel of record.

*/s/ Lindsey R. Keiser*
*Counsel for the Commonwealth of Kentucky*