IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | |
|---|---|
| RICHARD BARTON, *et al.*<br><br>　*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR, *et al.*,<br><br>　*Defendants*. | **Civil Action No. 5:24-cv-00249**<br><br>**PROPOSED INTERVENOR-DEFENDANTS' RESPONSE TO ORIGINAL PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF** |

Plaintiffs[1] have not come close to justifying their request to strip vital protections from tens of thousands of vulnerable U.S. farmworkers and farmworkers on H-2A visas. Their policy disagreements with the Department of Labor ("Department" or "agency") do not, as Plaintiffs imagine, render the Final Rule arbitrary and capricious under the APA. *See* Improving Protections for Workers in Temporary Agricultural Employment in the United States, 89 Fed. Reg. 33,898 (Apr. 29, 2024) ("Final Rule"). Nor do Plaintiffs' misreadings of various statutes and of the Final Rule itself mean the agency acted in excess of statutory authority or contrary to law. Plaintiffs' motion should be denied in full.

But even if this Court agrees with Plaintiffs on any one particular provision of the Final Rule, their requested relief—annihilating the entire Final Rule—is wildly overbroad. Each provision of the Final Rule is severable. Thus, if this Court finds that the preliminary injunction

---

[1] Throughout this brief, Proposed Intervenor-Defendants use "Plaintiffs" or "the Barton Plaintiffs" to refer to the original plaintiffs in this case, *see* ECF No. 1, rather than the intervening state plaintiffs, *see* ECF No. 15, unless otherwise specified.

factors tilt in favor of relief on any one section of the Final Rule, it should carefully tailor such relief to that particular provision.[2]

## I.    Plaintiffs Are Not Entitled to Preliminary Relief on Any of their Claims

### A.  *The Final Rule Does Not Violate the NLRA*

The Final Rule does not violate the National Labor Relations Act. Plaintiffs and Plaintiff-Intervenors contend that the Final Rule ensures some agricultural employees enjoy rights that the NLRA forbids DOL from providing. But the Final Rule does not mirror the NLRA, and the NLRA does not forbid DOL from providing the protections in the Final Rule.

Initially, the Plaintiffs overstate any similarities between the Final Rule and the NLRA. To set the record straight: The Final Rule does not, as Plaintiffs imagine, provide "collective bargaining rights." Barton Pls.' Mem. Supp. Mot. Prelim. Inj. 3, 5, ECF No. 21-1 ("Barton Pls.' PI Mem."); State Pls.' Mem. Supp. Mot. Stay & Prelim. Inj. 12–13, 18, ECF No. 17-1 ("State Pls.' PI Mem."). If workers on H-2A visas request that their employer bargain with them collectively, the employer is free under the Final Rule to ignore their request. In contrast, under the NLRA, an employer's failure to collectively bargain is an unfair labor practice. 29 U.S.C. § 158(a)(5). Unionized employees under the NLRA can file a charge with the NLRB. *Id.* § 160(b). If the NLRB issues an order compelling the employer to bargain and the employer refuses, the agency's order can then be enforced in an Article III court. *Id.* § 160(e). Nothing like this extensive framework for enforcing rights to collectively bargain under the NLRA exists under the Final Rule.

---

[2] The Barton Plaintiffs seek both a preliminary injunction and a stay pursuant to 5 U.S.C. § 705. *See* Barton Pls.' Mot. for Prelim. Relief 1, ECF No. 21. The standards for each form of relief are the same, and so Proposed Intervenor-Defendants address them together. *Ohio ex rel. Celebrezze v. NRC*, 812 F.2d 288, 290 (6th Cir. 1987).

Moreover, even if DOL had copied and pasted the NLRA's operative provisions into the Final Rule, nothing in the NLRA would forbid the agency from doing so. Of course, the NLRA excludes agricultural laborers from *that statute's* ambit. But the Plaintiffs overread that exclusion to imply that *no statute* can authorize regulations protecting agricultural workers' ability to engage in concerted action. That does not follow. "Where Congress 'leaves the employer-employee relation free of regulation in some aspects, it implies that in such matters [Congress] is indifferent.'" *United Farm Workers of Am., AFL-CIO v. Ariz. Agric. Emp. Rels. Bd.*, 669 F.2d 1249, 1256–57 (9th Cir. 1982) (quoting *Bethlehem Steel Co. v. N.Y. State Lab. Rels. Bd.*, 330 U.S. 767, 773 (1947) (ellipsis omitted)). That the NLRA has nothing to say about agricultural workers means only that those agricultural workers cannot rely on the NLRA.

Against this straightforward reading, Plaintiffs and Plaintiff-Intervenors erroneously argue the NLRA represents a congressional judgment that agricultural labor relations should be left unregulated under *any* federal statute. *See, e.g.*, State Pls.' PI Mem. 11 ("Congress expressly chose not to extend [NLRA] provisions to agricultural workers."); Barton Pls.' PI Mem. 6 (claiming "the NLRA . . . specifically says agricultural workers are not entitled to [NLRA] rights"). There is a name for this argument: *Machinists* preemption, under which courts read the NLRA as expressing a congressional intent "to leave some activities unregulated and to be controlled by the free play of economic forces."[3] *Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp. Rels. Comm'n*, 427 U.S. 132, 144 (1976).

