IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | |
|---|---|
| RICHARD BARTON, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF LABOR, *et al.*, <br><br> *Defendants*. | Civil Action No. 5:24-cv-00249 <br><br> **PROPOSED INTERVENOR-DEFENDANTS' RESPONSE TO INTERVENOR-PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF** |

State Plaintiffs ask this Court to upset considered judgments of all three branches of government. They seek to have this Court rewrite the National Labor Relations Act, the Immigration and Nationality Act, and the Wagner-Peyser Act to better accord with their view of what Congress should have done. They request that this Court upend the executive branch's considered determination that the H-2A program as presently structured is so rife with abuse and exploitation of vulnerable workers that it adversely affects U.S. workers. And, although another federal district court has already rejected many of the arguments they make here, they now seek to second-guess that court's decision.

State Plaintiffs have not come close to demonstrating entitlement to the "extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), of preliminary equitable relief.[1] They fail to meet the demanding standard required for such relief because they have

---

[1] State Plaintiffs seek both a preliminary injunction and a stay pursuant to 5 U.S.C. § 705. *See* State Pls.' Mem. Supp. Mot. for Prelim. Relief 2 (ECF 17-1). The standards for each form of relief are the same, and so Proposed Intervenor-Defendants address them together. *Ohio ex rel. Celebrezze v. NRC*, 812 F.2d 288, 290 (6th Cir. 1987).

"simply no likelihood of success on the merits," which "is usually fatal" to such a request. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). Moreover, many of their arguments relate solely to provisions of the Final Rule they effectively concede do not impose on them any costs or obligations, and so State Plaintiffs have failed to demonstrate irreparable harm or standing as to large swathes of the Final Rule.

Furthermore, even if State Plaintiffs could demonstrate an entitlement to preliminary equitable relief as to any given provision of the Final Rule, each provision of the Final Rule is severable. Thus, should this Court determine any preliminary relief is warranted, it should limit such relief to those provisions on which State Plaintiffs can meet the requirements for a preliminary injunction or § 705 stay.

## I.    State Plaintiffs Are Not Entitled to Preliminary Relief on Any of Their Claims

State Plaintiffs make four arguments: (A) the Department of Labor ("Department" or "agency") lacks statutory rulemaking authority; (B) the worker voice and empowerment provisions of the Final Rule violate the NLRA; (C) the Final Rule "commandeers" State agencies; and (D) the Final Rule is arbitrary and capricious. None of these arguments succeeds.

### A.  *DOL Has Ample Rulemaking Authority to Justify the Final Rule*

i.  <u>State Plaintiffs Ignore the Wagner-Peyser Act, Which Explicitly Authorizes DOL to Make Rules with Respect to the Only Provisions of the Final Rule That Affect Them</u>

State Plaintiffs apparently did not read the Final Rule carefully enough. They argue only that *the Immigration Reform and Control Act* does not grant DOL rulemaking authority. *See* State Pls.' Mem. Supp. Mot. Prelim. Relief 6–11 ("State Pls.' PI Mem."). But much of the Final Rule—specifically, those provisions of the Final Rule amending 20 C.F.R. parts 651, 653, and 658—relies on *the Wagner-Peyser Act*. *See* 89 Fed. Reg. at 33,899 (invoking 29 U.S.C. § 49k),

33,902–36 (describing revisions to the Wagner-Peyser Act implementing regulations). And there can be no doubt the Wagner-Peyser Act explicitly grants DOL rulemaking authority. *See* 29 U.S.C. § 49k ("The Secretary [of Labor] is authorized to make such rules and regulations as may be necessary to carry out the provisions of this chapter.").

Those portions of the Final Rule that fall under the Wagner-Peyser Act include the provisions governing discontinuation of a State Workforce Agency's ("SWA's") employment services, *see* 20 C.F.R. §§ 651.10, 658.500–.504; 89 Fed. Reg. at 33,907–08, 33,916–36, as well as those sections governing SWAs' obligations, *see* 20 C.F.R. § 653.501; 89 Fed. Reg. at 33,910–16. Indeed, State Plaintiffs forthrightly acknowledge that the Wagner-Peyser Act governs these aspects of the H-2A program. *See* State Pls.' PI Mem. 3. They simply ignore that the Wagner-Peyser Act has a crystal-clear delegation of rulemaking authority to the agency regarding these issues. This has three consequences.

First, as to those sections of the Final Rule that amend the Wagner-Peyser Act's implementing regulations, *see* 20 C.F.R. §§ 651.10, 653.01, 658.500–.504; 89 Fed. Reg. at 34,058–59, 34,065–67, State Plaintiffs are vanishingly unlikely to succeed on the merits. They argue that the agency lacks statutory authority to promulgate such regulations, in the face of a statute saying the agency "is authorized to make such rules and regulations as may be necessary to carry out the provisions of" the Wagner-Peyser Act. 29 U.S.C. § 49k. They are thus not entitled to preliminary relief on their no-rulemaking-authority argument as to these provisions. *See Gonzales*, 225 F.3d at 625 (failure to establish "likelihood of success on the merits is usually fatal" to request for preliminary relief).

Second, as to those sections of the Final Rule for which DOL did *not* rely on the Wagner-Peyser Act, State Plaintiffs lack standing, and so are unlikely to succeed on the merits of their

3

claims. To establish standing, State Plaintiffs rely solely on those portions of the Final Rule governing what SWAs must or must not do. *See* State Pls.' Compl. ¶¶ 37–41, ECF No. 15 (alleging standing based solely on compliance costs from amendments to 20 C.F.R. §§ 653.501, 658.501, which are authorized by the Wagner-Peyser Act rather than IRCA). But "standing is not dispensed in gross." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018) (cleaned up). State Plaintiffs do not, and cannot, argue that those portions of the Final Rule that regulate *private actors*, rather than a SWA, injure them.

