UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| RICHARD BARTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5: 24-249-DCR |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| UNITED STATES DEPARTMENT | ) | **AND ORDER GRANTING** |
| OF LABOR, et al., | ) | **INJUNCTIVE RELIEF** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

## Introduction

In 1986, Congress created the H-2A temporary agricultural visa program through the Immigration Reform and Control Act ("IRCA"). The IRCA allows employers to hire foreign agricultural workers on a temporary, seasonal basis when there is a demonstrable shortage of U.S. workers to fill the needed positions. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Farmers across the country rely on H-2A visa workers to perform temporary or seasonal agricultural work. And while the program is vital to the success of American farmers, it can be complicated and expensive for employers to meet its requirements. [Record No. 1, p. 2-3]

At the time of enactment, the H-2A program included protections for American workers in the agricultural industry. Under the statute, applicants under the program seeking to hire H-2A workers must first obtain a "labor certification" from the Secretary of Labor. Before the Secretary of Labor may issue a "labor certification," an employer must certify that (1) "there are not sufficient workers who are able, willing and qualified, and who will be available at the time and place needed" and (2) employment of the H-2A worker "will not adversely affect the

wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1). The Secretary of Labor will issue a certification if both conditions are met, and the Attorney General will approve the employer's petition for H-2A workers. *Id.*

In addition to the Department of Labor's ("DOL") certification requirements, employers seeking to hire H-2A workers must submit their job orders to a State Workforce Agency ("SWA") to review the job order for compliance with related state regulations. *See* 20 C.F.R. § 655.121(e)(2). If an SWA approves the job order, "the SWA must promptly place the job order in intrastate clearance and commence recruitment of U.S. workers" and then an SWA will "refer each U.S. worker who applies" to the farmer. *See* 20 C.F.R. § 655.121(f), (g); *Flores v. Rios*, 36 F.3d 507, 512 (6th Cir. 1994).

The DOL regulates the H-2A program to ensure that American workers are not adversely affected by the issuance of H-2A visas to foreign workers and it performs this duty through various methods. One longstanding exercise of this authority originating from the Immigration and Nationality Act of 1952 is the DOL's prescription of the adverse effect wage rate ("AEWR"). *See* 8 U.S.C. § 1101-1483. The AEWR is the minimum wage rate DOL determines employers must pay H-2A workers to ensure American workers are not adversely affected. While the current consensus is that the DOL has authority to set the AEWR, other regulations the DOL promulgates have been scrutinized more closely in the wake of the United States Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2247, (2024) (holding, in part, that United States Courts no longer give broad deference to statutory interpretation by federal agencies).

**The Final Rule**

On April 29, 2024, the DOL issued a regulation entitled *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898 (Apr. 29, 2024) ("Final Rule").  This Final Rule substantially altered the requirements for employers seeking to hire workers under the H-2A temporary agricultural visa program.  It includes provisions such as worker protections and employer-mandated seatbelt requirements, which raised numerous objections from states and private parties.  89 Fed Reg. at 33,901.  In response, seventeen states, a farm, and a farmers' association brought suit in the United States District Court for the Southern District of Georgia seeking a preliminary injunction or a stay of the Final Rule pursuant to 5 U.S.C. § 705.  *Kansas v. Department of Labor*, No. 2:24-cv-00076-LGW, 2024 WL 3938839, at *1 (S.D. Ga. Aug. 26, 2024).  Judge Lisa Godbey Wood, United States District Judge for the Southern District of Georgia, issued a well-reasoned opinion which included injunctive relief, but limited the scope of relief to the parties in the case.

In relevant part, District Judge Wood found that the "a party-specific preliminary injunction offer[ed] completed relief to Plaintiffs." *Id.* at *10.  In issuing injunctive relief, the *Kansas* Court found that, although the DOL had the requisite authority to promulgate the Final Rule under the Immigration and Nationality Act ("INA"), it violated the National Labor Relations Act ("NLRA").  The DOL chose not to seek review through an interlocutory appeal.

The DOL's decision to continue enforcing the Final Rule in other states not subject to the *Kansas* Court's injunction has led to other lawsuits across the country.[1]  The plaintiffs before this Court include seven Kentucky farmers who employ workers through the H-2A visa program and five association entities that, on behalf of their members and shareholders, file H-2A applications and offer support through a variety of educational and advocacy efforts related to the program.  The plaintiffs filed suit against the United States Department of Labor, Julie Su, the Acting Secretary of the DOL, Jose Javier Rodriguez, the Assistant Secretary for Employment and Training at the DOL, and Jessica Looman, an Administrator of the Wage & Hour Division of the DOL.  Thereafter, West Virginia, Alabama, Ohio, and Kentucky were granted permission to intervene as plaintiffs.

Under the facts presented in this case, the Court finds multiple portions of the Final Rule being challenged unlawful under the Administrative Procedure Act.  More specifically, the Final Rule contains provisions that contravene the National Labor Relations Act and the Takings Clause of the Fifth Amendment.  Further, the Final Rule includes other provisions that are arbitrary and capricious.  As a result, the undersigned will issue injunctive relief preventing the DOL from enforcing the provisions discussed herein.

**The Final Rule Makes Numerous Changes to the Longstanding H-2A Program.**

In perhaps its most blatant arrogation of authority, the Final Rule seeks to extend numerous rights to H-2A workers which they did not previously enjoy through its worker voice and empowerment provisions.  The DOL justifies this attempted regulatory expansion as an

---

[1]    In addition to the *Kansas* and this matter, other challenges to the Final Rule are pending in the United States District Courts for the Eastern District of North Carolina and the Southern District of Mississippi.  *See N.C. Farm Bureau Fed'n, Inc. v. DOL*, No. 5:24-cv-00527-FL (E.D.N.C.); *Int'l Fresh Produce Ass'n v. DOL*, No. 1:24-cv-309-HSO-BWR (S.D. Miss).

effort to prevent the alleged "unfair treatment" of H-2A workers by employers and to protect similarly situated American workers.  89 Fed. Reg at 33900.  The DOL explained that the purpose of the new rule is "to protect workers' rights to association and access to information both to make them less susceptible to labor exploitation . . . and to interrupt factors that impose barriers to workers advocating or complaining regarding working conditions and thus have an adverse effect on workers in the United States similarly employed."  89 Fed. Reg. at 34017.

To achieve these ends, the Final Rule requires employers to provide assurances that they will not intimidate, threaten, or otherwise discriminate against certain workers or others for engaging in "activities related to self-organization," including "concerted activities for the purpose of mutual aid or protection relating to wages or working conditions," or refusing to engage in such activities.  20 CFR § 655.135(h)(2).  Under the NLRA, H-2A workers had not previously enjoyed these protections, and the DOL has not cited any statutory authority for the change in policy extending these protections to workers.  *See* 29 U.S.C. § 152(3).  The petitioners in this suit have claimed these new protections amount to "collective bargaining rights," [Record Nos. 1, 15, 17-1, 21-1] which contravene the NLRA because agricultural workers are excluded from the Act.  [Record Nos. 1, 15, 17-1, 21-1]  *Kansas*, WL 3938839, at *7.

In addition to these new protections labeled "worker voice and empowerment provisions," the Final Rule provides new requirements for employers seeking to hire H-2A workers and makes those requirements apply retroactively to employers who have already hired H-2A workers for the current year.  Among the new, yet retroactive, requirements for H-2A employers are the following provisions of the Final Rule:

1) Employers must now disclose extensive personal information about owners, operators, managers, and supervisors working with H-2A employees. 89 Fed. Reg. at 34047; 20 C.F.R. § 655.130(a)(3).

