**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| RICHARD BARTON, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>U.S. DEPARTMENT OF LABOR, *et al.*,<br><br>                    Defendants. | Case No. 5:24-cv-00249-DCR |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Nearly 40 years ago, Congress delegated authority to the Department of Labor ("DOL") to ensure that the hiring of temporary nonimmigrant farmworkers pursuant to the H-2A program did not "adversely affect the wages and working conditions of workers in the United States similarly employed." *See* 8 U.S.C. § 1188(a)(1). Beginning in 1987 and over the last four decades, DOL has promulgated regulations to implement that clear and broad statutory command. The Final Rule is one such lawful exercise of that authority. *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898, 33,991 (Apr. 29, 2024) ("Final Rule" or "Rule"). Although incoming DOL leadership may wish to take a different policy approach than that embodied in the Final Rule, Defendants nevertheless submit that the Final Rule survives the instant challenge.

Notwithstanding the Rule's fealty to Congress's direction, seven individuals and five associations ("Private Plaintiffs"), as well as four intervening states ("State Plaintiffs"), allege that certain provisions of the Rule (the "worker voice and empowerment provisions") violate the National Labor Relations Act ("NLRA"), the Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), and the Administrative Procedure Act ("APA"). The State Plaintiffs also challenge provisions related to the discontinuation of an employer's access to certain worker recruitment services. The Private Plaintiffs additionally allege that other aspects of the Rule constitute retroactive rulemaking, violate due process, constitute a taking, and are otherwise unlawful. Private and State Plaintiffs have filed a Joint Motion for Summary Judgment. *See* Pls.' Joint Mot.*, ECF No. 66.

While the Court determined at the preliminary injunction stage that Plaintiffs were likely to succeed on the merits, *see* Prelim. Inj. Op., ECF No. 49, when considered in reference to the standard for summary judgment, Plaintiffs' claims fail. The Court correctly concluded that 8 U.S.C. § 1188 gives DOL "broad authority" to issue regulations ensuring that any certifications it issues do not adversely affect American workers. Prelim. Inj. Op. at 15. Despite this conclusion about DOL's authority, the Court was troubled by certain provisions of the rule it worried contradicted the NLRA, created takings without just compensation, or were arbitrary and capricious, and therefore granted the

1

request for preliminary relief. *See id.* at 40. But the record before the Court at summary judgment demonstrates that the Final Rule does not contradict the NLRA but merely regulates a field that Congress has left to other entities to regulate, does not effectuate any Fifth Amendment taking, and is not arbitrary; accordingly, this Court should consider anew the merits of Plaintiffs' arguments and conclude that Plaintiffs are not entitled to summary judgment. The Rule's revisions do not conflict with the NLRA. The question here is *not* whether the NLRA affords protections to H-2A workers. All parties and the Court recognize that it does not. The question is, instead, whether by excluding agricultural workers from the NLRA, Congress intended to affirmatively deny any other regulatory entity the authority to provide similar protections to H-2A workers. There is no evidence Congress intended such a result.

Plaintiffs point to no provision of the NLRA that prohibits DOL from promulgating the challenged provisions. Instead, Plaintiffs assert that the challenged provisions violate the NLRA because that law's definition of "employee" does "not include any individual employed as an agricultural laborer." *See* 29 U.S.C. § 152(3). But that definitional provision does not preclude wholesale any regulation of agricultural employees' interactions with their employers. It is well established that individuals that fall outside of the NLRA's "employee" definition may be covered by other labor statutes and regulations—including those promulgated by other federal agencies. Thus, the Court's finding that the NLRA bars DOL from implementing certain provisions of the Final Rule should not stand at summary judgment. The Court reached this conclusion by relying on remarks by a handful of Representatives discussing an amendment to the NLRA that would have included agricultural workers. *See* Prelim. Inj. Op. at 18. But in this very same discussion, one Representative stated that the NLRA was only meant to be an incremental step, and that "We hope that the agricultural workers eventually will be taken care of." 79 Cong. Rec. 9668, 9720-21 (1935). This bit of legislative history can be read to support DOL's authority to implement Congress's later pronouncements under the INA through the Final Rule as much as it can be read, as the Court did, to negate it. In this regard, such legislative history—remarks by individual representatives whose words do not represent the intentions of the full Congress—lacks persuasive value. *Cf. Weinberger v.*

2

*Rossi*, 456 U.S. 25, 35 (1982) ("it suffices to say that one isolated remark by a single Senator, ambiguous in meaning when examined in context, is insufficient to establish the kind of affirmative congressional expression necessary to evidence [Congress's] intent"). Additionally, although the Court found a meaningful distinction between a federal agency's authority to regulate in the open space left in the NLRA's regulatory framework and a State's authority, grounded in the fact that States are empowered to create new rights of action, but agencies are not, *see* Prelim. Inj. Op. at 20-21, this distinction is a red herring, for the Final Rule cannot plausibly be read to suggest it creates any new right to bring a claim in court.

Summary judgment should be denied as to Plaintiffs' other claims as well. First, the Rule does not constitute retroactive rulemaking as it does not apply to any pre-promulgation conduct. Whether the employers have approved job orders and associated applications that predate the Final Rule does not bear on the question of retroactivity. Second, the Rule's revisions to the discontinuation provisions, including 20 C.F.R. § 658.501, satisfy due process and do not violate the anti-commandeering doctrine. Third, the Rule's recognition of workers' rights to invite and accept guests to worker housing does not constitute a taking because the First Amendment rights of workers living in company housing are a background restriction on owners' property rights and because the rule permits employers to place reasonable restrictions on these rights. Viewed through the analytical framework the Supreme Court articulated in *Cedar Point*, the Final Rule does not violate the Takings Clause. Fourth, revisions to other provisions—termination for cause, 20 C.F.R. § 655.122(n); requirement to offer, advertise, and pay the highest applicable wage rate, *id.* § 655.122(*l*); requirement to ensure seat belts used in employer-provided transportation, 655.122(h)(4)(ii); and expanded information collection, *id.* § 655.130(a)(3)—were properly promulgated pursuant to DOL's § 1188 authority and are not arbitrary and capricious. Finally, DOL's efforts to comply with the *Kansas* Order are not unlawful.

As the Court is aware, Defendants filed a motion to stay this litigation for 90 days on the basis that DOL is still in the process of onboarding new leadership, including the yet-to-be-Senate-confirmed nominees for Secretary of Labor, Deputy Secretary of Labor, and Assistant Secretary of

the Employment and Training Administration, as well as the Administrator for the Wage and Hour Division for which no nomination has been submitted, and as a result, more time is needed for the new administration to review this pending litigation.  ECF No. 75.  That fact remains true and, accordingly, Defendants respectfully submit that judicial efficiency and economy would be served by staying this matter to allow a meaningful opportunity for incoming DOL leadership to review this litigation.  Defendants appreciate that the Court has not granted that motion. However, although incoming DOL leadership may wish to take a different policy approach than that embodied in the Final Rule, Defendants nevertheless submit that the Court should deny Plaintiffs' motion for summary judgment based on the record before the Court.  Should the Court decide, however, to grant Plaintiffs' motion, it should abide by its previous finding that a universal remedy or nationwide injunction is not appropriate in this case.  Additionally, the Court should again conclude that any offending provision is severable from the remainder of the Rule, as the Department made clear its intent that the various regulatory provisions be severable from each other and further explained that the diverse regulatory provisions established by the Rule would function sensibly should any particular provision or provisions be invalidated.  *See* 89 Fed. Reg. at 33,952 (explaining that the contested provisions "adopted in this rule, along with other provisions, provide layers of protection to prevent adverse effect, and these layers of protection would remain workable and effective at preventing adverse effect even if any individual provision is invalidated."); *id.* at 33,953 ("[T]he various protections for workers through the ES System can operate independently from the protections in [20 C.F.R.] Part 655.").

<div align="center">**BACKGROUND**</div>

I.    **DOL's § 1188 Labor Certification and Rulemaking Authority**

The INA, as amended by IRCA, establishes an "H-2A" nonimmigrant visa classification for a worker "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform" temporary or seasonal "agricultural labor or services."  8 U.S.C. § 1101(a)(15)(H)(ii)(a); *see also* 8 U.S.C. §§ 1184(c)(1), 1188.  The statute requires multiple federal agencies to take several steps before foreign workers may be admitted to the United States under the H-2A classification.

A prospective H-2A employer must apply to DOL for a temporary employment certification ("TEC"). Congress authorized DOL to issue a TEC only if certain statutory requirements are met. First, DOL must certify that:

> **(A)** there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
>
> **(B)** the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). Unless both conditions (A) and (B) are established, DOL may not issue a TEC. *Id.* § 1188(b). Second, DOL may not issue a TEC "if any" of the additional conditions listed in 8 U.S.C. § 1188(b) exists, such as if "[t]here is a strike or lockout in the course of a labor dispute which, under the regulations, precludes such certification" or in the previous two years, the employer employed H-2A workers and "substantially violated a material term or condition" of a TEC. *Id.* Third, certain rules "shall apply in the case of the filing and consideration of an application for a labor certification under [§ 1188(a)]." *Id.* § 1188(c). For example, DOL must ensure that the employer (i) "has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary)" and (ii) does not have "qualified eligible individuals . . . to perform such labor or services on the terms and conditions of a job offer which meets the requirements of the Secretary." *Id.* § 1188(c)(3)(A).

To apply for a TEC, employers must first complete and submit a job order to DOL, 20 C.F.R. §§ 655.103(b), 655.121(b), which then transmits a copy to the State Workforce Agency ("SWA") in the relevant state, *id.* § 655.121(e)(1). The SWA then must confirm that the job order complies with various requirements, including that the employer has agreed to abide by "the requirements of [20 C.F.R. part 655, subpart B]." 20 C.F.R. § 655.121(e)(2); *see also id.* § 655.121(a)(4). One of the longstanding requirements of subpart B is that an employer make a number of "assurances," including that it will not engage in discriminatory hiring practices, is not seeking H-2A workers among an ongoing strike or lockout, and has not treated or will not treat unfairly any person who has engaged

in a host of protected activities.  *See* 20 C.F.R. § 655.135.[1]  After reviewing the job order, the SWA works with the employer to address any noted deficiencies.  *Id.* § 655.121(e)(2).  If the job order is fully compliant, the SWA will "place the job order in intrastate clearance and commence recruitment of U.S. workers."  *Id.* § 655.121(f).  Once an employer obtains a TEC, it may then file a petition for a nonimmigrant worker with the United States Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS").  *See* 8 U.S.C. § 1184(c).

## II.    The Final Rule

1.    Since 1987, the H-2A statutory and regulatory scheme has provided numerous wage and working condition protections for H-2A visa workers and workers in corresponding employment,[2] including anti-retaliation provisions.  *See, e.g., Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States,* 52 Fed. Reg. 20,496, 20,517 (June 1, 1987) ("1987 H-2A IFR").  Before DOL promulgated the Final Rule, these anti-retaliation protections provided that H-2A employers may not "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has "filed a complaint," "instituted" a "proceeding," "testified" "in any proceeding," "consulted with an employee of a legal assistance program or an attorney," or "exercised or asserted on behalf of themselves or others any right or protection afforded by 8 U.S.C. § 1188" or DOL regulations.  20 C.F.R. § 655.135(h) (effective Nov. 14, 2022); 29 C.F.R. § 501.4(a) (effective Nov. 14, 2022).

Despite these protections, DOL found that "violations of the H-2A program requirements remain pervasive."  89 Fed. Reg. at 33,989; *see also id.* at 33,988 (citing violation data).  DOL further found that H-2A visa workers represent a population especially vulnerable to exploitation because of "the temporary nature of the work, frequent geographic isolation of the workers, and dependency on

---

[1] Congress also delegated broad authority to DOL to ensure that employers provide these baseline protections.  *See* 8 U.S.C. § 1188(g)(2) (authorizing DOL to "impos[e] appropriate penalties and seek[] appropriate injunctive relief and specific performance of contractual obligations" as "necessary to assure employer compliance with terms and conditions of employment under this section.").

[2] "Corresponding employment" refers to the employment of non-H-2A workers by an employer who has an approved *Application for Temporary Employment Certification* in any work included in the job order, or in any agricultural work performed by the H-2A workers.  20 C.F.R. § 655.103, 29 C.F.R. § 501.3(a).

a single employer." *Id.* at 33,987. It also found that retaliation against H-2A workers for asserting or advocating for their rights remains common. *Id.* at 33,993. In some instances, DOL has "debarred and assessed penalties against H-2A employers that instructed workers to lie about their pay to investigators and threatened to kill, harm, punish, fire, blacklist, or deport workers for talking to authorities." *Id.* at 33,998. Based on this experience, DOL deemed existing H-2A program regulations insufficient to protect H-2A workers who advocate for themselves regarding working conditions. *Id.* at 33,987. DOL determined that enabling H-2A workers to advocate for themselves would lead to "significantly" fewer violations of the H-2A baseline requirements that are necessary to avoid adverse effect on domestic workers. *Id.* at 33,991–92.