---

[3] There is a second kind of preemption under the NLRA called *Garmon* preemption. This doctrine applies to conduct "the NLRA protects, prohibits, or arguably protects or prohibits." *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) (citation omitted); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959). *Garmon* has no application here, where the NLRA has nothing to say one way or the other about agricultural workers. *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1274 (9th Cir. 1994) ( "[I]f [a company's] employees are

Though typically applied to *States' regulation* of labor relations, *Machinists* is also the correct lens for analyzing horizontal preemption arguments that the NLRA precludes other federal actions affecting labor relations. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 111 (1989) ("The *Machinists* rule creates a free zone from which all regulation, '*whether federal or State*,' is excluded." (emphasis added) (citing *Machinists*, 427 U.S. at 153)); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1334 (D.C. Cir. 1996) (noting there is no "doubt that *Machinists* 'pre-emption' applies to federal as well as state action" and applying framework to federal executive action). *Machinists* is thus the proper framework for assessing whether the NLRA precludes DOL from regulating agricultural labor relations.

Plaintiffs do not admit outright they are invoking *Machinists* preemption, perhaps because that doctrine forecloses their argument. Courts consistently hold that Congress did *not* intend to leave agricultural labor relations to "the free play of economic forces" when it excluded agricultural workers from the NLRA. *See Willmar Poultry Co. v. Jones*, 430 F. Supp. 573, 578 (D. Minn. 1977) ("The court has not been directed to, nor has it found, any explicit expression of a national labor policy that agricultural laborers be denied all representational rights. . . . [T]he exclusion of agricultural laborers from the NLRA's coverage standing alone cannot be construed to mean that Congress intended the area to remain unregulated."); *UFW of Am., AFL-CIO*, 669 F.2d at 1256–57; *Chamber of Com. v. City of Seattle*, 890 F.3d 769, 793 (9th Cir. 2018) ("[T]he fact that a group of workers is excluded from the definition of 'employee' in [29 U.S.C.] § 152(3), without more, does not compel a finding of *Machinists* preemption" and noting that *Machinists* does not apply to agricultural laborers). The precedent thus squarely contradicts

'agricultural laborers,' then the NLRA does not apply, and the company's conduct is not arguably prohibited under the Act" for *Garmon* purposes.).

Plaintiffs' position: The fact that agricultural laborers are outside the ambit of the NLRA says nothing about any other actor's power to regulate agricultural labor relations under different sources of authority.

Finally, Plaintiffs incorrectly cite *Alexander v. Sandoval*, 532 U.S. 275 (2001), and *Gonzaga University v. Doe*, 536 U.S. 273 (2002), to contend that DOL cannot create "rights." *See* State Pls.' PI Mem. 13 (citing *Gonzaga*), Barton Pls.' PI Mem. 7 (citing *Alexander* and *Gonzaga*). Those cases are irrelevant. They address not whether an agency has statutory authority to regulate agricultural labor relations, but rather whether a statute creates a right *enforceable under 42 U.S.C. § 1983* (in the case of *Gonzaga*, 536 U.S. at 283) or whether an agency can by regulation create *a private right of action* in court (in the case of *Alexander*, 532 U.S. at 291). Neither question has any bearing here. Plaintiffs' invocation of these cases serves only to highlight the absence of law supporting their positions.

B. *DOL Did Not Violate the APA When It Complied with a Federal Court Order*

In parallel litigation, the U.S. District Court for the Southern District of Georgia issued a preliminary injunction against the Final Rule in seventeen states and as to an individual farm and trade association, but did not issue a nationwide injunction. *Kansas v. U.S. Dep't of Lab.*, __ F. Supp. 3d __, 2024 WL 3938839 (S.D. Ga. Aug. 26, 2024). The Barton Plaintiffs would have this Court believe that when an agency is subject to a court order—as the Government Defendants are here—the agency needs to go through notice-and-comment before it can comply with that order. *See* Barton Pls.' PI Mem. 7–9. The Barton Plaintiffs are unlikely to succeed on this argument.

To begin with, the Plaintiffs do not, and could not, contend that either the Final Rule or the prior set of H-2A regulations did not go through notice-and-comment. So whichever set of

regulations an employer is subject to—either the Final Rule, outside the *Kansas* injunction, or the prior regulations, inside the injunction—that employer is not subject to "new" substantive standards promulgated without notice and comment. *Id.* at 8. Instead, Plaintiffs claim that when DOL explained on September 10, 2024, how it would determine which set of substantive rules applies to a particular application, *that explanation* was itself a legislative rule. Not so.

The September 10 announcement is not a legislative rule, but instead a textbook example of an agency policy statement, which need not go through notice and comment. *See* 5 U.S.C. § 553(b)(A). "An agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (Kavanaugh, J.). This description fits the September 10 announcement like a glove. The "extant . . . rule[s]" here are the Final Rule and the prior set of regulations. *Id.* The "permitting discretion" is the agency's 8 U.S.C. § 1188(a)(1) certification authority. *Id.* And the September 10 announcement "explains how the agency will enforce" the regulations in question, *id.*, that is, how it will determine which set of extant rules applies to a given application.