Thus, although State Plaintiffs argue IRCA does not give the agency authority, *e.g.*, to "ensure that all individuals riding in employer-provided transportation wear seat belts," or to "requir[e] employers to permit an H-2A worker to designate a representative to attend any interview related to potential discipline," State Pls.' PI Mem. 8, they have not shown that SWAs must comply with or are injured by those provisions. *See* 20 C.F.R. §§ 655.122(h)(4)(ii) (seatbelts), 655.135(m) (designation of representative at disciplinary proceeding). Because State Plaintiffs have "fail[ed] to show a substantial likelihood of standing" as to those provisions of the Final Rule, they are "not entitled to a preliminary injunction." *Waskul*, 900 F.3d at 256 n.4 (cleaned up).

Third, again as to those sections of the Final Rule for which the agency did not rely on the Wagner-Peyser Act, State Plaintiffs have not shown irreparable harm. The reason is similar to why State Plaintiffs lack standing to challenge these portions of the Final Rule. The only provisions State Plaintiffs rely on to show irreparable harm are within Parts 653 and 658, which are authorized by the Wagner-Peyser Act. *See* State Pls.' PI Mem. 20–22 (arguing State Plaintiffs will incur compliance costs from rule revisions regarding "discontinuation of employment services" and "review of job orders"); 20 C.F.R. §§ 658.500–.504 (discontinuation),

4

653.501 (review of job orders). The provisions of the Final Rule that fall outside the Wagner-Peyser-supported sections do not require a SWA's compliance, and so do not cause that SWA to incur compliance costs constituting irreparable injury. That failure is "dispositive; a plaintiff *must* present the existence of an irreparable injury to get a preliminary injunction." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). Thus, preliminary relief is unwarranted as to these provisions.

### ii.    IRCA Grants the Agency Rulemaking Authority

Even if State Plaintiffs had standing to challenge, or could demonstrate irreparable injury from, those portions of the Final Rule for which DOL relied on its rulemaking authority under IRCA, State Plaintiffs are not entitled to preliminary relief because they are unlikely to succeed on the merits.

State Plaintiffs' argument that Congress has not granted DOL rulemaking authority in carrying out the agency's obligations under the H-2A program is contrary to precedent. Just a few months ago, a district court in Georgia rejected this precise contention in parallel litigation. *See Kansas v. U.S. Dep't of Labor*, __ F. Supp. 3d __, 2024 WL 3938839, at *8 (S.D. Ga. Aug. 26, 2024) ("Importantly, the Court does not hold, nor could it, that the DOL is barred from issuing *any* labor regulations governing agricultural workers. Indeed, the IRCA delegates rulemaking authority to the DOL to issue labor regulations governing H-2A workers . . . ."). That court is far from an outlier. *See, e.g.*, *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2021) ("Congress directed the Secretary of Labor . . . to promulgate regulations that would set the parameters of the [H-2A] program, particularly for temporary workers coming 'to perform agricultural labor or services.'" (quoting 8 U.S.C. § 1101(a)(15)(H))[2]; *Bayou Lawn &*

---

[2] Though *Overdevest* relied on the since-overturned *Chevron* doctrine for another part of its analysis (whether the rule challenged in that case permissibly interpreted the statute), *see* 2 F.4th

*Landscape Servs. v. Sec'y of Lab.*, 713 F.3d 1080, 1084 (11th Cir. 2013) (noting that IRCA "expressly *grants* DOL rulemaking over the agricultural worker H-2A program" (second emphasis omitted)); *Nat'l Council of Agric. Emps. v. U.S. Dep't of Labor*, No. 22-cv-3569, 2024 WL 324235, at *2 (D.D.C. Jan. 29, 2024) ("Congress has delegated authority to promulgate regulations governing the parameters of the H-2A program to the Secretary of Labor."), *appeal docketed*, No. 24-5072 (D.C. Cir.). Indeed, Proposed Intervenor-Defendants are not aware of any case coming to the contrary conclusion.

The numerous cases concluding the agency has rulemaking authority under IRCA proceed directly from the text of the statute. State Plaintiffs cite a handful of IRCA provisions directing the agency to make rules about specific subjects. *See* State Pls.' PI Mem. 8. They ignore that elsewhere, the statute repeatedly and explicitly contemplates broader regulations. *See, e.g.*, 8 U.S.C. § 1188(b)(1) (forbidding agency from issuing a labor certification if "[t]here is a strike or lockout . . . which, *under the regulations*, precludes such certification" (emphasis added)); *id.* § 1188(c)(3)(B)(i) (requiring certain employers to "offer to provide benefits, wages and working conditions required pursuant to this section *and regulations*" (emphasis added)); *id.* § 1188(c)(3)(B)(vi) (exempting employers from liability under an existing regulation "*or any successor regulation*" under certain circumstances (emphasis added)); *id.* § 1188(c)(4) ("Employers shall furnish housing in accordance *with regulations*." (emphasis added)). Taken together, the only plausible reading of these provisions is that Congress explicitly intended for the agency to issue regulations "to fill up the details" in IRCA's statutory framework. *Wayman v. Southard*, 23 U.S. 1, 43 (1825). Indeed, any other reading would render these references to broad

---

at 982–84, the D.C. Circuit did not apply *Chevron* deference to the question at hand here, *i.e.*, whether the agency has rulemaking authority in the first instance, *see id.* at 980.

regulations entirely superfluous, a result at odds with elementary principles of statutory interpretation. *See United States v. Wilkes*, 78 F.4th 272, 280 (6th Cir. 2023).