2) Employers must immediately implement a new system for calculating wages to ensure employees are paid the higher amount between the AEWR and the piece-rate based on worker production. 89 Fed. Reg. at 34061; 20 C.F.R. § 655.122(1).

3) State Workforce Agencies ("SWA") must discontinue employment services to employers who have been found to have violated provisions of the Final Rule without the same appeal and due process rights they previously enjoyed. 89 Fed. Reg. at 34067; 20 C.F.R. § 658.502(b).

4) Employers must allow H-2A workers to invite guests onto the property in which they are being housed. 89 Fed. Reg. at 34063; 20 C.F.R. § 655.135(n).

5) Employers must ensure that all H-2A workers riding in employee-owned vehicles wear a seatbelt, and employers will be held strictly liable for the failure of any H-2A employee not wearing a seatbelt. 89 Fed. Reg. at 34060; 20 C.F.R § 655.122(h)(4).

To enforce these provisions, the Final Rule mandates that SWAs "initiate procedures for discontinuation of [employment] services to employers" who do not comply with the new provisions of the Final Rule. 89 Fed. Reg. at 34,065-66. Those challenging this Final Rule oppose these requirements, not only because of the burden they impose on them in their efforts to comply, but also because they did not agree to them when they applied for H-2A employees under the regulatory framework established before the Final Rule. *See N.C. Farm Bureau Fed'n, Inc. v. DOL*, No. 5:24-cv-00527-FL (E.D.N.C.); *Int's Fresh Produce Ass'n v. DOL*,

No. 1:24-cv-309-HSO-BWR (S.D. Miss); *Kansas v. Department of Labor*, No. 2:24-cv-00076-LGW (S.D. Ga.).

### The *Kansas* Court Injunction to Prevent Enforcement of the Final Rule

In the *Kansas* case, Judge Wood found that the DOL had the requisite authority to promulgate the Final Rule under the Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act ("IRCA"). The court began its analysis by noting that, "when the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Kansas*, WL 3938839, at *5, citing *Loper Bright*, 144 S. Ct. at 2247. It also stated that, "while the DOL does not enjoy a grant of general rulemaking authority, the IRCA does reflect congressional intent to confer some rulemaking authority upon DOL." *Id.* at *5.

The relevant provision states "the AG may not issue any H-2A visas until the DOL has issued a 'certification' that: (A) there are not enough American workers to perform the relevant labor and (B) the issuance of such visas will not 'adversely affect' similarly-employed American laborers." *Id.*, citing 8 U.S.C. § 1188(a)(1). The court determined that, "[p]ut plainly, the 'best reading' of § 1188, in its entirety, is that Congress granted the DOL the authority to issue regulations to ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." *Id*. In reaching this determination, Judge Wood relied on the D.C. Circuit's opinion in *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991).

In *Dole*, private parties challenged the DOL's authority to recalculate the minimum wage rate for employers who wanted to hire foreign agricultural workers. *Id.* The *Dole* court

concluded "[t]he Department is obliged to balance the competing goals of the statute—providing an adequate labor supply and protecting the jobs of domestic workers." *Id.* Judge Wood concluded that consequently, "§ 1188 affords the DOL considerable latitude to promulgate regulations that protect American workers from being adversely affected by the issuance of H-2A visas." *Kansas,* WL 3938839, at *6.

Judge Wood then examined the DOL's factual findings justifying the Final Rule to determine whether its actions were within the scope of the DOL's mandate under § 1188. *Id.* In those findings, the DOL concluded that employers were violating the H-2A requirements, and more oversight was needed to ensure that H-2A workers were not being exploited. *Id.* It reasoned that, by "leveling the playing field" between H-2A workers and their American counterparts, farmers would not simply prefer H-2A migrant workers because they could be exploited. Therefore, it reasoned that by providing additional protections to H-2A workers, employers would have less incentive to seek out foreign agricultural workers at the expense of American workers, and American workers would thus *not* be adversely affected by the program. Given the considerable increase in the use of the H-2A program, the court ultimately agreed that the Final Rule served to "alleviate adverse effects on American agricultural workers" and thus fell "within the DOL's rulemaking authority under § 1188." *Id.* at *7.

The court, however, further and correctly determined that "providing agricultural workers with collective bargaining rights is foreclosed by the NLRA's explicit exclusion of all agricultural workers from its definition of 'employee[s]' who have a federal right to collectively bargain." *Id*. at *7. In reaching this conclusion, Judge Wood explained, "[l]anguage in a regulation . . . may not create a right that Congress has not." *Kansas,* WL 3938839, at *5, (quoting *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001)); *see also Gonzaga*

*Univ. v. Doe*, 536 U.S. 273, 283 (2002) (explaining that courts "must determine whether Congress intended to create a federal right" to determine whether a federal right exists). And while the DOL argued that the Final Rule did not create a right to collective bargaining, the court properly disagreed, finding that "much of the Final Rule's language mirror[red] that of the NLRA." *Kansas,* WL 3938839, at *7. It further reasoned that "the Final Rule provides for agricultural workers' right to participate in concerted activity to further their interests. That is a right that Congress ha[d] not created by statute." *Id*. at *8. In fact, Congress explicitly excluded agricultural workers from receiving collective bargaining rights. *Id.* The court completed its analysis by noting that "[a]dministrative agencies, including the DOL, cannot create law, and the DOL cannot create rights that Congress has not. The DOL cannot make both executive rules and congressional laws." *Id.* at *9.

After finding that the Final Rule likely contravened the NRLA, Judge Wood concluded that the private individual plaintiffs, trade associations, and the plaintiff-states would suffer irreparable harm if the DOL implemented the Final Rule. *Id.* at *9. Notably, the court found the Final Rule would: (1) significantly hamper the operation of the private parties' farms; (2) increase regulatory costs to the trade association plaintiff; and (3) create "additional administrative costs associated with state workforce agency review of applications [.]" *Id*. In addition, these increases in administrative costs cannot be recovered from the federal government because of sovereign immunity. *Id.*

The court ruled that the balance of equities favored the issuance of injunctive relief. And in relevant part, it found the public had a substantial interest in having agencies act within their congressionally designated authority. *Id.* at *10. The court enjoined the Final Rule, given

- 9 -

the high likelihood of the plaintiffs' success on the merits and because principles of equity and public interest favored relief.  *Id.*

The court then analyzed several potential forms of relief available under Section 750 of the APA.  ("[The] reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of agency action or to preserve status or rights pending conclusion of the review proceedings.")  *Id.* at *11 ("[The] reviewing court … may issue all necessary and appropriate process to postpone the effective date of agency action or to preserve status or rights pending conclusion of the review proceedings.") (quoting *Califano v. Yamasaki*, 442, U.S. 682, 702 (1979)).  The plaintiffs asked the court to issue a nationwide injunction, noting that similarly situated parties across the country stood to be injured by implementation of the Final Rule.  *Id.* at *10.  They further argued that only "allowing union-like rights" for workers in un-enjoined would funnel labor away from enjoined plaintiff states, thereby creating an unequal outcome.  *Id.* at *12.  But the court ultimately held that a nationwide preliminary injunction to protect those similarly situated was not appropriate as "non-uniformity us not a proper consideration for issuing a nationwide injunction."  *Id.*  ("[N]onuniformity is a deliberate feature of our federal court system, and Congress—not one of the 94 federal district courts or 12 regional circuit courts—is best positioned to choose when to depart from that norm.")  *Id.* at *12.  As such, District Judge Wood found that a party-specific preliminary injunction offered complete relief to the plaintiffs and would be no broader than necessary to address the harms demonstrated.  *Id.* at *13.