The agency further found that similarly employed domestic workers "may be less likely to face the unique vulnerabilities and forms of retaliation experienced by H-2A workers." *Id.* at 33,992. Because H-2A workers are easier to exploit, some employers are more likely to fill jobs through the H-2A program and less likely to hire U.S. workers. *See id.* at 33,991. Because DOL is required to certify that H-2A workers will not adversely affect workers in the United States, *see id.* at 33,993 (citing 8 U.S.C. § 1188(a)(1)), additional protections were necessary in order to "place the H-2A workforce on more equal footing with similarly employed workers [in the United States] and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers." *Id.*

DOL issued the Final Rule to "establish the minimum terms and conditions of employment (*i.e.*, the 'baseline' working conditions) necessary to 'neutralize any adverse effect resultant from the influx of temporary foreign workers.'" *See id.* at 33,987 (quoting *Williams v. Usery*, 531 F.2d 305, 306–07 (5th Cir. 1976)). Plaintiffs' claims are primarily directed at the following provisions found in 20 C.F.R. § 655.135, including:

- 20 C.F.R. § 655.135(h)(1)[3]: H-2A employers cannot "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has:

---

[3] Parallel provisions appear at 29 C.F.R. § 501.4(a)(1).

    ○  § 655.135(h)(1)(v): "Consulted with a key service provider . . ."

    ○  § 655.135(h)(1)(vii): "Filed a complaint, instituted, or caused to be instituted any proceeding; or testified, assisted, or participated (or is about to testify, assist, or participate) in any investigation, proceeding, or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws"

    ○  § 655.135(h)(2)(i)[4]: "Has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or has refused to engage in any or all of such activities"

    ○  § 655.135(h)(2)(ii): "Has refused to attend an employer-sponsored meeting with the employer or its agent, representative or designee, if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected by this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart"

- 20 C.F.R. § 655.135(m): "With respect to any H–2A worker or worker in corresponding employment engaged in agriculture as defined and applied in 29 U.S.C. 203(f), employed at the place(s) of employment included in the Application for Temporary Employment Certification, the employer must permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview. Where the designated representative is present at the worksite at the time of the investigatory interview, the employer must permit the representative to attend the investigatory interview in person. Where the designated representative is not present at the time and place of the investigatory interview, the employer must permit the representative to attend the investigatory interview remotely, including by telephone, videoconference, or other means."

- 20 C.F.R. § 655.135(n): "Workers residing in employer-furnished housing must be permitted to invite, or accept at their discretion, guests to their living quarters and/or the common areas or outdoor spaces near such housing during time that is outside of the workers' workday subject only to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas. Because workers' ability to accept guests at their discretion depends on the ability of potential guests to contact and seek an invitation from those workers, restrictions

---

[4] 20 C.F.R. § 655.135(h)(2) & (m) apply only to persons engaged in agriculture as defined and applied in 29 U.S.C. § 203(f), *i.e.*, persons exempt from the NLRA. *See* 89 Fed. Reg. at 33,991.

impeding this ability to contact and seek an invitation will be evaluated as restrictions on the workers' ability to accept guests."

    **2.**    The Final Rule also makes changes to the procedures by which SWAs are required to discontinue employers' access to SWA services, including processing job orders, when employers are in violation of program conditions. As part of the Wagner-Peyser Act of 1933, Congress established the United States Employment Service ("ES") as a bureau within the DOL. S. 510, 73rd Cong. (1933). The ES is charged with overseeing the national system of public employment and coordinating SWAs across the country. *Id.* § 3(a). The Act delegates general rulemaking authority to DOL to "make such rules and regulations as may be necessary to carry out the [Act]." 29 U.S.C. § 49k. A State's participation in the ES is voluntary. In exchange for federal funding, States must pass a statute agreeing to abide by program conditions. *Id.* § 49c. Each of the State Plaintiffs has done so. *See* Ky. Rev. Stat. Ann. § 336.045; Ala. Code § 25-2-2; Ohio Rev. Code Ann. § 6301.02; W. Va. Code Ann. § 21A-2-16.

    The Act authorizes DOL to direct SWAs to discontinue the provision of employment services to employers who fail to comply with federal law. *See NAACP, W. Region v. Brennan*, 360 F. Supp. 1006, 1013 (D.D.C. 1973) (ordering DOL to use its "various program approval and modification powers culminating in fiscal and other program sanctions" to address SWAs' and employers' unlawful discrimination against migrant workers). To comply with the Court's order in *NAACP*, DOL issued final rules in 1977 and 1980 creating formal procedures by which employers could be discontinued from using employment services if found in violation of ES regulations or employment-related laws. 42 Fed. Reg. 4,722 (Jan. 25, 1977); 45 Fed. Reg. 39,454 (June 10, 1980). Under the Final Rule, if a SWA investigates and determines that there is a valid basis for discontinuation,[5] 20 C.F.R. § 658.501, the SWA notifies the employer of its intent to discontinue services and invites any rebuttal evidence

---

[5] If it is initially determined that another employment law is alleged to be violated, the SWA refers the complaint to the responsible federal enforcement agency. 20 C.F.R. § 658.416(b)(1). If the federal enforcement agency determines an employer is in violation, the SWA is required to discontinue its provision of employment services to the employer. *Id.* at § 658.416(b)(2).

to be provided within the next 20 working days, *id.* § 658.502, before issuing a final determination, *id.* at § 658.503.[6]

Prior to the Final Rule, when a SWA notified employers of the final determination and the opportunity to provide rebuttal evidence, it also offered the alternative of requesting an immediate hearing. *Id.* § 658.502(a)(1)(iv), (2)(iii), (3)(v), 5(iv), 6(v), 7(iv) (removed by Final Rule). If requested, the SWA's inquiry concluded, which resulted in scant factual records being available at the hearing. *See* 89 Fed. Reg. 33,928. Under the Final Rule, employers may not request a hearing until after the SWA issues its final determination.[7]  20 C.F.R. §§ 658.503–658.504 (2024). Discontinuation is effective 20 working days after the date of the final determination. *Id.* at § 658.503(a). If the employer requests a hearing during this 20-day period, however, the discontinuation is automatically stayed. *Id.* Additionally, employers can apply for reinstatement of employment services at any time after they come into compliance with the applicable ES regulation or labor-related law. *Id.* The Rule allows more detailed development of administrative records and aligns the hearing procedures with those under the related ES Complaint System, which allow for a hearing only after the SWA issues a final decision on a complaint. 89 Fed. Reg. at 33,928.

The only instance in which discontinuation is effective before the opportunity to request a hearing is when, under § 658.502(b), the State Administrator determines that one of the bases for discontinuation under § 658.501(a) is met and that waiting for exhaustion of the administrative process before discontinuation will result in "substantial harm to workers." 20 C.F.R. § 658.503(b). As DOL explains in the Rule, however, this does not mean that the employer does not receive notice. In order

---

[6] In many instances, the SWA's invitation to submit rebuttal evidence is not the first and only opportunity for the employer to communicate with the SWA to resolve the matter. In order to meet several of the bases for discontinuation under § 658.501(a), the employer must have refused to comply; these bases "assume[s] that the SWA has already attempted to resolve issues, which provided the employer with an opportunity to avoid initiation of discontinuation of services." 89 Fed. Reg. 33,917.
[7] The Rule also makes several other changes to discontinuation: an employer's discontinuation in one state now results in discontinuation nationwide; discontinuation applies to an employer's agents and successors in interest; and SWAs must cross-reference DOL's debarment (H-2A and H-2B) and discontinuation of services when processing job orders. 89 Fed. Reg. 33,904, et seq. Plaintiffs do not challenge these changes specifically.

for the SWA to issue a notice of immediate discontinuation to an employer, "the SWA must *first* have sufficient factual information—*e.g.,* a finding via a field check that an employer has misrepresented the terms in its job order (§ 658.501(a)(3)) or a finding of violations of ES regulations (§ 658.501(a)(5))—to articulate a basis for discontinuation. The SWA must *then* have a sufficient basis, supported by factual detail, to support its determination that *not* taking immediate action would cause substantial harm to workers." 89 Fed. Reg. at 33,932.

**3.**    The Final Rule made a number of other changes.  The Rule clarifies longstanding protections for workers terminated not "for cause" by adding a definition of "termination for cause" for purposes of the H-2A Program.  *See* 89 Fed. Reg. at 33,968–69; *see also* 20 C.F.R. § 655.122(n).  H-2A workers and workers in corresponding employment are at-will employees; however, the regulations have provided since 1987 that such workers lose certain protections if they are terminated for cause.[8]  To clarify when an employer is excused from providing these protections, the Rule describes the circumstances in which DOL will deem a worker terminated "for cause."  *See* 20 C.F.R. § 655.122(n)(2) (explaining that worker is terminated for cause if terminated for failure to meet productivity standards or to comply with employer policies or rules); *id.* § 655.122(n)(2)(i)(A)–(F) (setting forth six conditions that, when satisfied, constitute a termination for cause); *id.* § 655.122(n)(2)(ii) (elaborating on sixth condition and defining progressive discipline system).  The Final Rule also describes when a termination would not be considered "for cause," *id.* § 655.122(n)(2)(iii), and explains that employers bear the burden of demonstrating that the termination meets the for-cause factors found in paragraph (n)(2), *id.* § 655.122(n)(2)(iv).

The Rule also makes two clarifications to the existing provisions at 20 C.F.R. §§ 655.120(a), 655.122(l) (2022) that already require H-2A employers to offer, advertise, and pay the highest of several enumerated wage rates, including any prevailing piece rates.  *See* 89 Fed. Reg. at 33,956.  First, it clarifies

---

[8] A worker who is terminated for cause is not entitled to the three-fourths guarantee, which guarantees wages for up to three-quarters of a contract period, nor to meals or housing (until the worker has departed for other H-2A employment or to the place outside the United States from which the worker came), 20 C.F.R. § 655.122(d), (g), (i)); outbound transportation, *id.* § 655.122(h)(2); nor, if a U.S. worker, to be contacted for work in the next year, *id.* § 655.153.  89 Fed. Reg. at 33,968–69.

that "where there is an applicable prevailing piece rate"—such as a prevailing wage for every bushel picked—"or where an employer intends to pay a . . . non-hourly wage rate, the employer must include [that] rate on the job order along with the highest hourly rate," even if it is not possible to determine at the outset which rate will result in higher pay. 89 Fed. Reg. at 33,956. Second, the Rule clarifies that, after the work is performed, the employer must "calculate and pay workers' wages using the wage rate that will result in the highest wages for each worker in each pay period." *Id.*

Additionally, the Rule "require[s] the employer to retain and maintain [its vehicles'] seat belts in good working order and ensure that each worker is wearing a seat belt before the vehicle is operated." *Id.* at 33,903; 20 C.F.R. 655.122(h)(4)(ii). And it requires employers who apply for certification to include the full name, date of birth, address, telephone number, and email address of owners, operators, managers, and supervisors overseeing H-2A workers. *Id.* at 33,980; 20 C.F.R. 655.130(a)(3).

**4.**     Various provisions of the Final Rule carry different effective dates. Most relevantly, the worker voice and empowerment revisions to the anti-retaliation provisions at 29 C.F.R. § 501.4(a) were scheduled to take effect on June 28, 2024, while the other worker voice and empowerment revisions at 20 C.F.R. § 655.135(h), (m), and (n) were scheduled to apply to clearance orders and associated H-2A applications received on or after August 29, 2024. *See* 89 Fed. Reg. at 33,904.[9]

## III.     Related Litigations

On June 10, 2024, a group of seventeen States and two private parties filed a lawsuit in the Southern District of Georgia challenging certain provisions of the Final Rule. *See Kansas v. DOL*, No. 2:24-cv-00076-LGW-BWC (S.D. Ga.). Those plaintiffs filed a motion for a preliminary injunction on June 13, 2024, *id.*, ECF No. 19, and on August 26, 2024, the court granted the motion and enjoined DOL from enforcing the Final Rule in the seventeen plaintiff States and against the private plaintiffs in that case, *Kansas* Order at 37. Two other cases challenging parts of the same Final Rule have since

---

[9] In response to litigation in the *Kansas* case discussed below, DOL issued a notice stating that the Final Rule's revisions to 29 C.F.R. § 501.4(a) would not be enforced until August 29, 2024. *See Kansas v. DOL*, No. 2:24-cv-00076-LGW-BWC (S.D. Ga.), ECF No. 28, ¶ 4.

been filed in the Eastern District of North Carolina and the Southern District of Mississippi.  *See N.C. Farm Bureau Fed'n, Inc. v. DOL*, No. 5:24-cv-00527-FL (E.D.N.C.); *Int'l Fresh Produce Ass'n v. DOL*, No. 1:24-cv-309-HSO-BWR (S.D. Miss.).  On November 25, 2024, the *Int'l Fresh Produce Ass'n* Court enjoined Defendants from implementing the Final Rule "insofar as [it] intends to amend 20 C.F.R. § 655.135(h)(2), (m)."  *Int'l Fresh Produce Ass'n*, No. 1:24 cv 309 HSO BWR, ECF No. 35.