Even if the September 10 announcement were not a policy statement, it is, at most, a procedural rule. *See* 5 U.S.C. § 553(b)(A) (exempting from notice and comment "rules of agency organization, procedure, or practice"). Such "procedural rules" "do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *James V. Hurson Assocs. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) (citation omitted); *see also Apogee Coal Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 112 F.4th 343, 355 (6th Cir. 2024).

That is the case here. The September 10 announcement "did not create new rights nor liabilities" and "[a]ccordingly, . . . did not require notice and comment rulemaking." *Apogee*, 112 F.4th at 356. Put differently, the September 10 announcement "did not change the *substantive standards* by which the [agency] evaluates [H-2A] applications." *Hurson Assocs.*, 229 F.3d at 280 (citation omitted). Outside the injunction states, those applications are subject to the Final Rule's substantive standards; inside the injunction states, such applications are subject to the prior regulations. The September 10 announcement neither created nor altered this reality; the *Kansas* injunction did. All the September 10 announcement did was advise the public of *the procedures by which* the agency would determine which set of substantive standards applies to a given application. At most, Plaintiffs complain that the procedures DOL set out in the September 10 announcement are burdensome. *See* Barton Pls.' PI Mem. 9. But "an otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties." *Hurson Assocs.*, 229 F.3d at 281.

### C.  *The Paperwork Reduction Act Has No Bearing on This Case*

To comply with the *Kansas* injunction, the Government Defendants told H-2A applicants they would need to provide information confirming whether they fell inside or outside the scope of the injunction. Plaintiffs claim that the collection of this additional information violates the Paperwork Reduction Act, so the additional questions set forth in the September 10 announcement violate the APA. Barton Pls.' PI Mem. 9–10. Wrong again.

First, as the Government Defendants note, *see* Combined Resp. 43, ECF No. 34, the agency *did* submit a collection of information to OMB, *see* Emergency Request to Reinstate Prior Approved Forms Affecting the H-2A Temporary Agricultural Labor Certification Program

and Agricultural Recruitment System, 89 Fed. Reg. 73,725 (Sept. 11, 2024), and OMB already *approved* that request, *see* https://perma.cc/JY84-ECKZ.

Second, a violation of the PRA provides only a defense to an enforcement proceeding, not a private cause of action. Plaintiffs assert that the September 10 announcement "violates the 'public protection' provision of the PRA," 44 U.S.C. § 3512. Barton Pls.' PI Mem. 10. But § 3512 "authorizes [the PRA's] protections to be used *as a defense*. The Act does not authorize a private right of action." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999); *see also Ohio Stands Up! v. U.S. Dep't of Health & Human Servs.*, 564 F. Supp. 3d 605, 613–14 (N.D. Ohio 2021) (collecting cases). Indeed, "the legislative history surrounding the 1995 amendments to the PRA states that § 3512 was intended as a defense only during 'an agency administrative process or any subsequent judicial review'." *United States v. Gross*, 626 F.3d 289, 296 (6th Cir. 2010) (quoting H.R. Conf. Rep. 104-99, at 36, *reprinted in* 1995 U.S.C.C.A.N. 239, 248). Thus, courts consistently reject frontal challenges to rulemakings based on alleged PRA violations. *See, e.g.*, *Util. Air Regul. Grp. v. EPA*, 744 F.3d 741, 750 n.6 (D.C. Cir. 2014); *Dithiocarbamate Task Force v. EPA*, 98 F.3d 1394, 1405 (D.C. Cir. 1996). Plaintiffs are not defending against an agency enforcement action, so they cannot invoke the PRA in this posture.

Third, even if Plaintiffs could enforce the PRA via an affirmative cause of action and even if the Government Defendants had violated the PRA, preliminary relief blocking or staying the September 10 announcement would be inappropriate because the only justifiable relief would be remand without vacatur. "An inadequately supported rule . . . need not necessarily be vacated. The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an

interim change that may itself be changed." *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (cleaned up); *Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023) (noting *Allied-Signal* rule applies in Sixth Circuit).

Both *Allied-Signal* factors counsel in favor of remand without vacatur here. Initially, Plaintiffs allege, at most, a purely procedural defect that could be (and has been) easily corrected by submitting a collection of information to OMB. And there is no real doubt "the agency chose correctly" by asking for the requested information, *id.*, because without that information there is no way for the agency to know whether the *Kansas* injunction applies to a given application, and so no way to administer the H-2A program. Moreover, vacating, preliminarily enjoining, or staying the September 10 announcement would be extraordinarily disruptive. If the Government Defendants cannot collect information necessary to determine whether the *Kansas* injunction applies to a given H-2A application, they effectively cannot process H-2A applications *at all* for fear of violating that injunction in the applicable states. Thus, vacatur or preliminary relief would freeze the H-2A application process for every agricultural employer in the United States—a result far more disruptive than anything Plaintiffs assert the agency has done here.

### D. *The Final Rule Is Not Impermissibly Retroactive*

Plaintiffs argue that the Final Rule constitutes a retroactive rule which DOL lacks authority to promulgate. Barton Pls.' PI Mem. 11–12. But the Final Rule applies only prospectively. For example, an employer faces no new retroactive liability or penalty if, the day before the Final Rule's effective date, he fired a worker for consulting with her pastor. *See* 29 C.F.R. § 501.4((a)(1)(v); *cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) (rule was retroactive where it lowered limits for reimbursable Medicare expenses for prior years). The only new consequences here are those that attach to future conduct.