Further, State Plaintiffs concede in passing that IRCA requires the agency to issue a certification "if the 'employer has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary).'" State Pls.' PI Mem. 8 (quoting 8 U.S.C. § 1188(c)(3)(A)(i)). There is no plausible interpretation of "criteria . . . as prescribed by the Secretary," 8 U.S.C. § 1188(c)(3)(A)(i), other than regulations such as the Final Rule. Indeed, if the agency were to promulgate such "criteria" *without* notice-and-comment rulemaking, one suspects the agency would promptly be sued for its failure to do so.

In short, the fact that Congress did not phrase an explicit grant of rulemaking authority in the way State Plaintiffs would prefer does not make the congressional intent here any less obvious. "[T]he best reading of [IRCA] is that it delegates discretionary authority to [the] agency" to make regulations structuring the H-2A program, and "the role of the reviewing court under the APA is, as always, to . . . effectuate the will of Congress subject to constitutional limits." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

iii.   Even if IRCA Did Not Grant the Agency Explicit Rulemaking Authority, It Would Do So Implicitly

Even if this Court were to agree with State Plaintiffs that 8 U.S.C. § 1188 does not explicitly grant the agency rulemaking authority, the statute would still do so implicitly. It is black-letter law that "[t]he power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy *and the making of rules* to fill any gap left, *implicitly or explicitly*, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) (emphasis added); *see generally HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016) (explaining that courts "have recognized that agencies enjoy some powers that were not

*expressly* enumerated by Congress," *i.e.*, those powers that are "statutorily implicit" (cleaned up)). Thus, although State Plaintiffs are correct that an agency can only make rules if Congress says so, they ignore that the "delegation [of rulemaking authority] need not be express." *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 684 (4th Cir. 2020).

The Fourth Circuit's decision in *Outdoor Amusement* is illustrative. That case involved the H-2B program; the relevant question was whether the Departments of "Homeland Security or Labor had statutory authority to promulgate" a set of rules that—like the Final Rule challenged here—"establish[ed] the standards governing the labor-certification-application process." *Id* at 684, 676. The court noted that the H-2B statute "leaves gaps to be filled" by an agency. *Id* at 684. For instance, like the H-2A program, the government can only issue "an H-2B visa . . . if American workers cannot be found to fill the relevant jobs." *Id.* at 685. But that raises the question "as to how to determine when U.S. workers are available." *Id.* Thus, the visa-issuing agency (for the H-2B program, Homeland Security) "sensibly chose[] to rely on Labor's expertise in the labor market to make a two-part determination for issuing a labor certification: 'whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers.'" *Id.* Further, "Labor could make rules to define how it would judge whether" a given application for an H-2B worker meets that test—a test that parallels the H-2A standard. *Id.* In short, "[t]he statutory circumstances reveal that Congress implicitly delegated Labor rulemaking authority to administer its labor certifications." *Id.* at 684.

If there were any remaining doubt that Congress granted DOL either explicit or implicit rulemaking authority, consider the absurdity of the counterfactual: that Congress intended to

forbid the agency from using rulemaking to "fill [the] gap[s] left" in the statute. *Morton*, 415 U.S. at 231. In State Plaintiffs' world, the agency is left to determine anew in every single case—for hundreds of thousands of H-2A workers annually—whether "sufficient [U.S.] workers" are available and whether hiring H-2A workers would "adversely affect the wages and working conditions of [U.S.] workers." 8 U.S.C. § 1188(a)(1). "Neither judgment is self-evident." *Outdoor Amusement*, 983 F.3d at 685. Thus, "[t]he alternative [to rulemaking] is for Labor to use an unstructured ad hoc process or return to informal guidance letters, both of which could lead to further delays, costs, and reduced accountability through shifting determinations." *Id.*

Moreover, State Plaintiffs do not contest that absent a rule, the agency could permissibly conclude in a single adjudication that it cannot grant a given H-2A application because the employer failed to promise, *e.g.*, not to fire workers for speaking with a medical provider. *See* 20 C.F.R. § 655.135(h)(1)(v). Nor do they appear to contest that even without a rule, the agency could make that same decision in *every* individual adjudication of an H-2A application. State Plaintiffs argue only that the agency cannot use a *rule* to announce such a policy prospectively. But when an agency wishes to "announc[e] new principles" that will apply prospectively, "the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." *NLRB v. Bell-Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974).