**Following the *Kansas* Decision, the DOL Has Created a Patchwork Regulatory Regime.**

Despite the *Kansas* Court's thoughtful and well-reasoned opinion, the DOL reissued the Final Rule on September 10, 2024.  As a result, the current regulatory landscape has

become increasingly complex and now encapsulates different schemes for applicants to navigate, depending on where the applicant is located.  [Record No. 21-1, p. 8]  If an employer operates in a state covered by the injunction, the party is bound by the requirements of the H-2A regulatory provisions and application processes that were in effect before the Final Rule was promulgated.  *Id.*  However, at the same time, if a party is located in a state not covered by the injunction, the party is bound by the new obligations and application processes set forth in the Final Rule.  *Id.*  And if the party operates in a state covered by the injunction but also in a state not covered, the party must fill out multiple H-2A applications and will be simultaneously bound by both the "old" H-2A rules as well as the Final Rule.  *Id.* at 9.  This new regulatory scheme has created obvious and understandable confusion among participating employers, farmers advocacy groups, and SWAs as different employees are subject to different rules depending on where they work.  *Id.*  Additionally, different employers may be bound by different rules in the same state depending on whether they were party to the litigation in the Southern District of Georgia.  As a result, employers and SWAs are struggling to adhere to the Final Rule and are incurring significant and additional compliance costs, while also remaining unsure if they are fully in compliance.

## Standard of Review

Under the Administrative Procedure Act, a district court "may issue all necessary and appropriate process to postpone the effective date of any agency action" to the extent necessary to prevent irreparable injury.  5 U.S.C. § 705.  To prevail on a motion for a stay under § 705 a plaintiff must demonstrate the same criteria as a plaintiff seeking a preliminary injunction. *Tennessee v. Cardona*, No. 2:24-cv-072, 2024 WL 3019146, at *7 (E.D. Ky. June 17, 2024) (*quoting Ohio v. Nuclear Reg. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987)).  Accordingly, the

- 11 -

Court will apply the following factors to the plaintiffs' motions: (1) Whether the plaintiffs are likely to succeed on the merits; (2) whether the plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief; (3) whether the balance of equities tips in the plaintiffs' favor; and (4) whether an injunction will best serve the public interest." *Winters v. National Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although courts will typically consider all four *Winters* factors, the third and fourth factors "merge when, as here, the Government is the opposing party." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020).

These factors are not "prerequisites that must be met," but instead, "interrelated considerations that must be balanced together." *Ne. Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). Still, some showing of irreparable harm is required—otherwise preliminary injunctive relief would not be necessary. *See D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). However, the extent of irreparable harm plaintiffs must prove is inversely proportional to the probability of success on the merits they are able to demonstrate. *See Blackwell*, 467 F.3d at 1009.

Against this backdrop, the undersigned remains mindful that a preliminary injunction is "an extraordinary remedy which should be granted only if the movant carries his or her burden in proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). As such, the proof required to obtain a preliminary injunction is much more stringent than that required to survive a motion for summary judgment. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). The purpose of a preliminary injunction is simply to preserve the relative positions of the parties until a trial on the merits can be held. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,

511 F.3d 535, 542 (6th Cir. 2007) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

**Likelihood of Success on the Merits**

**A. The Final Rule is Within the DOL's Authority.**

The DOL cites 8 U.S.C. § 1188, of the Immigration and Nationality Act, (as amended by the IRCA) ("§ 1188") as its authority to promulgate the Final Rule. The IRCA was primarily geared towards controlling and reforming illegal immigration, expanding temporary guestworker programs, and legalizing some of the illegal immigrants living in the United States. *See* Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986). This resulted in the H-2A visa program, a migrant guestworker program specifically for agricultural workers. *Id.* Before IRCA was passed, "the Department had, under the Immigration and Naturalization Act of 1952 ("INA"), long issued regulations which set forth the minimum wage at which foreign agricultural workers could be employed[.]" *AFL-CIO v. Dole,* 923 F.2d 182, 187 (D.C. Cir. 1991). The plaintiffs, however, argue that the DOL lacks the requisite statutory authority to promulgate the Final Rule and they advocate for a narrow reading of § 1188. Conversely, the defendants claim that "Congress delegated broad authority to DOL to promulgate regulations to ensure that an employer's use of H-2A workers would not harm similarly employed workers in the United States." [Record No. 34, p. 13]

The starting point for analyzing any statute is the language of the statute itself. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Under § 1188(a), the Attorney General may not issue any H-2A visas until the DOL certifies there are not sufficient American workers willing and qualified to perform the job and that employing a foreign laborer will not adversely affect American workers. 8 U.S.C. § 1188(a)(1). These conditions are known as the DOL's

dual mandate.  If the DOL determines the requirements set out in these subsections are met, it *must* issue a certification to an employer.  But if those requirements are not met, the DOL may not issue the certification.  Further, § 1188(c) serves as a supplement to the DOL's authority, allowing rules "in the case of the filing and consideration of an application for a labor certification." 8 U.S.C. § 1188(c).  In a wider delegation of rulemaking authority granted to the DOL under the H-2A program, § 1188(c)(3) provides that the Secretary "shall make . . . the certification described in subsection (a)(1) if – (i) the employer has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)."

A broader reading of § 1188 is consistent with chronologically proximate court precedent.  "[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining a statute's meaning." *Loper Bright,* 144 S. Ct. 2244 at 2262, (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  A year after IRCA's passage, the D.C. Circuit adjudicated the extent to which the DOL could set an AEWR to offset wage protection based on the text of § 1188.  *See AFL-CIO v. Brock*, 835 F.2d 912, 916 (D.C. Cir. 1987).  In 1991, the D.C. Circuit determined "[t]he Department is obliged to balance the competing goals of the statute—providing an adequate labor supply and protecting the jobs of domestic workers."  *Dole*, 923 F.2d at 364.  Notably, neither of these cases relied on *Chevron*. Courts were long exercising their independent discretion in their evaluations of the statute, and their continuous construction of § 1188's broad authority never rested on blind deferral to the DOL.  And even if they had relied on *Chevron*, "[t]he holdings of those cases that specific agency actions are lawful . . .

are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Loper Bright*, 144 S. Ct. at 2273.

The state plaintiffs maintain this is not the case, insisting "nothing in the text of 29 U.S.C § 1188 gives the Department authority to promulgate regulations establishing requirements on employers as conditions to issuing the certification." [Record No. 17-1, p. 9] Not only is this interpretation challenged by pertinent case law from the time the statute was enacted, it also fails to address the broad authority granted under § 1188(c)(3). "Statutory interpretation is a 'holistic endeavor[.]'" *Tennessee v. Cardona*, Civil Action No. 2: 24-072-DCR, 2024 WL 3019146, at *9 (E.D. Ky. June 17, 2024) (citing *Keen v. Helson*, 930 F.3d 799, 802-04 (6th Cir. 2019)). Regarding § 1188 specifically, "[t]he statute explicitly envisions implementing regulations that will clarify the meaning and application of its provisions." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). The words "including criteria for the recruitment of eligible individuals as prescribed by the Secretary" do not limit the DOL to "recruitment" regulation, but instead contextualize its wider authority to promulgate conditions that aid it in carrying out its dual mandate.

The state plaintiffs attempt to cabin this power to "recruitment," but do so ineffectively. They argue *Dole's* holding remains cogent because the *power to set the AEWR is related to recruitment*, but their analysis stops there. They fail to explain why setting AEWR pertains to recruitment but, for example, creating substantive conditions that make H-2A workers more difficult to exploit does not pertain to recruitment. Moreover, they overlook 8 U.S.C.A. § 1188(c)(3)(B)(iii), which requires that the Secretary of Labor "promulgate, on an interim or final basis, regulations based on his findings" regarding whether the employment of migrant guest workers is adversely affecting their American counterparts.