## IV.    Procedural Background

Seven individual and five associational plaintiffs ("Private Plaintiffs") filed this matter on September 16, 2024.  ECF No. 1.  On September 20, 2024, four states ("State Plaintiffs") moved to intervene.  ECF No. 11.  The Court granted State Plaintiffs' intervention motion on September 25, 2024.  ECF No. 14.  On October 15, 2024, State Plaintiffs filed a motion for a § 705 stay and preliminary injunction.  ECF No. 17.  State Plaintiffs' motion primarily challenges two sets of provisions: (1) the concerted activity provisions and (2) the discontinuation provisions.  *See generally id.* On October 17, 2024, Private Plaintiffs filed a motion for preliminary injunction and stay.  ECF No. 21.  Private Plaintiffs' motion challenges nearly all the provisions described above.  *See generally id.*  The Court held a hearing on both motions on November 4, 2024.  ECF Nos. 20, 22.  On November 25, 2024, the Court granted the preliminary injunction and enjoined Defendants from enforcing certain provisions of the Final Rule within the States' jurisdictions or against Plaintiffs and their members. ECF No. 49.  These included the seat belt provision, the concerted activity provisions, provisions allowing invitation and acceptance of guests, the information collection provision, and the pay requirements provisions.  *Id.*  The Court did not address the discontinuation process.  *Id.*  Private and State Plaintiffs filed a Joint Motion for Summary Judgment on January 13, 2025, raising the same merits issues argued during the preliminary injunction proceedings but seeking to set aside the entire Final Rule.

On January 27, 2025, the parties filed a proposed agreed order, ECF No. 71, requesting an extension of time for summary judgment proceedings.  On January 28, 2025, the Court construed this filing as a motion, which it subsequently granted, extending the timeline to respond until March 5, 2025.  ECF No. 72.  Defendants then filed an opposed motion for a stay of proceedings on February

28, 2025, which explained that "incoming leadership at the Department of Labor (DOL) [need] further time to review this litigation" because "nominees for Secretary of Labor, Deputy Secretary of Labor, and Assistant Secretary of the Employment and Training Administration, as well as the Administrator for the Wage and Hour Division" had yet to be confirmed by the Senate.  ECF No. 75.  This remains so at the time of this filing and, accordingly, Defendants respectfully submit that judicial efficiency and economy would be served by staying this matter to allow a meaningful opportunity for incoming DOL leadership to review this litigation.  However, appreciating that the Court has not granted Defendants' stay motion, Defendants are submitting this filing in accordance with the schedule set in the Court's January 28 order, ECF No. 72.

## V.    DOL's Implementation of Court Orders

On August 28, 2024, in response to the *Kansas* Order, DOL announced that it was delaying updating its H-2A application filing system to implement revised H-2A job order and application forms associated with the Final Rule and, in the interim, it would process H-2A job orders and applications in accordance with 20 CFR part 655, subpart B in effect as of June 27, 2024 (the "old" forms).  *See* Aug. 28, 2024 Announcement, https://www.dol.gov/agencies/eta/foreign-labor/news. Then, on September 10, 2024, DOL announced that it was updating its filing system as of September 12, 2024 to route applicants to either the "old" forms (for those applicants subject to the *Kansas* Order) or the "new" forms (for those applicants not subject to the *Kansas* Order).  *See* Sept. 10, 2024 Announcement, https://www.dol.gov/agencies/eta/foreign-labor/news.

However, subsequent to this Court's November 25, 2024 Order and the *IFPA* November 25, 2024 Order, DOL announced on November 27, 2024 that all applicants should utilize the "old" forms and that further guidance would be forthcoming.  And on December 20, 2024, DOL announced that, in light of the various court orders, DOL had concluded that utilization of the "new" forms associated with the Farmworker Protection Rule was infeasible in the short term and, as a result, DOL would continue to utilize the forms applicable under the version of 20 CFR part 655, subpart B in effect on June 27, 2024 (i.e., the "old" forms) for all applicants.  *See* Updated DOL Guidance re Barton and

14

IFPA_PI_Implementation.pdf; *see also* https://www.dol.gov/agencies/eta/agriculture/monitor-advocate-system/laws-regulations.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact, and judgment should be granted as a matter of law. Fed. R. Civ. P. 56(c)(1). Under Federal Rule of Civil Procedure 56(c), summary judgment is an appropriate tool for resolving questions of a purely legal nature. *See, e.g., Highland Mining Co. v. United Mine Workers of Am.*, 105 Fed. Appx. 728, 730 (6th Cir. 2004) (summary judgment is the appropriate procedural device for resolving matters that are "purely legal in nature").

## ARGUMENT

### I.    The Final Rule Does Not Violate the APA.

#### A.  Section 1188 Authorizes DOL to Issue the Final Rule.

As the *Kansas* court explained, and this Court agreed, "the 'best reading' of § 1188, in its entirety, is that Congress granted the DOL the authority to issue regulations to ensure that any certifications it issues for H-2A visas do not 'adversely affect' American agricultural workers." *Kansas* Order at *15; Prelim Inj. Op. at 16. That includes the authority to promulgate the challenged provisions related to concerted activity: "DOL acted within its authority as proscribed by Congress through [IRCA]" when it issued these provisions. *Id.* at *19; *see also id.* ("Final Rule does not exceed [rulemaking] authority granted to the DOL by Congress under § 1188."). The Court's determination at the preliminary injunction stage was correct, and summary judgment should be denied to Plaintiffs on this claim.

Congress delegated broad authority to DOL to promulgate regulations to ensure that an employer's use of H-2A workers would not harm similarly employed workers in the United States. "Section 1188(a)(1) establishes the INA's general mission," but "Congress left it to [DOL] to implement that mission through the creation of specific substantive provisions." *Mendoza v. Perez*, 754

F.3d 1002, 1021 (D.C. Cir. 2014) (describing DOL's authority without suggesting § 1188 is ambiguous or relying on *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244 (2024)).  Congress "often enact[s]" statutes in which "the agency is authorized to exercise a degree of discretion." *Loper Bright*, 144 S. Ct. at 2263.  "[S]ome statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term." *Id.* (citation omitted).  "Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Id.* (citation omitted).

Section 1188 is one such statute that "delegates discretionary authority to an agency." *See id.* "The statute explicitly envisions implementing regulations that will clarify the meaning and application of its provisions." *Mendoza*, 754 F.3d at 1021-22 (citing 8 U.S.C. § 1188(b)(1), subsections of (c)(3), and (c)(4)); *see also Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084 (11th Cir. 2013) (IRCA "expressly *grants* DOL rulemaking authority over the agricultural worker *H-2A* program".

The rulemaking "authority Congress conferred upon DOL can be found in § 1188 of the IRCA." *Kansas* Order at *14.  In § 1188(c), Congress set forth rules that "shall apply in the case of the filing and consideration of an application for a labor certification under this section"—*i.e.*, the labor certification described in § 1188(a).  8 U.S.C. § 1188(c); *see also Kansas* Order at *14 ("Section 1188(c) expounds upon the DOL's role in the certification process by providing 'rules [that] apply in the case of the filing and consideration of an application for a labor certification.'").  Subsection (c)(3)(A) then provides:

> The Secretary of Labor shall make, not later than 30 days before the date such labor or services are first required to be performed, the certification described in subsection (a)(1) if—
>
> > (i) the employer has complied with the *criteria for certification* (including criteria for the recruitment of eligible individuals *as prescribed by the Secretary*), and
> >
> > (ii) the employer does not actually have, or has not been provided with referrals of, qualified eligible individuals who have indicated their availability to perform such labor or services on *the terms and conditions of a job offer which meets the requirements of the Secretary.*

16

8 U.S.C. § 1188(c)(3)(A) (emphasis added).  Other provisions in § 1188 reflect that these *criteria* and *requirements* will be laid out in *regulations*.  For example, § 1188(c)(3)(B) describes the circumstances in which employers must "offer to provide benefits, wages and working conditions required pursuant to this section *and regulations*."  *Id.* § 1188(c)(3)(B)(i) (emphasis added); *see also id.* § 1188(b)(2)(A) (referring to "material term[s] [and] condition[s] of the labor certification" described in § 1188(a)).  The statute as a whole, and § 1188(c)(3) in particular, vests the Secretary[10] with authority to issue regulations governing the terms and conditions of employment under the program, and thus with discretionary authority to "give meaning" to and "fill up the details" of § 1188(a)(1)(B)'s adverse-effect standard (which is cross-referenced in § 1188(c)(3)(A)).  As the *Kansas* court explained, "Congress grants the DOL the power to issue regulations to ensure that the certification requirements of § 1188(a)— specifically, the requirement that American agricultural workers not be adversely affected—are met before the DOL issues such a certification."  *Kansas* Order at 14-15.

Soon after IRCA's enactment in 1986, DOL began issuing regulations to effectuate its statutory responsibility under what is now § 1188(a).[11]  *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,507 (describing "methodology for the two-fold determination of availability of domestic workers and of any adverse effect"); *see also Loper Bright*, 144 S. Ct. at 2258 ("respect to [agency] interpretations of federal statutes" is "especially warranted when [such interpretations are] issued roughly contemporaneously with enactment of the statute and remain[] consistent over time").  In issuing these regulations, DOL "has historically understood the INA's adverse effect requirement" as (1) "establishing a baseline 'acceptable' standard for working conditions below which workers in the United States would be adversely affected" and (2) "requiring parity between the terms and conditions of employment provided to H-2A workers and other workers employed by an H-2A employer."  89 Fed. Reg. at 33,987.

---

[10] The Secretary's authority has been delegated to "the Office of Foreign Labor Certification (OFLC)," which is tasked with issuing TECs, as well as WHD, which is tasked with "conduct[ing] certain investigatory and enforcement functions with respect to terms and conditions of employment" under the H-2A program.  *See* 20 C.F.R. § 655.101(a), (b).

[11] The 1987 regulations retained the minimum terms and conditions of employment set forth in the 1978 pre-IRCA regulations.  *See* 1978 H-2A Rule, 43 Fed. Reg. 10,306, 10,312.

For example, a TEC application must contain the terms and conditions of employment, 20 C.F.R. § 655.122(b), (c), and the employer must agree to abide by all H-2A regulations, *id.* § 655.135; *see also Cervantes v. Spring Meadow Nursery, Inc.*, No. 1:20-CV-1132, 2021 WL 5310914, at *2 (W.D. Mich. July 27, 2021) ("[A]t a minimum, an H-2A worker's employment contract consists of the terms of the job order and obligations imposed by statute and DOL regulations."). In addition, DOL's offered wage provision requires employers to offer, advertise in their recruitment, and pay the highest of various wages, including the Adverse Effect Wage Rate ("AEWR"), the prevailing wage, any collective bargaining wage, and the federal and state minimum wages. *See* 20 C.F.R. §§ 655.120(a), 655.122(*l*).[12] Other regulations setting forth minimum terms and conditions of employment similarly prevent adverse effects to workers in the United States.[13] So too does the regulatory requirement—issued shortly after IRCA's enactment—that employers provide assurances that they will not retaliate against workers for taking steps to ensure employer compliance with the requirements of IRCA and its implementing regulations. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,501, 20,517 (describing assurances).

DOL lawfully promulgated the challenged provisions in exercise of this broad rulemaking authority. *Kansas* Order at 16-18 (summarizing Final Rule's rationale). DOL concluded that these provisions are necessary to ensure that H-2A employment does not adversely affect the wages and working conditions of workers in the United States similarly employed for two principal reasons. First, DOL explained that for agricultural workers in the United States to meaningfully be able to assert their rights and advocate regarding wages and working conditions, their H-2A program counterparts must be able to do the same without the grave and unique risks that retaliation means for them. *See* 89 Fed. Reg. at 33,987 (explaining "the characteristics of the H-2A program, including the temporary

---

[12] The applicable wage must be offered to U.S. workers, and then—to the extent an insufficient number of U.S. workers are willing to perform the requested labor—to both H-2A workers and workers in corresponding employment. *Id.* § 655.122(a), (*l*).