Plaintiffs do not dispute that they face no new liability for past acts. Rather, they claim the Final Rule is retroactive because it "upsets employers' settled expectations by changing the previously agreed upon terms and conditions of employers' *present* participation in the H-2A program." Barton Pls.' PI Mem. 11. But a change in "law that merely upsets expectations based in prior law is not retroactive on that basis." *Cox v. Kijakazi*, 77 F.4th 983, 992 (D.C. Cir. 2023) (cleaned up); *accord Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70 (1994) ("A statute does not operate 'retrospectively merely because it . . . upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment."); *Fouts v. Warren City Council*, 97 F.4th 459, 568 (6th Cir. 2024). Thus, the Final Rule is not retroactive.

E.  *The Barton Plaintiffs Are Not Entitled to Preliminary Relief on Their Arbitrary and Capricious Claims Merely Because They Would Prefer a Different Policy*

Plaintiffs next complain that two specific provisions of the Final Rule are arbitrary and capricious: that employers cannot operate transport vehicles unless they ensure all passengers are wearing seat belts, and that employers seeking to hire H-2A workers must disclose certain information about themselves. Barton Pls.' PI Mem. 12–15. But the Plaintiffs' argument runs headlong into the standard of review. To survive an arbitrary-and-capricious challenge, a regulation need only be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S.279, 292 (2024) (citation omitted). "In reviewing an agency's action under that standard, a court may not substitute its judgment for that of the agency." *Id.* (cleaned up); *accord Arizona v. Biden*, 40 F.4th 375, 392 (6th Cir. 2022). The agency easily met this requirement as to both challenged provisions.

1. <u>Seat Belts</u>

The Barton Plaintiffs object to only one aspect of the agency's updated seat belt provisions, namely the requirement that employers ensure that workers in fact use seatbelts in employer-provided transportation.[4] Plaintiffs' argument principally relies on their contention that there is no federal law requiring every driver or passenger in a motor vehicle to wear a seatbelt, nor does every state's law do so. Barton Pls.' PI Mem.12–14. But Plaintiffs fail to cite any authority (because there is none) that a regulation is arbitrary and capricious because it is stricter than different regulations that apply in different contexts. Under the applicable standard, the Final Rule is eminently "reasonable and reasonably explained." *Ohio*, 603 U.S. at 292 (citation omitted). The agency explained that "[t]he history of seat belt adoption shows that the provision of seat belts does not automatically result in their use; rather, enforcement and education is necessary for adoption." 89 Fed. Reg. at 33,964. And the agency responded directly to Plaintiffs' argument that employers cannot practically ensure their employees wear seatbelts, explaining that "numerous other workplace safety and health laws and regulations require employers to shape and influence the behavior of their workers so that the employer may be in compliance." *Id.*

DOL also responded to the argument that requiring seatbelts does not prevent an adverse effect on U.S. workers. Barton Pls.' PI Mem. 13. For one, "H-2A workers may have more limited recourse when placed in an inherently dangerous situation, such as being transported in a vehicle without seat belts, than workers in the United States similarly employed." *Id.* at 33,963.

---

[4] The Barton Plaintiffs inaccurately characterize this requirement as a rule establishing "strict liability." Barton Pls.' PI Mem. 13. The concept of strict liability, which arises in tort law, has nothing whatsoever to do with the H-2A employment relationship, which is primarily governed by regulation and contract law.

The agency reasonably decided to eliminate an unsafe employer's incentive to hire H-2A workers—rather than U.S. workers who may be more likely to advocate for safer working conditions—by eliminating the employer's unsafe conditions. For another, as the agency noted, "unbelted passengers in a vehicle pose significant risks to other passengers and the driver; studies have found that unrestrained occupants can become projectiles in a crash and increase the risk of death for other occupants." *Id.* Those "other occupants," *id.*, often include U.S. workers in corresponding employment, who work alongside employees on H-2A visas. Thus, the Final Rule also prevents adverse effects on U.S. workers by preventing them from being harmed in crashes.

Nor does the mere fact that the agency is changing course from prior positions render the seatbelt provision unlawful. This is not an instance in which the agency "depart[s] from a prior policy *sub silentio*," without "display[ing] awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). To the contrary, the agency recited at length its history of considering the issue, which plainly indicates the agency knew its new position differed from its prior decisions. *See* Improving Protections for Workers in Temporary Agricultural Employment in the United States, 88 Fed. Reg. 63,750, 63,777 (Sept. 15, 2023) (NPRM) ("The Department has periodically considered the inclusion of seat belt requirements in farmworker transportation safety regulations."). And the agency explained why circumstances are different now than on prior occasions when it declined to impose such requirements. *Id.* ("Much has changed with respect to seat belts . . . ."). The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old on; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Fox Television*, 556 U.S. at 515. Such is the case here.

Finally, the Barton Plaintiffs must establish an irreparable harm to obtain preliminary relief. That harm "must be both certain and great, rather than speculative or theoretical." *Ohio ex rel. Celebrezze v. NRC*, 812 F.2d 288, 290 (6th Cir. 1987). The Barton Plaintiffs do not even attempt to explain how taking a few seconds to remind their workers to put their seat belts on at the beginning of a drive satisfies this demanding standard. This failure alone defeats preliminary relief. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (noting that preliminary relief requires plaintiff "to demonstrate that irreparable injury is *likely*").