By requiring the agency to create and enforce the same substantive policies in the Final Rule through case-by-case adjudication of H-2A applications, State Plaintiffs' interpretation would serve only to throw sand in the gears of the administrative process and harm employers and workers alike. Forcing the agency to reinvent the wheel in every adjudication in which an agricultural employer applies for permission to hire H-2A workers would deny employers the stability and predictability that comes with rulemaking. That would be disastrous for agricultural

9

employers who depend on a stable and predictable supply of labor to stay afloat. State Plaintiffs provide no reason why Congress would have intended to structure the statute to frustrate the statutory goals of the H-2A program, presumably because no such reason exists. The "best reading of [the] statute is that it delegates discretionary authority to" the agency, and that discretion includes not only the determination whether an individual H-2A application would have an adverse effect on U.S. workers, but also the discretion to issue rules governing all such determinations. *Loper Bright*, 144 S. Ct. at 2263.

        iv.   <u>Congress Has Ratified and Acquiesced in the Agency's Exercise of Rulemaking Authority Under IRCA</u>

Even if State Plaintiffs might once have been able to argue that Congress had not unambiguously authorized the agency to exercise rulemaking authority, that ship has long since sailed. The agency has been exercising this rulemaking authority for decades. Indeed, the agency was issuing regulations on guest agricultural workers before the modern H-2A statute even existed. *See, e.g.*, *Williams v. Usery*, 531 F.2d 305 (5th Cir. 1976) (describing regulations under predecessor to H-2A program). And Congress was not in the dark about this. To the contrary, from the earliest days of the agricultural guest worker program, Congress has repeatedly said it is acutely aware the agency uses rulemaking to carry out its responsibilities. Under these circumstances, Congress has ratified the agency's exercise of rulemaking authority and acquiesced in the agency's interpretation of the statute allowing it to do so.

Acquiescence and ratification are venerable rules of statutory construction. "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (cleaned up); *accord Lorillard v. Pons*, 434 U.S. 575,

580 (1978); *Green Rock LLC v. IRS*, 104 F.4th 220, 228 (11th Cir. 2024) (where Congress is aware of an agency regulation interpreting a statute, legislates on the same subject, "and does not disturb an agency's existing regulation," courts "presume . . . [that] Congress ratifies the agency's legal interpretation"); *Outdoor Amusement*, 983 F.3d at 687 ("That Labor has been providing labor certifications and has promulgated rules governing them for decades before the [challenged] Rules without serious challenge from the political branches or courts is at least some evidence that Congress intended that [DOL] could rulemake" vis-à-vis the H-2B program).

*Phillip C. ex rel. A.C. v. Jefferson County Board of Education*, 701 F.3d 691 (11th Cir. 2012), is a good example of how acquiescence and ratification work in practice. *Phillip C.* involved a local board of education's challenge to a longstanding U.S. Department of Education rule interpreting the Individuals with Disabilities in Education Act ("IDEA") to require the state to reimburse parents for certain independent educational evaluations ("IEEs"). *Id.* at 694–95. As here, the Board argued that the regulation exceeded the agency's statutory authority. *Id.* at 695. But the Eleventh Circuit disagreed. The court noted ample evidence that Congress was plainly aware of the regulation in question. *Id.* at 696. Moreover, in the decades following the promulgation of the regulation, "Congress reauthorized the IDEA in 1990, 1997, and 2004 without altering a parent's right to a publicly financed IEE." *Id*. Explaining that "'Congress is presumed to be aware of an administrative . . . interpretation of a statute and to adopt that interpretation when it reenacts a statute without change,'" the court held that "doctrine is particularly applicable here, where a parent's right to a publicly financed IEE has endured since the [agency] first implemented the IDEA." *Id.* at 696–97 (quoting *Lorillard*, 434 U.S. at 580). Thus, "Congress has clearly evinced its intent that parents have the right to obtain an IEE at public expense," and the regulation was within the agency's statutory authority. *Id.* at 697.

This logic fits the history of the agency's rulemaking authority like a glove. First, Congress has obviously known about the agency's exercise of rulemaking authority. Indeed, Congress copied IRCA's two-prong test for whether the agency can approve a labor certification directly from a 1978 Department regulation on guestworkers that predates the H-2A program itself. *See AFL-CIO v. Brock*, 835 F.2d 912, 914 (D.C. Cir. 1987) (noting that IRCA "expressly incorporates the adverse effect prohibition that [the agency] had earlier introduced by regulations"); *United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102, 108 n.12 (D.D.C. 2002) (similar). Quite literally from the birth of the H-2A program almost 40 years ago, Congress knew about and not only declined to disturb, but expressly ratified, the agency's rulemaking authority. *See Phillip C.*, 701 F.3d at 695–96 (finding ratification/acquiescence in agency's statutory authority in part because Congress codified one such pre-existing agency regulation).

Further, Congress is plainly aware that the agency thinks it can issue rules on the H-2A program. As noted above, the face of the statute repeatedly references DOL regulations. *See, e.g.*, 8 U.S.C. §§ 1188(b)(1), 1188(c)(3)(B)(i), 1188(c)(3)(B)(vi), 1188(c)(4). There is no need to wonder if Congress has legislated with full awareness that DOL has always read the guestworker statutes to allow the agency to issue appropriate regulations. Congress has said as much.

Not only has Congress known the whole time that the agency reads the statute to grant rulemaking authority; in the years following IRCA, Congress has repeatedly legislated in this area without ever disturbing that authority. Consider a sampling of the agency rulemaking and Congressional action related to 8 U.S.C. § 1188 in the years following IRCA's passage:

- 1986: Congress passes IRCA, ratifying prior Department regulations as discussed above. *See* Pub. L. No. 99-603, 100 Stat. 3359 (Nov. 6, 1986).

- 1987: DOL promulgates by regulation the first set of rules under the H-2A program, establishing an AEWR and various other protections that form the basis of the current

12

regulations. *See* Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States, 52 Fed. Reg. 20,496 (June 1, 1987). The agency relies on the same statutes it does in the Final Rule: 8 U.S.C. §§ 1101(a)(15)(H)(ii)(A), 1184(c), and 1188.[3] *Compare* 52 Fed. Reg. at 20,507, *with* 89 Fed. Reg. at 34,059 ("The authority citation for [20 C.F.R.] part 655 continues to read as follows: . . . Subpart B issued under 8 U.S.C. [§§] 1101(a)(15)(H)(ii)(a), 1184(c), and 1188; and 8 C.F.R. § 214.2(h).")