- 15 -

"Section 1188(a)(1) establishes the INA's general mission; Congress left it to the Department of Labor to implement that mission through the creation of specific substantive provisions." *Mendoza*, 754 F.3d at 1021.  Ultimately, the DOL's mission under § 1188 is to ensure that the H-2A program's use of migrant workers "does not adversely affect the wages and working conditions of American workers similarly employed." *Id.*  Based on both the plain text of the statute and the broad authority recognized by other courts, this Court agrees that "the 'best reading' of § 1188, in its entirety, is that Congress granted the DOL the authority to issue regulations to ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." *Kansas,* WL 3938839, at *5.

Given this understanding of the DOL's statutory authority, the next question becomes whether the DOL exceeded that authority in the Final Rule.  "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Loper Bright*, 144 S. Ct. at 2273. This is an inquiry separate and distinct from whether the DOL adequately explains the need for certain provisions, or whether specific portions are arbitrary and capricious.  As such, agency action can be unlawful if arbitrary, capricious, an abuse of discretion, *or* in excess of statutory jurisdiction.  *See* 5 U.S.C. section 706(2)(A), (2)(C).

Here, the Final Rule was created to "enhance the Department's ability to enforce regulations related to foreign labor recruitment, to improve accountability for successors in interest and employers who use various methods to attempt to evade the law and regulatory requirements, and to enhance worker protections[.]"  89 Fed. Reg. at 33900.  Provisions of the Final Rule that comport with the "adverse effect" standard may still otherwise violate the APA because of the wide latitude § 1188 allows.  *See Mendoza*, 754 F.3d 1002.

- 16 -

The Final Rule contains provisions relating to: (1) protections for worker voice and empowerment; (2) clarification of termination for cause; (3) changing the AEWR's effective date; (4) enhanced transparency for job opportunity and foreign labor recruitment; (5) enhanced transparency and protection for agricultural workers; and (6) enhanced integrity and enforcement.  *See* 89 Fed. Reg. at 33901-03.  In principle, these are rules that, if compliant with the remainder of 5 U.S.C. § 706(2), are related to the DOL's adverse effects dual mandate. Under its mandate, the DOL must ensure that American workers are not adversely affected by the issuance of H-2A visas.  *See Dole,* 923 F.2d 182.

Empowering H-2A workers could conceivably accomplish this goal, if exploitation has led to employers favoring H-2A workers over domestic laborers as the DOL suggests. Clarifying the definition of termination for cause could also be related for the same reason, as employers may see H-2A workers as more preferable in the absence of a clear definition. Dictating the AEWR has likewise been considered a longstanding power within the ambit of § 1188.  *See Brock*, 835 F.2d 912.  Finally, enhancing transparency and protection for recruitment of foreign laborers in agriculture and related enforcement measures also fall under § 1188's adverse effects mandate, as counterbalancing the rights of H-2A workers in juxtaposition to their American counterparts could eliminate employer motives to avoid domestic laborers.

In sum, "§ 1188 affords the DOL considerable latitude to promulgate regulations that protect American workers from being adversely affected by the issuance of H-2A visas." *Kansas,* WL 3938839, at *6.  This Court sees no reason to depart from the statute's text and longstanding interpretation governing the DOL's jurisdiction.  But even if the Final Rule's

- 17 -

measures are conceivably authorized under the IRCA, this Court finds many of the provisions contrary to other law and are arbitrary and capricious.

**B.  A Portion of the Final Rule Violates the NLRA.**

Under section 706(2) of the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia,* "otherwise not in accordance with law." This includes "*any* law, and not merely those laws that the agency itself is charged with administering. *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003).  In addition, "[t]he power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law." *Dixon v. United States*, 381 U.S. 68, 74 (1965).  Rather, agencies are limited to "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute[,]" and only when "Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights." *See Id.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) (cleaned up).

**The NLRA Does Not Protect Agricultural Workers.**

The NLRA extends to "any employee . . . but shall not include any individual employed as an agricultural laborer[.]" 29 U.S.C. § 152(3).  The legislative history of the NLRA indicates that agricultural employees were excluded from the NLRA's protections due to Congress' concern that farms with a small, seasonal workforce would be unduly burdened by the organization of casual employees.  79 Cong. Rec. 9668, 9720-21 (1935).  In fact, Congress considered amending the statute to include protections for agricultural workers but declined to do so. *Id.* ("After thorough consideration, [the] committee decided, at this time, not to include agricultural workers.")  Thus, exclusion of agricultural workers was [and remains] intentional. Congress was explicit in its desire to limit the scope of the NLRA.  Thus, the plaintiffs argue

that the expansion of rights through the DOL's Final Rule contravenes the APA because such action is squarely "not in accordance with law[.]" 5 U.S.C. § 706(2). In response, the DOL asserts that the Final Rule is within its regulatory authority because: (1) NLRA preemption boundaries that apply to states also apply to federal agencies; (2) those same boundaries do not foreclose the DOL's worker empowerment provisions in the Final Rule; and (3) in the past, employment rights have been created for groups excluded from the NLRA's definition of employee.

It is well-established that "[l]anguage in a regulation . . . may not create a right that Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560 at 577 ("The language of the statute and not the rules must control") (cleaned up)). In *NextWave*, when the FCC argued its actions *were* in accordance with § 525 of the bankruptcy code, the Supreme Court iterated: "where Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly" and held the agency did *not* act in accordance with the law. 537 U.S. at 302. Agencies must have unambiguous permission from Congress in cases where their actions contravene another law under the APA. Regarding agencies, "the driving force behind the Supreme Court's case law in this area is a requirement that courts find a Congressional intent to create a particular federal right." *Harris v. James*, 127 F.3d 993, 1008 (11th Cir. 1997).

The DOL initially contends that NLRA preemption principles traditionally applied to states apply equally "federal governmental behavior that is thought similarly to encroach into the NLRA's regulatory territory." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1334 (D.C. Cir. 1996). While true, this Court faces a different issue. *Reich* did not address an agency blatantly bestowing rights contained in the NLRA upon a group specifically excluded

- 19 -

from the act. It addressed "economic weapons" preemption under *Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n*, 427 U.S. 132 (1976). For the same reasons, *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 363 (D.C. Cir. 2003), is not persuasive. In *UAW*, former President George W. Bush signed an executive order requiring that "all government contracts involving more than $100,000 . . . include a provision requiring contractors to post notices at all of their facilities informing employees of . . . rights under federal labor law that protect employees from being forced to join a union or to pay mandatory dues for costs unrelated to representational activities." *Id.* at 360. Factually, the executive action was unrelated to the definition of certain workers under the NLRA, and the notices required under the order related to labor rights that were *already established*. The DOL fails to cite authority in which a *federal agency* has created a right under 29 U.S.C. § 152(3).

The closest the DOL gets is by providing cases where *states* were permitted to do so. It cites *United Farm Workers of Am., AFL-CIO v. Arizona Agr. Emp. Rels. Bd.*, 669 F.2d 1249, 1251 (9th Cir. 1982), *Chamber of Com. of the United States of Am. v. City of Seattle*, 890 F.3d 769, 775 (9th Cir. 2018), and *Willmar Poultry Co. v. Jones*, 430 F. Supp. 573, 574 (D. Minn. 1977), for the proposition that "classes of employees excluded from the NLRA's 'employee' definition may still be subject to other labor protections." [Record No. 34, p. 22] These cases involve state or municipal regulatory action, but *none* involve federal agency action such as that taken by the DOL.

In *Kansas*, Judge Wood distinguished these cases from the present facts, noting that "this case presents the question of whether an administrative agency can create a right that Congress has not. The answer is no. State governments can create law and protect rights in excess of those provided under federal law." *Kansas,* WL 3938839, at *8 (quoting Brigham

City v. Stuart, 547 U.S. 398, 409 (2006) (Stevens, J., concurring) ("Federal interests are not offended when a single State elects to provide greater protection for its citizens than the Federal Constitution requires."))