[13] *See, e.g.*, 20 C.F.R. § 655.122(f) (employer provided items); *id.* § 655.122(g) (meals); *id.* §655.122(h) (inbound and outbound transportation); *id.* § 655.122(i) (guarantee to offer the worker employment for at least three-fourths of the work contract); *id.* § 655.122(j) (earnings records); *id.* § 655.122(k) (hours and earnings statements); *id.* § 655.122(m) (frequency of pay); *id.* § 655.122(n) (termination for cause); *id.* § 655.122(o) (protections in the event of contract impossibility); *id.* § 655.122(p) (deductions); *id.* § 655.122(q) (provision of work contract).

nature of the work, frequent geographic isolation of the workers, and dependency on a single employer" that "create a vulnerable population of workers for whom it is uniquely difficult to advocate or organize regarding the terms and conditions of employment or to seek access to certain service providers").  Domestic agricultural workers who are not satisfied with their working conditions or who believe their employer has violated federal or state laws may express their dissatisfaction by obtaining other employment.  That is not an option for H-2A workers because their temporary nonimmigrant visa permits them to work only for the sponsoring employer.  If employers could turn to the relatively captive and vulnerable H-2A workforce to undermine efforts by workers in the United States to advocate about wages and working conditions, the H-2A program would directly have an adverse effect on those workers in the United States.  *See Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1285 (11th Cir. 2016) ("The H-2A regulations . . . require an 'employer' to provide certain minimum benefits to H-2A temporary workers," thereby "ensur[ing] that foreign workers will not appear more attractive to the 'employer' than domestic workers . . . .").  Second, the challenged provisions "seek[] to expand and improve the tools available to workers protected under the H-2A program to prevent exploitation and to ensure compliance with the law," based on DOL's "experience and evidence . . . demonstrating that the current framework of protections are insufficient to satisfy the Department's statutory mandate" to prevent adverse effects.  89 Fed. Reg. at 33,995; *see also id.* at 33,990 (similar).  The Department concluded that these provisions "thus can improve compliance with the various terms and conditions of H-2A employment that the Department has separately determined are necessary to prevent adverse effect on similarly employed workers."  *Id.* at 33,991.

Rather, IRCA represents a "broad congressional delegation" to DOL in which "Congress entrusted" the agency with a significant role: "strik[ing] the balance" between the "competing goals" of "providing an adequate labor supply and protecting the jobs of domestic workers"—interests "which are often in tension."  *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991).  DOL has made that determination since prior to IRCA's enactment in 1987, including by setting minimum standards and protections for H-2A workers and those in corresponding employment.  *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,496 ("IRCA codif[ies] DOL's role" in the "agricultural labor certification process" to

prevent adverse effects). And in enacting the IRCA, Congress vested DOL with "discretion" to determine "how to ensure that the importation of farmworkers met the statutory requirements." *Dole*, 923 F.2d at 184.

The statute refers, numerous times, to the Department's "regulations" governing the wages and working conditions of the H-2A program. *See, e.g.*, 8 U.S.C. § 1188(c)(3)(B)(i) (requiring that H-2A employers "offer to provide benefits, wages and working conditions required pursuant to this section and regulations"); *id.* § 1188(c)(3)(B)(iii) (requiring that the Secretary make findings to ensure that use of H-2A workers does not adversely affect workers in the United States and "promulgate, on an interim or final basis, regulations based on his findings"); *id.* § 1101(a)(15)(H)(ii)(a) (granting the Department authority to "define" the workers eligible to participate in the H-2A program); *id.* § 1188 note (referring to "regulations to be issued implementing sections [8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188]"). After considering these provisions, the *Kansas* court explained that its "reading [was] supported by the D.C. Circuit's" *Dole* decision. *Kansas* Order at *15. And the court's determination that the "Final Rule falls within the DOL's rulemaking authority under § 1188" similarly turned on the court's own review of the Rule itself. *Id.* at *15–18. In any event, State Plaintiffs offer "no reason to depart from the D.C. Circuit's well-reasoned interpretation" that "§ 1188 affords the DOL considerable latitude to promulgate regulations that protect American workers from being adversely affected by the issuance of H-2A visas." *Id.* at *16.

Plaintiffs wrongly assert that DOL "offer[s] no rational explanation" as to how workers in the United States "could possibly suffer an adverse effect" by the failure to protect H-2A workers' ability to engage in self-advocacy and concerted activities for mutual aid and protection. Pls.' Joint Mot. at 7. In this regard, Plaintiffs misunderstand the Final Rule in four key ways. First, the "benefits" intended by these provisions—tools to ensure that workers can advocate for themselves, including prohibitions on employer retaliation for such advocacy—first must be offered to potential U.S. farmworkers before H-2A employers can fill the open positions with H-2A workers. *See* 20 C.F.R. § 655.122(a). Second, any workers in corresponding employment—including U.S. workers—must receive the same "benefits, wages, and working conditions" provided by H-2A employers to H-2A

employees. *See Overdevest Nurseries v. Walsh*, 2 F.4th 977, 984 (D.C. Cir. 2021) (describing corresponding employment requirements). That includes the challenged provisions. Third, that these provisions protect only workers employed under the H-2A program (H-2A and corresponding workers) is not unique. Rather, DOL's regulations have always required that participating employers offer and provide certain minimum terms and conditions, not otherwise required of non-H-2A employers, as a means of discouraging the exploitation of H-2A labor and thus preventing adverse effects to workers in the United States.[14] Finally, affording these protections to especially vulnerable H-2A workers is intended to ensure that employers do not seek to use the program to exploit the unique vulnerability of H-2A workers. *See Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 790 (E.D. Mich. 2021) (describing retaliation allegations brought by H-2A workers, including threats to "sen[d] back to Mexico and blacklist[] [worker] from the H-2A program" for complaining about unpaid wages).

### B. The Final Rule Does Not Exceed DOL's Statutory Authority by Contravening the NLRA.

The Government reasserts its previous position, which incoming DOL leadership has not had a meaningful opportunity to review, that Plaintiffs point to no provision of the NLRA that affirmatively prohibits DOL from providing the challenged protections to agricultural workers employed under the H-2A program. Instead, Plaintiffs assert that these provisions violate the NLRA simply because the NLRA itself does not reach agricultural workers. *See* Pls.' Joint Mot. at 7 (citing 29 U.S.C. § 152(3)).[15] But 29 U.S.C. § 152(3), the definitional provision on which Plaintiffs rely, does

---

[14] The AEWR provides a simple example. The AEWR is often higher than the minimum wage non-H-2A employers may pay to agricultural workers. But requiring payment of the AEWR still prevents adverse effects for workers in the United States, including workers *not* employed under the H-2A program, "[b]y requiring that the 'employer' provide these baseline benefits, the regulations ensure that foreign workers will not appear more attractive to the 'employer' than domestic workers, thus avoiding any adverse effects *for domestic workers*." *Garcia-Celestino*, 843 F.3d at 1285 (emphasis added).

[15] The "NLRA's protections extend only to workers who qualify as 'employee[s]' under [29 U.S.C. § 152(3)]." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 397 (1996). That section, which defines "employee" for NLRA purposes, does "not include any individual employed as an agricultural laborer." 29 U.S.C. § 152(3). While "[n]o definition of 'agricultural laborer' appears in the NLRA," the term "derive[s] its meaning from the definition of 'agriculture' supplied by" the Fair Labor Standards Act ("FLSA"). *Holly Farms*, 517 U.S. at 397; *see also* 29 U.S.C. § 203(f) (defining "agriculture"

not preclude any regulation of agricultural employees' interactions with their employers. Courts have consistently held that those individuals that fall outside of the NLRA's "employee" definition may still be subject to, and protected by, other labor statutes and regulations—including those promulgated by other federal agencies.

Respectfully, neither the Court at the preliminary injunction stage, nor Plaintiffs then or now, point to any specific provision of the NLRA that affirmatively prohibits or conflicts with the challenged provisions. Rather, Plaintiffs' entire argument rests on the flawed premise that these provisions violate the NLRA because that act defines "employee" to "not include" "an agricultural laborer." 29 U.S.C. § 152(3); *see* Pls.' Joint Mot. at 5. But that definitional provision merely defines "employee" for NLRA purposes and does not state that agricultural employees are prohibited from engaging in the activities protected by the challenged provisions—and accordingly does not bar DOL from issuing the Final Rule.

In the context of labor regulations, federal agencies have the same authority to regulate within the room Congress left beyond the NLRA as state agencies do, subject only to one difference: federal agencies may not create new private rights of action. Outside of this exception, the limitations on federal agencies are the same as those on States; "[t]o determine whether [] tension [between a federal regulation and the NLRA] constitutes unacceptable conflict [courts] look to the extensive body of Supreme Court cases that mark out the boundaries of the field occupied by the NLRA." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1333–34 (D.C. Cir. 1996). "Since the progenitors of these cases originally arose in the context of state actions that were thought to interfere with the federal statute, they are referred to collectively as establishing the NLRA 'pre-emption doctrine.'" *Id.* at 1334. "The principles developed, however, have been *applied equally to federal governmental behavior that is thought similarly to encroach into the NLRA's regulatory territory*." *Id.* (emphasis added); *see also UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362-63 (D.C. Cir. 2003) (applying same analysis and refusing to

---

for FLSA purposes). "In construing the agricultural laborer exemption," the National Labor Relations Board looks to DOL, the agency "charged with the responsibility for and has the experience of administering the [FLSA]." *Holly Farms*, 517 U.S. at 405.

enjoin DOL from enforcing an Executive Order ("EO") that required certain contractors to post notices informing employees of their right not to join union on the basis that the EO did not, under the relevant "preemption" doctrines, conflict with NLRA); 89 Fed. Reg. at 33,993-94 (describing additional cases). At the preliminary injunction stage, the Court dismissed *Reiche* and *UAW* as raising different issues than the ones presented here because they "did not address an agency blatantly bestowing rights contained in the NLRA upon a group specifically excluded from that act." Prelim. Inj. Op. at 19-20. But this reflects a misunderstanding of the Final Rule for the reasons described above, and in any event, it is not clear why any such distinction would matter. Indeed, *UAW* held that it does not: NLRA preemption "operat[es] only as to activities arguably protected or prohibited [by the NLRA], *not* to ones simply left alone, *even if left alone deliberately*." *UAW-Lab. Emp. & Training Corp.*, 325 F.3d at 364 (second emphasis added). The challenged provisions cover activities that the NLRA "left alone," and Congress neither provided concerted activity protections to agricultural workers nor prohibited such workers from engaging in concerted activity. Rather than affirmatively prohibiting agricultural workers from engaging in concerted activities, Congress merely declined to include agricultural workers within the framework of labor relations and enforcement governed by the NLRA.[16]

Numerous cases applying the NLRA preemption doctrine support DOL's authority to regulate in this space (and do not distinguish between state and federal regulation). *See, e.g.*, *UFW v. Ariz. Agric. Emp't Rels. Bd.*, 669 F.2d 1249, 1257 (9th Cir. 1982); *Willmar Poultry Co. v. Jones*, 430 F. Supp. 573, 577–78 (D. Minn. 1977) (finding no "explicit expression of a national labor policy that

---

[16] The relationship between federal minimum wage law and the AEWR is similar. Congress established the federal minimum wage when it passed the FLSA in 1938, three years after enacting the NLRA. Fair Labor Standards Act of 1938, ch. 676, § 6, 52 Stat. 1060, 1062-63 (1938). Most employees were covered by the FLSA's minimum wage requirement, but agricultural workers were not. *See id.* at § 13(a)(6), 52 Stat. at 1067. Some agricultural workers, including certain employees on small farms, family members, local hand harvest laborers, migrant hand harvest workers under the age of 16, and range production employees, continue to be excluded from the federal minimum wage, *see* 29 U.S.C. § 213(a)(6); 29 C.F.R. § 780.3, and all are still excluded from FLSA's overtime protections, *see* 29 U.S.C. § 213(b)(12). Neither fact restricts DOL's authority, in the more limited context of the H-2A program and its adverse-effects mandate, to require H-2A employers to pay the AEWR to such workers.

23

agricultural laborers be denied all representational rights"); *Chamber of Commerce v. City of Seattle,* 890 F.3d 769, 793 (9th Cir. 2018) (rejecting argument that independent contractors were intended to be free of all regulation "federal or local"); *Nat'l Ass'n of Mfrs.* v. *Perez,* 103 F. Supp. 3d 7, 25 (D.D.C. 2015) ("Congress did not intend for the NLRA to wholly occupy the field with respect to labor regulation and thereby foreclose all other regulation of that area."). And those cases, as discussed above, provide the applicable conflict analysis courts use to assess the scope of federal agency power to regulate labor issues, which demonstrates that the challenged provisions do not conflict with the NLRA. *See Chamber*, 74 F.3d at 1333-34; *UAW-Lab. Emp. & Training Corp.*, 325 F.3d at 362-63.[17]

Although the Court determined at the preliminary injunction stage that these cases do not matter because they involved States, which, unlike federal agencies, have the authority to create new private rights of action, Prelim. Inj. Op. at 20-21, that determination bears revisiting now. Nowhere in the Final Rule did DOL create a private right of action, rendering the argument unavailing here. A private right of action is defined as "[t]he right to bring a specific case to court." RIGHT OF ACTION, Black's Law Dictionary (12th ed. 2024). And Plaintiffs identify no provision of the Final Rule that purports to grant H-2A workers—or any other private parties—the right to bring a case to court. Unlike *Sandoval* and *Gonzaga*, which both turned on the bestowing of a new private right of action, the Final Rule cannot plausibly be ready to create a new right of action enforceable in court. While the challenged provisions may affect the substantive rights and obligations of H-2A employers and farmworkers—just as the AEWR and other rules promulgated under § 1188 do in order to prevent adverse effect—they do so through the same longstanding enforcement mechanisms that apply to an

---

[17] Because there is no conflict between these provisions and the NLRA, Plaintiffs' reliance on *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003), is also misplaced. *See* Pls.' Joint Mot. at 7. The provision at issue in *NextWave* affirmatively prohibited an agency from "revok[ing] . . . a license . . . to . . . a person that is . . . a debtor under [the Bankruptcy Code] . . . solely because such . . . debtor . . . has not paid a debt that is dischargeable in the case under this title . . . ." 537 U.S. at 300 (quoting 11 U.S.C. § 525). The FCC's revocation of NextWave's licenses was therefore "not in accordance with law" because the agency directly violated the Bankruptcy Code. *See id.* at 300-01 (explaining that the FCC revoked NextWave's licenses because of the company's "failure to make the payments that were due"). There is no comparable prohibition here—in the NLRA's definition of "employee" or elsewhere in that law.