## 2.  Personal Information

The Plaintiffs take further umbrage at the agency's requirement that employers provide certain information about themselves in an H-2A application, including birth dates of employers, managers, and supervisors. *See* Barton Pls.' PI Mem. at 14–15. But that requirement is "reasonable and reasonably explained." *Ohio*, 603 U.S. at 292. The agency explained it needs this information to "identify, investigate, and pursue remedies from program violators; ensure that sanctions, such as debarment or civil money penalties, are appropriately assessed and applied to responsible entities, including individuals and successors in interest when appropriate; and determine whether an H-2A employer subject to investigation has a prior investigative history under a different name." 89 Fed. Reg. at 33,981. And the agency further explained that gathering additional identifying information "will assist the Department in determining whether the employer has demonstrated a bona fide temporary or seasonal need, or, conversely, whether an employer has, through multiple related entities, sought to obtain a year-round H-2A labor force." *Id.*

Thus, the Plaintiffs' assertion that the agency "provides no explanation for how the dates of birth could possibly shed light on whether an H-2A employer applicant has a seasonal need

for labor," falls flat. Barton Pls.' PI Mem. 14. The agency explained that it needs such information to uncover when, for instance, an H-2A employer has a history of program violations. 89 Fed. Reg. at 33,981. If Corporation A is debarred from the H-2A program for abusing its workers, an application by Corporation B the next year may not raise an eyebrow just because both companies are majority-owned by a man named John Smith. But it might if the John Smiths share a birthday and business address. Similarly, if two nominally distinct corporate entities—one with its busy season in the spring and the other in the fall—employ many of the same supervisors, that could indicate that a functionally single employer is gaming the H-2A system to establish an effectively permanent H-2A workforce, at the expense of hiring American workers. *See* 89 Fed. Reg. at 33,981. In short, the agency reasonably concluded that collecting this information would protect U.S. workers by making it harder for bad actors who prefer to hire more vulnerable H-2A workers to game the system.

F. *The Final Rule Provides Ample Due Process in Discontinuation Proceedings*

Plaintiffs claim that the Final Rule requires State Workforce Agencies (SWAs) to discontinue employment services under the Wagner-Peyser Act instantaneously without a hearing, thereby violating due process. *See* Barton Pls.' PI Mem. 15–17. In the vast majority of cases, this is simply wrong. The Final Rule almost always *does* provide the opportunity for a pre-deprivation hearing, as Proposed Intervenor-Defendants explain in their Opposition to the State Plaintiffs' motion for preliminary relief. *See* Prop. Interv.-Defs.' Opp'n to State Pls.' Mot. Prelim. Relief 19–21. But even on its own terms, Plaintiffs' argument has two fatal flaws. First, it is not ripe for judicial review. And second, due process permits the agency to provide a prompt

post-deprivation opportunity for a hearing in the narrow class of cases in which failing to discontinue services would cause workers immediate harm.

First, Plaintiffs' due process claim is not ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). "[A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *accord Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (cleaned up)).

Plaintiffs bring a facial challenge to the process by which the agency will adjudicate future discontinuation proceedings, prior to such a dispute arising. This challenge is based entirely "upon contingent future events," *Texas*, 523 U.S. at 300, namely: whether any plaintiff commits one of the grounds for discontinuation and whether a SWA obtains evidence that failing immediately to discontinue employment services would substantially harm workers. Such claims are not ripe. *See, e.g.*, *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 58–66 (1993) (court could not conclude facial challenge to regulations governing procedures by which INS would determine applicants' eligibility for adjustment of immigration status was ripe, where record did not reflect

whether those procedures had been applied to any plaintiff member's application); *Ammex, Inc. v. Cox*, 351 F.3d 697, 706–10 (6th Cir. 2003) (company's constitutional challenge not ripe where it was not clear government would begin enforcement proceedings against company); *CBA Pharma, Inc. v. Perry*, No. 22-5358, 2023 WL 129240, at *3–4 (6th Cir. 2023) (similar); *cf United States v. Salerno*, 481 U.S. 739, 745 (1987) ("The fact that the [challenged statute] might operate unconstitutionally [under the Due Process Clause] under some conceivable set of circumstances is insufficient to render it wholly invalid" and so challengers' facial claim was unsuccessful). As the Court put it in *Texas*, "[u]nder these circumstances, where we have no idea whether or when such a sanction will be ordered, the issue is not fit for adjudication." 523 U.S. at 300 (cleaned up)).

Second, even if the claim is justiciable, it fails on the merits. The Final Rule requires SWAs to discontinue services immediately *only* where "an employer has met any of the bases for discontinuation of services under [20 C.F.R.] § 658.501(a) and, in the judgment of the State Administrator, exhaustion of the administrative procedures set forth in this section would cause substantial harm to workers." 20 C.F.R. § 658.502(b). Thus, except in those narrow cases in which health and safety are at risk, the regulations provide the opportunity for extensive pre-deprivation hearing procedures. *Id.* § 658.503. Plaintiffs do not, and cannot, argue that these procedures are constitutionally inadequate.