- 1988: Congress revises and reenacts what is now 8 U.S.C. § 1188, including some technical corrections and renumbering the section, but without making any substantive change. *See* Pub. L. No. 100-525, § 2(*l*), 102 Stat. 2609, 2612 (Oct. 24, 1988).

- 1989: The agency by regulation updates its methodology for computing AEWRs, again citing 8 U.S.C. §§ 1101(a)(15)(H), 1184(c), and 1188 for its authority to do so. *See* Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States; Adverse Effect Wage Rate Methodology, 54 Fed. Reg. 28,037, 28,046 (July 5, 1989).

- 1991: Congress makes technical corrections to 8 U.S.C. § 1188, again without disturbing any agency regulatory authority. Pub. L. No. 102-232, §§ 307(*l*)(4), 309(b)(8), 105 Stat. 1733, 1756, 1759 (Dec. 12, 1991).

- 1994: Congress amends 8 U.S.C. § 1188, and—once again—stays mum about rulemaking authority. *See* Pub. L. No. 103-416, § 219(z)(8), 108 Stat. 4305, 4318 (Oct. 25, 1994).

- 1999: Congress amends 8 U.S.C. § 1188, this time by adjusting certain timelines, and without touching the agency's rulemaking authority. Pub. L. No. 106-78, § 748, 113 Stat. 1135, 1167 (Oct. 22, 1999).

- July 2000: The agency promulgates a rule implementing the DOJ's delegation of authority to adjudicate H-2A petitions. The Department lists 8 U.S.C. § 1188 as statutory authority. *See* Labor Certification and Petition Process for the Temporary Employment of Nonimmigrant Aliens in Agriculture in the United States; Delegation of Authority to Adjudicate Petitions, 65 Fed. Reg. 43,538, 43,542 (July 13, 2000).

- December 2000: Congress amends 8 U.S.C. § 1188 to tweak when the agency must determine that employer-provided housing is adequate. In a now-familiar pattern, Congress says nothing whatsoever about rulemaking authority—even though the agency had long-since published regulations governing the adequacy of employer-provided housing. *See* Pub. L. No. 106-554, § 105, 114 Stat. 2763, 2763A-11 (Dec. 21, 2000).[4]

---

[3] The agency cited 8 U.S.C. § 1186, which Congress transferred to 8 U.S.C. § 1188 the following year.

[4] Congress last amended 8 U.S.C. § 1188 in 2000.

The July 2000 rulemaking and December 2000 legislation noted above are particularly instructive. In addition to amending § 1188's timeline for determining the adequacy of housing, Congress also forbade the agency from implementing the July 2000 rule. *See* Pub. L. No. 106-554, § 104, 114 Stat. 2763, 2763A-11 (Dec. 21, 2000). But Congress expressed no skepticism of the agency's general ability to make rules under § 1188. Far from it. Congress included a proviso stating "[t]hat nothing in this section shall prohibit the development or revision of such a rule, or the publication of any similar or successor proposed or final rule . . . or other activities necessary and appropriate in preparing to implement such a rule with an effective date after September 30, 2001." *Id.* In effect, Congress told the agency it could not promulgate the July 2000 regulation now, *but it could do so later*—a legislative instruction completely at odds with State Plaintiffs' theory that the agency cannot regulate in this space at all.

In sum, since the inception of the H-2A program, Congress has not just expressly incorporated agency regulations into the statute and demonstrated in the statute's text it knows full well the agency understands the statute to grant rulemaking authority. Congress has tinkered repeatedly with that statute, all without ever hinting it disagrees with the agency's interpretation of 8 U.S.C. § 1188 to authorize rulemaking. These circumstances provide as clear an example of congressional ratification and acquiescence as one could hope to come across.

B.  *The Final Rule Does Not Violate the NLRA*

State Plaintiffs next argue that the worker voice and empowerment provisions of the Final Rule, *see* 20 C.F.R. § 655.135(h)(2)(i)–(ii), (m), violate the NLRA. *See* State Pls.' PI Mem. 11–14. These arguments are substantially the same as the original Plaintiffs' arguments in their motion for preliminary relief. *See* Barton Pls.' Mem. Supp. Mot. Prelim. Inj. 5–7, ECF No. 21-1. Rather than duplicate briefing, Proposed Intervenor-Defendants incorporate here by reference

their arguments in opposition to the original Plaintiffs' NLRA arguments. *See* Prop. Interv.-Defs.' Opp'n to Orig. Pls.' Mot. Prelim. Inj. 2–5.

    C.  *The Final Rule Does Not "Commandeer" the States*

        i.  <u>The Final Rule and the Wagner-Peyser Act Create Permissible Conditions on a State's Choice to Accept Federal Funding</u>

State Plaintiffs next argue that the Final Rule violates the anti-commandeering doctrine by "compel[ling] the States or officers of the States to implement, administer, or enforce federal regulatory programs." State Pls.' PI Mem. 15. But they studiously ignore that the Wagner-Peyser Act does not impose freestanding obligations on State actors. Rather, the Wagner-Peyser Act and its implementing regulations create conditions on the receipt of federal funding. The Wagner-Peyser Act, and its implementing regulations including the Final Rule, are well within Congress's spending power.