Finally, the DOL correctly states that the Supreme Court in *Sandoval* and *Gonzaga* addressed the creation of a private right of action and enforceable rights under FERPA, respectively.  Regardless, both cases unequivocally hold that the federal government cannot create rights without the permission of Congress.  *See* 532 U.S. at 291; 536 U.S. at 283.  The undersigned does not deny the DOL's authority under § 1188.  Rather, the Court refuses to extend it to labor regulations traditionally limited to Congress and the states.  The defendants' contention that Congress' decision to unambiguously exclude agricultural workers from the NLRA means the field was "left alone" for *agencies* to regulate is misguided.  [Record No. 34, p. 22] However, the DOL fails to provide any examples where an *agency* was permitted to alter or expand the scope of 29 U.S.C. § 152(3).  It instead proffers cases where *states* did so, and two cases where labor- adjacent executive orders unrelated to § 152(3) were upheld.  The APA requires courts to set aside agency action that is not in accordance with law.  5 U.S.C. § 706(2).  And the Court's "task is to give effect to the will of Congress[.]" *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982).  Therefore, if the Final Rule grants collective bargaining protections on a group outside of the NLRA's purview, those provisions cannot stand.

Accordingly, the Court turns to whether the Final Rule's worker voice and empowerment provisions are indeed collective bargaining rights and, if so, whether they are invalid under the APA.

- 21 -

**Worker Voice and Empowerment Provisions Amount to Collective Bargaining Rights.**

The plaintiffs contend that portions of the Final Rule effectively grant collective bargaining rights to H-2A workers. The DOL, however, argues that the Final Rule is merely an expansion of "the H-2A program's existing anti-discrimination provisions, enforced by WHD [Wage and Hour Division], which expressly protects from employer retaliation workers who engage in self-advocacy and self-organization." [Record No. 34, p. 20] To determine which interpretation is correct, the Court compares the relevant portions of the NLRA to the Final Rule.

The NLRA grants protected workers "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. It also classifies acting "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157[,]" and "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it" as unfair labor practices, and bars "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" *Id.* at § 157(a)(1)-(3).

The Final Rule provides H-2A employers cannot "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has:

> Filed a complaint, instituted, or caused to be instituted any proceeding; or testified, assisted, or participated (or is about to testify, assist, or participate) in any investigation, proceeding, or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws[.]

[E]ngaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or has refused to engage in any or all of such activities[.]

[R]efused to attend an employer-sponsored meeting with the employer or its agent, representative or designee, if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected by this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart[.]

*See* 20 C.F.R. § 655.135(h)(1), 29 C.F.R. § 501.4(a).  The rule also prescribes:

With respect to any H–2A worker or worker in corresponding employment engaged in agriculture as defined and applied in 29 U.S.C. 203(f), employed at the place(s) of employment included in the Application for Temporary Employment Certification, the employer must permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview.  Where the designated representative is present at the worksite at the time of the investigatory interview, the employer must permit the representative to attend the investigatory interview in person. Where the designated representative is not present at the time and place of the investigatory interview, the employer must permit the representative to attend the investigatory interview remotely, including by telephone, videoconference, or other means.

*See* 20 C.F.R. § 655.135(m).

The DOL argues that these provisions "do not purport to bring any workers within the ambit of the NLRA and do not extend the enforcement powers of the National Labor Relations Board to agricultural workers."  [Record No. 34, p. 20]  It adds that the Final Rule "does not provide for collective bargaining rights nor does the rule compel a worker to join a union.  As finalized, the rule does not grant any rights to labor organizations" and "does not require collective bargaining, employer recognition, or any other action by the employer in response to worker organizing."  *Id.* (citing 89 Fed. Reg. at 33991, 33994).

- 23 -

However, the DOL cannot confer substantive rights on parties simply by *saying* it is not doing so.  The Final Rule effectively prevents employers from taking action against an employee who attempts to "form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection."  20 C.F.R. § 655.135(h)(1); 29 C.F.R. § 501.4(a).  The NLRA allows employees to engage in "concerted activities for the purpose of *collective bargaining* or other mutual aid or protection."  29 U.S.C. § 157.  The DOL appears to have found significant inspiration for the Final Rule's worker voice and empowerment provisions in the NLRA's text, but it made sure to remove the words "collective bargaining" from the regulation wherever possible.

Additionally, under the NLRA, it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157."  *Id.*  The Final Rule bans retaliation against anyone who has filed a "complaint, instituted, or caused to be instituted any proceeding; or testified, assisted, or participated (or is about to testify, assist, or participate) in any investigation, proceeding, or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws."  20 C.F.R. § 655.135(h)(1); 29 C.F.R. § 501.4(a). The words are different, but the meaning is the same.  The worker voice and empowerment provisions, unlike the NLRA, do not specifically self-reference their protections, but they substantively prohibit action taken in response to violations of federal law, which would include the Final Rule.

The DOL's distinction treats its negative prohibition on employer "retaliation" completely distinct from an affirmative bestowal of rights like self-organization, engaging in "other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions" or unwarranted representation in a meeting with an employer.  20 C.F.R.

§ 655.135(h)(1), 29 C.F.R. § 501.4(a).  While it is true that the Final Rule neither requires H-2A employers to recognize labor organizations or personally engage in collective bargaining activities, nor does it create a board for enforcement and adjudication of labor disputes, this is largely beside the point.  Discussing some areas where the Final Rule is not exactly like the NLRA does not establish the lack of an illegal overstep.  It is also irrelevant whether employers hold specific mandates exactly like those in the NLRA, because the ultimate effect of the Final Rule is to create a new right for H-2A workers that bypasses Congress.  "Removing the word 'bargaining' and moving the location of the word 'collective' does not change the fact that the Final Rule mirrors the NLRA."  *Kansas,* WL 3938839, at *8.

The Final Rule need not perfectly duplicate the NLRA to violate the APA.  *United States v. Grimaud*, 220 U.S. 506, 517, (1911) ("From the beginning of the government, various acts have been passed conferring upon executive officers the power to make rules and regulations . . . [n]one of these statutes could confer legislative power.").  The Final Rule not so sneakily creates substantive collective bargaining rights for H-2A agricultural workers through the "prohibitions" it places on their employers.  Framing these provisions as mere expansions of anti-retaliation policies, the DOL attempts to grant H-2A workers substantive rights without Congressional authorization.  The worker voice and empowerment provisions thus illegally contravene the NLRA.

### Certain Parts of the Final Rule are Arbitrary and Capricious.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  When promulgating a rule, the agency must "'reasonably consider . . . the relevant issues and factors" bearing on the analysis, s*ee Advocs. for Highway & Auto Safety v.*

*FMCSA*, 41 F.4th 586, 595 (D.C. Cir. 2022), and must draw "rational connection[s] between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Any agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Michigan v. EPA*, 576 U.S. 743, 750 (2015).

Under this narrow standard of review, "a court is not to substitute its judgment for that of the agency" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009), but instead is to assess only whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Therefore, when reviewing an agency's rulemaking, courts "must uphold a rule unless it exceeds the authority vested in the agency by Congress or is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Radio Ass'n on Defending Airwave Rights, Inc. v. Dep't of Transp.*, 47 F.3d 794, 801-02 (6th Cir. 1995) (quoting 5 U.S.C. § 706(2)(A)).  An agency acts in an arbitrary and capricious manner when it: (1) "has relied on factors which Congress has not intended it to consider"; (2) "entirely fail[s] to consider an important aspect of the [regulatory] problem"; (3) "offer[s] an explanation for" its conduct "that runs counter to the evidence before" it; or (4) reaches a determination that "is so implausible ... it could not be ascribed to a difference in view or ... agency expertise." *State Farm*, 463 U.S. at 43, 103 S. Ct. 2856.