24

H-2A employer's failure to pay the AEWR or provide meals, transportation, housing, or meet any other obligation—not through the creation of a private right of action. *See* 8 U.S.C. § 1188(g)(2).

The challenged provisions, therefore, neither "re-write" nor "override" the NLRA. Pls.' Joint Mot. at 6. Although the provisions utilize terminology that carries established meaning under the NLRA, they do not purport in any way to apply the NLRA's provisions or enforcement framework to agricultural workers. The Rule thus does not "conflict[] with Congress's judgment that agricultural workers are not to be included within the scope of 'employees' for the purposes of the NLRA's regulation relations between labor and management," *id.* at 7; rather, the Rule leaves untouched the NLRA's provisions defining that law's scope. The Rule simply prohibits those employers who choose to participate in the H-2A program from retaliating against workers who engage in certain self-advocacy efforts, making employers who violate the prohibition subject to the H-2A program's enforcement mechanisms and penalties/remedies—but not to any aspect of the NLRA's distinct enforcement regime.

### C.    DOL's Efforts to Comply with Court Orders are Inherently Lawful and Do Not Require Notice-and-Comment.

Plaintiffs assert a series of arguments that DOL's implementation of the *Kansas* Order is unlawful, but Defendants maintain none of these claims has merit.[18] Pls.' Joint Mot. at 7–10. The *Kansas* court enjoined DOL "from enforcing the Final Rule . . . within [the seventeen plaintiff States in that case] and against [the two private Plaintiff entities]." *Kansas* Order at 37. DOL implemented the *Kansas* Order by announcing that: (1) employers covered by the injunction (*i.e.*, those operating in the seventeen plaintiff States) would be required to follow the "old" H-2A regulatory provisions and application process that were in effect before the Final Rule; (2) employers not covered by the injunction (*i.e.*, those operating outside the seventeen plaintiff States) would be required to follow the new requirements and application process set forth in the Final Rule; and (3) employers operating in multiple states, some covered and some not covered by the injunction, would be bound by the old

---

[18] In addition to not having had a meaningful opportunity to review this litigation, incoming leadership at DOL also has not had any opportunity to review the agency's compliance measures taken in accordance with this Court and the *Kansas* Court's preliminary injunctions.

requirements in the enjoined States and the new requirements in the non-enjoined States.  *See* https://www.dol.gov/agencies/eta/foreign-labor; Pls.' Joint Mot. at 12.  Subsequently, as set forth above, on November 27, 2024, in response to this Court's November 25, 2024 Order, as well as in light of the *Kansas* Order and *IFPA* Order, DOL announced that it was utilizing the "old" forms for all program applicants.[19]  Plaintiffs make no mention of this development, which largely renders their arguments moot, despite this guidance being available weeks before Plaintiffs filed their motion for summary judgment.

As an initial matter, it is not appropriate for Plaintiffs to seek relief from *this* Court regarding implementation of *another* court's injunction.  An enjoined party is obligated to comply with a court's order.  If Plaintiffs have a basis to believe that DOL has misinterpreted the *Kansas* Order or failed to comply with that order in some way, they should seek relief from the *Kansas* court.  *See* Fed. R. Civ. P. 70 (providing that a court may order compliance with a judgment issued by that court or hold a disobedient party in contempt); *cf. In re McLean*, 794 F.3d 1313, 1318–19 (11th Cir. 2015) ("[T]he court that issued the injunctive order alone possesses the power to enforce compliance with and punish contempt of that order, and this power to sanction contempt is jurisdictional." (internal quotation marks and citation omitted)).[20]  An order from this Court deeming DOL's implementation of the *Kansas* Order unlawful would encroach upon the jurisdiction of that court.

Plaintiffs' first response is that DOL's compliance measures taken pursuant to the preliminary injunction violate the agency's own rules and regulations.  Joint Mot. at 9.  This is so, they say, because the H-2A regulations provide that "[a]n employer may file only one *Application for Temporary Employment Certification* covering the same area of intended employment, period of employment, and occupation or comparable work to be performed."  20 C.F.R. § 655.130(e)(2).  But complying with the *Kansas* Court's order does not conflict with this regulation.  The purpose of § 655.130(e)(2) is to avoid

---

[19]https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/Updated%20DOL%20Guidance%20re%20Barton%20and%20IFPA%20PI%20Implementation.pdf.

[20] Plaintiffs do not claim to be members of the private association that was a plaintiff in *Kansas*, so they do not have standing to challenge DOL's interpretation of the scope of the *Kansas* Order as to members of that association.  *See* Pls.' Joint Mot. at 9 n.2.

employers filing duplicate applications; it does not mean that DOL cannot employ different application forms, particularly in order to comply with a court order.[21] Any hypothetical injury (being subject to arguably conflicting regulatory regimes),[22] is a result of compliance requirements, not DOL's two-form solution.

Next, Plaintiffs argue that notice-and-comment rulemaking was required for DOL to implement the *Kansas* Court's order in this way. Pls.' Joint Mot. at 8-10 (citing 5 U.S.C. §§ 551, 553(b)). Plaintiffs cite no authority for the proposition that an agency is required to go through the notice-and-comment process in order to implement a court order. It is well established that an agency need not wait to go through notice and comment rulemaking "when rulemaking without notice and comment is a reasonable and perhaps inevitable response to a court order." *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 134 (D.C. Cir. 2015) (internal quotation marks and citation omitted). An injunction is effective immediately unless the court specifies otherwise, whereas the notice-and-comment process takes a significant amount of time. Plaintiffs offer no reasoned basis why an agency cannot implement a court order enjoining a new regulation by announcing that the pre-existing regulatory regime will be put back in place in the areas covered by the scope of the injunction. If agencies could not do so, then courts would lack authority to enter tailored relief, which is contrary to basic Article III and remedies principles. *See infra* Part V. And doing so is not arbitrary and capricious. *Contra* Pls.' Joint Mot. at 10; *cf.* 5 U.S.C. § 533(b)(B) ("good cause" exception to notice-and-comment requirement).

Plaintiffs also argue that DOL's announcement that employers submitting an H-2A job order must identify whether they are a member of the private association that was a plaintiff in *Kansas*, whether they are located in one of the *Kansas* plaintiff states, or whether they are a plaintiff themselves in *Kansas*, without first submitting this updated questionnaire to the Office of Management and Budget

---

[21] Contrary to the suggestion in Pls.' Joint Motion at 9, n. 2, DOL did not charge a second certification fee for cross-state employers in enjoined and non-enjoined states.

[22] Employers operating in multiple states may already have to abide by different regulatory regimes in different areas because H-2A employers are required to abide by applicable state and local laws. *See* 20 C.F.R. § 655.122(d)(1)(ii) (housing), (h)(4) (transportation), (*l*) (overtime rates of pay); *id.* § 655.135(e) (compliance with all applicable laws).

("OMB") and publishing a notice in the Federal Register—violates the Paperwork Reduction Act ("PRA"). Pls.' Joint Mot. at 10-13. But DOL properly obtained OMB approval to collect precisely the set of information that Plaintiffs now claim is being unlawfully obtained through the PRA's expedited clearance procedures. *See* 44 U.S.C. § 3507(j); 5 C.F.R. § 1320.13. DOL published the required Federal Register notice, *see* 89 Fed. Reg. 73725 (Sept. 11, 2024), and on September 12, 2024, OMB approved DOL's request and assigned a valid PRA control number, *see* https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202409-1205-001#. In the Emergency Supporting Statement associated with the request, DOL explicitly discussed the fact that filers would need to answer a preliminary question identifying whether they were covered by the *Kansas* Court's order. *See* https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202409-1205-001. Therefore, in contrast to Plaintiffs' argument to the contrary, the Department did receive approval to collect this information. Regardless, because all program applicants now use the "old" forms, the Department is no longer requiring program applicants to answer this preliminary question. *See* https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/Updated%20DOL%20Guidance%20re%20Barton%20and%20IFPA%20PI%20Implementation.pdf. In addition, on March 4, 2025, DOL published another *Federal Register* notice, *see* 90 Fed. Reg. 11188 (Mar. 4, 2025), seeking an extension without change to reinstate the "old" forms. Accordingly, Plaintiffs' PRA argument must be rejected.

## D.    The Final Rule is Not Impermissibly Retroactive.

Plaintiffs argue that the Final Rule is a "retroactive rulemaking" and that DOL lacks authority to issue such rules because the Rule applies to employers who are already participating in the H-2A program. *See* Pls. Joint Mot. at 13-14 (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 209 (1988)). The Final Rule is not retroactive. It applies only to conduct going forward. As Plaintiffs recognize, the Final Rule was issued on April 29, 2024 and became effective on June 28, 2024, but its concerted activity provisions imposed requirements on employers beginning on August 29, 2024. *See id.* at 11. For a rule to be retroactive, it would have to apply to conduct *before* the date the rule was issued. "[A]n agency order that only upsets expectations based on prior law is not retroactive . . . ." *Nat'l Cable &*

*Telcomm'ns Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009) (internal quotation marks and citation omitted); *see also Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 162 (D.C. Cir. 2010). Because the Final Rule is forward-looking only, Plaintiffs' retroactivity argument fails.

Justice Scalia's concurrence in *Bowen* provides a helpful illustration of the difference between primary retroactivity, which is usually impermissible, and secondary retroactivity, which is the kind alleged here and is perfectly allowable:

> "The Treasury Department might prescribe, for example, that for purposes of assessing future income tax liability, income from certain trusts that has previously been considered nontaxable will be taxable—whether those trusts were established before or after the effective date of the regulation. That is not retroactivity in the sense at issue here, *i.e.*, in the sense of altering the *past* legal consequences of past actions. Rather, it is what has been characterized as 'secondary' retroactivity. A rule with exclusively future effect (taxation of future trust income) can unquestionably *affect* past transactions (rendering the previously established trusts less desirable in the future), but it does not for that reason cease to be a [valid] rule under the APA." 488 U.S. at 219 (citations omitted) (emphasis in original).

Like this hypothetical tax regulation, the Final Rule undoubtedly *affects* past agreements that employers have entered into, perhaps even rendering these agreements less desirable to certain employers, but it does not hold them accountable for actions that predate the rule and would now be considered a violation of it (for example, a situation in which employers were required to pay backpay for the period between their entry to the agreement and the effective date of the rule for times that the piece-rate wage exceeded the hourly wage). Accordingly, Plaintiffs' argument fails because the Final Rule is only secondarily retroactive.

### E.    The Final Rule is Not Arbitrary and Capricious.

The Government reasserts its position that the Final Rule is not arbitrary and capricious, notwithstanding the fact that incoming DOL leadership has not had a meaningful opportunity to review it. Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (citation omitted). A court's review is "narrow" and it "is not

to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### 1. Seatbelt Requirements

DOL adequately explained its change from previously requiring only the provision of seat belts to now requiring the actual wearing of seat belts. DOL explained that in 2022, "271 of 589 fatal workplace injuries suffered by agricultural workers . . . were caused by transportation-related incidents." *Id.* at 33,964. In addition, DOL explained that research has shown that seat belt use is "an essential life-saving technology," citing Department of Transportation studies reflecting that use of seat belts reduces fatalities in transportation-related incidents. *Id.* at 33,963. As a result, the agency determined that just providing seatbelts was ineffective because, without a requirement that employers actually enforce their use, there was low adoption of the practice of wearing them. The agency cited the history of seatbelt adoption in the U.S. as guiding its thinking. Reports from the National Highway Traffic Safety Administration showed that "seat belt usage in the United States was very low before States required and national campaigns encouraged their use (compare 14% usage in 1983 to 86% usage in 2012, and up to 90% in 2020)." *Id.* DOL explained that its authority to implement the seat belt rule was grounded in its duty to "prevent adverse effect[s] on similarly employed workers in the United States" that result from "degrading worker safety conditions." *Id.*

DOL explained that employer liability will advance the goal of avoiding degrading worker safety conditions because it incentivizes "the employer [to] create[] and communicate[] operating procedures [that] shape worker behavior to comply with the standard, including by issuing work rules to prevent the violation, communicating those rules to workers, taking measures to discover violations, and taking action when violations are discovered." 89 Fed. Reg. at 33,964. At the preliminary injunction stage, the Court concluded that the seatbelt provision was arbitrary and capricious because "[r]equiring an individual to use a seatbelt, that is already provided, does not alter the safety *conditions*

for the worker, it simply mandates an employee to use a tool that is already provided." Prelim. Inj. Op. at 30 (emphasis in original). However, upon further consideration, this distinction lacks force. Merriam-Webster defines "conditions" as "attendant circumstances." *See* CONDITIONS, Merriam Webster's Dictionary, https://www.merriam-webster.com/dictionary/conditions. The enforcement of the use of a safety tool, in addition to its mere provision, contributes to the attendant circumstance of being safe, thus altering safety conditions. Because DOL's reasoning for adopting the seatbelt provision was adequately explained and within the zone of reasonableness, the requirement is not arbitrary and capricious.