As for the sliver of cases in which the regulations provide for discontinuation without a pre-deprivation hearing—*i.e.*, where waiting for administrative process to play out "would cause substantial harm to workers," *id.* § 658.502(b)—that is also constitutionally permissible. The Supreme "Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process

satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (collecting cases). This is such a case. Initially, Plaintiffs mistakenly assert that the regulations require discontinuation "based on a mere allegation of a violation." Barton Pls.' PI Mem. 15, 16. But the agency "emphasize[d] that a complaint or allegation alone is insufficient to warrant immediate discontinuation." 89 Fed. Reg. at 33,934. Rather, "[t]he State Administrator must have *information evidencing* that substantial harm to workers will occur if action is *not* immediately taken." *Id.* Hard evidence of danger from waiting for a pre-deprivation hearing is the textbook case in which due process does not require a pre-deprivation proceeding. *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 582 (1975) (explaining that although due process applies to school suspensions, "[s]tudents whose presence poses a continuing danger to persons or property . . . may be immediately removed from school" without a pre-suspension hearing).

Moreover, an employer subjected to immediate discontinuation has the opportunity for a prompt post-deprivation hearing. They can "submit a written request for reinstatement of services to the SWA or may, within 20 working days of receiving notice of the SWA's final determination, appeal the discontinuation by submitting a written request for a hearing." 20 C.F.R. § 658.504(a). If the employer submits a request for reinstatement, the SWA has twenty working days to respond. *Id.* § 658.504(b)(1). And if the SWA declines to reinstate, "it must specify the reasons for the denial and notify the employer that it may request a hearing." *Id.* In the context of agency adjudications, twenty-day turnarounds are remarkably quick. Thus, if in the future any Plaintiff finds themself in a situation in which a SWA has information demonstrating that substantial harm will come to the Plaintiff's workers if the SWA does not immediately discontinue employment services, that Plaintiff will have a prompt post-deprivation opportunity for a hearing that satisfies the Due Process Clause.

G. *The Plaintiffs' Takings Claim Is Patently Meritless*

Plaintiffs are not entitled to preliminary equitable relief on their Takings Clause claim because they are not irreparably injured and they are unlikely to succeed on the merits.

1. <u>Plaintiffs Will Not Be Irreparably Harmed Even if the Final Rule Imposes a Taking, Because the Tucker Act Provides a Complete and Adequate Legal Remedy</u>

Plaintiffs' Takings Clause claim is baseless. But even if the Final Rule effected a taking (which it does not), Plaintiffs would not be irreparably harmed. That is because any affected plaintiff would have an available, adequate legal remedy—damages—and so any harm is reparable. As the Supreme Court explained in *Knick v. Township of Scott*, 588 U.S. 180 (2019), "because the federal . . . government[] provide[s] just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Id.* at 201. Here, the adequate legal remedy is the Tucker Act, which provides for inverse condemnation claims against the federal government. *See* 28 U.S.C. § 1491(a)(1); *Knick*, 588 U.S. at 189–90; *e.g.*, *United States v. Causby*, 328 U.S. 256, 267 (1946). Plaintiffs do not, and cannot, contend that the Tucker Act is somehow inadequate as a legal remedy. So the availability of Tucker Act damages for takings precludes their request for equitable relief.[5]

2. <u>The Final Rule Does Not Create a Taking of Private Property</u>

Even if they sought the correct remedy, Plaintiffs are not likely to succeed on the merits of their Takings Clause claim for at least two reasons.

---

[5] The Tucker Act would also preclude vacatur at the summary judgment stage under the APA, because 5 U.S.C. § 704 permits review only of "final agency action *for which there is no other adequate remedy in a court.*" (emphasis added).

First, 20 C.F.R. § 655.135(n)—which makes clear that "[w]orkers residing in employer-furnished housing must be permitted to invite, or accept at their discretion, guests to their living quarters" subject to certain "reasonable restrictions"—is not a taking of property owners' right to exclude. DOL has not issued a regulation saying that any agricultural employer must permit anyone access to their property. Rather, the guest-access provisions are a condition of receiving a government benefit. No one is forcing Plaintiffs or their members to apply for H-2A workers. But if they choose to apply, the government is well within its rights to impose reasonable conditions on the receipt of that benefit.

The closest line of cases is the *Nollan-Dolan-Koontz* doctrine. *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013); *see also Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 275–76 (2024) (summarizing *Nollan-Dolan-Koontz*). Under this line of cases involving building permits, a government condition on a benefit is a taking if "the condition would qualify as a taking if the government had directly required it," there is no "'nexus' between the condition and the project's social costs," and there is no "'rough proportionality' between the condition the project; that is, the condition's burdens on the owner must approximate the project's burdens on society." *Knight v. Metro. Gov't of Nashville*, 67 F.4th 816, 825 (6th Cir. 2023) (citations omitted).