This is not a case like *Printz v. United States*, 521 U.S. 898 (1997), on which State Plaintiffs rely. *See* State Pls.' PI Mem. 15–16. In *Printz*, the federal government "purport[ed] to direct state law enforcement officers to participate . . . in the administration of a federally enacted regulatory scheme." 521 U.S. at 904. Importantly, for the commandeering doctrine to apply, States' participation must not be optional. *Id.* at 905 (describing the issue as "compelled enlistment of state executive officers for the administration of federal programs"); *id.* at 928 (explaining commandeering doctrine applies where state officers are "'dragooned' . . . into administering federal law" (citation omitted)).

But State Plaintiffs are not compelled to enforce the federal governments' wishes here; rather, they freely agreed to do so as a condition of accepting federal funds. *See* 29 U.S.C. §§ 49d (authorizing appropriations under Wagner-Peyser Act), 49c ("In order to obtain the benefits of appropriations apportioned under section 49d of this title, a State shall, pursuant to

State statute, accept the provisions of this chapter . . . ."). *Printz* is thus the wrong framework through which to assess State Plaintiffs' challenge. *See Printz*, 521 U.S. at 917–18 (distinguishing requirements of state officers which "are connected to federal funding measures, and can perhaps be more accurately described as conditions upon the grant of federal funding than as mandates to the States" and noting that such laws "are not before us").

This case is governed not by *Printz*, but by *South Dakota v. Dole*, 483 U.S. 203 (1987). *South Dakota* explained that "[i]ncident to [Congress's spending] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Id.* at 206 (cleaned up). Moreover, "[t]he power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution." *Id.* at 207 (quoting *United States v. Butler*, 297 U.S. 1, 66 (1936)). "Thus, objectives not thought to be within Article I's 'enumerated legislative fields' may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *Id.* (quoting *Butler*, 297 U.S. at 65); *accord Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) ("One of the distinguishing features of the spending power is that it allows Congress to exceed its otherwise limited and enumerated powers by regulating in areas that the vertical structural protections of the Constitution would not otherwise permit.").

Under *South Dakota*, Congress may impose conditions on a State's receipt of federal funds if it meets five requirements. 483 U.S. at 207–08; *Cutter v. Wilkinson*, 423 F.3d 579, 585 (6th Cir. 2005). Those conditions are:

- "First, the language of Article I requires that Congress use its power to further 'the general welfare.'" *Cutter*, 423 F.3d at 585 (quoting *South Dakota*, 483 U.S. at 207).

- "The second limitation requires Congress to state all conditions on the receipt of federal funds 'unambiguously' so as to 'enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id.* (quoting *South Dakota*, 483 U.S. at 207).

- "Third, the conditions attached to federal funds might be invalid if they are not related 'to the federal interest in particular national projects or programs.'" *Id.* (quoting *South Dakota*, 483 U.S. at 207–08).

- "The fourth limitation is that financial incentives offered by Congress must not be so significant that they amount to coercion." *Id.* (citing *South Dakota*, 483 U.S. at 211).

- "Finally, spending and conditions on funds must not violate any other constitutional provision." *Id.* (citing *South Dakota*, 483 U.S. at 208).

The Wagner-Peyser Act and the Final Rule pass this test with flying colors.

First, the Wagner-Peyser Act and the Final Rule advance the general welfare by promoting the employment of and preventing adverse effects on U.S. workers, and by preventing the abuse of vulnerable workers on H-2A visas. In assessing this factor, "courts [are] to 'defer substantially to the judgment of Congress' in deciding what constitutes 'the general welfare.'" *Cutter*, 423 F.3d at 585 (quoting *South Dakota*, 483 U.S. at 207). Indeed, Congress's ability to define the general welfare is so broad "that the 'general welfare' restriction might not be 'judicially enforceable at all.'" *Id.* (quoting *South Dakota*, 483 U.S. at 208 n.2) (ellipsis omitted).

Second, the Wagner-Peyser Act's and the Final Rule's requirements of States are unambiguous. The States do not and cannot contend that the crystal-clear language of 29 U.S.C. § 49c, which requires States to "accept the provisions of this chapter" "[i]n order to obtain the benefits of appropriations apportioned under" the Wagner-Peyser Act, is somehow ambiguous. And they do not argue that 29 U.S.C. § 49k's grant of rulemaking authority—which is among "the provisions of this chapter" that the States must "accept," 29 U.S.C. § 49c—is itself unclear.

17

Nor do State Plaintiffs assert that they cannot tell what the Final Rule requires of them. *See Tennessee v. Becerra*, 117 F.4th 348, 358–59 & n.3 (6th Cir. 2024) (noting that the required specificity may be provided by administrative agencies implementing broad congressional language).

Moreover, the agency announced its Program Year 2024 allocations of Wagner-Peyser Act funds on May 9, 2024—*after* the promulgation of the Final Rule challenged here. *See* Program Year (PY) Title III Wagner-Peyser Act Employment Service Allotments, 89 Fed. Reg. 39,650 (May 9, 2024). Thus, State Plaintiffs were on notice of the contents of the Final Rule when they received their current allotment of Wagner-Peyser Act funds.

Third, the Wagner-Peyser Act's and the Final Rule's obligations on States "meet[] the low bar of being germane to the federal interest[s] in providing the funding" to promote the employment of U.S. workers by employers who will treat them fairly and to ensure that the employment of H-2A workers will not adversely affect U.S. workers. *City of Los Angeles v. Barr*, 929 F.3d 1163, 1176 (9th Cir. 2019). Requiring States to discontinue employment services to law-breaking employers, to screen H-2A applications for compliance with federal requirements before placing job orders in interstate clearance, and so on are "reasonably calculated" means "to address [a] particular impediment to a purpose for which the funds are expended." *South Dakota*, 483 U.S. at 209.