## Method of Pay

The Final Rule dictates employers can no longer choose the method by which they calculate their employees' pay in many circumstances.  89 Fed. Reg. at 34061; 20 C.F.R. § 655.122(1).  Before the Final Rule, employers could choose whether to compensate their

employees on a piece rate or hourly basis.  But under the Final Rule, employers are required, at the end of every pay period, to recalculate and pay employees by whichever method the Department claims would have resulted in higher pay to the workers during that period.  *Id*.

The DOL fails to adequately explain why it changed the requirements for how it had previously mandated employers calculate their pay rate.  Historically, the DOL has allowed employers to determine their employees' pay rate because there are reasons why some employers may choose to pay on a piece rate as opposed to an hourly rate and vice versa. [Record No. 43, p. 17-25].  For example, it may depend on the type of crop the farmer grows, the weather conditions during harvest, safety conditions related to harvesting a particular crop, and the farm's production needs.  *Id*.  Historically, the *only exception to the employer's choice in* compensation is if farmers were paid on a piece rate and, at the end of a pay period, the worker's earnings did not equal what they would have earned, the employer would have to supplement the worker's piece pay rate.  73 Fed. Reg. 77110, 77219 (Dec. 18, 2008).  The Final Rule creates an additional burden on the employer *regardless* of whether the employer uses a piece rate or hourly wage rate.  § 655.122(1).  Now, an employer who chooses to pay an hourly rate must recalculate what workers would have been paid had they been paid based solely on their production.  *Id*.

The DOL has failed to provide sufficient justification for their change in the Final Rule. The change to the Final Rule deviates from the DOL's longstanding practice recognizing employers may choose to pay their employees in the manner that best serves their business interest.  *See Federal Communications Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 518 (2009) (explaining that an "agency must ordinarily display awareness that it is changing

position"). Because the DOL has neither provided sufficient justification nor displayed awareness that its position is different, this change is arbitrary and capricious.

### Identification Requirements

The DOL fails to adequately explain the requirements for additional employer information, including birth dates, and they are therefore arbitrary and capricious. On July 31, 2024, the DOL issued new H-2A application forms which mandate the disclosure of personal information, including the birth dates of any owner, operator, manager or supervisor of H-2A workers and workers in corresponding employment. *See* 89 Fed. Reg. at 33984; 20 C.F.R. § 655.130(a)(3).

The department argues the information is necessary for "determining whether the employer has demonstrated a bona fide temporary or seasonal need" and determining "whether an individual or successor in interest should be . . . subject to any sanctions or remedies[.]" *See* 89 Fed. Reg. at 33981; 89 Fed. Reg. at 33982. The plaintiffs argue that the DOL: (1) has never needed this information before, (2) provides no explanation for how the birth dates could indicate whether an H-2A employer applicant has a seasonal need for labor, and (3) fails to explain why the information the DOL already collects from employers (including business addresses, phone numbers, email addresses, federal employee identification numbers, and workers compensation certificates of coverage) is insufficient to identify an employer as opposed to birth dates.

The undersigned agrees with the plaintiffs. The DOL does not adequately connect the need for birth dates to its goals of ascertaining an employer's hiring needs or sanctioning individual employers. It mentions that certain bad actors exploit the current process by changing roles from employer to manager, thereby evading enforcement measures. 89 Fed.

- 28 -

Reg. at 33980.  But this does not justify the vast breadth and sensitivity of the information demanded.  While information collection can be warranted, the personal information here far exceeds what the DOL may need to address the limited instances of misfeasance it cites.  The DOL's justification for the additional is thus arbitrary and capricious because it lacks "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

### Seatbelts

The requirement that all H-2A workers wear seatbelts in employer owned vehicles is a significant deviation from longstanding DOL policy.  Further, the rule imposes a strict liability penalty for employers if an employee is found to be non-compliant with the rule.  Historically, the DOL only required employers to provide seatbelts to employees, and its stated rationale for the change is to "avoid degrading worker safety conditions."  89 Fed. Reg. 33964.  Yet, the DOL does not explain how holding *employers* liable for the failure of the employee to wear a seatbelt addresses the issue of avoiding degrading worker safety conditions.  In fact, it fails to rationally connect the two.  The DOL's failure to explain this departure from long-standing rules regarding the use of seatbelts and lack of an obvious connection between the rule and its stated objective means the department has engaged in arbitrary and capricious rulemaking in violation of the APA.  The provision of the Final Rule that holds employers liable for the failure of an employee to use a seatbelt also has no rational relation to the authority of the secretary to issue regulations under the IRCA.

Moreover, there is no federal law that requires all drivers and passengers in a vehicle to wear a seatbelt, and state laws vary as to who must wear one.  *See, e.g.*, WASH REV. CODE § 46.61.688(3), (5) (placing obligation to wear safety belt on *every person* aged 16 or older

- 29 -

and holding liable *the person* violating the statute).  Requiring an individual to use a seatbelt, that is already provided, does not alter the safety *conditions* for the worker, it simply mandates an employee use a tool that is already provided.  In fact, requiring and actively monitoring the use of seatbelts by adults does nothing more than make the employee's working conditions degrading because they will now find themselves under greater levels of scrutiny and supervision.

The plaintiffs argue that there is no federal law that requires all drivers and passengers in a vehicle to wear a seatbelt and state laws vary concerning who must wear a seatbelt vary, demonstrating that this provision of the Final Rule not only exceeds the DOL's authority but holds H-2A employers to a higher standard than employers of non-migrant laborers.  [Record No. 21-1, p. 12].  Yet, under the Final Rule, an employer can be held liable for the decisions of employees whether to wear a seatbelt despite having little control over whether the employee does so.  As such, the Court finds this part of the Final Rule to be arbitrary and capricious.

**The Final Rule's Requirement that H-2A Workers be Allowed to Invited Guests onto an Employer's Property Constitutes an Unconstitutional Taking.**

The Final Rule's mandate that H-2A employers allow their employees to invite guests onto employer property, without the employer's consent, and without compensation constitutes an unconstitutional taking.  The plaintiffs argue the DOL lacks authority to violate the employers' property rights and that the DOL's explanation of the change is arbitrary and capricious because, "outside of the H-2A program, the government does not grant the general public access to private property and thus no adverse effect on similarly employed American

workers can result from employing H-2A workers whose employer-provided housing is open to the public." [Record No 21-1, p. 17-18].

A "government authorized invasion . . . of property . . . is a *per se* physical taking." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2066, 2074 (2021). In *Cedar Point Nursery*, the United States Supreme Court analyzed whether a California state regulation that permitted labor union organizers to enter agricultural employers' property for up to three hours per day, 120 days per year, constituted a *per se* taking. *Id.* at 2066. It reasoned that the right to exclude individuals from entering one's property is a "fundamental element of the property right." *Id.* at 2066 (citing *Kaiser Aetna v. United States*, 444 U.S. 164 (1979)). The Court then specified "physical appropriations constitute the 'clearest sort of taking,' and we assess them using a simple, *per se* rule: The government must pay for what it takes." *Id.* at 2071.

But under the California regulation at issue in *Cedar Point Nursery*, individuals held only a qualified *right* to enter farmers' property. In addressing the limitations of the right of entry, the Court held that "a physical appropriation is a taking whether it is permanent or temporary; the duration of the appropriation bears only on the amount of compensation due." *Id.* at 2066. It rejected the theory "that the access regulation merely regulates, and does not appropriate, the growers' right to exclude." *Id.* at 2077-78. Therefore, any government regulation which grants individuals the right to enter the property of another without compensation is an unconstitutional taking.