### 2. Expanded Information Collection

The Department explained the need for the expanded information collection under 8 U.S.C. § 1188(g)(2) to enforce "employer compliance with terms and conditions of employment" in the H-2A program and to collect information to assess whether an employer has a temporary or seasonal need under 8 U.S.C. § 1101(a)(15)(H)(ii)(a). 89 Fed. Reg. at 33,981. The purpose of the collection is twofold. First, it "allow[s] the Department to more easily detect instances in which a single owner/operator uses multiple business entities in an attempt to skirt H-2A regulations or to continue seeking H-2A workers despite having been debarred." *Id.* at 33,983. Second, "the new information collections will assist the Department in determining whether the employer has demonstrated a bona fide temporary or seasonal need, or, conversely, whether an employer has, through multiple related entities, sought to obtain a year-round H–2A labor force." *Id.* at 33,981.

The weight of Plaintiffs' objection focuses on the collection of employer birth dates, which they characterize as "lack[ing] any logic" that would connect the collection to DOL's purposes. Pls.' Joint Mot. at 17. But the Department cited commenters who described "numerous examples of debarred employers reconstituting with owners and managers switching roles to avoid enforcement." *Id.* at 33,980. The collection of "prior ['doing business as'] names and identifying information [including birth dates] for people other than the employer at the time of filing" allows the agency "to search across applications within a filing system database to identify instances in which employers

have changed names, or roles, to avoid complying with program regulations or avoid monetary penalties or serious sanctions such as program debarment." *Id.* at 33,982. Identifying information, including dates of birth, allows the Department to more easily identify instances in which employers are trying to "skirt H-2A regulations" by switching owners' and managers' roles or by using other means to avoid detection. The information collection is not arbitrary and capricious because the agency explained it is necessary to complete cross-referencing in the filing system database and rationally connected it to its statutory enforcement responsibilities.

At the preliminary injunction stage, the Court determined that "the personal information here far exceeds what the DOL may need to address the limited instances of misfeasance it cites." Prelim. Inj. Op. at 29. Respectfully, however, Defendants disagree with the Court's determination based on the agency's experience administering and enforcing the H-2A program. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 371 (2024) (the APA "mandat[es] deferential judicial review of agency policymaking and factfinding"). DOL's decision met the APA's "minimum standard of rationality," *Mexican Gulf Fishing Co.* v. *United States Dep't of Com.*, 60 F.4th 956 (5th Cir. 2023) (citations omitted), and it would be error, at summary judgment, for the Court to "substitute its judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Moreover, the APA requires courts to "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 286 (1974)). Here, the agency's path to deciding to collect birth dates can be reasonably discerned from its explanation for why it was instituting the information collection generally (in order to complete cross-referencing in its database). DOL did not fail to adequately connect the decision made to the facts found, and in any event, its policy judgment is entitled to judicial deference.

### 3.  Payment Method

Plaintiffs are similarly not entitled to summary judgment on their challenge to the clarifications to the existing provisions at 20 C.F.R. §§ 655.120(a), 655.122(l) that already require H-2A employers to offer, advertise, and pay the highest of several enumerated wage rates, including any applicable

prevailing piece rates.  20 C.F.R. § 655.120(a) (2022); *see Torres Hernandez v. Su*, 2024 WL 2559562, *1 (9th Cir. 2024) (interpreting prior version of § 655.120(a) to require H-2A employers to include applicable prevailing piece rates on job orders despite not knowing in advance the total wages a worker would earn based on the piece rate and noting that allowing employers to ignore prevailing piece rates would "largely nullify" the regulatory provision for determining prevailing wages).  Defendants acknowledge that, at the preliminary injunction stage, the Court concluded that "[b]ecause the DOL has neither provided sufficient justification nor displayed awareness that its position is different, this change is arbitrary and capricious."  Respectfully, the Court should revisit this finding because it appears to apply the standard of a "more searching review," *FCC v. Fox Television Stations Inc.*, 556 U.S. 502 (2009), that is applicable when an agency's new policy position "reverses course," *id.* at 514, and the agency fails to acknowledge as much.  *See* Prelim. Inj. Op. at 27 (citing *Fox Television*).  But as *Fox Television* further held, there is "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review."  556 U.S. 502, at 514 (2009).  Clarifying that employers—in order to comply with the existing requirement to offer, advertise, and pay the highest of the enumerated wage rates, including any prevailing piece rate, *see* § 655.120(a) (2022)—must list any such prevailing piece rate on job orders because such rates have the potential to be higher than applicable hourly wage rates and, where such piece rates indeed are higher, to pay those higher piece rate wages is far from a reversal in course.  Instead, it is consistent with the plain language of the prior version of § 655.120(a) and is in complete synergy with and is a logical outgrowth from the previous explicitly-stated requirement that piece-rate workers be paid the hourly wage when it is higher.  *Fox Televisions* makes clear that the mere fact that a new policy requires something that was not required before is not sufficient to give rise to the type of heightened scrutiny the Court evidently applied here.

Furthermore, DOL adequately explained that, based on the agency's experience, both clarifying revisions are necessary to further DOL's statutory obligation to prevent adverse effects.  As noted earlier, these provisions require that, *ex ante*, employers offer and advertise the highest of all applicable wages and then, *ex post*, pay the highest applicable wage based on the work performed

33

during a given pay period. *See* 89 Fed. Reg. at 33,956. The previous regulations also required employers to offer, advertise, and pay the highest of various rates, including any applicable piece rates. 20 C.F.R. § 655.120(a) (2022). But that seemingly straightforward requirement was practically difficult because "it is usually not possible to determine until the time work is performed whether the prevailing piece rate will be higher than the highest of the applicable hourly wage rates as this will depend on worker productivity." 89 Fed. Reg. at 33,957. And, as a result, employers were only required "to list a wage offer that is at least equal to the highest applicable hourly wage—usually the AEWR—on job orders." *Id.* Without listing all potentially available wage rates on a job order, however, it was hard to "accurately determine whether there [were] U.S. workers who would be available and willing to accept the employment," *id.* at 33,959—which DOL is statutorily required to assess in deciding whether to grant a TEC, *see* 8 U.S.C. § 1188(a). Further, where a prevailing piece rate existed but was not included on a job order, DOL's WHD generally was not able to enforce payment of that rate—even if, after the work was performed, it was clear that the prevailing piece rate would have resulted in the highest payment amount to the worker. 89 Fed. Reg. at 33,957.

DOL also adequately explained the statutory basis for the second clarifying revision, which provides that employers must pay the highest hourly or non-hourly wage rate as determined by the work performed during the pay period. *Id.* Previously, as Plaintiffs acknowledged, "if workers were paid on a piece rate and, at the end of the pay period, the earnings did not equal what would have been earned at the hourly rate, the employer had to supplement the worker's piece rate pay." Priv. Pls.' Mot. at 20. But the prior regulation did "not include an analogous requirement that an employer supplement workers' pay when a worker who is paid by the hour does not earn enough to meet the applicable prevailing piece rate." 89 Fed. Reg. at 33,957. In effect, that is what the Final Rule explicitly requires: an employer must, after work is performed, calculate and pay the highest applicable wage rate. *Id.* This clarification is necessary to ensure that, when applicable, workers receive the prevailing piece rates to which they were already entitled under § 655.120(a). *See Torres Hernandez*, 2024 WL 2559562, *1.

34

Plaintiffs raise a host of policy objections, none of which has merit.  First, Plaintiffs say they want to choose which rate to pay their workers.  Pls.' Joint Mot. at 17-19.  But even before the Final Rule, that choice was limited by the need to pay the highest applicable rate, including any prevailing piece rate, and to true-up workers if the hourly rate was higher than the piece rate.  The Final Rule merely clarifies that employers must, in effect, do the same thing if the piece rate calculation would be higher than the hourly wage rate.  Second, Plaintiffs assert that these changes will be administratively difficult to implement.  *Id.* at 19-20.  DOL addressed this issue in the Final Rule, explaining that "H-2A employers are already required to accurately track and record both hours worked and field tallies pursuant to § 655.122(j) [which the 2024 Rule did not amend]," such that "employers should already have processes in place to accurately record information needed for compliance with the proposed changes," "minimizing any additional administrative burden these proposed changes would place on employers."  89 Fed. Reg. at 33,957.  DOL recognized, however, that some employers may need to make changes to their recordkeeping practices.  *Id.* at 33,960.  But DOL determined that, on balance, those potential costs were outweighed by the statutory command to ensure that workers were paid the wages DOL had already determined are necessary to prevent adverse effects when they are the highest applicable wage rate.  Finally, Plaintiffs argue that the Department failed to consider an important part of the problem—how requiring a piece-rate wage might result in lower quality harvests—and that the explanations offered for the change were not adequate to justify the agency's change of course.  *See* Pls. Joint Mot. at 20-22.  This runs counter to the record: DOL did, in fact, discuss impacts on the quality of harvests and ultimately decided to accept comments from employers and to amend part of the rule that would have forbidden employment termination based on a worker's generation of poor-quality produce.  *See* 89 Fed. Reg. at 33,973.  DOL further recognized that "a worker who harvests peaches such that every peach is bruised may not be performing up to the employer's standards, even if meeting outlined productivity standards."  *Id.*  DOL's resolution of the problem was to leave intact accountability mechanisms allowing employers to incentivize quality over quantity when employers see fit to do so, thereby offsetting any contravening incentives Plaintiffs fear the piece-rate wage might create.

35

Because the agency's policy did not reverse course but logically expanded an existing policy and provided an adequate explanation for doing so, at summary judgment the Court should reconsider its finding in the context of the preliminary injunction proceeding that the wage provisions were arbitrary and capricious. Additionally, it should reject Plaintiffs' policy arguments because limiting employers' choice of payment method is not a new concept they are unaccustomed to; most employers are already required to have systems in place that would ameliorate the burden of calculating the piece-rate wage, and DOL considered all important parts of the problem.

## II.  The Final Rule is Constitutional.

### A.  The Final Rule Affords Due Process.

While the Court did not previously make a determination regarding the merits of Plaintiffs' claim that the Final Rule's provisions governing the process for discontinuing an employer's access to SWAs' services fails to afford them due process, it should now reject such contentions. The Fifth Amendment forbids the government from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. Although new DOL leadership has not a meaningful opportunity to consider the Final Rule, Defendants maintain that the discontinuation procedures afford sufficient process to employers.

Analysis of an alleged due process violation "must begin with a determination of the precise nature . . . of the private interest." *Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961). Namely, there must be a protected liberty or property interest at stake. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). When the government intends to deprive a party of one of these interests, it must provide, at a minimum, "notice and an opportunity to be heard." *Arch of Ky., Inc. v. Dir., OWCP*, 556 F.3d 472, 478 (6th Cir. 2009). To determine whether the afforded process is sufficient, a court weighs the importance of the private interest at stake against the value and burden of additional or substitute procedural safeguards. *See Mathews*, 424 U.S. at 335.

### 1.  No Property or Liberty Interest Is at Stake.

Plaintiffs do not identify a protected property or liberty interest of employers in the H-2A program.  A property interest requires "more than an abstract need or desire for [a benefit].  [A [person] must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks and citation omitted).  Here, employers lack a protected property interest in the voluntary H-2A program.  Just as government contractors lack a property interest in continued bidding on federal contracts, employers do not have a protected interested in continued access to a SWA's ES recruitment services.  While a contractor who does not comply with federal law may be suspended from participating in the government system, 48 C.F.R. § 9.400 *et seq.*, there is flatly "not a property interest"[23] in avoiding "suspension" to be had by those "dealing with the government on an ongoing basis," *Transco Sec., Inc. of Ohio v. Freeman*, 639 F.2d 318, 321 (6th Cir. 1981); *see also Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 962 (D.C. Cir. 1980) (holding there is no Due Process property interest in avoiding debarment and suspension).  Plaintiffs offer no reason why they are differently situated such that they would have a protected property interested here.