The *Nollan-Dolan-Koontz* test is easily met here. The guest-access provision would not constitute a taking if DOL had directly imposed it because, as explained *infra*, when Plaintiffs are acting as landlords, they do not have the right to exclude their tenant-employees' guests from their property, and so there is no employer right to exclude that the agency could take. Moreover, there is plainly a nexus between the condition and the "social costs" of hiring H-2A workers. *Id.*

19

As the agency documented throughout the rulemaking, the isolation of H-2A workers living in employer-provided housing renders them more vulnerable to exploitation than most U.S. workers, which creates adverse effects on U.S. workers by incentivizing employers to prefer hiring more easily exploitable H-2A workers. 89 Fed. Reg. at 34,016–17, 34,020. Ensuring that H-2A workers have the right, in their off hours and at their homes, to receive guests mitigates that isolation. Reducing isolation makes H-2A workers less easily exploitable, and so bears a clear "nexus" to the social costs sought to be mitigated, namely, adverse effects on the wages and working conditions of U.S. workers. Finally, the requirement is proportionate. The Final Rule makes clear that the guest-access provision applies only to visits to worker housing "during time that is outside of the workers' workday" and "subject . . . to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas." 20 C.F.R. § 655.135(n).

Second, the Final Rule did not "take" Plaintiffs' right to exclude their worker-tenants' guests from worker housing, because that right belongs to the worker-tenants rather than the employer-landlords.[6] *See, e.g.*, *Folgueras v. Hassle*, 331 F. Supp. 615, 624–25 (W.D. Mich. 1971) (holding agricultural employer lacked right to exclude guests of farmworkers who lived on his property because workers were tenants and "[o]ne of the rights of tenancy with which the landlord may not interfere is the right to invite and associate with guests of the tenant's own choosing" (collecting cases)); *Odumn v. United States*, 227 A.3d 1099, 1104–07 (D.C. 2020) (summarizing

---

[6] This distinguishes the Final Rule from the regulation at issue in *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), on which the Barton Plaintiffs rely. *Cedar Point* made clear that "none of [the workers at issue] live[d] on the property." *Id.* at 144–45. Thus, it was undisputed "that, without the access regulation, the growers would have had the right under [state] law to exclude union organizers from their property." *Id.* at 155. Here, with or without the Final Rule, elementary "background principles of property law" mean Plaintiffs never had a right to exclude in the first place. *Id.* at 162.

caselaw around the country); *State v. Dixon*, 725 A.2d 920, 922–23 (Vt. 1999) ("The common law is clear that the landlord may not prevent invitees or licensees of the tenant from entering the tenant's premises by passing through the common area."); *State v. Schaffel*, 229 A.2d 552, 561 (Conn. Cir. Ct. App. Div. 1966) ("The implication which necessarily flows from the tenant's control and possession is that it is the tenant, not the landlord, who has the final word as to the person or persons who may enter upon the demised premises. The landlord has neither the power of exclusion nor the power of selection" (collecting cases)). No Plaintiff has alleged or shown that their property is in a jurisdiction where this "traditional background principle of property law" is inapplicable. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 162 (2021). Thus, they are unlikely to succeed on their claims that the Final Rule takes a right they never had.

## H.  *Plaintiffs' Smorgasbord of Federalism Arguments Fails*

Finally, Plaintiffs make a mishmash of federalism arguments, *see* Barton Pls.' PI Mem. 18–22, none persuasive.

Initially, the Barton Plaintiffs concede the agency may rulemake "to ensure the hiring of H-2A workers does not adversely affect the wages and working conditions of similarly employed American workers." *Id.* at 19. They instead complain that the Final Rule provides protections beyond those found under various states' laws, without explaining the connection to preventing adverse effects on U.S. workers. *Id.* But that connection is "reasonable and reasonably explained." *Ohio*, 603 U.S. at 292. As the agency stated, the Final Rule "expand[s] and improve[s] the tools available to workers protected under the H-2A program to prevent exploitation and to ensure compliance with the law, in light of the Department's program experience and evidence . . . demonstrating that the current framework of protections are insufficient to satisfy the Department's statutory mandate" to prevent adverse effects on U.S.

workers." 89 Fed. Reg. at 33,995. These additional protections are necessary, the agency continued, because "H-2A workers in particular[] are living and working in a foreign land, are often unfamiliar with their geographical surroundings and legal rights, often live in isolated environments where their access to information and resources is limited, and are entirely dependent on their employers due to their visa status," all of which "make[s] them particularly vulnerable to intimidation, retaliation, and coercion by employers when they seek to advocate for their rights." *Id.* at 33,997. In short, the agency determined that the disproportionate baseline vulnerability of H-2A workers means that, unless these workers have special protections, unscrupulous employers have an incentive to prefer more exploitable H-2A workers over U.S. workers. Plaintiffs' disagreement with that policy judgment does not make the Final Rule unlawful.

Next, Plaintiffs complain that the Final Rule makes clear employers must advertise a prevailing piece rate along with the highest applicable hourly rate on their job order. *See* 20 C.F.R. § 655.122(*l*). Plaintiffs claim this is an unexplained change from the prior legal regime. *See* Barton Pls.' PI Mem. 20, 22. Not so. As the agency explained, this language merely "clarif[ies]" the preexisting rule that the employer must advertise and pay the highest applicable wage; it does not impose any new obligations. 89 Fed. Reg. at 33,956. And the agency did acknowledge and explain the change from prior practice. *Id.* at 33,956–57 ("While seemingly straightforward, this [preexisting] requirement has been difficult to apply in practice because, for instance, where there is an applicable prevailing piece rate, it is usually not possible to determine until the time work is performed" whether the piece rate or hourly rate will be more). Again, Plaintiffs may prefer a different regulatory scheme, but their policy preferences do not render the Final Rule unlawful.