Fourth, State Plaintiffs cannot show the amount of Wagner-Peyser Act funding they stand to lose makes the Final Rule "coercive." *South Dakota*, 483 U.S. at 211. For one, State Plaintiffs "falter[] because [they] do[] not quantify [their] expected loss." *Oklahoma v. United States*, 62 F.4th 221, 236 (6th Cir. 2023). This forecloses a Spending Clause coercion argument because "[w]ithout knowing how much money is at stake, how [is a court] to say the sum is too high?"

*Id.* It is State Plaintiffs' burden to show they are likely to succeed on the merits. As they have not submitted evidence regarding how much Wagner-Peyser Act money is at stake, as a matter of law, they cannot meet their burden to show the Final Rule's requirements are coercive.

Even if State Plaintiffs had submitted evidence regarding the amount of money they stand to lose, the Wagner-Peyser Act and the Final Rule would not be coercive. The Supreme Court has found coercion only once. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580–585 (2012) (opinion of Roberts, C.J.). In that case, States stood to lose all of their federal Medicaid funding, which comprised, on average, "over 10 percent of [their] overall budget[s]." *Id.* at 582. A simple comparison between Medicaid and the Wagner-Peyser Act reveals how different these cases are. Ohio (which gets more Wagner-Peyser funding than any other State Plaintiff) received $22,471,826 in Wagner-Peyser employment service funding for the current Program Year.[5] In contrast, Ohio received roughly $23 *billion* in federal Medicaid reimbursements in FY2022[6]— over a thousand times as much as its PY 2024 Wagner-Peyser employment service funding. Indeed, the total Wagner-Peyser employment services funding to *every* state and territory for PY 2024 amounts to just under $673,000,000[7]—roughly three percent of what Ohio got in Medicaid funding for FY 2022. The money at issue here is pocket change, not "a gun to the head." *NFIB*, 567 U.S. at 581.

Fifth, there is no "other constitutional provision[] [that] may provide an independent bar to the conditional grant of federal funds." *South Dakota*, 483 U.S. at 208. State Plaintiffs assert

---

[5] *See* Program Year 2024 Title III Wagner-Peyser Act Employment Service Allotments, 89 Fed. Reg. 39650, 39,656 (May 9, 2024) (Table D). Alabama received $7,994,781, Kentucky received $7,958,398, and West Virginia $5,365,031.

[6] *See* The State of Ohio Executive Budget FY2024–25, at 443 (Jan. 31, 2023), https://archives.obm.ohio.gov/Files/Budget_and_Planning/Operating_Budget/Fiscal_Years_2024 -2025/ExecutiveBudget/BudgetRecommendations_FY2024-2025.pdf.

[7] 89 Fed. Reg. at 39,656.

in their commandeering argument that the provisions of the Final Rule violate due process. State Pls.' PI Mem. 16–17. Initially, State Plaintiffs do not, and cannot, contend the Final Rule denies *them* due process. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by an reasonable mode of interpretation, be expanded to encompass the States of the Union . . . ."). They instead argue the Final Rule requires them to deny due process to employers.

But the Final Rule does violate employers' right to due process. State Plaintiffs argue that the Final Rule does not require a hearing prior to the discontinuation of employment services. *See* State Pls.' PI Mem. 16. However, "due process does not require a hearing, but instead an *opportunity* to be heard." *Lewis v. Whirlpool Corp.*, 630 F.3d 484, 490 (6th Cir. 2011) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982)). Thus, "the availability of recourse to a constitutionally sufficient administrative procedure satisfies due process requirements if the complainant merely declines or fails to take advantage of the administrative procedure." *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004) (cleaned up); *see also Boddie v. Connecticut*, 401 U.S. 371, 378–79 (1971) ("[T]he hearing required by due process is subject to waiver . . . .").

The Sixth Circuit's decision in *Kaplan v. University of Louisville*, 10 F.4th 569 (6th Cir. 2021) is instructive. In that case, a professor sued a university for suspending and then firing him, claiming a "liberty interest[] in his reputation." *Id.* at 584. But the professor "never requested a name-clearing hearing from" the university, even though one was available. *Id.* So, the Sixth Circuit explained, he had no due process claim. *Id.*

Like the name-clearing hearing in *Kaplan*, *id.*, the Final Rule provides notice and "an *opportunity* to be heard" prior to discontinuation of services in almost every case. *Lewis*, 630 F.3d at 490. Under the regulations, if a "SWA determines that there is an applicable basis for

20

discontinuation of services under [20 C.F.R.] § 658.501(a)(1) through (8), the SWA must notify the employer in writing that it intends to discontinue the provision of ES services in accordance with this section and must provide the reasons for proposing discontinuation of services." 20 C.F.R. § 658.502(a). Then, for each applicable basis for discontinuation, "[t]he SWA must notify the employer in writing that all ES services will be terminated unless the employer within 20 working days" corrects the error or provides evidence that discontinuation is unwarranted, as appropriate. *See id.* § 658.502(a)(1)–(8). The employer can also request a hearing on the SWA's final determination, which "stays the discontinuation pending the outcome of the hearing." *Id.* § 658.503(a). State Plaintiffs offer no reason why this method of offering notice and an opportunity for a hearing does not satisfy due process.