The same issues are present here. The regulation in *Cedar Point Nursery* required agricultural employers to allow union organizers to enter their property for up to three hours a day, 120 days a year. Under the Final Rule, a new employer obligation is created "that would explicitly allow H-2A workers and workers in corresponding employment the right to invite

- 31 -

or accept guests to worker housing and also would provide a narrow right of access to worker housing to labor organizations." § 655.135(n). This provision grants any individual an unlimited right of access to the property if he or she is invited by an H-2A worker, regardless of the reason for entry onto the property. *Id.* The consent of the employer, i.e., the *owner* of the property, is not required under the Final Rule. *Id.*

The rule that was found to be an unconstitutional taking in *Cedar Point* was far less invasive to the property owner's rights than the Final Rule. Unlike the Final Rule, in *Cedar Point*, only a specific type of person was granted access to the property for a specific purpose and there were limitations on how often and for how long those individuals could stay on the property. Here, the Final Rule grants unqualified access to employers' property as long as guests are invited by residents. Yet, as the Court made clear in *Cedar Point Nursery*, physical invasions constitute a taking even if they are intermittent as opposed to continuous. *Id.* at 2075.

The DOL justifies its provision as an effort "to protect workers' rights to association and access to information both to make them less susceptible to labor exploitation . . . and to interrupt factors that impose barriers to workers advocating or complaining regarding working conditions and thus have an adverse effect on workers in the United States similarly employed." 89 Fed. Reg. at 34021. Regardless of the DOL's stated purpose, this provision is an infringement on the property rights of employers. *See e.g. Golf Village North, LLC v. City of Powell, Ohio*, 14 F.4th 611, 618 (6th Cir. 2021) ("There is no dispute that a property owner's right to exclude is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'") (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176, (1979)).

The Final Rule amounts to a taking of the employer's property. An employer, like any other property owner, has a right to exclude individuals from his or her property and the Final Rule seeks to deprive the owner of that right. The Final Rule's creation of a public right of access to employer-provided housing deprives employers of their right to exclude individuals from their property, and as such, they are entitled to compensation, which is not provided under the Final Rule. Therefore, the provision of the Final Rule which grants the public access to the employers' property is unconstitutional.

**Irreparable Injury**

The second factor the Court weighs in deciding whether to issue injunctive relief is whether the moving party "is likely to suffer irreparable harm in the absence of preliminary relief." *Platt v. Bd. of Comm'rs on Grievances & Discipline of the Ohio Sup. Ct.*, 769 F.3d 447, 453 (6th Cir. 2014). Irreparable harm is generally defined as harm that cannot be fully compensated by money damages. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Some circuits have concluded that compliance costs do not qualify as irreparable harm because they are an ordinary result of new government regulation. *See New York v. U.S. Dep't of Education*, 477 F. Supp. 3d 279, 303 (S.D.N.Y. 2020). The Sixth Circuit, however, has not adopted this rule and instead found that it depends on the circumstances of the case. *Commonwealth v. Biden*, 57 F.4th 454, 556 (6th Cir. 2023) (noting that "the peculiarity and size of a harm affects its weight in the equitable balance, not whether it should enter the calculus at all").

In this case, the plaintiffs have sufficiently demonstrated that the Final Rule's sweeping policy changes require employers to implement changes in a short timeframe leading to high compliance costs. This factor weighs in favor of a finding of irreparable harm because the

recovery of these costs would necessarily be barred. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.").

In addition to testimony presented during the evidentiary hearing on the motions requesting injunctive, the record contains numerous affidavits and declarations detailing the irreparable damage resulting from the Final Rule. [Record No. 21] The parties submitting the affidavits and declarations are predominantly farmers experienced with the H-2A program, and representatives of organizations that support farmers by helping them comply with the requirements of the H-2A program in order to remain financially competitive. The farmers, located throughout the country, all state that they are reliant on H-2A workers, have employed them for numerous years, and employ anywhere from five to over fifty workers. Additionally, the farmers explain that when they first applied to participate in the H-2A program, they agreed to abide by the regulations in effect the day that their participation in the program was approved, not the more expansive regulations under the Final Rule. [Record No. 21-1, p. 11]

In particular, the farmers' affidavits have expressed that they will suffer because of the following provisions of the Final Rule:

(1) de facto collective bargaining "rights" afforded to H-2A workers;

(2) granting members of the public permission to enter the employer's property;

(3) requiring employers implement a new system for calculating pay ensuring employees are always paid the higher amount between the AEWR and piece-rate based on worker production;

- 34 -

(4) requiring employers to ensure that every H-2A worker that rides in an employer-provided vehicle wears a seatbelt; and

(5) requiring disclosure to the government of intrusive and sensitive personal information such as the birth dates of any owner, operator, manager or supervisor of H-2A employees.

The Final Rule that requires employers to allow their employees to invite individuals into housing facilities located on employers' property, § 655.135(n), will likely cause irreparable harm. Although H-2A employers often allow their employees to invite guests onto their property, requiring employers to do so poses new risks to the property owners. [Record No. 43, p. 71]. Among the risks they face, farmers will not know who or how many individuals may be on their property at a given time. [Record No. 43, p. 54]. As such, farmers will lose full control over their property. [Record No. 43, p. 57]. Additionally, one farmer testified that he is concerned this may pose risks to individuals who enter the property because farms are active worksites and thus there is often equipment on farms that could be dangerous if an individual did not know of its presence. [Record No. 43, p. 71]. Finally, the plaintiffs have expressed concerns that union organizers or similar organizations may enter employers' property and try to threaten or coerce workers into taking certain actions, thereby disturbing working and living conditions on the property. [Record No. 43, p. 84]. Therefore, the strong potential for harm due to this provision of the regulation leans in favor of awarding temporary relief.

The requirement to pay employees the higher of either the AEWR or the piece wage rate creates new burdens and costs on H-2A employers and thus causes irreparable harm. Employers who have typically used an hourly rate to pay workers do not have a system in

- 35 -

place to track individual worker production, thus making it nearly impossible to calculate their pay accurately. Under the Final Rule, every employer using H-2A workers will have to monitor their production to determine what each employee's piece rate wages would be relative to their hourly wage rate and then pay the higher amount. § 655.122(l).

Forcing employers to calculate both wage rates will create an additional administrative burden, and the additional cost of paying workers the higher rate regardless of which method is practical will hurt farmers. [Record No. 43, p. 17-25]. It also has the real potential to hurt farmers in less apparent ways, as the method used to pay H-2A workers often relates to the farmer's specific goals regarding a particular harvest. [Record No. 43, p. 17-25]. For example, some crops must be handled with care, and employers will prefer to pay those employees on an hourly rate, so employees do not feel pressured to harvest crops quickly and inadvertently damage the produce. *Id.* Alternatively, some crops need to be harvested quickly, otherwise they will spoil. For those, a farmer may for very legitimate reasons desire to pay on a piece rate basis to incentivize quick harvesting. *Id.* Eliminating these choices from farmers stands to stymie their production and will lead to greater costs. Therefore, this provision of the Final Rule stands to harm H-2A employers in several apparent ways.

The Final Rule's requirement that all employees using employer-owned vehicles must wear seatbelts also will likely result in irreparable injury. Requiring employees to use seatbelts and holding employers strictly liable for an employee's failure to do so is impracticable. [Record No. 43, p. 15, 54, 70]. Employers are already required to ensure their vehicles are equipped with seatbelts and inform employees that they are required to use them. [Record No. 43, p. 47]. Under the Final Rule, however, not only must the employer inform the employee of the requirement to properly use a seatbelt, the employer would also need to perform a

"seatbelt check" when an employee uses a vehicle and then continuously monitor the employee to ensure continuous use. Otherwise, the employer will face strict liability penalties. Generally, employers are not held liable for the failure of employees to wear a seatbelt.[2] Laws regarding when adults must utilize seatbelts vary across states, with some states only requiring adult individuals to wear seatbelts while on public roadways.