Nor is there a protected liberty interest at stake here.  In certain circumstances, a government contractor may have a protected liberty interest in avoiding suspension, which is grounded in being "free from stigmatizing governmental defamation having an immediate and tangible effect on [the] ability to do business." *Old Dominion*, 631 F.2d at 961.  But that interest flows from the fact that, in the context of government contracting, a consequence of suspension is that the government makes a public announcement stating that the contractor is "'nonresponsible' due to a 'lack of integrity.'" *Id.* Discontinuation from accessing SWA services is not accompanied by such clearly stigmatizing statements.  Because discontinuation does not result in similar stigma—and Plaintiffs do not argue otherwise—it does not implicate a constitutionally protected liberty interest.

---

[23] Property interests are typically implicated when there is a direct effect on a party's budgetary bottom-line.  *See Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare); *Mathews*, 424 U.S. 319 (unemployment benefits); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) (employment).  As discussed below, any such effect here is attenuated at best.

The Court should also reject the State Plaintiffs' suggestion that a protected due process right to access employment services may have been recognized in passing in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez* ("*Snapp*"), 458 U.S. 592, 609 (1982). *See* Pls. Joint Motion at 37. Constitutionally protected interests are not recognized obliquely; instead, the Supreme Court has required far greater clarity, explaining that identifying a protected due process interest demands "a determination of the precise nature . . . of the private interest." *Cafteria & Rest. Workers*, 367 U.S. at 895. In *Snapp*, the Supreme Court held that Puerto Rico had *parens patriae* standing to pursue the "interests" of resident jobseekers who were being discriminated against in favor of foreign laborers, which the Court concluded denied them their "full and equal participation in the federal employment service scheme." *Snapp*, 458 U.S. at 609. An interest in the equal protection of the laws, however, is of course distinct from a cognizable liberty or property interest for which due process is required. *Cf. Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ("equal protection" and "due process" are not "interchangeable phrases"). The passing statement in *Snapp*, a case that did not even concern procedural due process, is far from a "precise" inquiry into the nature of the private interest. Because discontinuation does not result in the deprivation of any cognizable property or liberty interest under the Fifth Amendment, Plaintiffs' due process argument fails at the start.

### 2. Even if a Protected Interest Exists, Employers Receive Sufficient Process.

Even if a cognizable interest can be found here, the requirements of the Fifth Amendment's Due Process Clause—notice and an opportunity to be heard—are satisfied by the discontinuation process. Before any discontinuation determination takes effect, an employer is afforded ample process. First, an employer is notified when the SWA has initiated discontinuation proceedings, and employers are invited to submit any rebuttal evidence. 20 C.F.R. § 658.502(a). If the SWA is unpersuaded by the employer's response, it sends another notice informing the employer of its conclusion and the right to request a "post-discontinuation hearing" within 20 working days. *Id.* at § 658.503(a). If the employer timely requests a hearing, the discontinuation is automatically stayed. *Id.* Because of the automatic stay, an employer who seeks a hearing is not deprived of access to ES services until after it has had its hearing. *See* 89 Fed. Reg. at 33,911 ("The SWA must continue to

38

process the employer's clearance orders, without delay, while the matter is on appeal."). Any due process requirements are therefore clearly met.

Plaintiffs make no serious attempt to argue that the *Mathews* balancing test requires additional procedural safeguards to prevent erroneous deprivations or serious hardships. *See Mathews*, 424 U.S. at 335, 340. To the contrary, the State Plaintiffs argue only that the Rule violates due process "if it results in deprivation of the employment services offered pursuant to the Wagner-Peyser Act without a hearing." State Pls.' Mot. at 17. As discussed, the Rule does not deprive employers of employment services without a hearing unless the employer foregoes exercising its right of appeal or the ground for immediate discontinuation have been met.

Private Plaintiffs' due process argument fares no better, as much of it rests on the flawed premise that discontinuation results in *de facto* debarment. Priv. Pls. Mot. at 15. This is not the case. Debarment and discontinuation are two very different tools that serve different purposes. 89 Fed. Reg. at 33,923. Debarment is only used for "substantial[] violat[ions]," § 655.182(a), such as a "heinous act showing such flagrant disregard for the law that future compliance with program requirements cannot reasonably be expected." *Id.* § 655.182(d)(1)(x). It is also for a specified period of time—up to three years—and there is no opportunity after appeal to obtain reevaluation of debarred status. *Id.* § 655.182(c)(2); (f)(6). Discontinuation is a less serious penalty used to encourage employers to cure any deficiencies. As soon as an employer shows persuasive evidence of its compliance, its access to employment services is immediately reinstated. *Id.* § 658.504. Given the difference in both the discouraged behavior and gravity of penalty, discontinuation remains distinct from debarment.

In rare circumstances, a SWA may initiate immediate discontinuation procedures to avoid "substantial harm to workers." 20 C.F.R. § 658.502(b). But even under immediate discontinuation procedures, employers have an opportunity to request a hearing; only the automatic stay is absent. *Id.* at § 658.503(b). The conclusory claim that a post-deprivation hearing violates due process is also incorrect, *see Mathews*, 424 U.S. at 340-41; "The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest." *Cafeteria & Rest. Workers*, 367 U.S. at 894. And even when it does, there is no hard and fast rule that the hearing must precede

39

the deprivation.  *Compare Goldberg v. Kelly*, 397 U.S. 254, 264 (1970) (pre-deprivation hearing required before terminating welfare benefits because a recipient would be deprived of "the very means by which to live while he waits"), *with Mathews*, 424 U.S. at 340-41 (no pre-deprivation hearing required before terminating unemployment benefits because there is minimal hardship in waiting to receive a backpay award if appeal is meritorious).  In fact, "the ordinary principle . . .  [is] that something less than an evidentiary hearing is sufficient prior to adverse administrative action."  *Mathews*, 424 U.S. at 343.  The use of a post-deprivation hearing in cases of immediate discontinuation is appropriate under *Mathews* balancing.  In the rare instances immediate discontinuation is used, providing a pre-deprivation hearing would be quite burdensome because of the threat of substantial harm to workers if the employer is not immediately discontinued.  20 C.F.R. § 658.502(b).  The deprivation is not so serious that it would deprive employers of "the very means by which to live" in the interim.  *Goldberg*, 397 U.S. at 264.

Because the standard discontinuation procedures provide notice and an opportunity for a hearing before any services are discontinued, employers are afforded not just sufficient process, but in fact more process than the Constitution requires.  In the case of immediate discontinuation, the magnitude of the potential imminent harm to workers represents a significant burden which satisfies *Mathews* balancing and therefore allows for a post-deprivation hearing.

### B.    The Final Rule Does Not Effectuate a Fifth Amendment Taking.

As with the rest of the Final Rule, incoming leadership at DOL has not had a meaningful opportunity to consider the worker-invited guests provision of the Final Rule.  Nevertheless, the Fifth Amendment protects private property from being "taken for public use, without just compensation."  U.S. Const. amend. V.  However, "government-authorized physical invasions will not amount to takings [when] they are consistent with longstanding background restrictions on property rights."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021).  Additionally, "the government may require

property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking." *Id.* at 161.[24]

Plaintiffs here challenge a provision that workers living in H-2A employer-furnished housing must be permitted to invite and accept guests. *See* 20 C.F.R. § 655.135(n). Contrary to plaintiffs' claim, this does not effectuate a Fifth Amendment taking by "grant[ing] the general public access to private property." Pls.' Joint Mot. at 26. Instead, the challenged provision merely asserts that workers living in employer-furnished housing have the same rights as any other tenant. *See* 89 Fed. Reg. at 34017 (recognizing that "workers do not relinquish their rights to association or access of information simply by virtue of residing in employer-furnished housing"). In any event, the requirement is a permissible condition on employers' participation in the H-2A program. Defendants respectfully submit that now, at summary judgment, and pursuant to the analytical framework supplied by *Cedar Point*, the Court should hold that the Final Rule does not offend the Takings Clause. In this analysis, it is appropriate to conclude that the First Amendment rights of tenants in company housing constitute a background restriction on property rights and that the Final Rule shares a nexus with and is proportionate to the regulatory scheme's impact on employers.

### 1. The Provision Recognizes Migrant Workers' First Amendment Rights to Associate and Receive Information Amount to Background Restrictions on Property Rights.

The right of a tenant to invite and receive guests is a longstanding background restriction on property rights. In the United States, employers do not have "absolute dominion" over tenants living in company housing, especially as it pertains to the exercise of their First Amendment rights. *Marsh v. Alabama*, 326 U.S. 501, 506 (1946) (holding that ordinance regulating distribution of literature in a company town, premised on the company's property rights, violated the residents' First Amendment

---

[24] Unlike the access provision at issue in *Cedar Point*, § 655.135(n) only applies to workers' "living quarters and/or the common areas or outdoor spaces near such housing," not to employers' worksites, and only applies outside of working hours. 20 C.F.R. § 655.135(n). Moreover, under § 655.135(n), access is subject to "reasonable restrictions" the employer may impose to protect worker safety or prevent interference with other workers' enjoyment of these areas. *Id.*

rights); *see also N.L.R.B. v. Lake Superior-Lumber Corp.*, 167 F.2d 147, 151 (6th Cir. 1948) (employer may not violate "constitutional rights of the [employee living on] the company's property").

Workers living in employer housing are "vested with the full rights of tenancy" and "must be allowed to receive visitors . . . of [their] own choice" because "[a]s a matter of property law, the ownership of a labor camp does not entail the right to cut off the fundamental rights of those who live in the camp." *Folgueras v. Hassle*, 331 F. Supp. 615, 623-24 (W.D. Mich. 1971); *see Rivero v. Montgomery Cnty.*, 259 F. Supp. 3d 334, 355 (D. Md. 2017). Thus, the challenged provision cannot amount to a taking because "the government does not take a property interest when it merely asserts a 'pre-existing limitation upon the land owner's title.'" *Cedar Point*, 594 U.S. at 160 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1028–29 (1992)).

2. **The Requirement that Employers Must Allow Workers to Invite and Accept Guests Shares a Nexus with and Is Proportional to the Government's Interest in Protecting Workers' First Amendment Rights**.

Under *Cedar Point*, the government may condition the benefit of participation in the H-2A program on allowing workers to invite guests into their employer-furnished housing so long as the certification condition "bears an 'essential nexus' and 'rough proportionality' to the impact of the proposed use of property." 594 U.S. at 161 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 386, 391 (1994)). Respectfully, at summary judgment, Defendants submit that the Court should re-analyze the nexus and proportionality considerations under *Cedar Point*. Here, there is an essential nexus between the benefit of certification to employ and house workers under the H-2A program and the condition that, while housing these workers, employers must permit them to invite guests, subject to reasonable restrictions, pursuant to their recognized First Amendment rights. Namely, there is a risk that employers will isolate workers in employer-furnished housing, making them vulnerable to violations and less likely to advocate for themselves, leading to an adverse effect on the wages and working conditions of workers in the U.S. similarly situated. *See* 89 Fed. Reg. 22,987, 34,016–17. There is also "rough proportionality" between the "government demands and the social costs of the applicant's propos[ed activity]." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605–06, (2013). The

42

burden of allowing guests in employer-furnished housing, outside of work areas and working hours and subject to reasonable restrictions the employer may impose, is outweighed by the constitutional and social cost of abridging workers' First Amendment rights to associate and receive information.

Because H-2A workers' First Amendment rights to associate with and receive information from guests are consistent with longstanding background restrictions on employer-housing providers' property rights, and because the access to worker housing provision meets the nexus and proportionality requirements of certification conditions, there is no Fifth Amendment taking.

### III.    The Final Rule Does Not Implicate the Major Questions Doctrine.

Although incoming DOL leadership has not had a meaningful opportunity to consider the Final Rule, Plaintiffs' argument that the rule violates the major questions doctrine fails, as that doctrine is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted," *West Virginia v. EPA*, 597 U.S. 697, 724 (2022).  The Final Rule does not meet these descriptions.

The Court should be skeptical of Plaintiffs' attempt to aggrandize this case as to constitute a matter of "great 'political significance,'" arising from an "'earnest and profound debate across the country.'"  *Id.* at 743 (Gorsuch, J. concurring) (quoting *NFIB v. OSHA*, 142 S.Ct., 661, 665 (2022) (Gorsuch, J. concurring) and *Gonzales v. Oregon*, 546 U.S. 243, 267-68 (2006)).  Accepting Plaintiffs' argument would require concluding that the changes effected by the Final Rule are of such great importance to the American people and the subject of such widespread, earnest debate as to be on par with the mask mandate during the height of the COVID-19 pandemic (*NFIB v. OSHA*), the legality of physician assisted suicide (*Gonzales v. Oregon*), and capping carbon emissions to address the existential threat of climate change (*West Virginia v. EPA*).  Plaintiffs attempt to argue that the Rule covers "a significant portion of the American economy," because the "entirety of the agriculture, food,

43

and related industries contributed approximately $1.53 trillion to the nation's gross domestic product." But of course, this case does not involve the "entirety" of these industries but merely a subset who employ H-2A workers.[25]

Plaintiffs fundamentally mischaracterize the changes effectuated by the Final Rule by asserting that they constitute "a wholesale revision of the at-will nature of employer-employee relationships that predominate throughout the American economy, including in agriculture." Pls.' Joint Mot. at 34. The Final Rule does no such thing. For one, the Rule applies only to H-2A employers, not all employers "throughout the American economy" or even agricultural employers generally. For another, H-2A workers remain at-will employees; the Final Rule merely defines the circumstances in which a termination will be deemed "for cause," which then has downstream consequences regarding the wage, housing, and other benefits to which a worker is entitled—"long-established obligations" that the Final Rule itself did not alter. 89 Fed. Reg. at 33,971.

Contrary to Plaintiffs' assertion, the Final Rule does not "represent[] an unauthorized intrusion into the domain of state law." Pls.' Joint Mot. at 35. Employers in Kentucky and elsewhere are free to pay workers (subject to federal and state law) however they choose.[26] But employers who voluntarily participate in the H-2A program must comply with requirements that ensure DOL adheres to Congress's statutory command to ensure that the use of H-2A workers does not adversely affect workers in the United States. Just as the AEWR and the prevailing wage rate do not improperly intrude on the domain of states to set minimum wage rates for employees outside the H-2A program, the challenged provisions—which merely ensure that such rates are properly offered, advertised, and paid—do not do so either.

---

[25] Plaintiffs acknowledge that H-2A workers comprise only a third of the agricultural labor force. Pls.' Joint Mot. at 33.
[26] Furthermore, the Rule expressly states that it does not preempt state laws. 89 Fed. Reg. at 34,007–08, 34,023.

Finally, Plaintiffs' argument that the major questions doctrine applies because DOL's authority under § 1188 is "limited" and "narrow[]," Pls.' Joint Mot. at 36, is inconsistent with this Court and the *Kansas* Court's finding that the very same section conveys to DOL "broad authority" to issue regulations ensuring that any certifications it issues do not adversely affect American workers. Prelim. Inj. Op. at 15. Moreover, the claim that DOL—the entity that has been assigned the responsibility for administering the certification process for the H-2A program—regulated outside of its "wheelhouse," Pls.' Mot. at 36, is contrary to 40 years of precedent in which DOL has regulated in this exact area.

This case does not implicate the major questions doctrine, and the Court should resist Plaintiffs' attempt to frame it as such.

## IV.    The Final Rule Does Not Commandeer SWAs.

The States also argue that the Final Rule violates the anti-commandeering doctrine.[27] Plaintiffs' argument fails because the States' participation in the ES program is voluntary, and the federal appropriations are not coercive. Congress has the enumerated power under the Spending Clause "to pay the Debts and provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. It is well established that "Congress may use this power to establish cooperative state-federal Spending Clause programs" in which it "condition[s] those offers [of program funding] on compliance with specified conditions." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 522, 537 (2012) ("*NFIB*"); *see also Oklahoma v. United States*, 62 F.4th 221, 234 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2679 (2024) ("Congress may 'encourage a State to regulate' or 'hold out incentives' in hopes of 'influencing a State's policy choices.'" (quoting *New York v. United States*, 505 U.S. 144, 166 (1992))).

This arrangement does not upset the state–federal balance so long as States accept the funds and program conditions voluntarily, knowingly, and without coercion. *See NFIB*, 567 U.S. at 577. Only in extraordinary circumstances, such as those the Court found present in *NFIB*, where exorbitant amounts of federal funding are on the line such that "pressure turns into compulsion," does the

---

[27] The Court's preliminary injunction opinion did not address this issue. ECF No. 49.

legislation run "contrary to our system of federalism." *Id.* at 577-80 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)) (withholding all of a State's past and future Medicaid funding, which accounted for more than 10 percent of States' budgets on average, was coercive); *compare with South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (withholding five percent of a State's federal highway funding, which constituted one-half of one percent of the State's budget, was not coercive).

The States knowingly and voluntarily accepted federal funds conditioned upon program compliance by enacting a statute declaring as much. *See* Ky. Rev. Stat. Ann. § 336.045; Ala. Code § 25-2-2; Ohio Rev. Code Ann. § 6301.02; W. Va. Code Ann. § 21A-2-16. Additionally, the cooperative state–federal program created by the Wagner-Peyser Act does not bear the hallmarks of commandeering; instead, it "presents States with a choice, not a command." *Oklahoma*, 62 F.4th at 235 (noting that even a "fraught" choice is still a choice and does not constitute commandeering). They can either accept the federal funding, and the conditions that come with it, or they may decline. But it is fully within Congress's "spending power to create incentives for States to act in accordance with federal policies." *NFIB*, 567 U.S. at 577. The offer to accept these funds based on certain conditions is by no means "a gun to the head" of the States. *Id.*, 567 U.S. at 581. Moreover, the voluntarily accepted federal funding implicated by the challenged provisions amounts to roughly 0.3 to 1.2 percent of each of the States' total state budgets fiscal year 2024.[28] In this regard, this case is like *Dole*, in which the Court found the federal funding condition was not coercive.

## V. The Court Should Deny Plaintiffs' Request for Relief.

As set forth above, the Court should deny Plaintiffs' Joint Motion for Summary Judgment. However, in the event that the Court finds that some Plaintiffs are entitled to relief, it should be no

[28] In Fiscal Year 2024, it appears that: Kentucky had a total budget of $20,171,386,700 and received $62,572,100 in program funding, representing 0.3 percent of the budget. *See* pp. 1, 127, https://perma.cc/36ZZ-KGDZ. Alabama had a total budget of $21,661,644,599 and received $160,706,906 in program funding, representing 0.7 percent of the budget. *See* pp. C-17 (combining general and earmarked funds), 171, https://perma.cc/5SC3-CJBB. Ohio had a total budget of $41,420,932,097 and received $165,190,735 in program funding, representing 0.4 percent of the budget. *See* pp. 3, 50, https://perma.cc/E8NG-69PF. West Virginia had a total budget of $5,350,000,000, https://perma.cc/4H8L-KESN, and received $66,473,189 in program funding, representing 1.2 percent of the budget. *See* p. 36, https://perma.cc/QG5F-WW4P.

broader than necessary to remedy any demonstrated harm. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The Plaintiff States have not established irreparable harm, and certainly have not established any harm as to the provisions that are challenged only by the private Plaintiffs. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (a plaintiff seeking a permanent injunction must satisfy a four-factor test, including by demonstrating that "it has suffered an irreparable injury," before a court may grant such relief"). So any equitable relief should extend no further than the private Plaintiffs.[29] Should the Court find that the private Plaintiffs have met the factors warranting relief, an injunction preventing enforcement of the Final Rule against those parties would provide complete relief to redress the parties' demonstrated actual injuries, and any broader relief would be inappropriate. *See Gill*, 585 U.S. at 73.

Neither set of Plaintiffs has clearly requested nationwide relief. But to the extent they do seek such a remedy, the Court should stand by its decision in the preliminary injunction phase to reject the invitation. "[N]ationwide injunctions or universal remedies . . . seem to take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act or refrain from acting toward nonparties in the case. . . . Nationwide injunctions sometimes give States victories they did not earn . . . ." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump v. Hawaii*, 585 U.S. 667, 720 (2018) (Thomas, J. concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power"); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (staying nationwide injunction of COVID-19 vaccination mandates as "an issue of great significance" that "will benefit from the airing of competing views in our sister circuits" (citation omitted)). As Justice Gorsuch, joined by Justice Thomas, has explained, "[b]ecause plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly

---

[29] Even if the Court finds that the Plaintiff States have established irreparable harm as to the few provisions they challenge, any injunctive relief that extends to the States must be limited to those provision they have challenged. *See infra* Part VI (explaining that the Final Rule is severable).

forum to secure a win nationwide." *Dep't of Homeland Sec*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This creates risks of "conflicting nationwide injunctions," with "asymmetric" stakes where "a single successful challenge is enough to stay the challenged rule across the country." *Id.*; *see Kansas* Order at 34–36 (explaining why a nationwide remedy against the Final Rule is inappropriate); *see also Trump*, 585 U.S. at 713 (Thomas, J., concurring) (Universal relief "take[s] a toll on the federal court system— preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.").

Nationwide relief would be particularly problematic here given that three other district courts in different circuits are currently considering similar challenges. A nationwide injunction would render the *Kansas* Order, as well as any additional orders that might follow from other courts considering similar claims, meaningless as a practical matter. It would also preclude appellate courts from testing Plaintiffs' claims against the Final Rule's operation in other jurisdictions. Moreover, more than half of the States are not challenging the Final Rule. There is no reason why Plaintiffs' disagreements with the Rule should govern the rest of the country. *See California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018) ("The detrimental consequences of a nationwide injunction are not limited to their effects on judicial decisionmaking. There are also the equities of non-parties who are deprived the right to litigate in other forums."); *see also id.* at 582–84 (vacating nationwide scope of injunction in facial challenge under the APA). Given all the above, the Court should not enter nationwide relief.[30]

---

[30] To the extent that Plaintiffs seek a "stay" under the APA, this does not compel a different outcome. As an initial matter, the request for a stay is moot; no postponement is available here because the effective date of the Final Rule has passed. *See VanDerStok v. Garland*, 633 F. Supp. 3d 847, 863 (N.D. Tex. 2022) ("While [§ 705] might authorize a Court to 'postpone the effective date' of an unlawful agency action in a particular context, the Final Rule at issue here took effect [already]."); *see also Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017). In any event, § 705 does not require a nationwide remedy. *See, e.g., California*, 911 F.3d at 582–84. Section 705 "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). No federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter. *See Trump v. Hawaii*, 585 U.S. 667, 716 (2018) (Thomas, J. concurring). A court "do[es] not lightly assume that Congress has intended to depart from

## VI.    If the Court Grants Relief to Plaintiffs, the Court Should Sever Any Provisions Found to Be Unlawful from the Remainder of the Final Rule.

In the event that the Court finds that any Plaintiffs are entitled to relief, the Court should sever the provisions that it finds to be unlawful from the remainder of the Final Rule.  Doing so would provide the incoming DOL leadership who have not had a meaningful opportunity to review the regulations with the most latitude to advance the new Administration's policy objectives.  Plaintiffs do not raise any merits argument against many of the Final Rule's provisions.  *See, e.g.*, 89 Fed. Reg. at 34,048–60 (changes to effective date of the annual Adverse Effect Wage Rate ("AEWR") calculation); 20 C.F.R. § 655.135(o) (prohibiting employers from confiscating or withholding workers' passports); 20 C.F.R. § 655.137 (requiring employers to provide certain information about foreign labor recruitment activities).  An injunction or vacatur as to the unchallenged parts of the Final Rule, or to the parts for which the Court rejects Plaintiffs' challenge, would be unwarranted.  "Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision."  *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988)).  In the Final Rule, the Department made clear its intent that the various regulatory provisions be severable from each other, and further explained that the diverse regulatory provisions established by the Rule would function sensibly should any particular provision or provisions be invalidated.  *See* 89 Fed. Reg. at 33,952 (the challenged provisions, "along with other provisions, provide layers of protection to prevent adverse effect, and these layers of protection would remain workable and effective at preventing adverse effect even if any individual provision is invalidated."); *id.* at 33,953 ("[T]he various protections for workers through the ES System can operate independently from the protections in [20 C.F.R.] Part 655.").  "[A]n express severability provision . . . plainly demonstrates the agency's actual intent regarding partial invalidation."  *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Nat'l Lab. Rels. Bd.*, 466 F. Supp. 3d 68, 98 (D.D.C.), *order amended on reconsideration*, 471

---

established principles" regarding equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).  The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed," *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967), such as a court's inherent power to define the scope of relief granted.

F. Supp. 3d 228 (D.D.C. 2020), *aff'd in part, rev'd in part and remanded*, 57 F.4th 1023 (D.C. Cir. 2023). Accordingly, the Final Rule is severable and the Court should at most enjoin only those provisions it finds unlawful, and only as to those Plaintiffs that can satisfy the preliminary injunction factors as to each provision.

## CONCLUSION

Defendants respectfully submit that judicial efficiency and economy would be served by staying this matter to allow a meaningful opportunity for incoming DOL leadership to review this litigation. However, absent a stay, the Court should deny Plaintiffs' motion for summary judgment. In the event the Court finds relief warranted for Plaintiffs, any such relief should be limited to the present Plaintiffs and only affect the offending provisions of the Final Rule.


DATED: March 5, 2025                    Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General

                                        JULIE STRAUS HARRIS
                                        Assistant Branch Director

                                        */s/ Eitan R. Sirkovich*
                                        EITAN R. SIRKOVICH
                                        MICHAEL P. CLENDENEN
                                        Trial Attorneys
                                        Civil Division, Federal Programs Branch
                                        U.S. Department of Justice
                                        1100 L Street, NW
                                        Washington, DC 20005
                                        Phone:   (202) 353-5525
                                        E-mail:   eitan.r.sirkovich@usdoj.gov

                                        *Counsel for Defendants*