Finally, Plaintiffs assert the Final Rule is "an unauthorized intrusion into the domain of state law." *Id.* at 19, 21. To the extent Plaintiffs mean to assert some form of constitutional federalism argument, their briefing on the issue is so scattershot they have forfeited the issue. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Such an argument would also be meritless. Initially, though employment matters are often the domain of state law, the federal government retains authority over matters of immigration—including the employment of foreign workers. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 403–07 (2012). Thus, in carrying out its statutory mission, the federal government has authority to impose requirements on the employment of H-2A workers that differ from those protections found in state law.

Moreover, none of the requirements in the Final Rule apply generally to agricultural employers. Rather, they are conditions of accepting a government benefit—the ability to hire workers on H-2A visas—to which an employer has no freestanding right. There is thus no meaningful difference between conditions in H-2A job orders that go beyond the protections found in state law and, *e.g.*, the unquestionably constitutional anti-discrimination conditions on government benefits found in Title VI, which apply to anyone who takes federal funding regardless of whether state law provides similar protections. *See* 42 U.S.C. § 2000d *et seq.*; *Lau v. Nichols*, 414 U.S. 563, 568–69 (1974) (holding that Title VI is a constitutional exercise of federal "power to fix the terms on which its money allotments . . . shall be disbursed"), *abrogated on other grounds by Alexander*, 532 U.S. 275.

## II.    Plaintiffs' Requested Relief is Overbroad Because Each Provision of the Final Rule is Severable

Should this Court conclude that Plaintiffs have suffered irreparable harm from and are likely to succeed on any particular provision of the Final Rule, it should preliminarily enjoin or stay only that provision.

23

Plaintiffs request preliminary relief against the entirety of the Final Rule. *See* Barton Pls.' PI Mem. at 22 ("[T]he Final Rule should be enjoined in full."). But each challenged provision of the Final Rule is severable, and Plaintiffs have made no argument whatsoever about many provisions of the Final Rule. Thus, Plaintiffs are not entitled to their requested relief even if this Court agrees with them as to any given provision.

"The doctrine of severability imposes a two-step inquiry on courts. First, a court must determine whether the regulation will function in a manner consistent with the intent of the agency. . . . Second, the reviewing court must determine whether the agency would have promulgated the rule in the absence of the severed provisions." *Tennessee v. Cardona*, No. 2:24-cv-72-DCR, 2024 WL 3631032, at *10 (E.D. Ky. July 10, 2024) (cleaned up). Further, "regulations—like statutes—are presumptively severable." *Bd. of Cnty. Comm'rs v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023). "[T]he burden is placed squarely on" Plaintiffs to overcome that presumption. *Alaska Airlines, Inc. v. Donovan*¸ 766 F.2d 1550, 1560 (D.C. Cir. 1985). Plaintiffs have not come close to doing so.

First, if any given provision of the Final Rule is enjoined, the unrelated protections of the rule can still function perfectly. For instance, if this Court were to enjoin the worker voice and empowerment provisions, *see* 20 C.F.R. § 655.135(h)(2), (m), there is no reason the seatbelt provisions could not function as intended, *see* 20 C.F.R. § 655.122(h)(4), and vice versa. In other words, no single challenged provision "is so integral to the Final Rule that attempting to salvage provisions through severance would leave an incoherent regulatory framework." *Tennessee*, 2024 WL 3631032, at *10.

Second, we know the agency would have promulgated the remainder of the Final Rule in the absence of any severed provision because the agency told us so, repeatedly. *See* 20 C.F.R.

§ 655.190; 29 C.F.R. § 501.10; 89 Fed. Reg. at 33,952–53, 34,041. These explicit severability clauses, "which expressly set[] forth [the agency's] intent that a [regulation] stand in the event one of its provisions is struck down, makes[]it extremely difficult for a party to demonstrate inseverability." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 441 (D.C. Cir. 1982); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 624 ("[A] severability . . . clause leaves no doubt about what the enacting Congress wanted if one provision of the law were later declared unconstitutional."). Plaintiffs' conclusory argument that it would be "better" to block the entire Final Rule does not come close to demonstrating inseverability. Barton Pls.' PI Mem. 22.

Thus, if this Court agrees with the Plaintiffs as to any given provision of the wide-ranging Final Rule, it should narrowly tailor any preliminary relief solely to those provisions.

### III. Conclusion

For the foregoing reasons, this Court should deny the Barton Plaintiffs' motion for preliminary relief.

Respectfully submitted this 4th day of November, 2024.

/s/ *Nathan Leys*
Nathan Leys (CT 442014)
(*pro hac vice* motion forthcoming)
FarmSTAND
712 H St. NE, Suite 2534
Washington, D.C. 20002
Phone: (202) 630-3095
Fax: (978) 845-2282
E-mail: nathan@farmstand.org

/s/ *Daniel J. Canon*
Daniel J. Canon (KY 92048)
Saeed & Little, LLP
8777 Purdue Rd., Ste. 225
Indianapolis, IN 46268
dan@sllawfirm.com
(317) 721-9214

**_Attorneys for Proposed Intervenor-Defendants_**