In extremely narrow circumstances where a SWA has evidence that not discontinuing services immediately "would cause substantial harm to workers," the Final Rule provides for a prompt post-deprivation hearing rather than a pre-deprivation hearing. *See* 20 C.F.R. § 658.502(b). But the Due Process Clause does not inflexibly require pre-deprivation hearings; the Supreme "Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). Rather than duplicate briefing, Proposed Intervenor-Defendants incorporate by reference their explanation why the Final Rule's provision of prompt post-deprivation hearings in situations where not discontinuing would substantially harm workers satisfies due process. Prop. Interv.-Defs.' Opp'n to Orig. Pls.' Mot. Prelim. Inj. 16–17.

D.  *The Final Rule Is Not Arbitrary or Capricious*

Finally, State Plaintiffs make a mishmash of arguments that various parts of the Final Rule are arbitrary and capricious. *See* State Pls.' PI Mem. 17–20. In large part, these arguments simply shoehorn their prior contentions into the phrasing of the *State Farm* standard. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). For example, State Plaintiffs repackage their NLRA argument to be that the agency "relied on factors Congress did not intend it to consider" and "fail[ed] to articulate a rational connection between the facts and the Final Rule" to reach "a result so implausible it could not be ascribed to a difference in view," and so on. State Pls.' PI Mem. 17, 18, 19. This is the same wine in a new bottle, and so Proposed Intervenor-Defendants refer back to their explanation why the NLRA poses no barrier to the Final Rule.

State Plaintiffs only make one argument that might be read as distinct from their repetitive NLRA arguments. They assert that because discontinuation of employment services means the SWA would not connect that employer to "American workers with employers who need workers," discontinuing services to an employer who violates the requirements of the H-2A program is "a result so implausible it could not be ascribed to a difference in view." *Id.* at 18–19. This argument fails.

Initially, this argument that discontinuing services will harm employers' workers is untethered from the regulations. "SWAs must continue to provide the full range of [employment services] and other appropriate services to workers whose employers experience discontinuation of services under this subpart." 20 C.F.R. § 658.503(f). So any asserted harm to workers from discontinuation would be the result of the State Plaintiffs' agencies failing to abide by the regulations, not the fault of the Final Rule.

Moreover, the provision State Plaintiffs complain about requiring SWAs to initiate discontinuation proceedings in certain circumstances falls under DOL's Wagner-Peyser authority, rather than its IRCA authority. *Compare* State Pls.' PI Mem. at 18 (referring to 89 Fed. Reg. at 34,065 (codified at 20 C.F.R. § 658.501)), *with* 89 Fed. Reg. at 34,065 (relying on DOL's authority under the Wagner-Peyser Act, rather than IRCA, to promulgate this position). That matters because the Wagner-Peyser Act says nothing about the "adverse effects" requirement State Plaintiffs rely on. The agency did not act arbitrarily and capriciously by not applying the regulatory framework of IRCA when it promulgated a rule under a different statute.

Finally, even if the regulations did not foreclose State Plaintiffs' asserted harms to workers and even if the agency needed to rely on IRCA rather than the Wagner-Peyser Act, this is a classic policy judgment within the agency's expertise and discretion. Assuming arguendo that discontinuing employment services to an employer who breaks the law would have an adverse effect on U.S. workers—itself a dubious premise—the agency permissibly concluded that the alternative, *i.e.*, failing to discontinue services to employers who break the law, would have an adverse effect on U.S. workers by creating an underclass of especially vulnerable foreign laborers whom unscrupulous employers would have an incentive to prefer. *See* 89 Fed. Reg. at 33,987 ("The Department . . . believe[s] that [the] vulnerability of the H-2A workforce, *and the ability of employers to hire this vulnerable workforce*, may" have adverse effects on "farmworkers in the United States . . . in light of the availability of the H-2A workforce" (emphasis added)). State Plaintiffs  challenge what "is really a policy decision taken within the bounds of a rather broad congressional delegation . . . to balance the competing goals of the [H-2A] statute—providing an adequate labor supply and protecting the jobs of domestic workers." *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1997) (Silberman, J.). Though State Plaintiffs

apparently prefer a different policy choice, "[s]triking that balance is a judgment call which Congress entrusted to the Department of Labor." *Id.*

## II.    Each Provision of the Final Rule Is Severable

Even if State Plaintiffs were entitled to preliminary relief as to any particular provision of the Final Rule, each provision of the Final Rule is severable. Proposed Intervenor-Defendants incorporate by reference their severability arguments from their opposition to the original Plaintiffs' motion for preliminary relief. *See* Prop. Interv.-Defs.' Opp'n to Orig. Pls.' Mot. Prelim. Inj. 23–25.

## III.    Conclusion

For the foregoing reasons, this Court should deny State Plaintiffs' motion for preliminary relief.

Respectfully submitted this 4th day of November, 2024.

/s/ *Nathan Leys*                                    /s/ *Daniel J. Canon*
Nathan Leys (CT 442014)                        Daniel J. Canon (KY 92048)
(*pro hac vice* motion forthcoming)            Saeed & Little, LLP
FarmSTAND                                          8777 Purdue Rd., Ste. 225
712 H St. NE, Suite 2534                          Indianapolis, IN 46268
Washington, D.C. 20002                          dan@sllawfirm.com
Phone: (202) 630-3095                            (317) 721-9214
Fax: (978) 845-2282
E-mail: nathan@farmstand.org

***Attorneys for Proposed Intervenor-Defendants***