This part of the Final Rule cannot be practically enforced by employers. Additionally, if employees are traveling in an employer's vehicle between states with different regulations, an employer's obligation to enforce the seatbelt mandate can change during the trip. In short, this part of the Final Rule will cause employers substantial harm regarding the time and resources necessary in attempting to enforce while the penalty for a violation is severe.

**Updated Employer Identification Provisions Will Also Cause Irreparable Harm.**

Section 655.130(a)(3) requires that employers disclose the names, addresses, business phone numbers, and the dates of birth for the owner(s) of (1) each employer, (2) each operator of the place(s) of employment, (3) all managers and supervisors of workers employed under the H-2A Application, and (4) any foreign labor recruiters used to hire the workers. The plaintiffs contend that this part of the Final Rule should be enjoined because of its intrusive nature. Employers agreed to participate in the program with the understanding that they would not be required to provide such information, and the plaintiffs believe that having to do so unnecessarily invades their privacy. [Record No. 43, p. 54-55].

Historically, this information has not been required as a condition of participating in the visa program, and the DOL provided scant reasoning regarding the basis for requiring the

---

[2] WASH REV. CODE § 46.61.688(3), (5)

information at this time.  *Id.*  Further, disclosing this information is not necessary to identify an employee's supervisor.  In addition, this additional requirement has spiked administrative costs, which is significant in an industry that often operates on the margins.  [Rec. No. 43, p. 30].  The Court concludes that this new requirement will result in irreparable harm if applied to the plaintiffs.

### Substantial Harm and the Public Interest

When the government is the opposing party, "the third and fourth [*Winters*] factors "merge.'"  *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020).  The Sixth Circuit has repeatedly recognized that "the public interest lies in a correct application" of the law.  *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (quoting *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991)).  The rules concerning the administration of the H-2A program have been in place for over thirty years and have remained relatively unchanged.  Further, issuance of injunctive relief will not harm the defendants because DOL has already paused implementation of the Rule in seventeen states.  Extending such relief to the present parties (including members of the associations that are parties before the Court) during the pendency of this litigation would not cause additional hardship.  The plaintiffs, on the other hand, have shown that they stand to suffer substantially in the absence of the requested relief being granted.

Moreover, the public interest weights in favor of issuing an injunction.  Although the DOL determined that issuing the Final Rule was in the best interest of the public, "the public interest lies in the correct application of the law." *Biden,* 57 F.4th at 556.  Here, given the plaintiffs' strong likelihood of success on the merits, the public will be best served by enjoining the offending portions of the Final Rule.  Weighing the competing interests, the Court

concludes that the balance of equities and public interest weighs in favor of issuing an injunction.

## Scope of Relief

What then is the appropriate scope of relief?  The plaintiffs have asked this Court to issue a nationwide injunction under Rule 65 of the Federal Rules of Civil Procedure and/or a stay under 5 U.S.C. § 705 to prevent the DOL from implementing the Final Rule.  The plaintiffs state, "the purpose of the preliminary injunction [sought] is to secure for Plaintiffs the same relief obtained by the plaintiffs in the U.S. District Court of the Southern District of Georgia and to protect their interests between the Court's ruling on this motion and its entry of a final judgment." [Record No. 21-1, p. 2].  Under § 705, a "district court 'may issue all necessary and appropriate process to postpone the effective date of any agency action' to the extent necessary to prevent irreparable injury." *Tennessee v. Cardona*, No. 2:24-cv-072, 2024 WL 3019146, at *7 (E.D. Ky. June 17, 2024).

Although this Court recognizes the incongruity in affording relief only to the parties to the suit, issuing preliminary relief any broader than to the parties currently before it (or who may be joined subsequently) is unnecessary and runs afoul of our federal system.  Therefore, while the plaintiffs (including members of the associations and non-profit corporate entities who are plaintiffs to the proceeding) will be granted preliminary injunctive relief to prevent enforcement of portions of the Final Rule which are discussed herein, the undersigned declines to award relief to any entities, States or Commonwealths that are not party to this suit.

The Court acknowledges that there are instances in which a single district court may issue a nationwide injunction.  *Florida v. Dep't of Health and Hum. Servs.*, 29 F.4th 1271, 1281-82 (11th Cir. 2021).  However, those circumstances are rare.  *Id.* at 1281.  "When a

federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff." *United States v. Texas*, 599 U.S. 670, 693 (Gorsuch, J. concurring).   Limiting the relief typically awarded by a federal court "comports with a federal court's Article III authority to decide cases and controversies for the parties to the litigation, not for any party anywhere." *Kansas,* WL 3938839, at \*11 (quoting U.S. CONST. art. 3, § 3, cl. 1); *see also Texas*, 599 U.S. at 693 (Gorsuch, J. concurring).

In summary, the undersigned agrees with United States District Judge Wood of the United States District Court of the Southern District of Georgia in reasoning that nationwide relief is not appropriate under the circumstances presented.   The plaintiffs have demonstrated that they are likely to incur irreparable harm absent an injunction and a more narrowly tailored injunction will afford appropriate relief to the parties to this proceeding.   Therefore, based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.    The motions for a preliminary injunction/stay [Record Nos. 17 and 21] are **GRANTED.**

2.    The United States Department of Labor, Julie Su, the Acting Secretary of the United States Department of Labor, along with their secretaries, directors, administrators, and employees, are **ENJOINED** and **RESTRAINED** from implementing, enacting, enforcing, or taking any action in any manner to enforce the following provisions of the Final Rule, *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898 (Apr. 29, 2024) (seatbelt modifications to enhanced safety requirements including but not limited to 20 C.F.R. § 655.122(h)(4); any and all worker voice and empowerment provisions, and provisions allowing workers to invite and accept guests

under 20 C.F.R. § 655.135 and any and all parallel provisions under §501.4, including but not limited to 20 C.F.R. § 655.135(h), § 655.135(m), and § 655.135(n); updated information collection requirements including but not limited to 20 C.F.R. § 655.130(a); and new minimum pay requirements including but not limited to 20 C.F.R. § 655.120(a) and 655.122(l)).

3.     This injunction is effective within Commonwealth of Kentucky and the States of Alabama, Ohio, and West Virginia.  Further, the above-named defendants are enjoined from enforcing the subject provisions of the Final Rule in connection with the activities of the following plaintiffs to this proceeding including any members of any association or entity which is plaintiff to this proceeding as of the effective date of this Memorandum Opinion and Order:  Richard Barton; Doug Langley; Benny Webb; Dale Seay; David DeMarcus, II; David DeMarcus, Sr.; Steve Stakelin; Agriculture Workforce Management Association, Inc. (including its shareholders/members); North Carolina Growers' Association, Inc. (including members of that non-profit association); Workers and Farmer Labor Association, also known as "Wafla" (including members of that non-profit association); USA FARMERS, Inc. (including members of that non-profit association); National Council of Agricultural Employers (including members of that non-profit association).  Within ten (10) days, the plaintiffs to this action (other than individual plaintiffs, States and the Commonwealth of Kentucky) are directed to file under seal and provide to the defendants a list of their members who will be subject to the protections of this injunctive.

4.     The Court determines that no bond shall be required as security for the relief sought, and injunctive relief is effective upon the filing of this memorandum opinion and order by the Clerk of the Court.

Dated: November 25, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky